ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1175 (L), 23-1222

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CITY OF PORT ISABEL, *et al.*,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

**PETITIONERS' JOINT RULE 30(c)
PROOF OPENING BRIEF**

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Tom Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78723
424-346-3276
tom.gosselin@sierraclub.org

Lisa M. Diaz
Sierra Club
910 Julia Street,
New Orleans, LA 70113
305-336-2258
lisa.diaz@sierraclub.org

*Attorneys for Sierra Club and Vecinos para el Bienestar de la Comunidad Costera*

**Additional counsel listed on inside cover.**

Gilberto Hinojosa
531 E. St. Francis St.
Brownsville, Texas 78520
(956) 544-4218
ghinojosa@ghinojosalaw.net

*Attorney for City of Port Isabel*

Dated Dec. 13, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties**

1.    Petitioners

### City of Port Isabel

No Rule 26.1 Corporate Disclosure Statement is required for Petitioner City of Port Isabel, a governmental entity.

### Sierra Club

Sierra Club has no parent companies, and there are no publicly held companies that have a 10 percent or greater ownership interest in it. Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, dedicated to the protection and enjoyment of the environment.

### Vecinos para el Bienestar de la Comunidad Costera

Vecinos para el Bienestar de la Comunidad Costera ("Vecinos") has no parent companies, and there are no parent companies that have a 10 percent or greater ownership interest in Vecinos.

Vecinos, an association organized and existing under the laws of the State of Texas, is an unincorporated nonprofit association dedicated

i

to protecting and improving the health, standard of living, and economic development of the coastal community in the Rio Grande Valley of South Texas.

2. Respondent

**Federal Energy Regulatory Commission**

3. Respondent-Intervenors

**Texas LNG Brownsville, LLC**

B.    **Rulings Under Review**

1.    Order on Remand, *Texas LNG Brownsville, LLC*, 183 FERC

      ¶ 61,047 (Apr. 21, 2023).

2.    Order Addressing Arguments Raised On Rehearing, *Texas*

      *LNG Brownsville, LLC*, 185 FERC ¶ 61,079 (Oct. 27, 2023).

C.    **Statement of Related Cases**

Pursuant to Circuit Rule 28(a)(1)(C), the undersigned states that

some of the issues raised in this case are similar to the issues raised in

the following case:

1.    *City of Port Isabel, et al. v. FERC*, D.C. Circuit Case Nos. 23-

      1174 (L) and 23-1221 (concerning Rio Grande LNG, LLC, *et*

      *al.* FERC Dkt. CP16-454, *et al.*). On November 16, 2023, the

      Court Clerk granted FERC's motion to calendar that case

      and this one before the same panel. (ECF No. 2027350)

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ...............................i

Table of Contents..................................................................................iv

Table of Authorities..............................................................................vi

Glossary ................................................................................................xi

Jurisdictional Statement........................................................................1

Issues for Review .................................................................................1

Statutes and Regulations .......................................................................3

Statement of the Case ...........................................................................3

    I.   Introduction.................................................................................3

    II.  Legal Framework.........................................................................6

        A.  Natural Gas Act ....................................................................6

        B.  National Environmental Policy Act .......................................7

    III. Factual Background......................................................................9

        A.  Initial FERC Review and Approval of the Texas LNG Terminal ...............................................................................10

        B.  *Vecinos* ..............................................................................13

        C.  Post-*Vecinos* Events ............................................................15

Summary of Argument.........................................................................16

Standing...............................................................................................17

Argument .............................................................................................17

    I.   Standard of Review ....................................................................17

    II.  FERC Could Not Cure The NEPA Violations Identified in *Vecinos* Without NEPA Process ...................................................18

A.    NEPA Required FERC to Prepare a Supplemental EIS..... 18

B.    The Process FERC Used Here Fell Short of NEPA's Requirements ................................................... 24

C.    Refusal to Use NEPA Procedures Is Itself Prejudicial ........ 29

III.   FERC's Analysis of Environmental Justice and Air Pollution Was ARbitrary ................................................... 35

A.    FERC Failed to Address Whether Air Pollution Would Have a Disproportionate and Adverse Effect on Environmental Justice Communities ........................................... 36

B.    FERC's Analysis of Air Pollution Was Arbitrary ............... 39

1.    FERC Arbitrarily Dismissed Higher, Nearer Background Data ........................................... 40

2.    FERC's Ozone Conclusions Are Unsupported .......... 42

IV.   FERC Failed to Respond to the VEcinos Remand Regarding Greenhouse Gases ................................................... 44

A.    The Social Cost of Carbon Is Generally Accepted, Including for Use in Project Level Review ........................................... 47

B.    FERC Must Exercise Its Own Judgment About Significance ................................................... 49

C.    FERC Ignored *Vecinos*'s Instruction to Consider Other Analytic Methods ................................................... 52

D.    FERC Failed to Comply with this Court's Instruction to Explain Whether and How Greenhouse Gases Impacted Its Public Interest Evaluation ................................................... 54

V.    Remedy ................................................... 55

Conclusion ................................................... 57

Certificate of Compliance ................................................... 59

Certificate of Service ................................................... 60

v

# TABLE OF AUTHORITIES

## Cases

*Am. Pub. Gas Ass'n v. Dep't of Energy,*
  72 F.4th 1324 (D.C. Cir. 2023) ............................................... 33

*American Public Gas Ass'n v. U.S. Department of Energy,*
  72 F.4th 1324 (D.C. Cir. 2023) ......................................... 34, 56

*Cboe Futures Exchange, LLC v. SEC,*
  77 F.4th 971 (D.C. Cir. 2023) ................................................ 49

*Center for Biological Diversity v. FERC,*
  67 F.4th 1176 (D.C. Cir. 2023) ......................................... 50, 51

*City of Bos. Delegation v. FERC,*
  897 F.3d 241 (D.C. Cir. 2018) ................................................ 17

*Communities Against Runway Expansion, Inc. v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ................................................ 38

*Daimler Trucks North America LLC v. EPA,*
  737 F.3d 95 (D.C. Cir. 2013) ................................................. 34

*Dakota Access, LLC v. Standing Rock Sioux Tribe,*
  142 S. Ct. 1187 (2022) .......................................................... 23

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) .............................................................. 27

*Duncan's Point Lot Owners Ass'n v. FERC,*
  522 F.3d 371 (D.C. Cir. 2008) ................................................ 50

*Eagle County, Colorado v. Surface Transp. Bd.,*
  82 F.4th 1152 (D.C. Cir. 2023) .............................................. 57

*EarthReports, Inc. v. FERC,*
  828 F.3d 949 (D.C. Cir. 2016) ................................................. 7

*Florida Power & Light Co. v. United States,*
  846 F.2d 765 (D.C. Cir. 1988)..............................................................25

*Friends of Buckingham v. State Air Pollution Control Bd.,*
  947 F.3d 68 (4th Cir. 2020)..................................................................37

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.,*
  877 F.3d 1051 (D.C. Cir. 2017)............................................................23

*Friends of the River v. FERC,*
  720 F.2d 93 (D.C. Cir. 1983).................................................26, 30, 31

*Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of Energy,*
  998 F.2d 1041 (D.C. Cir. 1993)............................................................54

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019)..............................................................19

*Idaho Sporting Congress v. Alexander,*
  222 F.3d 562 (9th Cir. 2000).................................................19, 20, 22

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989)........................................................................8, 21

*Minisink Residents for Env't Preservation & Safety v. FERC,*
  762 F.3d 97 (D.C. Cir. 2014)...........................................................32, 33

*Mont. Wilderness Ass'n v. McAllister,*
  666 F.3d 549 (9th Cir. 2011)................................................................50

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................18

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
  783 F.3d 1301 (D.C. Cir. 2015)........................................................32, 33

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n,*
  823 F.3d 641 (D.C. Cir. 2016)..........................................................19, 31, 32

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
   45 F.4th 291 (D.C. Cir. 2022) ("*Oglala Sioux II*")................................31

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
   896 F.3d 520 (D.C. Cir. 2018) ("*Oglala Sioux I*")................................34

*Pennaco Energy, Inc. v. U.S. Dept. of Interior,*
   377 F.3d 1147 (10th Cir. 2004)..............................................20

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989)..........................................................7, 30

*Sierra Club v. EPA,*
   705 F.3d 458 (D.C. Cir. 2013)................................................38

*Sierra Club v. FERC,*
   68 F.4th 630, 646 (D.C. Cir. 2023) ("*Mountain Valley*") .................1, 20

*Sierra Club v. U.S. Dep't of Energy,*
   867 F.3d 189 (D.C. Cir. 2017)................................................7

*Southeastern Michigan Gas Co. v. FERC,*
   133 F.3d 34 (D.C. Cir. 1998)................................................21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,*
   985 F.3d 1032 (D.C. Cir. 2021).....................................23, 29, 34, 56, 57

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
   600 U.S. 181 (2023)..........................................................17

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002).............................................33, 34

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
   305 F.3d 1152 (10th Cir. 2002).............................................26

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
   6 F.4th 1321 (D.C. Cir. 2021) ("*Vecinos*").....1, 3, 5, 8, 13, 14, 17, 18, 24, 36, 44, 45, 46, 47, 49, 51, 54

viii

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021)........14, 15, 44

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013)...............................................17

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006)...............................................55

**Statutes**

15 U.S.C. § 717b...............................................................1, 6, 7, 54

**Regulations**

18 C.F.R. § 380.1.................................................................8

18 C.F.R. § 380.10........................................................25, 28

18 C.F.R. § 380.7...............................................................52

40 C.F.R § 1502.21.............................................................52

40 C.F.R. § 1501.9...............................................................8

40 C.F.R. § 1502.1..............................................................26

40 C.F.R. § 1502.14..............................................................7

40 C.F.R. § 1502.21................................................3, 44, 46, 48, 51

40 C.F.R. § 1502.8..............................................................26

40 C.F.R. § 1502.9........................................8, 19, 20, 22, 23, 25, 26

40 C.F.R. § 1506.11.......................................................25, 28

40 C.F.R. § 1506.6..............................................................25

40 C.F.R. § 1508.1...............................................................8

## FERC Orders

*Florida Southeast Connection,*
162 FERC ¶ 61,233 (Mar. 14, 2018)....................................................... 19

*Florida Southeast Connection,*
164 FERC ¶ 61,099 (Aug. 10, 2018)....................................................... 47

*Interim GHG Policy,*
178 FERC ¶ 61,108 (Feb. 18, 2022) .......................................................53

*Mountain Valley Pipeline,*
163 FERC ¶ 61,197 (June 15, 2018) ...................................................... 48

Order Addressing Arguments Raised on Rehearing, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC,*
182 FERC ¶ 61,112 (Feb. 23, 2023) ...................................................... iii

Order Granting Extension of Time Request, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC,*
181 FERC ¶ 61,023 (Oct. 13, 2022) ("Extension Order") ..................... iii

*Rio Grande LNG,* 170 FERC ¶ 61,046 (Jan. 23, 2020) ..............11, 42, 43

*Rio Grande LNG, LLC & Rio Bravo Pipeline Co., LLC,* 169 FERC ¶ 61,131 (Nov. 22, 2019) .......................................................................... 12

*Tennessee Gas Pipeline Co.,* 180 FERC ¶ 61,205 (2022)........................................................................ 47

## Federal Register Notices

Counsil on Environmental Quality, *Interim NEPA Guidance on Consideration of Greenhouse Gases,*
88 Fed. Reg. 1196 (Jan. 9, 2023) ....................................................53, 59

## Other Authorities

Pub. L. No. 118-5, § 321, 137 Stat. 10 (June 3, 2023)................................9

## GLOSSARY

| | |
|---|---|
| Authorization Order | *Rio Grande LNG*, 169 FERC ¶ 61,131 (Nov. 22, 2019), R.1314 [JA_____] |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| JA___ | Joint Appendix page(s) |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| NAAQS | National Ambient Air Quality Standards |
| $\mu g/m^3$ | Micrograms per cubic meter |
| $PM_{2.5}$ | Fine Particulate Matter |
| Rehearing Order | *Order Addressing Arguments etc. re: Texas LNG Brownsville, LLC,*185 FERC ¶ 61,079 (Oct. 27, 2023), R.1583 [JA___] |
| Rehearing Request | *Sierra Club et al. Request for Rehearing of the April 21, 2023 Order under CP16-116* (May 22, 2023), R.1569 [JA__] |
| Remand Order | *Order on Remand re: Texas LNG Brownsville, LLC*, 183 FERC ¶ 61,047 (April 21, 2023), R.1564 [JA__] |

# JURISDICTIONAL STATEMENT

This petition challenges a FERC order (the "Remand Order",
R.1564 [JA___]) issued pursuant to 15 U.S.C. §§ 717b(e). Petitioners City
of Port Isabel, Sierra Club, and Vecinos para el Bienestar de al
Comunidad Costera intervened in the FERC docket at issue. Order
Granting Authorizations Under Section 3 of the Natural Gas Act, R.1391,
P8 [JA___] (the "Authorization Order"). All petitioners (collectively,
"Vecinos") filed a timely request for rehearing of the Remand Order.
R.1569 [JA___] (the "Rehearing Request"). When FERC failed to respond
within 30 days, 15 U.S.C. § 717r(b), Vecinos filed a timely petition for
review. On October 27, 2023, FERC issued an order responding to this
rehearing request, R.1583 [JA___] (the "Rehearing Order"), and lodged
the administrative record. Both the Remand Order and the Rehearing
Order are now before this Court. *See Sierra Club v. FERC*, 68 F.4th 630,
646 (D.C. Cir. 2023), *vacated as moot by* 2023 WL 5537562 (D.C. Cir.
2023) ("*Mountain Valley*").

# ISSUES FOR REVIEW

On remand from *Vecinos para el Bienestar de la Comunidad
Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) ("*Vecinos*"), was FERC's

1

decision to reissue authorization for the Texas LNG terminal arbitrary, where:

1. Although *Vecinos* concluded that FERC had violated NEPA, 6 F.4th at 1329-31, FERC reissued its approval without additional NEPA process, even though the Remand Order rests on new information and concludes that impacts on environmental justice communities will be broader in scope than FERC had previously stated.

2. Although *Vecinos* instructed FERC to revisit its conclusion that the project "would not have disproportionate adverse effects on minority and low-income residents," on remand, FERC did not opine on whether air pollution from the project would have such an effect, even though FERC concluded that air pollution would affect many more such communities.

3. FERC's conclusion that the project's air pollution would not have significant impacts did not account for higher baseline data from an air monitor closer to the terminal and Port

Isabel, and where FERC ignored cumulative ozone issues that FERC itself had previously recognized.

4. Although *Vecinos* instructed FERC to address whether the "social cost of carbon" protocol was "generally accepted in the scientific community" for purposes of 40 C.F.R. § 1502.21(c), 6 F.4th at 1329-30, FERC neither discussed acceptance of this tool nor explained why, if the tool was accepted, FERC could refuse to use it.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## STATEMENT OF THE CASE

## I.   INTRODUCTION

In *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) , this Court held that in approving the Texas LNG terminal, FERC's analyses of environmental justice and greenhouse gas emissions violated both the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and the Natural Gas Act, 15 U.S.C. §§ 717b,

717f. After remand, FERC has reauthorized this project. But FERC has disregarded the Court's instructions, and failed to correct its prior errors.

On environmental justice, *Vecinos* held that FERC failed to explain its decision to limit its analysis of impacts on minority and low-income communities to within two miles of the terminal, and FERC's conclusion that many of the projects' impacts, including air pollution, would extend much further. 6 F.4th at 1330-31. *Vecinos* remanded with instructions to address this discrepancy and revisit FERC's conclusion that the project "would not have disproportionate adverse effects on minority and low-income residents in the area." *Id.* at 1331.

On remand, FERC did not opine whether the air pollution would have disproportionate and adverse impacts on environmental justice communities. FERC concluded that the impacts of air pollution would be insignificant, but as FERC itself recognized, "insignificant" impacts can still have a disproportionate adverse environmental justice impact. FERC's failure to answer the question *Vecinos* posed was arbitrary. FERC also failed to support its underlying assertion that the project's air pollution would have only insignificant impacts.

4

With respect to climate, *Vecinos* held that FERC's conclusion that it could not evaluate the significance of greenhouse gas emissions was arbitrary, when FERC had not addressed whether 40 C.F.R. § 1502.21(c) required it to use methods "generally accepted in the scientific community," potentially including the "social cost of carbon" protocol, to evaluate these impacts. *Id*. *Vecinos* remanded to FERC with instructions to explain whether the social cost of carbon was such a method, and to otherwise address this regulation.

Here, FERC's order on remand also failed to heed *Vecinos*'s instructions. FERC contends that the social cost of carbon is not suited to review of individual projects like this one. FERC failed to provide any reasons to support its assertion that the tool is unsuited to project-level review despite being generally accepted for rulemaking. But more fundamentally, FERC again failed to apply 40 C.F.R. § 1502.21(c). FERC did not address whether the scientific community generally accepts the use of social cost of carbon in project-level review. But the tool plainly is generally accepted for this purpose, is recommended for such use by the Council on Environmental Quality, and has been used for project-level review by numerous other agencies. FERC also failed to respond to

5

Vecinos' argument that the 701,709 tons per year of greenhouse gas emissions at issue here are facially significant, whether viewed directly or through the lens of the social cost of carbon.

FERC also acted arbitrarily by refusing to provide any NEPA process on remand. Although *Vecinos* held that FERC had violated NEPA, FERC did not issue a supplemental EIS or other NEPA document in its attempt to cure these violations. FERC did solicit public comments on some of the developers' own technical submissions, but this fell far short of the public participation NEPA requires. FERC's failure to use NEPA procedures is itself reason to vacate and remand.

Because FERC already had an opportunity to cure the deficiencies in its approval of the project and failed to do so, the appropriate remedy is vacatur.

## II.  LEGAL FRAMEWORK

### A.  Natural Gas Act

FERC issued the orders under review pursuant to Natural Gas Act section 3, 15 U.S.C. §§ 717b.

Under section 3, FERC exercises delegated authority to "approve or deny an application for the siting, construction, expansion, or operation"

6

of liquefied natural gas export infrastructure. 15 U.S.C. § 717*b*(e)(1);

*EarthReports v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016). FERC will

approve an export project unless it would be inconsistent with the public

interest. *EarthReports*, 828 F.3d at 953. The "public interest" standard is

broad and includes consideration of "environmental" and "conservation"

impacts. *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 202-03 (D.C.

Cir. 2017).

## B.   National Environmental Policy Act

NEPA "declares a broad national commitment to protecting and

promoting environmental quality." *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 348 (1989). To serve that goal, NEPA mandates

that federal agencies prepare an environmental impact statement (EIS)

before taking any major federal action that significantly affects the

environment. 42 U.S.C. § 4332(2)(C) (2022).[1] An EIS must take a hard

look at the effects of the action, including alternatives to the proposed

action, 40 C.F.R. § 1502.14, the "significance" of the impacts, *id.*

---

[1] Congress amended NEPA, including 42 U.S.C. § 4332, after FERC issued the Remand Order. *See* Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-45 (June 3, 2023). Those amendments are immaterial here.

§ 1502.16(a)(1), and opportunities to mitigate these effects. *Id.* §
1502.14(e). The EIS must also take a broad perspective, considering
direct, indirect, and cumulative effects, *id.* § 1508.1(g), of both the
individual action and of any "connected actions," that "are closely
related." *Id.* § 1501.9(e)(1). FERC has adopted the Council on
Environmental Quality's NEPA regulations. 18 C.F.R. § 380.1.

As part of its NEPA review, FERC also considers "environmental
justice," *i.e.*, whether projects "will have a disproportionately high and
adverse impact on low-income and predominantly minority
communities." *Vecinos*, 6 F.4th at 1326 (cleaned up).

Finally, NEPA obligations do not end with publication of the EIS.
So long as an agency has "a meaningful opportunity to weigh the benefits
of the project versus the detrimental effects on the environment," *Marsh
v. Oregon Nat. Res. Council*, 490 U.S. 360, 372 (1989), NEPA imposes a
continuing obligation to "supplement" the EIS to address "significant new
circumstances or information." 40 C.F.R. § 1502.9(d)(1). Such
supplementation must follow the same procedures as preparation of the
EIS itself. *Id.* § 1502.9(d)(3).

## III.  FACTUAL BACKGROUND

The proposed Texas LNG export terminal would be sited on vacant land in Cameron County, Texas, in between the Brownsville Shipping Channel and the Bahia Grande unit of the Laguna Atascosa Wildlife Refuge, approximately 2.5 miles east of the City of Port Isabel. EIS, 1-2 [JA___] (map).

The communities closest to the terminal are predominantly environmental justice communities, where the population is largely minority and/or low-income. Remand Order PP28, 34 [JA___-___, ___] (defining the term and identifying the amount of environmental justice communities). Cameron County is 88.2 Hispanic/Latino and 34.8% of its residents live below the poverty line. EIS 4-156 [JA___].

The area is a major destination for tourism and outdoor recreation. *Id.* at 4-144 [JA___]. In particular, the area and its wildlife refuges are also home to one of the only remaining U.S. populations of endangered ocelots. *Id.* at 4-315 [JA___].

## A.  Initial FERC Review and Approval of the Texas LNG Terminal

The Texas LNG terminal would occupy 625 acres adjacent to the Laguna Atascosa refuge. EIS, ES-2, ES-6 [JA___, ___]. It would have the capacity to export 4 million tons per annum of LNG. *Id.* at ES-1; Remand Order, P4 [JA___, ___-___]. Although FERC's initial approval of the Texas LNG project did not identify a source for its gas, Texas LNG has since contracted to receive gas from the Valley Crossing Pipeline, an existing pipeline. Remand Order, P4 [JA__-___].

FERC issued its EIS for the project in March 2019. EIS [JA___]. That EIS concluded that the project, together with the neighboring Rio Grande LNG, Rio Bravo pipeline, and Annova LNG (now abandoned) projects, would have significant adverse impacts on protected species, noise, surface water quality, and scenic resources. Authorization Order, P18 [JA___].

The EIS stated that operation of the terminal would emit 613,901 metric tons of carbon dioxide equivalent annually. EIS, 4-182 [JA___] (FERC has since revised this figure upward, to 701,709 tons. Remand Order P23 [JA___]). However, FERC concluded that it was unable to

10

evaluate the impacts of these emissions, including whether this impact was "significant." EIS, 4-344 [JA___].

FERC concluded that other impacts of the project would be insignificant. Although Texas LNG would impact 45.2 acres of wetlands, the EIS assumed that mitigation required by the Corps of Engineers would render net wetland impacts to be insignificant. *Id.* at 4-31, 4-35 – 4-36 [JA___, ___-___]. The EIS acknowledged that the project would emit hundreds of tons per year of air pollution, but concluded that because these emissions would not cause a violation of any National Ambient Air Quality Standard ("NAAQS"), these emissions were insignificant. EIS, 4-181 – 4-182, 4-186 – 4-187 [JA___-___, ___-___].

In response to a rehearing request filed by City of Port Isabel, Sierra Club, and Vecinos para el Bienestar de la Comunidad Costera, FERC acknowledged that the EIS's analysis of one air pollutant—ozone—was incomplete. R.1403, P50 [JA___] (summarizing *Rio Grande LNG,* 170 FERC ¶ 61,046, at PP 51-56, 61-62 (Jan. 23, 2020). The EIS had not considered the cumulative effect of emissions from the export projects' stationary sources together with LNG-related shipping traffic. *Rio Grande LNG,* 170 FERC ¶ 61,046, P55 & n.175. FERC concluded

11

that when shipping emissions were accounted for, this nearly doubled the anticipated emissions of ozone-forming pollution. *Id.* And FERC concluded that these emissions could cumulatively cause ambient ozone levels to reach 76.5 parts per billion, exceeding the 70 part per billion NAAQS. R.1403, P50 [JA___]. FERC therefore concluded that the cumulative impact on regional air quality from ozone would not have a disproportionately high and adverse impact on environmental justice communities. *Id* P53 [JA___-___].

The EIS also concluded that the project's other impacts would not have a disproportionate adverse impact on environmental justice communities. EIS, 4-157 [JA___]. FERC rested this conclusion on analysis of census blocks within a two-mile radius. *Id.* 4-156 to -157. The EIS concluded that all of the communities in this radius were environmental justice communities, and that environmental justice communities were not disproportionately affected. *Id.*

After issuing the April 2019 EIS, FERC approved Texas LNG on November 22, 2019. Authorization Order [JA___]. On that same day, FERC also approved the neighboring proposal for the Rio Grande

terminal and Rio Bravo pipelines. *Rio Grande LNG, LLC & Rio Bravo Pipeline Co., LLC*, 169 FERC ¶ 61,131 (Nov. 22, 2019).

**B.  *Vecinos***

In *Vecinos*, this Court held that FERC violated both NEPA and the Natural Gas Act in its analyses of greenhouse gas emissions and environmental justice impacts of the Texas LNG project and the Rio Grande terminal and Rio Bravo pipelines. 6 F.4th at 1329-31. The Court concurrently issued an unpublished judgment rejecting other NEPA claims.

On greenhouse gases, FERC had claimed that it was unable to determine the significance of emissions because FERC had no methodology for doing so. *Id.* at 1328. *Vecinos* held that FERC failed to respond to the argument that 40 C.F.R. § 1502.21(c) required FERC to use the social cost of carbon protocol. *Id*. This regulation provides that where an agency does not know how to evaluate foreseeable significant impacts, the agency must evaluate those impacts using "'theoretical approaches or research methods generally accepted in the scientific community.'" *Id.* (quoting the regulation). *Vecinos* remanded to FERC

13

with instructions to explain whether the social cost of carbon was such a method, and to otherwise address this regulation.

As to environmental justice, *Vecinos* held that FERC had failed to explain its decision to limit its environmental justice analysis to communities within two miles of the terminal, where FERC had determined that the terminal's environmental impacts would extend much farther. 6 F.4th at 1330. *Vecinos* remanded with instructions to either explain this disparity or to expand the analysis, and then reconsider FERC's conclusion that the project "would not have disproportionate adverse effects on" environmental justice communities. *Id.* at 1331. *Vecinos* further held that these NEPA violations also prevented FERC from concluding that the project was in the public interest, for purposes of the Natural Gas Act. *Id.*

In the unpublished judgment, the Court rejected arguments related to ozone. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021). The Court concluded that petitioners had waived process arguments regarding FERC's decision to address cumulative impacts only in the 2020 Rehearing Order, rather than in a NEPA document. *Id.* at *3 n.2. On

14

content, the 2020 Rehearing Order's cumulative ozone analysis, which acknowledged potential NAAQS exceedances and significant impacts on air quality, was "succinct" but "adequate." *Id.* at *4.

## C.  Post-*Vecinos* Events

After *Vecinos*, FERC began issuing environmental information requests to Texas LNG. FERC sent six in all, with the first sent on February 3, 2022, R.1450 [JA___] and the last on February 7, 2023. R.1558 [JA___]. On September 30, 2022, FERC requested comment on two of the developers' responses to FERC environmental information requests. R.1468, 1 [JA___]. Texas LNG provided additional pertinent information after FERC solicited comment, on October 3, 2022. R.1471 [JA___-___]. Vecinos, and many others, submitted timely comments. *See* R.1503 [JA___].

On April 21, 2023, FERC issued the Remand Order [JA___]. Vecinos filed a timely request for rehearing. Rehearing Request, R.1569 [JA___]. FERC allowed that request to be denied by operation of law, and issued an order addressing the merits of the rehearing request after this petition for review was filed. Rehearing Order, R.1583 [JA___].

15

## SUMMARY OF ARGUMENT

After *Vecinos* held that FERC violated NEPA, and FERC responded by, *inter alia*, soliciting new analysis of air pollution, FERC was required to present that analysis using the NEPA process. FERC's process here fell short, and the violation of NEPA procedures prejudiced FERC's decisionmaking.

FERC failed to address whether the projects' air pollution would have a disproportionate adverse impact on environmental justice communities. FERC's conclusion that air impacts would be insignificant does not answer that question. And that conclusion is itself unsupported.

On greenhouse gas emissions, FERC asserted that the social cost of carbon was not suitable for project-level review, but FERC did not dispute that the scientific community generally accepts using the tool for this purpose. FERC can evaluate the significance of social costs without a defined threshold for significance. Alternatively, FERC failed to explain why the 701,709 tons of annual greenhouse gas emissions here were not facially significant.

16

## STANDING

The City of Port Isabel will be harmed by, *inter alia*, the project's traffic and disruption of the fishing and tourism industries. Hockema Decl. ¶¶2-16; *City of Bos. Delegation v. FERC*, 897 F.3d 241, 250 (D.C. Cir. 2018).

Remaining petitioners are nonprofit organizations whose members and leaders live, work, and recreate in areas that will be adversely affected by the construction and operation of the project. Mancias Decl. ¶¶2-12; Hinojosa Decl. ¶¶2-13; Guevara Decl. ¶¶2-12; Nunez Decl. ¶¶2-11; *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 200-01 (2023).

This Court can redress the harm to these members by remanding for reconsideration by FERC. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

## ARGUMENT

## I.  STANDARD OF REVIEW

The Administrative Procedure Act provides the standard of review here. *Vecinos*, 6 F.4th at 1327, 1331. Under this standard, Courts "shall … hold unlawful and set aside" any agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). FERC must have "examine[d] the relevant data" and made "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30, 43 (1983) (cleaned up). Where FERC "rests a decision, at least in part, on an infirm ground, [the Court] will find the decision arbitrary and capricious." *Vecinos*, 6 F.4th at 1331.

## II. FERC COULD NOT CURE THE NEPA VIOLATIONS IDENTIFIED IN *VECINOS* WITHOUT NEPA PROCESS

*Vecinos* held that FERC's analyses of both environmental justice and greenhouse gases violated NEPA. 6 F.4th at 1330-31. Here, FERC again violated NEPA by reauthorizing the project without preparing a supplemental EIS or other additional NEPA analysis. FERC's ad-hoc procedures fell far short of its NEPA obligations. And FERC's failure to follow NEPA's procedures cannot be dismissed as harmless error.

### A. NEPA Required FERC to Prepare a Supplemental EIS

NEPA required additional process both to respond to *Vecinos* and to address new information, including FERC's conclusion that the project would impact hundreds of additional environmental justice communities.

18

Agencies found to have violated NEPA normally respond on remand by preparing a new NEPA document. Typically, this is a supplemental EIS focused on the deficiency, rather than a full EIS, even though the information considered therein might not be "new" in the sense of being previously unavailable. 40 C.F.R. 1502.9(d)(2)(ii); *see Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 177 (D.C. Cir. 2019); *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 823 F.3d 641, 644 (D.C. Cir. 2016). FERC has done the same. *Florida Southeast Connection,* 162 FERC ¶ 61,233, PP11-14 (Mar. 14, 2018) (discussing supplemental EIS prepared on remand from *Sabal Trail*, 867 F.3d 1357).

Such a supplemental NEPA analysis is required because NEPA does not permit filling gaps in an EIS other than by using NEPA procedures. *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 564 (9th Cir. 2000). In *Idaho Sporting Congress*, a court had previously determined that a Forest Service EIS failed to adequately consider cumulative effects and potential mitigation measures. The Forest Service attempted to cure these deficiencies by issuing "supplemental information reports." *Id.* at 566-67. The court explained that such non-NEPA reports could be used to determine whether a supplemental EIS

19

was required, but could not substitute for a supplemental EIS, nor could they be used to "provide … information and analysis" that was unlawfully omitted from the EIS. *Id.* at 567; *accord Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004) (holding that gap in EIS's analysis could not be filled by affidavit prepared after the NEPA process).

Independent of the obligation to use NEPA procedures to fix NEPA violations, a supplemental EIS is also required where there are "significant new circumstances or information relevant to environmental concerns" and "Federal action remains to occur." 40 C.F.R. § 1502.9(d)(1). New information about the "nature" or the "extent" of impacts can trigger this obligation. *Mountain Valley Pipeline*, 68 F.4th at 651, *vacated as moot by* 2023 WL 5537562 (D.C. Cir. 2023). An agency can use non-NEPA documents to help decide whether new information warrants supplementation, but such documents cannot substitute for the supplemental NEPA process itself. *Idaho Sporting Congress*, 222 F.3d at 567. And because this obligation exists independent of whether there has been a remand, here, FERC must supplement to consider significant new information regardless of whether that information pertains to the

20

specific questions remanded. New information requires a supplement so long as there is "remaining government action [that] would be environmentally significant" and the agency retains "a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment." *Marsh*, 490 U.S. at 372. FERC plainly had such opportunity here: "once FERC reacquired jurisdiction" on remand, "it had the discretion to reconsider the whole of its original decision." *Southeastern Michigan Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998).

Here, these two paths for an obligation to supplement intersect, because FERC responded to *Vecinos* by directing the applicants to prepare an entirely new analysis of air pollution impacts, *see* R.1450, 2-3 [JA___-___], which revealed a much broader geographical extent of impacts on environmental justice communities. Remand Order, PP33-34, 73-74 [JA___-___, ___-___].

Nonetheless, FERC refused to prepare a supplemental EIS, or to use any other NEPA procedures to present and analyze this information. FERC mistakenly argues that even though it relied on new information, FERC's conclusion that "there would be no significant impacts on air

quality" means that there were no "'significant new circumstances or information'" within the meaning of 40 C.F.R. § 1502.9(d), and that FERC did not need to prepare a supplemental EIS. Rehearing Order, P31 [JA___-___]. The record does not support FERC's conclusion that air impacts would be insignificant, as explained *infra* Part III.B. But even if, counterfactually, this insignificance finding was supported, FERC's refusal to prepare a supplemental EIS would still have been arbitrary, for three reasons.

First, because *Vecinos* already found that FERC's 2019 EIS was inadequate, a supplemental EIS is required regardless of whether there is new information. *Idaho Sporting Congress*, 222 F.3d at 567. Here, FERC isn't deciding whether new information calls an otherwise-valid EIS into question. FERC is attempting to remedy conceded deficiencies with a new environmental justice analysis. But new analysis cannot cure a NEPA violation unless it is developed using NEPA's procedures. *Id.* Where those procedures are not used, "courts should harbor substantial doubt" about whether the analysis is correct. *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032, 1052-53 (D.C.

22

Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022).

Second, new "circumstances or information" can be "significant" for purposes of § 1502.9(d)(1)(ii) even if they do demonstrate a new significant "impact." Supplementation is required where new information demonstrates that a project "will affect the quality of the human environment … to a significant extent not already considered." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (cleaned up). Here, new information demonstrated that the project would impact environmental justice communities in hundreds of census block groups, as opposed to the five identified in the EIS. *Compare* Remand Order, P34 [JA___], *with* EIS, 4-156 [JA___]. This presents "a seriously different picture of the environmental landscape." *Friends of Capital Crescent Trail*, 877 F.3d at 1060. Once this threshold was crossed, FERC was required to use the NEPA process to evaluate, *inter alia*, whether the impacts are significant.

Third, FERC's conclusion that air impacts would be insignificant does not answer the question before FERC, and thus fails to demonstrate that the landscape is not "seriously different" in pertinent regards. *Id.*

23

FERC had to evaluate whether the Project's impacts on environmental justice communities more than two miles from the terminal site would be "disproportionate [and] adverse." *Vecinos*, 6 F.4th at 1331. As discussed *infra* Part III.A, impacts that are "insignificant" in general can still have a disproportionate and adverse impact on environmental justice communities. EPA, *Promising Practices for EJ Methodologies in NEPA Reviews*, at 33, 38-39 (Mar. 2016) ("Promising Practices") [JA___, ___-___]. FERC has not provided any argument to the contrary. Thus, even if FERC had demonstrated that the impacts of air pollution on newly-identified communities would be insignificant, this would not demonstrate that there was no need to analyze the newly presented data, modeling, *etc.*, in a supplemental EIS.

## B.  The Process FERC Used Here Fell Short of NEPA's Requirements

Rather than providing a draft supplemental EIS for comment, FERC solicited comments on two of the eight developer responses to FERC's information requests. R.1468, 1 [JA___] (citing R.1465 [JA___], R.1467 [JA___]); Rehearing Order, PP6-7 [JA___-___]. This provided far less than the robust public participation opportunity that NEPA

24

requires. The procedural requirements for a supplemental EIS are the same as for the EIS itself. 40 C.F.R. § 1502.9(d)(3).[2] *Inter alia,* agencies must circulate a draft EIS that is as complete as possible, § 1502.9(b); provide adequate notice, 40 C.F.R. § 1506.6; provide the public at least 45 days to comment, § 1506.11(d); and FERC must provide commenters on a draft EIS a right to intervene in the FERC proceeding, 18 C.F.R. § 380.10(a)(1)(i). FERC's ad-hoc, non-NEPA comment solicitation fell short on each count.

First, soliciting comments on developer submissions is not equivalent to soliciting comments on a draft supplemental EIS prepared by FERC. The public cannot meaningfully comment without something adequate to comment *on. See Florida Power & Light Co. v. United States,* 846 F.2d 765, 771 (D.C. Cir. 1988) (holding, in the Administrative Procedure Act rulemaking context, that agencies must "must provide sufficient factual detail and rationale … to permit interested parties to comment meaningfully"). For this reason, NEPA regulations provide that a draft supplemental EIS circulated for public comment must, "[t]o the

---

[2] The exception is that "scoping" is not required for a supplement.

25

fullest extent practicable … meet the requirements established for final statements." 40 C.F.R. § 1502.9(b). This includes the requirement to "present evidence and discussion relevant to [the agency's] environmental decisionmaking in one comprehensive document." *Friends of the River v. FERC*, 720 F.2d 93, 105-06 (D.C. Cir. 1983). That comprehensive document must be "concise, clear, and to the point," 40 C.F.R. § 1502.1, and written "in plain language" so the public can "readily understand" its contents. 40 C.F.R. § 1502.8. And it must present the *agency's* conclusions: NEPA does not permit EISs to uncritically accept applicants' representations. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) (holding that Corps violated NEPA by failing to verify cost estimates). Here, the developer's filings have none of these qualities. The developer's materials provide focused answers to specific questions, written for an audience of FERC technical staff rather than the general public, without providing 'comprehensive' context or FERC's interpretation of the information.

Second, FERC did not provide notice that there would be no further comment opportunities. When an agency solicits comments on a draft EIS or draft supplemental EIS, members of the public and other agencies

know that issues not raised in comments on a draft EIS may be waived. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Here, when FERC solicited comments on the developer's responses in September 2022, the public had no reason to doubt that another comment period, regarding an actual NEPA document that reflected FERC's analysis of this new information, would be forthcoming. FERC's solicitation did not provide notice that comments were required, or that comments should go beyond the issues specific to the individual developer filings singled out in FERC's notice, and address all other issues pertaining to FERC's ultimate decisionmaking (such as impacts to individual census tracts, and what this meant for FERC's environmental justice analysis).

Other federal agencies were also apparently caught unaware. The EPA has commented on *every* draft EIS regarding new gas infrastructure that FERC has released in the last three years.[3] In most of these

---

[3] Final EISs for these projects, which include FERC's responses to EPA's comments, are available at https://www.ferc.gov/industries-data/natural-gas/environmental-overview/environmental-documents-2023.

comments, EPA addressed environmental justice issues.[4] It is therefore reasonable to assume that if FERC had published a draft supplemental EIS, EPA would have commented here as well. But EPA did not respond to FERC's non-NEPA comment solicitation.

Third, FERC only provided 21 days for public comment, R.1468, 2 [JA___], whereas NEPA regulations provide a 45-day minimum. 40 C.F.R. § 1506.11(d). Thus, even if FERC had provided Vecinos with adequate material to comment on, and even if FERC had provided notice about the necessity and necessary scope of comments, Vecinos still would have had less than half the time the regulations specify as the minimum needed to enable effective comment preparation.

Fourth, if FERC had complied with NEPA and circulated a draft supplemental EIS for comment, this would have given members of the public who had not already intervened in the authorization proceedings (including the Carrizo Comecrudo Tribe of Texas, a petitioner in case 23-1174) a right to intervene. 18 C.F.R. § 380.10(a)(1)(i).

---

[4] *See, e.g.*, FERC Dkt. CP19-502, Accession No. 20220523-5182 (May 23, 2022) and FERC Dkt. CP22-21, Accession No. 20230314-5012 (Mar. 14, 2023).

## C.  Refusal to Use NEPA Procedures Is Itself Prejudicial

FERC's failure to undertake any NEPA process after *Vecinos* remanded for NEPA violations is itself reason to remand. The lack of an EIS further substantially increases doubt as to the agency's decisionmaking on the substance: "Where an EIS was required but not prepared, courts should harbor substantial doubt that the agency chose correctly regarding the substantive action at issue." *Standing Rock Sioux Tribe*, 985 F.3d at 1052-53 (vacating and remanding where the Corps of Engineers' finding of no significant impact and refusal to prepare an EIS were arbitrary). Thus, even if the Court is not persuaded by Vecinos' challenges to the content of FERC's analysis, the procedural failure is itself prejudicial error.

FERC's procedural failings here undermined Vecinos' and others' ability to effectively comment. If FERC had circulated a draft supplemental EIS for comment before issuing the Remand Order, Vecinos would have been able to more fully develop the arguments presented *infra*. In addition, Vecinos would have investigated additional theories. For example, at the time FERC solicited comments, the modeling Texas LNG had submitted predicted NAAQS exceedances for

29

multiple criteria pollutants. R.1455, 10 [JA___]. But after that comment period, Texas LNG submitted modeling predicting significantly lower pollution impacts, without such exceedances. R.1553, 3-4 [JA___]. Vecinos did not have adequate opportunity to investigate this new modeling and to comment thereon. But such comments could have spurred FERC to seek out additional information and/or alter its decision.

In contrast, where this Court has held that a violation of NEPA procedures did not itself require remand, the Court found that the violation was truly harmless on the facts at issue. In *Friends of the River*, FERC's EIS had failed to consider an alternative, which FERC then discussed in its rehearing order. 720 F.2d at 106-07. The Court held the rehearing order demonstrated to the public that FERC had considered the issue, and thereby fulfilled NEPA's purpose. *Id.* at 108.

Informing the public is one purpose of an EIS, but as the Supreme Court explained six years after *Friends of the River*, a "perhaps more significant[]" purpose is to "provide a springboard for public comment," so that the public may "play a role in … the decisionmaking process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

30

*Friends of the River* did not consider an argument that NEPA process could allow the public to comment on FERC's belated analysis, and thereby influence FERC's decision. In the absence of such an argument, the Court held that remand would serve no purpose other than "to redo, under the proper heading, what has already been done." 720 F.2d at 108.

In this Circuit's two cases following this holding from *Friends of the River,* the Court similarly found that the violation of NEPA process was truly harmless, without confronting arguments that process could change the agency's decision. In *Oglala Sioux Tribe v. Nuclear Regulatory Commission*, 45 F.4th 291, 301 (D.C. Cir. 2022) ("*Oglala Sioux II*"), the EIS omitted required statements about the unavailability of cultural resource information. The agency provided these statements in a later public document. *Id.* The challenger did not "dispute the reasonableness or accuracy of" those later statements, "but maintain[ed] only that they had to be within the EIS." *Id.* The Court held that remand merely to "repeat … unchallenged findings" would be pointless. *Id.* Similarly, in *Natural Resources Defense Council v. Nuclear Regulatory Commission*, 879 F.3d 1202, 1210 (D.C. Cir. 2018), although an EIS was supplemented with additional information without going through NEPA's procedures,

the challengers had "not pointed to any harmful consequence of the supplementation." *Id.* Thus, none of these cases addressed a claim that violating NEPA procedures had undermined public comment, and that comments could have altered the agency's analysis and decision.

These three cases are further distinguishable because in each, the agency had published an EIS and attempted to comply with NEPA, even though the EISs fell short. Here, in contrast, *after Vecinos* held that FERC had violated NEPA, FERC arbitrarily refused to conduct any NEPA process whatsoever.

Nor do the cases FERC cites in its rehearing order here demonstrate that FERC's ad-hoc comment solicitation rendered FERC's NEPA violations harmless. FERC cites *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1327 (D.C. Cir. 2015) and *Minisink Residents for Env't Preservation & Safety v. FERC*, 762 F.3d 97, 115 (D.C. Cir. 2014). Rehearing Order P31 & n.89 [JA___]. Neither case addressed a claim that FERC committed a statutory violation by failing to provide the process NEPA requires, including comments on a draft EIS. Instead, both rejected arguments that where FERC had prepared a more limited environmental assessment, FERC committed a constitutional due process

32

violation by not publicly disclosing material until late in FERC's process. *Myersville*, 783 F.3d at 1327; *Minisink*, 762 F.3d at 115. Because NEPA imposes procedural obligations far beyond the constitutional minimum, neither case applies here.

Moreover, in *Myersville* and *Minisink*, as in *Friends of the River, Oglala Sioux II*, and *Natural Resources Defense Council,* this Court did not find that purported procedural failings could never be prejudicial; instead, the Court held that the facts did not show harm in those particular cases. *Myersville*, 783 F.3d at 1327 (No petitioner "contend[ed] that they lacked ample time to comment on the evidence" at issue); *Minisink*, 762 F.3d at 115 ("There is no dispute, … that Petitioners had the chance to make meaningful use of this information in connection with their petitions for rehearing.")

In analogous rulemaking cases, this Court has held "'an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure.'" *Am. Pub. Gas Ass'n v. Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)). In *American Public Gas*, petitioners explained

how they might have commented, and this Court readily found "enough uncertainty" as to how the agency would have responded to comments to demonstrate prejudice from the agency's "utter" procedural failure. *Id.* In *Sugar Cane Growers*, challengers similarly identified considerations they would have raised, although the Court held that "they need not have." 289 F.3d at 97. This Court has applied these cases in the NEPA context. *See Standing Rock Sioux Tribe*, 985 F.3d at 1052 (citing *Daimler Trucks North America LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013)). More broadly, where an agency's refusal to use NEPA process is deliberate, the Court considers this fact in its remedy analysis. *Oglala Sioux Tribe v. Nuclear Regul. Comm'n,* 896 F.3d 520, 537 (D.C. Cir. 2018) (*"Oglala Sioux I")* (discussing agency's "across-the-board" failure). Because NEPA is a "'purely procedural statute,'" treating significant violations of NEPA procedures as harmless would "'vitiate' the statute." *Standing Rock Sioux Tribe*, 985 F.3d at 1052 (quoting *Oglala Sioux I*, 896 F.3d at 536).

FERC's failure to provide a draft supplemental EIS for comment denied Vecinos the foundation and time needed to prepare thorough comments, which could have influenced FERC's decision. In the alternative, insofar as this Court finds that Vecinos failed to fully present

to FERC the substantive concerns explained in the following sections of this brief, FERC's procedural violations provide a "reasonable ground for [Vecinos'] failure to do so." 15 U.S.C. § 717r(b).

## III.  FERC'S ANALYSIS OF ENVIRONMENTAL JUSTICE AND AIR POLLUTION WAS ARBITRARY

*Vecinos* held that FERC's analysis of environmental justice was arbitrary, because FERC had failed to explain why it based that analysis on the demographics of communities within two miles of the terminal, while simultaneously concluding that the projects' impacts, particularly on air quality, would be felt far beyond that radius. 6 F.4th at 1330-31. *Vecinos* instructed FERC to address this disparity and to revisit its conclusion that the project "would not have disproportionate adverse effects on minority and low-income residents." *Id*. at 1331.

On remand, FERC directed Texas LNG to perform an entirely new analysis of air pollution impacts, which FERC used to perform a new analysis of environmental justice. Both are arbitrary. On environmental justice, FERC did not even purport to state whether air emissions would have a disproportionate adverse effect on environmental justice communities. And FERC repeated its prior error of conducting an

35

analysis untethered to FERC's estimates of the actual geographic scope of project impacts. As to air pollution generally, FERC failed to support its conclusion that the impacts of air pollution would be insignificant.

## A.  FERC Failed to Address Whether Air Pollution Would Have a Disproportionate and Adverse Effect on Environmental Justice Communities

In the Remand Order's discussion of the environmental justice impacts of air pollution, FERC repeatedly states that "air quality impacts on environmental justice communities … would be less than significant." Remand Order PP71, 72  [JA___, ___-___, ___-___]; *accord id.* P75 [JA___-___]. But as FERC recognizes elsewhere, whether impacts are "significant" and whether there are "disproportionate adverse impacts to environmental justice communities" are two separate questions. FERC claims that its analysis comports with EPA's *Promising Practices* guidance. Remand Order PP28, 30 [JA___-___, ___]. This guidance states that "[a] finding of no significant impacts to the general population is insufficient (on its own) to base a determination that there are no disproportionately high and adverse impacts to" environmental justice communities. *Promising Practices* at 38 [JA___]; *accord* Remand Order P31 n.77 [JA___] (quoting the guidance). Having recognized this principle

36

in general, FERC offers no explanation for its failure to apply this principle to analysis of the project's air impacts.

FERC's general acknowledgement that "certain" impacts to environmental justice communities would be disproportionately adverse, Remand Order P82 [JA___], does not relieve FERC of the obligation to address whether air pollution is among those impacts. FERC is not prohibited from approving a project with disproportionate effects, *Sabal Trail*, 867 F.3d at 1368. Thus, "environmental justice is not merely a box to be checked." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020). Instead, evaluating environmental justice, like evaluating significance, serves to inform FERC's analysis of whether to deny the project, whether to require an alternative that reduces those effects, or whether to require other forms of mitigation. *Sabal Trail*, 867 F.3d at 1370; 18 C.F.R. § 380.7(d). Those analyses are necessarily effect-specific: if the problem is air pollution, mitigating visual impacts would be of little help. Thus, neither FERC's assertion that air impacts would be insignificant nor FERC's concession that environmental justice communities would suffer some disproportionately

high and adverse impacts satisfied FERC's obligation to take a hard look at the environmental justice impacts of air pollution.

A separate problem with FERC's environmental justice analysis is that FERC has once again based its analysis on a geographic area untethered from FERC's estimates of impacts. To analyze disproportionate impact, an agency will ordinarily "compare the demographics of the population predicted to be affected … to the demographics of" some broader comparison population. *Communities Against Runway Expansion v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004). Here, FERC based its analysis on all communities within 50 kilometers of the terminal. Remand Order P33 [JA___-___]. FERC states that this is the maximum distance at which EPA expects that air impacts *can* occur, for any project. *Id.* But FERC does not contend that *this* project will actually affect air quality in any communities 50 kilometers away. Instead, FERC claims that for air pollution, "the radius of impact, or the distance at which the concentration of a criteria pollutant goes from above to below the significant impact level is approximately 24 kilometers." *Id.*; *see Sierra Club v. EPA*, 705 F.3d 458, 461-62 (D.C. Cir. 2013) (describing significant impact levels).

38

FERC provided no discussion of the demographics of the communities that it expects would actually suffer an increase in air pollution above the respective significant impact level. Vecinos agree that the significant impact level may not be the appropriate way to decide whether a community is "affected" for purposes of environmental justice analysis.[5] But somehow, FERC must delineate the affected community, and this delineation must be tethered to actual effects. FERC has not done that here. Arbitrary over-inclusivity can obscure demographics and be just as arbitrary as under-inclusivity. In evaluating whether the project would have disproportionate and adverse effects on environmental justice communities, FERC needed to explain who would actually be affected.

## B.   FERC's Analysis of Air Pollution Was Arbitrary

FERC's new analysis of air pollution is arbitrary, and does not support its conclusion that the project will not have a significant impact on air quality. FERC's analysis rests on entirely new air emission data;

---

[5] *See* Rehearing Request, 12-14 [JA___-___].

indeed, FERC ultimately relied on modeling submitted in January 2023, after FERC's comment solicitation. Remand Order, P76 [JA____].

For the reasons stated above, FERC's deficient process limited Vecinos' ability to comment on this new data and analysis. Nonetheless, it is clear that FERC's conclusions were arbitrary for at least two reasons. FERC did not justify its decision not to use background air quality data from the air monitor closest to the terminal and Port Isabel. And FERC did not provide data supporting its conclusions regarding ozone, or demonstrate that it had taken a hard look at cumulative ozone impacts.

### 1. FERC Arbitrarily Dismissed Higher, Nearer Background Data

FERC arbitrarily refused to use background air quality data from a nearby, official air monitor that indicated that the project would cause air pollution exceeding the health-based NAAQS.

FERC's discussion of air pollution relies on modeling Texas LNG submitted on January 30, 2023. Remand Order, P76 [JA___-___]. That analysis used background data from 2018 through 2020 at an air monitor

28 kilometers west of the terminal. R.1553, pdf 7 [JA___].[6] Texas LNG

concluded that the projects would nearly cause a violation of the NAAQS

for fine particulate matter ($PM_{2.5}$). *Id*. at pdf 9-10 [JA___-___] (predicting

1-hour $PM_{2.5}$ of 11.75 µg/m$^3$, with a NAAQS of 12, and 24-hour $PM_{2.5}$ of

32.29, with a NAAQS of 35); *accord* Remand Order, B27 [JA___].

But FERC arbitrarily refused to consider data from the Texas

Commission on Environmental Quality's Isla Blanca air monitor, near

Port Isabel and only half the distance (roughly 13 kilometers) from the

terminal. Rehearing Request, 9-11 [JA___]. This monitor showed much

higher background levels of $PM_{2.5}$, that when combined with Texas LNG's

contribution, would exceed the $PM_{2.5}$ NAAQS. *Id*. at 10 [JA___-___].

The rehearing order provided two arbitrary reasons for dismissing

this monitor. First, FERC argued that "the monitor did not have three

years of data" that FERC preferred "at the time the analysis was

completed." Rehearing Order, P17 [JA___-___]. FERC relied on an

analysis conducted in January 2023, Remand Order, P76 [JA___-___],

_____

[6] Texas LNG used Monitor 48-061-0006 which is located at 344
Porter Drive, Brownsville, Texas 78520. *See*
https://www.tceq.texas.gov/cgi-bin/compliance/monops/site_info.pl

thirty-nine months after the October 2019 start of this monitor's data. Rehearing Order, P17 [JA___-___].

Second, FERC claimed that the more distant Brownsville monitor's "proximity to environmental justice communities" justified using it instead of the nearer Isla Blanca monitor. *Id*. FERC's reasoning is unclear. Port Isabel and surrounding communities also contain significant environmental justice populations, and locations where environmental justice populations work and recreate. Regardless, FERC cannot dismiss real health harms to these nearby populations by arguing that there is a larger, less impacted population elsewhere.

## 2. FERC's Ozone Conclusions Are Unsupported

The Remand and Rehearing Order ignore cumulative ozone issues that FERC previously recognized as significant.

Before *Vecinos*, FERC acknowledged that the EIS's ozone analysis was incomplete, because it only considered stationary source emissions. *Rio Grande LNG,* 170 FERC ¶ 61,046, P55 & n.175 (summarized at R.1403, P50 [JA____]). Although the EIS made some assumptions about the cumulative impact of stationary emission from Texas LNG, Rio Grande and the now-abandoned Annova proposal, 170 FERC ¶ 61,046,

P53, the EIS provided no analysis of marine vessels' contribution to ozone impacts, whether from the terminals individually or collectively. *Id.* P55.

FERC's 2020 Rehearing Orders, however, recognized that cumulative marine vessel emissions were a large part of the problem. *Id.* FERC estimated that adding these additional emissions nearly doubled ambient ozone, with estimated levels reaching 76 parts per billion, exceeding the 70 parts per billion NAAQS limit. *Id.*, *accord* R.1403, P50 [JA____].

This time, FERC appears to have ignored these issues. The Remand Order merely relies on the 2019 EIS, without acknowledging FERC's own subsequent criticism and supplementation thereof. Remand Order P74 [JA___-____]. FERC states that Texas LNG's stationary source emissions are "less than 10%" of Rio Grande LNG's, and that a 10% increase in ozone formation beyond what the EIS modeled for Rio Grande would still not violate the NAAQS. *Id.* But this "analysis" continues to the ignore mobile source emissions that FERC, in 2020, concluded constituted a major additional volume of emissions, sufficient to tip the impact from non-exceedance to exceedance.

43

Rather than confront Vecinos' questions about cumulative ozone impacts, FERC suggests that it can ignore them. Rehearing Order, P19 [JA___]. FERC mistakenly argues that the *Vecinos* judgment held that the EIS's discussion of ozone satisfied NEPA. *Id.* (citing 2021 WL 3716769, at *1). This is wrong. The Court held that the analysis "in the … [2020] rehearing order" was adequate, *because* it addressed the other terminals and cumulative marine vessel traffic, and the impact of resulting ambient ozone levels. *id* at *4. But the Court did not hold that the EIS, which ignored these issues, satisfied NEPA's requirement to consider cumulative impacts. Here, FERC did not provide any parallel to the 2020 Rehearing Order's supplemental discussion of cumulative ozone impacts, nor did FERC provide any argument as to why such additional discussion was unnecessary.

## IV.  FERC FAILED TO RESPOND TO THE VECINOS REMAND REGARDING GREENHOUSE GASES

*Vecinos* held that FERC "failed to adequately analyze the impact of the projects' greenhouse gas emissions" by failing to address 40 C.F.R. § 1502.21(c). 6 F.4th at 1329. *Vecinos* remanded with instructions to "explain whether 40 C.F.R. § 1502.21(c) calls for [FERC] to apply the

44

social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not." *Id.* at 1330. *Vecinos* further required FERC to "reconsider its determinations of public interest and convenience … , along with its NEPA [analysis] of the projects' impacts on climate change." *Id.* at 1331.

On remand, FERC did not do this. FERC now predicts that the project will emit 701,709 tons of greenhouse gases annually. Remand Order PP23 [JA___]. FERC used the social cost of carbon[7] to estimate that over the lifetime of the project, these emissions would cause nearly $700 million in harm, using the central discount rate. *Id.* P24 [JA___-___]. But FERC refused to consider that estimate, excluding its own social cost calculations in deciding whether these emissions were "significant" under NEPA, or in FERC's Natural Gas Act public interest determination. FERC contended that this refusal was appropriate because, although the social cost of carbon is accepted for rulemaking, it

_____

[7] The social cost of carbon protocol has been updated to include methane and nitrous oxide, as well as carbon dioxide. Remand Order, P92 n.206 [JA___]. For consistency with *Vecinos*, we use "social cost of carbon" here.

is not appropriate for review of individual projects. Rehearing Order P42 [JA___-___]. But FERC offered no explanation for this contention, and crucially, did not dispute that other agencies, and the scientific community generally, accept social cost of carbon for project-level review. Nor does FERC explain how 40 C.F.R. § 1502.21(c) could permit FERC to refuse to use such a generally accepted method.

FERC's only other social cost of carbon argument is to lament that there is not a universally-accepted threshold for when monetized environmental impacts become "significant" for NEPA purposes. Remand Order, P20 [JA___-___]. But FERC offers no argument as to why the $700 million worth of harm at issue here is not significant, nor does FERC explain why this question is different than the myriad other judgment calls agencies make under NEPA without pre-determined significance thresholds.

FERC also failed to respond to *Vecinos*'s instruction to consider "other analytic framework[s]." 6 F.4th at 1330. On remand, Vecinos explained that, rather than using social cost, FERC could simply make an ad-hoc determination that the 701,709 tons per year of greenhouse gases at issue here were significant, analogously to a prior FERC

46

proceeding. Rehearing Request, 33-34 [JA___-___]. FERC did not respond to this argument. Rehearing Order, PP38-45 [JA___-___].

Finally, FERC failed to rationally explain its conclusion that the project was in the public interest despite these greenhouse gas emissions and their associated climate costs. It is unclear how, or even whether, FERC considered these emissions in that analysis.

## A. The Social Cost of Carbon Is Generally Accepted, Including for Use in Project Level Review

FERC has repeatedly conceded that the social cost of carbon is generally accepted in the scientific community. *Vecinos*, 6 F.4th at 1329 (citing *Florida Southeast Connection*, 164 FERC ¶ 61,099, P35 (Aug. 10, 2018)); *Tennessee Gas Pipeline Co.*, 180 FERC ¶ 61,205, P75 (2022), FERC does not dispute this acceptance here.

Instead, FERC argues that the social cost of carbon is unsuited for use in review of individual projects. Rehearing Order PP42, 44 [JA___-___, ___]. Even if FERC can focus on this narrow context of project-level review, FERC still needs to ask whether the tool is "generally accepted" for use in that context. FERC entirely failed to ask this question. But the answer is plainly yes. The Council on Environmental Quality states that

NEPA reviews should use social cost of carbon "in most cases." *Interim NEPA Guidance on Consideration of Greenhouse Gases*, 88 Fed. Reg. 1196, 1202 (Jan. 9, 2023). As FERC has previously acknowledged, other agencies have used the tool for project-level NEPA review. *Mountain Valley Pipeline*, 163 FERC ¶ 61,197 P281 n.772 (June 15, 2018) (citing examples from the Bureau of Ocean Energy Management and Office of Surface Mining Reclamation and Enforcement). Other agencies have continued to do so since *Mountain Valley*.[8] FERC is therefore still in the position it was in in *Vecinos*: FERC has not disputed that social cost of carbon is "generally accepted," and FERC has not offered any explanation as to why 40 C.F.R. § 1502.21(c) does not therefore require

---

[8] *See, e.g.*, Maritime Administration, Final EIS for the Sea Port Oil Terminal Deepwater Port Project, App'x BB (July 2022), *available at* https://www.regulations.gov/document/MARAD-2019-0011-5032; Bureau of Land Management, Draft SEIS for the Coastal Plain Oil and Gas Leasing Program, App'x F-3 to F-4 (August 2023), *available at* https://eplanning.blm.gov/public_projects/2015144/200492847/20085217/250091399/Coastal_Plain_Draft_SEIS_Vol3_508.pdf; Bureau of Ocean Energy Management, Final Programmatic EIS for the 2024-2029 National Outer Continental Shelf Oil and Gas Leasing Program, at 30-31 (Sept. 2023), *available at* https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/2024-2029NatOCSOilGasLeasing_FinalPEISVol1_0.pdf.

FERC to use this tool "notwithstanding [FERC's] concerns" about it. 6 F.4th at 1329.

Moreover, separate from the question of scientific acceptance, FERC's assertion that the social cost of carbon is unsuitable for project-level review is completely unsupported. The tool allows decision-makers to understand the costs, in dollars, of each additional ton of carbon dioxide emitted into the atmosphere. FERC offers no explanation as to why it matters whether those emissions result from an agency's rulemaking or a project-level decision. *See, e.g.*, *Cboe Futures Exchange, LLC v. SEC*, 77 F.4th 971, 978 (D.C. Cir. 2023) (holding that agency acted arbitrarily when it failed to explain why chosen action would further its stated goal).

## B.  FERC Must Exercise Its Own Judgment About Significance

FERC next argues that even if the social cost of carbon is a generally accepted method for translating tons of emissions into dollar value of social harm, that there is no generally accepted threshold for then deciding what level of monetized harm is "significant," for NEPA purposes. Remand Order P20 [JA___]; Rehearing Order P42 [JA___-___].

49

Few, if any, of the other resources FERC evaluates have significance thresholds of this kind. But FERC exercises its policy judgment to determine the severity and significance of impacts to wetlands, recreation, wildlife, habitat, *etc*., anyway. Authorization Order, Dissent of Comm'r Glick P19 and n.46 [JA___] (collecting examples). FERC offers no justification for treating climate any differently. "The NEPA process involves an almost endless series of judgment calls." *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (cleaned up). FERC cannot refuse to exercise such judgment; FERC must do "the best it can with the data it has." *Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559 (9th Cir. 2011).

Moreover, this is not a close call here. FERC estimated the lifetime social cost of the project's greenhouse gas emissions as nearly $700 million in the middle case. Remand Order P24 [JA__-__]. FERC's assertion that it simply has no idea how to determine whether these damages are significant is absurd.

FERC mistakenly argues that *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) supports FERC's refusal to consider the social cost of carbon. Rehearing Order P44 n.142 [JA___].

But the question *Vecinos* put to FERC is whether 40 C.F.R. § 1502.21(c) required FERC to use the social cost of carbon "notwithstanding [FERC's] concerns" about the tool. 6 F.4th at 1329. *Center for Biological Diversity* held that petitioners there had waived arguments about this regulation, and the Court did not discuss the regulation or whether the social cost of carbon was "generally accepted in the scientific community." 67 F.4th at 1184.

Moreover, putting § 1502.21 aside, *Center Biological Diversity* relied on two other arguments that FERC abandoned in the Remand and Rehearing Orders here: FERC's claim that the social cost of carbon did not reflect physical impacts, and that there was no consensus as to a single discount rate. 67 F.4th at 1184. Whether because of FERC's expanded understanding of the tool or for some other reason, FERC— correctly—no longer faults the tool in these regards. But neither *Center for Biological Diversity* nor any prior court held that FERC's hesitancy to make a policy judgment about whether a particular amount of monetized environmental harm is "significant" is sufficient, standing alone, to justify refusing to consider the social cost of carbon.

51

**C. FERC Ignored *Vecinos*'s Instruction to Consider Other Analytic Methods**

Alternatively, FERC potentially could have avoided the social cost of carbon issue by evaluating the significance of greenhouse gas emission using some other method. FERC failed to respond to Vecinos' argument that FERC should do so here. Rehearing Request, 33-34 [JA___-___].

FERC needs to evaluate the significance of greenhouse gas emissions *somehow*. FERC's regulations require it to identify all "significant environmental impacts." 18 C.F.R. § 380.7(a), (d). Council on Environmental Quality regulations similarly require that FERC take a hard look at "environmental impacts … *and the significance of those impacts*." 40 C.F.R. § 1502.16(a)(1) (emphasis added). But the specific requirement to use "methods generally accepted in the scientific community" only applies when such methods would provide relevant information that is otherwise missing. 40 C.F.R § 1502.21(c).

Here, FERC simply could have made an ad-hoc determination of significance. Rehearing Request, 33-34 [JA___-___]. 701,709 tons per year of emissions, like nearly $700 million in monetized costs, are facially significant. FERC previously made an analogous ad-hoc determination in

52

*Northern Natural Gas*, 174 FERC ¶ 61,189 (Mar. 22, 2021), which presented the converse situation of facially insignificant greenhouse gas emissions. There, FERC concluded that although it had not yet identified a significance threshold for greenhouse gases, the 315 tons per year of emissions at issue were clearly below any threshold FERC could plausibly adopt, and therefore insignificant. *Id.* PP29, 33. Here, in contrast, the 701,709 tons per year of emissions at issue greatly exceed any significance threshold FERC or any other agency has proposed. *Interim GHG Policy*, 178 FERC ¶ 61,108, PP93-95 (Feb. 18, 2022) (explaining FERC's proposal to set a 100,000 ton per year significance threshold, and summarizing lower thresholds proposed or adopted by various agencies).

Such an admission of significance, while straightforward, would still inform the rest of FERC's NEPA and Natural Gas Act analyses. While neither NEPA nor the Natural Gas Act prohibit agencies from taking actions with significant environmental impacts, a finding of significance identifies impacts that need to be taken seriously, and warrant mitigation. *Id.* PP79, 106, 108; *accord NEPA Guidance on*

*Consideration of Greenhouse Gases*, 88 Fed. Reg. at 1206. But FERC

failed to respond to Vecinos' request for such an ad-hoc determination.

**D.  FERC Failed to Comply with this Court's Instruction to Explain Whether and How Greenhouse Gases Impacted Its Public Interest Evaluation**

*Vecinos* instructed FERC to "reconsider" its Natural Gas Act

determinations regarding the public interest in light of FERC's revised

analyses of impacts on climate change. 6 F.4th at 1331. FERC failed to do

so. Neither the Remand Order or Rehearing Order provides discussion of

whether or how greenhouse gas emissions influenced FERC's public

interest evaluation.

FERC principally relies on a "presumption" favoring approval,

Rehearing Order. P38 [JA___-___] (citing 15 U.S.C. § 717b(a)). But FERC

was required to explain why evidence of the terminal's extensive adverse

climate impact did not rebut the presumption favoring approval. FERC

must "identify the stepping stones" explaining its implicit conclusion that

the presumption was not rebutted by the terminal's 701,709 tons of

greenhouse gas emissions per year, causing billions of dollars in damage

over the life of the project. *Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of

Energy*, 998 F.2d 1041, 1046 (D.C. Cir. 1993) (quotation omitted).

54

Remand Order PP96, 98 [JA___-___]. But, nothing in the record explains whether FERC viewed the Texas LNG terminal's greenhouse gas emissions here as too trivial to matter, important but outweighed by public benefits, or whether FERC simply ignored them entirely. This Court cannot uphold FERC's action "based only on [a] best guess as to what reasoning truly motivated it." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006).

Separately, under section 3 of the Natural Gas Act, the decision before FERC is not merely whether to approve or deny a project, but also whether to require modifications. Here, one such modification would be to require carbon capture and sequestration at the terminal, as the neighboring Rio Grande LNG project has proposed. FERC cannot rationally determine whether such modifications are in the public interest without explaining how it weighs increases or reductions in greenhouse gas emissions.

## V.   REMEDY

"The ordinary practice … is to vacate unlawful agency action." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032,

1050 (D.C. Cir. 2021) (citation omitted). There is no reason to depart from that ordinary practice here.

FERC has already had an opportunity to substantiate its decision on remand, but has "yet again come up with insufficient support." *American Public Gas Ass'n v. U.S. Department of Energy*, 72 F.4th 1324, 1343 (D.C. Cir. 2023) (cleaned up). This Court has explained several times that where an agency fails to substantiate its decision after a remand without vacatur, the Court will vacate. For example, in *American Public Gas Ass'n v. U.S. Department of Energy*, this Court vacated after a challenge to the Department of Energy's decision to re-issue, after a remand, an energy efficiency standard for commercial packaged boilers. 72 F.4th at 1343. There, the Department of Energy failed use the required notice and comment procedures on remand and failed to address a question specifically remanded to it. *Id.* at 1342. Here, FERC failed to use the analogously required NEPA procedures on remand and failed to resolve two questions remanded to it. Moreover, the new analyses provided by FERC on remand are arbitrary. These are significant deficiencies that FERC already had an opportunity to address on remand, but has "yet again come up with insufficient support." *Id.* at

1343; *see also Standing Rock Sioux Tribe*, 985 F.3d at 1051 (vacatur

appropriate where a "court had previously remanded without vacatur"

and the Army Corps failed to resolve the issues remanded to it).

Additionally, Respondents will not be able to satisfy their burden

that vacatur would be disruptive. *Eagle County, Colorado v. Surface

Transp. Bd.*, 82 F.4th 1152, 1196 (D.C. Cir. 2023).

## CONCLUSION

For the reasons stated above, Vecinos respectfully request that the

Court grant the petition and vacate FERC's Remand Order.

Dated: December 13, 2023

Respectfully submitted,

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Lisa M. Diaz
Sierra Club
910 Julia Street,
New Orleans, LA 70113
305-336-2258
lisa.diaz@sierraclub.org

Tom Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78723
424-346-3276
tom.gosselin@sierraclub.org

*Attorneys for Sierra Club, and*
*Vecinos para el Bienestar de la*
*Comunidad Costera*


*/s/ Gilberto Hinojosa*
Gilberto Hinojosa
531 E. St. Francis St.
Brownsville, Texas 78520
(956) 554-4218
ghinojosa@ghinojosalaw.net

*Attorney for City of Port Isabel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1. the type-volume limitations established by this Court's November 15, 2023 briefing order, setting a limit of 13,000 words for Petitioners' opening brief, because this brief contains 10,142, excluding the parts of the brief exempted by Rule 32(f); and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org
*Attorney for Vecinos para el Bienestar de la Comunidad Costera, and Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2023, I have served the foregoing Joint Opening Brief for Petitioners, including the Addendum thereto, on all registered counsel through the Court's electronic filing system (ECF).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

*Attorney for Vecinos para el Bienestar de la Comunidad Costera, and Sierra Club*