**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 23-1175 and 23-1222 (consolidated)**

———————

CITY OF PORT ISABEL, *ET AL.*,
*Petitioners*,
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Robert M. Kennedy
 Senior Attorney

Jason T. Perkins
 Attorney
 jason.perkins@ferc.gov

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

February 12, 2024

## CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties and Amici

The parties who have appeared before the Court are listed in

Petitioners' Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

1.    *Texas LNG Brownsville LLC*, Order on Remand, 183 FERC

¶ 61,047 (April 21, 2023), R. 1564, JA ___; and

2.    *Texas LNG Brownsville LLC*, Order Addressing Arguments

Raised on Rehearing, 185 FERC ¶ 61,079 (October 27, 2023), R. 1583,

JA ___.

### C.    Related Cases

The Commission orders challenged in this case concern the Texas

LNG Project and were issued in response to this Court's remand in

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th

1321 (D.C. Cir. 2021).

The *Vecinos* court also remanded Commission orders authorizing

the Rio Grande LNG terminal and Rio Bravo pipeline (Rio Grande

Project), which are proposed to be constructed in the same geographic

region as the Texas LNG Project.  Petitioners have challenged the

Commission's remand orders regarding the Rio Grande Project in *City*

*of Port Isabel, et al. v. FERC*, Nos. 23-1174, *et al.*  The Court has

ordered that this case (No. 23-1175, *et al.*) and No. 23-1174, *et al*. be

scheduled for oral argument on the same day and before the same

panel.  *See* Nov. 16, 2023 Order, ECF No. 2027350.

<u>*/s/ Jason T. Perkins*</u>
Jason T. Perkins
Attorney

# TABLE OF CONTENTS

Introduction ........................................................................ 1

Statement Of The Issues .................................................... 5

Statutory And Regulatory Provisions ................................ 6

Statement Of Facts ............................................................ 6

I.     Statutory And Regulatory Background ...................... 6

     A.    Natural Gas Act ................................................. 6

     B.    National Environmental Policy Act .................. 8

     C.    Environmental Justice ....................................... 9

II.    The Commission's Review ........................................ 10

     A.    An Overview Of Liquefied Natural Gas .......... 10

     B.    The Texas LNG Project .................................... 10

     C.    The Commission's Environmental Review ...... 13

     D.    Project Approval ............................................... 14

          1.    The Department of Energy .................... 14

          2.    The Commission .................................... 15

III.   The *Vecinos* Decisions ............................................. 16

     A.    *Vecinos I* ......................................................... 16

     B.    *Vecinos II* ........................................................ 17

IV.   The Remand Orders ......................................................... 18

    A.   Environmental Justice ...............................................19

        1.   Geographic scope.................................................... 19

            a.   Updated analysis .......................................... 19

            b.   Conclusions .................................................. 21

        2.   Social cost of carbon protocol ................................ 23

        3.   Natural Gas Act analysis........................................ 24

Summary of Argument....................................................... 24

Argument............................................................................... 26

I.     Standard Of Review ..................................................... 26

II.    The Commission Reasonably Responded To
The Court's Remand....................................................... 28

    A.   The Commission Reasonably Analyzed
Environmental Justice Impacts..................................... 29

        1.   The Commission reasonably expanded the
geographic scope of its analysis ............................. 29

        2.   The Commission reasonably explained
its conclusions ....................................................... 31

        3.   Sierra Club's objections lack merit........................ 33

            a.   Air pollution impacts ..................................... 33

i.      Project site construction emissions would not adversely impact air quality at nearest residences ............................................... 33

ii.     No air standard violations from operations ............................................... 34

iii.    Reliance on air standards ..................... 35

b.      Geographic scope ............................................ 37

c.      The Isla Blanca air monitor ............................ 39

d.      Ozone ............................................................. 40

B.      The Commission Reasonably Addressed 40 C.F.R. § 1502.21(c) ...................................................... 42

1.      Section 1502.21(c) does not compel use of the social cost of carbon protocol ............................ 42

a.      Project-level review ........................................ 43

b.      Significance threshold .................................... 46

2.      The Commission addressed the significance of the Project's potential climate impacts ............... 49

C.      The Commission Reasonably Reassessed Its Public Interest Determination ................................... 51

1.      The Commission reaffirmed its Natural Gas Act findings ......................................... 51

2.      Sierra Club's complaint lacks merit ...................... 53

III.  The Commission Reasonably Prepared Its Updated
      Environmental Justice Analysis ............................................... 55

      A.  A Supplemental EIS Was Not Required
          By 40 C.F.R. § 1502.9(d)(1) ............................................... 56

      B.  The Commission Reasonably Presented
          Its Analysis In The Remand Order ................................. 59

      C.  The Commission's Process Fostered
          Public Participation ......................................................... 62

Conclusion ........................................................................ 68

# TABLE OF AUTHORITIES

## COURT CASES:

*Appalachian Voices v. FERC*,
    No. 17-1271, 2019 WL 847199
     (D.C. Cir. Feb. 19, 2019) ........................................................... 47

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ............................................................. 8-9, 27

*Chamber of Commerce v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006) ...................................................... 67

*City of Boston Delegation v. FERC*,
    897 F.3d 241 (D.C. Cir. 2018) ................................................... 27-28

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991) ................................................................. 53

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
    355 F.3d 678 (D.C. Cir. 2004) ....................... 29-30, 31, 36, 37-38

*Constellation Energy Commodities Grp. v. FERC*,
    457 F.3d 14 (D.C. Cir. 2006) ................................................ 49, 60

*Center for Biological Diversity v. FERC*,
    67 F.4th 1176 (D.C. Cir. 2023) .......... 27-28, 40, 44, 45, 47, 51, 55

*Del. Riverkeeper Network v. FERC*,
    45 F.4th 104 (D.C. Cir. 2022) ..................................................... 45

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .................................................................. 8

*EarthReports, Inc. v. FERC*,
    828 F.3d 949 (D.C. Cir. 2016) ................................................ 45, 47

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ............................................................. 26-27

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ............................................................. 26

*Food & Water Watch v. FERC,*
    28 F.4th 277 (D.C. Cir. 2022) ............................................. 37

*FPC v. Transcon. Gas Pipe Line Corp.,*
    365 U.S. 1 (1961) .................................................................. 53

*FPC v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976) ............................................................. 67

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.,*
    877 F.3d 1051 (D.C. Cir. 2017) ....................................... 28, 57

*Friends of the River v. FERC,*
    720 F.2d 93 (D.C. Cir. 1983) .............................................. 61

*Hawkins v. Haaland,*
    991 F.3d 216 (D.C. Cir. 2021) ............................................ 66

*Idaho Sporting Cong. v. Alexander,*
    222 F.3d 562 (9th Cir. 2000) .............................................. 60

*Johnston v. SEC,*
    49 F.4th 578 (D.C. Cir. 2022) ............................................ 67

*Laguna Greenbelt, Inc. v. Dep't of Transp.,*
    42 F.3d 517 (9th Cir. 1994) ................................................ 57

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989) ..................................................... 28, 57, 61

*Minisink Residents for Env't Pres. & Safety v. FERC,*
    762 F.3d 97 (D.C. Cir. 2014) .............................................. 65

*Murray Energy Corp. v. EPA,*
    936 F.3d 597 (D.C. Cir. 2019)...................................................... 35

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301  (D.C. Cir. 2015)..................................... 52-53, 65

*NAACP v. FPC,*
    425 U.S. 662 (1976) ......................................................................... 6

*Nat'l Comm. for the New River, Inc. v. FERC,*
    373 F.3d 1323 (D.C. Cir. 2004)...........................................27, 59

*Nat. Res. Def. Council v. NRC,*
    879 F.3d 1202 (D.C. Cir. 2018).................................................. 61

*Nevada v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) .................................................... 27

*Oglala Sioux Tribe v. NRC,*
    45 F.4th 291 (D.C. Cir. 2022) .................................................... 61

*Process Gas Consumers Grp. v. FERC,*
    292 F.2d 831 (D.C. Cir. 2002)................................................... 28

*Pub. Serv. Comm'n of W. Va. v. FERC,*
    777 F.2d 31 (D.C. Cir. 1985) ......................................... 27, 52-53

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ...................................................................... 8

*Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs,*
    56 F.4th 992 (5th Cir. 2023)................................................. 10-11

*Sierra Club v. FERC,*
    672 F. App'x 38 (D.C. Cir. 2016) .............................................. 47

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017)...........................................32, 36

*Stand Up for California! v. Dep't of Interior,*
  994 F.3d 616 (D.C. Cir. 2021).................................................... 57

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ................................................................ 66

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  6 F.4th 1321 (D.C. Cir. 2021)......................... 1, 2, 2-3, 3, 7-8, 16,
        16-17, 17, 29, 29-30, 30, 31, 37, 41, 42-43, 51.

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  No. 20-1045, 2021 WL 3716769
  (D.C. Cir. Aug. 3, 2021) .............2, 17-18, 18, 35-36, 42, 56-57, 57

*W. Va. Pub. Servs. Comm'n v. Dep't of Energy,*
  681 F.2d 847 (D.C. Cir. 1982)....................................................... 8

*Williams Nat. Gas Co. v. FERC,*
  872 F.2d 438 (D.C. Cir. 1989).................................................... 64

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013).................................................... 51

## ADMINISTRATIVE CASES:

*Driftwood Pipeline LLC,*
  183 FERC ¶ 61,049 (2023) .................................................. 48-49

*Fla. Se. Connection, LLC,*
  162 FERC ¶ 61,233 (2018) .................................................. 44-45

*Fla. Se. Connection, LLC,*
  164 FERC ¶ 61,099 (2018) ...................................... 43-44, 44, 45

*LA Storage, LLC,*
  182 FERC ¶ 61,026 (2023) ....................................................... 46

*N. Nat. Gas Co.*,
 174 FERC ¶ 61,189 (2021) ........................................................ 48

*Rio Grande LNG, LLC*,
 170 FERC ¶ 61,046 (2020) ....................................................52, 54

*Rio Grande LNG, LLC*,
 174 FERC ¶ 61,048 (2021) ................................................... 40-41

*Rio Grande LNG, LLC*,
 183 FERC ¶ 61,046 (2023) ............................................. 30-31, 64

*Texas LNG Brownsville LLC*,
 169 FERC ¶ 61,130 (2019) (Authorization Order)
    ............................. 13, 14, 15-16, 16, 50, 51, 52, 54, 59

*Texas LNG Brownsville LLC*,
 170 FERC ¶ 61,139 (2020) (Authorization Rehearing Order)
    ...................................................11, 16, 36, 40, 58, 59,

*Texas LNG Brownsville LLC*,
 183 FERC ¶ 61,047 (2023) (Remand Order)............. 9, 10-11, 11,
    18, 19, 19-20, 20-21, 21, 22, 23, 24, 30, 31, 31-32, 32
    33, 34, 35, 36, 38, 39, 41, 42, 43, 46, 47, 48, 50, 50-51,
    51, 54, 55, 56, 57-58, 58, 59, 60,  63-64, 64.

*Texas LNG Brownsville LLC*,
 185 FERC ¶ 61,079 (2023) (Remand Rehearing Order)
    .................................. 22, 24, 32, 33, 35-36, 36, 38, 39,
    40, 42, 44, 45, 46, 47, 48-49, 49, 52, 54, 55, 57, 57-58,
    59, 62, 63, 65, 66, 67.

*Texas LNG Brownsville LLC*,
 Order No. 3716, DOE/FE Docket No. 15-62-LNG
 (Sept. 24, 2015)………………………………………………….... 14

*Texas LNG Brownsville LLC*,
    Order No. 4489, DOE/FE Docket No. 15-62-LNG
    (Feb. 10, 2020)……………………………………………..14, 15, 52, 54

## STATUTES:

Administrative Procedure Act
    5 U.S.C. § 706(2)(A)..................................................................... 26

Natural Gas Act
    15 U.S.C. § 717 ..................................................................... 6, 6-7

    15 U.S.C. § 717b .....................................1-2, 7, 8, 15, 24, 27, 55

    15 U.S.C. § 717f............................................................................ 27

    15 U.S.C. § 717r..................................................................37, 49, 59

National Environmental Policy Act
    42 U.S.C. § 4321 ......................................................................... 5

Department of Energy Organization Act
    42 U.S.C. § 7151(b)...................................................................... 7

## REGULATIONS:

    18 C.F.R. § 380.7(a) .................................................................... 50

    40 C.F.R. § 1502.9(d) ............................................................56, 59

    40 C.F.R. § 1502.16(a) ............................................................... 50

    40 C.F.R. § 1502.21(c) .............................17, 25, 28, 42-43, 43, 47

    40 C.F.R. § 1502.22 .................................................................... 44

## OTHER AUTHORITIES:

Executive Order 12,898,
     59 Fed. Reg. 7,629 (Feb. 11, 1994) ..................................... 9

*NEPA Guidance on Consideration of*
*Greenhouse Gas Emissions and Climate Change,*
     88 Fed. Reg. 1196 (Jan. 9, 2023) ..................................... 46

# GLOSSARY

| | |
|---|---|
| Authorization Order | *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019) (R. 1391), JA ___ |
| Authorization Rehearing Order | *Texas LNG Brownsville LLC*, 170 FERC ¶ 61,139 (2020) (R. 1403), JA ___ |
| Br. | Petitioners' Opening Brief |
| Commission or FERC | Federal Energy Regulatory Commission |
| EIS or Final EIS | In text, environmental impact statement; in citations, Final Environmental Impact Statement, Texas LNG Project (Mar. 15, 2019) (R. 1374), JA ___ |
| Laguna Atascosa | Laguna Atascosa National Wildlife Refuge |
| LNG | Liquefied natural gas |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* |
| Project | Texas LNG's proposed liquefied natural gas terminal |
| Remand Order | *Texas LNG Brownsville LLC*, Order on Remand, 183 FERC ¶ 61,047 (2023), (R. 1564), JA ___. |
| Remand Rehearing Order | *Texas LNG Brownsville LLC*, Order Addressing Arguments Raised on Rehearing, 185 FERC ¶ 61,079 (2023) (R. 1583), JA ___. |
| Rio Bravo | Rio Bravo Pipeline Company, LLC |
| Rio Grande | Rio Grande LNG, LLC |

| | |
|---|---|
| Sierra Club | Collectively, petitioners City of Port Isabel, Sierra Club, and Vecinos para el Bienestar de la Comunidad Costera |
| Terminal | A liquefied natural gas (LNG) export terminal and associated facilities, specifically here those capable of exporting approximately 4 million metric tons per annum of natural gas as LNG |
| Texas LNG | Texas LNG Brownsville LLC |

# In the United States Court of Appeals
# for the District of Columbia Circuit

### Nos. 23-1175 and 23-1222 (consolidated)
_____

CITY OF PORT ISABEL, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

### BRIEF OF RESPONDENT
### FEDERAL ENERGY REGULATORY COMMISSION
_____

## INTRODUCTION

This case returns to the Court after a 2021 remand to the Federal

Energy Regulatory Commission. *See Vecinos para el Bienestar de la*

*Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (*Vecinos I*).

The Court directed the Commission to address three discrete issues in

connection with its authorization of Texas LNG Brownsville LLC

(Texas LNG) to construct and operate a liquefied natural gas (LNG)

1

export terminal (Project or Terminal) pursuant to section 3 of the Natural Gas Act, 15 U.S.C. § 717b.

(The Court did not vacate the Commission's prior authorization, finding it "reasonably likely that on remand the Commission can redress its failure of explanation." 6 F.4th at 1332. And in a companion unpublished opinion, the Court denied all other challenges to the Commission's authorization. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021) (per curiam) (*Vecinos II*).)

In *Vecinos I*, the Court asked the Commission to reconsider the geographic scope of its environmental justice analysis. The Court questioned why the Commission "chose to analyze the projects' impacts only on [environmental justice] communities . . . within two miles" of the Project, given that air quality impacts could affect a broader radius of communities. *Vecinos I*, 6 F.4th at 1331.

Second, the Court directed the Commission to address whether 40 C.F.R. § 1502.21(c) – which concerns the use of generally accepted scientific methodologies – requires the use of the social cost of carbon

protocol or some other method to evaluate the Project's contribution to climate change.  *See* 6 F.4th at 1329-30.

Third, the Court instructed the Commission to consider whether its response to either issue necessitated any change to the Commission's public interest conclusion that the Project is properly authorized under the Natural Gas Act.  *Id*. at 1331.

The Commission addressed each issue on remand.  The Commission expanded the geographic scope of its environmental justice analysis to include those communities within a 50-kilometer radius of the Terminal site – boundaries that are coextensive with the farthest possible extent of air quality impacts.  The Commission concluded that Project impacts would be disproportionately borne by environmental justice communities.  But apart from visual impacts near the Terminal site, none would be substantial.

The Commission also explained that 40 C.F.R. § 1502.21(c) does not require use of the social cost of carbon protocol as it is not generally accepted as a scientific method to estimate environmental impacts for a specific project.  Nor is there agreement on a threshold for declaring impacts "significant."  Nonetheless, the Commission estimated the

social cost of Project-related greenhouse gas emissions for informational purposes.  The Commission further recognized that the Project would contribute to future climate change, without characterizing that impact as significant or insignificant, but concluding that the Project (with appropriate mitigation conditions) would be environmentally acceptable.

Finally, the Commission found that nothing in its updated environmental analysis called into question its earlier conclusion that the Project should be authorized under the Natural Gas Act.

Petitioners Sierra Club, City of Port Isabel, and Vecinos para el Bienestar de la Comunidad Costera (collectively, Sierra Club) take issue with certain substantive aspects of the Commission's updated analysis. None of their criticisms has merit.

The same is true of Sierra Club's claim that the Project's environmental review – which began more than 8 years ago – must be drawn out further with the preparation of a supplemental environmental impact statement (EIS) to address environmental justice matters already studied by the Commission.

The remand proceeding was appropriately limited to the discrete issues identified by the Court – *i.e.*, use of the social cost of carbon protocol and the scope of the environmental justice analysis. All information pertaining to those issues was available to interested parties. Indeed, Sierra Club and others submitted extensive comments on that information. And the Commission responded to those comments in its order on remand, which was subject to rehearing. Neither the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* (NEPA), nor any other authority requires anything more.

## STATEMENT OF THE ISSUES

The issues presented for review are:

1.      Did the Commission reasonably respond to the Court's remand when it expanded the geographic scope of its environmental justice analysis to include all communities that could potentially experience direct impacts from the Project?

2.      Did the Commission, which calculated and disclosed the social cost of the Project's emissions, reasonably respond to the Court's remand by explaining that neither the social cost of carbon, nor any other methodology, is generally accepted in the scientific community for

assessing whether a particular project will have a "significant" impact on climate change?

3.      Did the Commission reasonably explain that its updated environmental analysis did not undermine its previous public interest authorization of the Project under the Natural Gas Act?

4.      Did the Commission reasonably conclude that it was not required to prepare a supplemental EIS where there was no significant new information bearing on the Project's environmental impacts?

## STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are contained in the Addendum to this brief.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    Natural Gas Act

The "principal purpose" of the Natural Gas Act is to "encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices." *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976).  The Act declares that "the business of transporting and selling natural gas for ultimate distribution to the public" and in "foreign commerce" is affected with the public interest.  15 U.S.C. § 717(a).  To meet these

aims, Congress vested the Commission with jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce. *Id*. §§ 717(b), (c).

Section 3 of the Act, 15 U.S.C. § 717b, prohibits natural gas exports without "first having secured an order of the Commission authorizing" such transactions. The Act deems exports to a country with which the United States has a free trade agreement "to be consistent with the public interest." *Id*. § 717b(c). Applications for such "exportation shall be granted without modification or delay." *Id*.

The Commission and the Department of Energy share regulatory responsibility under Natural Gas Act section 3. The Department has sole authority over the export of LNG as a commodity. *See* 42 U.S.C. § 7151(b). The Commission has delegated authority under Natural Gas Act section 3(e), 15 U.S.C. § 717b(e), to approve the siting, construction, or operation of LNG terminal facilities used for export. *See* DOE Delegation Order No. S1-DEL-FERC-2006 (effective May 16, 2006) (renewing delegation to the Commission of authority over the construction and operation of liquefied natural gas facilities); *see also*

*Vecinos I*, 6 F.4th at 1325 (explaining division of statutory responsibilities).

With respect to the Commission's review, the Natural Gas Act provides that the Commission "shall" authorize a proposed LNG terminal unless it finds that construction and operation "will not be consistent with the public interest." 15 U.S.C. § 717b(a). Section 3 thus "sets out a general presumption favoring such authorization." *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982).

## B.    National Environmental Policy Act

Before authorizing a new LNG terminal, the Commission must conduct an environmental review under NEPA. That statute sets out procedures to be followed by federal agencies to ensure that the environmental effects of proposed actions are "adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA imposes only procedural requirements . . . with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). Accordingly, an agency

must "take a 'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

### C.    Environmental Justice

Executive Order 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994), requires federal agencies to "identify[] and address[], as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations." *Id*. § 1-101.  The Order directs federal agencies to conduct "environmental justice" analyses by considering "information on the race, national origin, [and] income level" of "areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations." *See id*. §§ 1-103, 3-302(a)-(b).

While the Commission is not one of the federal agencies specified in the Order, the Commission addresses environmental justice issues in its NEPA reviews.  *See, e.g., Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047, P 27 (2023) (R. 1564) (Remand Order), JA ___.

## II.    THE COMMISSION'S REVIEW

### A.    An Overview of Liquefied Natural Gas

Natural gas liquefies when cooled to minus 260 degrees Fahrenheit.  This permits the liquefied gas to be transported by ship to terminals around the world.  At those receiving terminals, the LNG may be warmed to return it to a gaseous state before being sent into a pipeline network for delivery.  *See* FERC, *Energy Primer:  A Handbook of Energy Market Basics* 14-15 (Dec. 2023), https://perma.cc/Q4ZZ-7WR7.

Historically, the United States has been an LNG importer.  Starting in 2010, however, increased domestic production led to numerous proposals to export LNG.  *Id*. 15-16.  As of January 2024, there are eight domestic export terminals in operation, seven under construction, and ten that have been approved but have not started construction.  *See* FERC, LNG Export Terminals, https://perma.cc/K5HB-B6A8.

### B.    The Texas LNG Project

The Project consists of two liquefaction trains – equipment systems that cool and liquify natural gas – each with a nominal output capacity of two million metric tons per year, for a total nominal capacity

of four million metric tons annually. *See* Remand Order P 4, JA __-__;

*see also Shrimpers & Fishermen of the RGV v. U.S. Army Corps of*

*Eng'rs*, 56 F.4th 992, 995 (5th Cir. 2023) (explaining LNG liquefaction

trains and terminals at a high level).  Additional facilities include two

storage tanks, a single LNG carrier berth, and associated

infrastructure.  *See* Remand Order P 4, JA __-__.  An estimated six

LNG carriers per month may dock at the Terminal via the adjacent,

man-made Brownsville Ship Channel.  *See* Remand Order P 53, JA ___-

__; *Texas LNG Brownsville LLC*, 170 FERC ¶ 61,139, P 41 (2020)

(R. 1403) (Authorization Rehearing Order), JA ___.

Figure 1-1
Project Overview Map

*See* Final Environmental Impact Statement, Texas LNG Project at 1-2

(Mar. 15, 2019) (R. 1374) (EIS), JA __; *see also id.* at 2-2, 2-4, 2-13

(depicting intended on-site facilities), JA ___, ___, ___.

12

### C.    The Commission's Environmental Review

In April 2015, the Commission approved the Project sponsor's request to utilize the agency's pre-filing process.  That process afforded an opportunity for resource agencies, affected communities, and other stakeholders to learn about the Project and identify environmental issues for detailed review.  *See id.* ES-2 to ES-3, JA ___-___.  In October 2018, Commission staff issued a draft EIS, which addressed the issues raised during the scoping period.  *See id.* ES-3, JA ___.  Subsequently, Commission staff held a public comment session, and received over 900 comment submissions from federal and state agencies, Native American Tribes, and other interested parties.  *Id.*

The final EIS, issued in March 2019, spanned hundreds of pages and analyzed the Project along several dimensions, including potential impacts on wetlands, vegetation, fish and wildlife, land use, recreation, visual resources, socioeconomics, air quality, and noise.  *Id.* i-v, ES-4 to ES-15, JA ___-___, ___-___; *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130, P 24 (2019) (R. 1391) (Authorization Order), JA ___.

The EIS evaluated alternatives to the Project and analyzed mitigation measures that could help reduce certain environmental

13

impacts.  The EIS concluded that the Project would result in some adverse environmental impacts that could be mitigated.  Authorization Order P 25, JA ___.  The Project would, however, result in significant cumulative impacts to certain resources, including on surface water quality in the Brownsville Ship Channel during operational vessel transits, on the federally-listed ocelot, jaguarundi, and aplomado falcon, and on nearby noise-sensitive areas during nighttime construction.  *Id.* P 26, JA ___.

### D.   Project Approval

#### 1.   The Department of Energy

In September 2015, the Department of Energy authorized Texas LNG to export up to 204.4 billion cubic feet of natural gas per year – which is roughly equivalent to the Project's annual capacity – to countries with which the Unites States has a free trade agreement. *Texas LNG Brownsville LNG*, DOE/FE Docket No. 15-62-LNG, Order No. 3716 (Sept. 24, 2015), https://perma.cc/LQR8-4BPF.  In February 2020, the Department extended that authorization to non-free trade agreement countries.  *See* Texas LNG Brownsville LNG, DOE/FE Docket No. 15-62-LNG, Order No. 4489 (Feb. 10, 2020), https://perma.cc/92EZ-4DTV.

The Department concluded that exports would provide the United States with net economic benefits, without affecting the ability to meet projected domestic demand. *Id*. 34-38. Exports would also improve energy security for the United States' allies and trading partners, which in turn would provide domestic economic and strategic benefits. *Id*. 38-39.

### 2.    The Commission

On November 22, 2019, the Commission approved the Terminal under section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a). *See* Authorization Order PP 1-2, JA ___.

The Commission explained that the Terminal would be sited in an area zoned for heavy industrial use along the Brownsville Shipping Channel and had been designed to comply with all federal safety standards. *Id*. PP 18-19, JA ___-___. Most of the Project's direct environmental impacts from construction would be temporary. *Id*. P 18, JA ___-___. Except for certain visual impacts on nearby areas and some cumulative impacts, the Project's impacts would be reduced to less-than-significant levels by the implementation of required mitigation measures. *Id*. PP 18, 74-80, JA ___-___, __-__. The Commission thus

15

found that the Project, as modified by Commission staff's recommended mitigation measures, would be an environmentally acceptable action and consistent with the public interest.  *Id*. PP 80, 85-86, JA ___, __-__.

The Commission denied Sierra Club's request for rehearing of the Authorization Order.  *See* Authorization Rehearing Order P 1, JA ___.

## III.  **THE *VECINOS* DECISIONS**

In August 2021, the Court addressed challenges to the Commission's Texas LNG Authorization Orders in two companion opinions.  (Those opinions also addressed contemporaneous Commission orders authorizing Rio Grande LNG, LLC's LNG terminal and Rio Bravo Pipeline Company, LLC's pipeline (collectively, the Rio Grande LNG Project), to be constructed in the same geographic region as the Texas LNG Project.)

### A.  *Vecinos I*

In the first – a published opinion referred to here as *Vecinos I* – the Court found that the Commission failed to adequately justify its choice to examine environmental justice impacts within a two-mile radius of the Project, when some impacts, such as those on air quality, would extend beyond that area.  *See* 6 F.4th at 1330-31.  The Court instructed the Commission to better explain its choice of a two-mile

16

scope or analyze the Project's impacts within a different radius. *Id*. at 1331.

The Court also found that the Commission failed to adequately respond to the contention that the Council on Environmental Quality's regulations (at 40 C.F.R. § 1502.21(c)) required the Commission to use the social cost of carbon protocol or some other generally accepted methodology to assess the climate impact of the Project's emissions. *See* 6 F.4th at 1328-30. The Court directed the Commission to "explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol" or some other scientifically accepted tool, "and if not, why not." *Id*. at 1329-30.

The Court further directed the Commission to reconsider its public interest determinations under the Natural Gas Act after addressing these two deficiencies. *Id*. at 1331. The Court did not vacate the Authorization Orders, finding it likely the Commission could remedy the deficiencies on remand. *Id*. at 1332.

### B.    *Vecinos II*

In the second opinion – an unpublished decision referred to here as *Vecinos II* – the Court "denied in all respects" all other challenges to

the Authorization Orders.  2021 WL 3716769 at *1.  Those rejected

challenges included the contention that the Commission should have

prepared a supplemental EIS to assess Rio Grande project design

changes, *id*. at *1-3, and that the agency failed to adequately consider

cumulative ozone impacts, *id*. at *3-4.

## IV.   THE REMAND ORDERS

In the orders on review, the Commission addressed the issues

remanded by the Court.  Beginning in February 2022, Commission staff

issued a series of information requests to Texas LNG regarding

environmental justice communities, visual impacts, air quality

modeling, and emergency planning, to be used to respond to the issues

identified in the Court's remand.  *See* Remand Order P 10, JA ___.

In September 2022, the Commission issued a notice seeking public

comment on Texas LNG's responses.  *See id*. P 11, JA __; Notice Seeking

Public Comment (R. 1468), JA ___-___, *published* 87 Fed. Reg. 60,679

(Oct. 6, 2022).  Pertinent comments filed in response to that notice were

addressed in the Remand Order.  *See, e.g*., Remand Order PP 76-78,

JA ___-___.

A.    **Environmental Justice**

1. **Geographic scope**

a. **Updated analysis**

The Commission updated its environmental justice analysis using fresh census information and an expanded area of review, consistent with Council on Environmental Quality and EPA guidance. *See id.* PP 26, 35, JA ___, ___. Specifically, the Commission looked to 2020 census data to identify minority and low-income communities within a geographic area that corresponded with the farthest, conservatively estimated impact associated with the Project site. *Id.* PP 28-34, JA ___-___.

The Commission's analysis (1) identified the environmental impact with the broadest geographic scope, (2) conservatively estimated the possible range of that impact, (3) identified environmental justice communities within that radius, (4) verified that impacts would not exceed the estimated range, and then (5) evaluated whether and how those communities would be affected by each of the expected impacts arising from that site. *See id.* PP 32-35, JA __-___. (The community data for areas affected by the Project, along with maps detailing the affected block groups, were included in Appendix B to the Remand

19

Order, JA ___-___.)

Thus, the Commission examined impacts on environmental justice communities within a 50-kilometer (31-mile) radius of the Terminal site. That figure reflects "a conservative estimate" of possible air quality impacts, which are the farthest-reaching impacts associated with the construction and operation of the Terminal. *Id.* PP 32-33, JA ___-___. Fifty kilometers is also the distance used by the EPA for Clean Air Act permitting. *Id.* P 33 n.80, JA ___. The geographic scope of the Commission's analysis of Terminal-related environmental justice impacts is illustrated below:



Texas LNG Brownsville LLC, February 23, 2023 Informational

Response at Figure 5-1 (R. 1558), *reproduced in* Remand Order, App. B-

28, JA __.

## b.    Conclusions

The Commission next identified which of those potentially affected

communities were environmental justice communities.  *See, e.g.,*

Remand Order PP 34 & App. B-2-B-26, JA ___, ___-___.  The

Commission then went on to analyze each impact expected to arise from

Project construction and operation – *i.e.*, on wetlands, recreational and

subsistence fishing, tourism, socioeconomics, road and marine traffic,

noise, safety, air quality, and visual resources – regarding the identified

communities.  *See id*. PP 35-82, JA ___-___.

The Commission found that the impacts arising from the Terminal

"would be predominately borne by environmental justice communities,"

and thus the Project would have a "disproportionately high and

adverse" impact on such communities.  *Id*. PP 82-83, JA ___.  But many

project impacts "would be less than significant."  *Id*. PP 82-83, JA ___.[1]

_____

[1] Beyond impacts on environmental resources, the updated
analysis also considered potential safety impacts on environmental
justice communities, using conservative, worst-case assumptions.  As a

The one exception was the Terminal's impact on the local visual landscape. *Id*. PP 81-83, JA ___-___. The Commission found that in part due to the size and scale of the proposed facility, "the project would result in a significant impact on visual resources when viewed from the Laguna Atascosa National Wildlife Refuge, which is within an environmental justice community." *Id*. P 79, JA ___-___; *Texas LNG Brownsville LLC*, 185 FERC ¶ 61,079, P 36 (2023) (R. 1583) (Remand Rehearing Order), JA ___-___; *see also* EIS 4-132 to 4-134 (presenting visual renderings), JA __-___. Texas LNG would follow a facility lighting plan to help reduce impacts from lighting. Remand Order, P 80, JA ___.

In sum, given the mitigation conditions imposed by the Authorization Order, the Commission continued to find that the project is an environmentally acceptable action. *Id*. PP 84-86, JA ___-___; Remand Rehearing Order PP 1-2, 35-37, JA ___, __-___.

---

result, the Commission required Texas LNG's Emergency Response Plan to take the needs of environmental justice communities into account, including dissemination of public education materials in English and Spanish. Remand Order PP 63-64, JA __-__.

### 2.      Social cost of carbon protocol

In the Remand Order, the Commission also addressed whether section 1502.21(c) of the Council on Environmental Quality's regulations requires the use of the social cost of carbon protocol to assess the Project's climate change impacts.  *See* Remand Order PP 18-25, JA __-___.[2]

The Commission explained that the regulation did not require the protocol's use, because the protocol was "not developed for project level review" and "does not enable the Commission to credibly determine whether the [greenhouse gas emissions] are significant."  *Id*. P 20, JA ___-___.  Nonetheless, for informational purposes, the Commission used the protocol to estimate the social cost of the Project's greenhouse gas emissions.  *Id*. PP 21-24, JA ___-___.  Using a variety of discount rates, those calculations resulted in values ranging between $215 million and $1.01 billion for the Project.  *Id*. PP 22-24, JA ___-___.

---

[2] In 2016, the protocol was updated to include the social costs of additional greenhouse gases, leading to the "social cost of GHG[s]" nomenclature.  *See* Remand Order P 20 n.48, JA ___.  This brief uses the "social cost of carbon" for consistency with the terminology in *Vecinos I*.

### 3.    Natural Gas Act analysis

The Commission found that nothing in its updated environmental analysis altered its prior determination that the Project is not inconsistent with the public interest.  *See, e.g.*, Remand Order PP 2, 85, JA ___, ___; *see also* 15 U.S.C. § 717b(a), *supra* p. 8 (explaining section 3's general presumption favoring LNG terminal authorization, unless such proposals "will not be consistent" with the public interest), *infra* p. 27 (noting the flexibility of Commission discretion under section 3).

The Commission affirmed its findings on rehearing.  *See* Remand Rehearing Order PP 1-2 & n.5, 35-37, JA ___, ____-____.  One Commissioner dissented from both orders.  In its opening brief, Sierra Club does not reference the dissent.  *See infra* p. 67 n.6 (any argument based on dissent now waived).

## SUMMARY OF ARGUMENT

***Environmental Justice:***  The Commission reasonably responded to the Court's remand by expanding the geographic scope of its environmental justice analysis to coincide with the farthest-reaching impact from the Project site.  The Commission's updated analysis appropriately concluded that the Project would have a disproportionate and adverse impact on environmental justice communities since they

would predominately bear its impacts.  But, with the exception of visual

impacts near the Terminal, those impacts would not be substantial.

*Social Cost of Carbon*:  The Commission reasonably responded

to the Court's remand by explaining that 40 C.F.R. § 1502.21(c) does not

require use of the social cost of carbon protocol because it was not

developed for project-level reviews and there is no generally accepted

threshold for assessing whether a particular amount of emissions is

significant.  Nonetheless, the Commission calculated the social cost of

the Project's emissions, explained that the Project would have an

incremental impact on climate change, and discussed potential climate

change impacts to the Project region.

*Natural Gas Act*:  The Commission reasonably addressed the

Court's remand by explaining that nothing in its updated analysis in

response to the two deficiencies identified by the Court altered its prior

conclusion that the Project is an environmentally acceptable action and

should continue to be authorized under the Natural Gas Act.

*Supplemental EIS*:  The Commission reasonably found that it

was not required to prepare a supplemental EIS in connection with its

updated environmental justice analysis.  That analysis did not reveal a

25

"seriously different picture" of the Project's impacts.  The Commission's conclusion – that environmental justice communities will bear the brunt of the Project's impact, but those impacts, for the most part, will not be substantial – is the same as that reached previously.  Moreover, the Commission's procedures on remand ensured that interested parties were able to participate in, and comment on, the Commission's review.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews Commission actions under the Administrative Procedure Act's narrow arbitrary and capricious standard.  5 U.S.C. § 706(2)(A).  Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives."  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).  Rather, the reviewing court must uphold the Commission's determination "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Id.* (cleaned up); *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("deferential" arbitrary-and-capricious standard

requires only that agency action "be reasonable and reasonably explained").

The grant or denial of an authorization under section 3 of the Natural Gas Act, 15 U.S.C. § 717b, is within the Commission's discretion, and the Court does not substitute its judgment for that of the agency. *See Pub. Serv. Comm'n of W. Va. v. Dep't of Energy*, 777 F.2d 31, 35 (D.C. Cir. 1985) (agency's section 3 discretion is "elastic," *i.e.*, "even more flexible than the discretion afforded" under NGA section 7, 15 U.S.C. § 717f).

The arbitrary and capricious standard also applies to NEPA challenges. *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006). The statute is purely procedural and thus "the court's role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting *Balt. Gas*, 462 U.S. at 97-98). The Commission's environmental analysis is subject to a "rule of reason" standard, and the Court has "consistently decline[d] to flyspeck" that analysis. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182

(D.C. Cir. 2023) (quotations omitted); *see also City of Boston Delegation v. FERC*, 897 F.3d 241, 251 (D.C. Cir. 2018) (same).

This narrow standard also applies to an agency's decision not to supplement its environmental analysis. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375-76 (1989). The question is simply "whether [the Commission's] 'decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) (quoting *Marsh*, 490 U.S. at 378).

## II.    THE COMMISSION REASONABLY RESPONDED TO THE COURT'S REMAND

The Court gave the Commission three discrete tasks on remand: (1) reconsider the geographic scope of its environmental justice analysis, (2) explain whether 40 C.F.R. § 1502.21(c) requires the use of the social cost of carbon protocol, and (3) assess whether the response to either task altered its previous conclusion that the Project is consistent with the public interest under the Natural Gas Act. The Commission reasonably responded to each issue. *See Process Gas Consumers Grp. v. FERC*, 292 F.3d 831, 840 (D.C. Cir. 2002) (question on review is whether agency determinations are responsive to the Court's mandate).

28

A.     **The Commission Reasonably Analyzed Environmental Justice Impacts**

1.     **The Commission reasonably expanded the geographic scope of its analysis**

The *Vecinos* court held that the Commission arbitrarily limited the geographic scope of its environmental justice analysis to communities within a two-mile radius of the Project when certain impacts could extend beyond that radius.  *See Vecinos I*, 6 F.4th at 1330-31.  The Court instructed the Commission to better justify its two-mile limitation, "or else analyze the projects' impacts on communities within a different radius."  *Id*. at 1331.

The Commission chose the latter course.  It took another look at the Project's associated environmental impacts and identified which impact had the broadest geographical scope.  The Commission then estimated a geographic radius that would capture that impact.  Within that radius, the Commission identified environmental justice communities and then analyzed whether and how the impacts associated with the Project would affect them.  *See supra* pp. 21-22.

The Commission's expanded delineation of the areas potentially affected by the Project was "reasonable and adequately explained." *Vecinos I*, 6 F.4th at 1330 (quoting *Cmtys. Against Runway Expansion,*

*Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).  The geographic scope

was reasonable because it was broad enough to encompass all possible

impacts from the Project site.  *See* Remand Order PP 32-33, JA__-__;

EIS 4-270, 4-271 (identifying potential scope of impacts), JA ___, ___.

For example, the air quality impacts of Terminal operations were

modeled using a 50-kilometer radius, the same distance the *Vecinos*

Court highlighted.  *Compare* Remand Order PP 9, 32-33, 74, JA __, ___-

___, ___-___, *with* 6 F.4th at 1330.  But the Commission also identified

instances where impacts would be more localized, as in the case of

construction emissions and impacts on visual resources.  *See, e.g.*,

Remand Order PP 67, 79, JA ___-___, ___-___.

The Commission's conclusions regarding geographic scope were

also reasonably explained.  For instance, the Commission found that a

50-kilometer radius was appropriate for analyzing the air quality

impacts of the Terminal's operating emissions, as that is consistent

with the EPA's Clean Air Act permitting practices.  *Id*. P 33 & nn.80-82

(citing 40 C.F.R. pt. 51, app. W (Guideline on Air Quality Models)),

JA ___-___; *see also Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, P 118

n.268 (2023) (explaining that 50 kilometers is the maximum distance

that can be reasonably forecasted in air modeling applications).  And by identifying environmental justice communities based on the measured distance of the farthest estimated direct impact, the Commission's analysis thus also included the study of impacts whose effects dissipate over shorter distances.  *Compare* Remand Order PP 32-35 (explaining geographic scope and community identification), JA __-__, *with id.* PP 55-60 (analyzing noise impacts from Project construction and operation), JA __-__.

Having chosen a reasonable geographic scope for its analysis and adequately explained that choice, the Commission's methodology "is entitled to deference."  *Cmtys. Against Runway Expansion*, 355 F.3d at 689.

### 2.    The Commission reasonably explained its conclusions

The Court also directed the Commission to address whether its prior conclusion – that the Project would not have a "disproportionate" effect, since all affected communities were minority or low-income – still held.  *Vecinos I*, 6 F.4th at 1331.

Based on its updated analysis, the Commission found that the impacts associated with construction and operation of the Terminal

31

would "be disproportionately high and adverse because they would be predominately borne by the environmental justice communities identified." Remand Order PP 82-83, JA ___; *see also id*. PP 35-81 (discussing specific impacts), JA ___-___. But apart from visual impacts near the Terminal, the Commission's conclusions regarding which Sierra Club does not challenge here (*see* Br. 37), the Project's impacts would not be substantial. *See* Remand Order P 82 ("impacts associated with wetlands, surface water, recreational and subsistence fishing, tourism, socioeconomics, traffic, noise, and air quality would be less than significant"), JA ___; *see also id*. P 35 (explaining that "[e]nvironmental justice concerns are not present for other resource areas such as" geology and groundwater, given minimal impacts), JA ___; Rehearing Remand Order P 25 n.66 (noting the exception of visual impacts), JA ___.

That explanation appropriately responds to the Court's remand and satisfies the "goal of an environmental-justice analysis" by "recogniz[ing] and discuss[ing]" the Project's "impacts on predominately-minority communities." *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).

### 3.    Sierra Club's objections lack merit

Sierra Club raises a series of substantive objections to the Commission's analysis. All are without merit.

### a.    Air pollution impacts

First, Sierra Club claims that "FERC did not even purport to state whether air emissions would have a disproportionate adverse effect on environmental justice communities." Br. 35. Not so. The Commission determined that certain impacts on environmental justice communities from the construction and operation of the Terminal – including air quality impacts – "would be disproportionately high and adverse," as they "would be predominately borne" by such communities. Remand Order P 82, JA __.

### i.    Project site construction emissions would not adversely impact air quality at nearest residences

The Commission explained, however, that Terminal construction emissions would "have the largest impact within a short radius around the construction footprint" of the Terminal, and "should not result in adverse impacts on air quality" at "the nearest residences (approximately 1.6 miles away)." *Id.* P 67, JA ___-___; *see also* Remand Rehearing Order P 25, JA ___-___.

The Commission also addressed the possibility of cumulative construction emission impacts.  These temporary cumulative impacts from Rio Grande LNG and Texas LNG construction activities would be "in the immediate vicinity of the LNG terminal sites" and would not affect any residences.  Remand Order P 72, JA ___-___; *see also id.* P 82 (identifying the three census block groups closest to the Terminal), JA ___.  The Commission explained, however, that they could impact "individuals from environmental justice communities fishing or otherwise recreating near the terminal." *Id.* P 72, JA __-__; *see also id.* P 69 (identifying Laguna Atascosa as a nearby area that could experience short-term elevated air pollution levels), JA ___. The Commission imposed monitoring and mitigation measures to help ensure that emission levels would remain below the National Ambient Air Quality Standards (NAAQS) during construction and start up. *Id.* PP 66-72, JA ___-___.

### ii.    No air standard violations from operations

As for operational emissions – both direct and cumulative – the Commission explained that they could potentially impact air quality up to 50 kilometers from the Terminal. *See id.* PP 32-34, 73-75, JA ___-

___, ___-___.  But communities within that radius would not face

significant air quality impacts because operation of the Terminal would

not cause air pollutant concentrations to exceed the NAAQS, which are

designed "to protect sensitive populations."  *Id*. PP 74-75 & nn.174-75,

JA ___-___.

### iii.    Reliance on air standards

Pointing to a passage from the EPA's *Promising Practices*, Sierra

Club contends that a finding of no significant impacts to the general

population cannot, standing alone, establish that there are no

disproportionately high and adverse impacts to environmental justice

communities.  Br. 36.  Sierra Club charges that "FERC offers no

explanation" for failing to apply this principle when analyzing the

Project's "air impacts."  *Id*. 36-37.  Not true.

The Commission explained that it compared expected emissions to

the NAAQS thresholds, which are meant to "protect sensitive

populations."  Remand Order PP 74-75, JA ___-___; *see also Murray

Energy Corp. v. EPA*, 936 F.3d 597, 604 (D.C. Cir. 2019) (NAAQS

"protect the public health," including that of "sensitive populations").

And the Court has already held in this litigation that the Commission

may rely on those standards to "appropriately capture potential health risks." *Vecinos II*, 2021 WL 3716769 at *4; *see also* Remand Rehearing Order PP 22-23, JA ___-___; *Sierra Club*, 867 F.3d at 1370 n.7 ("FERC appropriately relied on EPA's national ambient air quality standards" (citing *Cmtys. Against Runway Expansion*, 355 F.3d at 689)).

Moreover, Sierra Club ignores that the Commission previously considered whether any Project impacts would disproportionately affect environmental justice communities in the area due to "factors unique to [those] population[s]," including "health factors." *See* Authorization Rehearing Order P 45, JA ___-___. Sierra Club does not offer any reason to expect that the relevant communities may be vulnerable to air quality impacts in a manner not already accounted for in the NAAQS. *See id.* PP 44-45, 49, JA ___-___, ___-___; *see also* Br. 36-38. Ultimately, the Commission concluded that the demographic characteristics of these communities would not cause emissions to have a disproportionately adverse impact on them as compared to the broader population. *See* Authorization Rehearing Order P 49, JA ___-___; Remand Order P 75, JA ___-___; *see also* Remand Rehearing Order PP 24-25, JA ___-___.

**b.    Geographic scope**

Having previously claimed that the geographic scope of the Commission's analysis was too narrow, *see Vecinos I*, 6 F.4th at 1330, Sierra Club now complains that the analysis is "over-inclusiv[e]" and "untethered from FERC's estimates of impacts,"  Br. 38-39.  This issue was not presented to the Commission on rehearing and the Court therefore lacks jurisdiction to consider it.  *See* Reh'g Req. 18-19 (R.1569), JA ___-___; *see also* 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022) (holding the NGA's issue exhaustion requirement is jurisdictional).

In any event, Sierra Club does not dispute that air quality impacts could occur as far as 50-kilometers away from a project.  Br. 38.  That alone establishes that the Commission reasonably established the geographic scope of its analysis.  *See Cmtys. Against Runway*

*Expansion*, 355 F.3d at 689 (agency's choice "among reasonable analytical methodologies is entitled to deference from this court").

Sierra Club seizes upon the Commission's statement that, beyond 24 kilometers (approximately 15 miles), there are no Clean Air Act criteria pollutants above the "significant impact level." Br. 38 (quoting Remand Order P 33, JA __-__). But that is a distraction.

First, the refence was simply "to give context for Commission staff's determination that a more conservative radius of 50 kilometers" was an "appropriate unit of geographic analysis." Remand Rehearing Order P 21, JA __-__.

Second, "significant impact levels" are established by the EPA under the Clean Air Act. If modeled emissions are below the pertinent level, the source is not considered to cause or contribute to a violation of the applicable air quality standard. *See* Remand Order P 33 n.81, JA ___-___. If the level is exceeded, then further analysis is required. *See* Remand Rehearing Order P 20 n.50, JA ___-___. Here, the Commission required cumulative air modeling extending to a radius of 50 kilometers, in part due to Sierra Club's comments on Texas LNG's initial submissions. *Id*. P 21, JA ___-___; Remand Order P 76, JA ___.

Once revised and completed, the final modeling established that, even under a worst-case scenario, Project emissions "would not cause or contribute to a potential exceedance of the NAAQS on a regional or localized basis." Remand Rehearing Order PP 21, 23, JA ___-___; *see also* Remand Order P 76, JA ___ (describing Commission staff's efforts to obtain "a full cumulative model" using "consistent methodology" to "analyze the impacts properly").

### c.    The Isla Blanca air monitor

Baseline data for the Commission's air quality analysis was gathered from a particulate matter monitor located in Brownsville, 28 kilometers from the Terminal. *See* Remand Rehearing Order PP 16-17, JA ___-___. Sierra Club charges that the Commission "arbitrarily refused to consider" data from the Isla Blanca monitor, located roughly 13 kilometers from the Terminal. Br. 41.

But as the Commission explained, EPA regulations and modeling guidance state that three years-worth of data should be used. Remand Rehearing Order P 17 & n.40, JA ___-___. The background data underlying the air quality analysis covered 2018 through 2020. *See* Jan. 30, 2023 Texas LNG Resp. at Response 1 & Table 9-4

(R. 1553), JA ___, ___.  The Isla Blanca monitor, which began collecting reliable data in October 2019, did not have three years of data at the time the analysis was completed.  *See* Remand Rehearing Order P 17, JA ___-___.

Moreover, after examining mapping data, the Commission determined that the Brownsville monitor was close to environmental justice communities, and thus was "adequately representative to identify impacts to potentially affected population centers."  *Id*. The Commission's use of data from the Brownsville monitor was thus reasonable.  *See Center for Biological Diversity*, 67 F.4th at 1182 (court "consistently decline[s] to flyspeck an agency's environmental analysis").

### d.    Ozone

In the pre-remand Authorization Orders, the Commission found that the cumulative emissions of ozone precursors from the three anticipated LNG projects could result in ozone air quality standard exceedances.  *See* Authorization Rehearing Order P 50, JA ___.  Since then, the Rio Grande LNG terminal was redesigned, and plans to build the third proposed nearby LNG terminal were abandoned.  *See Rio*

*Grande LNG, LLC*, 174 FERC ¶ 61,048, P 12 n.40 (2021) (noting reduction in ozone precursors would "reduce the cumulative Ozone levels"); *Vecinos I*, 6 F.4th at 1327 (noting abandonment of Annova LNG project).

On remand, the Commission asked Texas LNG to provide an updated cumulative emissions analysis. *See* Remand Order P 73, JA ___. That analysis showed that, even with "worst-case concentration scenarios" from estimated Project emissions, predicted criteria pollutant concentrations would be below the NAAQS at all locations within 50 kilometers of the Terminal. *See id.* PP 73-74, JA ___-___ (citing, in part, *id.* App. B, Table 2, JA ___). Given its smaller size, the Terminal would be expected to emit only one-tenth the amount of ozone precursors as the larger, nearby Rio Grande LNG facility. *See id.* Thus, even when considered in combination with the Rio Grande facility, cumulative impacts would remain below the 8-hour ozone NAAQS. *Id.* (citing, in part, EIS 4-339, JA ___), JA___.

Sierra Club contends that the Commission's discussion of the updated ozone analysis is subject to challenge for failure to comply with NEPA. Br. 42-44. But the Court already determined that the

41

Commission's initial analysis fulfilled its NEPA obligations:  "FERC was aware of and adequately considered the cumulative ozone effects when it decided to approve the [Project].  The NEPA demands no more." *Vecinos II*, 2021 WL 3716769 at *4; *see also* Remand Rehearing Order P 19 (discussing *Vecinos* II), JA ___.  Questions regarding the Commission's initial ozone analysis are thus beyond the scope of the remand proceeding.

In any event, the Commission explained that the updated study by Texas LNG "estimated ozone concentrations following EPA's Modeled Emissions Rates for Precursors" and state agency guidance; substantively, it found that there would not be a significant cumulative impact with respect to 8-hour ozone during operation of the Terminal. Remand Rehearing Order P 19 & nn.48-49, JA ___ (citing R. 1455 and Remand Order P 74, JA ____).  The Commission thus had no basis to doubt the completeness or accuracy of those calculations.  *Id*.

> **B.   The Commission Reasonably Addressed 40 C.F.R. § 1502.21(c)**

> **1.   Section 1502.21(c) does not compel use of the social cost of carbon protocol**

The Court directed the Commission to "explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol or some

other analytical framework" and "if not, why not." *Vecinos I*, 6 F.4th at 1329-30. Section 1502.21(c) requires agencies to evaluate impacts "based upon theoretical approaches or research methods generally accepted in the scientific community." The Commission explained that the regulation does not require the use of the social cost of carbon protocol in this proceeding for two reasons. Remand Order P 20, JA ___.

### a.    Project-level review

First, the "tool was not developed for project level review." *Id*. Sierra Club asserts both that this finding is "completely unsupported" (Br. 49) and that the Commission has "conceded" the protocol is "generally accepted in the scientific community." Br. 47, 49. Neither assertion is correct.

In the Remand Order, the Commission pointed to its *Florida Southeast Connection* proceeding to support its long-standing position that the protocol is not appropriate for assessing individual infrastructure projects. *See* Remand Order P 20 & n.49, JA ___. There, the Commission noted comments the EPA filed with the Commission explaining that the "tool was developed to aid the

43

monetary cost-benefit analysis of rulemakings." *Fla. Se. Connection,*

*LLC*, 164 FERC ¶ 61,099, P 35 n.103 (2018) (quoting EPA July 26, 2018

Comments in FERC Docket No. PL18-1-000, available at

https://perma.cc/9KVT-9DNA).  By contrast, when analyzing a specific

project under NEPA (a context for which the social cost of carbon was

not designed for), the Commission does not – and often cannot –

quantitively capture all project benefits.  *See id*. PP 28, 32, 36, 35 n.103.

Qualitative assessments are required.  *Id*. P 36.  Using the social cost of

emissions on one side of the equation would thus result in a "distorted

cost-benefit analysis," since it would "not make sense to only quantify

one side of the equation."  *Id*. PP 28, 32; *see also* 40 C.F.R. § 1502.22

(monetary cost-benefit analysis should not be used "when there are

important qualitative considerations").

　　　Moreover, "it remains the case that there is a 'lack of consensus

about how to apply the social cost of carbon on a long time horizon.'"

Remand Rehearing Order P 44 n.142 (citing *Center for Biological*

*Diversity*, 67 F.4th at 1184), JA ___;[3] *see also Fla. Se. Connection, LLC,*

---

　　　[3] Sierra Club falsely asserts that the Commission has "abandoned"
this historic concern about the lack of consensus regarding an

162 FERC ¶ 61,233, P 49 (2018).  This can result in "significant variation in output" that "belies the[] contention that the Commission acted unreasonably in finding the tool inadequately accurate to warrant inclusion under NEPA."  *EarthReports Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016); *see also Center for Biological Diversity*, 67 F.4th at 1184 (claim that the "generally accepted in the scientific community" regulation "mandates a social cost of carbon analysis" is "in tension with *EarthReports*" and other cases finding a "lack of scientific consensus").

Thus, while the protocol may be generally accepted in the scientific community for "rulemaking proceedings" (*Fla. Se. Connection*, 164 FERC ¶ 61,099 at P 35), the Commission reiterated here that such a consensus does not exist for project-level reviews.  *See* Remand Rehearing Order PP 41-42, JA __-___; *see also Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) (upholding determination that protocol is not appropriate for project-specific review).

---

appropriate discount rate.  Br. 51.  Equally untrue is the claim that the Commission "abandoned" its concern that the protocol does not measure environmental impacts.  *See* Remand Rehearing Order P 44 n.142 ("it remains the case that . . . the [protocol] . . . does not measure environmental impacts as such"), JA ___.

As Sierra Club notes, agencies whose responsibilities are more directly tied to fossil fuel production or consumption have chosen to use the protocol.  Br. 48.  But that does not establish that it is scientifically accepted for use in a project-specific infrastructure analysis under NEPA.  And, in any event, the Commission used the protocol to generate a range of the Project's social costs.  *See* Remand Order PP 20-25, JA ___-___; *supra* p. 23.

### b.    Significance threshold

Separately, section 1502.21(c) does not mandate use of the protocol because it does not "enable the Commission to credibly determine" whether a project's emissions "are significant or not significant in terms of their impact on global climate change."  Remand Order P 20, JA ___-___; *see also* Remand Rehearing Order P 42, JA ___-___.  "There are currently no criteria to identify what monetized values are significant for NEPA purposes."  Remand Order P 20 n.52 (quoting *LA Storage, LLC*, 182 FERC ¶ 61,026, P 14 (2023)), JA ___; *see also NEPA Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196, 1200 (Jan. 9, 2023) ("This guidance does not establish any particular quantity of GHG emissions as

46

'significantly' affecting the quality of the human environment.").

Recognizing the lack of scientific consensus, the Court has repeatedly found that the Commission has "no obligation … to consider the social cost of carbon." *Center for Biological Diversity*, 67 F.4th at 1184; *see also EarthReports*, 828 F.3d at 956 (same); *Sierra Club v. FERC*, 672 F. App'x 38, 39 (D.C. Cir. 2016) (per curiam) (same); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, *2 (D.C. Cir. Feb. 19, 2019) (per curiam) (same).

Sierra Club says the Commission should just make a "policy judgment" as to whether a particular level of emissions, or its monetized cost, constitutes a significant environmental impact.  Br. 49-50.  But the issue here is whether section 1502.21(c) requires, as a legal matter, use of the social cost of carbon protocol.  And that regulation addresses "methods generally accepted in the scientific community," not policy calls by regulators.  40 C.F.R. § 1502.21(c); *see also* Remand Rehearing Order P 44, JA ___.

Sierra Club also asserts that the Commission "ignored" the Court's "instruction to consider other analytic methods."  Br. 52; *see also id.* 46.  Not true.  *See* Remand Order P 20, JA ___-___ ("Nor are we

47

aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions"); *see also* Remand Rehearing Order P 42 (same), JA ___-___; EIS 4-344 (discussing review of other potential models and methodologies), JA ___.

Sierra Club's only contention is that the Commission could have just "made an ad-hoc determination." Br. 52-53. Sierra Club points to the Commission's case-specific significance determination in *Northern Natural Gas Co.*, 174 FERC ¶ 61,189 (2021). But in that one case, the Commission did not use any generally accepted methodology. It simply concluded that the impact of a particular project that increased state emission levels by 0.000078 percent and 0.0002 percent, would, under any approach, be insignificant. *Id*. PP 33-36.

Sierra Club also notes that the Commission at one time proposed a significance threshold of 100,000 tons per year of carbon dioxide equivalent. Br. 53. That threshold – since suspended – was set "as a matter of policy." *See* Remand Order P 25 n.64, JA ___. Again, the legal question under § 1502.21(c) concerns the use of scientifically accepted methodologies. An eye-ball test or policy preference does not

suffice.  *See* Remand Rehearing Order P 41 (declining to use ad hoc emission level), JA ___; *see also Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, P 61 (2023) (explaining limited value of monetizing social cost of pipeline emissions).

### 2. The Commission addressed the significance of the Project's potential climate impacts

Sierra Club asserts that, notwithstanding the lack of any scientific consensus regarding the social cost of carbon protocol, other Council on Environmental Quality and FERC regulations require the Commission to make an up-or-down call as to whether potential climate change impacts cross a "significant" threshold.  Br. 52 (citing 18 C.F.R. § 380.7(a), (d); 40 C.F.R. § 1502.16(a)(1)).  But these regulations were not even cited in Sierra Club's request for agency rehearing, much less argued.  The Court thus lacks jurisdiction to consider this contention on review.  *See* Reh'g Req. 29-34 (R. 1569), JA ___-___; *see also* 15 U.S.C. § 717r(b); *Constellation Energy Commodities Grp. v. FERC*, 457 F.3d 14, 21 (D.C. Cir. 2006) (argument waived where rehearing request "never even cited the sections of the tariff upon which they now rely").  Moreover, the question of whether the Commission must make a binary significance determination is beyond the scope of the remand.  *See*

Remand Rehearing Order PP 38-39, JA ___-___.

In any event, the now-cited CEQ regulation – 40 C.F.R.

§ 1502.16(a)(1) – requires the Commission to discuss the "significance of

[a project's] impacts." Plainly the Commission did so here.[4]

The Commission estimated the Project's greenhouse gas

emissions. *See* Remand Order PP 23-24, JA ___-___. The Commission

determined that they would contribute incrementally to climate change.

*See id.* P 25, JA ___. The Commission calculated an estimated social

cost of those emissions (*see id.* P 24, JA ___-___), after having

contextualized emissions from the Project pre-remand by comparing

them to the national inventory. *See* Authorization Order PP 66-68,

JA ___-___. The Commission discussed the environmental impacts in

the region attributable to climate change, such as flooding and

increased storm intensity. *See* EIS 4-342 to 4-344, JA ___-___. And the

Commission ultimately concluded that the Project, with added

---

[4] Sierra Club also cites to 18 C.F.R. § 380.7(a), but that section does not say the Commission must definitively determine whether an impact crosses a "significant" threshold. It simply provides that the "staff conclusion section" in an EIS "will include summaries of [t]he significant environmental impacts of the proposed action." *Id.*

construction and operational conditions to mitigate adverse effects, would be "environmentally acceptable."  Remand Order P 84, JA ___. All this satisfies "the required 'hard look.'"  *Id.* P 25, JA ___; *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013) (quantifying emissions and comparing them to national and state inventory levels is a "reasonable proxy" for assessing climate impacts); *Center for Biological Diversity*, 67 F.4th at 1184 (comparing Project emissions with state and national inventories is "reasonable").

### C.    The Commission Reasonably Reassessed Its Public Interest Determination

The Court also directed the Commission to "revisit its determinations" under the Natural Gas Act, including its finding that "the LNG terminals were 'not inconsistent with the public interest.'" *Vecinos I*, 6 F.4th at 1331 (quoting in part Authorization Order P 86, JA ___).  The Commission did so.

### 1.    The Commission reaffirmed its Natural Gas Act findings

The Commission "continue[d] to find" that the Project was "environmentally acceptable."  Remand Order P 84, JA ___.  It also "continue[d] to find that, under section 3 of the NGA, the Texas LNG Project is not inconsistent with the public interest."  *Id.* P 85, JA ___;

51

*see also supra* pp. 7-8 (explaining "not inconsistent" statutory standard).

The Commission revisited its environmental analysis as directed, noted its new findings, and determined that none of the information from its updated analysis on remand undermined its NGA conclusions. Remand Rehearing Order PP 36-37, JA ___-____. It took notice of the Terminal's export authorization by the Department of Energy, which concluded that Terminal exports would provide the United States with economic benefits, without affecting the ability to meet projected domestic demand. *See id.* P 37, JA___-___; Texas LNG Brownsville LNG, DOE Order No. 4489 at 34-39, https://perma.cc/92EZ-4DTV; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046, PP 15-18 (2020) (noting how exporting natural gas can yield benefits, including domestic public benefits). Constructing and operating the Terminal would allow for the realization of these economic benefits. *See* Authorization Order PP 16-18, 21, JA ___-___, ____.

The Commission thus reaffirmed that the Terminal is "not inconsistent with the public interest" as conditioned in its orders. Remand Rehearing Order P 37, JA ___-___; *supra* pp. 7-8 (explaining statutory standard). This Natural Gas Act section 3 determination is

52

well within the Commission's discretion and its conclusion is afforded

deference. *See Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783

F.3d 1301, 1308 (D.C. Cir. 2015) (addressing the Commission's NGA

section 7 discretion); *Pub. Serv. Comm'n of W. Va.*, 777 F.2d at 35

(Natural Gas Act section 3 discretion is "even more flexible than the

discretion afforded" under NGA section 7).

### 2. Sierra Club's complaint lacks merit

Sierra Club asserts that the Commission "failed to comply" with

the Court's mandate because it did not precisely lay out the steps of its

public interest determination, in particular the weight given to one

specific element (greenhouse gas emissions).  Br. 54-55.

Of course, a public interest finding is not susceptible to a

mathematical equation.  It "entails not merely economic and

mathematical analysis but value judgment." *City of Columbia v. Omni

Outdoor Advert., Inc.*, 499 U.S. 365, 377 (1991); *see also FPC v.

Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961) ("a forecast of the

direction in which future public interest lies necessarily involves

deductions based on the expert knowledge of the agency").  In any

event, the entirety of the record demonstrates that the Commission

considered all factors bearing on the public interest – including

environmental considerations – consistent with its responsibilities

under the Natural Gas Act.

The Commission explained that the Terminal would facilitate the

exportation of natural gas, which Congress has declared to be in the

national interest.  *See* Remand Rehearing Order P 37, JA ___-___; *see*

*also* DOE Order No. 4489 at 34-39 (describing benefits from authorizing

exports); *Rio Grande LNG,* 170 FERC ¶ 61,046 at PP 15-18.

As to environmental impacts, the Commission compared expected

Project emissions to a national inventory and has since estimated the

associated social costs.  *See* Authorization Order P 67, JA ___; Remand

Order P 24, JA __-__.  The Commission acknowledged and discussed

various expected environmental impacts from the Project.  *See, e.g.*,

Remand Rehearing Order P 36, JA __-__.  That included climate change

impacts in the Project region.  Authorization Rehearing Order P 76,

JA __ (citing, in part, EIS 4-342 to 4-344, JA __-___); *see also* Remand

Order P 25 (same), JA ___.

The Commission ultimately concluded that construction and

operation of the Terminal as conditioned by the Commission, is an

"environmentally acceptable action." Remand Order P 84, JA ___.

Thus, the Natural Gas Act's presumption in favor of authorization,

*see* 15 U.S.C. § 717b(a), "was not overcome." Remand Rehearing Order

P 38, JA ___-__; *see also* supra p. 8 (discussing section 3 standards);

*Center for Biological Diversity*, 67 F.4th at 1188 (rejected NEPA

challenges "fare no better when framed as [Natural Gas Act]

challenges").

## III. THE COMMISSION REASONABLY PREPARED ITS UPDATED ENVIRONMENTAL JUSTICE ANALYSIS

In connection with its updated environmental justice analysis, the

Commission directed Texas LNG to provide updated emissions

modeling to account for all operational emissions from the Project,

taking into account expected emissions from the Rio Grande project and

other sources. *See, e.g.*, Remand Order P 73, JA ___. The modeling –

like the modeling used in the EIS's cumulative impact analysis –

covered a 50-kilometer radius from the Terminal. *See* EIS 4-271, 4-337

to 4-342, JA ___-___; Remand Order PP 73-76, JA ___-___.

The Commission's requests for information and the Project

sponsor's responses were placed on the public docket. *See* Remand

Rehearing Order PP 6-7, JA ___. And in September 2022, the

Commission requested public comment on those responses. *See* Notice

(R. 1468), JA ___-___.[5]  In fact, Sierra Club itself commented on the air

modeling data Texas LNG submitted, prompting further Commission

staff requests and Texas LNG responses. *See* Remand Order P 76, JA

___.  The Commission's updated analysis, and its response to pertinent

public comments, were set forth in the April 2023 Remand Order, which

was subject to rehearing.

In Sierra Club's view, all that was not enough and a supplemental

environmental impact statement was required.  Sierra Club is incorrect.

## A.    A Supplemental EIS Was Not Required By 40 C.F.R. § 1502.9(d)(1)

Sierra Club contends that, because the Commission's updated

analysis employed a broader geographic scope, 40 C.F.R. § 1502.9(d)

required the Commission to prepare a supplemental EIS.  Br. 25-26.

---

[5] Additional requests for information primarily sought (1) further information about pollutant concentrations and dispersion in Texas LNG's modeling, (2) an updated refined air quality model enabling cumulative impact analysis for both proposed LNG terminals, (3) greenhouse gas emissions rates, (4) maps and data reflecting the expanded geographic scope of the Commission's analysis (like those included in Appendix B to the Remand Order) and (5) data regarding rocket launch sites.  *See* Remand Rehearing Order P 7, JA ___ (identifying dates of requests and responses); R. 1542, R. 1547, R. 1551, R. 1553, R. 1558, R. 1572, R. 1576.

But as this Court explained earlier, the obligation imposed by that
regulation only attaches when "new information will affect the quality
of the human environment in a significant manner or to a significant
extent not already considered." *Vecinos II*, 2021 WL 3716769 at *2
(quoting *Friends of Cap. Crescent Trail v. Fed. Transit. Admin.*, 877
F.3d 1051, 1060 (D.C. Cir. 2017)).  It does not attach "every time new
information comes to light." *Id.* (quoting *Marsh v. Oregon Nat. Res.
Council*, 490 U.S. 360, 373 (1989)).  Put another way, "a [supplemental
EIS] must be prepared only where new information provides a *seriously*
different picture of the environmental landscape." *Stand Up for
California! v. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021)
(internal quotations omitted).

Here, there were no "new significance determinations" resulting
from the issues addressed on remand.  Remand Rehearing Order P 31,
JA \_\_\_-\_\_\_ (citing, in part, *Laguna Greenbelt, Inc. v. Dep't of Transp.*,
42 F.3d 517, 529 (9th Cir. 1994) (upholding agency's decision not to
prepare a supplemental EIS where the agency concluded that new
information did not result in any new significant impacts)).  The
Commission concluded that, given the updated emissions analysis, the

Project would not have a significant impact on air quality for
communities within a 50-kilometer radius of the Terminal.  *Id*.; *see also*
Remand Order PP 73-74, JA __-__.  This was similar to the
Commission's prior conclusions as well – the EIS found that air quality
impacts from criteria pollutants would not result in an exceedance of
the NAAQS, except perhaps for one pollutant in the uninhabited area
between the two fencelines of the Texas LNG and Rio Grande LNG
projects.  *See, e.g.,* Authorization Order P 61 (citing EIS 5-368 to 5-369,
JA ___-___), JA ___; EIS 4-337 to 4-339, JA ___-___; Authorization
Rehearing Order PP 35, 38 JA ___-___.

Given that air quality impacts within a 50-kilometer (31-mile)
radius of the Terminal had been studied and not found significant
before, the most novel information in the Commission's updated
analysis was the demographics of the communities beyond the
previously analyzed two-mile radius.  The Commission gathered that
publicly available information and found, within that expanded radius,
that Project impacts "would be predominately borne by environmental
justice communities."  Remand Order PP 82-83, JA ___.  But, apart

from cumulative visual impacts, those impacts would be "less than significant." *Id*. PP 82-83, JA ___.

This is not a "seriously different picture" than that generated by the Commission's original analysis. *Nat'l Comm. for the New River*, 373 F.3d at 1330. The Commission previously concluded that environmental justice communities would bear all the Project's impacts (*see* Authorization Rehearing Order P 45, JA ___-___), but that the vast majority of those impacts would be less than significant. *See id*. PP 34-38 (air quality impacts would not exceed NAAQS, with minor exception), JA __-__; *see also* Authorization Order P 78 (noting potential for significant cumulative visual impacts), JA ___; Remand Order PP 82-83 (reaching similar conclusions), JA ___. Accordingly, a supplemental EIS was not required under 40 C.F.R. § 1502.9(d). *See* Remand Rehearing Order PP 31-32, JA ___-___.

## B.    The Commission Reasonably Presented Its Analysis In The Remand Order

Sierra Club argues that a supplemental EIS is separately required by case law purportedly establishing that "NEPA does not permit filling gaps . . . other than by using NEPA procedures." Br. 19-20. The Court lacks jurisdiction to consider this argument on review because it was

not presented to the Commission on rehearing.  *See* Reh'g Req. 23-25,

JA ___-___; 15 U.S.C. § 717r(b).  Indeed, Sierra Club's principal case –

*Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000)

– is not even cited in its rehearing request.  *See Constellation Energy*,

457 F.3d at 21.

In any event, *Idaho Sporting Congress* faulted the Forest Service

for issuing a supplementary analysis without reopening its decision-

making process.  *See* 222 F.3d at 568.  As a result, the new information

could not "serve practically as an important contribution to the

decisionmaking process."  *Id.* at 567 (citation omitted).

Here, by contrast, the Commission expressly considered its

updated environmental justice analysis – along with public comments

on that analysis – when determining that the Project was an

environmentally acceptable action and should be authorized under the

Natural Gas Act.  *See* Remand Order PP 82-85, JA ___.  Indeed, unlike

the "*post-hoc*" analysis at issue in *Idaho Sporting Congress*, the

Commission imposed new mitigation measures based on the results of

its updated analysis.  *Compare* 222 F.3d at 568 *with* Remand Order

PP 69-70 (requiring localized air quality monitoring during Terminal construction), JA ___-___.

The Commission's process here satisfied NEPA's fundamental purpose of ensuring that environmental information was available to decisionmakers and the public before the Commission rendered its decision on remand.  In such circumstances, as Sierra Club acknowledges (Br. 31-32), this Court has repeatedly declined to order further procedures.  *See, e.g.*, *Oglala Sioux Tribe v. NRC*, 45 F.4th 291, 301 (D.C. Cir. 2022) (permissible for agency to "present[] the substance of its findings in publicly accessible decisions after on-the-record hearings"); *Nat. Res. Def. Council v. NRC*, 879 F.3d 1202, 1211 (D.C. Cir. 2018) (permissible for agency to evaluate information omitted from EIS during a subsequent hearing and present its findings in a publicly accessible order); *see also Friends of the River v. FERC*, 720 F.2d 93, 106-08 (D.C. Cir. 1983) (permissible for agency to include the required analysis in a publicly accessible opinion "composed after due investigation and before the matter was brought to court"); *cf. Marsh*, 490 U.S. at 380-83 (permitting agency reliance on non-NEPA document in assessing whether new information requires a supplemental EIS).

## C.    The Commission's Process Fostered Public Participation

Sierra Club raises a series of contentions to support its claim that the Commission's process did not permit appropriate public participation.  None has merit.

Initially, it is important to recognize that members of the public, including those in environmental justice communities, have had ample opportunities to participate in the review process – a process which began more than 8 years ago.  *See* EIS 1-10, JA ___.  FERC and the project sponsor held multiple public scoping and comment meetings in the Project region.  The draft EIS was circulated widely to state and local governments, community organizations, and individuals within and beyond the 50-kilometer radius used in the Commission's updated environmental justice analysis.  *See, e.g.*, EIS 1-10 to 1-14, 4-333 to 4-334, App. A, JA ___-___, ___-____, ___-___; *see also* Remand Rehearing Order P 13 (discussing public participation), JA ___-___.  And from the start, the Commission's environmental analysis explained that some Project impacts could extend 50 kilometers.  *See* EIS 4-271, 4-337 to 4-339 (studying operational air quality impacts within a 31-mile radius of Terminal), JA ___, ___-___.

62

Nonetheless, Sierra Club contends that the information put out for public comment lacked "comprehensive context" and was too "technical" to permit meaningful comment.  Br. 26.  In fact, the materials are very similar to the type of information found in an EIS.  *Compare* Jan. 30, 2023 Texas LNG Resp. at Tables 9-5, 9-6 (R. 1553), JA ___-___ *with* EIS 4-341, JA ___.  Texas LNG's submission further explains in plain language that "no modeled exceedances were identified in the analysis."  Jan. 30, 2023 Texas LNG Resp. at Resp. 2, JA ___.  As for context, Sierra Club understood Texas LNG's submissions to indicate that "all but three of the census block groups . . . included in the modeling" would be environmental justice communities.  Sierra Club Oct. 19, 2022 Remand Comments at 8 (R.1503), JA ___.

The over 100 public comments submitted in response to the Commission's solicitation – including Sierra Club's detailed critique of the project sponsor's submissions in October 2022 (plus an additional unsolicited comment in March 2023) – further demonstrate that the process fostered meaningful public participation.  *See* Remand Rehearing Order P 15, JA ___.  Indeed, Commission staff and Texas

63

LNG undertook revisions to the air modeling analysis after Sierra

Club's comments were received.  Remand Order P 76, JA ___.  This

shows that the Commission took commenters' concerns seriously and

that the public meaningfully participated on remand here.  *See*

*Williams Nat. Gas Co. v. FERC*, 872 F.2d 438, 446 (D.C. Cir. 1989)

(observing that the "whole point of notice-and-comment" procedures are

to inform the agency, and potentially induce it to modify its views).

Sierra Club also complains that comment period was too short and

that the Commission did not "provide notice that there would be no

further comment opportunities."  Br. 26.  But again, the Commission's

deadline was long enough for over 100 entities to submit comments.

Nor did the Commission's procedures prevent Sierra Club from filing

post-deadline comments about consistency between the Rio Grande and

Texas LNG air modeling data that were considered and addressed.

*See* Remand Order P 76, JA ___; *see also Rio Grande LNG*, 183 FERC

¶ 61,046 at P 87 (describing Dec. 2, 2022 comments, R.2956 in Case No.

23-1174).

As for those filings after the Commission's September 2022

request for comments, such as the modeling update discussed in the

Remand Order (Br. 29-30), parties to the docket were aware of any subsequent filings "and could have provided comment on it at any time." Remand Rehearing Order PP 15 n.35, 31, JA ___, __-__. Indeed, Sierra Club did submit comments on other issues (e.g., safety and related transparency concerns) after that modeling update was made available. *See* Sierra Club March 17, 2023 Letter (R.1560), JA ___-___; *see also* Remand Rehearing Order P 13 & n.28, JA ___-___; Remand Order PP 61-65 (discussing safety issues and directing that certain emergency response information be provided to the public), JA __-__.

And, of course, all parties had the 30 days afforded to them by the Natural Gas Act to seek rehearing and urge the Commission to "alter its decision" in the Remand Order. Br. 30; *see also* 15 U.S.C. § 717r(a) (specifying rehearing procedures); Reh'g Req. 8-9, JA ___-___; *Minisink Residents for Env't Pres. and Safety v. FERC*, 762 F.3d 97, 115 (D.C. Cir. 2014) (commenter who had ample time to comment on evidence before rehearing deadline had meaningful opportunity to participate); *Myersville*, 783 F.3d at 1327 (same).

Sierra Club contends that *Minisink* and *Myersville* are distinguishable as they principally address due process concerns.

Br. 32-33. But regardless of Sierra Club's preferred source of law,
Sierra Club had ample opportunity to participate – and did participate –
in this Commission proceeding. Remand Rehearing Order P 31, JA __-
__. No further procedures were required. *Id.* And given Sierra Club's
own participation, it is not clear whose alleged procedural injury Sierra
Club would like this Court to redress. *See id.* P 33 ("Moreover, Sierra
Club does not offer any example of an individual or group that sought to
participate in the proceeding but was unable to do so."), JA ___; Br. 15
("Vecinos, and many others, submitted timely comments."); *see also*
*Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (requiring
identification of "some concrete interest" of the complaining party);
*Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (jurisdiction
cannot rest on mere speculation about third parties).

Sierra Club also complains that the Commission's process did not
afford another opportunity for interested parties to intervene. But as
the Commission explained, "any person may file comments on the

docket, even if the person did not formally move to intervene" as a party.  Remand Rehearing Order P 33, JA ___.[6]

When acting on remand, the Commission possesses the "administrative discretion" to decide "how, in light of internal organizational considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976).  The Commission's procedures here reflect an appropriate exercise of that discretion.  *See, e.g., Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (noting, in rulemaking remand context, that "notice and comment are not required" when additional fact gathering "confirm[s] or corroborat[es] data" already in the record).

---

[6] Commissioner Clements' dissent made additional arguments in support of her view that a supplemental EIS was appropriate here. *See* Remand Rehearing Order Dissent PP 3-8, JA ___-___.  Sierra Club has not raised those arguments – or even cited the dissent – and it is too late to do so now.  *See Johnston v. SEC*, 49 F.4th 569, 578 n.3 (D.C. Cir. 2022) (argument not raised in opening brief "is forfeit[ed]").

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

Robert M. Kennedy
Senior Attorney

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory
   Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

February 12, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,894 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney


Federal Energy Regulatory
    Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

February 12, 2024

# ADDENDUM

## STATUTES

## AND

## REGULATIONS

# TABLE OF CONTENTS

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ................................................................ ...A-1

Natural Gas Act

    15 U.S.C. § 717 ...................................................................A-3

    15 U.S.C. § 717b ................................................................A-4

    15 U.S.C. § 717f................................................................A-7

    15 U.S.C. § 717r ................................................................A-9

Department of Energy Organization Act

    42 U.S.C. § 7151(b)................................................................A-12

Regulations

    18 C.F.R. § 380.7 ................................................................A-15

    40 C.F.R. § 1502.9................................................................A-16

    40 C.F.R. § 1502.16................................................................A-18

    40 C.F.R. § 1502.21................................................................A-20

    40 C.F.R. § 1502.22 ................................................................A-20

to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

#### Editorial Notes

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## §801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same

Sec.
717b–1.    State and local safety considerations.
717c.    Rates and charges.
717c–1.    Prohibition on market manipulation.
717d.    Fixing rates and charges; determination of cost of production or transportation.
717e.    Ascertainment of cost of property.
717f.    Construction, extension, or abandonment of facilities.
717g.    Accounts; records; memoranda.
717h.    Rates of depreciation.
717i.    Periodic and special reports.
717j.    State compacts for conservation, transportation, etc., of natural gas.
717k.    Officials dealing in securities.
717l.    Complaints.
717m.    Investigations by Commission.
717n.    Process coordination; hearings; rules of procedure.
717o.    Administrative powers of Commission; rules, regulations, and orders.
717p.    Joint boards.
717q.    Appointment of officers and employees.
717r.    Rehearing and review.
717s.    Enforcement of chapter.
717t.    General penalties.
717t–1.    Civil penalty authority.
717t–2.    Natural gas market transparency rules.
717u.    Jurisdiction of offenses; enforcement of liabilities and duties.
717v.    Separability.
717w.    Short title.
717x.    Conserved natural gas.
717y.    Voluntary conversion of natural gas users to heavy fuel oil.
717z.    Emergency conversion of utilities and other facilities.

## §717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

### (d) Vehicular natural gas jurisdiction

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or
(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, §1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, §404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(a), Aug. 8, 2005, 119 Stat. 685.)

#### Editorial Notes

##### Amendments

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).

1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

#### Statutory Notes and Related Subsidiaries

##### Termination of Federal Power Commission; Transfer of Functions

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

##### State Laws and Regulations

Pub. L. 102–486, title IV, §404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or

"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

### Executive Documents

EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

## § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, § 2, 52 Stat. 821; Pub. L. 102–486, title IV, § 404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(b), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).

1992—Par. (10). Pub. L. 102–486 added par. (10).

### Statutory Notes and Related Subsidiaries

TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a)(1), 7291, and 7293 of Title 42, The Public Health and Welfare.

## § 717b. Exportation or importation of natural gas; LNG terminals

### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

### (b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

**(c) Expedited application and approval process**

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find[1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

(1) In this subsection, the term "military installation"—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult[2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

(June 21, 1938, ch. 556, §3, 52 Stat. 822; Pub. L. 102–486, title II, §201, Oct. 24, 1992, 106 Stat. 2866; Pub. L. 109–58, title III, §311(c), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

#### References in Text

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454 as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

The Clean Air Act, referred to in subsec. (d)(2), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to chapter 85 (§7401 et seq.) of Title 42, The Public Health and Welfare. For complete classification

---

[1] So in original. Probably should be "finds".

[2] So in original. Probably should be "coordinates and consults".

of this Act to the Code, see Short Title note set out under section 7401 of Title 42 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (d)(3), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§ 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

AMENDMENTS

2005—Pub. L. 109–58, § 311(c)(1), inserted ''; LNG terminals'' after ''natural gas'' in section catchline.

Subsecs. (d) to (f). Pub. L. 109–58, § 311(c)(2), added subsecs. (d) to (f).

1992—Pub. L. 102–486 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

Executive Documents

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with authorizations for importation of natural gas from Alberta as pre-deliveries of Alaskan gas issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to the Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

DELEGATION OF FUNCTIONS

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423, Aug. 16, 1968, 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

EX. ORD. NO. 10485. PROVIDING FOR THE PERFORMANCE OF CERTAIN FUNCTIONS HERETOFORE PERFORMED BY THE PRESIDENT WITH RESPECT TO ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON THE BORDERS OF THE UNITED STATES

Ex. Ord. No. 10485. Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, provided:

SECTION 1. (a) The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(2) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

(b) In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

SEC. 2. [Deleted.]

SEC. 3. The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

SEC. 4. All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

SEC. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

## § 717b–1. State and local safety considerations

### (a) Promulgation of regulations

The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after August 8, 2005. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct an LNG terminal and encourage applicants to cooperate with State and local officials.

### (b) State consultation

The Governor of a State in which an LNG terminal is proposed to be located shall designate the appropriate State agency for the purposes of consulting with the Commission regarding an application under section 717b of this title. The Commission shall consult with such State agency regarding State and local safety considerations prior to issuing an order pursuant to section 717b of this title. For the purposes of this section, State and local safety considerations include—

(1) the kind and use of the facility;

(2) the existing and projected population and demographic characteristics of the location;

(3) the existing and proposed land use near the location;

(4) the natural and physical aspects of the location;

(5) the emergency response capabilities near the facility location; and

(6) the need to encourage remote siting.

### (c) Advisory report

The State agency may furnish an advisory report on State and local safety considerations to the Commission with respect to an application no later than 30 days after the application was filed with the Commission. Before issuing an

A-6

### (b) Costs of production and transportation

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

## § 717e. Ascertainment of cost of property

### (a) Cost of property

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

### (b) Inventory of property; statements of costs

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, §6, 52 Stat. 824.)

## § 717f. Construction, extension, or abandonment of facilities

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however*, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

### (d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

#### (e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

#### (f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

#### (g) Certificate of public convenience and necessity for service of area already being served

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

#### (h) Right of eminent domain for construction of pipelines, etc.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, § 7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, § 608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, § 2, Oct. 6, 1988, 102 Stat. 2302.)

#### Editorial Notes

##### Amendments

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, § 608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, § 608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1988 Amendment

Pub. L. 100–474, § 3, Oct. 6, 1988, 102 Stat. 2302, provided that: "The provisions of this Act [amending this section and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988]."

#### Executive Documents

##### Transfer of Functions

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

### § 717g. Accounts; records; memoranda

#### (a) Rules and regulations for keeping and preserving accounts, records, etc.

Every natural-gas company shall make, keep, and preserve for such periods, such accounts,

mission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The Board shall be appointed by the Commission from persons nominated by the State commission of each State affected, or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

**(b) Conference with State commissions regarding rate structure, costs, etc.**

The Commission may confer with any State commission regarding rate structures, costs, accounts, charges, practices, classifications, and regulations of natural-gas companies; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

**(c) Information and reports available to State commissions**

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, §17, 52 Stat. 830.)

**§717q. Appointment of officers and employees**

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, §18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, §1106(a), 63 Stat. 972.)

EDITORIAL NOTES

CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" are omitted as obsolete and superseded.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed by Pub. L. 89–554, Sept. 6, 1966, §8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5, Government Organization and Employees. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

Such appointments are now subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, §1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

AMENDMENTS

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

STATUTORY NOTES AND RELATED SUBSIDIARIES

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

**§717r. Rehearing and review**

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, §19, 52 Stat. 831; June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, §313(b), Aug. 8, 2005, 119 Stat. 689.)

### Editorial Notes

#### REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

1958—Subsec. (a). Pub. L. 85–791, §19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, §19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

### § 717s. Enforcement of chapter

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

**(b) Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys by Commission**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Violation of market manipulation provisions**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or

(2) engaging in the business of—

(A) the purchasing or selling of natural gas; or

(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, §20, 52 Stat. 832; June 25, 1948, ch. 646, §1, 62 Stat. 875, 895; Pub. L. 109–58, title III, §318, Aug. 8, 2005, 119 Stat. 693.)

**Editorial Notes**

CODIFICATION

The words "the District Court of the United States for the District of Columbia" in subsec. (a) following "district court of the United States" and in subsec. (b) following "district courts of the United States" omitted as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of title 28 which states that "The District of Columbia constitutes one judicial district".

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

### § 717t. General penalties

(a) Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished by a fine of not more than $1,000,000 or by imprisonment for not more than 5 years, or both.

(b) Any person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter, shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $50,000 for each and every day during which such offense occurs.

(June 21, 1938, ch. 556, §21, 52 Stat. 833; Pub. L. 109–58, title III, §314(a)(1), Aug. 8, 2005, 119 Stat. 690.)

**Editorial Notes**

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §314(a)(1)(A), substituted "$1,000,000" for "$5,000" and "5 years" for "two years".

## (c) Location

The Secretary shall locate such office at a university with expertise and experience in the matters specified in subsection (b).

(Pub. L. 106–398, § 1 [div. C, title XXXI, § 3197], Oct. 30, 2000, 114 Stat. 1654, 1654A–482.)

#### Editorial Notes

##### CODIFICATION

Section was enacted as part of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, and not as part of the Department of Energy Organization Act which comprises this chapter.

### § 7144e. Office of Indian Energy Policy and Programs

#### (a) Establishment

There is established within the Department an Office of Indian Energy Policy and Programs (referred to in this section as the "Office"). The Office shall be headed by a Director, who shall be appointed by the Secretary and compensated at a rate equal to that of level IV of the Executive Schedule under section 5315 of title 5.

#### (b) Duties of Director

The Director, in accordance with Federal policies promoting Indian self-determination and the purposes of this chapter, shall provide, direct, foster, coordinate, and implement energy planning, education, management, conservation, and delivery programs of the Department that—

(1) promote Indian tribal energy development, efficiency, and use;

(2) reduce or stabilize energy costs;

(3) enhance and strengthen Indian tribal energy and economic infrastructure relating to natural resource development and electrification; and

(4) bring electrical power and service to Indian land and the homes of tribal members located on Indian lands or acquired, constructed, or improved (in whole or in part) with Federal funds.

(Pub. L. 95–91, title II, § 217, as added Pub. L. 109–58, title V, § 502(a), Aug. 8, 2005, 119 Stat. 763.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

### SUBCHAPTER III—TRANSFERS OF FUNCTIONS

### § 7151. General transfers

(a) Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and the functions vested by law in the officers and components of either such Administration.

(b) Except as provided in subchapter IV, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

(Pub. L. 95–91, title III, § 301, Aug. 4, 1977, 91 Stat. 577.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

#### Executive Documents

##### EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to the Secretary of Energy, see Parts 1, 2, and 7 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

##### EX. ORD. NO. 12038. TRANSFER OF CERTAIN FUNCTIONS TO SECRETARY OF ENERGY

Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, as amended by Ex. Ord. No. 12156, Sept. 10, 1979, 44 F.R. 53073, provided:

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 et seq.) it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act [subsec. (a) of this section], hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended [formerly set out as a note under 31 U.S.C. 501], relating to Federal Regional Councils, is further amended by deleting "The Federal Energy Administration" in Section 1(a)(10) and substituting "The Department of Energy", and by deleting "The Deputy Administrator of the Federal Energy Administration" in Section 3(a)(10) and substituting "The Deputy Secretary of Energy".

(b) Executive Order No. 11790 of June 25, 1974 [set out as a note under 15 U.S.C. 761], relating to the Federal Energy Administration Act of 1974, is amended by deleting "Administrator of the Federal Energy Administration" and "Administrator" wherever they appear in Sections 1 through 6 and substituting "Secretary of Energy" and "Secretary", respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended [set out as a note under 42 U.S.C. 6201], relating to energy policy

and conservation, and Proclamation No. 3279, as amended [formerly set out as a note under 19 U.S.C. 1862], relating to imports of petroleum and petroleum products, are further amended by deleting "Administrator of the Federal Energy Administration", "Federal Energy Administration", and "Administrator" (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting "Secretary of Energy", "Department of Energy", and "Secretary", respectively, and by deleting "the Administrator of Energy Research and Development" in Section 10(a)(1) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act [subsec. (b) of this section], the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, [set out as a note under 15 U.S.C. 717b], relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting "Federal Power Commission" and "Commission" wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977 [formerly set out as a note under 15 U.S.C. 717], relating to the administration of the Emergency Natural Gas Act of 1977 [formerly set out as a note under 15 U.S.C. 717], is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Power Administration, other members of the Federal Power Commission" in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting therefor "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended [formerly set out as a note under 42 U.S.C. 1962b], relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents,".

SEC. 3. *Functions of the Secretary of the Interior.* In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act [42 U.S.C. 7152], the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration.*

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act [subsec. (a) of this section] the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended [set out as a note under 50 U.S.C. 3161]; Executive Order No. 10899 of December 9, 1960 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11057 of December 18, 1962 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11477 of August 7, 1969 [set out as a note under 42 U.S.C. 2187]; Executive Order No. 11752 of December 17, 1973 [formerly set out as a note under 42 U.S.C. 4331]; and Executive Order No. 11761 of January 17, 1974 [formerly set out as a note under 20 U.S.C. 1221]; are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233) [42 U.S.C. 5801 et seq.], and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974 [42 U.S.C. 5801 et seq.].

(2) [Former] Executive Order No. 11652, as amended, relating to the classification of national security matters, is further amended by substituting "Department of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976 [formerly set out as a note under 42 U.S.C. 5841], relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) [Former] Executive Order No. 11905, as amended, relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator or the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions.*

(a) Executive Order No. 10480, as amended [formerly set out as a note under former 50 U.S.C. App. 2153], is further amended by adding thereto the following new Sections:

"SEC. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"SEC. 610. Whenever the Administrator of General Services believes that the functions of an Executive

agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended [set out as a note under 44 U.S.C. 1505].

(b) Executive Order No. 11490, as amended [formerly set out as a note under 50 U.S.C. App. 2251], is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

Sec. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act [this chapter] pursuant to the provisions of section 901 [42 U.S.C. 7341] thereof and Executive Order No. 12009 of September 13, 1977 [formerly set out as a note under 42 U.S.C. 7341], and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

JIMMY CARTER.

### § 7151a. Jurisdiction over matters transferred from Energy Research and Development Administration

Notwithstanding any other provision of law, jurisdiction over matters transferred to the Department of Energy from the Energy Research and Development Administration which on the effective date of such transfer were required by law, regulation, or administrative order to be made on the record after an opportunity for an agency hearing may be assigned to the Federal Energy Regulatory Commission or retained by the Secretary at his discretion.

(Pub. L. 95–238, title I, § 104(a), Feb. 25, 1978, 92 Stat. 53.)

#### Editorial Notes

##### Codification

Section was enacted as part of the Department of Energy Act of 1978—Civilian Applications, and not as part of the Department of Energy Organization Act which comprises this chapter.

### § 7152. Transfers from Department of the Interior

#### (a) Functions relating to electric power

(1) There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

(A) the Southeastern Power Administration;

(B) the Southwestern Power Administration;

(C) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.];

(D) the power marketing functions of the Bureau of Reclamation, including the con-

struction, operation, and maintenance of transmission lines and attendant facilities; and

(E) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

(2) The Southeastern Power Administration, the Southwestern Power Administration, and the Bonneville Power Administration,[1] shall be preserved as separate and distinct organizational entities within the Department. Each such entity shall be headed by an Administrator appointed by the Secretary. The functions transferred to the Secretary in paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) shall be exercised by the Secretary, acting by and through such Administrators. Each such Administrator shall maintain his principal office at a place located in the region served by his respective Federal power marketing entity.

(3) The functions transferred in paragraphs (1)(E) and (1)(F)[2] of this subsection shall be exercised by the Secretary, acting by and through a separate and distinct Administration within the Department which shall be headed by an Administrator appointed by the Secretary. The Administrator shall establish and shall maintain such regional offices as necessary to facilitate the performance of such functions. Neither the transfer of functions effected by paragraph (1)(E) of this subsection nor any changes in cost allocation or project evaluation standards shall be deemed to authorize the reallocation of joint costs of multipurpose facilities theretofore allocated unless and to the extent that such change is hereafter approved by Congress.

#### (b), (c) Repealed. Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407

#### (d) Functions of Bureau of Mines

There are transferred to, and vested in, the Secretary those functions of the Secretary of the Interior, the Department of the Interior, and officers and components of that Department under the Act of May 15, 1910, and other authorities, exercised by the Bureau of Mines, but limited to—

(1) fuel supply and demand analysis and data gathering;

(2) research and development relating to increased efficiency of production technology of solid fuel minerals, other than research relating to mine health and safety and research relating to the environmental and leasing consequences of solid fuel mining (which shall remain in the Department of the Interior); and

(3) coal preparation and analysis.

(Pub. L. 95–91, title III, § 302, Aug. 4, 1977, 91 Stat. 578; Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407; Pub. L. 104–58, title I, § 104(h), Nov. 28, 1995, 109 Stat. 560.)

[1] So in original. The comma probably should not appear.

[2] See References in Text note below.

**§ 380.7  Format of an environmental impact statement.**

In addition to the requirements for an environmental impact statement prescribed in 40 CFR 1502.10 of the regulations of the Council, an environmental impact statement prepared by the Commission will include a section on the literature cited in the environmental impact statement and a staff conclusion section. The staff conclusion section will include summaries of:

(a) The significant environmental impacts of the proposed action;

(b) Any alternative to the proposed action that would have a less severe environmental impact or impacts and the action preferred by the staff;

(c) Any mitigation measures proposed by the applicant, as well as additional mitigation measures that might be more effective;

(d) Any significant environmental impacts of the proposed action that cannot be mitigated; and

(e) References to any pending, completed, or recommended studies that might provide baseline data or additional data on the proposed action.

**§ 380.8  Preparation of environmental documents.**

The preparation of environmental documents, as defined in § 1508.10 of the regulations of the Council (40 CFR 1508.10), on hydroelectric projects, natural gas facilities, and electric transmission facilities in national interest electric transmission corridors is the responsibility of the Commission's Office of Energy Projects, 888 First Street NE., Washington, DC 20426, (202) 502–8700. Persons interested in status reports or information on environmental impact statements or other elements of the NEPA process, including the studies or other information the Commission may require on these projects, can contact this office.

[Order 689, 71 FR 69471, Dec. 1, 2006, as amended by Order 756, 77 FR 4895, Feb. 1, 2012]

**§ 380.9  Public availability of NEPA documents and public notice of NEPA related hearings and public meetings.**

(a)(1) The Commission will comply with the requirements of 40 CFR 1506.6 of the regulations of the Council for public involvement in NEPA.

(2) If an action has effects of primarily local concern, the Commission may give additional notice in a Commission order.

(b) The Commission will make environmental impact statements, environmental assessments, the comments received, and any underlaying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552 (1982)). The exclusion in the Freedom of Information Act for interagency memoranda is not applicable where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Such materials will be made available to the public at the Commission's Public Reference Room at 888 First Street NE., Room 2A, Washington, DC 20426 at a fee and in the manner described in Part 388 of this chapter. A copy of an environmental impact statement or environmental assessment for hydroelectric projects may also be made available for inspection at the Commission's regional office for the region where the proposed action is located.

[Order 486, 52 FR 47910, Dec. 17, 1987, as amended by Order 603–A, 64 FR 54537, Oct. 7, 1999]

**§ 380.10  Participation in Commission proceedings.**

(a) *Intervention proceedings involving a party or parties*—(1) *Motion to intervene.* (i) In addition to submitting comments on the NEPA process and NEPA related documents, any person may file a motion to intervene in a Commission proceeding dealing with environmental issues under the terms of § 385.214 of this chapter. Any person who files a motion to intervene on the basis of a draft environmental impact statement will be deemed to have filed a timely motion, in accordance with § 385.214, as long as the motion is filed within the comment period for the draft environmental impact statement.

(ii) Any person that is granted intervention after petitioning becomes a party to the proceeding and accepts the record as developed by the parties as of the time that intervention is granted.

**A–15**

**Council on Environmental Quality**

avoid duplication and delay. Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for final agency action.

**§ 1502.5  Timing.**

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§1501.2 of this chapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (go/no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the application. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

**§ 1502.6  Interdisciplinary preparation.**

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.9 of this chapter).

**§ 1502.7  Page limits.**

The text of final environmental impact statements (paragraphs (a)(4) through (6) of §1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.

**§ 1502.8  Writing.**

Agencies shall write environmental impact statements in plain language and may use appropriate graphics so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

**§ 1502.9  Draft, final, and supplemental statements.**

(a) *Generally.* Except for proposals for legislation as provided in §1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them, as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all

major points of view on the environmental impacts of the alternatives including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

### § 1502.10  Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a)(1) through (8) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

### § 1502.11  Cover.

The cover shall not exceed one page and include:

(a) A list of the responsible agencies, including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one-paragraph abstract of the statement.

(f) The date by which the agency must receive comments (computed in cooperation with EPA under § 1506.11 of this chapter).

(g) For the final environmental impact statement, the estimated total cost to prepare both the draft and final environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs. If practicable and noted where not practicable, agencies also should include

**Council on Environmental Quality**                                    **§ 1502.16**

costs incurred by cooperating and participating agencies, applicants, and contractors.

### § 1502.12   Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public, and the issues to be resolved (including the choice among alternatives). The summary normally will not exceed 15 pages.

### § 1502.13   Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

[87 FR 23469, Apr. 20, 2022]

### § 1502.14   Alternatives including the proposed action.

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

### § 1502.15   Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). The environmental impact statement may combine the description with evaluation of the environmental consequences (§ 1502.16), and it shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16   Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of

621

Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17  Summary of submitted alternatives, information, and analyses.

(a) The draft environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters during the scoping process for consideration by the lead and cooperating agencies in developing the environmental impact statement.

(1) The agency shall append to the draft environmental impact statement or otherwise publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(2) Consistent with §1503.1(a)(3) of this chapter, the lead agency shall invite comment on the summary identifying all submitted alternatives, information, and analyses in the draft environmental impact statement.

(b) The final environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the final environmental impact statement.

### § 1502.18  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19  Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§1501.12 of this chapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with §1503.4 of this chapter.

**Council on Environmental Quality**

§ 1502.23

### § 1502.20 Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in §1503.4(c) of this chapter. The agency shall transmit the entire statement electronically (or in paper copy, if so requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

### § 1502.21 Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, ''reasonably foreseeable'' includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.22 Cost-benefit analysis.

If the agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision.

### § 1502.23 Methodology and scientific accuracy.

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents.

623

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 12, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>*/s/ Jason T. Perkins*</u>
Jason T. Perkins
Attorney