ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1175 (L), 23-1222

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

CITY OF PORT ISABEL, *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

TEXAS LNG BROWNSVILLE, LLC,

*Intervenor for Respondent.*

On Petition for Review of Order of the
Federal Energy Regulatory Commission

**JOINT APPENDIX**

**VOLUME I OF I**

**COUNSEL LISTED ON INSIDE COVER**

Dated: March 15, 2024

*Attorneys for Sierra Club and Vecinos para el Bienestar de la Comunidad Costera, Petitioner*:

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Tom Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78723
424-346-3276
tom.gosselin@sierraclub.org

Lisa M. Diaz
Sierra Club
910 Julia Street,
New Orleans, LA 70113
305-336-2258
lisa.diaz@sierraclub.org

*Attorney for City of Port Isabel, Petitioner:*

Gilberto Hinojosa
531 E. St. Francis St.
Brownsville, Texas 78520
956-544-4218
ghinojosa@ghinojosalaw.net

*Attorneys for FERC, Respondent:*

Matthew R. Christiansen
General Counsel
Robert H. Solomon
Solicitor
Robert M. Kennedy
Senior Attorney
Jason T. Perkins
Attorney
jason.perkins@ferc.gov
Federal Energy Regulatory Commission
Washington, D.C. 20426

*Attorneys for Texas LNG Brownsville, LLC, Respondent-Intervenor:*

Michael R. Pincus
Paul Korman
Mosby Perrow
Van Ness Feldman, LLP
2000 Pennsylvania Ave., NW, Ste. 6000
Washington, D.C. 20006
202-298-1800
mrp@vnf.com
pik@vnf.com
mperrow@vnf.com

# TABLE OF CONTENTS

| Record No. | Record Materials | Page No. |
|---|---|---|
| R.1564 | "Remand Order" — Order on Remand re Texas LNG Brownsville LLC under CP16-116. | JA001 |
| R.1583 | "Rehearing Order " — Order Addressing Arguments etc. re: Texas LNG Brownsville LLC under CP16-116. | JA137 |
| R.748 | Texas LNG Brownsville LLC submits Section 3 Application for Authorization for certain facilities which comprise the proposed Texas LNG Project under CP16-116. | JA183 |
| R.1302 | Technical Support Document: Social Cost of Carbon (Ex. 99 to Sierra Club et al. Comments on Draft EIS). | JA191 |
| R.1374 | Final Environmental Impact Statement for the Texas LNG Brownsville LLC's Texas LNG Project under CP16-116. | JA195 |

| R.1391 | Order Granting Authorization under Section 3 of the Natural Gas Act re Texas LNG Brownsville LLC under CP16-116. | JA301 |
|---|---|---|
| R.1403 | Order on Rehearing and Stay re Texas LNG Brownsville LLC under CP16-116. | JA374 |
| R.1450 | Letter Requesting Texas LNG Brownsville LLC to file a response to environmental information request within 30 days to assist in FERC's analysis of the application for the Texas LNG project under CP16-116. | JA448 |
| R.1452 | Texas LNG Brownsville LLC Submits Response to February 3, 2022 Environmental Information Request for the Texas LNG Project under CP16-116. | JA451 |
| R.1455 | Texas LNG Brownsville LLC submits Supplemental Information in Response to FERC February 3, 2022 Environmental Information Data Request for Texas LNG Project under CP16-116. | JA452 |

| R.1460 | Letter requesting Texas LNG Brownsville LLC et al. to file a response to environmental information request within 30 days to address deficiencies noted in the U.S. Court of Appeals for the D.C. Circuit's etc. for the Texas LNG Project under CP16-116. | JA459 |
|---|---|---|
| R.1465 | Texas LNG Brownsville LLC submits response to August 16, 2022 Environmental Information Request for the Texas LNG project under CP16-116. | JA460 |
| R.1467 | Texas LNG Brownsville LLC submits Supplemental Response to August 16, 2022 Environmental Information Request for the Texas LNG Project under CP16-116. | JA461 |
| R.1468 | Notice Seeking Public Comment on Responses to Information Requests re Texas LNG Brownsville LLC under CP16-116. | JA462 |

| R.1470 | Texas LNG Brownsville LLC submits response to August 16, 2022 Environmental Information Request for the Texas LNG Project under CP16-116. | JA465 |
|--------|---------------------------------------------------------------------------------------------------------------------------------------------|-------|
| R.1503 | Comments of Sierra Club, et al. under CP16-116. | JA466 |
|  | Promising Practices for EJ Methodologies in NEPA Reviews (Mar. 2016) (Exhibit to R.1503). | JA486 |
| R.1523 | Comments of Sierra Club re Climate and Environmental Justice Impacts of the Rio Grande LNG and Texas LNG Facilities under CP16-116, et al. | JA490 |
| R.1542 | Letter requesting Texas LNG Brownsville LLC et al. to file a response to environmental information request within 10 days to address deficiencies noted in the U.S. Court of Appeals for the D.C. Circuit's etc. for the Texas LNG Project under CP16-116. | JA492 |

| R.1547 | Texas LNG Brownsville LLC submits Response to Environmental Information Request for the Texas LNG Project under CP16-116. | JA496 |
|---|---|---|
| R.1551 | Letter requesting Texas LNG Brownsville LLC to file a response to environmental information request within 15 days etc. for the Texas LNG Project under CP16-116. | JA497 |
| R.1553 | Texas LNG Brownsville LLC submits Response to FERC's January 6, 2023, Environmental Information Request for the Texas LNG Project under CP16-116. | JA498 |
| R.1558 | Texas LNG Brownsville LLC submits Response to FERC's February 7, 2023 Additional Information Request for the Texas LNG Project under CP16-116. | JA506 |
| R.1560 | Comments of Sierra Club and a dozen Community Leaders from the Texas and Louisiana Gulf Coast under PF22-10 et al. | JA507 |

| | | |
|---|---|---|
| R.1569 | Sierra Club et al. submits Request for Rehearing of the April 21, 2023 Order under CP16-116. | JA512 |

183 FERC ¶ 61,047
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Texas LNG Brownsville LLC                              Docket No. CP16-116-002

ORDER ON REMAND

(Issued April 21, 2023)

1.     The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit)[1] remanded the Commission's orders authorizing Texas LNG Brownsville LLC's (Texas LNG) construction and operation of the Texas LNG Project,[2] directing the Commission to (1) explain whether 40 C.F.R. § 1502.21(c) calls for [the Commission] to apply the social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not;"[3] and (2) "explain why it chose to analyze the projects' impacts only on [environmental justice] communities in census blocks within two miles of the project sites, or else analyze the projects' impacts on [environmental justice] communities within a different radius of each project site."[4]   Further, the court directed the Commission to revisit its public interest determination under section 3 of the Natural Gas Act (NGA).[5]

---

[1] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (*Vecinos*).

[2] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019) (Authorization Order), *order on reh'g*, *Texas LNG Brownsville LLC*, 170 FERC ¶ 61,139 (2020) (Rehearing Order).  The D.C. Circuit also remanded, in the same opinion, the Commission's authorization for Rio Grande LNG, LLC to construct and operate an LNG terminal and pipeline, which the Commission addressed in a separate order issued concurrently. *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023).

[3] *Vecinos*, 6 F.4th at 1330.

[4] *Id.* at 1331.

[5] *Vecinos*, 6 F.4th at 1331-32.

**JA001**

2.      We supplement our environmental analysis of the Texas LNG Project by
(1) addressing the argument regarding the social cost of carbon and 40 C.F.R.
§ 1502.21(c); and (2) updating our analysis of the project's environmental justice impacts
consistent with the Commission's current practice.  We reaffirm that the Texas LNG
Project, as conditioned in the Order Granting Authorization Under Section 3 of the NGA
(Authorization Order)[6] and as modified herein, is not inconsistent with the public
interest.[7]

## I.      Background

3.      Texas LNG, a limited liability company organized under the laws of Delaware
with its headquarters in Houston, Texas, is a single purpose subsidiary of
Texas LNG LLC.  As its operations will not be in interstate commerce, Texas LNG will
not be a natural gas company as defined in the NGA,[8] although it will be subject to the
Commission's jurisdiction under NGA section 3.

### A.      Authorization Order

4.      On November 22, 2019, the Commission authorized Texas LNG to construct and
operate a liquefied natural gas (LNG) export terminal and associated facilities in order to
export approximately 4 million metric tonnes per annum (MTPA) of natural gas as LNG.[9]
The project will be sited on 625 acres of land[10] and include two full-containment LNG

---

[6] Authorization Order, 169 FERC ¶ 61,130.

[7] *See id.* PP 21, 86.

[8] Section 2(6) of the NGA defines a natural gas company to be a person engaged
in the transportation of natural gas in interstate commerce.  15 U.S.C. § 717a(6).

[9] On September 24, 2015, Texas LNG received authorization from the Department
of Energy, Office of Fossil Energy (DOE) to export the project's full capacity, which is
equivalent to 204.4 billion cubic feet (Bcf) annually (approximately 0.56 Bcf per
day (Bcf/d)) equivalent of natural gas, in the form of LNG to countries with which the
United States has a Free Trade Agreement (FTA).  *Texas LNG Brownsville LNG*,
DOE/FE Docket No. 15-62-LNG, Order No. 3716 (Sept. 24, 2015),
https://www.energy.gov/sites/prod/files/2015/09/f26/ord3716.pdf.  On February 10,
2020, DOE issued an order authorizing Texas LNG to export LNG to non-FTA nations,
but with which the U.S. still permits such trade.  *Texas LNG Brownsville LNG*, DOE/FE
Docket No. 15-62-LNG; Order No. 4489 (Feb. 10, 2020)
https://www.energy.gov/sites/prod/files/2020/02/f71/ord4489.pdf.

[10] Of the 625 acres, about 312 acres would be disturbed for construction of the

**JA002**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

Docket No. CP16-116-002                                                    - 3 -

storage tanks with a capacity of approximately 210,000 cubic meters of LNG each; two liquefaction trains, each with a capacity of 2.0 MTPA of LNG;[11] a single LNG carrier berth; mooring and loading facilities; and other appurtenant facilities.[12]  The terminal will receive natural gas via an approximately 10.2-mile-long non-jurisdictional intrastate natural gas pipeline that would interconnect with the Valley Crossing Pipeline.[13]  To date, Texas LNG has not begun construction of any facilities.

5.     The Commission determined, based on the findings in the final Environmental Impact Statement (EIS) for the project,[14] that the project's direct and indirect impacts on environmental resources would be temporary or reduced to less-than-significant levels by the implementation of appropriate mitigation measures, with the exception of impacts on visual resources where the project would result in significant impacts when viewed from the Laguna Atascosa National Wildlife Refuge.[15]  In addition, the final EIS concluded that the Texas LNG Project, combined with other projects in the relevant geographic scope, would result in significant cumulative impacts:  from sediment/turbidity and shoreline erosion within the Brownsville Ship Channel during operations from vessel transits;[16] on the federally listed ocelot and jaguarundi, from habitat loss and potential for increased vehicular strikes during construction;[17] on the federally listed aplomado falcon, from habitat loss;[18] and on visual resources from the presence of aboveground

---

project facilities.  Authorization Order, 169 FERC ¶ 61,130 at P 54.

    [11] While each liquefaction train will have a nameplate capacity of 2.25 MTPA, Texas LNG anticipates that as operated, each train will produce approximately 2.0 MTPA of LNG for export.  *Id.* at n.5 (citing Application at 4, n.8).

    [12] *Id.* P 5.

    [13] The Valley Crossing Pipeline is a non-jurisdictional natural gas pipeline that extends southwest from a header system near the Agua Dulce natural gas hub in Nueces County, Texas, to a jurisdictional border-crossing facility east of Cameron County, Texas.  *See Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at P 4 (2017).

    [14] The Texas LNG final EIS was issued on March 15, 2019.

    [15] Final EIS at 4-115.

    [16] *Id.* at 4-303.

    [17] *Id.* at 4-317.

    [18] *Id.* at 4-318.

**JA003**

structures.[19]  The final EIS noted that the Commission could not determine the project's impacts on the environment caused by GHG emissions nor could it determine the significance of the project's contribution to climate change.[20]  The final EIS found that neither the construction nor operation of the project would result in disproportionately high or adverse environmental and human health impacts on environmental justice communities.[21]  The Commission agreed with the conclusions presented in the final EIS and found that the project, if constructed and operated as described in the final EIS, is an environmentally acceptable action.[22]

## B.    Rehearing Order

6.    On December 23, 2019, Sierra Club and seven other petitioners jointly[23] sought rehearing of the Authorization Order.  Sierra Club raised numerous concerns, including, air quality impacts, environmental justice impacts, mitigation measures, greenhouse gas emissions, and the Commission's public interest determination.  Specifically, Sierra Club stated that the Commission violated NEPA by failing to take a hard look at whether environmental justice communities will bear a disproportionate share of the negative environmental consequences from the project.[24]  Sierra Club also asserted that the Commission's conclusions regarding its inability to determine whether the project's GHG emissions and contribution to climate change were significant and its reasoning as to why it would not use the social cost of carbon protocol to assess the impacts from the project's GHG emissions were arbitrary.[25]

7.    On February 21, 2020, the Commission denied rehearing.  The Commission affirmed the Authorization Order's decision to not calculate or apply the social cost of

---

[19] *Id.* at 4-327.

[20] *Id.* at 4-344.

[21] *Id.* at 4-156 to 4-157.

[22] Authorization Order, 169 FERC ¶ 61,130 at P 86

[23] Specifically, Sierra Club, Texas Rio Grande Legal Aid, Save RGV from LGV, Defenders of Wildlife, the City of South Padre Island, the City of Port Isabel, and the Town of Laguna Vista (collectively, Sierra Club) filed a request for rehearing.

[24] Sierra Club Request for Rehearing and Stay at 14-22.

[25] *Id.* at 27.

carbon protocol.[26]  The Commission concluded that the final EIS adequately identified and addressed impacts on environmental justice communities,[27] and reaffirmed the conclusion from the final EIS and Authorization Order that there would not be any disproportionately high or adverse environmental and human health impacts on those communities.[28]  Subsequently, Sierra Club petitioned for review of the Authorization and Rehearing Orders in the D.C. Circuit.

### C.    The Court's Remand Order

8.    On August 3, 2021, the D.C. Circuit remanded the Authorization and Rehearing Orders, holding that the Commission's NEPA analyses of the project's impacts on climate change and environmental justice communities were deficient under the Administrative Procedures Act (APA), and thus, the Commission  "must also revisit its determinations of public interest and convenience under Sections 3 and 7 of the NGA."[29]  Specifically, the court held that the Commission failed to address the petitioners' argument concerning the applicability of the Council on Environmental Quality's (CEQ) regulations with respect to whether the social cost of carbon protocol is "generally accepted" analytical tool for assessing the significance of GHG impacts, thereby rendering the analysis of the project's GHG emissions deficient.[30]  The court directed the Commission on remand to:  "explain whether 40 C.F.R. § 1502.21(c) calls for [the Commission] to apply the social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not."[31]

---

[26] Rehearing Order, 170 FERC ¶ 61,139 at PP 72-74.

[27] *Id.* P 40.

[28] *Id.* PP 45, 47.

[29] *Vecinos*, 6 F.4th at 1331.

[30] *Id.* at 1329.

[31] *Id.* at 1329-30.  Section 1502.21(c) provides that "[i]f . . . information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known, the agency shall include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R § 1502.21(c) (2022).  In its 2020 rulemaking, CEQ redesignated § 1502.22, "Incomplete or unavailable information" as § 1502.21 in the final rule.

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

Docket No. CP16-116-002                                                                           - 6 -

9.      The court also held that the Commission's decision to limit its environmental justice analysis of the project's impacts to those affecting communities in census blocks within two miles of the project sites was arbitrary,[32] given that the EIS had determined that certain environmental effects of the project would extend beyond that radius (e.g., the court noted that air quality impacts could occur within a radius of 31 miles).[33] The court directed the Commission on remand to explain why it chose to analyze the project's impacts only on communities within a two-mile radius, or, in the alternative, to analyze the project's impacts on communities within a different radius from the project site, and determine whether the Commission's environmental justice conclusion still holds.[34]  Additionally, because the Commission's analyses of the project's impacts on climate change and environmental justice communities were deficient, the court directed the Commission to revisit its NGA public interest and public convenience and necessity determinations.[35]

## II.     **Procedural Issues**

10.     On February 3, August 16, August 31, and October 28, 2022, and on January 6, 2023, Commission staff issued environmental information requests to Texas LNG regarding environmental justice communities, visual impacts, air quality modeling, and emergency planning, in order to address deficiencies noted in the D.C. Circuit's decision. Texas LNG responded to Commission staff's information requests on March 4, May 2, September 15, September 21, October 3, and November 7, 2022, and on January 30, and February 23, 2023.

11.     On September 30, 2022, the Commission issued a notice seeking public comments on Texas LNG's responses.  The notice stipulated that initial comments were due no later than October 21, 2022, and reply comments no later than November 4, 2022.

12.     Numerous comments were filed during the initial comment period, including: (1) statements in general opposition to or support for the project; (2) assertions of deficiencies in Texas LNG's responses, including the revised air modeling; (3) concerns with project impacts on environmental justice communities, including the air quality impacts of volatile organic compounds (VOC) and particulate matter on those communities, inadequate outreach to environmental justice communities, and insufficient information provided on the impacts of offsite parking locations and Texas LNG's

---

[32] *Vecinos*, 6 F.4th at 1331.

[33] *Id.* at 1330.

[34] *Id.* at 1331.

[35] *Id.*

**JA006**

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

Docket No. CP16-116-002                                                                        - 7 -

Emergency Response Plan; (4) concerns regarding climate change and GHGs; and
(5) requests for public meetings in a town hall format with Spanish language translation
and for all permit documents to be translated into the Spanish language.  These comments
are addressed below.

13.     On November 4, 2022, Texas LNG and American Petroleum Institute submitted
reply comments requesting a prompt ruling on the remanded issues.  As we are issuing
this order, the requests are moot.

14.     As noted, commenters requested that the Commission hold public meetings in a
town hall format.[36]  Commenters also requested that the Commission provide greater
access to Spanish-speaking communities by providing Spanish language translation at
any public meetings and provide a translated version of the Commission's requests for
information and the comments and responses to the information requests from
Texas LNG.[37]

15.     In this proceeding, and consistent with how the Commission has processed other
remand orders,[38] we reviewed the record to determine whether the deficiencies identified
by the court could be redressed and what, if any, additional information would be helpful.
This order addresses the particular issues identified by the court on remand.[39]  Although
the public had opportunities for involvement during the prefiling and environmental
review processes associated with the Commission's original consideration of the
project,[40] during this remand proceeding the Commission provided additional

---

[36]  *See* Sierra Club Oct. 19, 2022 Comments at 3-4; Nancy McNab Oct. 21, 2022
Comments at 1.

[37]  *See* Sierra Club Oct. 19, 2022 Comments at 3-4.

[38]  *See Spire STL Pipeline LLC*, 181 FERC ¶ 61,232, at PP 18-20 (2022)
(determining the record was sufficient to allow the Commission to address the issues
on remand without additional requested briefing); *on reh'g*, *Spire STL Pipeline LLC*,
183 FERC ¶ 31,048 (2023); *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 (2020)
(reviewing the record and the court's instructions on remand to issue a certificate of
convenience and public necessity without soliciting additional comments).

[39]  *See, e.g.*, *SFPP, L.P. v. FERC*, 967 F.3d 788, 797 (D.C. Cir. 2020), *cert.
dismissed*, 141 S. Ct. 2170 (2021) (finding that on remand it is up to the Commission to
determine if the record should be reopened).

[40]  *See* Final EIS at 4-468.  As the final EIS notes, the applicant provided materials
regarding the project in both English and Spanish and Spanish-speaking representatives
were present at both the public scoping and comment meetings held in Port Isabel.

Docket No. CP16-116-002                                                        - 8 -

opportunities for the public to comment and respond to information filed by Texas LNG related to the issues before us on remand. As stated above, on September 30, 2022, we explicitly solicited comments on the responses provided by Texas LNG to Commission staff's information requests and received over 100 comments. We have considered and responded to all comments within the scope of this remand proceeding and, therefore, because the record is sufficient for us to address the issues identified by the court, we decline to hold additional public meetings on the remanded issues. As for requests related to Spanish translation of documents, while we are not providing such translations in this proceeding, the Commission continues to consider how we can provide greater accessibility to our processes for non-English speaking populations.

16.      Commenters also raised issues that are outside the scope of the court's mandate, generally falling within the following categories: (1) opposition to the Texas LNG Project; (2) general comments in support of the projects and requests for regulatory clarity; (3) cultural resource concerns, including concerns relating to consultation with Tribes; (4) biological resource concerns, including impacts on endangered species, wildlife and wildlife habitat, migratory birds, and coastal resources; and (5) general statements about the Commission, LNG, and energy infrastructure. Mr. John Young also questions whether Texas LNG has obtained feedgas from the Valley Crossing Pipeline and whether the Valley Crossing Pipeline operates as an intrastate natural gas pipeline.[41] The Commission will not address these arguments because the Commission considered them in the Authorization and Rehearing Orders[42] and the court's remand was limited to two issues—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis—and they thus are collateral attacks on those orders and need not be considered further.[43]

---

[41] Mr. John Young November 12, 2021 Comments at 5, 6.

[42] *See* Authorization Order, 169 FERC ¶ 61,130 at PP 18-21 (making a finding that the project is in the public interest); Final EIS at 4-160 (addressing concerns raised by the Carrizo Comecrudo Tribe of Texas); Authorization Order, 169 FERC ¶ 61,130 at PP 42-48 (discussing the impacts on wildlife, migratory birds, and aquatic resources); Authorization Order, 169 FERC ¶ 61,130 at P 4 (noting that Valley Crossing is not a jurisdictional pipeline).

[43] *See, e.g.*, *Fla. Se. Connection*, 162 FERC ¶ 61,233, at P 16 (2018) (declining to consider issues that fell outside the scope of the court's mandate); *Arlington Storage Co., LLC*, 149 FERC ¶ 61,158 (2015) (rejecting a request for rehearing of a notice to proceed with construction as a collateral attack on the underlying orders).

Docket No. CP16-116-002                                          - 9 -

## III.    Discussion

17.    As discussed above, the D.C. Circuit remanded the Commission's orders authorizing the Texas LNG Project and directed the Commission to (1) address the argument of whether it must, under CEQ's regulations, apply the social cost of GHG to analyze the project's impacts on climate change, and (2) explain the decision to limit the scope of its environmental justice analysis of the project's impacts to those communities within two miles of the project or else analyze the project's impacts within a different radius.  In response to the court's directive, we address the argument regarding the social cost of carbon and 40 C.F.R. § 1502.21(c), as well as update our analysis of the project's environmental justice impacts consistent with the Commission's current practice and with CEQ[44] and the U.S. Environmental Protection Agency (EPA) guidance.[45]

### A.    Greenhouse Gas Emissions and Climate Change

18.    The court directed the Commission, on remand, to explain whether section 1502.21(c) of CEQ's NEPA-implementing regulations requires the Commission to "apply the social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not."[46]

19.    Section 1502.21(c) of CEQ's regulations requires that,

> [i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

---

[44] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf.

[45] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[46] *Vecinos*, 6 F.4th at 1330 (quoting 40 C.F.R. § 1502.21(c)).

**JA009**

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.[47]

20.     The social cost of carbon protocol, now updated to calculate the social cost of specific GHGs,[48] is an administrative tool intended to quantify, in dollars, estimates of long-term damage that may result from future emissions of carbon dioxide, nitrous oxide, and methane.  Accordingly, although we are including the social cost of GHG figures for informational purposes, we find that because the social cost of GHGs tool was not developed for project level review and, as discussed below, does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does not require its use in this proceeding.

While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[49] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[50]  Currently, however,

---

[47] 40 C.F.R. § 1502.21(c).  We pause to note that at the time the final EIS was prepared, this regulation was codified at 40 C.F.R. § 1502.22(b).

[48] The Interagency Working Group on the Social Cost of Greenhouse Gases (IWG) published its first estimates of the social cost of carbon in 2010, which calculated the cost of the damages created by one extra ton of carbon dioxide emissions.  In 2016, the IWG published a technical update that included the social costs of methane (social cost of $CH_4$) and nitrous oxide (social cost of $N_2O$) thus creating the social cost of GHG nomenclature.

[49] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[50] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del.*

**JA010**

there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[51]  Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[52]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of GHGs, including to assess significance.[53]

21.    For informational purposes, we are disclosing Commission staff's estimate of the social cost of GHGs associated with the reasonably foreseeable emissions from the project, i.e., the emissions from the construction and operation of the project.[54]

---

*Riverkeeper v. FERC*, 45 F.th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[51] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd, Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14; *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

[52] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.")

[53] *See, e.g.*, *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper v. FERC*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (same).

[54] *See Vecinos*, 6 F.4th at 1329-30.

**JA011**

22.     Commission staff calculated the social cost of GHGs based on methods and values contained in the Interagency Working Group on the Social Cost of Greenhouse Gases (IWG)'s current draft guidance but note that different values will result from the use of other methods.[55]

23.     For this proposed action, the reasonably foreseeable and causally connected GHG emissions are those associated with the project's construction and operation.  Based on its filed emissions data, Texas LNG estimated that construction of the Texas LNG Project would result in 122,048 tons of carbon dioxide equivalent ($CO_2e$) emissions (equivalent to 110,720 metric tons of $CO_2e$) over the six years of construction, inclusive of terminal, barge, and commissioning emissions.[56]  GHG emissions from the operation of the Texas LNG Project would result in annual $CO_2e$ emissions of about 701,709 tons per year (tpy) (equivalent to 636,580 metric tpy),[57] which calculation assumes 100% utilization; i.e., it is assumed that the facilities are operated at maximum capacity for 365 days/year, 24 hours/day.[58]

24.     Commission staff calculated the social cost of carbon dioxide, nitrous oxide, and methane for the construction and operation of the Texas LNG Project.  For the calculations, staff assumed discount rates of 5%, 3%, and 2.5%,[59] the project would begin

---

[55] Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990, Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, (Feb. 2021), https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf (accessed Dec. 14, 2022) (IWG Interim Estimates Technical Support Document).

[56] Texas LNG Mar. 4, 2022 Response to Commission staff Feb. 3, 2022 Data Request at attach. 9-1.

[57] Texas LNG May 2, 2022 Response to Commission staff Feb. 3, 2022 Data Request at attach. 9-1.  The Texas LNG Project will be constructed and begin operation in two phases, the first phase operational emissions would be 433,227 tons of $CO_2e$ emissions (equivalent to 393,017 metric tons of $CO_2e$) in 2026 and 2027.  *Id.*

[58] *Id.*  The estimate also includes fugitive emissions.  We note that this calculation is an overestimate because facilities likely operate at full capacity during, what are typically, limited periods of full demand.

[59] IWG Interim Estimates Technical Support Document at 24.  To quantify the potential damages associated with estimated emissions, the IWG methodology applies consumption discount rates to estimated emissions costs.  The IWG's discount rates are a function of the rate of economic growth where higher growth scenarios lead to higher discount rates.  For example, IWG's method includes the 2.5% discount rate to address

**JA012**

construction activities in 2023, and that once construction activities are complete, emissions would transition to operational emissions. Noting these assumptions, the emissions from construction and operation of the Texas LNG Project are calculated to result in a total social cost of GHGs equal to $215,011,202, $697,367,480, and $1,013,421,544, respectively (all in 2020 dollars).[60] Based on the 95th percentile of the social cost of GHGs and the three percent discount rate,[61] the total social cost of GHGs from the project is calculated to be $2,022,865,531 (in 2020 dollars).

25.     The Commission has disclosed the project's reasonably foreseeable GHG emissions. By adopting the analysis in the final EIS, we recognize that the project's contributions to GHG emissions globally contributes incrementally to future climate change impacts,[62] including impacts in the region.[63] We note that there currently are no accepted tools or methods for the Commission to use to determine significance, therefore Commission is not herein characterizing these emissions as significant or insignificant.[64] Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

---

the concern that interest rates are highly uncertain over time; the 3% value to be consistent with Office of Management and Budget Circular A-4 (2003) and the real rate of return on 10-year Treasury Securities from the prior 30 years (1973 through 2002); and the 5% discount rate to represent the possibility that climate-related damages may be positively correlated with market returns. Thus, higher discount rates further discount future impacts based on estimated economic growth. Values based on lower discount rates are consistent with studies of discounting approaches relevant for intergenerational analysis. *Id.* at 18-19, 23-24.

[60] The IWG draft guidance identifies costs in 2020 dollars. *Id.* at 5 (Table ES-I).

[61] This value represents "higher-than-expected economic impacts from climate change further out in the tails of the [social cost of $CO_2$] distribution." *Id.* at 11. In other words, it represents a higher impact scenario with a lower probability of occurring.

[62] Final EIS at 4-342 to 4-344.

[63] *Id.* (discussing observations from the Fourth Assessment Report).

[64] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended, and opened to further public comment. *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022).

## B.  <u>Environmental Justice</u>

26.     The court found the Commission's analysis of environmental justice impacts to be deficient, directing the Commission on remand to either explain why it chose to analyze the projects' impacts only on communities within a two-mile-radius area of review, or, in the alternative, to analyze the projects' impacts on communities in an area of review with a different radius from each project site and determine whether the Commission's environmental justice conclusion still holds.[65]  Accordingly, on remand, Commission staff conducted a new environmental justice analysis using our current methods for determining an area of review, consistent with CEQ[66] and EPA[67] guidance and recommendations, and analyzed the project's impacts on environmental justice communities within those areas.  Below, Commission staff has identified the presence of impacted environmental justice communities and has analyzed associated impacts from the Texas LNG Project.

27.     In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[68]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged

---

[65] *Vecinos*, 6 F.4th at 1331.

[66] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf.

[67] *See generally Promising Practices* https://www.epa.gov/sites/default/files/2016-08/ documents/nepa_promising_practices_ document_2016.pdf.

[68] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  *See* 15 U.S.C. § 717b; *see also* 18 C.F.R. § 380.12(g) (2022) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

**JA014**

communities, as well as the accompanying economic challenges of such impacts."[69] Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[70]

28.     Consistent with CEQ and EPA guidance and recommendations, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[71] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.[72]  Consistent with the Commission's current methodology for identification of environmental justice

---

[69] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, *EJ 2020 Glossary* (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[70] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sep. 6, 2022).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision-makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[71] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[72] CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement during the Commission's prefiling and environmental review processes.  Final EIS at 1-10 to 1-13, and 4-333.  In addition, the Commission requested public comment on responses to recent information requests related to the remand.

communities, staff reviewed the 2020 U.S. Census Bureau American Community survey data for the impact area surrounding the Texas LNG terminal project. As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[73] Specifically, a minority population is present where either: (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[74]

29.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county.

30.     To identify potential environmental justice communities, Commission staff used 2020 U.S. Census American Community Survey data[75] for the race, ethnicity, and poverty data at the state, county, and block group level.[76] Additionally, in accordance with *Promising Practices*, Commission staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors. Appendix B provides current environmental justice community data for the areas affected by the project, including data for the affected block groups, state, and county and maps detailing the affected block groups in relation to the Texas LNG Project.

31.     Commission staff collected the block group level data, as discussed in further detail below, and conducted an impacts analysis for the identified environmental justice communities and evaluated health and environmental hazards; the natural physical

---

[73] *See Promising Practices* at 21-25.

[74] Here, we selected Cameron and Willacy Counties, Texas as the comparable reference communities to ensure that affected environmental justice communities are properly identified.

[75] U.S. Census Bureau, American Community Survey 2020 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=b03002.

[76] Appendix B includes the data used to inform this environmental justice analysis. Table 1 of Appendix B includes block groups within the 50-kilometer radius of the project.

environment; and associated social, economic, and cultural factors to determine whether impacts would be disproportionately high and adverse on environmental justice communities and also whether those impacts would be significant.[77]  Commission staff assessed whether those impacts on an environmental justice community are disproportionately high and adverse, consistent with EPA's recommendations in *Promising Practices*.[78]

32.     As discussed above, the court's opinion explained that an agency's environmental justice analysis must have an area of review for impacts on environmental justice communities that is reasonable and adequately explained, with a rational connection between the facts and the decision made.[79]  In response, Commission staff has reanalyzed the project's impacts on environmental justice communities within an area of review based on the measured distance of the furthest estimated direct impact.

33.     Commission staff determined that the furthest potential direct impact for this project is air quality impacts.  A 50-kilometer radius around the project represents a conservative estimate of the furthest possible extent of potential impacts associated with air quality.[80]  Accordingly, staff determined that a 50-kilometer radius (approximately 31-mile radius) around the approved Texas LNG site is the appropriate geographic area of analysis for identification of project impacts on environmental justice communities.  Further, air modeling for the project indicates that the radius of impact, or the distance at which the concentration of a criteria pollutant goes from above to below the significant impact level[81] is approximately 24 kilometers (approximately 15 miles), which is within

---

[77] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[78] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[79] *Vecinos*, 6 F.4th at 1330.

[80] Fifty kilometers is the distance used by the EPA for cumulative air modeling for major stationary sources under its Prevention of Significant Deterioration (PSD) air permitting requirements.  40 C.F.R. pt. 51, app. W.

[81] A modeled result predicting that a proposed source's maximum impact will be below the corresponding significant impact level value may generally be considered to be

the 50-kilometer radius of analysis for impacts on environmental justice communities.[82]

34.    Within a 50-kilometer radius of the Texas LNG Project, there are 284 total census block groups and, out of this total, Commission staff identified 279 environmental justice community block groups.  Of those 279 environmental justice block groups, 124 have a minority population that exceeds 50% or is meaningfully greater than their respective counties, one has a low-income population that is equal to or greater than their respective counties, and 154 have both a minority population and a low-income population that exceed the respective thresholds.[83]  The Texas LNG Project itself is located within an environmental justice community.

35.    This order includes an updated analysis of impacts on environmental justice communities using an expanded radius.  In reviewing the data, Commission staff determined that potential impacts on the identified environmental justice communities may relate to wetlands, recreational fishing, tourism, socioeconomics, traffic, noise, safety, air quality, greenhouse gases, and visual resources.  Environmental justice concerns are not present for other resource areas such as geology, groundwater, surface water,[84] wildlife, land use, or cultural resources, because the project would have a minimal impact on these resources.  The applicable topics, and related mitigation measures, are covered below.

### 1.    <u>Wetlands</u>

36.    The final EIS documents that the total impacted wetland area for the Texas LNG Project (42.9 acres) represents about 0.07% of the approximately 65,495 acres of wetlands contained within the hydrologic unit code (HUC) 12 where the project is located.[85]  The loss of wetland habitat, and the subsequent decrease in wetland benefits

---

a sufficient demonstration that the proposed source will not cause or contribute to a violation of the applicable National Ambient Air Quality Standard or Prevention of Significant Deterioration increment.

[82] *See infra* PP 67-78.

[83] App. B tbl. 1.

[84] The final EIS determined that increased vessel traffic along the Brownsville Ship Channel would result in a significant cumulative impact on surface water resources during operations from increases in turbidity and shoreline erosion.  Final EIS at 4-304.  Impacts on environmental justice communities associated with turbidity are discussed below in Section III.B.4, Tourism.  Impacts on environmental justice communities associated with shoreline erosion are discussed below in Section III.B.7, Marine Traffic.

[85] Bahia Grande-BSC Hydrological Unit Code (HUC) 12 Watershed.

Docket No. CP16-116-002                                                                                      - 19 -

(i.e., shoreline and habitat protection for a variety of plant and animal species that can be used for recreation and/or sustenance, and education opportunities), could affect environmental justice communities near the watershed, in which the project is located,[86] particularly the communities in Census Tract 142.02, Block Group 2 and Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 4, and Census Tract 123.05, Block Group 1, because these communities are closest to the impacts and as the distance from the project increases, the impacts on wetlands decreases.[87]  We note that Texas LNG is required to obtain applicable U.S. Army Corps of Engineers (Army Corps) Clean Water Act permits for permanent loss of wetland habitat and implement any mitigation measures required by the Army Corps for that loss.[88]

37.    All wetlands mitigation for the project would take place at the Loma Ecological Preserve, a preserve located one mile south of the project and within the same watershed as the project.[89]  Based on the foregoing analysis, we conclude that, with implementation of these mitigation measures, impacts on wetlands would be minimized and would not have a significant impact on environmental justice communities.

38.    Environmental justice communities in the study area would experience cumulative impacts on wetlands due to impacts previously discussed along with additional impacts from the additional projects within the cumulative geographic scope for wetlands.[90]  Wetland impacts, even with the addition of the Texas LNG Project, would be less than significant[91] and all impacts from the various projects with the geographic scope for wetlands would be appropriately mitigated through implementation of the Clean Water Act permits (state and federal).  Thus, overall cumulative wetland impacts on environmental justice communities would be less than significant.

---

[86] Final EIS at 4-31.

[87] App. B Fig. 5-1-1 to 5-2-15.

[88] Final EIS at 4-35 to 4-36.

[89] *Id.*

[90] *Id.* at 4-274.

[91] *Id.* at 4-37.

## 2.    **Recreational and Subsistence Fishing**

39.    As stated in the final EIS, construction and operation of the project could cause some local anglers to use undesignated areas further from the project site.[92] Texas LNG's proposed pile driving could cause fish to temporarily leave the area, altering behavior patterns of fish near the project, potentially affecting recreational fishing success.[93]  Given that a majority of the communities within the study area are environmental justice communities, recreational and subsistence fishing users of the area waterbodies likely include individuals from environmental justice communities, particularly the communities located in Census Tract 142.02, Block Group 2 and Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 4, and Census Tract 123.05, Block Group 1.[94]  Anglers using unknown and undesignated fishing areas near the project site would likely seek other fishing opportunities in the region.[95]  Construction activities at the Texas LNG Project site would not restrict fishing access to bays in the project area or the Gulf of Mexico.  In addition, fishing opportunities exist along the remainder of the undeveloped channel shoreline.  Permanent impacts on recreational and subsistence fishing by individuals from environmental justice communities may occur due to the loss of available fishing areas from the loss of approximately 1 mile of shoreline due to operation of the LNG marine facilities and loss of in-water fishing areas at certain times due to LNG carrier traffic.  Overall, the final EIS concludes that impacts on recreational fishing as a result of the project are not anticipated to be significant.[96]  Based on the foregoing analysis, we conclude that recreational and subsistence fishing impacts on environmental justice communities associated with construction and operation of the Texas LNG Project would occur, but due to the overall size of the waterway and existing alternative recreational and subsistence fishing opportunities in the area, we conclude impacts would be less than significant.

40.    Environmental justice communities in the study area would experience cumulative impacts on fishing, including recreational and subsistence fishing due to fishing vessel traffic from the project along with additional impacts from the projects within the cumulative geographic scope for recreational and subsistence fishing.[97]  Based on the

---

[92] *Id.* at 4-153.

[93] *Id.* at 4-153.

[94] App. B Figs. 5-1-1 to 5-2-15.

[95] *Id.* at 4-153.

[96] *Id.* at 4-152.

[97] *Id.* at 4-274.

**JA020**

foregoing analysis, and due to the overall size of the waterway and existing alternative recreational and subsistence fishing opportunities in the area, we conclude that cumulative recreational and subsistence fishing impacts on environmental justice communities would be less than significant.

### 3.    Tourism

41.    Overall, the final EIS found that construction and operation of the project could impact local tourism as a result of increased noise, traffic along area roads, traffic within the Brownsville Ship Channel, as well as impacting visual resources in the area (primarily from the presence of the LNG aboveground structures in the viewshed).[98] Impacts on tourism may result in a loss of revenue or jobs for individuals from environmental justice communities.  Noise during construction would likely be audible to boats passing through the Brownsville Ship Channel and could be audible to visitors within the South Bay Coastal Preserve, the closest designated recreation area to the project.[99]  The final EIS found that increased LNG vessel traffic during operation would have a permanent but minor impact on marine traffic in the Brownsville Ship Channel.[100] LNG carriers transiting the Brownsville Ship Channel could also result in delays for charter boats and sightseeing tours.[101]  Visual impacts on some nearby recreation areas, such as the Laguna Atascosa National Wildlife Refuge are anticipated to be significant.[102] Nevertheless, visual impacts are not anticipated to impact beach visitors, as the South Padre Island beaches face east towards the Gulf of Mexico, away from the project.[103]  In addition, view of the project facilities from many area beaches would likely be obstructed by hotels and condominiums along the South Padre Island shore.[104]  Visual impacts would affect charter boats and sightseeing tours transiting the Brownsville Ship Channel; however, it is anticipated that most recreational tours would be headed to the Laguna

---

[98] *Id.* at 4-152.

[99] *Id.* at 4-153.

[100] *Id.*

[101] *Id.*

[102] *See infra* PP 79–82.

[103] Final EIS at 4-153.

[104] *Id.*

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

Docket No. CP16-116-002                                                    - 22 -

Madre or the Gulf of Mexico and would not be operating primarily within the
Brownsville Ship Channel.[105]

42.     Given the number of tourism opportunities in the project area, tourists may go to
other sites so that visitation patterns may change, but overall the number of visits to the
project area would likely not change.  Therefore, based on the foregoing analysis we
conclude that impacts on environmental justice communities associated with tourism
(e.g., loss of revenue or jobs related to tourism) would be less than significant.

43.     Environmental justice communities in the study area would experience cumulative
impacts on tourism from the Texas LNG Project,[106] as previously described, along with
additional impacts from the additional projects within the cumulative geographic scope
for tourism.[107]  Cumulative impacts with the addition of those from the project would be
less than significant,[108] and, given the availability of tourism opportunities further from
the LNG facility and the additional project sites, we conclude overall cumulative tourism
impacts on environmental justice communities would be less than significant.

### 4.     Socioeconomics

44.     As stated in the final EIS, construction of project would require an average
monthly construction workforce of 700 workers, with a peak workforce of approximately
1,312 workers, over the 5-year construction period; Texas LNG anticipates that a
majority of these workers would be hired locally and the remainder would be non-
local.[109]  Texas LNG anticipates that 110 non-local workers would be employed at the
Texas LNG Project during operation.  These additional workers would represent a
negligible increase in the local population.[110]

45.     During construction and operation, the temporary influx of workers/contractors
into the area could increase the demand for community services, such as schools, police

---

[105] *Id.* at 4-153 to 4-154.

[106] *Id.* at 4-332 to 4-333.

[107] *Id.* at 4-274.

[108] *Id.* at 4-153 to 4-154.

[109] *Id.* at 4-143.

[110] *Id.*

**JA022**

enforcement, and medical care, as well as housing.[111]  As stated in the final EIS, impacts on community services would be less than significant.[112]  In addition, an adequate number of housing units are available in the affected area; therefore, impacts on the local housing market would be less than significant.[113]  Based on the foregoing analysis we conclude socioeconomic impacts on environmental justice communities, due to an increased demand for community services and housing, would be less than significant.

46.     Environmental justice communities in the study area would experience cumulative impacts on socioeconomic resources from the Texas LNG Project, along with additional impacts from other projects within the cumulative geographic scope for socioeconomic resources.[114]  Cumulative socioeconomic impacts with the addition of the project would be less than significant.[115]  Given that community facilities would continue to operate adequately and the existing availability of housing units in the affected geographic area, we conclude cumulative socioeconomic impacts on environmental justice communities would be less than significant.

### 5.    Road Traffic

47.     The final EIS finds that area residents may be affected by roadway traffic delays during construction of the Texas LNG Project.[116]  The total number of construction vehicles arriving and departing the facility per day during Texas LNG's proposed Phase 1 and Phase 2 construction plans would be 1,220 and 1,000, respectively, with up to 1,454 vehicles during peak construction of the project.[117]  Impacts on local users of the roadway network due to construction of the project include potential delays from increased traffic

---

[111] *Id.* at 4-146 to 4-148.

[112] *Id.* at 4-148.  The final EIS also addresses impacts should Texas LNG hire more than 20% of its workforce from outside the local area.  *Id.* at 4-146 to 4-147.

[113] *Id.* at 4-147.  The number of vacant housing units has increased since issuance of the Final EIS.  U.S. Census Bureau 2020 Decennial Census, File H1, Occupancy Status.

[114] Final EIS at 4-274.

[115] *Id.* at 4-329.

[116] *Id.* at 4-149.

[117] *Id.*

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

levels and diminished roadway capacity.[118]  These impacts would most likely affect environmental justice communities near the LNG terminal site, such as Census Tract 142.02, Block Group 2 and Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 4, and Census Tract 123.05, Block Group 1.[119]

48.    To minimize impacts, Texas LNG proposes to construct an auxiliary lane by a contractor hired and paid for by Texas LNG prior to the start of construction, in order to minimize impacts on State Highway 48 users.[120]  In addition, to minimize roadway traffic and safety hazards at the project site, Texas LNG proposes to coordinate with the Cameron County Sheriff's office to manually control the vehicle traffic during construction as a result of employees leaving the project site and turning left on State Highway 48.[121]

49.    Sierra Club stated that the offsite parking locations impacts data provided by Texas LNG is inadequate.[122]  To ensure that parking location impacts data is adequately addressed and to further minimize impacts on roadway vehicle traffic associated with the project, Environmental Condition 22 of the Authorization Order required Texas LNG to file with the Commission a Traffic Management Plan prior to construction, for review and written approval by the Director of the Office of Energy Projects, that includes measures to minimize impacts on roadway traffic, including transporting workers from offsite locations via buses.  Impacts on environmental justice communities will be evaluated as part of this approval.[123]

50.    Based on Texas LNG's proposed mitigation, including the construction of the auxiliary lane, and implementation of Environmental Condition 22, staff determined in the final EIS that the project would have moderate, but temporary impacts on roadway traffic.[124]  Therefore, based on the foregoing analysis we conclude traffic impacts on

---

[118] *Id.*

[119] App. B Figs. 5-1-1 to 5-2-15.

[120] Final EIS at 4-150.

[121] *Id.* at 4-149 to 4-150.

[122] Sierra Club Oct. 19, 2022 Comments at 13.

[123] Authorization Order, 169 FERC ¶ 61,130 at Env't Condition 22.

[124] *Id.* at 4-150.

Docket No. CP16-116-002                                                          - 25 -

environmental justice communities, due to increased traffic on local roadways, would be less than significant.

51.     Environmental justice communities in the study area would experience cumulative impacts associated with roadway vehicle construction traffic from the Texas LNG Project, as previously described, along with additional impacts from other projects within the cumulative geographic scope for roadway traffic.[125]  As discussed above, impacts with the addition of the Texas LNG Project would be less than significant.[126]  Based on the foregoing analysis, we conclude overall cumulative roadway traffic impacts on environmental justice communities would be less than significant.

### 6.     Marine Traffic

52.     According to the final EIS, over the 5-year construction period for the project, Texas LNG anticipates about 109 barge deliveries with a peak of approximately three deliveries per day.[127]  Current vessel traffic in the Brownsville Ship Channel is about 1,057 vessels per year,[128] which equates to an average of about 88 vessels per month.[129]  The additional barge deliveries trips associated with Texas LNG's construction would represent an increase of about two percent in current barge traffic and would not result in significant impacts on vessel traffic in the channel.[130]  Therefore, based on the updated environmental justice analysis in response to the court remand, we conclude users of the channel from environmental justice communities would not be significantly impacted during construction.

53.     According to the final EIS, permanent increases in marine traffic within the Brownsville Ship Channel would occur with the addition of six LNG carriers per month; however, the U.S. Coast Guard has determined that the waterway is suitable for the project LNG vessel use.[131]  Based on the foregoing analysis, we conclude recreational boaters and fishers within the Brownsville Ship Channel, which include individuals from

---

[125] *Id.* at 4-274.

[126] *Id.* at 4-331.

[127] Final EIS at 4-150.

[128] This number does not include commercial and recreational fishing vessels.

[129] *Id.* at 4-150.

[130] *Id.* at 4-151.

[131] *Id.*

**JA025**

environmental justice communities, would not experience significant changes in marine traffic. Additionally, increased vessel traffic during construction and operation could increase shoreline erosion and suspended sediment concentrations due to changes in wave dynamics.[132] Environmental justice communities in proximity to the project, particularly the communities in Census Tract 142.02, Block Group 2, Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 4, and Census Tract 123.05, Block Group 1,[133] would be affected most by shoreline erosion and suspended sediment concentrations as they are located immediately adjacent to the Brownsville Ship Channel. Texas LNG would install rock armoring along the side slopes of the maneuvering basin to provide protection from propeller wash.[134] Use of the waterways by LNG carriers, barges, and support vessels during construction and operation of the project would be consistent with the planned purpose and existing use of active shipping channels, and associated impacts on shoreline erosion and water quality from resuspension of sediments due to vessel traffic would not be significant.[135]

54.    Environmental justice communities in the study area would experience cumulative impacts associated with marine traffic from the Texas LNG Project, as previously described, along with additional impacts from other projects within the cumulative geographic scope for marine traffic.[136] As discussed above, even with the addition of the Texas LNG Project, marine traffic impacts would be less than significant.[137] Based on the foregoing analysis, we conclude overall cumulative marine traffic impacts on environmental justice communities would be less than significant.

### 7.    Noise

55.    As stated in the final EIS, noise levels resulting from construction of the Texas LNG Project would vary over time and would depend on the number and type of equipment in operation, operating conditions, and the distances between sources and receptors during construction.[138] Texas LNG's proposed pile driving, dredging, and

---

[132] *Id.* at 4-24.

[133] App. B Figs. 5-1-1 to 5-2-15.

[134] Final EIS at 4-24.

[135] *Id.*

[136] *Id.* at 4-274.

[137] *Id.* at 4-151.

[138] *Id.* at 4-192.

**JA026**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

facility construction have the potential to produce noise impacts.[139]  The closest noise
sensitive areas (NSA) to the Texas LNG Project terminal within environmental justice
communities are:  NSA 1, about 1.6 miles north-northeast of the project and includes the
residential area located off of Port Road, between Industrial Drive and Bahia Drive;
NSA 2, about 1.6 miles north-northeast of the project and includes residences in the
Pirate's Cove development, located off Port Road between Industrial Drive and Bahia
Drive; and NSA 3, about 1.7 miles northeast of the project and includes the closest
residences on the northwest end of West Scallop, located northeast of the project.[140]

56.      The predicted sound levels at the identified NSAs during all project construction
activities, except for the proposed pile-driving activities, were lower than the
Commission's noise standard of 55 decibels on the A-weighted scale (dBA) day-night
sound level (Ldn).[141]  The human ear's threshold of perception for noise change is
considered to be 3 dBA; 6 dBA is clearly noticeable to the human ear; and 10 dBA is
perceived as a doubling of noise.[142]  The increased sound from construction at NSA 1
would not exceed the 3 dBA threshold for human perception of noise change and the
increased sound from construction at NSAs 2 and 3 would be 6 decibels and 5.7 decibels,
respectively, and therefore may be perceptible.[143]

57.      Pile driving would occur for approximately 13 months, with peak pile driving
activities occurring over 4 months, and was calculated to produce Ldn 24-hour equivalent
sound levels that are below the Commission's noise criterion of 55 dBA at the nearest
NSAs.  The calculated maximum sound levels, or Lmax, of pile-driving (i.e., highest
sound level during each hammer strike) would be similar to slightly above, the existing
ambient noise levels.  Although pile driving would be audible at nearby NSAs when
ambient sound levels are low, Texas LNG would limit pile driving to only occur during
daytime construction hours (typically 7 a.m. to 5 p.m.).  The noise of pile-driving would
be audible outside of residences, and potentially indoors in the homes closest to the
project.  Therefore, to ensure that impacts due to maximum pile driving noise levels at
the project would be minimized, the Authorization Order requires Texas LNG to monitor

---

[139] *Id.*

[140] *Id.* at 4-189.

[141] *Id.* at 4-194.

[142] *See* Bies and Hansen, *Engineering Noise Control:  Theory and Practice* at
Table 2.1 (1988), https://www.semanticscholar.org/paper/ENGINEERING-NOISE-
CONTROL%3A-Theory-and-Practice-Bies-
Hansen/23a7741e61d5b42d7da770b857054a50f1380648 (last visited March 2023).

[143] Final EIS at 4-194.

sound levels during the start of pile-driving activities.[144]  If the sound levels due to pile-driving are greater than 10 dBA over the ambient sound levels, then Texas LNG is also required to cease that work, implement noise mitigation, and file evidence of reduced pile-driving sound levels.

58.     Operational noise associated with the project would be persistent and would increase noise levels over ambient levels between 0.1 and 1.3 decibels at the closest NSAs.[145]  Based on these estimates, the noise increase generated by the operation of the Texas LNG Project is not likely to be perceptible at nearby NSAs within environmental justice communities.  In addition, Environmental Conditions 25 and 26 of the Authorization Order require Texas LNG to meet the Commission's sound level requirements.  Based on the foregoing analysis, Texas LNG's estimate that operation of the project will not exceed the 3 dBA threshold for human perception of noise change at the nearest NSAs, and given the Authorization Order's conditions for measurement of construction and operational sound levels, we conclude the project would result in less than significant noise impacts on local residents and the surrounding communities,[146] including environmental justice populations.

59.     For simultaneous construction activities, the final EIS stated that the predicted sound level increase over the existing ambient ranges from 2.2 to 9.8 dBA Ldn at the NSAs and sound levels of slightly over 55 dBA Ldn are predicted for NSAs C2, C3, and C5,[147] resulting in a minor to significant impact.  For construction activities that are not simultaneous but incremental, the predicted sound level increase ranges from 1.0 to 8.6 dBA Ldn at the NSAs.  These increases would result in a minor to moderate impact; however, all levels would be below 55 dBA Ldn.  For Palmito Ranch Battlefield, Calculation Point-1 (CP-1), the predicted cumulative construction increase was 10.1 dBA Ldn over the existing ambient, resulting in a perceived doubling of loudness.  For the Laguna Atascosa NWR, Calculation Point 2 (CP-2) there is a higher ambient sound level so the predicted increase due to cumulative construction noise would be 2.7 dBA Ldn, resulting in a less than noticeable increase.[148]

60.     The final EIS concluded that environmental justice communities in the study area would experience cumulative impacts related to noise from operation of the Texas LNG

---

[144] Authorization Order, 169 FERC ¶ 61,130 at app. Env't Condition 24.

[145] Final EIS at 4-197.

[146] *Id.* at 4-296.

[147] These NSAs are residences in proximity of the project.  *Id.* at 4-346.

[148] *Id.* at 4-357.

Project, along with additional impacts from other projects within the cumulative geographic scope for noise.[149]  The final EIS showed that for operational noise with all projects fully operational, the predicted sound level impacts are much lower than construction impacts, with potential increases over the existing ambient of between 0.3 and 1.5 dBA Ldn at NSAs, resulting in minor impacts.  Operational impacts are slightly higher at two locations, the Palmito Ranch Battlefield, CP-1, and Laguna Atascosa NWR CP-2, with possible increases in sound levels due to operations of between 1.3 and 4.8 dBA Ldn.  This is generally considered a minor to moderate long-term impact.[150]  Based on the foregoing analysis, we conclude that overall cumulative noise impacts on environmental justice communities during construction and operation would be less than significant.

## 8.   **Safety**

61.    The Energy Policy Act of 2005 amended the NGA to require Emergency Response Plans and Cost Sharing Plans to be developed by the LNG terminal operator.  During an incident, response decisions would be made by local emergency responders according to conditions as they exist at that time at the facility and in offsite areas.  While the company may provide advice regarding hazards and potential impacts to the public, the emergency responders direct all response tactics, evacuation, sheltering in place, and public notification through an Incident Command System.

62.    In order to further mitigate potential offsite risks,[151] Environmental Conditions 36 and 37 of the Authorization Order require Texas LNG to prepare an Emergency Response Plan and Cost Sharing Plan, to be approved by Commission staff before Texas LNG receives its final approval to begin construction.[152]  Texas LNG's Emergency Response Plan is required to be developed in coordination with U.S. Coast Guard, state, county, and local emergency planning groups; fire departments; and state and local law enforcement.  This ensures that Texas LNG works with the local emergency providers to

---

[149] *Id.* at 4-274.

[150] *Id.* at 4-356.

[151] The Emergency Response Plans are considered the last layer of protection in a series of layers of protection evaluated by Commission staff to mitigate potential offsite risks.  An evaluation of all layers of protection and recommendations to enhance the effectiveness and reliability of those safety layers of protection are described in the original final Environmental Impact Statement.  These recommendations were adopted as conditions in the Authorization Order.

[152] 15 U.S.C. § 717b-1(e) (requiring an emergency response plan for any order authorizing an LNG terminal).

identify resource needs based on the hazards that could be present due to the facility. The result is pre-incident planning to establish procedures, training, and capabilities that would be available to the Incident Commander as they decide how best to address a specific incident.

63.     In response to Commission staff's data requests,[153] Texas LNG evaluated potential impacts from incidents identified along the LNG marine vessel transit route and at the LNG terminal,[154] including potential impacts to people with access and functional needs as defined in the National Fire Protection Association (NFPA) 1600, Standard on Continuity, Emergency, and Crisis Management[155] and NFPA 1616, Standard on Mass Evacuation, Sheltering, and Re-Entry Programs.[156] Separately, Commission staff performed an independent analysis[157] of potential safety impacts on environmental justice communities using conservative, worst-case distances in the modeling assumptions.[158]

64.     To ensure Texas LNG's Emergency Response Plan incorporates any special considerations and pre-incident planning for infrastructure and public with access and functional needs, including environmental justice communities, and, at a minimum, is

---

[153] Commission staff Aug. 16, 2022 Data Request; Commission Staff Aug. 31, 2022 Data Request.

[154] Texas LNG Sept. 15, 2022 Response to Commission staff Data Request; Texas LNG Sept. 21, 2022 Response to Commission staff Data Request; Texas LNG Oct. 10, 2022 Response to Commission staff Data Request.

[155] The NFPA standards are free and publicly accessible to view in English and Spanish on the NFPA website. NFPA, *NFPA 1600: Standard on Continuity, Emergency, and Crisis Management*, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1600.

[156] NFPA, *NFPA 1616: Standard on Mass Evacuation, Sheltering, and Re-entry Programs*, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1616.

[157] Appendix C includes additional discussion and details on Commission staff's environmental justice safety analysis.

[158] The block groups located within environmental justice communities that exceed the thresholds for minority and low income would include Census Tract 142.02, Block Group 2, Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 2, Census Tract 123.04, Block Group 4 (based on the minority and low-income thresholds); Census Tract 123.04, Block Group 3 (based on the minority threshold); and Census Tract 123.04 Block Group 1 (based on low-income threshold).

consistent with the recognized and generally accepted good engineering practices for evacuating and sheltering in place,[159] we modify Environmental Conditions 36 and 37 from the Authorization Order in Appendix A of this order. These modified conditions specify that Texas LNG's emergency response and cost sharing considerations require the preparation of public education materials, including for environmental justice communities, that identifies potential hazards and impacts, steps for notification, proposed evacuation routes and shelter in place locations. The plan must also provide for first responder training, emergency command centers and equipment, and public communication methods and devices. These conditions also require that Texas LNG periodically disseminate public education materials and that they be made available in English and Spanish.

65.     We also clarify our expectation that certain Emergency Response Plan information be provided as public information. While the Commission has long required that certain contents of the plan be subject to public disclosure, this has been previously interpreted to mean the plan could be filed requesting privileged or CEII treatment and that the public could access this information through Freedom of Information Act procedures. We clarify the intent is for project sponsors to file certain Emergency Response Plan information as public so that surrounding communities are informed about the possible steps that an Incident Commander may require regarding notification, evacuation, and sheltering in place.

## 9.     <u>Air Quality</u>

66.     As discussed in the final EIS, construction of the Texas LNG Project would impact air quality.[160] The construction emissions are anticipated from operation of construction equipment, operation of the onsite concrete batch plants, deliveries of supplies by barge and truck, worker commutes, and land disturbance. Fugitive dust emissions would include contributions from general site construction work (a function of acreage impacted), earth-moving fugitive dust emissions (quantity of soil moved), and unpaved road travel (distance of travel and weight of vehicles). Fugitive dust would be produced primarily during the site preparation activities, when the site would be cleared of debris, leveled, and graded, including at proposed offsite facilities.[161]

67.     The final EIS determined that construction air emissions from the project, when considered with background concentrations, combined with staged emissions impacts

---

[159] *See* app. C at P 2 (citing NFPA 1600, NFPA 1616, NFPA 1620, NFPA 470, and NFPA 475).

[160] Final EIS at 4-175.

[161] *Id.* at 4-175.

from commissioning, start-up, and operations of the project, could result in an exceedance of the NAAQS in the vicinity of the project for construction years when these emissions are taking place concurrently.[162]  Emissions from construction tend to be variable, depending primarily on the number, type, horsepower, and manufacture date of equipment, as well as the phase of construction.  Construction emissions typically have a greater nearby impact due to the lower height of the exhaust, and the ground level emission from dust (as $PM_{2.5}$ and $PM_{10}$).  Therefore, emissions from construction of the Texas LNG Project would be highly localized and have the largest impact within a short radius around the construction footprint, but would disperse at further distances.  Because pollutant concentrations decrease with distance, the dispersal of Texas LNG's construction emissions at the distance of the nearest residences (approximately 1.6 miles away)[163] should not result in adverse impacts on air quality.  But construction emissions could be elevated at recreational areas near the LNG terminal site, such as the Laguna Atascosa National Wildlife Refuge, which has a border approximately 200 feet north of the project.[164]

68.    Texas LNG will implement the following mitigation measures to minimize construction impacts on air quality, including application of water to minimize fugitive dust, limiting engine idling, and using recent models of construction equipment manufactured to meet air quality standards.[165]  Fugitive dust emissions would be minimized by Texas LNG through implementation of the Fugitive Dust Control Plan developed for the project.[166]  Nevertheless, these fugitive dust emissions may still have an adverse impact, and may add to evaluated levels of $PM_{2.5}$ and $PM_{10}$ during periods where construction, commissioning, and operation are concurrent.  Additionally, commissioning activities are not steady-state operations and they can have an increased emission intensity during start up.

69.    Texas LNG plans to commission and begin operations on the first completed liquefaction facilities while it continues to construct the remaining facilities; the simultaneous construction, commissioning and start-up, and operations at the project will result in periods of overlapping construction and operational emissions.  As a result, Commission staff cannot exclude the possibility of short term ambient emission concentrations of $PM_{2.5}$, $PM_{10}$, and $NO_2$ at levels above the NAAQS at nearby public

---

[162] *Id.*

[163] *Id.* at 4-323.

[164] *Id.* at 4-56.

[165] *Id.* at 4-336.

[166] *Id.* at 4-178.

recreational areas, such as the Laguna Atascosa National Wildlife Refuge. As such, to prevent such occurrences and to ensure protection of air quality for these areas, we are requiring, in Environmental Condition 130 in Appendix A of this order that Texas LNG take action to ensure that concurrent emissions during construction, commissioning and start-up, and operation of terminal facilities would not exceed the NAAQS.

70.     Prior to commissioning, Texas LNG shall prepare and file a Project Ambient Air Quality Mitigation and Monitoring Plan for reducing the air quality impacts of overlapping construction, commissioning, and terminal operations. Such plan could include measures such as revising construction and commissioning schedules to reduce impacts. Texas LNG shall also include how it will monitor 1-hour $NO_2$, 24-hour $PM_{10}$, and 24-hour $PM_{2.5}$ during this period. The plan must describe the site selection process for installing air quality monitors, and include procedures for data management and reporting. This monitoring will ensure that the mitigation measures implemented are effective in keeping emissions below the NAAQS, as specified in 40 C.F.R. pt. 50 (2022).

71.     Based on Commission staff's updated environmental justice analysis, and the addition of Environmental Condition 130 in Appendix A of this order, we conclude that air quality impacts on environmental justice communities during construction of the Texas LNG Project would be less than significant.

72.     The greatest potential for cumulative construction emissions impacts between Texas LNG and Rio Grande would be during years over overlapping construction. Simultaneous construction of the Rio Grande LNG and Texas LNG Terminals could result in a temporary, moderate to major increase in emissions of criteria pollutants in the immediate vicinity of the LNG terminal sites.[167] In addition, transport of construction materials associated with the Rio Grande LNG and Texas LNG Terminals would cumulatively add to regional emissions.[168] Both Texas LNG and Rio Grande would implement similar mitigation measures to minimize construction impacts. As noted above, construction emissions are localized, and impacts would be greatest in the immediate vicinity of the LNG terminal sites. During the time period when construction and operational activities at both facilities are taking place concurrently, there may be adverse impacts on air quality.[169] Because pollutant concentrations would decrease with distance from the project site, concurrent emissions would be unlikely to adversely impact air quality in residential areas, which are located 1.6 miles away or further. As

---

[167] *Id.* at 4-336. We note that since issuance of the final EIS, the proposed Annova LNG Project, included in the cumulative impact analysis, is no longer proposed.

[168] *Id.*

[169] Final EIS at 4-269.

**JA033**

previously described, although residential areas would not likely experience adverse air quality impacts, individuals from environmental justice communities fishing or otherwise recreating near the terminal may experience adverse air quality impacts.  As discussed above, we are requiring Texas LNG to prepare a Project Ambient Air Quality Monitoring and Mitigation Plan as Environmental Condition 130 in Appendix A of this order, and a similar plan for Rio Grande LNG; thus, we conclude that cumulative construction air quality impacts on environmental justice communities would be less than significant.

73.    In order to assess the impact of operational emissions from the Texas LNG Project facility on the air quality in environmental justice communities, Commission staff requested that Texas LNG provide a cumulative air model of the emissions.  In response, Texas LNG provided a cumulative model that included all emissions from the Texas LNG Project, including mobile ship emissions (LNG carrier, tugs, escort vessels), relevant regional monitoring ambient background data, and existing and proposed regional industrial major sources within 50 kilometers of the project's fenceline boundary.[170]  This also includes emissions from the authorized Rio Grande LNG Project terminal and its associated vessel emissions.  The model provided worst-case concentration scenarios that were then compared to the NAAQS.

74.    Table 2 in Appendix B displays the results from the cumulative model (combined operation of Texas LNG terminal, LNG vessel, and tugboat sources), which represents the worst-case scenario resulting in the maximum possible emissions.  Under this cumulative modeling assessment, the highest predicted concentrations for CO, $NO_2$, $PM_{2.5}$, $PM_{10}$, and $SO_2$ were found to be below the NAAQS at all locations within 50 kilometers of the Texas LNG facility.[171]  Although the Texas LNG Project would cumulatively add to existing background concentrations of criteria air pollutants within the regional airshed, the total concentration of background plus modeled emissions from sources within this 50-kilometer radius, including emissions from both the Texas LNG and Rio Grande LNG Project terminals, would remain under applicable NAAQS thresholds, which are meant to protect sensitive populations.  In the final EIS, Commission staff analyzed the impact of emissions of ozone precursors—NOx and VOC—by comparing them to the analysis of ozone impacts for the Rio Grande LNG Project, whose projected emission of those precursors was ten times larger.  The analysis for the Rio Grande LNG Project showed that the 8-hour maximum predicted increase in

---

[170] The background inventory data were obtained from Texas Commission on Environmental Quality.

[171] The modeling indicates that lead emissions are not a measurable amount and thus Commission staff omitted them from further analysis.

**JA034**

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

ozone concentration would not result in an exceedance of the 8-hour ozone NAAQS.[172]
Because the Texas LNG Project would contribute less than 10% of the annual NOx
emissions estimated for the Rio Grande LNG terminal, Commission staff concluded that
the Texas LNG facility would also not result in a NAAQS exceedance for ozone.[173]
Moreover, in order to analyze the cumulative impact of the proposed LNG facilities,
Commission staff reasoned that if the maximum predicted increase of ozone
concentration estimated for the Rio Grande LNG terminal is increased by 10% (to
account for Texas LNG's NOx emissions), the cumulative impact would remain below
the 8-hour ozone NAAQS.  We agree and conclude that there would not be a significant
cumulative impact with respect to 8-hour ozone during operation of the facility.

75.    Both the Texas LNG and Rio Grande LNG Projects would be in compliance with
the NAAQS during operations[174] and the NAAQS are designated to protect sensitive
populations.[175]  The operation of the projects when combined with the other projects
within the cumulative geographic scope for air quality[176] would not cause or contribute to
a potential exceedance of the NAAQS on a regional or localized basis.[177]  Based on the

---

[172] Final EIS for Rio Grande LNG, Docket No. CP16-454-000, at 4-269.

[173] Final EIS at 4-339.

[174] Air quality modeling of criteria pollutants for both LNG terminals reviewed
impacts on a regional and local scale and did not identify any areas of NAAQS thresholds
exceedance that would be attributable to the LNG terminals.  Texas LNG Jan. 30, 2023
Response to Commission staff Jan. 6, 2023 Environmental Information Request at
Tables 9-5 and 9-6, and Rio Grande Jan. 27, 2023 Response to Commission staff Jan. 6,
2023 Environmental Information Request, Rio Grande LNG Project Air Dispersion
Modeling Report.

[175] The combustion of natural gas produces the criteria pollutants regulated by
NAAQS as well as volatile organic compounds including hazardous air pollutant
chemicals known to cause health impacts.  Final EIS at 4-163 to 4-164.  The Texas LNG
terminal is a minor source of hazardous air pollutants and is required to comply with
certain general provisions for minor area sources under the Clean Air Act. The Rio
Grande LNG facility is a major source of hazardous air pollutants and must comply with
the Clean Air Act National Emission Standards for Hazardous Air Pollutants for
stationary sources at the LNG terminal.

[176] Final EIS. at 4-274.

[177] Texas LNG Jan. 30, 2023 Response to Commission staff Jan. 6, 2023
Environmental Information Request at Tables 9-5 and 9-6, and Rio Grande Jan. 27, 2023
Response to Commission staff Jan. 6, 2023 Environmental Information Request, Rio

Document Accession #: 20230421-3057     Filed Date: 04/21/2023
Docket No. CP16-116-002                                                    - 36 -

foregoing analysis, we conclude environmental justice communities would not experience significant air quality impacts during operation of the Texas LNG Project.

76.     Sierra Club commented on an air model filed by Texas LNG on August 16, 2022, questioning some of the emission data (for example, why Texas LNG's estimates for the hoteling of LNG vessels was greater than the estimates for the maneuvering of LNG vessels).[178]  Commission staff requested, on February 3, 2022, Texas LNG to provide a model of emissions from the Texas LNG facility, but exclude the Rio Grande facility. On August 16, 2022, we further requested the Texas LNG to provide the impact of only Texas LNG (worst-case scenario) at each census block and to provide the worst-case modeled background concentrations for each census block.  Sierra Club's October 19, 2022 comments relate to this model.  Nevertheless, in order to analyze the impacts properly, Commission staff requested, on January 6, 2023, that Texas LNG work with Rio Grande LNG to provide a full cumulative model to determine the maximum concentrations attributable to the operation of the Rio Grande LNG Terminal and Texas LNG Terminal, and therefore a consistent methodology to assess the cumulative air quality impact, including background concentrations from mobile ship emissions and all other sources within 50 kilometers, from simultaneous operation of both terminals. . Texas LNG filed this model on January 30, 2023, and Commission staff relied on this updated model in its analysis above.

77.     Citizens filed comments about the risks of air pollution to communities populated by marginalized people and indigenous people.  The analysis presented here addresses air quality impacts on environmental justice communities and on all communities within 50 kilometers of the proposed facility.  Commission staff concluded that there would be no significant impact on air quality from the proposed facility based on refined cumulative air modeling.

## 10.     **Visual Impacts**

78.     Sierra Club commented that the Commission has not requested sufficient information to analyze the visual impacts of the Texas LNG Project.  In fact, Commission staff conducted a comprehensive visual impacts analysis for the project during the preparation of the EIS for this project.  As stated in the final EIS, the project site and adjoining lands along State Highway 48 are undeveloped and primarily comprised of open lands and tidal flats with isolated lomas (clay dunes).[179]  Impacts on visual resources may occur during construction of the LNG terminal when increased equipment, vehicles,

---

Grande LNG Project Air Dispersion Modeling Report.

[178] Sierra Club Oct. 19, 2022 Comments at 7.

[179] *Id.* at 4-112.

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

soil disturbance, import of fill, and construction of the LNG terminal are visible to local residents and visitors, including individuals from environmental justice communities,[180] particularly the communities located in Census Tract 142.02, Block Group 2 and Census Tract 127, Block Group 2, Census Tract 123.04, Block Group 4, and Census Tract 123.05, Block Group 1, which are closest to the project.[181]

79.    Impact on visual resources would also occur during operation to the extent that facilities or portions of facilities and their lighting are visible to residents and visitors.[182] Texas LNG assessed potential operational impacts on the viewshed and found that from five key observation points, including recreation areas, residential areas, and roadways, by producing visual simulations of the project facilities during the day, at night, and during flaring events.[183]   While the Texas LNG Project, especially the storage tanks and flares, would be visible from most of the key observation points located in environmental justice communities, it would generally not dominate the viewshed.[184]   Nevertheless, the Texas LNG Project would dominate the daytime and nighttime viewshed at State Highway 48 and at the Laguna Atascosa National Wildlife Refuge, and the project facilities would be prominent at the Loma Ecological Preserve, which are in environmental justice communities.[185]   The project facilities would also likely be visible from some residences in Port Isabel and South Padre Island, which are in environmental justice communities.  South Padre Island, in particular, has numerous high-rise condominiums that would have views of the project facilities, especially from the higher floors.[186]   In addition to residences, the project facilities would be visible from sightseeing tours that operate within the Brownsville Ship Channel.[187]   As the Commission previously determined, due to the relatively undeveloped nature of the

---

[180] *Id.*

[181] App. B Figs. 5-1-1 to 5-2-15.

[182] Final EIS at 4-112.

[183] *Id.* at 4-115 to 4-118.

[184] *Id.*  Key observation points include State Highway 48 (Laguna Atascosa National Wildlife Refuge), Port Isabel State Historic Site, Isla Blanca Park, Palo Alto Battlefield National Historic Park, and Palmito Ranch Battlefield National Historic Landmark.

[185] *Id.*

[186] *Id.* at 4-141.

[187] *Id.*

**JA037**

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

project area, the visual sensitivity of nearby recreation areas, and the inability to implement visual screening measures due to the size and scale of the proposed facility, the project would result in a significant impact on visual resources when viewed from the Laguna Atascosa National Wildlife Refuge, which is within an environmental justice community and would have a negligible to moderate impact on the other visual resources evaluated.[188]

80.    Texas LNG would minimize visual impacts from lighting by implementing measures outlined in its Facility Lighting Plan, including shielding lights, using lights designed to minimize glare, and using timers and motion detection sensors where feasible.[189]  Several light reduction techniques would also be implemented including limiting the amount of outdoor lighting installed, dimming lights at night, and directing lights downward.[190]  Despite these mitigation measures, based on the location of the project facility and the foregoing analysis, we conclude visual impacts on environmental justice communities would be significant.

81.    As the Commission previously determined, the Texas LNG Project would result in temporary to permanent and negligible to significant impacts on the viewshed.  Other projects constructed within the geographic scope Texas LNG Project would also contribute to cumulative impacts on the viewshed with the Texas LNG Project.[191]  Consistent with the Commission's earlier visual impacts analysis, we conclude that overall potential significant cumulative visual resources impacts, including on environmental justice communities, would occur, along with additional impacts from the projects within the cumulative geographic scope for visual resources.

---

[188] *Id.*

[189] *Id.* at 4-112.

[190] *Id.* at 4-199 to 4-200.

[191] *Id.* at 4-326 to 4-327.

**JA038**

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

## 11.    Environmental Justice Conclusion

82.    As described in the final EIS, the Texas LNG Project will have a range of impacts on the environment and individuals living in the vicinity of the project facilities, including environmental justice communities.  As detailed above, we revised the scope of our analysis to include analyses commensurate with the associated impact.  Out of 284 block groups identified within a 50-kilometer radius of the Texas LNG Project, 279 block groups were considered environmental justice communities.  The closest environmental justice block groups are Census Tract 142.02, Block Group 2 and Census Tract 127, Block Group 2, and Census Tract 123.04, Block Group 4, which abut the Texas LNG Project terminal.  These block groups would be the most impacted and impacts would diminish as the distance from the project increases.  We have determined that certain impacts from construction and operation of the project would be disproportionately high and adverse, as impacts would be predominately borne by environmental justice communities.  As concluded in the final EIS and above, environmental justice communities within the project area may experience significant project-related and cumulative visual impacts.  Project-related impacts associated with wetlands, surface water, recreational and subsistence fishing, tourism, socioeconomics, traffic, noise, and air quality would be less than significant.

## IV.    Conclusion

83.    In conformance with the court's opinion, in this order on remand, we respond to the arguments pertaining to whether the use of the social cost of GHGs is required by CEQ's regulations and disclose the social cost of GHG calculations for informational purposes, but, as discussed, we do not characterize the significance of the projects' GHG emissions.  Additionally, consistent with CEQ and EPA guidance, the Commission conducted a new environmental justice analysis with updated units of geographic analysis for assessing the project's impacts on environmental justice communities.  We conclude that the impacts on environmental justice populations from the project would be disproportionately high and adverse because they would be predominately borne by the environmental justice communities identified and, specifically, communities in the areas near the Texas LNG Project may experience significant visual impacts, as well as significant cumulative visual impacts; but that all other project-related impacts would be less than significant.

84.    We continue to find that the project, as conditioned in the Authorization Order and as modified herein, is an environmentally acceptable action.

85.    Further, as stated above, we continue to find that, under section 3 of the NGA, the Texas LNG Project is not inconsistent with the public interest.

86.     Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

87.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this authorization.  The Commission encourages cooperation between Texas LNG and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[192]

88.     At a hearing held on April 20, 2023, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, applicant data responses, and exhibits therein, and all comments, and upon consideration of the record,

The Commission orders:

        (A)     The Commission affirms its earlier determinations that the Texas LNG Project is not inconsistent with the public interest.

        (B)     The authorization in Ordering Paragraph (A) is conditioned on Texas LNG's compliance with the environmental conditions set forth in the appendix to the Authorization Order and Appendix A of this order

---

[192] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted); *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Docket No. CP16-116-002                                         - 41 -

    (C)    Texas LNG shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Texas LNG.  Texas LNG shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Phillips is concurring with a separate statement attached.
                        Commissioner Clements is dissenting with a separate statement attached.

( S E A L )

                                Debbie-Anne A. Reese,
                                  Deputy Secretary.

## Appendix A

### Texas LNG Project
### Modified Environmental Conditions 36 and 37 and
### Additional Environmental Condition 130

Texas LNG shall continue to comply with the environmental conditions set forth in the appendix to the Commission's Authorization Order, 169 FERC ¶ 61,130 (2019).  In addition this order modifies conditions 36 and 37; and includes condition 130:

36.    **Prior to construction of final design**, Texas LNG shall file with the Secretary, for review and approval by the Director of the Office of Energy Projects, or their designee, an Emergency Response Plan, including evacuation and any sheltering and re-entry, and coordinate procedures with the U.S. Coast Guard; state, county, and local emergency planning groups; fire departments; state and local law enforcement; and other appropriate federal agencies.  This plan shall be consistent with recommended and good engineering practices, as defined in National Fire Protection Association (NFPA) 1600, NFPA 1616, NFPA 1620, NFPA 470, NFPA 475, or approved equivalents, and based on potential impacts and onsets of hazards from accidental and intentional events along the liquefied natural gas (LNG) marine vessel route and potential impacts and onset of hazards from accidental and intentional events at the LNG terminal, including but not limited to a catastrophic failure of the largest LNG tank.  This plan shall address any special considerations and pre-incident planning for infrastructure and public with access and functional needs and shall include at a minimum:

   a.    materials and plans for periodic dissemination of public education and training materials in English and Spanish for potential hazards and impacts, identification of potential hazards, and steps for public notification, evacuation, and shelter in place within any transient hazard areas along the marine vessel route, and within LNG terminal hazard areas in the event of an incident;

   b.    plans to competently train emergency responders required to effectively and safely respond to hazardous material incidents including, but not limited to LNG fires and dispersion;

   c.    plans to competently train emergency responders to effectively and safely evacuate or shelter public within transient hazard areas along the marine vessel route, and within hazard areas from LNG terminal;

   d.    designated contacts with federal, state and local emergency response agencies responsible for emergency management and response within any

**JA042**

transient hazard areas along the marine vessel route, and within hazard areas from LNG terminal;

e.    scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

f.    scalable procedures for mobilizing response and establishing a unified command, including identification, location, and design of any emergency operations centers and emergency response equipment required to effectively and safely to respond to hazardous material incidents and evacuate or shelter public within transient hazard areas along the marine vessel route, and within LNG terminal hazard areas;

g.    scalable procedures for notifying public, including identification, location, design, and use of any permanent sirens or other warning devices required to effectively communicate and warn the public prior to onset of debilitating hazards within any transient hazard areas along the LNG marine vessel route and within hazard areas from LNG terminal;

h.    scalable procedures for evacuating the public, including identification, location, design, and use of evacuation routes/methods and any mustering locations required to effectively and safely evacuate public within any transient hazard areas along the LNG marine transit route and within hazard areas from LNG terminal; and

i.    scalable procedures for sheltering the public, including identification, location, design, and use of any shelters demonstrated to be needed and demonstrated to effectively and safely shelter public prior to onset of debilitating hazards within transient hazard areas that may better benefit from sheltering in place (i.e., those within Zones of Concern 1 and 2), along the route of the LNG marine vessel and within hazard areas that may benefit from sheltering in place (i.e., those within areas of 1,600 BTU/ft2-hr and 10,000 BTU/ft2-hr radiant heats from fires with farthest impacts, including from a catastrophic failure of largest LNG tank) of the LNG terminal.

Texas LNG shall notify the Commission staff of all planning meetings in advance and shall report progress on the development of its Emergency Response Plan **at 3-month intervals**.  Texas LNG shall file with the Secretary public versions of offsite emergency response procedures for public notification, evacuation, and shelter in place.

37.     **Prior to construction of final design**, Texas LNG shall file with the Secretary for review and written approval by the Director of the Office of Energy Projects, or the Director's designee, a Cost-Sharing Plan identifying the mechanisms for funding all Project-specific security/emergency management costs that would be imposed on state and local agencies.  This comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base.  This plan shall include sustained funding of any requirement or resource gap analysis identified to effectively and safely evacuate and shelter public and to effectively and safely respond to hazardous material incidents consistent with recommended and good engineering practices.  Texas LNG shall notify FERC staff of all planning meetings in advance and shall report progress on the development of its Cost Sharing Plan **at 3-month intervals**.

130.    **Prior to commissioning**, Texas LNG shall file with the Secretary, for review and written approval by the Director of the Office of Energy Projects, or the Director's designee, a Project Ambient Air Quality Mitigation and Monitoring Plan for periods when construction, commissioning and start-up, and operation of the LNG Terminal occur simultaneously.  To ensure that concurrent emissions during construction, commissioning and start-up, and operation of terminal facilities are effectively mitigated, the plan's thresholds for concentrations of particulate matter ($PM_{2.5}$ and $PM_{10}$) and nitrogen oxide ($NO_2$) must be established based on the National Ambient Air Quality Standards (NAAQS), as specified in 40 C.F.R. Part 50 and shall:

a.      include a monitoring plan for $PM_{2.5}$, $PM_{10}$, and $NO_2$, including a description of the site selection process for the proposed locations for air quality monitors; data management; reporting; and protocols to manage any potential exceedances of the NAAQS for $PM_{2.5}$, $PM_{10}$, and $NO_2$ that may be observed during the monitoring activities;

b.      detail what measures Texas LNG will implement should the levels of $PM_{2.5}$ or $PM_{10}$ exceed the NAAQS 24-hour limit or should the levels of $NO_2$ exceed the NAAQS 1-hour limit as specified in 40 C.F.R. Part 50; and

c.      provide that Texas LNG will file weekly reports during periods when the plan is in use, documenting the duration of any exceedances, reasons for elevated levels of $PM_{2.5}$, $PM_{10}$, or $NO_2$, actual measured values, and to the extent there are exceedances, what minimization or mitigation measures Texas LNG implemented to reduce these levels and documentation of a reduction to or below the threshold(s).

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

# **Appendix B**

## **Environmental Justice Tables and Figures**

**Table 1**
**Texas LNG Project**
**Minority Populations by Race and Low-Income Populations Within 50 km of Terminal Site**

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| State/County/Census Tract/Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| **Cameron County** | 420,554 | 8.5 | 0.4 | 0.7 | 0.1 | 0.0 | 0.1 | 0.3 | 90.0 | 91.5 | 25.3 |
| *CT 101.01, BG 1* | 1,295 | 4.2 | 0.0 | 2.2 | 0.0 | 0.0 | 0.0 | 0.0 | 93.5 | 95.8 | 32.4 |
| *CT 101.01, BG 2* | 1,582 | 16.7 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 82.3 | 83.3 | 2.4 |
| *CT 101.01, BG 3* | 835 | 16.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.9 | 81.0 | 83.8 | 25.9 |
| *CT 101.02, BG 1* | 501 | 79.8 | 0.0 | 2.4 | 0.0 | 0.0 | 0.0 | 5.0 | 12.8 | 20.2 | 21.5 |
| *CT 101.02, BG 2* | 847 | 22.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 77.9 | 77.9 | 70.4 |
| *CT 101.02, BG 3* | 310 | 4.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.5 | 95.5 | 36.2 |
| *CT 101.03, BG 1* | 868 | 5.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.1 | 94.1 | 11.3 |
| *CT 101.03, BG 2* | 1,519 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 11.3 |

JA046

Docket No. CP16-116-002

B- 3 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 102.01, BG 1* | 1,403 | 16.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 83.3 | 83.3 | 16.0 |
| *CT 102.01, BG 2* | 465 | 2.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.6 | 97.6 | 30.4 |
| *CT 102.04, BG 1* | 1,792 | 22.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 77.2 | 77.2 | 16.5 |
| *CT 102.04, BG 2* | 2,412 | 27.1 | 0.0 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 64.6 | 72.9 | 40.3 |
| *CT 102.05, BG 1* | 1,430 | 8.3 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.2 | 91.7 | 19.3 |
| *CT 102.05, BG 2* | 744 | 47.2 | 0.0 | 2.6 | 0.0 | 0.0 | 0.0 | 0.0 | 50.2 | 52.8 | 0.0 |
| *CT 105.00, BG 1* | 401 | 12.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.5 | 87.5 | 3.9 |
| *CT 105.00, BG 2* | 2,361 | 2.5 | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 97.3 | 97.5 | 21.4 |
| *CT 106.02, BG 1* | 1,691 | 29.5 | 0.9 | 3.4 | 0.0 | 0.0 | 0.0 | 2.9 | 63.3 | 70.5 | 7.9 |
| *CT 106.03, BG 1* | 1,576 | 3.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.1 | 96.1 | 29.4 |
| *CT 106.03, BG 2* | 1,316 | 13.2 | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 86.0 | 86.8 | 20.3 |
| *CT 106.03, BG 3* | 1,929 | 16.2 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 83.4 | 83.8 | 43.6 |

JA047

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 106.04, BG 2 | 1,558 | 14.4 | 0.0 | 7.6 | 0.0 | 0.0 | 0.0 | 0.0 | 78 | 85.6 | 24.0 |
| CT 106.04, BG 3 | 1,442 | 12.3 | 0.0 | 0.0 | 5.3 | 0.0 | 0.0 | 1.4 | 81.1 | 87.7 | 25.7 |
| CT 107.00, BG 1 | 1,286 | 4.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.1 | 94.5 | 95.6 | 10.5 |
| CT 107.00, BG 2 | 880 | 20.0 | 0.0 | 0.0 | 0.0 | 6.2 | 0.0 | 0.0 | 80.0 | 80.0 | 36.5 |
| CT 107.00, BG 3 | 1,164 | 9.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 83.9 | 90.1 | 13.7 |
| CT 108.01, BG 1 | 1,054 | 13.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.0 | 87.0 | 26.6 |
| CT 108.01, BG 2 | 1,329 | 16.0 | 0.5 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 81.6 | 84.0 | 3.1 |
| CT 108.01, BG 3 | 1,978 | 1.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.1 | 98.1 | 42.7 |
| CT 108.02, BG 1 | 2,485 | 6.4 | 1.7 | 0.0 | 0.6 | 0.0 | 0.0 | 0.0 | 91.2 | 93.6 | 37.4 |
| CT 108.02, BG 2 | 967 | 18.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 81.8 | 81.8 | 23.5 |
| CT 108.02, BG 3 | 614 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| CT 109.00, BG 1 | 387 | 6.5 | 5.2 | 2.1 | 0.0 | 0.0 | 0.0 | 2.3 | 84.0 | 93.5 | 28.0 |

JA048

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 5 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 109.00, BG 2* | 980 | 5.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.3 | 91.7 | 94.1 | 29.0 |
| *CT 110.00, BG 1* | 783 | 15.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 84.7 | 84.7 | 49.1 |
| *CT 110.00, BG 2* | 632 | 5.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.1 | 94.1 | 49.6 |
| *CT 110.00, BG 3* | 1,445 | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 | 98.0 | 49.0 |
| *CT 111.00, BG 1* | 509 | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 80.0 | 80.0 | 30.7 |
| *CT 111.00, BG 2* | 1,435 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.7 | 99.7 | 30.0 |
| *CT 111.00, BG 3* | 672 | 10.0 | 17.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 73.1 | 90.0 | 15.6 |
| *CT 112.00, BG 1* | 892 | 4.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.4 | 95.4 | 29.7 |
| *CT 112.00, BG 2* | 772 | 13.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 86.5 | 86.5 | 31.3 |
| *CT 113.01, BG 1* | 755 | 40.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 59.5 | 59.5 | 3.0 |
| *CT 113.01, BG 2* | 560 | 22.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 77.1 | 77.1 | 30.5 |
| *CT 113.02, BG 1* | 1,511 | 18.6 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 5.4 | 71.7 | 81.4 | 8.0 |

**JA049**

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 59 of 562

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 113.02, BG 2* | 1,362 | 26.8 | 1.4 | 10.9 | 0.0 | 0.0 | 0.0 | 0.0 | 60.9 | 73.2 | 9.8 |
| *CT 113.02, BG 3* | 1,980 | 25.0 | 6.7 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 64.0 | 75.0 | 1.1 |
| *CT 114.01, BG 1* | 664 | 29.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 70.2 | 70.2 | 13.4 |
| *CT 114.01, BG 2* | 1,127 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 12.2 |
| *CT 114.01, BG 3* | 1,750 | 13.6 | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 84.7 | 86.4 | 8.6 |
| *CT 114.02, BG 1* | 1,289 | 10.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 90.0 | 90.0 | 9.3 |
| *CT 114.02, BG 2* | 753 | 16.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 83.1 | 83.1 | 18.9 |
| *CT 114.02, BG 3* | 685 | 29.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 70.4 | 70.4 | 26.4 |
| *CT 115.00, BG 1* | 580 | 6.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 93.1 | 93.1 | 30.0 |
| *CT 115.00, BG 2* | 848 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 38.6 |
| *CT 115.00, BG 3* | 1,178 | 2.4 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.4 | 97.6 | 32.4 |
| *CT 115.00, BG 4* | 530 | 7.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.5 | 92.5 | 19.2 |

B- 7 -

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 115.00, BG 5 | 2,969 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.3 | 97.3 | 26.9 |
| CT 116.01, BG 1 | 723 | 3.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.0 | 97.0 | 51.8 |
| CT 116.01, BG 2 | 1,724 | 0.9 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.7 | 99.1 | 24.7 |
| CT 116.02, BG 1 | 1,024 | 15.4 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 82.6 | 84.6 | 24.4 |
| CT 116.02, BG 2 | 2,194 | 3.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.5 | 96.5 | 34.5 |
| CT 117.01, BG 1 | 1,075 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 35.7 |
| CT 117.01, BG 2 | 3,466 | 5.3 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.3 | 94.7 | 29.6 |
| CT 117.02, BG 1 | 2,220 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 27.9 |
| CT 117.02, BG 2 | 551 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 38.0 |
| CT 117.02, BG 3 | 1,185 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 24.6 |
| CT 118.01, BG 1 | 1,505 | 6.3 | 1.5 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 89.4 | 93.7 | 51.1 |
| CT 118.01, BG 2 | 1,782 | 1.3 | 0.0 | 0.0 | 1.6 | 0.0 | 0.0 | 0.0 | 97.0 | 98.7 | 4.5 |

JA051

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Filed: 03/15/2024    Page 61 of 562

Docket No. CP16-116-002

B- 8 -

| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 118.01, BG 3* | 512 | 34.2 | 1.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 64.1 | 65.8 | 60.5 |
| *CT 118.01, BG 4* | 1,665 | 14.2 | 1.6 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 83.1 | 85.8 | 18.6 |
| *CT 118.02, BG 1* | 753 | 3.2 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | 1.9 | 93.5 | 96.8 | 36.3 |
| *CT 118.02, BG 2* | 1,885 | 3.6 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.4 | 96.4 | 46.6 |
| *CT 118.02, BG 3* | 1,619 | 11.4 | 0.0 | 2.2 | 0.0 | 0.0 | 0.0 | 0.6 | 85.9 | 88.6 | 28.7 |
| *CT 120.02, BG 1* | 823 | 34.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 66.0 | 66.0 | 7.3 |
| *CT 120.02, BG 4* | 907 | 16.2 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 83.4 | 83.8 | 5.8 |
| *CT 120.03, BG 3* | 1,370 | 17.7 | 3.5 | 2.9 | 0.0 | 0.0 | 0.0 | 0.0 | 75.8 | 82.3 | 32.5 |
| *CT 121.03, BG 1* | 461 | 89.2 | 0.0 | 8.2 | 0.0 | 0.0 | 0.0 | 0.0 | 2.6 | 10.8 | 0.0 |
| *CT 121.04, BG 1* | 2,052 | 12.0 | 0.0 | 4.7 | 0.8 | 0.0 | 0.0 | 0.4 | 82.1 | 88.0 | 2.9 |
| *CT 121.04, BG 2* | 1,940 | 5.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.4 | 94.4 | 12.1 |
| *CT 121.04, BG 3* | 720 | 6.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.0 | 94.0 | 4.4 |

GEOGRAPHIC AREA AND POPULATION

RACE AND ETHNICITY

LOW-INCOME

JA052

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 9 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 121.05, BG 1 | 1,784 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.7 | 95.7 | 10.5 |
| CT 121.05, BG 2 | 920 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.7 | 99.7 | 14.7 |
| CT 121.06, BG 1 | 462 | 11.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 89.0 | 89.0 | 52.7 |
| CT 121.06, BG 2 | 985 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 39.9 |
| CT 122.01, BG 1 | 244 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 45.8 |
| CT 122.01, BG 2 | 1,469 | 13.5 | 24.2 | 0.0 | 0.0 | 0.0 | 0.2 | 0.1 | 62.0 | 86.5 | 28.6 |
| CT 122.01, BG 3 | 1,502 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 19.8 |
| CT 122.02, BG 1 | 1,178 | 1.4 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.5 | 98.6 | 25.9 |
| CT 122.02, BG 2 | 1,181 | 8.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.4 | 91.1 | 91.6 | 21.2 |
| CT 122.02, BG 3 | 704 | 6.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 | 0.0 | 92.9 | 93.2 | 16.7 |
| CT 122.03, BG 1 | 1,042 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 27.4 |
| CT 122.03, BG 2 | 371 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 34.7 |

JA053

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 10 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 122.03, BG 3* | 2,764 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.7 | 99.7 | 34.4 |
| *CT 123.01, BG 1* | 1,666 | 56.9 | 0.0 | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 | 42.3 | 43.1 | 17.1 |
| *CT 123.01, BG 2* | 909 | 49.5 | 2.6 | 0.0 | 1.2 | 0.0 | 0.0 | 0.0 | 46.6 | 50.5 | 25.3 |
| *CT 123.01, BG 3* | 325 | 29.8 | 0.0 | 0.0 | 28.6 | 0.0 | 0.0 | 0.0 | 41.5 | 70.2 | 0.0 |
| *CT 123.01, BG 4* | 1,319 | 65.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 | 33.9 | 34.2 | 27.8 |
| *CT 123.04, BG 1* | 588 | 37.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 62.8 | 62.8 | 29.6 |
| *CT 123.04, BG 2* | 1,689 | 6.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 93.4 | 93.4 | 28.9 |
| *CT 123.04, BG 3* | 955 | 37.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.4 | 60.8 | 62.2 | 11.3 |
| *CT 123.04, BG 4* | 630 | 11.6 | 0.0 | 11.4 | 0.0 | 0.0 | 0.0 | 0.0 | 77.0 | 88.4 | 37.3 |
| *CT 123.05, BG 1* | 2,454 | 71.5 | 4.2 | 2.2 | 0.0 | 0.0 | 1.9 | 1.5 | 18.8 | 28.5 | 6.0 |
| *CT 124.02, BG 1* | 1,907 | 10.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 89.8 | 89.8 | 27.0 |
| *CT 124.02, BG 2* | 313 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.4 | 99.4 | 24.3 |

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B-11 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaska Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 124.02, BG 3 | 1,108 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 88.0 | 88.0 | 58.8 |
| CT 124.02, BG 4 | 2,515 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.7 | 91.7 | 49.2 |
| CT 124.03, BG 1 | 1,437 | 20.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 79.8 | 79.8 | 19.8 |
| CT 124.03, BG 2 | 2,623 | 8.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.0 | 92.0 | 16.5 |
| CT 124.04, BG 1 | 598 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.7 | 95.7 | 10.9 |
| CT 124.04, BG 2 | 1,963 | 3.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.8 | 96.8 | 46.7 |
| CT 124.04, BG 3 | 1,000 | 12.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.6 | 87.6 | 9.7 |
| CT 125.06, BG 1 | 1,371 | 3.8 | 0.0 | 3.5 | 0.0 | 0.0 | 0.0 | 0.0 | 96.2 | 96.2 | 13.8 |
| CT 125.06, BG 2 | 1,263 | 27.3 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 69.2 | 72.7 | 11.4 |
| CT 125.06, BG 3 | 1,484 | 28.1 | 0.0 | 0.3 | 2.1 | 0.0 | 0.0 | 0.0 | 69.5 | 71.9 | 9.8 |
| CT 125.08, BG 1 | 1,051 | 26.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 73.4 | 73.4 | 14.7 |
| CT 125.08, BG 2 | 2,993 | 2.7 | 0.0 | 0.8 | 0.2 | 0.0 | 0.0 | 0.0 | 96.4 | 97.3 | 21.0 |

JA055

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 12 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | | LOW-INCOME |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 125.09, BG 1* | 495 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 40.1 |
| *CT 125.09, BG 2* | 3,024 | 3.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.1 | 96.1 | 24.1 |
| *CT 125.10, BG 1* | 1,998 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.0 | 96.0 | 100.0 | 24.3 |
| *CT 125.10, BG 2* | 1,338 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 93.0 | 93.0 | 13.9 |
| *CT 125.10, BG 3* | 1,858 | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.3 | 98.3 | 42.9 |
| *CT 125.11, BG 1* | 1,199 | 1.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.2 | 98.2 | 31.2 |
| *CT 125.11, BG 2* | 1,747 | 5.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.4 | 94.4 | 0.0 |
| *CT 125.11, BG 3* | 2,629 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 29.4 |
| *CT 125.12, BG 1* | 971 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 47.3 |
| *CT 125.12, BG 2* | 1,527 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 33.3 |
| *CT 125.13, BG 1* | 2,260 | 5.7 | 0.0 | 0.0 | 0.4 | 0.0 | 0.0 | 0.2 | 93.7 | 94.3 | 29.0 |
| *CT 125.13, BG 2* | 1,172 | 12.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.4 | 87.4 | 35.7 |

JA056

Docket No. CP16-116-002

B- 13 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 125.14, BG 1* | 2,787 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 8.5 |
| *CT 125.14, BG 2* | 2,536 | 14.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 85.6 | 85.6 | 18.1 |
| *CT 125.15, BG 1* | 1,669 | 4.8 | 0.0 | 2.6 | 0.0 | 0.0 | 0.0 | 0.0 | 92.6 | 95.2 | 0.0 |
| *CT 125.15, BG 2* | 1,251 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 15.4 |
| *CT 125.16, BG 1* | 946 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 125.16, BG 2* | 300 | 8.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.3 | 91.3 | 0.0 |
| *CT 125.16, BG 3* | 1,671 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 125.17, BG 1* | 1,550 | 5.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.8 | 94.8 | 11.5 |
| *CT 125.17, BG 2* | 951 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 125.17, BG 3* | 1,400 | 2.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.1 | 97.1 | 26.1 |
| *CT 126.07, BG 1* | 1,467 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.7 | 99.7 | 22.4 |
| *CT 126.07, BG 2* | 1,121 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.9 | 98.9 | 48.6 |

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 126.08, BG 1* | 1,530 | 0.5 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.1 | 99.5 | 34.3 |
| *CT 126.08, BG 2* | 819 | 5.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.1 | 94.1 | 37.5 |
| *CT 126.08, BG 3* | 2,578 | 2.1 | 1.6 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 91.9 | 97.9 | 9.3 |
| *CT 126.08, BG 4* | 283 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| *CT 126.13, BG 1* | 1,038 | 7.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.6 | 92.6 | 15.3 |
| *CT 126.13, BG 2* | 705 | 3.7 | 0.7 | 7.1 | 0.0 | 0.0 | 0.0 | 0.0 | 88.5 | 96.3 | 7.6 |
| *CT 126.13, BG 3* | 2,377 | 5.8 | 0.0 | 1.6 | 0.0 | 0.0 | 0.0 | 1.2 | 91.4 | 94.2 | 10.9 |
| *CT 126.13, BG 4* | 1,570 | 2.3 | 5.3 | 2.8 | 0.0 | 0.0 | 0.0 | 0.8 | 88.9 | 97.7 | 36.3 |
| *CT 126.14, BG 1* | 1,353 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 37.5 |
| *CT 126.14, BG 2* | 1,725 | 1.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.7 | 98.7 | 47.1 |
| *CT 126.15, BG 1* | 918 | 2.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.8 | 97.8 | 36.3 |
| *CT 126.15, BG 2* | 1,128 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 28.3 |

JA058

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 126.15, BG 3 | 1,067 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 36.5 |
| CT 126.16, BG 1 | 1,959 | 5.5 | 0.6 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 92.0 | 94.5 | 3.0 |
| CT 126.16, BG 2 | 1,719 | 1.7 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.7 | 98.3 | 9.0 |
| CT 126.17, BG 1 | 1,095 | 1.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.6 | 98.6 | 37.2 |
| CT 126.17, BG 2 | 1,494 | 1.1 | 0.0 | 6.5 | 0.0 | 0.0 | 0.0 | 0.0 | 92.4 | 98.9 | 4.9 |
| CT 126.17, BG 3 | 818 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.7 | 91.7 | 26.1 |
| CT 127.00, BG 1 | 1,370 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.4 | 99.4 | 27.7 |
| CT 127.00, BG 2 | 611 | 4.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.1 | 95.1 | 29.8 |
| CT 127.00, BG 3 | 1,535 | 1.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.7 | 98.7 | 31.3 |
| CT 127.00, BG 4 | 1,954 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 54.1 |
| CT 128.00, BG 1 | 1,167 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.7 | 91.7 | 32.5 |
| CT 128.00, BG 2 | 1,067 | 12.7 | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 82.3 | 87.3 | 12.9 |

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 128.00, BG 3 | 1,099 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.0 | 99.0 | 33.9 |
| CT 128.00, BG 4 | 1,575 | 1.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.4 | 98.4 | 21.1 |
| CT 12.009, BG 1 | 899 | 17.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 82.2 | 82.2 | 35.6 |
| CT 129.00, BG 2 | 416 | 22.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 77.2 | 77.2 | 17.0 |
| CT 129.00, BG 3 | 2,387 | 5.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.4 | 94.4 | 41.1 |
| CT 129.00, BG 4 | 717 | 24.7 | 2.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 73.2 | 75.3 | 29.2 |
| CT 130.02, BG 1 | 1,073 | 7.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.9 | 92.9 | 22.4 |
| CT 130.02, BG 2 | 1,053 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.8 | 98.8 | 21.1 |
| CT 130.02, BG 3 | 718 | 8.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.8 | 91.8 | 29.8 |
| CT 130.02, BG 4 | 1,730 | 5.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.9 | 94.9 | 49.3 |
| CT 130.03, BG 1 | 757 | 4.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 | 96.0 | 42.7 |
| CT 130.03, BG 2 | 1,467 | 4.8 | 1.2 | 0.0 | 0.5 | 0.0 | 5.4 | 1.2 | 87.0 | 95.2 | 44.5 |

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 17 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | | LOW-INCOME |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 130.04, BG 1* | 876 | 11.8 | 0.0 | 3.1 | 0.0 | 0.0 | 0.0 | 1.3 | 83.9 | 88.2 | 17.9 |
| *CT 130.04, BG 2* | 654 | 14.8 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 84.1 | 85.2 | 22.6 |
| *CT 130.04, BG 3* | 692 | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.3 | 98.3 | 25.5 |
| *CT 131.02, BG 1* | 620 | 15.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 84.4 | 84.4 | 0.0 |
| *CT 131.02, BG 2* | 1,417 | 2.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.1 | 97.1 | 5.1 |
| *CT 131.02, BG 3* | 2,360 | 12.8 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 86.2 | 87.2 | 25.0 |
| *CT 131.04, BG 1* | 1,485 | 6.9 | 0.0 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 92.6 | 93.1 | 0.0 |
| *CT 131.04, BG 2* | 862 | 12.1 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 1.9 | 85.0 | 87.9 | 0.0 |
| *CT 131.04, BG 3* | 982 | 3.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.7 | 96.7 | 37.3 |
| *CT 131.06, BG 1* | 1,848 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.5 | 99.5 | 58.5 |
| *CT 131.06, BG 2* | 1,789 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.5 | 98.5 | 27.1 |
| *CT 131.06, BG 3* | 1,113 | 3.6 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 93.7 | 96.4 | 31.9 |

JA061

Docket No. CP16-116-002

B- 18 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | | LOW-INCOME | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | | Below Poverty Level[b] (%) | |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | | 13.3 | |
| CT 132.03, BG 1 | 1,521 | 2.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.9 | 95.9 | 97.8 | | 42.2 | |
| CT 132.03, BG 2 | 778 | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.1 | 99.1 | | 35.7 | |
| CT 132.04, BG 1 | 1,015 | 3.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.2 | 96.2 | | 44.4 | |
| CT 132.04, BG 2 | 810 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | 0.0 | 98.4 | 100.0 | | 26.1 | |
| CT 132.05, BG 1 | 1,865 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 98.8 | 99.3 | | 21.7 | |
| CT 132.05, BG 2 | 2,103 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.5 | 99.5 | | 48.6 | |
| CT 132.06, BG 1 | 851 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | | 36.7 | |
| CT 132.06, BG 2 | 927 | 2.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.2 | 97.2 | | 33.2 | |
| CT 132.06, BG 3 | 897 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | | 25.6 | |
| CT 132.07, BG 1 | 1,894 | 5.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.4 | 94.4 | | 17.8 | |
| CT 132.07, BG 2 | 1,724 | 3.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.1 | 96.1 | | 36.8 | |
| CT 132.07, BG 3 | 952 | 7.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.1 | 92.1 | | 44.3 | |

JA062

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 19 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 133.03, BG 1* | 925 | 0.9 | 0.0 | 1.3 | 0.0 | 1.8 | 0.0 | 0.0 | 96.0 | 99.1 | 2.0 |
| *CT 133.03, BG 2* | 1,587 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.4 | 99.4 | 35.6 |
| *CT 133.03, BG 3* | 1,640 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 39.4 |
| *CT 133.05, BG 1* | 1099 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.8 | 98.8 | 20.1 |
| *CT 133.05, BG 2* | 1,144 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.6 | 99.6 | 20.2 |
| *CT 133.05, BG 3* | 1,311 | 2.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.1 | 97.1 | 25.6 |
| *CT 133.05, BG 4* | 736 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 26.7 |
| *CT 133.06, BG 1* | 966 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 38.4 |
| *CT 133.06, BG 2* | 1,627 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 21.7 |
| *CT 133.07, BG 1* | 856 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 30.6 |
| *CT 133.07, BG 2* | 1,297 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 41.8 |
| *CT 133.08, BG 1* | 1,436 | 4.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.5 | 95.5 | 21.4 |

JA063

Docket No. CP16-116-002

B- 20 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 133.08, BG 2 | 546 | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 | 98.0 | 37.8 |
| CT 133.08, BG 3 | 1,595 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.4 | 99.4 | 46.0 |
| CT 133.09, BG 1 | 1,293 | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 | 98.0 | 37.8 |
| CT 133.09, BG 2 | 1,705 | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.6 | 99.6 | 44.8 |
| CT 134.01, BG 1 | 1,336 | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.1 | 99.1 | 46.7 |
| CT 134.01, BG 2 | 772 | 3.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.5 | 96.5 | 36.5 |
| CT 134.02, BG 1 | 767 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.7 | 99.7 | 23.2 |
| CT 134.02, BG 2 | 655 | 13.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 86.7 | 86.7 | 21.8 |
| CT 134.02, BG 3 | 616 | 0.0 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 98.9 | 100.0 | 51.6 |
| CT 135.00, BG 1 | 1,185 | 17.0 | 0.5 | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 | 81.5 | 83.0 | 4.4 |
| CT 135.00, BG 2 | 843 | 1.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.2 | 98.2 | 24.3 |
| CT 136.00, BG 1 | 327 | 11.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 89.0 | 89.0 | 64.6 |

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

JA064

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 74 of 562

Docket No. CP16-116-002

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 136.00, BG 2 | 1,148 | 7.5 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.9 | 92.5 | 9.5 |
| CT 136.00, BG 3 | 801 | 3.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.6 | 96.6 | 18.2 |
| CT 136.00, BG 4 | 486 | 11.9 | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 87.9 | 88.1 | 36.7 |
| CT 137.00, BG 1 | 623 | 7.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 92.5 | 92.5 | 14.1 |
| CT 137.00, BG 2 | 490 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.3 | 97.3 | 60.8 |
| CT 137.00, BG 3 | 935 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 66.7 |
| CT 137.00, BG 4 | 1,859 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.3 | 97.3 | 46.6 |
| CT 138.01, BG 1 | 574 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.8 | 98.8 | 56.2 |
| CT 138.01, BG 2 | 1,602 | 4.1 | 4.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 91.3 | 95.9 | 65.0 |
| CT 138.02, BG 1 | 448 | 1.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.2 | 98.2 | 35.7 |
| CT 138.02, BG 2 | 551 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 39.7 |
| CT 138.02, BG 3 | 984 | 8.4 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.1 | 91.6 | 56.7 |

JA065

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 22 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaska Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 138.02, BG 4* | 876 | 3.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.2 | 96.2 | 32.9 |
| *CT 139.01, BG 1* | 396 | 5.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 94.9 | 94.9 | 52.0 |
| *CT 139.01, BG 2* | 1,976 | 1.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.4 | 98.4 | 35.9 |
| *CT 139.02, BG 1* | 1,323 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 20.5 |
| *CT 139.02, BG 2* | 1,679 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.8 | 98.8 | 33.8 |
| *CT 139.02, BG 3* | 1,295 | 3.1 | 0.0 | 3.0 | 0.0 | 0.0 | 0.0 | 0.0 | 93.9 | 96.9 | 43.0 |
| *CT 139.03, BG 1* | 2,185 | 0.0 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 98.9 | 100.0 | 43.6 |
| *CT 139.03, BG 2* | 2,231 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 32.8 |
| *CT 140.01, BG 1* | 937 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.5 | 99.5 | 25.7 |
| *CT 140.01, BG 2* | 989 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 99.5 | 100.0 | 78.3 |
| *CT 140.01, BG 3* | 430 | 5.8 | 0.0 | 7.4 | 0.0 | 0.0 | 7.4 | 11.2 | 68.1 | 94.2 | 61.2 |
| *CT 140.02, BG 1* | 1,130 | 10.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 90.0 | 90.0 | 35.5 |

JA066

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 23 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaska Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 140.02, BG 2* | 918 | 12.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.8 | 88.0 | 60.2 |
| *CT 141.01, BG 1* | 1,031 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 14.1 |
| *CT 141.01, BG 2* | 1,039 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 141.01, BG 3* | 1,373 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 40.0 |
| *CT 141.01, BG 4* | 833 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 28.3 |
| *CT 141.02, BG 1* | 2,221 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 51.9 |
| *CT 141.02, BG 2* | 694 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.8 | 98.8 | 9.5 |
| *CT 141.02, BG 3* | 1,126 | 12.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 87.2 | 87.2 | 58.1 |
| *CT 141.03, BG 1* | 1,278 | 3.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.6 | 96.6 | 10.5 |
| *CT 141.03, BG 2* | 95 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 141.03, BG 3* | 1,573 | 8.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.5 | 91.5 | 46.2 |
| *CT 142.01, BG 1* | 942 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 99.3 | 99.3 | 54.3 |

JA067

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 24 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 142.01, BG 2* | 822 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 10.1 |
| *CT 142.02, BG 1* | 1897 | 14.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 85.7 | 85.7 | 19.2 |
| *CT 142.02, BG 2* | 1103 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.8 | 0.0 | 92.2 | 100.0 | 44.9 |
| *CT 143.00, BG 1* | 1,726 | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.7 | 88.4 | 95.0 | 43.6 |
| *CT 143.00, BG 2* | 2,057 | 3.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.3 | 96.3 | 52.8 |
| *CT 143.00, BG 3* | 1,036 | 9.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 90.7 | 90.7 | 28.4 |
| *CT 144.01, BG 1* | 1,997 | 1.2 | 0.0 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | 98.1 | 98.8 | 4.4 |
| *CT 144.01, BG 2* | 4,337 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 17.8 |
| *CT 144.01, BG 3* | 1,223 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 100.0 | 0.0 |
| *CT 144.02, BG 1* | 2,819 | 21.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 78.9 | 78.9 | 3.4 |
| *CT 144.02, BG 2* | 1,291 | 8.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.3 | 91.3 | 16.3 |
| *CT 144.02, BG 3* | 1,958 | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.0 | 95.0 | 11.1 |

JA068

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 25 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| *CT 144.03, BG 1* | 3,200 | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.3 | 98.3 | 3.5 |
| *CT 144.03, BG 2* | 782 | 0.0 | 0.0 | 4.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 | 100.0 | 61.2 |
| *CT 144.04, BG 1* | 3,541 | 0.0 | 0.0 | 3.4 | 0.0 | 0.0 | 0.0 | 0.0 | 96.6 | 100.0 | 18.7 |
| *CT 144.04, BG 2* | 1,288 | 23.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 76.2 | 76.2 | 37.3 |
| *CT 145.01, BG 1* | 1,856 | 13.8 | 0.0 | 9.1 | 0.0 | 0.0 | 0.0 | 0.0 | 77.2 | 86.2 | 27.8 |
| *CT 145.01, BG 2* | 1,716 | 6.9 | 0.0 | 4.4 | 0.0 | 0.0 | 0.0 | 0.0 | 88.7 | 93.1 | 3.4 |
| *CT 145.01, BG 3* | 946 | 6.4 | 2.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 91.0 | 93.6 | 14.2 |
| *CT 145.02, BG 1* | 2,106 | 3.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.1 | 92.2 | 96.3 | 1.4 |
| *CT 145.02, BG 2* | 1,127 | 6.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.0 | 88.4 | 93.3 | 27.2 |
| *CT 145.02, BG 3* | 1,959 | 3.9 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 95.7 | 96.1 | 5.6 |
| *CT 9800.01, BG 1* | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| *CT 9801.00, BG 1* | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

JA069

Docket No. CP16-116-002

B- 26 -

| GEOGRAPHIC AREA AND POPULATION | | RACE AND ETHNICITY | | | | | | | | | LOW-INCOME |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| State/ County/ Census Tract/ Block Group | Population | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Below Poverty Level[b] (%) |
| **State of Texas** | 28,862,581 | 40.7 | 11.8 | 5.0 | 0.2 | 0.1 | 0.3 | 2.3 | 39.8 | 59.3 | 13.3 |
| CT 9900.00, BG 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Willacy County** | 20,423 | 10.3 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.8 | 88.2 | 89.7 | 29.4 |
| CT 9506.00, BG 1 | 899 | 23.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 76.9 | 76.9 | 36.9 |
| CT 9507.00, BG 1 | 1,070 | 27.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 72.1 | 72.1 | 47.5 |
| CT 9900.00, BG 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

Source: U.S. Census Bureau (2021), American Community Survey 5-year Estimates 2017-2021, File # B17017 and File # B03002.a

"Minority" refers to people who reported their ethnicity and race as something other than non-Hispanic White.

b Minority or low-income populations exceeding the established thresholds are indicated in bold type and gray shading.

Due to rounding differences in the dataset, the totals may not reflect the sum of the addends.

JA070

**Table 2**
**Texas LNG Project**
**Results of the Cumulative Impact Analysis – Hoteling Scenario**

| Pollutant | Averaging Period | Highest Predicted Concentration (Max Impact) | Ambient Background Values [1] | Direction of Max Impact from TX LNG | Distance of Max Impact from TX LNG | NAAQS | Over NAAQS? | Maximum TX LNG Impact [5] |
|---|---|---|---|---|---|---|---|---|
| | | (µg/m³) | (µg/m³) | | (km) | (µg/m³) | | (µg/m³) |
| CO | 1-hour | 6,867.45 | 3,778.50 | SW | 5.40 | 40,000 | No | 951.23 |
| | 8-hour | 4,545.67 | 2,175.50 | SW | 5.40 | 10,000 | No | 120.37 |
| NO₂ | 1-hour | 147.78 | [2] | SE | 0.38 | 188 | No | 124.55 |
| | Annual | 9.60 | 4.72 | S | 0.53 | 100 | No | 4.79 |
| PM₁₀ | 24-hour [3] | 112.99 | 69.67 | SW | 15.36 | 150 | No | 4.04 |
| PM₂.₅ | 24-hour [3] | 32.29 | [2] | NW | 43.50 | 35 | No | 3.33 |
| | Annual [4] | 11.75 | 10.13 | SW | 15.74 | 12 | No | 0.17 |
| SO₂ | 1-hour | 140.96 | 14.85 | W | 25.48 | 196 | No | 10.80 |
| | 3-hour | 96.41 | 5.24 | W | 25.48 | 1,300 | No | 53.37 |
| | 24-hour | 21.34 | 3.14 | W | 25.48 | 365 | No | 6.85 |
| | Annual | 5.19 | 1.36 | SW | 5.40 | 80 | No | 0.92 |

Notes:

(1) Ambient background values are included in the Highest Predicted Concentration (Maximum Impact) values.

(2) Seasonal/diurnal background data were developed for use in the 1-hour NO2 modeling analysis; seasonal background data were developed for use in the 24-hour PM25 modeling analysis. Table 9-4 of the Final EIS summarizes the PM2.5 seasonal background concentrations that were developed based on the three-year average of seasonal 98th percentile 24-hr monitor values.

(3) Secondary 24-hour PM2.5 impact of 0.2617 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(4) Secondary annual PM2.5 impact of 0.0077 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(5) Maximum Texas LNG contribution that could occur anywhere or anytime on the grid. The Texas LNG impact is not paired in time or space with the peak concentration.

JA071

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210

B- 28 -

Docket No. CP16-116-002



Figure 5-1
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

JA072

Docket No. CP16-116-002



Figure 5-1-1
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210
USCA Case #23-1175

Docket No. CP16-116-002



Figure 5-1-2
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Proposed Project Site
Proposed Project
Site 50 km Buffer
Census Block Group
(CBG) Boundary
CBG Crossed by Project
Site 50 m Buffer
County Boundary
Population of Color
(50% threshold or
more than 10% greater
than county)

1:31,680

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

Figure 5-1-3
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Legend:
- Proposed Project Site
- Proposed Project Site 50 km Buffer
- Census Block Group (CBG) Boundary
- CBG Crossed by Project Site 50 km Buffer
- County Boundary
- Population of Color (50% threshold or more than 10% greater than county)

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210
USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 85 of 562

Docket No. CP16-116-002



Figure 5-1-4
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Figure 5-1-5
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 87 of 562

Figure 5-1-6
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

JA078

Document Accession #: 20230421-3057 Filed Date: 04/21/2023 Document #2045210

USCA Case #23-1175 Filed: 03/15/2024 Page 88 of 562

Docket No. CP16-116-002



Figure 5-1-7
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

JA079

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Filed: 03/15/2024    Page 89 of 562

Docket No. CP16-116-002



Figure 5-1-8
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210
USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 90 of 562

Docket No. CP16-116-002



**Figure 5-1-9**
**Texas LNG Project**
Environmental Justice
Populations of Color
Cameron County, Texas

Proposed Project Site

Proposed Project
Site 50 km Buffer

Census Block Group
(CBG) Boundary

CBG Crossed by Project
Site 50 km Buffer

County Boundary

Population of Color
(50% threshold or
more than (10% greater
than county)

1:31,680

CT 122.01,
BG 2

CT 124.03,
BG 1

CT 124.03,
BG 2

CT 122.01,
BG 1

CT 122.01,
BG 2

CT 125.06,
BG 2

CT 114.01,
BG 2

CT 125.11,
BG 1

CT 114.01,
BG 1

CT 116.00,
BG 5

CT 116.00,
BG 1

CT 121.04,
BG 3

CT 125.11,
BG 3

CT 125.15,
BG 1

CT 115.00,
BG 4

CT 115.01,
BG 2

CT 121.04,
BG 2

CT 125.15,
BG 2

JA081

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 91 of 562

Docket No. CP16-116-002



**Figure 5-1-10**
**Texas LNG Project**
Environmental Justice
Populations of Color
Cameron County, Texas

JA082

Figure 5-1-11
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Proposed Project Site

Proposed Project
Site 50 km Buffer

Census Block Group
(CBG) Boundary

CBG Crossed by Project
Site 50 km Buffer

County Boundary

Population of Color
(>50% threshold or
more than 10% greater
than county)

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 93 of 562

Docket No. CP16-116-002



Figure 5-1-12
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

JA084

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

Docket No. CP16-116-002

**Figure 5-1-13**
**Texas LNG Project**
Environmental Justice
Populations of Color
Cameron County, Texas

Legend:
- Proposed Project Site
- Proposed Project Site 50 km Buffer
- Census Block Group (CBG) Boundary
- CBG Crossed by Project Site 50 km Buffer
- County Boundary
- Population of Color (50% threshold or more than 10% greater than county)

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175

Filed: 03/15/2024    Page 95 of 562

Docket No. CP16-116-002



Figure 5-1-14
Texas LNG Project
Environmental Justice
Populations of Color
Cameron County, Texas

Document Accession #: 20230421-3057     Filed Date: 04/21/2023     Document #2045210

B- 43 -

Docket No. CP16-116-002



TEXAS LNG

**Figure 5-1-15**
**Texas LNG Project**
Environmental Justice
Population of Color
Cameron County, Texas

Proposed Project Site

Proposed Project
Site 50 km Buffer

Census Block Group
(CBG) Boundary

CBG Crossed by Project
Site 50 km Buffer

County Boundary

Population of Color
(50% threshold or
more than 10% greater
than county)

1:31,680

ERM

JA087

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002

B- 44 -



Figure 5-2
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

**JA088**

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

B- 45 -

Docket No. CP16-116-002



JA089

Figure 5-2-2
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

TEXAS LNG

Proposed Project Site
Proposed Project
Site 50 km Buffer
Census Block Group
(CBG) Boundary
CBG Crossed by Project
Site 50 km Buffer
County Boundary
Low Income Population
(Greater than county)

1:31,680

0      .12      .24
        Miles

ERM

Docket No. CP16-116-002

Document Accession #: 20230421-3057          Filed Date: 04/21/2023          Document #2045210

USCA Case #23-1175          Document #2045210

Filed: 03/15/2024          Page 99 of 562

JA090

Figure 5-2-3
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

Document Accession #: 20230421-3057    Filed Date: 04/21/2023
USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 100 of 562

Docket No. CP16-116-002

JA091



Figure 5-2-4
Texas LNG Project
Environmental Justice
Low-Income Populations
Cameron County, Texas

Document Accession #: 20230421-3057        Filed Date: 04/21/2023
USCA Case #23-1175        Document #2045210        Filed: 03/15/2024

Docket No. CP16-116-002

JA092

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210
USCA Case #23-1175

Docket No. CP16-116-002



Figure 5-2-5
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

USCA Case #23-1175

Docket No. CP16-116-002

Figure 5-2-6
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

JA094

Document Accession #: 20230421-3057

USCA Case #23-1175    Document #2045210

Filed Date: 04/21/2023

Filed: 03/15/2024    Page 104 of 562

Docket No. CP16-116-002



Figure 5-2-7
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

Proposed Project Site
Proposed Project
Site 50 km Buffer
Census Block Group
(CBG) Boundary
CBG Crossed by Project
Site 50 km Buffer
County Boundary
Low Income Population
(Greater than county)

Document Accession #: 20230421-3057        Filed Date: 04/21/2023

Docket No. CP16-116-002



Figure 5-2-8
Texas LNG Project
Environmental Justice
Low-Income Populations
Cameron County, Texas

JA096

Document Accession #: 20230421-3057     Filed Date: 04/21/2023     Document #2045210

USCA Case #23-1175     Document #2045210

B- 53 -

Docket No. CP16-116-002



**Figure 5-2-9**
**Texas LNG Project**
Environmental Justice
Low Income Populations
Cameron County, Texas

JA097

Document Accession #: 20230421-3057    Filed Date: 04/21/2023    Document #2045210

B- 54 -

Docket No. CP16-116-002



**TEXAS LNG**

**Figure 5-2-10**
**Texas LNG Project**
Environmental Justice
Low Income Populations
Cameron County, Texas

Proposed Project Site
Proposed Project Site 50 km Buffer
Census Block Group
CBG/s Boundary
CBG Crossed by Project
Site 50 km Buffer
County Boundary
Low Income Population
(Greater than county)

**ERM**

JA098

Document Accession #: 20230421-3057
USCA Case #23-1175    Filed Date: 04/21/2023    Document #2045210
Filed: 03/15/2024    Page 108 of 562

Docket No. CP16-116-002



Figure 5-2-11
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

JA099

Document Accession #: 20230421-3057
USCA Case #23-1175    Filed Date: 04/21/2023    Document #2045210

Docket No. CP16-116-002



Figure 5-2-12
Texas LNG Project
Environmental Justice
Low Income Populations
Cameron County, Texas

Proposed Project Site
Proposed Project
Site 50 km Buffer
Census Block Group
(CBG) Boundary
CBG Crossed by Project
Site 50 km Buffer
County Boundary
Low Income Population
(Greater than county)

JA100

Document Accession #: 20230421-3057          Filed Date: 04/21/2023          Document #2045210



Figure 5-2-13
Texas LNG Project
Environmental Justice
Low Income Population
Cameron County, Texas

Docket No. CP16-116-002

**JA101**

Document Accession #: 20230421-3057    USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 111 of 562

Docket No. CP16-116-002



JA102

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

USCA Case #23-1175    Document #2045210    Filed: 03/15/2024    Page 112 of 562

Docket No. CP16-116-002

**Figure 5-2-15**
**Texas LNG Project**
Environmental Justice
Low Income Populations
Cameron County, Texas

Legend:
- Proposed Project Site
- Proposed Project Site 50 km Buffer
- Census Block Group (CBG) Boundary
- CBG Crossed by Project Site 50 km Buffer
- County Boundary
- Low Income Population (Greater than county)

1:31,680

JA103

Document Accession #: 20230421-3057          Filed Date: 04/21/2023

## Appendix C

**Commission Staff's Environmental Justice Analysis of Potential Public Safety Impacts and Emergency Response Plans for the Texas LNG Project and LNG Marine Vessels**

### A.    Onsite and Offsite Emergency Response Plans

Texas LNG would continue to develop a comprehensive Emergency Response Plan with local, state, and federal agencies and emergency response officials and would continue these collaborative efforts during the development, design, and construction of the project.[1]  As required by Environmental Condition 36, Texas LNG must file an Emergency Response Plan covering the terminal and ship transit for review and approval by Commission staff prior to construction.  Commission staff would also review and approve final design information related to the various layers of protection that would enhance the safety and security of the Texas LNG Project and would be in accordance with recommended and generally accepted good engineering practices.[2]  These reviews go above the minimum federal requirements required by the Pipeline and Hazardous Materials Safety Administration (PHMSA) and U.S. Coast Guard (USCG) regulations under for the liquefied natural gas (LNG) facility,[3] and USCG regulations for LNG marine vessels.[4]  In addition, for LNG marine vessels, the 2004 Sandia Report describes the risk and consequences within each Zone of Concern with risk management strategies to mitigate risk to infrastructure and the public.[5]  The layers of protection and risk management strategies reduce public incident impacts to less than significant levels, including impacts to those with access and functional needs and environmental justice communities.

The Emergency Response Plan and Cost Sharing Plan requirements are required by Environmental Conditions 36 and 37, as modified in Appendix A of this order.

---

[1] Texas LNG Sept. 15, 2022 Response to Commission staff Data Request at 24-26.

[2] Final EIS, *Preliminary Engineering Design Review* section, 4-219 to 4-244.

[3] 49 C.F.R.§ 193 (2022) (PHMSA Regulations); 33 C.F.R. §§ 105, 127 (2022) (USCG Regulations).

[4] 33 C.F.R. § 104; 46 C.F.R. § 154.

[5] Sandia National Laboratories, *Guidance on risk analysis and safety implications of a large liquefied natural gas (LNG) spill over water*, sections 1.3.1, 1.3.2, https://www.osti.gov/servlets/purl/882343/.

**JA104**

However, in order to mitigate the potential offsite risks from a catastrophic incident from an LNG marine vessel or at the LNG terminal to people with access and functional needs, Texas LNG would need to consider additional identified elements of recommended and generally accepted good engineering practices for emergency response plans and resource requirements, including, but not limited to consistency with the following National Fire Protection Association (NFPA) codes and standards:  NFPA 1600,[6] NFPA 1616,[7] NFPA 1620,[8] NFPA 470,[9] and NFPA 475[10] or approved equivalents.  Specifically, NFPA 1600 (2019 edition) provides provisions for the planning and design process of an emergency management program and includes the following provisions:

- Section 5.2.2 specifies a risk assessment to be conducted evaluating the likelihood and severity of hazards, including accidental and intentional events that may result in hazardous material releases, explosions, and fires as well as consideration of specific causes and preceding events, such as geological events (e.g., subsidence, earthquakes, tsunamis, volcanic, etc.) and meteorological events (e.g., extreme temperatures, hurricanes, tornadoes, floods, snow and ice storms, and wildland fires, etc.).[11]
- Section 5.2.2.2 specifies the vulnerability of people, property, operations, environment, and supply chain operations to be evaluated.

---

[6] The NFPA standards are free and publicly accessible to view in English and Spanish on the NFPA website.  NFPA 1600, Standard on Continuity, Emergency, and Crisis Management, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1600.

[7] FNFPA 1616, Standard on Mass Evacuation, Sheltering, and Re-entry Programs, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1616.

[8] NFPA 1620, Standard for Pre-Incident Planning, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1620.

[9] NFPA 470, Hazardous Materials/Weapons of Mass Destruction (WMD) Standard for Responders, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=470.

[10] NFPA 475, Recommended Practice for Organizing, Managing, and Sustaining a Hazardous Materials/Weapons of Mass Destruction Response Program, https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=475.

[11] Final EIS 4-224 to 4-244.

**JA105**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

- Section 5.2.3 specifies the analysis of the impacts of the hazards identified in section 5.2.2 on the health and safety of persons in the affected area and personnel responding to the incident as well as impacts to properties, facilities, and critical infrastructure.
- Section 5.2.4 specifies an analysis of the escalation of impacts over time.
- Section 5.2.5 specifies evaluation of incidents that could have cascading impacts.
- Section 5.2.6 specifies the risk assessment to evaluate the adequacy of existing prevention and mitigation measures.

Chapter 6 of NFPA 1600 (2019 edition) covers the implementation of the plans, including health and safety of personnel, roles and responsibilities of internal and external entities, lines of authority, process for delegation of authority, liaisons with external entities, and logistics support and resource requirements.

- Section 6.3.1 specifies the implementation of a mitigation strategy that includes measures to limit or control the consequences, extent, or severity of an incident that cannot be prevented based on the results of hazard identification and risk assessment and analysis of impacts.
- Section 6.9.2 specifies that emergency response plans should identify actions to be taken to protect people, including people with disabilities and other access and functional needs.[12]
- Sections 6.6 and 6.9.4 stipulate an emergency response plan include warning, notification, and communication should be determined and be reliable, redundant, and interoperable and tested and used to alert stakeholders potentially at risk from an actual or impending incident.
- Section 6.8 specifies the development of an incident management system to direct, control, and coordinate response, continuity, and recovery operations.
- Section 6.8.1 stipulates primary and alternate emergency operations centers be established capable of managing response, continuity, and recovery operations and may be physical or virtual.

In addition, NFPA 1600 (2019 edition) Chapter 7 provides specifications for execution of the plan, Chapter 8 provides for training and education provisions, Chapter 9 provides for exercises and tests to be conducted periodically, and Chapter 10 provides for its continued maintenance and improvement.

NFPA 1616 (2020 edition) covers organizing, planning, implementing, and evaluating a program for mass evacuation, sheltering, and re-entry.  Similar to NFPA

---

[12] NFPA 1600 defines "access and functional need" as "Persons requiring special accommodations because of health, social, economic, or language challenges."

**JA106**

1600, the following sections of NFPA 1616 stipulate:

- Section 4.5 stipulates similar hazard identification, risk assessment, and requirements analysis as NFPA 1600.
- Section 5.1 stipulates plans to address the health and safety of personnel including persons with disabilities and access and functional needs.[13]
- Section 5.6 specifies a requirements analysis in sub-section 5.6.1 that is based upon the threat, hazard identification, and risk assessment. Sub-section 5.6.2(1) specifies the requirements analysis include characteristics of the potentially affected population, including persons with disabilities and other access and functional needs. In addition, sub-section 5.6.2(2) stipulates consideration of existing mandatory evacuation laws and expected enforcement of those laws. Sub-section 5.6.2(3) stipulates the requirements analysis to include characteristics of the incident that trigger consideration for evacuation based on weather, season, and ambient conditions, speed of onset, magnitude, location and direction, duration, resulting damages to essential functions, risk for cascading effects and secondary disasters, and capability of transportation routes and systems to transport life-sustaining materials (e.g., water, medical supplies, etc.) into the affected area.
- Section 5.6.3 stipulates the determination if evacuation or sheltering-in-place is appropriate to the situation and resources available based on 1) the anticipated impact and duration of the event, 2) the distance to appropriate sheltering facilities, 3) the availability of and access to transportation to those facilities, and 4) the ability to communicate with the affected population within the required timeframe.
- Section 5.6.4 stipulates the 1) establishment of a single or unified command, 2) development of information system to notify public and provide an assessment of the time needed to reach people with the information, 3) identification of appropriate sheltering facilities by location, size, types of services available, accessibility, and building safety, and 4) identification of the modes and routes for evacuee transportation and the time needed to reach them, sources of evacuee

---

[13] NFPA 1616 defines "People with Access and Functional Needs" as "Persons with disabilities and other access and functional needs include those from religious, racial, and ethnically diverse backgrounds; people with limited English proficiency; people with physical, sensory, behavioral and mental health, intellectual, developmental and cognitive disabilities, including individuals who live in the community and individuals who are institutionalized; older adults with and without disabilities; children with and without disabilities and their parents; individuals who are economically or transportation disadvantaged; women who are pregnant; individuals who have acute and chronic medical conditions; and those with pharmacological dependency."

**JA107**

support services, and manpower requirements based on various potential shelters.

- Section 5.8 also has stipulations for dissemination of information on evacuation, shelter in place, and re-entry before, during, and after an incident to personnel and to the public.
- Section 5.9 has stipulations for warning, notification, and communication needs that are reliable and interoperable and redundant where feasible that takes into account persons with disabilities and other access and functional needs.

Similar to NFPA 1600, NFPA 1616 has requirements in Chapter 6 on Implementation, Chapter 7 on Training and Education, Chapter 8 on Exercises, and Chapter 9 on Program Maintenance and Improvement with additional specifics for mass evacuation, sheltering in place and re-entry.

NFPA 1620 (2020 edition) specifies the characteristics of the facility and personnel onsite that should be within a pre-incident plan, such as emergency contact information, including those with knowledge of any supervisory, control, and data acquisition systems, communication systems, emergency power supply systems, and facility access controls as well as personnel accountability and assistance for people with self-evacuation limits, means of egress, emergency response capabilities, spill containment systems, water supply and fire protection systems, hazardous material information (e.g., safety datasheets), special considerations for responding to hazardous materials (e.g., firewater may exacerbate LNG fires, boiling-liquid-expanding-vapor explosion (BLEVE)[14] potential, etc.), and access to emergency action plans developed by the facility. Similar to NFPA 1600 and NFPA 1616, NFPA 1620 section 8.5.2 also addresses the implementation of an incident management system for the duration of the event and Chapter 10 establishes maintenance of a pre-incident plan.

NFPA 1600, NFPA 1616, and NFPA 1620 provisions for threat, hazard identification, and risk assessment provisions and identification of resource requirements and gaps are also consistent with Department of Homeland Security FEMA's Comprehensive Preparedness Guide 101, Developing and Maintaining Emergency

---

[14] The American Institute of Chemical Engineers Center for Chemical Process Safety defines a boiling-liquid-expanding-vapor-explosion or BLEVE as a "type of rapid phase transition in which a liquid contained above its atmospheric boiling point is rapidly depressurized, causing a nearly instantaneous transition from liquid to vapor with a corresponding energy release. A BLEVE of flammable material is often accompanied by a large aerosol fireball, since an external fire impinging on the vapor space of a pressure vessel is a common cause. However, it is not necessary for the liquid to be flammable to have a BLEVE occur."  Center for Chemical Process Safety, *Boiling-Liquid-Expanding-Vapor Explosion (BLEVE)*, https://www.aiche.org/ccps/resources/glossary/process-safety-glossary/boiling-liquid-expanding-vapor-explosion-bleve, (last visited April 2023).

**JA108**

Operations Plans, Version 3.0, September 2021, and Comprehensive Preparedness Guide 201, Threat and Hazard Identification and Risk Assessment and Stakeholder Preparedness Review Guide, Third Edition, May 2018, and other FEMA guidance.

NFPA 470 covers the competencies and job performance requirements for emergency response personnel to incidents involving hazardous materials, including awareness level personnel (i.e., personnel onsite that would call for emergency responders and secure the scene), operations level responders (i.e., personnel responding to incident for implementing supporting actions to protection public), hazardous material technicians (i.e., personnel responding to incident for analyzing and implementing planned response), hazardous materials officers, hazardous materials safety officers, emergency medical services (EMS) personnel, incident commanders, and other specialist employees.  The standard covers competencies and Job Performance Requirements , including the ability to identify hazardous material releases and hazardous materials involved and identifying surrounding conditions, such as topography, weather conditions, public exposure potential, possible ignition sources, land use and adjacent land use, overhead and underground wires and pipelines, rail lines, and highways, bodies of water, storm and sewer drains, and building information (e.g., ventilation ducts and air returns). Part of the standard also describes the ability and requirement to estimate potential outcomes in order to properly plan response strategies and tactics, and the selection and use of proper personnel protective equipment (PPE).  Many of these provisions are similar and synergistic with NFPA 1600, NFPA 1616, and NFPA 1620.

NFPA 475 covers the organization, management, and sustainability of a hazardous material response program, including identifying facilities with hazardous materials, analyzing the risk of hazardous material incidents, including identifying hazardous materials at each location, (e.g., quantity, concentration, hazardous properties, etc.), type and design of containers; surrounding population and infrastructure, including vulnerable populations and critical facilities (e.g., schools, hospitals, businesses, etc.).  NFPA 475 similarly calls for analyzing the risk of an incident based on the consequences of a release and predicting its behavior and estimating the probability for an incident to take place and potential for cascading incidents.  NFPA 475 Chapter 7 also has provisions for resource management, including the identification, acquisition, and management of personnel, equipment, and supplies to support hazardous material response programs.  NFPA 475 Chapter 8 expands upon staffing requirements and use of different staffing models and Chapter 9 expands upon training program with reference and similarities to NFPA 470.

In accordance with these recommended and generally accepted good engineering practices, Commission staff evaluated the potential impacts from incidents caused by a range of natural hazards, accidental events, intentional events, and potential for cascading damage at the LNG terminal, including scenarios that would lead to a potential catastrophic failure of a tank required to be accounted in emergency response plans by PHMSA regulations in 49 CFR § 193.2509, and along the LNG carrier route using the

**JA109**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

Zones of Concern referenced in USCG Navigation and Vessel Inspection Circular
(NVIC) 01-11.[15]  In addition, Commission staff identified potential emergency response
needs based on the potential impacts to and characteristics of the population and
infrastructure for potential intentional and accidental incidents along the LNG marine
vessel route and at the LNG terminal.  Consistent with these practices, Commission staff
evaluated the potential hazards from incidents, the potential impacts to areas from
incidents and the evaluation of characteristics of population, including those with
potential access and functional needs, and infrastructure that require special
considerations in pre-incident planning, including but not limited to:

- daycares;
- elementary, middle, and high schools and other educational facilities;
- elderly centers and nursing homes and other boarding and care facilities;
- detention and correctional facilities;
- stadiums, concert halls, religious facilities, and other areas of assembly;
- densely populated commercial and residential areas, including high rise buildings, apartments, and hotels;
- hospitals and other health care facilities;
- police departments, stations, and substations;
- fire departments and stations;
- military or governmental installations and facilities;
- major transportation infrastructure, including evacuation routes, major highways, airports, rail, and other mass transit facilities as identified in external impacts section; and
- industrial facilities that could exacerbate the initial incident, including power plants, water supply infrastructure, and hazardous facilities with quantities that exceed thresholds in U.S. Environmental Protection Agency (EPA) RMP and/or OSHA PSM standards as identified in external impacts section.

Many of these facilities are also identified and defined in NFPA 101, Life Safety
Code, and require emergency action plans.  NFPA 101 is currently used by every U.S.
state and adopted statewide in in 43 of the 50 states.[16]  Texas adopted and follows

---

[15] NVIC 01-11,
https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5p/5ps/NVIC/2011/NVIC%200
1-2011%20Final.pdf, accessed January 2023.

[16] NFPA, NFPA 101 Fact Sheet,
https://www.nfpa.org/assets/files/AboutTheCodes/101/NFPA101FactSheet0809.pdf,
accessed January 2023.

NFPA 101 (2015 edition) without amendments.[17]  These areas are also similar to "identified sites" defined in 49 C.F.R. § 192 that define high consequence areas and those identified within Pipelines and Informed Planning Alliance (PIPA) for special land use planning considerations near pipelines.[18]

## B.    Potential Hazards

An incident can result in various potential hazards and are initiated by a potential liquid and/or gaseous release with the formation of vapor at the release location, as well as from any liquid that pooled. The fluid released may present low or high temperature hazards and may result in the formation of toxic or flammable vapors.  The type and extent of the hazard will depend on the material released, the storage and process conditions, and the volumes and durations released.

Exposure to either cold liquid or vapor could cause freeze burns and depending on the length of exposure, more serious injury or death. However, spills would be contained to on-site areas and the cold state of these releases would be greatly limited due to the continuous mixing with the warmer air.  The cold temperatures from the release would not present a hazard to the public, which would not have access to onsite areas.  The cold temperatures may also quickly cool any materials contacted by the liquid on release, causing extreme thermal stress in materials not specifically designed for such conditions. These thermal stresses could subsequently subject the material to brittleness, fracture, or other loss of tensile strength and result in cascading failures.  However, regulatory requirements and the Environmental Conditions in the Authorization Order would ensure that these effects would be accounted for in the design of equipment and structural supports.

A rapid phase transition (RPT) can occur when a cryogenic liquid is spilled onto water and changes from liquid to gas, virtually instantaneously.  Unlike an explosion that releases energy and combustion products from a chemical reaction, an RPT is the result of heat transferred to the liquid inducing a change to the vapor state.  RPTs have been observed during LNG test spills onto water.  In some test cases, the overpressures generated were strong enough to damage test equipment in the immediate vicinity of the

---

[17] Up Codes, Texas Codes, https://up.codes/codes/texas, accessed January 2023; Texas State Fire Marshal, Standards of Inspection, https://www.tdi.texas.gov/fire/fmfsinotices.html, accessed January 2023.

[18] Pipelines and Informed Planning Alliance, Partnering to Further Enhance Pipeline Safety in Communities through Risk-Informed Land Use Planning, Final Report of Recommended Practices, https://primis.phmsa.dot.gov/comm/pipa/landuseplanning.htm, November 2010.

**JA111**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

LNG release point.  The sizes of the overpressure events have been generally small and are not expected to cause significant damage.  Six of the 18 Coyote spills[19] produced RPT explosions.  Most were early RPTs that occurred immediately with the spill, and some continued for the longer periods.  Including RPTs near the end of the spills on three tests.  LNG composition, water temperature, spill rate and depth of penetration all seem to play a role in RPT development and strength.  The maximum strength RPT yielded equivalent to up to 6.3 kilograms of TNT free-air point source at the maximum spill rate of 18 $m^3$/min (4,750 gpm).  This would produce an approximate 1 psi overpressures less than 100 feet from the spill source.  These events are typically limited to the area within the spill and are not expected to cause damage outside of the area engulfed by the LNG pool.  However, a RPT may affect the rate of pool spreading and the rate of vaporization for a spill on water.

### C.   Vapor Dispersion

Depending on the size and product of the release, liquids may form a liquid pool and vaporize.  Additional vaporization would result from exposure to ambient heat sources, such as water or soil.  The vapor may form a toxic or flammable cloud depending on the material released.  The dispersion of the vapor cloud will depend on the physical properties of the cloud, the ambient conditions, and the surrounding terrain and structures.  Generally, a denser-than-air vapor cloud would sink to the ground and would travel with the prevailing wind, while a lighter-than-air vapor cloud would rise and travel with the prevailing wind.  The density will depend on the material releases and the temperature of the material.  For example, an LNG release would initially form a denser than-air vapor cloud and transition to lighter-than-air vapor cloud as the vapor disperses downwind and mixes with the warm surrounding air.  However, experimental observations and vapor dispersion modeling indicate an LNG vapor cloud would not typically be warm, or buoyant, enough to lift off from the ground before the LNG vapor cloud disperses below its lower flammable limit (LFL).

A vapor cloud formed following an accidental release would continue to be hazardous until it dispersed below toxic levels and/or flammable limits.  Toxicity is

---

[19] Goldwire, H.C., et al, Coyote Series Data Report LLNL/NWC 1981 LNG Spill tests Dispersion, Vapor Burn, and Rapid Phase Transition, Lawrence Livermore Laboratory, UCID-19952, Volume 1, October 1983.  In 1981, a series of LNG spill experiments were performed at the Naval Weapons Center, located at China Lake, California, they are commonly referred to as the Coyote series.  There was a total of ten Coyote series experiments, which included the study of vapor dispersion and burning vapor clouds and rapid-phase transition explosions. *Id.*

primarily dependent on the airborne concentration of the toxic component and the exposure duration, while flammability of the vapor cloud is primarily dependent just on the concentration of the vapor when mixed with the surrounding air. In general, higher concentrations within the vapor cloud would exist near the spill, and lower concentrations would exist near the edge of the cloud as it disperses downwind.

Toxicity is defined by several different agencies for different purposes. Acute Exposure Guideline Level (AEGL) and Emergency Response Planning Guidelines (ERPG) can be used for emergency planning, prevention, and response activities related to the accidental release of hazardous substances. Other federal agencies, such as the Department of Energy (DOE), EPA, and National Oceanic and Atmospheric Administration (NOAA), use AEGLs and ERPGs as the primary measure of toxicity.

There are three AEGLs and three ERPGs, which are distinguished by varying degrees of severity of toxic effects with AEGL-1 and ERPG-1 (level 1) being the least severe to AEGL-3 and ERPG-3 (level 3) being the most severe.

- AEGL-1 is the airborne concentration of a substance above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or certain asymptomatic non sensory effects. However, these effects are not disabling and are transient and reversible upon cessation of the exposure.
- AEGL-2 is the airborne concentration of a substance above which it is predicted that the general population, including susceptible individuals, could experience irreversible or other serious, long lasting adverse health effects or an impaired ability to escape.
- AEGL-3 is the airborne concentration of a substance above which it is predicted that the general population, including susceptible individuals, could experience life-threatening health effects or death.

The EPA directs the development of AEGLs in a collaborative effort consisting of committee members from public and private sectors across the world. Commission staff uses AEGLs preferentially as they are more inclusive and provide toxicity levels at various exposure times (10 minutes, 30 minutes, 1 hour, 4 hours, and 8 hours). The use of AEGLs is also preferred by the DOE and NOAA. Under the EPA RMP regulations in 40 C.F.R. § 68, the EPA currently requires the determination of distances to toxic concentrations based on ERPG-2 levels. ERPG levels have similar definitions but are based on the maximum airborne concentration below which it is believed nearly all individuals could be exposed for up to 1 hour without experiencing similar effects defined in each of the AEGLs. The EPA provides ERPGs (1 hour) for a list of chemicals. These toxic concentration endpoints are comparable to AEGLs endpoints.

In addition, any non-toxic release that does not contain oxygen would be classified

**JA113**

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

as simple asphyxiants and may pose extreme health hazards, including death, if inhaled in significant quantities within a limited time.  Very cold methane and heavier hydrocarbons vapors may also cause freeze burns.  However, the locations of concentrations where cold temperatures and oxygen-deprivation effects could occur are greatly limited due to the continuous mixing with the warmer air surrounding the spill site.  For that reason, exposure injuries from contact with releases of methane, nitrogen, and heavier hydrocarbons normally represent negligible risks to the public.

Flammable vapors can develop when a flammable material is above its flash point and concentrations are between the LFL and the upper flammable limit (UFL). Concentrations between the LFL and UFL can be ignited, and concentrations above the UFL or below the LFL would not ignite.

The extent of the affected area and the severity of the impacts on objects within a vapor cloud would primarily be dependent on the material, quantity, and duration of the initial release, the surrounding terrain, and the weather (e.g., wind speed and direction, temperature, humidity, etc.) present during the dispersion of the cloud.

### D.    **Flammable Vapor Ignition**

If the flammable portion of a vapor cloud encounters an ignition source, a flame would propagate through the flammable portions of the cloud.  In most circumstances, the flame would be driven by the heat it generates.  This process is known as a deflagration, or a flash fire, because of its relatively short duration.  However, exposure to a deflagration, or flash fire, can cause severe burns and death, and can ignite combustible materials within the cloud.  If the deflagration in a flammable vapor cloud accelerates to a sufficiently high rate of speed, pressure waves that can cause damage would be generated.  As a deflagration accelerates to super-sonic speeds, the large shock waves produced, rather than the heat, would begin to drive the flame, resulting in a detonation.  The flame speeds are primarily dependent on the reactivity of the fuel, the ignition strength and location, the degree of congestion and confinement of the area occupied by the vapor cloud, and the flame travel distance.  Once a vapor cloud is ignited, the flame front may propagate back to the spill site if the vapor concentration along this path is sufficiently high to support the combustion process.  When the flame reaches vapor concentrations above the UFL, the deflagration will transition to a pool or jet fire back at the source.  If ignition occurs soon after the release begins, a fireball may occur near the source of the release and would be of a relatively short duration compared to an ensuing jet or pool fire.  The extent of the affected area and the severity of the impacts on objects in the vicinity of a fire would primarily be dependent on the material, quantity, and duration of the fire, the surrounding terrain, and the ambient conditions present during the fire.

**JA114**

## E.   Overpressures

If the deflagration in a flammable vapor cloud accelerates to a sufficiently high rate of speed, pressure waves that can cause damage would be generated.  As a deflagration accelerates to super-sonic speeds, large pressure waves are produced, and a shock wave is created.  In this scenario, the shock wave, rather than the heat, would drive the flame, resulting in a detonation.  Deflagrations or detonations are generally characterized as "explosions" as the rapid movement of the flame and pressure waves associated with them cause additional damage beyond that from the heat.  The amount of damage an explosion causes is dependent on the amount the produced pressure wave is above atmospheric pressure (i.e., an overpressure) and its duration (i.e., pulse).  For example, a 1 psi overpressure, often cited as a safety limit in NFPA 59A (2019 edition) and U.S. regulations, is associated with glass shattering and traveling with velocities high enough to lacerate skin.

Flame speeds and overpressures are primarily dependent on the reactivity of the fuel, the ignition strength and location, the degree of congestion and confinement of the area occupied by the vapor cloud, and the flame travel distance.

The potential for unconfined LNG vapor cloud detonations was investigated by the USCG in the late 1970s at the Naval Weapons Center in China Lake, California.  Using methane, the primary component of natural gas, several experiments were conducted to determine whether unconfined LNG vapor clouds would detonate.  Unconfined methane vapor clouds ignited with low-energy ignition sources (13.5 joules), produced flame speeds ranging from 12 to 20 mph.  These flame speeds are much lower than the flame speeds associated with a deflagration with damaging overpressures or a detonation.

To examine the potential for detonation of an unconfined natural gas cloud containing heavier hydrocarbons that are more reactive, such as ethane and propane, the USCG conducted further tests on ambient-temperature fuel mixtures of methane-ethane and methane-propane.  The tests indicated that the addition of heavier hydrocarbons influenced the tendency of an unconfined natural gas vapor cloud to detonate.  Less processed natural gas with greater amounts of heavier hydrocarbons would be more sensitive to detonation.

Although it has been possible to produce damaging overpressures and detonations of unconfined LNG vapor clouds, the feed gas stream proposed for the project would have lower ethane and propane concentrations than those that resulted in damaging overpressures and detonations.  The substantial amount of initiating explosives needed to create the shock initiation during the limited range of vapor-air concentrations also renders the possibility of detonation of these vapors at an LNG plant as unrealistic.  Ignition of a confined LNG vapor cloud could result in higher overpressures.  To prevent

**JA115**

such an occurrence, Texas LNG would take measures to mitigate the vapor dispersion and ignition into confined areas, such as buildings. Texas LNG would install hazard detection devices at all combustion and ventilation air intake equipment to enable isolation and deactivation of any combustion equipment whose continued operation could add to, or sustain, an emergency. In general, the primary hazards to the public from an LNG spill that disperses to an unconfined area, either on land or water, would be from dispersion of the flammable vapors or from radiant heat generated by a pool fire.

In comparison with LNG vapor clouds, there is a higher potential for unconfined propane clouds to produce damaging overpressures. This has been shown by multiple experiments conducted by the Explosion Research Cooperative to develop predictive blast wave models for low, medium, and high reactivity fuels and varying degrees of congestion and confinement. The experiments used methane, propane, and ethylene, as the respective low, medium, and high reactivity fuels. In addition, the tests showed that if methane, propane, or ethylene are ignited within a confined space, such as in a building, they all have the potential to produce damaging overpressures.

Fires and overpressures may also cause failures of nearby storage vessels, piping, and equipment if not properly mitigated. These failures are often termed cascading events or domino effects and can exceed the consequences of the initial hazard. The failure of a pressurized vessel could cause fragments of material to fly through the air at high velocities, posing damage to surrounding structures and a hazard for operating staff, emergency personnel, or other individuals in proximity to the event. In addition, failure of a pressurized vessel when the liquid is at a temperature significantly above its normal boiling point could result in a BLEVE. BLEVEs can produce overpressures when the superheated liquid rapidly changes from a liquid to a vapor upon the release from the vessel. BLEVEs of flammable fluids may also ignite upon its release and cause a subsequent fireball.

## F.    Potential Infrastructure Impacts from LNG Facilities

The final EIS for the Texas LNG Project assessed potential impacts to the public and whether the project would operate safely, reliably, and securely. The Texas LNG Project would be subject to design requirements and would include mitigation to meet regulation requirements and the conditions of the Commission's Authorization Order. Although the likelihood of incidents and hazards described in the final EIS are extremely low due to the mitigation required by regulations and Environmental Conditions, potential impacts from these hazards could impact onsite personnel and offsite public.[20]

---

[20] Specific distances of potential impacts from incidents at an LNG terminal have not been provided at this time to try and balance the potential security interests in releasing such information. Specific distances for various hazards described would be

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

Commission staff evaluated a range of releases to evaluate the potential impacts to populations and infrastructure within vicinity of the plant. Impacts would vary based on the initiating event and subsequent release characteristics (e.g., size, location, direction, process conditions, etc.), hazard (i.e., vapor dispersion, overpressures, fires, BLEVE and pressure vessel bursts), weather conditions, and surrounding terrain. Distances to radiant heats of 5 kW/m$^2$ (or approximately 1,600 BTU/ft$^2$-hr) from fires produced by accidental and intentional acts could impact onsite personnel or offsite public. For example, Section 2.2.2.2 in NFPA 59A-2001, incorporated by reference in PHMSA regulations in 49 C.F.R. § 193, requires spill containments, serving vaporization, process, or LNG transfer area, to contain liquid releases from 2-inch diameter holes and guillotine releases of piping less than 6-inches in diameter. Additionally, PHMSA siting regulations for flammable vapor dispersion and thermal radiation exclusion zones limit the dispersion of flammable vapors and 1,600 BTU/ft$^2$-hr radiant heat from LNG pool fires in those spill containment systems in certain weather conditions from extending beyond the control of the operator or government agency and prevent it from extending onto areas accessible by the public. Environmental Condition 84 of the Authorization Order requires spill containment systems to capture all liquid from guillotine ruptures of the single largest line and largest vessel(s) to limit their pool spread and vaporization. This effectively limits the extent of the 1,600 BTU/ft$^2$-hr radiant heat from pool fires to onsite for even the largest releases from a single source and considerably reduces the dispersion distances to flammable vapors. However, ignition of releases larger than those used in the siting analyses can result in 1,600 BTU/ft$^2$-hr and 10,000 BTU/ft$^2$-hr radiant heats from jet and pool fires that extend offsite onto publicly accessible areas.

The only offsite infrastructure that could be impacted by 10,000 BTU/ft$^2$-hr radiant heat from a fire would be a portion of Texas State Highway 48 with no impacts to nearby communities. The offsite infrastructure that could be impacted by 1,600 BTU/ft$^2$-hr radiant heat from a fire would be the authorized Texas LNG facility[21] and the infrastructure within the 10,000 BTU/ft$^2$-hr radiant heat with no impact to nearby communities. The unignited vapor dispersion from a catastrophic failure of an LNG storage tank is extremely unlikely but, if it occurred, could extend farther offsite and could impact the following critical infrastructure: commercial areas including the Port Isabel-San Benito Navigation District, and the Space X assembly facility; numerous local

---

provided in emergency response plans for reference and use by emergency responders, Further, potential hazards have been described and potential impacts to communities are disclosed to balance the importance of public disclosure and transparency on the balance of potentially releasing information that has not been previously released and could be used by intentional actors.

[21] *Texas LNG Brownsville LLC, Order Granting Authorization Under Section 3 of the Natural Gas Act*, 169 FERC ¶ 61,130

government buildings including the Port Isabel Police Department, Cameron County Precinct 1 Constable's Office, Port Isabel City Fire Department, Cameron County Tax Assessor-Collector Office, Port Isabel City Hall, and Port Isabel City Social Worker Office; two health care facilities including the Port Isabel Health Clinic, the Luna Medical Clinic, and Emergency Medical Services; and several major roadways, including the Queen Isabel Causeway, Texas State Highway 100, and Texas State Highway 48. Several communities within the extent of the unignited vapor release from a catastrophic failure of one of the LNG storage tanks could include multiple residential homes, apartment complexes, several schools including Garriga Elementary School, Derry Elementary School, Port Isabel Junior High School, Port Isabel High School, Port Isabel Independent School District, several child-care facilities including the Little Learners Academy, Esperanza B. Garza Head Start, and Beacon Bay Head Start, hotels, and places of worship.

## G.     Potential Infrastructure Impacts Along LNG Marine Vessel Route

As LNG marine vessels proceed along the intended transit route, the estimated impacts would extend onto populated areas and infrastructure. These distances are provided as Zones of Concern in the publicly available guidance NVIC 01-11[22] used by the USCG and correspond to 37.5 kW/m$^2$ (approximately 12,000 BTU/ft$^2$-hr) radiant heats from fires for Zone 1, 5 kW/m$^2$ (approximately 1,600 BTU/ft$^2$-hr) radiant heats from fires for Zone 2, and flammable vapor dispersion distances for Zone 3. The areas, including a description of the infrastructure and communities, impacted by the three different hazard zones were provided for accidental and intentional events in the Texas LNG final EIS.[23]

## H.     Potential Impacts on People with Access and Functional Needs and Environmental Justice Communities

Commission staff used EJScreen[24] as an initial screening tool to identify the potential impacts from incidents along the LNG marine vessel transit route and at the LNG terminal, including potential impacts to people with access and functional needs as defined in NFPA 1600 and 1616. Table 1 shows the resultant percentages of people with potential access and functional needs based on 2016-2020 U.S. Census Bureau, American

---

[22] NVIC 01-11, https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5p/5ps/NVIC/2011/NVIC%2001-2011%20Final.pdf, accessed January 2023.

[23] Texas LNG Final EIS, pages 4-211 to 4-212 in Figures 4.12.3-1 and 4.12.3-2.

[24] EPA, EJScreen, https://ejscreen.epa.gov/mapper/, accessed December 2022.

Community Survey (ACS) as follows.[25]

---

[25] Based on EPA, EJScreen User Guide Version 2.1, 2022, the impact area would aggregate appropriate portions of the intersecting block groups, weighted by population, to create a representative set of data for the entire ring area, honoring variation and dispersion of the population in the block groups within it. For each indicator, the result is a population-weighted average, which equals the block group indicator values averaged over all residents who are estimated to be inside the impact area.  A weight factor for each block group is determined by summing each block point population percentage for that block group.  If the impact area touches part of a neighboring block group that contains no block points, nothing will be aggregated; if an impact area intersects a number of block groups, EJScreen indices will be aggregated within each block group based on the affiliated block points.  The aggregation is done by using factor-weighted block points.

**TABLE 1**

**People With Access and Functional Needs within Potential Impact Areas**

| Potential Incident Impact Area | Population Density (per square mile) [1] | Households[1] | Housing Units[1] | Age 0-4 (percent)[1] | Age 65+ (percent)[1] | Linguistically Isolated Households (percent)[1, 2, 3] |
|---|---|---|---|---|---|---|
| Zone 1 (LNG marine vessel - Accidental) | 0 | 0 | 0 | 0 | 0 | 0 |
| Zone 2 (LNG marine vessel - Accidental) | 455 | 75 | 397 | 2% | 34% | 0 |
| Zone 3 (LNG marine vessel - Accidental) | 235 | 256 | 1,359 | 2% | 34% | 0 |
| Zone 1 (LNG marine vessel - Intentional) | 2 | 0 | 1 | 2% | 34% | 0 |
| Zone 2 (LNG marine vessel - Intentional) | 211 | 195 | 1,033 | 2% | 34% | 0 |
| Zone 3 (LNG marine vessel - Intentional) | 228 | 1,557 | 4,093 | 5% | 22% | 14.9% |
| 10,000 BTU/ft$^2$-hr (LNG Terminal) | 0 | 0 | 0 | 0% | 0% | 0 |
| 1,600 BTU/ft$^2$-hr (LNG Terminal) | 0 | 0 | 0 | 0% | 0% | 0 |
| Flammable Vapor Cloud (LNG Terminal) | 208 | 3,102 | 5,979 | 9% | 19% | 13.2% |

[1] American Community Survey, 2016-2020, ACS Estimates
[2] Households in which no one 14 and over speaks English "very well" or speaks English only.
[3] Calculated by dividing the number of linguistically isolated households by the total number of households multiplied by 100.

The worst-case distances from these potential incidents would potentially impact six census block groups, all of which are considered environmental justice communities. The block groups located with environmental justice communities that exceed the thresholds for minority and low income would include Census Tracts 142.02 Block Group 2, 127 Block Group 2, 123.04 Block Group 2, 123.04 Block Group 4 (based on the minority and low-income thresholds); Census Tract 123.04 Block Group 3 (based on the minority threshold); and Census Tract 123.04 Block Group 1 (based on low-income threshold).

**JA120**

Docket No. CP16-116-002                                                                 C- 18 -

I.     **Emergency Response Plans and Mitigation**

     In order to mitigate these potential offsite risks, this order modifies, in
Appendix A, the Emergency Response Plan and Cost Sharing Plan Environmental
Conditions 36 and 37 from Authorization Order.  The modified language specifies
emergency response and cost sharing considerations related to public education materials,
including those with access and functional needs and environmental justice communities,
on proposed evacuation routes and shelter in place locations, first responder training,
emergency command centers and equipment, and public communication methods and
devices.  These revisions will further enhance the safety and security measures beyond
that which would normally be required at the LNG terminal by the minimum standards
for LNG safety promulgated in PHMSA regulations under 49 C.F.R. § 193 and USCG
regulations under 33 C.F.R. § 127 and 33 C.F.R. § 105.

     As stated in Sandia National Laboratories Report, Guidance on Risk Analysis and
Safety Implications of a Large LNG Spill Over Water, SAND2004-6258, which was the
basis for the Zones of Concern and referenced in NVIC 01-011, Zone 1 represents "risks
and consequences of an LNG spill could be significant and have severe negative impacts"
and radiant heat demarked by this zone "poses a severe public safety and property hazard,
and can damage or significantly disrupt critical infrastructure."  Subsequently, the Sandia
report concludes that for accidental Zone 1 impacts, "risk management strategies for
LNG operations should address both vapor dispersion and fire hazards" and the most
rigorous deterrent measures, such as vessel security zones, waterway traffic management,
and establishment of positive control over vessels are options to be considered as
elements of the risk management process."  Zone 1 is based upon a 37.5 kW/m$^2$ radiant
heat from a fire, which would cause significant damage to equipment and structures that
are located within 1,640 feet.[26]  Sandia recommends that "incident management and
emergency response measures should be carefully evaluated to ensure adequate resources
(i.e., firefighting, salvage, etc.) are available for consequence and risk mitigation."

     Sandia indicates Zone 2 represents where radiant heat "transitions to less severe
hazard levels to public safety and property" and the consequence of an accidental LNG
spill are reduced and risk reduction and mitigation approaches and strategies can be less
extensive."  Zone 2 is based upon a 5 kW/m$^2$ radiant heat, which would cause significant
impacts to individuals, but would not be expected to significantly impact most
structures.[27]  Sandia concludes that for accidental Zone 2 impacts, "risk management

---

     [26] Texas LNG Final EIS 4-211 to 4-212 (describing the specifics of Sandia Zone 1
impacts).

     [27] Texas LNG Final EIS4-211 to 4-212 (describing the  specifics of Sandia Zone 2
impacts).

strategies for LNG operations should focus on approaches dealing with both vapor dispersion and fire hazards" and "should include incident management and emergency management and emergency response measures, such as ensuring areas of refuge (e.g., enclosed areas, buildings) are available, development of community warning signals, and community education programs to ensure persons know what precautions to take."

Sandia indicates Zone 3 represents "risks and consequences to people and property of an accidental LNG spill over water are minimal" and radiant heat "poses minimal risks to public safety and property." Zone 3 is based upon the dispersion distance to flammable vapors under worst-case wind conditions.[28] In the rare circumstance that the flammable vapors are not ignited until later, there could be flash fires or explosions depending on congestion, confinement, and ignition strength and location. Subsequent pool fires that would be demarked from the Zone 1 and 2 fire hazard distances, Sandia concludes that for accidental Zone 3 impacts, "risk reduction and mitigation strategies can be significantly less complicated or extensive" and "should concentrate on incident management and emergency response measures that are focused on dealing with vapor cloud dispersion . . . " such as ensuring "areas of refuge are available, and community education programs . . . to ensure that persons know what to do in the unlikely event of a vapor cloud." Sandia makes similar recommendations for the Zones of Concern for intentional acts. The modified Emergency Response Plan and Cost Sharing Plan Environmental Conditions 36 and 37 in Appendix A incorporate the considerations from the Sandia recommendations and would be consistent with the recognized and generally accepted good engineering practices for evacuating and sheltering in place, such as NFPA 1600, NFPA 1616, NFPA 1620, NFPA 470, and NFPA 475.

As described in the final EIS, Commission staff evaluated Rio Grande's application with a focus on potential hazards from within the terminal and near the site, including external events, which may have the potential to cause damage or failure to the project facilities. Based on these potential hazards, staff examined the project's engineering design features that would mitigate potential hazards and any risk to safety and reliability.[29] When reviewing an applicant's engineering design for a project, the Commission requires it to be site-specific and developed to the extent that further detailed design would not result in significant changes to the siting considerations, basis of design, operating conditions, major equipment selections, equipment design conditions, or safety system designs. The engineering design that staff evaluated included: process design; mechanical design; hazard mitigation design for the spill containment design; spacing and plant layout design; ignition control design; hazard detection; emergency shutdown and depressurization system design; hazard control

---

[28] Final EIS 4-211 to 4-212 (describing the specifics of Sandia Zone 3 impacts).

[29] *Id.* at 4-211 to 4-244.

design; passive cryogenic and fire protection design; firewater system design; geotechnical and structural design, including natural hazards design; and onsite and offsite emergency response plans.[30]

To analyze the reliability and safety of these designs, staff considered the occurrence and likelihood of potential hazards and the likely severity of consequences based on past incidents and validated hazard modeling. As part of its review, staff recommended 93 mitigation measures in the final EIS, which were adopted as conditions in the Authorization Order.[31] In addition to the earlier review, staff reevaluated the potential impacts along the LNG marine vessel transit route and at the LNG terminal as described above.[32] This review resulted in modifications to Environmental Conditions 53 and 54 from the Authorization Order related to emergency response and cost sharing plans in order to further mitigate potential offsite risks.[33] Based on these reviews, Commission staff determined that the risk (i.e., likelihood and consequence) of accidental and intentional events would be less than significant with implementation of the proposed safety and security recommendations that further enhance the safety and security measures above what is required at the LNG terminal by PHMSA regulations under 49 C.F.R. § 193 and USCG regulations under 33 C.F.R. Part 127 and 33 C.F.R. Part 105, and those required for the LNG marine vessel by USCG regulations under 33 C.F.R. Part 104 and 46 C.F.R. Part 154.

The Energy Policy Act of 2005 requires LNG terminal operator's Emergency Response Plan be developed in consultation with the USCG and State and local agencies and be approved by the commission prior to final approval to begin construction. To satisfy this requirement, this order modifies Environmental Conditions 36 and 37 in Appendix A of this order, that prior to construction of final design, Texas LNG shall file with the Secretary a revised Emergency Response Plan (ERP), including evacuation and any sheltering and re-entry, a request for review and written approval by the Office of Energy Projects Director or his designee. The ERP must be developed and coordinated with the USCG; state, county, and local emergency planning groups; fire departments; state and local law enforcement; and other appropriate federal agencies. This plan must be consistent with recommended and good engineering practices, as defined in NFPA 1600, NFPA 1616, NFPA 1620, NFPA 470, NFPA 475, or approved equivalents, and based on potential impacts and onsets of hazards from accidental and intentional events

---

[30] Id. (detailing staff's evaluation of the project's engineering design).

[31] Authorization Order, 169 FERC ¶ 61,130 at Env't Conditions 31-125.

[32] See supra at C-19 & C-20.

[33] See supra Order on Remand and Amending Certificate at P 64.

along the LNG marine vessel route and potential impacts and onset of hazards from accidental and intentional events at the LNG terminal, including but not limited to a catastrophic failure of the largest LNG tank. The plan must also address any special considerations and pre-incident planning for infrastructure and public with access and functional needs and must include at a minimum:

a. materials and plans for periodic dissemination of public education and training materials in English and Spanish for potential hazards and impacts, identification of potential hazards, and steps for public notification, evacuation, and shelter in place within any transient hazard areas along the marine vessel route, and within LNG terminal hazard areas;

b. plans to competently train emergency responders required to effectively and safely respond to hazardous material incidents including, but not limited to LNG fires and dispersion;

c. plans to competently train emergency responders to effectively and safely evacuate or shelter public within transient hazard areas along the marine vessel route, and within hazard areas from LNG terminal;

d. designated contacts with federal, state and local emergency response agencies responsible for emergency management and response within any transient hazard areas along the marine vessel route, and within hazard areas from LNG terminal;

e. scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

f. scalable procedures for mobilizing response and establishing a unified command, including identification, location, and design of any emergency operations centers and emergency response equipment required to effectively and safely to respond to hazardous material incidents and evacuate or shelter public within transient hazard areas along the marine vessel route, and within LNG terminal hazard areas;

g. scalable procedures for notifying public, including identification, location, design, and use of any permanent sirens or other warning devices required to effectively communicate and warn the public prior to onset of debilitating hazards within any transient hazard areas along the LNG marine vessel route and within hazard areas from LNG terminal;

h. scalable procedures for evacuating the public, including identification, location, design, and use of evacuation routes/methods and any mustering locations required effectively and safely evacuate public within any transient hazard areas along the LNG marine transit route and within hazard areas from LNG terminal; and

i. scalable procedures for sheltering the public, including identification, location, design, and use of any shelters demonstrated to be needed and demonstrated to effectively and safely shelter public prior to onset of debilitating hazards within transient hazard areas that may better benefit from sheltering in place (i.e., those within Zones of Concern 1 and 2), along the route of the LNG marine vessel and

**JA124**

within hazard areas that may benefit from sheltering in place (i.e., those within areas of 1,600 BTU/ft$^2$-hr and 10,000 BTU/ft$^2$-hr radiant heats from fires with farthest impacts, including from a catastrophic failure of largest LNG tank) of the LNG terminal.

Environmental Condition 36 requires Texas LNG to notify Commission staff of all planning meetings in advance and to report progress on the development of its Emergency Response Plan at 3-month intervals.

The Energy Policy Act of 2005 requires LNG terminal operators develop a cost-sharing plan to reimburse direct costs to state and local agencies.  To satisfy this requirement, Environmental Condition No. 37 requires Texas LNG to provide a Cost Sharing Plan that includes sustained funding of any requirement or resource gap analysis identified above to be needed and to effectively and safely evacuate and shelter public and required to effectively and safely respond to hazardous material incidents.  Once submitted by Texas LNG, we would evaluate the revised Emergency Response Plan and Cost Sharing Plan in accordance with recommended and good engineering practices such as, but not limited to, NFPA 1600, NFPA 1616, NFPA 1620, NFPA 470 and NFPA 475, or approved equivalents.

Based on our preliminary analysis of the hazards from the LNG facilities and along the LNG marine vessel route and the Environmental Conditions set forth in the Authorization Order and modified Environmental Conditions herein, Texas LNG must provide additional information, for review and approval, on development of emergency response plans prior to construction of final design.  Texas LNG will also have to file three dimensional drawings, for review and approval, under the Environmental Condition 41 of the Authorization Order that demonstrate there is a sufficient number of access and egress locations at the LNG terminal.  Texas LNG is also required under Environmental Condition 36 to coordinate with local, state, and federal agencies on the development of an emergency response plan and cost sharing plan.  Texas LNG has provided and must continue to provide periodic updates on the development of these plans for review and approval, and ensure they are in place prior to introduction of hazardous fluids.  In addition, the Texas LNG Project will be subject to regular inspections throughout the life of the facility and will continue to require Texas LNG to file updates to the Emergency Response Plan.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.    CP16-116-002

(April 21, 2023)

PHILLIPS, Chairman, *concurring*:

1.      I concur in today's orders.[1]  In *Vecinos para el Bienestar de la Comunidad Costera v. FERC*,[2] the U.S. Court of Appeals for the District of Columbia Circuit held that "the Commission's analyses of the [Rio Bravo and Texas LNG projects'] impacts on climate change and environmental justice communities were deficient," and directed the Commission on remand to "revisit its determinations of public interest and convenience under Sections 3 and 7 of the NGA" after adequately considering those issues.  With today's order, we have provided a full response to both deficiencies identified by the Court.

2.      First, with respect to climate change, the Court held that the Commission did not adequately respond to arguments regarding why it should deploy the Social Cost of Carbon.[3]  In response, consistent with recent precedent, we have included the Social Cost of Carbon figures in today's order.

3.      Second, with respect to environmental justice, the Court held that the Commission did not adequately explain its method for identifying environmental justice communities potentially affected by the projects.  In response, we have conducted a full review of the projects' impacts on environmental justice communities.  Throughout 2022, Commission staff issued multiple data requests to gather information on the projects' potential impacts on environmental communities with 50 kilometers of the facilities.  In addition, we provided all stakeholders an opportunity to comment on the information submitted in those data requests, including what that information meant for environmental justice communities.  While I recognize that certain of my colleagues would have preferred more process or less, I believe that the record assembled throughout the last year is an appropriate middle ground that represents an adequate basis to fully consider the issues the Court remanded to us in *Vecinos* nearly two years ago.

---

[1] I enter the same concurrence in this case as *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023).

[2] 6 F.4th 1321, 1331 (D.C. Cir. 2021).

[3] *Id.* at 1328-30.

**JA126**

Document Accession #: 20230421-3057    Filed Date: 04/21/2023

4.      And we did just that.  Today's order conducts a full environmental justice examination using our current methods, which are consistent with EPA and CEQ guidance.  As part of that investigation, and in direct response to the Court, we identified all environmental justice communities within 50 kilometers of the projects, as opposed to just those within the 2-mile radius considered in the initial orders.[4]  We then analyzed each project's impacts on affected EJ communities.  As part of that full examination and due to required mitigation, we affirmed our earlier conclusion that the projects' impacts would be less than significant.

5.      To that point, today's order takes an unprecedented and bipartisan step to protect environmental justice communities from potential concerns about the projects' effects on air quality.  Because portions of the projects will enter service before construction is completed, there is the potential that those overlapping activities could, in connection with other background emissions, contribute to an exceedance of the National Ambient Air Quality Standards (NAAQS) for certain pollutants.  To mitigate that concern, the Commission is, for the first time, *sua sponte*, requiring the projects' sponsors to file a plan to ensure that the overlapping construction and operation of project do not cause any exceedance of the NAAQS.  That measure allows the Commission to conclude that the projects will not have any significant air quality impacts on environmental justice communities.

6.      In addition, at a broader level, this mitigation illustrates how the Commission is making progress on the critically important issue of cumulative impacts.  At the Commission's March 29, 2022 Roundtable on Environmental Justice and Equity in Infrastructure Permitting, we heard from several stakeholders, including community groups, about the importance of considering cumulative impacts—i.e., not just the air emissions directly caused by a particular project, but also those emissions in conjunction with the emissions from other sources within the region.  Today's order takes a critical step toward addressing that concern by requiring that the project sponsors develop a plan to ensure that incremental emissions impacts associated with these projects, on top of all sources, do not cause a NAAQS exceedance, thereby helping to protect communities, including environmental justice communities, that may venture near the projects.

        For these reasons, I respectfully concur.


        _____
        Willie L. Phillips
        Chairman


_____

        [4] The underlying orders identified only communities within in two miles or over three kilometers of the facility.

**JA127**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.    CP16-116-002

(Issued April 21, 2023)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from the Order[1] because (1) the Commission was required to prepare a supplemental environmental impact statement (EIS) and its failure to do so renders the Order's significance determinations unsupportable; (2) the Commission should have granted the requests it received to hold public meetings addressing the Commission's new analyses of environmental and other impacts;[2] and (3) I disagree with the Order's explanation for why the Commission is not determining the significance of greenhouse gas (GHG) emissions associated with the Texas LNG Terminal project.[3]  The Commission's failure to prepare a supplemental environmental impact statement (EIS) for the project, and to take public comment on the supplement, leaves the Commission with a fundamentally flawed record that cannot support a public interest determination for the project.  I therefore dissent from the Order's ultimate conclusion that the Texas LNG Terminal is not inconsistent with the public interest.[4]

2.      In performing the expanded review of EJ impacts required by the D.C. Circuit's remand decision in *Vecinos*,[5] the Commission identified 274 additional EJ communities in the area around the Texas LNG Terminal that could be impacted by the project,

---

[1] *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Order).

[2] *See* Order at PP 12, 15.

[3] *See id.* at PP 21, 26.

[4] *Id.* at P 84.

[5] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).  The Court instructed that, on remand, the Commission must explain why it used only a two-mile radius for its analysis of EJ impacts or use a different radius. *Id.* at 1331.  The Commission correctly chose to use the 50-kilometer radius in its analysis on remand because that was the only rational choice given that the Commission uses that radius for analysis of air quality impacts.  *See* Order at P 34 & n.86 (explaining 50 kilometers is the distance that the U.S. Environmental Protection Agency uses for cumulative air modeling for major stationary sources under its Prevention of Significant Deterioration Program).

**JA128**

Docket No. CP16-116-002                                                - 2 -

beyond the five identified in the Commission's original analysis..  The Commission has not provided members of these newly identified EJ communities any meaningful opportunity to comment on the impacts the projects may have on them or what mitigation measures would help prevent or minimize any adverse impacts.  For the reasons explained below, the Commission should have issued the new environmental and safety analyses included in the body and appendices of the Order as a supplemental EIS, issued targeted notices of the supplemental EIS to potentially affected EJ communities, and allowed a reasonable period for public comment on the supplemental EIS, including oral comments at the town hall style meetings that commenters have requested.  The Commission's failure to do so leaves us with an incomplete administrative record with respect to potential adverse impacts on newly identified EJ communities, the significance of those impacts, and mitigation measures to address them.  In short, we lack the foundation for reasoned decision-making on these vital issues.

3.      The National Environmental Policy Act (NEPA) requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."[6]  The Commission did so before approving the Texas LNG Terminal project.  However, that was not enough to meet our obligations under NEPA.  According to the Council on Environmental Quality's (CEQ) regulations implementing NEPA, an agency must prepare a *supplemental* EIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[7]  Since issuing the original EIS for the Texas LNG Terminal project, and following the remand in *Vecinos,* the Commission has identified hundreds of additional potentially affected EJ communities.  Under any reasonable interpretation of CEQ's regulation, this is significant new information "relevant to environmental concerns."  For that reason alone, the Commission should have issued its new analyses as a supplemental EIS and provided an opportunity for public comment on it.[8]

---

[6] 42 U.S.C. § 4332(2)(C).

[7] 40 C.F.R. § 1502.9(d)(1)(ii).  The Commission's regulations implementing NEPA provide that the Commission will comply with CEQ's regulations.  *See* 18 C.F.R. § 380.1.

[8] CEQ's regulations provide that an agency "shall prepare, publish, and file a supplement to a[n EIS] . . . as a draft and final statement."  40 C.F.R. § 1502.9(3).  Although the regulation does not say so explicitly, the only purpose for publishing a draft would be for the public to comment on it.  Consistent with the regulation, the Commission's practice is to issue a draft supplemental EIS for public comment.  *See, e.g.*, *Magnolia LNC, LLC; Notice of Availability of the Draft Environmental Impact Statement for the Proposed Magnolia Production Capacity Amendment*, 84 Fed. Reg. 52,881 (Oct. 3, 2019); *Florida Southeast Connection, LLC; Transcontinental Gas Pipe*

Document Accession #: 20230421-3057     Filed Date: 04/21/2023

4.      The other reasons a supplemental EIS is required are equally plain.  In the Order, the Commission finds that, even with Texas LNG's proposed mitigation measures, during periods when construction, operation, and commissioning activities occur at the same time at the LNG terminal, the Clean Air Act National Air Ambient Quality Standards (NAAQS) may be exceeded for certain air pollutants.[9]  The Order imposes a new air pollution and monitoring condition that may prevent or reduce NAAQS violations.[10]  Although I agree that imposing this condition is a beneficial step to take, I cannot conclude that it will be sufficient to reduce cumulative air emissions to an insignificant level because the condition itself is vague[11] and we have had no public comment on whether it will be effective or what additional mitigation may be needed.  The Order also finds that visual impacts on EJ communities would be significant.[12]  However, it imposes no new mitigation measures to minimize those impacts.  These findings in the Order themselves indicate a supplemental EIS is necessary.

5.      The need for a supplemental EIS does not hinge on a definitive finding that environmental impacts will be significant.  To the contrary, NEPA requires that an agency prepare an EIS where there "might" be "any" significant environmental impacts.[13]  Moreover, "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance."[14]  Since the Commission has determined

---

*Line Company, LLC; Sabal Trail Transmission, LLC; Notice of Availability of the Draft Supplemental Environmental Impact Statement for the Southeast Market Pipelines Project*, 82 Fed. Reg. 16,233 (Oct. 4, 2017).

[9] Order at PP 68, 70.

[10] *Id.* at PP 70-71.

[11] The new condition describes the basic components of the monitoring and mitigation plan that Texas LNG must file for approval, but it leaves it to the company to flesh out the specific monitoring protocol and corrective actions to be employed.  In particular, the condition does not say what Texas must do in response to a NAAQS exceedance or how quickly it must do it.  *See* Order, App. A, Condition 130.

[12] *Id.* at PP 80-82.

[13] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Tr. v. FAA,* 290 F.3d 339, 340 (D.C. Cir. 2002)); *see also Sierra Club v. Peterson,* 717 F.2d 1409, 1415 (D.C. Cir. 1983).

[14] *Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616, 628 (D.C. Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)) (internal quotation marks omitted).

Docket No. CP16-116-002                                                          - 4 -

that there may be significant air pollution and visual impacts associated with the Texas LNG Terminal, it was required to prepare a supplemental EIS.

6.      The procedures employed here run counter to NEPA's fundamental purposes.  As the Supreme Court has explained, the statute's EIS requirement "ensures that the agency, *in reaching its decision*, will have available, and will carefully consider, detailed information concerning significant environmental impacts." [15]  NEPA's public participation requirements ensure that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[16]  Publishing an EIS "provides a springboard for public comment."[17]  By failing to issue a supplemental EIS for public comment prior to today's Order, the Commission deprived the public of any meaningful opportunity to participate.  That, in turn, prevented the Commission from reflecting in its decision today essential information the public generally and affected EJ communities otherwise could have provided on the Commission's new environmental and safety analyses.

7.      Embedding the Commission's new environmental and safety analyses in the Order and its appendices is no substitute for the public notice and comment process under NEPA.  The Commission does not send out notices of its orders to the mailing list compiled for purposes of the original EIS process. And it certainly does not send targeted notices to members of newly identified EJ communities.  Consequently, the hundreds of EJ communities potentially impacted by the Texas LNG Terminal project have no practical way of even discovering that they are within the project's potential impact zone.

8.      Failing to allow meaningful public participation is not just some technical error.  Rather, public input provides the foundation for an agency's substantive decisions.  The procedures used here not only violated NEPA, but also undermined the Commission's ability to engage in reasoned decision-making, as it is required to do under the Administrative Procedure Act (APA).[18]  That is because the Commission does not have a

---

[15] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (emphasis added); *see also Marsh*, 490 U.S. at 371 ("[B]y focusing Government and public attention on the environmental effects of proposed agency action . . . NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.") (citations omitted); 40 C.F.R. § 1500.1(a) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process.").

[16] *Robertson*, 490 U.S. at 349.

[17] *Id.*

[18] 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State*

**JA131**

complete record reflecting input from the hundreds of newly identified EJ communities, or from the public generally, on the new environmental and safety analyses.

9.      Even if the Commission were not legally required to issue a supplemental EIS for public comment, doing so would be the right way to implement the applicable Executive Orders (EOs) and guidance on EJ.[19]  These documents call for identification, analysis, and mitigation of impacts on EJ communities. Where agencies have identified potentially affected minority and/or low income communities, the identification "should trigger" an "enhanced outreach effort to assure that low-income and minority populations are engaged in public participation."[20]  Section 5-5 of the 1994 EJ EO states that agencies "*shall* work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public."[21]  Furthermore, the 1997 CEQ Guidance specifically instructs that agencies "should develop effective public participation strategies" and "overcome linguistic, cultural, institutional, geographic, and other barriers to meaningful participation."[22]  The sad fact is that the Commission has made no effort to inform potentially affected EJ communities of its new environmental and safety analyses, let alone make the analyses

---

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (requiring that an agency's explanation be a "product of reasoned decisionmaking" under the APA); *Vecinos,* 6 F.4th at 1330 ("[A] petitioner may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA."); *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006) (finding an agency's environmental justice considerations reviewable under the "arbitrary and capricious" standard of the APA).

[19] The Commission states that it complies with the relevant EOs and guidance. *See* Order at PP 28-29; *see generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (1994) (1994 EJ EO); Presidential Memorandum, Executive Order on Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations, 1 Pub. Papers 241 (Feb. 11, 1994) (1994 EJ Memo); Federal Interagency Working Group on Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* (2016) (Promising Practices Guidance).

[20] Council on Envtl. Quality, *Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analysis* 28 (1998) (1998 CEQ Guidance).

[21] 1994 EJ EO § 5-5(c) (emphasis added); *see also* 1994 EJ EO § 5-5(b) (stating that meeting this public accessibility standard may require, "whenever practicable and appropriate," "translat[ing] crucial public documents, notices, and hearings related to human health or the environment for limited English speaking populations").

[22] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 9 (1997) (1997 CEQ Guidance) (emphasis added).

"readily accessible" to them.  Rather than implementing an "effective public participation strategy," the Commission has shut the door on public participation by embedding its new analyses in the Order.

10.      I am particularly troubled that neither the general public nor the newly identified EJ communities will have a meaningful opportunity to comment on the Commission's new air monitoring and mitigation condition or other potential mitigation measures. CEQ's guidance on EJ specifically instructs that "members of the affected communities should be consulted" when an agency is "identifying and developing potential mitigation measures to address environmental justice concerns."[23]

11.      To give credit where it is due, the Commission did provide an opportunity for comment on the project sponsors' responses to certain of Commission staff's environmental information requests (EIRs).[24]  However, there was *no* opportunity to comment on critical air modeling information used in the Commission staff's cumulative air impacts analysis because that information was submitted after the comment period closed.[25]  The necessity for, and value of, allowing public comment on the new analyses is evinced by the fact that Vecinos para el Bienestar de la Comunidad Costera and Sierra Club submitted a joint comment letter identifying discrepancies in Texas LNG's and Rio Grande LNG's cumulative air impacts modeling that led staff to direct the companies to reconcile their analyses and submit new cumulative air impact modeling.[26]

12.      At the Commission's March 29, 2023, Roundtable on Environmental Justice and Equity in Infrastructure Permitting, all Commissioners acknowledged the importance of appropriately addressing EJ concerns in our proceedings.  In this of all cases, where the D.C. Circuit remanded our inadequate EJ analysis, we should translate our good intentions into action and provide EJ communities a meaningful opportunity to participate.  Considering our discussion at the Roundtable of how to facilitate EJ communities' full participation, it is especially disheartening that the Order rejects

---

[23] 1998 CEQ Guidance at 36.

[24] *See* Order at P 11.

[25] *See id.* at P 77 ("Texas LNG filed [its updated air quality impact] model on January 30, 2023."), P 11 ("[I]nitial comments were due no later than October 21, 2022, and reply comments no later than November 4, 2022.").

[26] *See id.* at P 74; *see also Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at PP 87, 137 (2023) (describing Sierra Club's joint comment letter that pointed out the modeling discrepancies between Rio Grande and Texas LNG).

**JA133**

requests to hold public meetings, with Spanish translation, to hear communities' concerns about the project and our new analyses.[27]

13.    I am sensitive to the comments in the record, from the project sponsor and others, that the Commission has unduly delayed its response to the court's remand in *Vecinos* and that the delay may postpone benefits the projects offer, including local employment opportunities.  More generally, I desire to efficiently process applications for approval of natural gas and LNG projects, as well as the Commission's response to any court directives relating to project approvals.  No member of the current Commission had control over the process for, or timing of, the Commission's response to the *Vecinos* court's remand.  The question now is what to do with the hand we have been dealt.  Taking procedural shortcuts is the wrong answer.  In failing to meet its statutory and regulatory obligations, the Commission invites litigation challenging the Order, potentially leading to further delay.   For the sake of all stakeholders, including project sponsors and communities impacted by our decisions, we must do better.

14.    Finally, I dissent from the Commission's explanation of why it cannot determine the significance of GHG emissions associated with the Texas LNG Terminal.[28]  This section of the Order could be interpreted as the Commission's definitive conclusion that the Social Cost of GHGs protocol is inherently unsuitable for determining the significance of GHG emissions associated with natural gas and LNG infrastructure projects.  Moreover, the Order suggests that there is no other "currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions."[29]  In other recent orders, the Commission has explained that it is not determining the significance of GHG emissions because the issue of how to do so is under consideration in the docket for the Commission's draft GHG Policy Statement.[30]  This Order does not say that.  Readers therefore might wonder whether this Order has effectively decided some of the central issues raised in the GHG Policy Statement docket.

15.    I do not know whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  That is because the Commission has not seriously studied the answer to that question.  Rather, the majority has simply decided the method does not work, with no explanation of why the Commission departs from the

---

[27] *See id.* at P 15.

[28] *See id.* at PP 20-21, 26.

[29] *Id.* at P 21.

[30] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174 (2023); *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171, at P 46 & n.93 (2023).

**JA134**

Docket No. CP16-116-002                                        - 8 -

approach so recently taken in other similar orders.[31]  We have yet to address the voluminous record in the GHG Policy Statement docket, including comments that speak to this question.  What I do know is that we should decide the important unresolved issues relating to our assessment of GHG emissions through careful deliberation in a generic proceeding with full transparency.

     For the foregoing reasons, I respectfully dissent.

_____

Allison Clements
Commissioner

---

[31] To depart from prior precedent without explanation violates the Administrative Procedure Act.  *See, e.g.*, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis.") (citations omitted).

**JA135**

Document Content(s)

CP16 116 002.docx.......................................................1

185 FERC ¶ 61,079
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| Texas LNG Brownsville LLC | Docket Nos.  CP16-116-003 |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued October 27, 2023)

1.      On April 21, 2023, the Commission issued an order on remand[1] reaffirming that Texas LNG Brownsville LLC's (Texas LNG) proposed liquified natural gas terminal project (Texas LNG Project or project) is not inconsistent with the public interest under section 3 of the Natural Gas Act (NGA).[2]  On May 22, 2023, Vecinos para el Bienestar de la Comunidad Costera, Sierra Club, and City of Port Isabel (together, Sierra Club) filed a timely rehearing request of the Remand Order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[3] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by NGA section 19(a),[4] we are modifying the discussion in the Remand Order and continue to reach the same result in this proceeding, as discussed below.[5]

---

[1] *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Remand Order).

[2] 15 U.S.C. § 717b.

[3] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[4] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[5] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Remand Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

**JA137**

## I.   **Background**

3.      On November 22, 2019, the Commission authorized Texas LNG to construct and operate a new liquified natural gas (LNG) terminal designed to produce up to 4 million metric tonnes per annum (MTPA) of LNG for export pursuant to NGA section 3.[6]  The project facilities will occupy 625 acres of land on the north side of the Brownsville Ship Channel in Cameron County, Texas, and include two full-containment LNG storage tanks with a capacity of approximately 210,000 cubic meters of LNG each; two liquefaction trains, each with a capacity of 2.0 MTPA of LNG; a single LNG carrier berth; mooring and loading facilities; and other appurtenant facilities.[7]

4.      On December 23, 2019, Sierra Club and several other parties jointly requested rehearing of the Authorization Order.[8]  On February 21, 2020, the Commission denied rehearing.[9]  Sierra Club petitioned for review of the Authorization and Rehearing Orders in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit).

5.      On August 3, 2021, the D.C. Circuit remanded the Authorization and Rehearing Orders, holding that the Commission's National Environmental Policy Act (NEPA) analyses of the project's impacts on climate change and environmental justice communities were deficient.[10]  On remand, the court directed the Commission to:  (1) explain whether the Council on Environmental Quality's (CEQ) regulations at 40 C.F.R. § 1502.21(c) require the Commission, in its environmental analysis of the projects, to apply the social cost of carbon protocol or some other analytical framework, as "generally accepted in the scientific community" within the meaning of the regulation; and (2) explain why the Commission chose to analyze the projects' impacts only on environmental justice communities within a two-mile radius, or, in the alternative, to analyze the projects' impacts on communities within a different radius from each project

---

[6] *Tex. LNG Brownsville LLC*, 169 FERC ¶ 61,130, at PP 4, ordering para. A (2019) (Authorization Order).

[7] Remand Order, 169 FERC ¶ 61,047 at PP 1, 5.

[8] The parties seeking rehearing were Sierra Club, Texas RioGrande Legal Aid (on behalf of Shrimpers and Fisherman of the RGV and Vecinos para el Bienestar de la Comunidad Costera), Save RGV from LNG, Defenders of Wildlife, the City of South Padre Island, the City of Port Isabel, and the Town of Laguna Vista.  *Tex. LNG Brownsville LLC*, 170 FERC ¶ 61,139, at P 1 (2020) (Rehearing Order).

[9] *Tex. LNG Brownsville LLC*, 170 FERC ¶ 61,139 (2020) (Rehearing Order).

[10] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (*Vecinos*).

Document Accession #: 20231027-3046          Filed Date: 10/27/2023

site and to determine whether the Commission's environmental justice conclusion still holds.[11]  Additionally, because the Commission's analyses of the project's impacts on climate change and environmental justice communities were deficient, the court directed the Commission to revisit its determination about the public interest under NGA section 3.[12]

6.      Following the D.C. Circuit's decision, Commission staff issued environmental information requests to Texas LNG on February 3, 2022, August 16, 2022, and August 31, 2022, regarding environmental justice communities, visual impacts, air quality modeling, and emergency planning.[13]  Texas LNG responded to Commission staff's information requests on March 4, 2022, May 2, 2022, September 15, 2022, and September 21, 2022.[14]  Commission staff sought public comment on information provided in these responses.[15]

7.      Commission staff issued additional environmental information requests to Texas LNG on October 28, 2022, January 6, 2023, and June 20, 2023.  Texas LNG filed responses on November 7, 2022, January 30, February 23, 2023, and July 18, 2023.

8.      In the Remand Order, the Commission addressed the issues remanded to the Commission by the court in *Vecinos* and supplemented the environmental analysis of the Texas LNG Project by:  (1) addressing the argument regarding the social cost of carbon and 40 C.F.R. § 1502.21(c); and (2) updating our analysis of the project's environmental justice impacts consistent with the Commission's current practice.  In the Remand Order,

---

[11] *Id.* at 1329-31.  40 C.F.R. § 1502.21(c) (2022) provides that "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known, the agency shall include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  In its 2020 rulemaking, CEQ redesignated § 1502.22, "[i]ncomplete or unavailable information" as § 1502.21 in the final rule.

[12] *Vecinos*, 6 F.4th at 1329-31.

[13] Remand Order, 169 FERC ¶ 61,047 at P 10.

[14] *Id.*

[15] *See* Texas LNG Brownsville LLC; Notice Seeking Public Comment on response to Information Requests, 87 Fed. Reg. 60,679 (Oct. 6, 2022) (Notice Seeking Public Comment).

the Commission determined that the project, as conditioned in the Authorization Order and as modified in the Remand Order, is not inconsistent with the public interest.[16]

## II.    Procedural Issue

9.    On June 6, 2023, Texas LNG filed a motion for leave to answer and answer to Sierra Club's rehearing request.  The Commission's Rules of Practice and Procedure generally prohibit answers to a request for rehearing.[17]  Accordingly, we deny Texas LNG's motion to answer and reject its answer.

## III.    Discussion

10.    On rehearing, Sierra Club argues that the Commission erred in the Remand Order by failing to: (1) consider issues that were not remanded by the court; (2) properly consider air pollution and environmental justice impacts; (3) properly consider greenhouse gas (GHG) emissions impacts; and (4) supplement the 2019 final environmental impact statement (Final EIS) based on new information concerning SpaceX.

### A.    Scope of the Remand

11.    Sierra Club asserts that once the Commission reacquired jurisdiction on remand, the Commission was not limited to only considering the two issues identified by the D.C. Circuit.[18]  Sierra Club argues that the project and environmental context have changed since the Commission's prior approval and thus on remand the Commission should consider a broader range of issues[19] and that Sierra Club contends that the Commission had discretion to reconsider the whole of its original decision once it reacquired jurisdiction.[20]  Finally, Sierra Club states that to the extent that the Commission sought new information regarding air quality impacts on environmental justice communities, the

---

[16] Remand Order, 169 FERC ¶ 61,047 at P 85.

[17] 18 C.F.R. § 385.713(d)(1); *id.* § 385.213(a)(2) (2022).

[18] Rehearing Request at 6-8.

[19] *See id.* (referencing examples including various air pollution and environmental justice issues, and NEPA supplementation in the context of SpaceX).

[20] *Id.* at 7 (citing *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998) (*Michigan Gas*)).

Docket No. CP16-116-003                                              - 5 -

Commission should have provided the public a meaningful opportunity to review and comment on such new information.[21]

12.     On remand, the Commission is under no legal obligation here to revisit any portion of its original decision other than those issues that are subject to the court's mandate.  To the contrary, as explained in the Remand Order, the Commission may reject arguments outside the scope of the remand.[22]  Sierra Club's citation to *Michigan Gas* is thus inapposite because while that case recognizes the Commission's *discretion* to consider a broader range of issues on remand, its holding does not *compel* Commission action outside the scope of a court's remand.[23]  The Commission reasonably limited its analysis to the two issues subject to the court's remand—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis.[24]

13.     To the extent that the Commission considered new information that bore upon the two issues that were subject to the court's remand, the public had a meaningful opportunity to review and comment on such information.  As stated above, on September 30, 2022, Commission staff issued a notice seeking public comments on Texas LNG's responses to Commission staff's information requests.[25]  The Commission received over 100 comments in response to this notice,[26] including from Sierra Club.[27]  Sierra Club also filed other, unsolicited comments during the pendency of the remand.[28]  The Commission reasonably concluded that the record was sufficient for the Commission

---

[21] *Id.* at 7.

[22] *See* Remand Order, 183 FERC ¶ 61,047 at P 16; *see also Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at P 9 (2018) (dismissing request for rehearing to the extent it presented arguments "beyond the remand scope" of the court's opinion).

[23] *See Michigan Gas*, 133 F.3d at 38 (stating only that the Commission has "the *discretion* to reconsider the whole of its original decision" on remand) (emphasis added).

[24] Remand Order, 183 FERC ¶ 61,047 at P 16.

[25] Notice Seeking Public Comment, 87 Fed. Reg. at 60,679.

[26] *See* Remand Order, 183 FERC ¶ 61,047 at P 15.

[27] *See* Sierra Club October 19, 2022 Comments.

[28] *See* Sierra Club March 17, 2023 Comments; Sierra Club October 19, 2022 Comments.

**JA141**

Document Accession #: 20231027-3046          Filed Date: 10/27/2023
Docket No. CP16-116-003                                              - 6 -

to address the issues identified in the court's remand,[29] which as discussed above, is committed to the Commission's discretion.[30]  Further, we note that Sierra Club fails to cite any precedent supporting its contention that the Commission's actions on remand were deficient.  Accordingly, we reject the argument that the public was not afforded an adequate opportunity to review and comment on the new.

## B.     Air Quality and Environmental Justice Communities

### 1.     Changes in Emissions Data

14.     Sierra Club argues that the Commission erred by using air pollution emission and modeling data in the Remand Order that differed from that in the Final EIS without explaining what factors caused the changes to the data or providing the public an opportunity to comment on it.[31]  For example, Sierra Club notes that Texas LNG reduced its estimate of nitrogen oxides (NOx) emissions by a quarter compared to the estimate in the Final EIS.[32]  Sierra Club also notes that Texas LNG reduced its estimates of marine vessel emissions of volatile organic compounds, carbon monoxide, particulate matter with an aerodynamic diameter of 10 microns or less (PM10), sulfur oxides (SOx), and GHGs, without providing a reasoned explanation for the reductions.[33]

15.     In its May 2, 2022 Data Response, Texas LNG explained that emission calculations for the facility and marine operational activities were updated since previous filings to reflect:  actual emission factors contained in the final permit issued by the Texas Council on Environmental Quality, updated U.S. Environmental Protection Agency (EPA) emission factors and conversion rates, and updated stationary and mobile sources consistent with current and planned fuel standards relating to sulfur content.[34]

---

[29] Remand Order, 183 FERC ¶ 61,047 at P 15.

[30] *See Spire STL Pipeline LLC*, 181 FERC ¶ 61,232, at P 20 (2022) ("Agencies on remand, unless otherwise directed by the court, may proceed as needed to supplement the record and redress issues identified by the court.").

[31] Rehearing Request at 8-9.  As discussed above, we disagree that the public was not afforded an adequate opportunity to review and comment on the new information. *See supra* P 13.

[32] *Id.* at 8.

[33] *Id.*

[34] Texas LNG May 2, 2022 Response to Commission staff Feb. 3, 2022 Data Request at 3-4.

**JA142**

Sierra Club fails to offer any rationale or analysis suggesting why Texas LNG's explanation for these updated estimates would be inaccurate.[35]  Accordingly, we find Texas LNG's explanation for the updated data to be reasonable and we disagree with Sierra Club's premise that we accepted the data without a reasoned explanation.

## 2.    PM2.5 Estimates

16.    Sierra Club questions Texas LNG's reliance on baseline data from an air monitor located 28 kilometers from the terminal site rather than using a closer air monitor maintained by the Texas Commission on Environmental Quality in Isla Blanca in Cameron County, Texas.[36]  Sierra Club argues that if Texas LNG's analysis of the cumulative impact of its operating emissions were modified to use the higher concentrations of particulate matter with an aerodynamic diameter of less than 2.5 microns (PM2.5) recorded at the Isla Blanca monitor, this would show a potential violation of the annual National Ambient Air Quality Standards (NAAQS) for PM2.5 and could show a potential violation of the 24-hour NAAQS for PM2.5.[37]  Sierra Club maintains that the Commission must incorporate data from the Isla Blanca monitor to fulfill the Commission's obligation under NEPA to "make use of reliable existing data and resources."[38]  Sierra Club states that the Isla Blanca monitor more accurately reflects the current PM2.5 concentrations near the project site and so more accurately discloses what the project's impacts will be on local air quality and the health and safety of nearby residents.[39]

17.    We find that the Isla Blanca monitor was appropriately excluded from the air quality analysis because it appears that the monitor did not have three years of data to calculate the annual and 24-hour PM2.5 design values as contemplated by EPA and the Texas Commission on Environmental Quality (TCEQ).[40]  The EPA lists the Isla Blanca

---

[35] Additionally, Sierra Club (or any other party) could have commented on this data when it was submitted by Texas LNG; the fact that Sierra Club only now calls this data into question on rehearing does not mean that it lacked the ability to comment on it before.

[36] Rehearing Request at 11.

[37] *Id.* at 10.

[38] *Id.* at 11 (quoting 40 § C.F.R. 1502.23 (2023)).

[39] *Id.*

[40] *See* 40 C.F.R. Pt. 50, App. N, §§ 4.1-4.2 (stating that three years of valid data are required to produce a valid annual or 24-hour design value); EPA, Guidance for Ozone and Fine Particulate Matter Permit Modeling at 50 (Jul. 29, 2022),

**JA143**

monitor as having a beginning or start date for valid design values of October 7, 2019,[41] which have three years of data at the time the analysis was completed.[42]  Therefore, we conclude that the use of the AQS monitor 48-061-0006 in Brownsville (Brownsville Monitor) for calculating PM2.5 concentrations was appropriate.  In addition, because the Brownsville Monitor is closer in proximity to environmental justice communities than the Isla Blanca monitor, we find that use of the Brownsville Monitor was adequately representative to identify impacts to potentially affected population centers.[43]

### 3.    Ozone

18.    Sierra Club argues that the Commission erred by relying on findings in the Final EIS that Texas LNG would contribute less than 10% of the annual NOx emissions estimated for the Rio Grande LNG Terminal to conclude that if Rio Grande LNG's ozone impacts are increased by 10%, there will be no exceedance of the NAAQS for ozone.[44] Sierra Club asserts that the Commission did not justify this methodology for calculating ozone impacts, particularly because Texas LNG provided an estimate of its ozone contribution.[45]  Sierra Club also argues that it is unclear whether the Commission's

---

https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM2.5_Permit_Modeling.pdf ("The PM2.5 design value for the annual averaging period is based on the 3-year average of the annual average PM2.5 concentrations, while the PM2.5 design value for the 24-hour averaging period is based on the 3-year average of the annual 98th percentile 24-hour average PM2.5 concentrations."); TCEQ, Air Quality Modeling Guidelines at 46 (Nov. 2019), https://www.tceq.texas.gov/assets/public/permitting/air/Modeling/guidance/airquality-mod-guidelines6232.pdf (stating that PM2.5 modeling should use the most recent three-year average of 98th percentile data for a monitoring site).

[41] EPA, Air Quality Design Values, https://www.epa.gov/sites/default/files/2021-05/pm25_designvalues_2018_2020_final_05_24_21.xlsx.

[42] *See* EPA, Interactive Map of Air Quality Monitors, https://www.epa.gov/outdoor-air-quality-data/interactive-map-air-quality-monitors (last updated Aug. 22, 2023) (enabling public to view the location of the Brownsville Monitor and Isla Blanca monitor by searching on an interactive map); Texas LNG February 22, 2023 Response to Environmental Information Request (showing the environmental justice census blocks within 50 kilometers of the terminal).

[43] *See id.*

[44] Rehearing Request at 11.

[45] *Id.* at 11-12.

cumulative impacts analysis repeats a purported flaw from the analysis in the Final EIS by improperly excluding mobile emission sources from Rio Grande LNG's ozone analysis.[46]

19.    Sierra Club's assertion that the ozone analysis in the Rio Grande Final EIS was flawed is contrary to the D.C. Circuit's judgment accompanying its *Vecinos* opinion in which the court explicitly held that "[the Commission] was aware of and adequately considered the cumulative ozone effects when it decided to approve the three terminal projects" and that "NEPA demands no more."[47]  Moreover, Texas LNG explained in its May 2 data response that it estimated ozone concentrations following EPA's Modeled Emission Rates for Precursors analysis guidance, which has been adopted by the Texas Commission on Environmental Quality.[48]  The analysis submitted by Texas LNG states that there would not be a significant cumulative impact with respect to 8-hour ozone during operation of the facility.[49]  Based upon staff's review, the Commission has no reason to doubt the asserted bases or the accuracy of the calculations provided by Texas LNG and their calculations fall below the NAAQS threshold for ozone.  In light of the court's prior approval of the Commission's ozone analysis, we decline to revisit this issue.

### 4.    Reliance on Significant Impact Level modeling

20.    Sierra Club states that if the Commission is relying on Significant Impact Level (SIL)[50] modeling to identify the area of impact or the significance of Texas LNG's air

---

[46] *Id.* at 12.

[47] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 2021 WL 3716769, at *1 (D.C. Cir. Aug. 3, 2021) (unpublished).  The court recognized that if the Commission's treatment of cumulative ozone impacts was sufficient in the Rio Grande terminal rehearing order, then they have no remaining claim that the agency's treatment was inadequate for the Texas LNG terminal.  *Id.* at *4 n.5.

[48] Texas LNG May 2, 2022 Response to Commission staff Feb. 3, 2022 Data Request at 6-8.

[49] *See* Remand Order, 183 FERC ¶ 61,047 at 74.

[50] The NAAQS SILs are defined by EPA under its statutory authority.  The EPA has historically interpreted Clean Air Act section 165(a)(3) and associated regulations to mean that a source must have a "significant impact" on ambient air quality in order to cause or contribute to a violation of the NAAQs.  *See* 42 U.S.C. § 7475(a)(3).  Under this authority, EPA has established its SILs through its regulations and various non-binding guidance documents.  EPA has issued various non-binding guidance documents.  *See* 40 C.F.R. § 51.165(b)(2) (stating that "[a] major source or major modification will be

**JA145**

emissions, then this is a misuse of that modeling.[51]  Sierra Club also states that "[i]nsofar as FERC relied on the claim that project contributions to pollution would be below significant impact levels, it is unclear whether FERC included all foreseeable sources of pollution attributable to the projects, rather than merely considering pollution from stationary sources regulated by the Clean Air Act."[52]

21.    As an initial matter, the referenced conclusion regarding SILs was in regard to pollution from stationary sources regulated under the Clean Air Act.  We also clarify that although the Remand Order noted the SIL-based radius of impact was 24 kilometers, that observation was only to give context for Commission staff's determination that a more conservative radius of 50 kilometers around the approved Texas LNG Project site would be the appropriate unit of geographic analysis for assessing project impacts on environmental justice communities.[53] Commission staff requested and Texas LNG provided a cumulative air model extending to a radius of 50 kilometers.[54]  The model provided by Texas LNG included direct emissions from the Texas LNG Project, mobile ship emissions (LNG carrier, tugs, escort vessels), relevant regional monitoring ambient background data, and existing and proposed regional industrial major sources within 50 kilometers of the project's fence line boundary and "provided the worst-case

---

considered to cause or contribute to a violation of a national ambient air quality standard when such source or modification would, at a minimum, exceed the following significance levels at any locality that does not or would not meet the applicable national standard" and providing the "significance levels" for $NO_2$ (annual amount), $SO_2$ (3-hour averaging time, 24-hour averaging time & annual amount), $PM_{2.5}$ (24-hour averaging time & annual amount), $PM_{10}$ (24-hour averaging time & annual amount), CO (1-hour averaging time & 8-hour averaging time)); EPA, Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, (April 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf.  SILs are stated as emissions concentrations.  Exceeding a SIL triggers additional analyses to include ambient conditions.  SILs are set conservatively to ensure protection of air quality.  We clarify that the Commission's conclusions regarding air quality are based on the SILs contained in 40 C.F.R. § 51.165(b)(2).

[51] Rehearing Request at 12-13.

[52] *Id*. at 3.

[53] Remand Order, 183 FERC ¶ 61,047 at P 33.

[54] *Id.* PP 73-77.

**JA146**

concentration scenarios that were then compared to the NAAQS."[55]  The Commission's reference to criteria pollutants dropping below the SIL at 24 kilometers merely shows that the distance at which the project's impacts on air quality are not expected to have a major impact on air quality falls within the broader 50-kilometer radius.

### 5.    Impacts Below the NAAQS

22.    Sierra Club argues that the Commission cannot assume that if air pollution will not violate the NAAQS, then health impacts related to air pollution will be insignificant.[56] Sierra Club states that EPA has recognized that concentrations of PM2.5, ozone, $NO_2$, and CO below the NAAQS can result in adverse health impacts.[57]  Sierra Club also notes that the EPA has explained in a guidance document that potential impacts below significance in the NEPA context can be "particularly disproportionate or particularly severe on minority and/or low-income communities."[58]  Sierra Club states that the Commission is obligated to determine whether factors specific to the identified environmental justice communities, like lack of access to healthcare, might increase the significance of the cumulative impact of emissions from multiple facilities on these communities, regardless of whether ambient air quality remains below the NAAQS.[59]

23.    The D.C. Circuit has affirmed the Commission's use of NAAQS as a comparative metric in its NEPA analyses.  In *Sabal Trail*, the court stated that "[the Commission] appropriately relied on EPA's [NAAQS] as a standard of comparison for air-quality impacts," and "[b]y presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard."[60]  The D.C. Circuit also made clear in *Sabal Trail* that the Commission's decision to use the NAAQS as a comparative metric is entitled to deference.[61]  Sierra

---

[55] *Id.* PP 73, 76.

[56] Rehearing Request at 14-18.

[57] *Id.* at 15-17.

[58] *Id.* at 17 (citing EPA Guidance at 3.2.2).

[59] *Id.* at 17-18.

[60] *See Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Cir. 2017) (*Sabal Trail*).

[61] *See id.* (citing *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (stating that an agency's "choice among reasonable analytical methodologies is entitled to deference"); *see also Commonwealth LNG, LLC*, 183 FERC

Docket No. CP16-116-003                                                    - 12 -

Club neither explains why the holding in *Sabal Trail* would not apply in this case, nor cites any authority for its assertion that NEPA's requirements cannot be satisfied by considering whether the projected criteria pollutant emissions are in compliance with the NAAQS. Thus, we continue to find that operation of the project, when combined with the other projects within the cumulative geographic scope for air quality, would not cause or contribute to a potential exceedance of the NAAQS on a regional or localized basis and as a result, environmental justice communities would not experience significant air quality impacts from criteria pollutants covered under the NAAQS during operation of the Texas LNG Project.[62]

### 6.    Which Communities May be Impacted by Air Emissions

24.    Sierra Club argues that the Commission fails to identify which environmental justice communities will experience emission impacts as a result of the project.[63] Sierra Club asserts that it is not sufficient to only identify the environmental justice communities within the project's zone of impact, but that the Commission must also identify which of those environmental justice communities will be most affected due to an increase in concentrations of air emissions.[64]

25.    As a threshold matter, we note that the Commission, both in the original authorization[65] and on remand,[66] found the project's air quality impacts from criteria pollutants covered under the NAAQS to be less than significant.[67] We disagree that the

---

¶ 61,173, at P 48 (2023) ("The Commission's comparison to the NAAQS, a generally-accepted standard established by EPA, for its analysis is entitled to deference.").

[62] Remand Order, 183 FERC ¶ 61,047 at P 75.

[63] Rehearing Request at 18-19.

[64] *Id.*

[65] *See* Authorization Order, 169 FERC ¶ 61,130 at P 63; *see also* Final EIS at 5-369 ("Through use of mitigation measures during construction activities and application of best available control technologies during operation, we conclude that there would be no regionally significant impacts on air quality.").

[66] *See* Remand Order, 183 FERC ¶ 61,047 at P 83 (stating that, with the exception of potentially significant visual impacts and cumulative visual impacts, "all other project-related impacts would be less than significant").

[67] *See id.* P 75 ("The operation of the projects when combined with the other projects within the cumulative geographic scope for air quality would not cause or contribute to a potential exceedance of the NAAQS on a regional or localized basis.

**JA148**

Commission failed to identify which communities may experience air quality impacts as a result of the project.[68]  As explained in the Remand Order, the Commission used a conservative 50-kilometer radius (approximately a 31-mile radius) around the Texas LNG Project to identify the environmental justice communities that could potentially be subject to air quality impacts from the project.[69]  The Commission went on to recognize that because emissions from construction activities, like those associated with the Texas LNG Project, are variable and have a greater impact near the source, construction emissions would be highly localized and have the largest impact within a short radius around the construction footprint but would disperse at further distances.[70]  The Commission also recognized that construction emissions should not adversely affect any residences, the nearest of which are approximately 1.6 miles away, due to the degree of dispersion that would occur prior to any construction emissions reaching that distance.[71]  The Commission specifically identified the Laguna Atascosa National Wildlife Refuge as the location within the 50-kilometer radius that may experience elevated construction impacts.[72]  Accordingly, we find that the Commission sufficiently identified the specific environmental justice areas within the geographic area of review that may experience elevated air quality impacts due to the Texas LNG Project and, therefore, reject Sierra Club's argument that anything more was required.[73]

---

Based on the foregoing analysis, we conclude environmental justice communities would not experience significant air quality impacts during operation of the Texas LNG Project.").

[68] *See id.* P 33, app. B.

[69] *Id.* P 33.

[70] *Id.* P 67.

[71] *Id.*  Air emissions typically disperse over distance due to operational factors, and weather factors such as wind direction, temperature, and pressure.

[72] *Id.*

[73] We observe that other than a generalized reference to a sentence in a CEQ guidance document (with which the Commission complied, as evidenced by the discussion in this section), *see* Rehearing Request at 19 n.53, Sierra Club cites no judicial or Commission precedent for this heightened obligation it purports to impose on the Commission.

Docket No. CP16-116-003                                                      - 14 -

### 7.     Mitigation and Monitoring Plan

26.     In the Remand Order, the Commission added a new Environmental Condition 130, which requires Texas LNG, prior to commissioning the project, to file with the Commission a Project Ambient Air Quality Mitigation and Monitoring Plan for particulate matter (PM2.5 and PM10) and nitrogen dioxide ($NO_2$) for periods when construction, commissioning and start-up, and operation of the project occur simultaneously.[74]  Sierra Club argues that the environmental condition is insufficient because it orders Texas LNG to produce a mitigation and monitoring plan in the future, and thus the effectiveness of such a plan could not be evaluated prior to the Commission issuing the Remand Order.[75]  Sierra Club contends that this alleged ambiguity precluded the Commission from relying on the environmental condition to determine that air quality impacts would not be significant during periods of concurrent construction and operation of the project, whether the project is considered its own or cumulatively with the Rio Grande LNG Project.[76]  Sierra Club also asserts that the Commission must afford the public and the EPA an opportunity to comment on the plan.[77]

27.     Sierra Club's argument fails because it rests on the erroneous premise that the Commission is required to have a final mitigation plan in place before it is able to act. However, the courts have made clear that NEPA does not require the formulation of a specific mitigation plan, only that mitigation is discussed in "sufficient detail to ensure that environmental consequences have been fairly evaluated."[78]  "NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."[79]  We disagree with

---

[74] Remand Order, 183 FERC ¶ 61,047 at app. A.

[75] Rehearing Request at 20-21.

[76] *Id.* at 19-21.

[77] *Id.* at 22.

[78] *Sierra Club v. FERC*, 38 F.4th 220, 233 (D.C. Cir. 2022) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)); *see also Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017) (recognizing that the role of NEPA analysis is primarily information-forcing, imposes only procedural requirements, and does not impose a duty on agencies to include "a detailed explanation of the specific measures which will be employed to mitigate the adverse impacts of a proposed action") (quoting *Methow Valley*, 490 U.S. at 353).

[79] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (citing *Methow Valley*, 490 U.S. at 353 & n.16).

**JA150**

Sierra Club's unsupported assertion that the Commission must afford the public and the EPA an opportunity to comment on the plan.[80]  The Commission, like other agencies, is generally master of its own calendar and procedures."[81]

28.     We also note that, notwithstanding the fact that the findings on which the Commission based its decision to impose Environmental Condition 130 were made public years ago in the Final EIS and Authorization Order, Sierra Club never argued that a mitigation and monitoring plan was necessary to reduce air impacts during periods of overlapping construction and operational activities.[82]

---

[80] Rehearing Request at 22.

[81] *Stowers Oil and Gas Co.*, 27 FERC ¶ 61,001, at 61,001 (1984); *see id.* at 61,002 n.3 (collecting precedent); *see, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("[T]his Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments."); *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) ("[A] reviewing court may not ... dictat[e] to the agency the methods, procedures, and time dimension of the needed inquiry ...."); *Richmond Power & Light v. FERC*, 574 F.2d 610, 624 (D.C. Cir. 1978) ("Agencies have wide leeway in controlling their calendars ....") (citing *City of San Antonio v. CAB*, 374 F.2d 326, 329 (D.C. Cir. 1967)); *Superior Oil Co. v. FERC*, 563 F.2d 191, 201 (5th Cir. 1977) (deferring to an agency's choice of procedures and allocation of resources because "[t]he Commission should 'realistically tailor the proceedings to fit the issues before it'") (quoting *Mobil Oil Corp. v. Fed. Power Comm'n*, 483 F.2d 1238, 1252 (D.C. Cir. 1973) (quotation marks omitted)); *Bell Tel. Co. v. FCC*, 503 F.2d 1250, 1266 (3d Cir. 1974) ("[T]he ultimate choice of procedure ... is left to the discretion of the agency involved, and will be reversed only for an abuse of discretion.").

[82] The Commission's conclusion that precipitated its imposition of Environmental Condition 130—that Commission staff could not exclude the possibility of short-term ambient emission concentrations of PM2.5, PM10, and NO2 at levels above the NAAQS during periods of overlapping construction and operational emissions —is not new as of the Remand Order.  To the contrary, Commission staff recognized in the Final EIS that "concurrent emissions from staged construction, commissioning and start-up, and operations of the LNG Terminal would temporarily impact local air quality and could result in exceedances of the NAAQS in the immediate vicinity of the LNG Terminal during these construction years," Final EIS at 5-368.  Commission staff nonetheless concluded that through use of mitigation measures during construction activities and application of best available control technologies, there would be no regionally significant impacts on air quality.  *Id.* at 5-369.  The Commission adopted these

Docket No. CP16-116-003                                                    - 16 -

## 8.    **Supplemental EIS**

29.    Sierra Club advances several arguments in support of its contention that the Commission was required on remand to prepare a supplemental NEPA document for its updated environmental justice analysis, all of which are unavailing.

30.    In *Marsh v. Oregon Natural Resources Council*, the Supreme Court explained that an agency's decision to prepare a supplemental EIS is governed by a "rule of reason" and that an agency need not supplement an EIS every time new information comes to light after an EIS is finalized, for to do so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[83]  The D.C. Circuit has similarly made clear that a supplemental EIS "must only be prepared where new information provides a *seriously* different picture of the environmental landscape."[84]  An agency's determination of whether a supplemental EIS is needed "implicates substantial agency expertise" and is thus governed by the arbitrary and capricious standard and is entitled to deference.[85]

31.    Here, the Commission was not required to prepare a supplemental EIS because the issues addressed on remand did not result in any new significance determinations. Commission staff concluded that there would be no significant impact on air quality from the project based on the expanded environmental justice analysis Commission staff

---

conclusions in the Authorization Order, finding that intermittent exceedances of the NAAQS during overlapping periods of construction and commissioning and/or operational activities, if any (the Commission has not affirmatively concluded that there would be such exceedances), would not be persistent and, accordingly, would not result in regionally significant impacts.  *See* Authorization Order, 169 FERC ¶ 61,130 at PP 61, 63.

[83] 490 U.S. at 373-74; *see also Mayo v. Reynolds*, 875 F.3d at 16.  As we explain above, the standard for the preparation of a supplemental EIS is set forth in CEQ's regulations.  *See* 40 C.F.R. § 1502.9(d).

[84] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (internal quotation marks omitted)).

[85] *Marsh*, 490 U.S. at 375-76; *see also Friends of Capital Crescent Trail*, 877 F.3d at 1059 ("If an agency's decision not to prepare a [supplemental EIS] turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment.") (quoting *Marsh*, 490 U.S. at 376).

**JA152**

conducted on remand.[86]  Moreover, the Commission's decision to not prepare a supplemental NEPA document did not preclude Sierra Club from commenting on the information in question.[87]  As a party to the docket, Sierra Club was on notice of the information when it was filed and could have provided comment on it at any time.[88]  Indeed, Sierra Club has previously submitted comments in this docket when comment was not expressly sought.[89]  For the reasons stated above, a supplemental EIS was not required.

32.     Sierra Club next argues that the Commission's finding in the Remand Order that certain impacts from construction and operation of the project would be disproportionately high and adverse because they would be predominantly borne by environmental justice communities[90] necessitates preparation of a supplemental EIS because, in the Final EIS, Commission staff concluded that there was no evidence environmental justice communities would be disproportionately affected by the project.[91]

---

[86] *See* Remand Order, 183 FERC ¶ 61,047 at PP 76, 82; *see also Laguna Greenbelt, Inc. v. Dep't of Transp.*, 42 F.3d 517, 529 (9th Cir. 1994) (upholding agency's decision not to prepare a supplemental EIS where the agency concluded that new information did not result in any new significant impacts).

[87] Sierra Club asserts that NEPA required the Commission to solicit public comment on information provided in response to an environmental information request issued on January 6, 2023.  *See* Rehearing Request at 23 (citing Environmental Information Request for Texas LNG Project, Docket No. CP16-116-000 (issued Jan. 6, 2023) (January 6 EIR)).  As discussed above, Sierra Club has not shown that it lacked notice of any information in the record or an opportunity to submit comments.

[88] *See* Texas LNG Brownsville LLC; Notice of Application, 81 Fed. Reg. 23,291, 23,292 (Apr. 20, 2016) (Notice of Application) ("A person obtaining party status will be placed on the service list maintained by the Secretary of the Commission and will receive copies of all documents filed by the applicant and by all other parties.").

[89] *See* Sierra Club October 19, 2022 Comments; Sierra Club March 31, 2021 Comments.  As the D.C. Circuit has explained, "a commenter before the Commission who has ample time to comment on evidence before the deadline for rehearing is not deprived of a meaningful opportunity to challenge the evidence." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1327 (D.C. Cir. 2015) (citing *Minisink Residents for Env't Preservation & Safety v. FERC*, 762 F.3d 97, at 115 (D.C. Cir. 2014)).

[90] Remand Order, 183 FERC ¶ 61,047 at P 82.

[91] Rehearing Request at 23-24 (citing Final EIS at 4-157).

Document Accession #: 20231027-3046    Filed Date: 10/27/2023

This argument fails because it distorts the standard for when a supplemental EIS is required. As discussed above, a supplemental EIS is required only on the basis described in 40 C.F.R. § 1502.9(d). The fact that the Commission found that certain impacts would be predominately borne by environmental justice communities does not require a supplemental EIS.

33.     Sierra Club contends that the 274 new environmental justice communities identified by the Commission during the remand proceeding lacked the ability to participate in the proceeding but would have been able to participate if the Commission had prepared a supplemental NEPA document.[92] Not so. As stated above, any person may file comments on the docket, even if the person did not formally move to intervene in the proceeding pursuant to the Commission's Rules of Practice and Procedure.[93] Moreover, Sierra Club does not offer any example of an individual or group that sought to participate in the proceeding but was unable to do so. We, therefore, reject the argument that a supplemental NEPA document is required to facilitate public participation for the reasons stated above.

34.     Finally, Sierra Club reiterates its request for the Commission to hold public meetings and provide information in Spanish,[94] arguing that the Commission's declination to do so in the Remand Order ran afoul of its environmental justice mandate under Executive Order 12,898.[95] We disagree and find that the Remand Order

---

[92] Rehearing Request at 24.

[93] *See* 18 C.F.R. § 385.214 (2022); *see also supra* P 13.

[94] As we noted in the Remand Order, Texas LNG provided materials regarding the project in both English and Spanish and Spanish-speaking representatives were present at both the public scoping and comment meetings held in Port Isabel. Remand Order, 183 FERC ¶ 61,047 at n.40. Additionally, the Commission continues to consider how we can provide greater accessibility to our processes for non-English speaking populations. *Id.* P 15.

[95] Rehearing Request at 25-28; *see also* Sierra Club Oct. 19, 2022 Comments at 3-4. Although the Commission is not one of the specified agencies in Executive Order 12898, *see Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 at § 6-604 ("Independent agencies are requested to comply with the provisions of this order."), the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance. *See* 18 C.F.R. § 380.12(g) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC *Guidance Manual for Environmental Report Preparation*, at 4-76 to 4-80

sufficiently discussed both issues;[96] accordingly, we summarily dismiss these arguments.[97]

### 9. Revisiting the NGA

35.    Sierra Club argues that the Commission failed to consider impacts to environmental justice communities as part of its public interest analysis under the NGA when the Commission reaffirmed the authorization for the project.[98]

36.    To revisit the Commission's environmental analysis under NEPA, as directed by the court in *Vecinos*, the Remand Order included a robust environmental justice analysis that builds upon Commission staff's environmental justice analysis in the Final EIS.  In the Remand Order, the Commission concluded that environmental justice communities may experience significant project-related and cumulative visual impacts, but that all other project-related impacts would be less than significant.[99]  More specifically, the Commission found that potentially significant visual impacts would occur when the project was viewed from the Laguna Atascosa National Wildlife Refuge and that the project would have a negligible to moderate impact on the other visual resources evaluated.[100]  The Commission recognized that Texas LNG would minimize visual impacts from lighting by implementing measures outlined in its Facility Lighting Plan.[101]  With this additional analysis, the Commission satisfied its NEPA responsibilities.  NEPA

---

(Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[96] *See* Remand Order, 183 FERC ¶ 61,047 at P 15.

[97] *See, e.g.*, *Coal. Of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1023 (D.C. Cir. 2022) (stating that the Commission is not obligated on rehearing to repeat its responses to arguments that were already raised and addressed by the Commission in the underlying order); *ISO New Eng. Inc.*, 179 FERC ¶ 61,186, at P 42 (2022) (summarily dismissing arguments raised on rehearing when they were raised and sufficiently addressed in the underlying order).

[98] Rehearing Request at 28-29.

[99] Remand Order, 183 FERC ¶ 61,047 at PP 82-83.

[100] *Id.* P 79; *see also* Final EIS at ES-16.

[101] Remand Order, 183 FERC ¶ 61,047 at P 80; *see also* Final EIS at 4-112.

itself "does not mandate particular results, but simply prescribes the necessary process."[102]

37.    For a proposal under NGA section 3 like the Texas LNG Project, there is a presumption favoring authorization.  The Authorization Order recognized that an LNG proposal "shall be approved unless the proposal 'will not be consistent with the public interest.'"[103]  That an NGA section 3 proposal "shall" be authorized unless it "will not be consistent with the public interest,"[104] "sets out a general presumption favoring such authorization[s]."[105]  Although NGA section 3(e) authorizes the Commission "to approve or deny an application,"[106] courts have explained that to overcome the favorable presumption in NGA section 3(a) there must be an "affirmative showing of inconsistency with the public interest."[107]  Moreover, NGA section 3(c) provides that the exportation of gas to FTA nations "shall be deemed to be consistent with the public interest."[108]  In granting the NGA section 3 authorization, the Commission recognized that the Department of Energy, "pursuant to its authority under NGA section 3, has authorized Texas LNG to export up to 4 MTPA, or 0.56 Bcf/d, of domestically-produced natural gas to free trade nations from the proposed Texas LNG Brownsville LLC Liquefied Natural Gas Export Project, at the Port of Brownsville, Texas."[109]  In the Authorization Order, the

_____

[102] *See Methow Valley*, 490 U.S. at 350 (If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (citations omitted).

[103] Authorization Order, 169 FERC ¶ 61,130 at P 14 (quoting 15 U.S.C. § 717b(a)).

[104] 15 U.S.C. § 717b(a).

[105] *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (*Alaska LNG*); *EarthReports v. FERC*, 828 F.3d at 953 (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017).

[106] 15 U.S.C. § 717b(e).

[107] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).

[108] 15 U.S.C. § 717b(c).

[109] Authorization Order, 169 FERC ¶ 61,130 at P 17.

Commission determined that the requested NGA section 3 authorization was not inconsistent with the public interest.[110]  None of the information analyzed and disclosed in our environmental analysis on remand undermines this conclusion.  In the Remand Order, the Commission appropriately reaffirmed its conclusion that the Texas LNG Project is not inconsistent with the public interest, as conditioned in the Authorization Order and as modified in the Remand Order.[111]  The Commission's balancing under the public convenience and necessity standard is consistent with the purpose of the NGA[112] and is therefore afforded deference.[113]

### C.  GHGs

38.    Sierra Club argues that the Commission has the authority and obligation to consider GHG emissions as part of its public interest determination under the NGA, which, in Sierra Club's view, requires the Commission to consider the significance and impact of such GHG emissions under NEPA.[114]  This argument is not properly before us on rehearing as it is outside the scope of the court's remand.  With respect to GHGs, the court's remand was limited to the narrow question of "whether 40 C.F.R. § 1502.21(c) call[ed] for [the Commission] to apply the social cost of carbon protocol or some other

---

[110] *Id.* P 18.

[111] *Id.*

[112] *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation") (*NAACP v. FPC*); *id*. (explaining that the principal purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act including "conservation, environmental, and antitrust questions") (citation omitted).

[113] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.") (*Chevron*); *Cf. Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1308 (D.C. Cir. 2015) ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Natural Gas Co. v. Fed. Power Comm'n,* 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004).") (*Myersville*).

[114] Rehearing Request at 30.

analytical framework as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not."[115]  Regardless, Sierra Club's argument conflates the Commission's NGA and NEPA responsibilities, which are separate and distinct.[116]  The Commission's balancing under the public interest standard[117] is consistent with the purpose of the NGA[118] and is therefore afforded deference.[119]  As the D.C. Circuit has explained, the NGA section 3 standard that a proposal "shall" be authorized unless it "will not be consistent with the public interest[,]"[120] "sets out a general presumption favoring such authorization[s]."[121]  To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an

---

[115] *Vecinos*, 6 F.4th at 1330.

[116] *See Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 37 (2023); *Transcon. Gas Pipe Line Co.*, 182 FERC 61,148, at P 101 (2023).

[117] *See* Remand Order, 183 FERC ¶ 61,047 at P 85; *see also Alaska LNG*, 67 F.4th at 1188.

[118] *See NAACP v. FPC*, 425 U.S. at 669 (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation"); *id.* (explaining that the purpose of the NGA is to "encourage the orderly development of plentiful supplies of … natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act including "conservation, environmental, and antitrust questions") (citation omitted).

[119] *See Chevron*, 467 U.S. at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also Myersville*, 783 F.3d at 1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Natural Gas Co. v. FPC,* 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004).").

[120] 15 U.S.C. § 717b(a).

[121] *Alaska LNG*, 67 F.4th at 1188; *EarthReports v. FERC*, 828 F.3d at 953 (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't. of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203.

"affirmative showing of inconsistency with the public interest."[122]  The Commission explained that here the presumption was not overcome.[123]  In conducting its public interest analysis under NGA section 3, the Commission is not required to characterize the project's estimated GHG emissions as significant or insignificant; no court has held to the contrary.  NEPA is not a means of "mandating that agencies achieve particular substantive environmental results";[124] rather, it is a procedural statute that "prescribes the necessary process."[125]

39.     Sierra Club next argues that the Commission erred by declining to use the social cost of carbon tool to determine whether the project's estimated GHG emissions are significant for the purpose of NEPA.[126]  Sierra Club also asserts that the Commission could use the Interim GHG Policy Statement to make a significance determination.[127] The Interim GHG Policy Statement argument is outside the scope of the court's remand and the Interim GHG Policy Statement was converted to a draft by the Commission.

---

[122] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d at 1111).

[123] *Alaska LNG*, 67 F.4th at 1188 ("The NGA 'sets out a general presumption favoring ... authorization.' *W. Va. Pub. Servs. Comm'n*, 681 F.2d 847 at 856.  FERC's approval of the Project easily comports with the NGA. The Commission expressly concluded the Project was in the public interest because it would have substantial economic and commercial benefits, and these benefits were not outweighed by the projected environmental impacts.").

[124] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[125] *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022); *see also Methow Valley*, 490 U.S. at 351 (1989) (explaining that "it would not have violated NEPA if the Forest Service, after complying with [NEPA's] procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15%, 50%, or even 100% of the mule deer herd" and also explaining that "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action").

[126] Rehearing Request at 30-33.

[127] *Id.* at 33-34 (citing *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement)).

**JA159**

40.     Moreover, Sierra Club argues that the Commission should follow CEQ's 2016 guidance,[128] questions the Commission's conclusion that the social cost of GHGs is not appropriate for project-level review,[129] and asserts that because FERC estimated the social cost of greenhouse gases directly emitted at over $2 billion, these emissions are not something that can be shrugged off and must be weighed in the public interest calculus.[130]

41.     First, we note that CEQ's 2016 guidance does not impose legal requirements on the Commission.  Second, we disagree with Sierra Club's suggestion that the social cost of GHGs is appropriate for project level review.  Third, we deny Sierra Club's claim that we must use SCC or some other method for measuring GHG impacts as part of our NGA merits review.  Since we have already found that SCC has no utility in the NEPA determination of significance—and there is no other scientifically valid method enabling us to do so—we disagree with Sierra Club's claim that we are *obligated* to use SCC in the NGA review.

42.     For informational purposes, Commission staff estimated the social cost of GHGs associated with reasonably foreseeable emissions from the project.[131]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[132] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[133]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are

---

[128] *Id*. at 32.

[129] *Id*. at 32-33.

[130] *Id*. at 32.  Sierra Club incorrectly states this estimate of monetized costs are attributable to the Rio Grande LNG and Rio Bravo projects.  We suspect, however, that Sierra Club meant to refer to the Texas LNG Project.  *See* Remand Order 183 FERC ¶ 61,047 at P 24 (stating that emissions from construction and operation of the Texas LNG Project are calculated to result in a social cost of GHGs totaling over $2 billion).

[131] *See* Remand Order, 183 FERC ¶ 61,047 at P 24.

[132] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[133] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

**JA160**

currently unable to identify any such appropriate criteria.[134]  Nor are we aware of any
other currently scientifically accepted method that would enable the Commission to
determine the significance of reasonably foreseeable GHG emissions.[135]  The D.C.
Circuit has repeatedly upheld the Commission's decisions not to use the social cost of
carbon, including to assess significance.[136]  In fact, the D.C. Circuit recently affirmed the
Commission's decision to not analyze the Social Cost of Carbon in its NEPA analysis,[137]
rejected the suggestion that it was required to do so, found that the petitioner's arguments
"fare no better when framed as NGA challenges," and then, in the very same paragraph,
sustained the Commission's public interest determination as "reasonable and lawful."[138]

---

[134] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain
Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197,
at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, 2019 WL 847199, at 2 ("[The
Commission] gave several reasons why it believed petitioners' preferred metric, the
Social Cost of Carbon tool, is not an appropriate measure of project-level climate change
impacts and their significance under NEPA or the Natural Gas Act.  That is all that is
required for NEPA purposes."); *EarthReports*, 828 F.3d at 949, 956 (D.C. Cir. 2016)
(accepting the Commission's explanation why the social cost of carbon tool would not be
appropriate or informative for project-specific review, including because "there are no
established criteria identifying the monetized values that are to be considered significant
for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75
(2022); *see, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf
Transmission, LLC*, 180 FERC ¶ 61,206 at P 91.

[135] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023) ("there are
currently no criteria to identify what monetized values are significant for NEPA
purposes, and we are currently unable to identify any such appropriate criteria").

[136] *See, e.g.*, *EarthReports v. FERC*, 848 F.3d 949, 956 (D.C. Cir. 2016)
(upholding the Commission's decision not to use the social cost of carbon tool due to a
lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper v.
FERC*, 45 F.4th 104 (D.C. Cir. 2022) (also upholding the Commission's decision not to
use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (same).

[137] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the
Commission compared the Project's direct emissions with existing Alaskan and
nationwide emissions.  It declined to apply the social cost of carbon for the same reasons
it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis
we have previously upheld.").

[138] *Id.*

**JA161**

43.     To the extent there are statements in the environmental documents and Remand Order that the project's contributions to GHG emissions globally contribute incrementally to future climate change impacts,[139] we clarify that this is assuming that the transported gas is not displacing equal- or higher-emitting sources.  As there currently are no accepted tools or methods for the Commission to use to determine significance, the Commission did not characterize these emissions as significant or insignificant,[140] nor do we do so on rehearing.  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

44.     Further, Sierra Club states that "FERC failed to address whether 40 C.F.R. § 1502.21 (formerly § 1502.22) required FERC to use methods generally accepted in the scientific community, including the social cost of carbon, to evaluate greenhouse gas emissions."[141]  That is incorrect.  The Commission directly addressed this argument.[142]  Specifically, we explained that "although we are including the social cost of GHG figures for informational purposes, we find that because the social cost of GHGs tool was not developed for project level review and . . . does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does not require its use in this proceeding."[143]

45.     Finally, Sierra Club argues that the Commission cannot satisfy its obligations under NEPA and the NGA by comparing direct project emissions to the United States' or Texas' inventories.[144]  We disagree.  This contention is also outside the scope of the issues considered on remand and is not properly before us on rehearing.  Regardless, it is

---

[139] *See, e.g.*, Remand Order, 183 FERC ¶ 61,047 at P 25; Final EIS at 4-344 ("Construction and operation of the Project would increase the atmospheric concentration of GHGs in combination with past and future emissions from all other sources and contribute incrementally to future climate change impacts.").

[140] *See id.*

[141] Rehearing Request at 6.

[142] Remand Order, 183 FERC ¶ 61,046 at PP 19-20.  Moreover, it remains the case that there is a "lack of consensus about how to apply the social cost of carbon on a long time horizon," "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and there is "no established criteria for translating these dollar values into an assessment of environmental impacts."  *Alaska LNG*, 67 F.4th at 1184.

[143] Remand Order, 183 FERC ¶ 61,047 at P 20.

[144] Rehearing Request at 34.

also substantively erroneous as the D.C. Circuit has explicitly held that the Commission acts reasonably by comparing a project's emissions with nationwide and state inventories.[145]

### D. SpaceX

46.     Sierra Club raises several arguments pertaining to SpaceX's launch operations, none of which are persuasive, and all of which are outside the scope of the remand.[146] Sierra Club first argues that the Commission should have supplemented its NEPA analysis to evaluate the potential for cascading impacts from future failed SpaceX launches of the Starship Super Heavy rocket, including impacts caused by particulate matter and vibrations.[147]  It next contends that the Commission should evaluate the cumulative impacts of SpaceX's launches and the operation of the project on environmental justice communities.[148]  Finally, Sierra Club asserts that the Commission should reconsider whether it is in the public interest to site an LNG facility in proximity to SpaceX's operations.[149]

47.     The Commission made clear in the Remand Order that the remand was limited to two issues—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis—and that it would not consider issues outside the scope of the court's mandate.[150]  The arguments regarding SpaceX are, therefore, not properly raised in this rehearing proceeding and are rejected.

48.     Moreover, as acknowledged by Sierra Club in its rehearing request,[151] the Authorization Order contains two conditions that require Texas LNG to develop and implement procedures to monitor and mitigate adverse impacts from SpaceX launches,

---

[145]  *See Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions….[The Commission's] approach was reasonable and mirrors analysis we have previously upheld.").

[146]  *See* Rehearing Request at 34-39.

[147]  *Id.* at 39.

[148]  *Id.*

[149]  *Id.*

[150]  Remand Order, 183 FERC ¶ 61,047 at P 16.

[151]  *See* Rehearing Request at 38-39.

**JA163**

including a requirement to reference any Federal Aviation Administration (FAA) launch guidance issued to the public.[152] These conditions are generally applicable and thus apply to the Starship Super Heavy rocket with which Sierra Club expresses concern. The conditions also impose ongoing compliance requirements for the duration of the authorization. Sierra Club asserts that these conditions are not sufficiently protective,[153] yet offers no support for this claim, nor does it explain why such generally applicable conditions would not adequately address adverse impacts from future Starship Super Heavy rocket launches. Assertions that are unsupported by evidence or explanation fall short of the specificity required on rehearing.[154] Accordingly, we reject these arguments as outside the scope of the issues before us on rehearing.

49.     In any event, the Commission was not required to conduct supplementary NEPA procedures to address the SpaceX information raised by Sierra Club on rehearing. As stated above, an agency is not required to prepare a supplemental EIS every time new information comes to light, but rather only when circumstances under 40 C.F.R. § 1502.9(d) occur. The information in question here does not meet that standard,

---

[152] *See* Authorization Order, 169 FERC ¶ 61,130 at app., envtl. condition 31 ("Prior to initial site preparation, Texas LNG shall develop and implement procedures to monitor rocket launch activity and to position onsite construction crews and plant personnel in areas that are unlikely to be impacted by rocket debris of a failed launch during initial moments of rocket launch activity from the Brownsville SpaceX facility. Texas LNG's procedures for positioning of onsite construction crews and plant personnel shall include reference to any guidance from the FAA to the public regarding anticipated SpaceX launches."); *id.* app., envtl. condition 115 ("Prior to introduction of hazardous fluids, Texas LNG shall develop and implement procedures for plant personnel to monitor the rocket launches from the Brownsville SpaceX facility and take mitigative actions before and after a rocket launch failure to minimize the potential of a release reaching offsite, or resulting in cascading effects that could extend offsite or impact safe operations.").

[153] Rehearing Request at 38-39.

[154] *See, e.g.*, *ZEP Grand Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10 (2023) (rejecting argument on rehearing for lack of specificity where the petitioner "offer[ed] only [a] conclusory assertion in support of its position); *Turlock Irrigation Dist.*, 140 FERC ¶ 61,207, at P 27 (2012) (finding an argument that was "nothing more than a bald assertion" as being waived for lack of specificity). Although these cases interpret the rehearing provision of the Federal Power Act, *see* 16 U.S.C. § 825l(a), the rehearing provisions of the NGA and FPA are "substantially identical" and "to be interpreted consistently with each other." *Granholm ex rel. Mich. Dept. of Nat. Res. v. FERC*, 180 F.3d 278, 280 n.2 (D.C. Cir. 1999).

particularly given that the Commission previously considered the potential for future SpaceX launches and included environmental conditions in the authorization that are specifically tailored to such launches.[155]  We find that there are no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[156]

The Commission orders:

In response to Sierra Club's rehearing request, the Remand Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Chairman Phillips is concurring with a separate statement attached.
Commissioner Danly is concurring in the result with a separate statement to be issued at a later date.
Commissioner Clements is dissenting with a separate statement attached.
Commissioner Christie is concurring with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

---

[155] *See Marsh*, 490 U.S. at 373-74 (holding that an agency need not supplement an EIS every time new information comes to light because doing so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made"); *Harrison Cnty., Miss. v. U.S. Army Corps of Eng'rs*, 63 F.4th 458, 466 (5th Cir. 2023) ("Continued implementation of a preexisting policy (even under shifting conditions) and adoption or consideration of a *new* policy are birds of a different feather.  Only the latter form of agency action requires supplementation of an existing EIS—ruling otherwise would create a freestanding obligation to supplement that would subject certain agencies to a never-ending game of environmental Whac-A-Mole.  In requiring prospective environmental analysis rather than retrospective environmental analysis in NEPA, Congress sanctioned no such game.") (emphasis in original).

[156] 40 C.F.R. § 1502.9(d)(1)(ii).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.  CP16-116-003

(Issued October 27, 2023)

PHILLIPS, Chairman, *concurring*:

1.    I write separately to underscore three points.  First, I am pleased that we are finally issuing these rehearing orders.  Our action today will only strengthen the legal durability of the authorizations we issued following the decision from the U.S. Court of Appeals for the D.C. Circuit in *Vecinos para el Bienestar de la Comunidad Costera v. FERC*.[1]

2.    Second, I recognize that Commissioner Danly is "concurring in the result" of this order.  In my earlier statement in *Mankato Energy Center, LLC*, I outlined my view on this issue.[2]  I stand by that position.

3.    Third, in my earlier statement in *Texas LNG Brownsville LLC*, I explained that the Commission satisfied the court's directions in *Vecinos* both by conducting a full environmental justice examination using our current methods, which are consistent with EPA and CEQ guidance, and by taking an unprecedented and bipartisan step to protect environmental justice communities from potential concerns about the projects' effects on air quality.[3]  I want to reaffirm that the Commission went beyond the requirements of the remand and that we are making progress on the critically important issue of environmental justice.

        For these reasons, I respectfully concur.

_____
Willie L. Phillips
Chairman

_____

[1] 6 F.4th 1321 (2021).

[2] 184 FERC ¶ 61,170 (Phillips, Comm'r, concurring) (2023).

[3] *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (Phillips, Comm'r, concurring) (2023).

**JA166**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.     CP16-116-003

(Issued October 27, 2023)

CLEMENTS, Commissioner, *dissenting*:

1.     I dissent from today's Order[1] for the same reasons I dissented from the Remand Order.[2]  In addition, and perhaps most fundamentally, I dissent because the Order flouts the D.C. Circuit court's directive in *Vecinos* to (1) explain whether the Council on Environmental Quality's (CEQ) regulation, 40 C.F.R. § 1502.21(c), required the Commission to use the Social Cost of Carbon (SCC) protocol to assess greenhouse gas (GHG) emissions; and (2) revisit the Commission's Natural Gas Act (NGA) public interest determination after addressing the deficiencies the court identified in the Commission's analysis of environmental justice (EJ) and climate change impacts.[3]

2.     In particular, I agree with the rehearing petitioners[4] (collectively, Sierra Club) that the Commission was obligated to (1) prepare a supplemental environmental impact statement (EIS) for Texas LNG Brownsville LLC's (Texas LNG) proposed liquified natural gas terminal project (Texas LNG Project or project), and (2) provide a meaningful opportunity for public comment on the supplemental EIS, as well as on required mitigation measures.  The Commission's failure to do so has left us with a fundamentally flawed record that cannot support a public interest determination for the project.  Moreover, I disagree with the Order's conclusion that it is impossible for the Commission to determine the significance of the environmental impacts of the project's GHG emissions.[5]  The Commission's continued failure to grapple with the significance issue

---

[1] *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Order).

[2] *See Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Remand Order) (Clements, Comm'r, dissenting).

[3] *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329, 1331 (D.C. Cir. 2021) (*Vecinos*).

[4] On May 22, 2023, Vecinos para el Beienestar de la Comunidad Costera, Sierra Club, and City of Port Isabel filed a joint request for rehearing of the Remand Order (Rehearing Request).

[5] *See* Order, 185 FERC ¶ 61,079 at PP 42-43.

**JA167**

puts our orders in jeopardy upon judicial review, particularly this one.  Finally, I object to language in the Order making it unclear—apparently deliberately—whether the Commission considered GHG emissions at all in its NGA public interest determinations, as it was legally required to do.[6]  For these reasons, I would have granted rehearing and found that the Texas LNG Project is inconsistent with the public interest.

3.      Following the D.C. Circuit court's remand of the Commission's original authorization orders in *Vecinos*, the Commission conducted new analyses of the project's impacts on EJ communities, including air quality and visual impacts.  Instead of issuing a supplemental EIS fully explaining these analyses and taking public comment on it, the Commission instead merely summarized the results in its Remand Order.  This was an unlawful procedural shortcut that left the Commission with a fatally deficient administrative record.

4.      Under CEQ's regulations implementing the National Environmental Policy Act (NEPA),[7] which the Commission's own NEPA regulations compel us to follow,[8] a supplemental EIS is required when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[9]  In my dissent from the Remand Order, I explained that the Commission's new analysis identifying *hundreds* of additional potentially affected EJ communities by itself constituted "significant new information" requiring a supplemental EIS.[10]  This new information painted a "*seriously* different picture of the environmental landscape," which necessitated a supplemental EIS under relevant case law.[11]  Moreover, the Commission found that the Texas LNG Project may cause significant air quality impacts and would

---

[6] *See id.* P 38.

[7] 42 U.S.C. §§ 4321-4370j (2021).

[8] *See* 18 C.F.R. § 380.1 (2022).

[9] 40 C.F.R. § 1502.9(d)(1)(ii) (2022).

[10] Remand Order, 183 FERC ¶ 61,047 (Clements, Comm'r, dissenting at P 3).

[11] *See Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017)) (internal quotation marks omitted).

Document Accession #: 20231027-3046      Filed Date: 10/27/2023

cause significant visual impacts on EJ communities and their individual members.[12]  This was another, independent reason that a supplemental EIS was required.[13]

5.      The impacts identified in the Commission's new analyses are particularly important because they would fall on EJ communities, which "experience disproportionate and adverse human health or environmental burdens."[14]  Members of these communities suffer from poorer health outcomes and have lower life expectancies than those in other communities.[15]  The causes of this include inequitable access to clean water, clean air, natural places, and resources for other basic human health and environmental needs.[16]  The cumulative effects of exposure to the disproportionate burdens placed on EJ communities, taken together with the adverse impacts identified in the Commission's new analyses, will further disadvantage these communities.  By failing to fully assess these impacts in a supplemental EIS reflecting input from affected EJ communities, the Commission contributes to a longstanding problem of "gaps in environmental and human health data … [that act as] a persistent and pernicious driver of environmental injustice."[17]

---

[12] *See* Remand Order, 183 FERC ¶ 61,047 at PP 69 (describing potential NAAQS violations from simultaneous construction, commissioning, start-up, and operations), 72 ("individuals from environmental justice communities fishing or otherwise recreating near the terminal may experience adverse air quality impacts"), and 79 (finding cumulative adverse visual impacts on individuals from EJ communities would be significant).  In contrast, the 2019 EIS found that "there is no evidence that [EJ] communities would be disproportionately affected by the project or that impacts on [EJ] communities would appreciably exceed impacts on the general population.  It is not anticipated that the project would cause significant adverse health or environmental harm to any community with a disproportionate number of minority or low-income populations."  EIS at 4-157.  The air quality cumulative impacts section concluded that air pollutant emissions would have only "minor impacts on the local air quality and would not result in significant impacts on regional air quality," and said nothing about significant adverse effects on EJ communities or their individual members.  *See id.* at 4-184.

[13] *See* Remand Order, 183 FERC ¶ 61,047 (Clements, Comm'r, dissenting at P 4).

[14] Exec. Order No. 14096, 88 Fed. Reg. 25251, 25252 (Apr. 21, 2023).

[15] *Id.*

[16] *Id.*

[17] *Id.*

6.      The Remand Order asserts that the Texas LNG Project would not have a significant impact on air quality—and that no supplemental EIS therefore is required—based on the unsupported assumption that the air monitoring and mitigation plan required by new Environmental Condition 130 would prevent the combined construction, commissioning, start-up, and operational emissions from causing an exceedance of the pertinent National Ambient Air Quality Standards (NAAQS).[18]  While the courts have generally held that mitigation measures can be used to justify a finding of no significant impact (FONSI), an agency "must explain *exactly* how the measures will mitigate the project's impact."[19]  Although the agency is not required to have a complete mitigation plan for a "mitigated FONSI," the measures must be "developed to a reasonable degree."[20]  Moreover, the agency must demonstrate the feasibility of the mitigation measures, rather than relying on cursory descriptions of them.[21]

7.      Environmental Condition 130 falls far short of these standards.  Indeed, the condition is nothing more than "a plan to have a plan," as Sierra Club aptly put it.[22]  The condition does not say how many or what type of monitors Texas LNG must have, how a NAAQS exceedance would be calculated, what mitigation measures Texas LNG must implement in response to a NAAQS exceedance or how quickly it must do so, or whether or how Texas LNG must share the results of its monitoring and analysis with federal and state air quality regulators or the public.[23]  Worst of all, there is no explanation of

---

[18]  Remand Order, 183 FERC ¶ 61,047 at PP 70-71.

[19]  *LaFlamme v. FERC*, 852 F.2d 389, 399 (9th Cir. 1988) (emphasis added) (citing *Steamboaters v. FERC,* 759 F.2d 1382, 1394 (9th Cir. 1985); *Jones v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986)).

[20]  *National Parks & Conservation Association v. Babbitt,* 241 F.3d 722, 734 (9th Cir. 2001) (citations omitted); *see also* CEQ, *Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact,* 76 Fed. Reg. 3843-01, 3848 (Jan. 21, 2011) (CEQ Mitigation Guidance) (mitigation measures should be "clearly described" and "carefully specified in terms of measurable performance standards or expected results").

[21]  *See O'Reilly v. U.S. Army Corps of Engineers,* 477 F.3d 225, 234 (5th Cir. 2007).

[22]  Rehearing Request at 20.

[23]  Environmental Condition 130 does require Rio Grande to file weekly reports with the Commission about exceedances.  Remand Order, 183 FERC ¶ 61,047 at app. A, P 130(c).  The Commission cannot reasonably assume that air quality regulators or members of the public would monitor the docket for this information without some form

whether it will even be feasible for Texas LNG to prevent a NAAQS exceedance.  For these reasons, the Commission cannot rely on Environmental Condition 130 to support its FONSI and therefore must prepare a supplemental EIS fully assessing significant air quality and other impacts, as well as mitigation measures to prevent or minimize those impacts.[24]

8.      The unfortunate fact is that the Commission cannot demonstrate that the air quality and visual impacts identified in the Remand Order are the only significant impacts EJ communities will suffer from the project.  The reason is simple:  the Commission did not effectively elicit the public comment that is foundational to a complete environmental review.  As I explained in my dissent from the Remand Order, members of the hundreds of newly identified EJ communities have no way of knowing they are within the project's potential impact zone, let alone knowledge of whether and how they might provide information to the Commission on what those specific impacts would be or how to mitigate them.[25]  The Commission's failure to give the public opportunity to comment on the new analyses in the Remand Order or on the "mitigated FONSI" included in that order appears to contravene CEQ's guidance.[26]  Although the Commission did provide an opportunity for comment on the project sponsor's responses to certain of Commission staff's highly technical environmental information requests, there was no opportunity to comment on critical air modeling information used in the Commission's cumulative air impacts analysis because that information was submitted *after* the public comment period

---

of affirmative notice from Rio Grande or the Commission.

   [24] The cases cited in the Order at P 27 are readily distinguishable.  None address the requirements for a mitigated FONSI.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *Sierra Club v. FERC*, 38 F.4th 220, 233 (D.C. Cir. 2022); *Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991).  And none approved a cursory plan to develop unspecified mitigation measures in the future.

   [25] Remand Order, 183 FERC ¶ 61,047 (Clements, Comm'r, dissenting at P 7).

   [26] *See* CEQ Mitigation Guidance, 76 Fed. Reg. 3848 (explaining CEQ's regulations provide for public involvement in the development of a mitigated FONSI document) (citations omitted).  In defending the Commission's approach, the Order states that the Commission "is generally master of its own calendar and procedures."  Order, 185 FERC ¶ 61,079 at P 27.  Although that may be generally true, the Commission's regulations provide that it will comply with CEQ's NEPA regulations (18 C.F.R. § 380.1), and CEQ interprets its regulations to require specific procedures for a mitigated FONSI.  None of the cases that the Order cites address public involvement with respect to a mitigated FONSI.  *See* Order 185 FERC ¶ 61,079 at P 27 n.81.

Document Accession #: 20231027-3046    Filed Date: 10/27/2023
Docket No. ER10-2502-010, et al.                                              - 6 -

closed.[27]  The Order misses the mark in claiming that "any person may file comments on the docket."[28]  The ability to file comments in the docket is meaningless, where, as here, potentially impacted communities have no actual notice of their ability to file.  To assure meaningful public participation, the Commission should have had an affirmative outreach program for potentially affected communities that included notifications in both English and Spanish.[29]

9.      I also dissent with respect to the Order's claim that the Commission is incapable of determining the significance of GHG emissions associated with the project.  The Order's insistence that there are no acceptable tools for determining the significance of GHG emissions remains unsupported, and gains nothing through reflexive repetition in virtually every recent Commission order issued under sections 3 and 7 of the NGA.

10.     In my recent concurrence in *Transco,* I explained the history of the language in Paragraphs 42 and 43 of the Order,[30] which has come to be known as the "*Driftwood* compromise."[31]  In *Driftwood,* the majority adopted unheralded new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticized the SCC protocol.[32]  I have dissented from this language in *Driftwood* and subsequent orders for two reasons:  (1) it reflects a final Commission

---

[27] *See* Remand Order, 183 FERC ¶ 61,047 (Clements, Comm'r, dissenting at P 11).

[28] Order, 185 FERC ¶ 61,079 at P 33.

[29] Despite the Projects' documented impact on majority Hispanic/Latino communities with limited English proficiency, the Commission declined to provide any materials in Spanish.  *See* Remand Order, 183 FERC ¶ 61,046 at PP 111, 119.  In Cameron County, 70 percent of residents speak Spanish at home and 33.5 percent of the Spanish speaking population speaks English less than very well.  In Port Isabel, the city closest to the LNG terminal, a majority of residents speaks Spanish at home and 27.1 percent speak English less than well.  *See* Rehearing Request at 39.  While Rio Grande did translate materials regarding the project and provided Spanish-speaking representatives at the public scoping and comments meeting, the Commission failed to do so.  *See* Remand Order, 183 FERC ¶ 61,046 at n.195; P 85.

[30] *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3).

[31] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at P 1).

[32] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

**JA172**

decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[33] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[34]  I dissent from the language in paragraphs 42 and 43 of the Order for the same reasons.

11.     More fundamentally, I dissent from the Order's discussion of GHGs because it fails to satisfy the court's direction in *Vecinos* to explain whether 40 C.F.R. § 1502.21(c) calls for the Commission to use the SCC protocol or some other analytical framework to assess GHGs and "if not, why not."[35]  Rather than providing a reasoned analysis of CEQ's regulation, the Order merely repeats the Commission's superficial arguments against use of the SCC protocol.[36]  In analyzing whether CEQ's regulation calls for use of the SCC protocol, the obvious central question is what CEQ's own position is on the protocol's usefulness in NEPA analyses.  The Commission needn't look far to discover

---

[33] Docket No. PL21-3.

[34] *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3); *see also Port Arthur LNG Phase II, LLC,* 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC,* 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4)*; Northern Natural Gas Company,* 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas Eastern Transmission, LP,* 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Remand Order*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[35] *Vecinos*, 6 F.4th at 1330.  Given the requirement under the Administrative Procedure Act that agencies provide a reasoned explanation for their decisions, *Envtl. Def. Fund v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021), I understand that is what the court has asked the Commission to provide on remand.  The Order is long on pronouncements, but woefully short on *reasoning*.

[36] Order, 185 FERC ¶ 61,079 at PP 41-44.  To be sure, some courts have upheld the Commission's determination not to use the SCC protocol.  *See id.* at P 42 & n.136.  But the court in *Vecinos* distinguished some of those cases because they did not address the CEQ regulation at issue here.  *Vecinos*, 6 F.4th at 1329.  The Sierra Club makes this very point, but the Order omits any mention of it, disregarding both the *Vecinos* decision and an important argument raised on rehearing.  *See* Rehearing Request at 32.

**JA173**

Docket No. ER10-2502-010, et al.                                                                              - 8 -

that CEQ unambiguously supports use of the SCC protocol in NEPA reviews. CEQ's 2016 GHG Guidance identifies the SCC protocol as a "harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review."[37] CEQ's new GHG guidance issued in 2023 similarly recommends using the protocol in NEPA reviews, making no distinction between project-level analyses and agency rulemakings.[38] The Order simply misses the point in stating CEQ's 2016 guidance "does not impose legal requirements on the Commission."[39] The question posed on remand is whether CEQ's regulation should be interpreted to call for use of the SCC protocol in assessing GHG emissions. Based on CEQ's 2016 and 2023 guidance documents, the answer is "yes."

12.      I further object to language in paragraph 38 of the Order making unclear whether the Commission considered GHG emissions at all in its public interest determination. Sierra Club asserts that the Commission has the authority and obligation to consider GHG emissions as part of its public interest determination under the NGA, including their significance and environmental impact.[40] As discussed below, the Order's response to this argument is deliberately vague and nearly unintelligible. Worse, the Order fails to provide a reasoned explanation of whether or how it "revisit[ed] its determinations of public interest and convenience under Section 3 . . . of the NGA,"[41] as the *Vecinos* court directed it to do. Rather than explaining whether and how the Commission factored its post-remand EJ and GHG analyses into its public interest determination, the Order seems to suggest that environmental considerations may not be part of the Commission's substantive public interest determination *at all*. It will likely come as quite a surprise to the court that the Commission may be using this order on rehearing to question decades of court and Commission precedents finding that environmental considerations are an integral part of the Commission's public interest determinations under the NGA.

---

[37] Council on Envt'l Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 33 n.86 (Aug. 1, 2016), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf.

[38] *See* Council on Envt'l Quality, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023).

[39] Order, 185 FERC ¶ 61,079 at P 41.

[40] Rehearing Request at 30.

[41] *Vecinos*, 6 F.4th at 1331.

**JA174**

Document Accession #: 20231027-3046     Filed Date: 10/27/2023

13.     In response to Sierra Club, the Order says the Rehearing Request "conflates the Commission's NGA and NEPA responsibilities, which are separate and distinct.  The Commission's balancing under the public interest standard is consistent with the purpose of the NGA and is therefore afforded deference."[42]  The Order then cites the Supreme Court's decision in *NAACP v. Fed. Power Comm'n,*[43] and includes a parenthetical explaining that the Court said "the purpose of the NGA is to 'encourage the orderly development of plentiful supplies of . . .  natural gas at reasonable prices' and also observing that there are subsidiary purposes to the Act including 'conservation, environmental, and antitrust questions.'"  This leaves ambiguous whether the Commission's public interest determination focuses exclusively on "encouraging the development of natural gas supplies" or also encompasses environmental considerations, including the impacts of GHG emissions.

14.     The Commission used nearly identical language in its order in *Commonwealth LNG*,[44] prompting me to dissent.[45]  If the Rorschach test could be translated into words, it might read like paragraph 38 of the Order.  The Order's language is a verbal inkblot, with no fixed meaning.  Its ambiguity leaves each of its authors free to say—outside the pesky confines of the Commission's actual order—*either* that the Commission does or does not consider GHG impacts in its public interest determinations.  The Order appears to be deliberately propagating ambiguity in this case considering that (1) I criticized the vagueness of the language in my dissent in *Commonwealth LNG*, and (2) there is no other reason for the majority to include the language here because, according to the Order, Sierra Club's "argument is not properly before us on rehearing as it is outside the scope of the court's remand."[46]

15.     As I explained in my dissent in *Commonwealth LNG*, a reviewing court cannot discern from the inkblot language whether the Commission finds that it must consider climate impacts and, if so, whether and how it weighs them in its public interest determinations.[47]  In failing to explain its reasoning, the Commission violates the most

---

[42] Order, 185 FERC ¶ 61,079 at P 38.

[43] 425 U.S. 662, 669 (1976).

[44] *See Commonwealth LNG, LLC,* 183 FERC ¶ 61,173, at P 37 (2023) (*Commonwealth LNG*).

[45] *Id.* (Clements, Comm'r, dissenting, at PP 2-4).

[46] Order, 185 FERC ¶ 61,079 at P 38.

[47] *Commonwealth LNG,* 183 FERC ¶ 61,173 (Clements, Comm'r, dissenting, at P 2).

basic requirement of the Administrative Procedure Act.[48]  Additionally, in this case, it flouts the *Vecinos* court's direction to revisit the Commission's public interest determinations under the NGA after correcting the deficiencies in the Commission's original EJ and GHG analyses.

16.     To the extent the language in paragraph 38 of the Order is meant to suggest the Commission is not required to consider the environmental impacts of the project's GHG emissions in its public interest determinations under section 3 of the NGA, it is plainly wrong and contravenes decades of court and Commission precedents.  The courts have consistently found that the Natural Gas Act public interest standard encompasses environmental considerations.  More than sixty years ago, the Supreme Court held that our predecessor agency, the Federal Power Commission, properly factored air pollution impacts into its public interest determination under section 7 of the NGA.[49]  Nearly fifty years ago, in *NAACP*, the Supreme Court held that environmental protection is one purpose of the NGA.[50]  Over twenty years ago, courts continued to recognize that the NGA public interest determination involves weighing "market support, economic, operational, and competitive benefits, and environmental impact[s]."[51]  Finally, many recent decisions—including the D.C. Circuit's remand decision in *this* case—make clear that the Commission must consider the climate impacts of GHG emissions in its public interest determinations under the statute.[52]  If the Commission now intends to say that

_____

[48] *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.").

[49] *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 5 (1961). While the case dealt with a Section 7 question, "[t]he Commission has long regarded Section 3's 'public interest' standard and Section 7's 'public convenience and necessity' standard as substantially equivalent." *Distrigas Corp. v. Fed. Power Comm'n.*, 495 F.2d 1057, 1065 (D.C. Cir. 1974).

[50] 425 U.S. at 669; Id. at 670 n.6.

[51] *See, e.g., South Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2000).

[52] *See Vecinos*, 6 F.4th at 1329, 1331 (finding Commission's analysis of climate change impacts deficient under *both* the NGA and NEPA and directing Commission to revisit its public interest determination after correcting deficiencies); *see also Cntr. for*

**JA176**

climate impacts (or any other environmental considerations) are no longer part of its public interest determination under the NGA, it must say so unambiguously and give a reasoned explanation for that conclusion.[53]

17.     NEPA also requires the Commission to consider climate and other environmental impacts in deciding whether to approve a project application.  As the Supreme Court has explained, NEPA's environmental impact statement requirement "ensures that the agency, *in reaching its decision*, will have available, and will carefully *consider*, detailed information concerning significant environmental impacts…."[54]  The Order's statement

---

*Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (holding that the Commission makes an appropriate NGA public interest determination when it finds that a project has "substantial economic and commercial benefits" that are "not outweighed by the projected environmental impacts"); *Birkhead v. FERC,* 925 F.3d 510, 519 (D.C. Cir. 2019) (in addressing arguments relating to GHG emissions, the court explains that the Commission's public interest determination includes environmental considerations); *Sierra Club v. FERC,* 867 F.3d 1357, 1373 (D.C. Cir. 2017) (in addressing Commission's treatment of GHG emissions, the court explains that the balancing of factors in determining the public convenience and necessity includes environmental effects); *Sierra Club v. FERC*, 827 F.3d 36, 42 (D.C. Cir. 2016) ("As required by the Natural Gas Act and NEPA, the Commission undertook an extensive review of the Freeport Projects."); *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) ("The Section 7 certificate process incorporates review of proposed projects under the National Environmental Policy Act (NEPA)." The court also noted that the NEPA review requires an analysis of downstream GHG emissions.); *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) (holding that *"[a]s part of the Section 7 certificating process…* the Commission must complete an environmental review of the proposed project under the National Environmental Policy Act.") (emphasis added); *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 106–11 (D.C. Cir. 2014) (stating that FERC is obligated to consider alternatives to a proposed project that might better serve the public interest, including on the basis of their environmental impact, when issuing a certificate under Section 7); *Delaware Riverkeeper Network v. FERC*, 45 F.4th 104, 115 (D.C. Cir. 2022) ("[T]he Commission's balancing of public benefits and adverse consequences [in issuing a certificate] reasonably accounted for potential environmental impacts.").

[53]  "[T]he requirement that an agency provide reasoned explanation for its action [under the Administrative Procedure Act] would ordinarily demand that it display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

[54] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (emphasis added).

that the Commission's responsibilities under the NGA are "separate and distinct" from those under NEPA could be interpreted to suggest the statutes bear no relation to each other.[55]  To the contrary, the Commission's obligations under the two statutes are inextricably linked.  NEPA directs federal agencies "to the fullest extent possible" to interpret and administer their organic statutes in accordance with the environmental protection objectives set forth in NEPA.[56]  In requiring the Commission to consider environmental impacts in its substantive decision-making, NEPA gives content to the NGA's broad "public interest" standard.[57]

18.    The best that can be said of the Order's attempt to divorce NEPA compliance from the Commission's substantive decision-making under the NGA is that it badly misconstrues both statutes.  But the Order's misguided language is even more indefensible here than it was in *Commonwealth LNG.*  The *Vecinos* court ordered the Commission to "reconsider its determinations of public interest and convenience under … [Section 3] of the NGA, along with its NEPA analyses of the projects' impacts on climate change and environmental justice communities."[58]  By failing to clearly explain how, *or even if*, the Commission factored its post-remand environmental analyses into its NGA public interest determination, the Commission failed to respond to the court's directive.  Of the many serious errors in this deeply flawed Order, that may be the greatest.

        For the foregoing reasons, I respectfully dissent.


_____

Allison Clements
Commissioner




_____

[55] *See* Order 185 FERC ¶ 61,079 at P 38.

[56] 42 U.S.C. § 4332; *see also* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives).

[57]  *Cf. Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665-66 (D.C. Cir. 2011) (upholding agency's interpretation of "public interest" in its organic statute to include environmental considerations given NEPA's language and goals).

[58] 6 F.4th at 1331.

**JA178**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| Texas LNG Brownsville LLC | Docket Nos. | CP16-116-003 |
|---|---|---|

(Issued October 27, 2023)

CHRISTIE, Commissioner, *concurring*:

1.      While today's order correctly rejects Sierra Club's insistence that the Commission incorporate the "social cost of GHG" constructed numbers associated with the project into its public interest calculus under the NGA,[1] I would have preferred that the order reject this unsupportable claim more comprehensively.  I write separately to emphasize the following points.

2.      On remand, the court directed us either to use social cost of GHG, or some other "scientifically accepted" measurement, or to explain why we are declining to do so.[2]  The order correctly notes that, as the Commission has explained previously, the social cost of GHG construct is *not* useful for evaluating project-level emissions.[3]  But this barely scratches the surface of the problems with using this construct in our certificate proceedings.

3.      To begin with, a social cost of GHG calculation does not have the slightest scientific validity in any serious cost-benefit analysis of a natural gas infrastructure project, for a slew of reasons.  As just one example, the social cost of GHG number is supposed to represent what economists call "negative externalities."  The typical social cost of GHG calculation, however, does not even bother to calculate a project's *positive* externalities and net them out, so the social cost of GHG number is utterly useless for its supposed purpose in weighing costs and benefits.  Used as the project opponents want us to use it, the social cost of GHG calculation is pure pseudoscience.[4]

---

[1] Order at PP 38 – 44.

[2] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329-30 (D.C. Cir. 2021) (*Vecinos*) ("On remand, the Commission must explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not.").

[3] Order at PP 41 – 43.

[4] One of the best definitions of "pseudoscience" is from the renowned 20th

Docket No. ER10-2502-010, et al.                                                    - 2 -

4.      The best that can be said about a social cost of GHG number in this context is that it is meaningless.  Using such a meaningless number to attempt to gauge the global climate impact of a single project, would be literally an exercise of "garbage in, garbage out."  Fortunately, the order makes clear both that the social cost of GHG calculation is not useful for ascertaining the global climate impacts of a single infrastructure project and that there is no other known method that would be scientifically valid for such purpose.[5]  This Commission simply cannot make such a determination, and *no court has ever told us we must attempt the impossible.*

5.      And let's get real:  The entire push, dating back to the failed attempt last year to enact the draft Certificate Policy and GHG Statements, has always had one overriding goal — a goal that is fully apparent from the insistence of the current CEQ and EPA that this Commission consider *both upstream and downstream non-jurisdictional* activities before approving any natural gas project.[6]  That goal is to put in place a process and legal foundation for this Commission to *reject* needed natural gas projects solely on the basis of a single project's purported impacts on the global climate.[7]  But as I said in my dissent

---

century philosopher Karl Popper, who said that, unlike true science, which seeks facts first before reaching logical conclusions, pseudoscience starts with preconceived conclusions and then selects (*viz.* "cherry picks") facts to fit its preconceived conclusions.  *See*, *e.g.*, "Drawing the line between science and pseudo-science."  Sternwedel, Janet D., *Scientific American Blog*, Oct. 4, 2011, https://blogs.scientificamerican.com/doing-good-science/drawing-the-line-between-science-and-pseudo-science/.

[5] Order at P 42.  This is what has been called the "*Driftwood* language."  It is worth observing that determining whether a proposed project is in the public convenience and necessity is not a question for the "scientific community"; it is a question for this Commission, acting pursuant to its lawful authority and in accordance with its good judgment.

[6] It is also flatly contrary to law.  *See*, *e.g.*, *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) (*Freeport*) ("[W]here, as here, an agency 'has no ability to prevent a certain effect due to' that agency's 'limited statutory authority over the relevant action,' then that action 'cannot be considered a legally relevant "cause" of the effect' for NEPA purposes.") (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 771 (*Public Citizen*)) (cleaned up).

[7] *See Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Christie, Comm'r, dissenting at P 49 & n.97) (Christie Dissent) (identifying that the goal of many well-funded groups is to stymie development of natural gas infrastructure), https://www.ferc.gov/news-events/news/items-c-1-and-c-2-commissioner-christies-dissent-certificate-policy-and-interim; *see also* Rich Glick and Matthew Christiansen, *FERC and Climate Change*, 40 ENERGY L.J. 1 (May 2019) ("Where

**JA180**

Document Accession #: 20231027-3046     Filed Date: 10/27/2023

to the GHG Policy Statement, that would represent a radical rewrite of the Natural Gas Act (NGA), which neither this Commission nor the D. C. Circuit, nor any other appellate court, has the authority to do.[8]  Global climate change is far beyond this Commission's legal authority to regulate under the NGA.  Clearly global climate change and what to do about it from a regulatory standpoint are major questions of public policy — which, as the Supreme Court has recently reminded us, are the exclusive province of the legislature.[9]

6.      To summarize, the order is sufficient as far as it goes to rebut Sierra Club's claims and to answer the D. C. Circuit's remand instructions, so I concur.  The order does not go far enough, however, to make it absolutely clear that the NGA gives this Commission no legal authority to reject a natural gas project based on its purported impact on global climate,[10] regardless of whether that purported impact is packaged as a "social cost of GHG" number or in some other wrapper.  Only Congress can decide the appropriate

---

climate change factors explicitly into the Commission's decision-making process, such as with respect to infrastructure permitting, the Commission *must thoroughly examine how its decision can affect the climate* in order to ensure that it is consistent with the public interest.  In these instances, the Commission cannot bury its head in the sand and ignore the climate change consequences of its decisions. . . .  [The Commission] *must consider an infrastructure project's implications for climate change* when evaluating whether that project is consistent with the public interest.  The urgent threat posed by climate change demands nothing less.") (emphases added).

[8] *See* Christie Dissent at PP 11-21.

[9] *See*, *e.g.*, *West Virginia v. EPA*, 597 U.S. ---, 142 S. Ct. 2587 (2022); *Biden v. Nebraska*, 600 U.S. ---, 143 S.Ct. 2355 (2023); *see also*, Christie Dissent at PP 22-40.

[10] Nor does this Commission have the authority under the NGA to reject a project based on its impacts on "environmental justice" or other communities as a result of the public-interest review under the NGA.  *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation"); *id*. (explaining that the purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . .  natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act) (citation omitted).  While impacts on such communities should be fully and carefully considered and the mitigation of such impacts should be a focus of attention in the NEPA process, along with the mitigation of other environmental impacts, they are not the legal basis for a rejection under the NGA.

Document Accession #: 20231027-3046    Filed Date: 10/27/2023

Docket No. ER10-2502-010, et al.                                    - 4 -

policy response to climate change and make amendments to the NGA.  This Commission has no such legislative authority.

      For these reasons, I respectfully concur.


_____
Mark C. Christie
Commissioner

**JA182**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| | ) | |
| **TEXAS LNG BROWNSVILLE LLC** | ) | **DOCKET NO. CP16-___-000** |
| | ) | |

**APPLICATION OF TEXAS LNG BROWNSVILLE LLC FOR**
**AUTHORIZATION UNDER SECTION 3 OF THE NATURAL GAS ACT**

Langtry Meyer
Chief Operating Officer
Texas LNG Brownsville LLC
2800 North Loop West, Suite 910
Houston, TX 77092
Tel: 832.849.4920
lmeyer@txlng.com

David L. Wochner
Sandra E. Safro
Michael L. O'Neill
1601 K Street, N.W.
Washington, D.C. 20006
Tel: 202.778.9000
Fax: 202.778.9100
david.wochner@klgates.com
sandra.safro@klgates.com
mike.oneill@klgates.com

**JA183**

Director of Energy Projects approved Texas LNG's request on April 14, 2015, and assigned Texas LNG docket number PF15-14-000.[5]

As set forth in greater detail in this Application, during the course of its pre-filing process, Texas LNG notified landowners and potential stakeholders of the proposed Texas LNG Project, participated in open houses and numerous other meetings to engage with stakeholders, submitted drafts to the Commission of the required environmental resource reports,[6] filed status reports with the Commission on a monthly basis, and submitted a Follow-On Waterway Suitability Assessment ("WSA") to the U.S. Coast Guard ("USCG").   As a result of its participation in the pre-filing process, Texas LNG has been able to identify and address stakeholder comments and refine its proposal and Application.

## IV.    EXECUTIVE SUMMARY

Texas LNG seeks authorization under Section 3 of the NGA to site, construct, and operate an LNG export facility in the Port of Brownsville, Texas capable of producing up to 4 MTA LNG using the Air Products (APCI) propane-mixed refrigerant technology.   The Project will liquefy natural gas and store and deliver the LNG as needed for export overseas.   As described in greater detail in the Resource Reports in Exhibit F, the Project will result in major investment in the United States and in Texas specifically, resulting in substantial positive economic and fiscal impacts on the local, state, and national economies.

Section 3(a) of the NGA prescribes that the Commission shall issue an order approving the activities proposed in this Application unless it finds that the proposal "will not be consistent

---

[5] The Commission's regulations require that an LNG terminal applicant wait to file its formal application until at least 180 days after the Director of the Office of Energy Projects issues its notice approving the applicant's request to initiate the pre-filing process. 18 C.F.R. § 153.6(c). Texas LNG's Application complies with this requirement.

[6] The Commission's regulations require that an LNG terminal applicant file its draft Resource Report 13 at least 90 days prior to submitting its formal application.  18 C.F.R. § 157.21(f)(12).  Texas LNG filed its draft Resource Report 13 on October 1, 2015. Therefore, Texas LNG's Application complies with this requirement.

with the public interest."[7]   As detailed in this Application, the Texas LNG Project advances the public interest by stimulating job creation; increasing economic activity at a local, state, and national level; increasing tax revenues; and helping to reduce global greenhouse gas emissions. Therefore, the Texas LNG Project is not inconsistent with the public interest and Texas LNG respectfully requests that the Commission grant the authorization requested in this Application.

## V.    DESCRIPTION OF THE PROPOSAL

Texas LNG is proposing to develop an LNG export facility capable of producing a nominal capacity of up to 4 MTA of LNG using the proven APCI propane-mixed refrigerant technology.   The Project will receive natural gas via an approximately 150-mile non-jurisdictional intrastate pipeline to be constructed and connected from the Agua Dulce natural gas hub to the Brownsville market that will provide natural gas to the proposed LNG export facilities in the Port of Brownsville, industrial projects, power generation facilities, gas utility companies, and export markets in Mexico.

Once onsite, the natural gas will be treated, liquefied, and stored onsite.   At full plant capacity, the Project will consist of two LNG trains each with the nominal capacity of 2 MTA of LNG[8] (total nominal capacity of approximately 4 MTA).   The Project will be built in two phases, with Phase 1 initiated upon receipt of all required authorizations and Phase 2 constructed upon receipt of sufficient customer demand.   Each phase is designed to process approximately 0.309 billion cubic feet per day ("Bcf/d")[9] and will consist of one LNG train and one single

---

[7] 15 U.S.C. § 717b.

[8] While each LNG train will have a nameplate capacity of 2.25 MTA, Texas LNG anticipates that each train will produce 2 MTA of LNG for export.

[9] 0.309 Bcf/d is approximately 2.25 MTA of LNG based on average gas composition, average ambient temperature, and operation 365 days per year.  The LNG production rate will vary with the ambient temperature.  In the winter, each train will produce approximately 2.58 MTA and requires approximately 0.355 Bcf/d of feed gas to support the production rate.  During the summer the production rate will be lower due to increased ambient temperatures and consequently the feed gas rate will be lower.  The summer and winter production rates are still under evaluation and are subject to change as the design matures.

domestic consumption.[23] By providing additional demand for U.S. natural gas, the Texas LNG Project will help encourage enhanced access to the abundant supply of U.S. natural gas and augment already increasing competition for these supplies.

In addition, Texas LNG plans to offer its customers the commercial flexibility necessary to compete in a dynamic global natural gas market.[24] The Texas LNG Project is smaller sized than a majority of the more traditional LNG export projects that developers have proposed to date. As a smaller scale project, Texas LNG will more easily attract and accommodate customers with small and mid-sized demand. Texas LNG also will provide its offtake customers with LNG processing and liquefaction services under a tolling model, which will allow its customers to determine their upstream natural gas transportation and negotiate their preferred pricing index for feed gas. This commercial structure, added to Texas LNG's ready access to both the Atlantic and Pacific LNG trading basins, combine to create a flexible market opportunity for natural gas players that will enhance market competition by encouraging both existing market participants and new market entrants to join the global LNG trade.

**B. The Texas LNG Project Will Create Positive Economic Impacts.**

The Texas LNG Project will generate significant benefits for the national, state, and local economies by increasing economic output and government revenue, by providing additional employment opportunities, and by stimulating economic activity in an environmental justice community.

---

[23] *Id.* at 6.

[24] *Innovative Mid-Sized US LNG Export Project Focused on Delivering Flexible Supply Terms to Asian Markets Makes Significant Progress*, NASDAQ GLOBENEWSWIRE (Jan. 7, 2014), http://www.globenewswire.com/news-release/2014/01/07/600874/10063336/en/Innovative-Mid-Sized-US-LNG-Export-Project-Focused-on-Delivering-Flexible-Supply-Terms-to-Asian-Markets-Makes-Significant-Progress.html (last visited Mar. 25, 2016).

As further explained in the Socioeconomic Report prepared by Aaron Economic Consulting, LLC,[25] the Texas LNG Project will increase economic output across the region. The Aaron Report predicts that Texas LNG's investment in the construction of Phase 1 of the Project will increase economic output across the state and local economies by a total of $251.8 million,[26] and that the cumulative economic output from the first ten years of the operation of Phase 1 of the Project (from 2020 through 2030) will be approximately $3.7 billion.[27] This output will include property tax revenues of approximately $10 million per year, state sales tax revenues of between $590,000 and $771,000 per year, and local sales tax revenues between $189,000 and $246,000 per year.[28]

The Texas LNG Project also will provide additional employment opportunities for the Brownsville area. Texas LNG expects to employ an average of approximately 700 people directly during the Project's four-year construction period[29] and Texas LNG could employ up to approximately 1,312 workers on site should construction of Phases 1 and 2 progress concurrently.[30]

Statistics and data demonstrate that Cameron County is one of the poorest counties in Texas, resulting in it qualifying as an environmental justice community.[31] As a result, providing economic opportunity for the Brownsville area is particularly important because Cameron County has an unemployment rate nearly twice as high as the unemployment rate for the State of

---

[25] Attached as Appendix 5A to Resource Report 5. Hereinafter the Socioeconomic Report prepared by Aaron Consulting, LLC is referred to as the "Aaron Report."

[26] Aaron Report at 21.

[27] *Id.* at 31.

[28] *Id.* at 29-31.

[29] Resource Report 5 at 5-7 and Aaron Report at 23-26.

[30] Resource Report 5 at 5-7. Under the "Peak Impact Scenario," Phase 2 of the Texas LNG Project is assumed to commence 18 months following the initiation of Phase 1 construction, for a total construction period of 58 months. Resource Report 5 at 5-1.

[31] Resource Report 5 at 5-17. Texas LNG identified Cameron County as an "environmental justice community" based on available 2010 census block group statistics regarding ethnicity, median income, and poverty levels.

**JA187**

Texas.[32]  Support among federal, state, and local officials demonstrates the importance of the Texas LNG Project to the local community.[33]  By expanding employment opportunities, through both direct and indirect jobs, the Texas LNG Project will contribute to lowering Cameron County's unemployment rate and create positive economic impacts for the region.

C.  **The Texas LNG Project Will Further the United States' Environmental Policy and International Energy Security Objectives.**

In addition to enhancing competition in the domestic market and creating economic benefits, exports of LNG via the Texas LNG Project will further U.S. environmental policy and global security objectives in a number of ways.

The Texas LNG Project will support implementation of the Obama Administration's Clean Power Plan.  The Clean Power Plan allows states to increase reliance on natural gas for power generation in order to meet the state's carbon dioxide emissions reductions goal.[34]  In order to meet these goals, states will need to adjust their power generation portfolio and deploy additional natural gas power generation units, which will require additional natural gas infrastructure to ensure adequate, reliable access to natural gas.[35]  As noted in this Application, the Texas LNG Project will assist in supporting development of additional infrastructure to bring feed gas to the facility and the Brownsville area for the first time, thereby advancing the public

---

[32] Resource Report 5 at 5-5 and 5-6.

[33] U.S. Sen. John Cornyn, State Sen. Eddie Lucio, Jr., and State Rep. Eddie Lucio III have submitted letters to the Commission in support of the Texas LNG Project.  In addition, U.S. Rep. Filemon Vela and Brownsville, Texas Mayor Antonio Martinez submitted letters in support of the Texas LNG Project to DOE.  The Brownsville Economic Development Council and the Port Isabel-San Benito Navigation District also filed comments with the Commission in support for the Texas LNG Project.

[34] Federal Plan Requirements for Greenhouse Gas Emissions from Electric Utility Generating Units Constructed on or Before January 8, 2014, 80 Fed. Reg. 64,966 at 64,991 (Oct. 23, 2015).  For example, the Clean Power Plan requires that Texas reduce its annual carbon dioxide emissions by 32.9% by 2030.  80 Fed. Reg. at 65,013.

[35] Texas, along with 28 other states and state agencies, has challenged the Clean Power Plan in federal court.  *See* Application by 29 States and State Agencies for Immediate Stay of Final Agency Action during Pendency of Petitions for Review, Docket No. 15A773 (U.S. Jan. 26, 2016).  Texas LNG expresses no opinion regarding the substance of the Clean Power Plan or the emission reduction requirements it imposes on states.

**JA188**

interest by helping existing and future market participants to access natural gas and meet state carbon dioxide emissions reduction goals under the Clean Power Plan.

In addition, the Texas LNG Project also will support the United States' compliance with international environmental agreements. The United States and many other nations around the world recently agreed to "pursue efforts to limit the temperature increase to 1.5° C above pre-industrial levels."[36] Developed countries, such as the United States, took on the responsibility of assisting developing countries to meet their obligations under the Paris Agreement.[37] One means of assisting developing countries in mitigating greenhouse gas emissions is providing natural gas supplies at a competitive price compared to other forms of traditional energy sources. As a study prepared for the U.S. Department of Energy concluded, life cycle greenhouse gas emissions from U.S. LNG would be lower for consumers in Europe and Asia as compared with using coal sourced from nearer regional deposits.[38] The study further found that the global warming potential from the U.S. LNG value chain is lower than that of natural gas transported via pipeline from Russia on a 20-year basis.[39] By providing a fuel source with significantly lower emissions than other fossil fuels used for power generation and industrial combustion, LNG exports from the Texas LNG facility will assist countries around the world in meeting their obligations under the Paris Agreement, thereby advancing the intergovernmental framework adopted by the United States.

Furthermore, U.S. LNG exports will allow strategic U.S. allies around the world to diversify their energy supply options, offering an alternative to sometimes unreliable natural gas

---

[36] Adoption of the Paris Agreement, FCCC/CP/2015/L.9/Rev.1 at Art. 2(1)(a) (Dec. 12, 2015) (hereinafter "Paris Agreement").

[37] Paris Agreement at Art. 11(3).

[38] NATIONAL ENERGY TECHNOLOGY LABORATORY, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States* at 9-10 (2014).

[39] *Id.* at 10.

suppliers and assisting these countries in meeting their commitments under the Paris Agreement. As U.S. Senator John Barrasso stated in January 2015, "LNG exports are, for the United States, a powerful means to bring about positive change throughout the world.  LNG exports will help increase the energy security of key U.S. allies and partners throughout Europe and Asia."[40]  By providing a stable and affordable energy option, U.S. LNG supplies, including those exported via the Texas LNG Project, will support U.S. allies and partners in developing a more secure energy supply chain, thereby encouraging economic growth and peaceful development around the world.

Next, the Texas LNG Project's support for the domestic energy industry will diminish U.S. industry's reliance on foreign sources of energy.  With the Texas LNG Project serving as an outlet to international gas markets, domestic natural gas producers are less likely to engage in harmful "boom and bust" practices where industry invests heavily in production temporarily then withdraws the investment due to price declines following an oversupply of gas in the market. With access to international markets and increased consumption of natural gas domestically, the U.S. industrial sector will be more likely to rely on domestic energy supplies rather than imported energy supplies.  By contributing to the stabilization of the domestic natural gas market, Texas LNG will discourage the U.S. economy's historic overreliance on foreign sources of energy.

For these reasons, the Texas LNG Project is not inconsistent with the "public interest" and the Commission should grant the instant Application.

---

[40] *S. 33, The LNG Permitting Certainty and Transparency Act: Hearing Before the Committee on Energy and Natural Resources*, 114th Cong. 4 (2015) (statement of Sen. Barrasso, Member, S. Committee on Energy and Natural Resources).  Also speaking to the Senate Energy and Natural Resources Committee, an official with the Atlantic Council argued that "U.S. LNG would provide a reliable and competitive alternative to the [U.S.] allies in Central and Eastern Europe."  *Id.* at 60 (statement of Mr. David Koranyi, Director, Atlantic Council).

**JA190**

# Technical Support Document: -
# Social Cost of Carbon for Regulatory Impact Analysis -
# Under Executive Order 12866 -

**Interagency Working Group on Social Cost of Carbon, United States Government**

**With participation by**

Council of Economic Advisers
Council on Environmental Quality
Department of Agriculture
Department of Commerce
Department of Energy
Department of Transportation
Environmental Protection Agency
National Economic Council
Office of Energy and Climate Change
Office of Management and Budget
Office of Science and Technology Policy
Department of the Treasury

**February 2010**

from the more optimistic (e.g. abundant low-cost, low-carbon energy) to more pessimistic (e.g. constraints on the availability of nuclear and renewables).[15]   Second, the socio-economic trajectories associated with a 550 ppm $CO_2$e concentration scenario are not derived from an assessment of what policy is optimal from a benefit-cost standpoint.   Rather, it is indicative of one possible future outcome.   The emission trajectories underlying some BAU scenarios (e.g. MESSAGE's 612 ppm) also are consistent with some modest policy action to address climate change.[16]   We chose not to include socio-economic trajectories that achieve even lower GHG concentrations at this time, given the difficulty many models had in converging to meet these targets.

For comparison purposes, the Energy Information Agency in its 2009 Annual Energy Outlook projected that global carbon dioxide emissions will grow to 30.8, 35.6, and 40.4 gigatons in 2010, 2020, and 2030, respectively, while world GDP is projected to be $51.8, $71.0 and $93.9 trillion (in 2005 dollars using market exchange rates) in 2010, 2020, and 2030, respectively.   These projections are consistent with one or more EMF-22 scenarios.   Likewise, the United Nations' 2008 Population Prospect projects population will grow from 6.1 billion people in 2000 to 9.1 billion people in 2050, which is close to the population trajectories for the IMAGE, MiniCAM, and MERGE models.

In addition to fossil and industrial $CO_2$ emissions, each EMF scenario provides projections of methane, nitrous oxide, fluorinated greenhouse gases, and net land use $CO_2$ emissions out to 2100.   These assumptions also are used in the three models while retaining the default radiative forcings due to other factors (e.g. aerosols and other gases).  See the Appendix for greater detail.

### F.  Discount Rate

The choice of a discount rate, especially over long periods of time, raises highly contested and exceedingly difficult questions of science, economics, philosophy, and law.   Although it is well understood that the discount rate has a large influence on the current value of future damages, there is no consensus about what rates to use in this context.   Because carbon dioxide emissions are long-lived, subsequent damages occur over many years.   In calculating the SCC, we first estimate the future damages to agriculture, human health, and other market and non-market sectors from an additional unit of carbon dioxide emitted in a particular year in terms of reduced consumption (or consumption equivalents) due to the impacts of elevated temperatures, as represented in each of the three IAMs.   Then we discount the stream of future damages to its present value in the year when the additional unit of emissions was released using the selected discount rate, which is intended to reflect society's marginal rate of substitution between consumption in different time periods.

For rules with both intra- and intergenerational effects, agencies traditionally employ constant discount rates of both 3 percent and 7 percent in accordance with OMB Circular A-4.   As Circular A-4 acknowledges, however, the choice of discount rate for intergenerational problems raises distinctive

---

[15] For instance, in the MESSAGE model's reference case total primary energy production from nuclear, biomass, and non-biomass renewables is projected to increase from about 15 percent of total primary energy in 2000 to 54 percent in 2100.  In comparison, the MiniCAM reference case shows 10 percent in 2000 and 21 percent in 2100.

[16] For example, MiniCAM projects if all non-US OECD countries reduce $CO_2$ emissions to 83 percent below 2005 levels by 2050 (per the G-8 agreement) but all other countries continue along a BAU path $CO_2$ concentrations in 2100 would drop from 794 ppmv in its reference case to 762 ppmv.

17

**JA192**

problems and presents considerable challenges. After reviewing those challenges, Circular A-4 states, "If your rule will have important intergenerational benefits or costs you might consider a further sensitivity analysis using a lower but positive discount rate in addition to calculating net benefits using discount rates of 3 and 7 percent." For the specific purpose of developing the SCC, we adapt and revise that approach here.

Arrow et al. (1996) outlined two main approaches to determine the discount rate for climate change analysis, which they labeled "descriptive" and "prescriptive." The descriptive approach reflects a positive (non-normative) perspective based on observations of people's actual choices—e.g., savings versus consumption decisions over time, and allocations of savings among more and less risky investments. Advocates of this approach generally call for inferring the discount rate from market rates of return "because of a lack of justification for choosing a social welfare function that is any different than what decision makers [individuals] actually use" (Arrow et al. 1996).

One theoretical foundation for the cost-benefit analyses in which the social cost of carbon will be used— the Kaldor-Hicks potential-compensation test—also suggests that market rates should be used to discount future benefits and costs, because it is the market interest rate that would govern the returns potentially set aside today to compensate future individuals for climate damages that they bear (e.g., Just et al. 2004). As some have noted, the word "potentially" is an important qualification; there is no assurance that such returns will actually be set aside to provide compensation, and the very idea of compensation is difficult to define in the intergenerational context. On the other hand, societies provide compensation to future generations through investments in human capital and the resulting increase in knowledge, as well as infrastructure and other physical capital.

The prescriptive approach specifies a social welfare function that formalizes the normative judgments that the decision-maker wants explicitly to incorporate into the policy evaluation—e.g., how inter-personal comparisons of utility should be made, and how the welfare of future generations should be weighed against that of the present generation. Ramsey (1928), for example, has argued that it is "ethically indefensible" to apply a positive pure rate of time preference to discount values across generations, and many agree with this view.

Other concerns also motivate making adjustments to descriptive discount rates. In particular, it has been noted that the preferences of future generations with regard to consumption versus environmental amenities may not be the same as those today, making the current market rate on consumption an inappropriate metric by which to discount future climate-related damages. Others argue that the discount rate should be below market rates to correct for market distortions and uncertainties or inefficiencies in intergenerational transfers of wealth, which in the Kaldor-Hicks logic are presumed to compensate future generations for damage (a potentially controversial assumption, as noted above) (Arrow et al. 1996, Weitzman 1999).

Further, a legitimate concern about both descriptive and prescriptive approaches is that they tend to obscure important heterogeneity in the population. The utility function that underlies the prescriptive approach assumes a representative agent with perfect foresight and no credit constraints. This is an artificial rendering of the real world that misses many of the frictions that characterize individuals' lives

18

initially, but applies a graduated scale of lower discount rates further out in time.[24]  A key question that has emerged with regard to both of these approaches is the trade-off between potential time inconsistency and giving greater weight to far future outcomes (see the EPA Science Advisory Board's recent comments on this topic as part of its review of their *Guidelines for Economic Analysis*).[25]

*The Discount Rates Selected for Estimating SCC*

In light of disagreement in the literature on the appropriate market interest rate to use in this context and uncertainty about how interest rates may change over time, we use three discount rates to span a plausible range of certainty-equivalent constant discount rates: 2.5, 3, and 5 percent per year.  Based on the review in the previous sections, the interagency workgroup determined that these three rates reflect reasonable judgments under both descriptive and prescriptive approaches.

The central value, 3 percent, is consistent with estimates provided in the economics literature and OMB's Circular A-4 guidance for the consumption rate of interest.  As previously mentioned, the consumption rate of interest is the correct discounting concept to use when future damages from elevated temperatures are estimated in consumption-equivalent units.  Further, 3 percent roughly corresponds to the after-tax riskless interest rate.  The upper value of 5 percent is included to represent the possibility that climate damages are positively correlated with market returns.  Additionally, this discount rate may be justified by the high interest rates that many consumers use to smooth consumption across periods.

The low value, 2.5 percent, is included to incorporate the concern that interest rates are highly uncertain over time.  It represents the average certainty-equivalent rate using the mean-reverting and random walk approaches from Newell and Pizer (2003) starting at a discount rate of 3 percent.  Using this approach, the certainty equivalent is about 2.2 percent using the random walk model and 2.8 percent using the mean reverting approach.[26]  Without giving preference to a particular model, the average of the two rates is 2.5 percent.  Further, a rate below the riskless rate would be justified if climate investments are negatively correlated with the overall market rate of return.  Use of this lower value also responds to certain judgments using the prescriptive or normative approach and to ethical objections that have been raised about rates of 3 percent or higher.

---

[24] For instance, the UK applies a discount rate of 3.5 percent to the first 30 years; 3 percent for years 31 - 75; 2.5 percent for years 76 - 125; 2 percent for years 126 - 200; 1.5 percent for years 201 - 300; and 1 percent after 300 years.  As a sensitivity, it recommends a discount rate of 3 percent for the first 30 years, also decreasing over time.

[25] Uncertainty in future damages is distinct from uncertainty in the discount rate. Weitzman (2008) argues that Stern's choice of a low discount rate was "right for the wrong reasons." He demonstrates how the damages from a low probability, catastrophic event far in the future dominate the effect of the discount rate in a present value calculation and result in an infinite willingness-to-pay for mitigation today. Newbold and Daigneault, (2009) and Nordhaus (2009) find that Weitzman's result is sensitive to the functional forms chosen for climate sensitivity, utility, and consumption. Summers and Zeckhauser (2008) argue that uncertainty in future damages can also work in the other direction by increasing the benefits of waiting to learn the appropriate level of mitigation required.

[26] Calculations done by Pizer et al. using the original simulation program from Newell and Pizer (2003).

23

**JA194**



**Federal Energy Regulatory Commission**
Office of Energy Projects
Washington, DC  20426

# Texas LNG Project
## *Final Environmental Impact Statement*
## *Volume I*



## Texas LNG Brownsville LLC

**March 2019**
**Docket No. CP16-116-000**
**FERC/EIS-0288F**

### Cooperating Agencies:









U.S. Environmental
Protection Agency

U.S. Department
of Transportation

U.S. Coast Guard

U.S. Department
of Energy

U.S. Army
Corps of Engineers









U.S. Fish and
Wildlife Service

Federal Aviation
Administration

National Park Service

National Oceanic
Atmospheric Administration -
National Marine Fisheries Service

**JA195**

TABLE OF CONTENTS

TEXAS LNG PROJECT

FINAL ENVIRONMENTAL IMPACT STATEMENT

VOLUME I

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

LIST OF TABLES ........................................................................................................... v

LIST OF FIGURES ...................................................................................................... viii

LIST OF APPENDICES ................................................................................................. xi

ACRONYMS AND ABBREVIATIONS ....................................................................... xii

**EXECUTIVE SUMMARY** ...........................................................................................1

PROPOSED ACTION ...............................................................................................1

PUBLIC INVOLVEMENT ........................................................................................2

PROJECT IMPACTS ................................................................................................4

ALTERNATIVES ....................................................................................................15

CONCLUSION ........................................................................................................16

**1.0     INTRODUCTION** ........................................................................................ 1-1

1.1     PURPOSE AND NEED ................................................................... 1-3

1.2     PURPOSE AND SCOPE OF THIS STATEMENT ......................... 1-3

1.2.1     Cooperating Agencies .................................................... 1-4

1.3     PUBLIC REVIEW AND COMMENT ........................................... 1-10

1.3.1     Pre-filing Process and Scoping ................................... 1-10

1.3.2     Additional Agency Interactions ................................. 1-13

1.3.3     Public Review of the Draft EIS ................................. 1-13

1.3.4     Final EIS ....................................................................... 1-14

1.4     NON-JURISDICTIONAL FACILITIES ....................................... 1-14

1.4.1     Intrastate Natural Gas Pipeline ................................ 1-17

1.4.2     Electric Transmission Line ......................................... 1-17

1.4.3     Potable Water Line ...................................................... 1-18

1.4.4     State Highway 48 Auxiliary Lane .............................. 1-18

1.5     PERMITS AND APPROVALS ...................................................... 1-19

JA196

2.0    PROPOSED ACTION ......................................................................... 2-1

    2.1    PROPOSED FACILITIES ........................................................... 2-1

        2.1.1    Gas Gate Station and Interconnect Facility ................. 2-3

        2.1.2    LNG Terminal .................................................................. 2-3

        2.1.3    LNG Storage ................................................................... 2-8

        2.1.4    LNG Carrier Loading ..................................................... 2-8

        2.1.5    Buildings and Facility Roads ........................................ 2-9

        2.1.6    Water, Power, and Communications .......................... 2-10

        2.1.7    Flares ............................................................................ 2-10

        2.1.8    Ancillary Facilities ..................................................... 2-11

    2.2    LAND REQUIREMENTS ........................................................ 2-12

    2.3    CONSTRUCTION SCHEDULE AND WORKFORCE ................. 2-15

    2.4    ENVIRONMENTAL COMPLIANCE ........................................ 2-15

    2.5    CONSTRUCTION PROCEDURES ........................................... 2-17

        2.5.1    Site Preparation ......................................................... 2-17

        2.5.2    Liquefaction Facility .................................................. 2-20

        2.5.3    LNG Storage Tanks ..................................................... 2-20

        2.5.4    Marine Facilities ......................................................... 2-21

        2.5.5    Site Access ................................................................... 2-27

        2.5.6    Vapor Wall ................................................................... 2-27

    2.6    OPERATION AND MAINTENANCE PROCEDURES ................. 2-27

        2.6.1    LNG Carrier Traffic .................................................... 2-27

        2.6.2    LNG Terminal .............................................................. 2-30

3.0    ALTERNATIVES ............................................................................. 3-1

    3.1    NO-ACTION ALTERNATIVE ..................................................... 3-2

    3.2    SYSTEM ALTERNATIVES ......................................................... 3-3

    3.3    SITE ALTERNATIVES ............................................................... 3-6

        3.3.1    LNG Terminal Site Alternatives ................................. 3-6

    3.4    PROCESS ALTERNATIVES ...................................................... 3-12

        3.4.1    Power Generation Alternatives ................................ 3-12

        3.4.2    Flaring System ............................................................ 3-12

**JA197**

4.0     ENVIRONMENTAL ANALYSIS ................................................................. 4-1

    4.1     GEOLOGIC RESOURCES ................................................................. 4-1

        4.1.1   Geologic Setting.................................................................. 4-1

        4.1.2   Mineral Resources ............................................................. 4-2

        4.1.3   Blasting .............................................................................. 4-3

        4.1.4   Paleontology ...................................................................... 4-3

        4.1.5   General Impacts and Mitigation........................................ 4-3

    4.2     SOILS .............................................................................................. 4-3

        4.2.1   Existing Soil Resources .................................................... 4-3

        4.2.2   Soil Contamination ........................................................... 4-6

        4.2.3   General Impacts and Mitigation........................................ 4-6

        4.2.4   Dredge Material Disposal Sites ........................................ 4-8

    4.3     WATER RESOURCES ................................................................... 4-12

        4.3.1   Groundwater Resources .................................................. 4-12

        4.3.2   Surface Water ................................................................... 4-15

    4.4     WETLANDS.................................................................................... 4-29

        4.4.1   Existing Wetland Resources ........................................... 4-30

        4.4.2   Wetland Impacts and Mitigation.................................... 4-31

        4.4.3   Alternative Measures to the FERC Procedures ..................... 4-36

    4.5     VEGETATION ................................................................................ 4-37

        4.5.1   Existing Vegetation Resources ....................................... 4-38

        4.5.2   Vegetation Impacts and Mitigation................................ 4-44

        4.5.3   Exotic or Invasive Plant Communities and Noxious Weeds ............... 4-44

        4.5.4   Vegetation Communities of Special Concern........................ 4-45

    4.6     WILDLIFE AND AQUATIC RESOURCES ................................. 4-47

        4.6.1   Wildlife Resources .......................................................... 4-47

        4.6.2   Aquatic Resources ........................................................... 4-58

        4.6.3   Essential Fish Habitat ..................................................... 4-75

    4.7     THREATENED, ENDANGERED, AND OTHER SPECIAL STATUS SPECIES
........................................................................................................ 4-80

        4.7.1   Federally Listed Threatened and Endangered Species ......................... 4-87

**JA198**

4.7.2    State-Listed and Special Status Species ................................. 4-87

4.8     LAND USE, RECREATION, AND VISUAL RESOURCES .......................... 4-97

4.8.1    Land Use ..................................................................................... 4-97

4.8.2    Landowner and Easement Requirements.............................. 4-103

4.8.3    Planned Developments............................................................ 4-103

4.8.4    Recreation and Special Interest Areas .................................. 4-104

4.8.5    Visual Resources..................................................................... 4-112

4.8.6    Coastal Zone Management ...................................................... 4-141

4.9     SOCIOECONOMICS ......................................................................... 4-142

4.9.1    Population ................................................................................. 4-142

4.9.2    Economy and Employment...................................................... 4-143

4.9.3    Local Taxes and Government Revenue .................................. 4-145

4.9.4    Housing .................................................................................... 4-146

4.9.5    Public Services ........................................................................ 4-147

4.9.6    Transportation ......................................................................... 4-148

4.9.7    Property Values........................................................................ 4-152

4.9.8    Tourism and Commercial Fishing .......................................... 4-152

4.9.9    Environmental Justice ............................................................ 4-154

4.10    CULTURAL RESOURCES ................................................................. 4-157

4.10.1   Consultations........................................................................... 4-157

4.10.2   Identification of Historic Properties...................................... 4-161

4.10.3   Unanticipated Discoveries Plan ............................................. 4-162

4.10.4   Status of Compliance with the National Historic Preservation Act..... 4-162

4.11    AIR QUALITY AND NOISE .............................................................. 4-163

4.11.1   Air Quality .............................................................................. 4-163

4.11.2   Noise ........................................................................................ 4-187

4.12    RELIABILITY AND SAFETY ............................................................ 4-201

4.12.1   LNG Facility Reliability, Safety, and Security Regulatory Oversight   4-201

4.12.2   DOT Siting Requirements and 49 CFR 193 Subpart B Determination 4-203

4.12.3   Coast Guard Safety Regulatory Requirements and Letter of Recommendation ................................................................. 4-206

**JA199**

4.12.4  LNG Facility Security Regulatory Requirements ................................. 4-215

4.12.5  FERC Engineering and Technical Review of the Preliminary Engineering Designs ................................................................................................ 4-217

4.12.6  Recommendations from FERC Preliminary Engineering and Technical Review ................................................................................................ 4-254

4.12.7  Conclusions on LNG Facility and Marine Vessel Reliability and Safety ..... ........................................................................................................... 4-268

4.13  CUMULATIVE IMPACTS ............................................................................ 4-269

4.13.1  Projects and Activities Considered ....................................................... 4-272

4.13.2  Potential Cumulative Impacts by Resource ........................................ 4-294

4.14  TRANSBOUNDARY EFFECTS .................................................................. 4-357

**5.0  CONCLUSIONS AND RECOMMENDATIONS ......................................... 5-358**

**5.1  CONCLUSIONS OF THE ENVIRONMENTAL ANALYSIS ................. 5-358**

5.1.1  Geologic Resources ............................................................................... 5-358

5.1.2  Soils ....................................................................................................... 5-358

5.1.3  Water Resources .................................................................................... 5-359

5.1.4  Wetlands ................................................................................................ 5-361

5.1.5  Vegetation .............................................................................................. 5-361

5.1.6  Wildlife and Aquatic Resources ........................................................... 5-362

5.1.7  Threatened, Endangered and Special Status Species ......................... 5-364

5.1.8  Land Use, Recreation, and Visual Resources ...................................... 5-365

5.1.9  Visual Resources ................................................................................... 5-366

5.1.10  Socioeconomics ................................................................................... 5-367

5.1.11  Cultural Resources .............................................................................. 5-368

5.1.12  Air Quality and Noise .......................................................................... 5-368

5.1.13  Reliability and Safety ........................................................................... 5-370

5.1.14  Cumulative Impacts ............................................................................. 5-371

5.1.15  Alternatives ......................................................................................... 5-374

**5.2  FERC STAFF'S RECOMMENDED MITIGATION .................................. 5-375**

**JA200**

# EXECUTIVE SUMMARY

On March 31, 2016, Texas LNG Brownsville, LLC (Texas LNG) filed an application in Docket No. CP16-116-000 with the Federal Energy Regulatory Commission (FERC or Commission) under Section 3(a) of the Natural Gas Act and Part 153 of the Commission's regulations. Texas LNG requests authorization to site, construct, and operate a liquefied natural gas (LNG) terminal to liquefy and export natural gas at a proposed site on the Brownsville Ship Channel in Cameron County, Texas.

The purpose of this environmental impact statement (EIS) is to inform FERC decision-makers, the public, and the permitting agencies about the potential adverse and beneficial environmental impacts of the proposed Texas LNG Project (Project), potential alternatives to the proposed action, and recommended mitigation measures that would reduce adverse impacts. We[1] prepared this EIS to assess the environmental impacts associated with construction and operation of the Project as required under the National Environmental Policy Act of 1969, as amended. Our analysis is based on information provided by Texas LNG, and further developed from data requests; field investigations; scoping; literature research; contacts with or comments from federal, state, and local agencies; and comments from individual members of the public.

FERC is the lead agency for the preparation of the EIS. The U.S. Army Corps of Engineers (COE), U.S. Coast Guard, U.S. Department of Energy (DOE), U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) and Federal Aviation Administration (FAA), the U.S. Fish and Wildlife Service (FWS), the National Park Service, the U.S. Environmental Protection Agency, and the National Oceanic and Atmospheric Administration    National Marine Fisheries Service (NMFS) are participating in the National Environmental Policy Act review as cooperating agencies.[2]

## PROPOSED ACTION

Texas LNG's stated purpose for the proposed Project is to convert domestically produced natural gas to LNG for storage and export. Texas LNG is developing the Project to produce up to 4 million tonnes per annum of LNG for export. The Project would be constructed in two phases, each with a capacity of 2 million tonnes per annum. Texas LNG plans to initiate construction of Phase 1 upon receipt of all required authorizations and Phase 2 once a customer for the production enters into a long-term tolling agreement that is sufficient to support the financing of the Phase 2 construction cost.

Section 3 of the Natural Gas Act requires that authorization be obtained from the DOE prior to importing or exporting natural gas, including LNG, from or to a foreign country. On September 24, 2015,[3] the DOE issued an order granting authorization to Texas LNG to export LNG by vessel from the LNG terminal to free trade agreement countries. The DOE is currently

---

[1]    "We," "us," and "our" refer to the environmental and engineering staff of the FERC's Office of Energy Projects.

[2]    A cooperating agency is an agency that has jurisdiction over all or part of a project area and must make a decision on a project and/or an agency that provides special expertise with regard to environmental or other resources.

[3]    Fossil Energy Docket No. 15-62-LNG

**JA201**

Document Accession #: 20190315-3053          Filed Date: 03/15/2019

conducting its review of Texas LNG's application to export LNG to non-free trade agreement countries.

The Texas LNG Project consists of a new LNG terminal on the north side of the Brownsville Ship Channel, 2.5 miles southwest of the Town of Port Isabel, Texas and 19 miles northeast of the City of Brownsville, Texas population center. Texas LNG would construct the LNG terminal on a 625-acre parcel owned by the Brownsville Navigational District, with an additional 26.5 acres necessary outside of the parcel within the banks of the Brownsville Ship Channel to allow for deep water access to the Brownsville Ship Channel. The Project consists of the following facilities:

- gas gate station and interconnect facility;

- pretreatment facility to remove water, carbon dioxide, hydrogen sulfide, mercury, and heavier (pentane and above) hydrocarbons;

- a liquefaction facility consisting of two liquefaction trains and ancillary support facilities;

- two approximately 210,000 cubic meter ($m^3$) aboveground full containment LNG storage tanks with cryogenic pipeline connections to the liquefaction facility and berthing dock;

- an LNG carrier berthing dock capable of receiving LNG carriers between approximately 130,000 $m^3$ and 180,000 $m^3$ capacity;

- a permanent material offloading facility to allow waterborne deliveries of equipment and materials during construction and mooring of tug boats while an LNG carrier is at the berth;

- thermal oxidizer, warm wet flare, cold dry flare, spare flare, acid gas flare, and marine flare; and

- administration, control, maintenance, and warehouse buildings and related parking lots; electrical transmission line and substation, water pipeline, septic system, and stormwater facilities/outfalls.

Natural gas would be delivered to the Texas LNG Project site via a non-jurisdictional, intrastate, 30-inch-diameter natural gas pipeline that would be constructed, owned, and operated by a third party, separate from Texas LNG.

**PUBLIC INVOLVEMENT**

On March 9, 2015, Texas LNG filed a request with FERC to use our pre-filing review process. We approved this request on April 14, 2015, and pre-filing Docket No. PF15-14-000 was established in order to place information filed by Texas LNG and related documents issued by FERC into the public record. Texas LNG held open houses in Brownsville and Port Isabel, Texas on May 5 and 6, 2015, respectively, to provide information to the public about the Project. FERC

**JA202**

staff participated in the open houses, explaining the FERC environmental review process to the public and providing those attending with information on how to file comments with FERC.

On July 23, 2015, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Texas Liquefied Natural Gas Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meeting* (NOI). This notice was sent to about 375 interested parties, including federal, state, and local officials; agency representatives; conservation organizations; Native American tribes; local libraries and newspapers; and property owners in the vicinity of proposed Project facilities. Publication of the NOI for the Project established a 30-day public comment period ending on August 24, 2015, for the submission of comments, concerns, and issues related to the environmental aspects of the Project. On August 11, 2015, FERC conducted a joint public scoping meeting in Port Isabel, Texas to provide an opportunity for the public to learn more about the Texas LNG Project, Annova LNG Project, and Rio Grande LNG Project and to participate in our analysis by providing verbal comments on environmental issues to be included in the EIS.

During the scoping period, we received comments on a variety of environmental issues. Substantive environmental issues identified through this public review process are addressed in this EIS. The transcripts of the public scoping meeting and all written comments are part of the FERC's public record for the Texas LNG Project and are available for viewing on the FERC website (http://www.ferc.gov).[4]

On October 26, 2018, we issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Texas LNG Project.* This notice, which was published in the Federal Register, listed the date and location of a public comment session and established a closing date of December 17, 2018, for receiving comments on the draft EIS. Copies of this notice were mailed to over 420 stakeholders. The EPA noticed availability of the draft EIS in the Federal Register on November 2, 2018. FERC received over 900 comment submissions from parties including federal and state agencies, interested parties, Indian tribes, and Texas LNG. The majority of comments received on the draft EIS were related to socioeconomics, wetlands, threatened and endangered species, safety, recreation, and air quality.

We held one public comment session in Port Isabel, Texas on November 15, 2018, to receive comments on the draft EIS. The comment session provided stakeholders an opportunity to present verbal comments on the analysis of environmental impacts described in the draft EIS. A total of 55 people commented during the comment session. Comments were documented by a court reporter. Transcripts of the public comment session and all written comments received are part of FERC's public record for the Project and are available for viewing through e-library.

All substantive environmental comments on the draft EIS have been addressed in this final EIS. In addition, issues raised in the comments and our responses are provided in appendix H of this final EIS.

---

[4]    To access public documents on the FERC website, use the "eLibrary" link, select "General Search" from the eLibrary menu, and enter the docket number, excluding the last three digits, in the "Docket Number" field (i.e., PF15-14 or CP16-116). Be sure to select an appropriate date range.

**JA203**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

## PROJECT IMPACTS

We evaluated the potential impacts of construction and operation of the Project on geology; soils; water use and quality; wetlands; vegetation; wildlife, aquatic resources, and essential fish habitat; threatened, endangered, and special status species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; and cumulative impacts. Where necessary, we recommend additional mitigation to minimize or avoid these impacts. Section 5 of the EIS contains a compilation of our recommendations.

Overall, construction and installation of facilities for the Project would require disturbance of about 311.5 acres of land. Following construction, Texas LNG would maintain or would revegetate, but not restore contours within 282 acres of land. The remaining 29.5 acres would be restored to pre-construction conditions and uses. Based on our analysis, scoping, and agency consultations, the major issues associated with the Project consist of impacts on surface water resources; wetlands; wildlife and aquatic resources; threatened and endangered species; land use, recreation, and visual resources; cultural resources; air quality; noise; reliability and safety; and cumulative impacts.

### Surface Water Resources

Texas LNG would dredge approximately 3.9 million cubic yards of material from existing tidal flats and the bank of the Brownsville Ship Channel to create the proposed marine berth. Dredging would be conducted by a hydraulic cutterhead dredge, which would minimize turbidity compared with a mechanical dredge within the Project area. Texas LNG would dispose of dredge material at placement area 5A, an existing confined dredge disposal site, in a way to ensure maximum settlement of sediment prior to discharge of water at the existing placement area 5A outfall. We conclude that Texas LNG's proposed dredge disposal methods would sufficiently minimize Project-related turbidity and sedimentation within the Brownsville Ship Channel. Texas LNG would conduct maintenance dredging of the marine berth every 3 to 5 years, generating 300,000 to 500,000 cubic yards of dredge material that would be disposed of at an existing placement area.

Dredge plume propagation modeling conducted by Texas LNG indicates that water quality parameters would be met within 460 feet of dredging activities. Texas LNG would conduct all dredging activities during construction and operation (maintenance dredging) in accordance with permits issued by the U.S. Army Corps of Engineers. Based on the use of the hydraulic dredge method, placement of dredge material in an existing disposal area, and the ongoing maintenance dredging within the Brownsville Ship Channel, we conclude that impacts on surface water quality as a result of dredging would be temporary, minor, and not significant.

Prior to commencement of operation, Texas LNG would hydrostatically test the LNG terminal piping and the storage tanks, obtaining most of the hydrostatic test water (approximately 34.4 million gallons) from the Brownsville Ship Channel. Texas LNG would use additives to limit bacteria and other corrosive components in seawater used for hydrostatic testing. Before returning the water to the Brownsville Ship Channel, Texas LNG would filter the water to remove suspended solids and neutralize or biodegrade the chemical additives into non-hazardous materials. In addition, Texas LNG would implement measures to minimize the potential for scour during

**JA204**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

discharge. Therefore, impacts on surface water as a result of hydrostatic testing are not anticipated to be significant.

During operation of the Project, an estimated 74 LNG carriers would call on the LNG terminal annually. LNG carriers would discharge ballast water as well as cooling water within the maneuvering basin during LNG loading. Discharged ballast water and cooling water could have different salinity, pH, temperature, and dissolved oxygen concentrations than the Brownsville Ship Channel. Due to the volume of water that would be discharged and the limited number of LNG carriers that would call on the LNG terminal annually, we conclude that impacts on surface water quality as a result of ballast water and cooling water discharges would be limited to the area immediately adjacent to the LNG carrier and not significant.

## Wetlands

Construction of the Project would impact 45.2 acres of wetlands, primarily consisting of tidal flats, of which, 42.9 acres would be permanently impacted as a result of dredging of the maneuvering basin, and to a lesser extent, fill for permanent structures. While the Project would result in the permanent impact of tidal flats, dredging of the maneuvering basin would also restore tidal exchange to adjacent tidal flats, resulting in a beneficial impact on wetlands. The COE did not approve Texas LNG's preliminary Compensatory Mitigation Plan to mitigate permanent wetland impacts. As of the writing of this final EIS, Texas LNG has not submitted a revised Compensatory Mitigation Plan to the COE. However, the COE will not issue Texas LNG a Section 404 permit until a suitable mitigation plan is developed to mitigate Project impacts on wetlands. Temporary wetland impacts would be minimized through the implementation of mitigation measures outlined in the Project-specific Environmental Construction Plan and would be restored following the completion of construction activities. Therefore, we conclude that the Project would not significantly impact wetlands.

## Wildlife and Aquatic Resources

The removal of 277.7 acres of vegetation within the Project site and conversion of the site to industrial use would permanently affect wildlife and wildlife habitats, including 249.3 acres of pollinator habitat. Impacts on wildlife from construction of the Project would include displacement, stress, and direct mortality of some less mobile species. Vegetation clearing would reduce suitable cover, nesting, and foraging habitat for some wildlife species; however, dredging of the maneuvering basin would restore tidal connectivity to the tidal flats north of the Project site, improving habitat for aquatic species as well as shorebirds.

During construction and operation, increases in lighting and noise would likely deter wildlife from the area; however, there is abundant available habitat in the surrounding areas. The greatest noise impacts would be during construction, especially pile driving; however, these impacts would be short-term. Texas LNG would implement measures outlined in its Facility Lighting Plan to minimize the effects of lighting on wildlife during operation. Impacts on wildlife would be further minimized through the implementation of the Project-specific Environmental Construction Plan; therefore, we conclude impacts on wildlife would not be significant.

**JA205**

Suitable habitat for migratory birds of conservation concern is present within the Project site and Texas LNG observed several birds of conservation concern during surveys. In addition to disturbance of habitat and potential sensory disturbances, elevated structures such as the storage tanks and flares would also affect migratory birds by increasing the potential for collisions. Texas LNG would implement measures in coordination with the FWS, as recommended by FERC staff, to minimize impacts on migratory birds during construction and operation, including pre-construction bird surveys or vegetation clearing restrictions during construction and operation. Based on the potential impacts on migratory bird habitat and the measures that Texas LNG would implement during construction and operation to minimize impacts on migratory birds in the area, we conclude that the Project would not have a significant impact on migratory bird populations.

The proposed Project site is across State Highway 48, but approximately 200 feet from the Laguna Atascosa National Wildlife Refuge (NWR). Due to the proximity of the Project site to the NWR, wildlife in the NWR would likely be impacted by increased noise and light during both construction and operation. Further, some wildlife displaced from the Project site during construction and operation could relocate to the NWR, increasing competition for resources. Impacts on wildlife within the Laguna Atascosa NWR would be greatest during the construction phase, due to increased traffic on State Highway 48 and increased noise from construction activities. During operation, noise impacts on wildlife within the Laguna Atascosa NWR would be much less and would decrease as distance from the Project site increases. Therefore, we conclude that impacts on wildlife within the Laguna Atascosa NWR would not be significant.

Dredging of the maneuvering basin during construction, as well as maintenance dredging during operation, would temporarily increase noise, turbidity, and sedimentation within the Brownsville Ship Channel, reducing light penetration and decreasing dissolved oxygen concentrations, adversely affecting fish eggs and juvenile fish survival, benthic community diversity and health, foraging success, and suitability of spawning habitat. Further, sediments in the water column could be deposited on nearby substrates, burying aquatic macroinvertebrates. Texas LNG would use a hydraulic cutterhead dredge to minimize the impacts from turbidity and sedimentation. Based on the estimates of underwater sound that would occur during dredging, behavioral disturbance of fish would occur within 96 feet of the dredge and injury would occur within 89 feet.

Dredging of the maneuvering basin would permanently convert 39.4 acres of tidal flats to open water habitat and would impact the existing open water areas associated with the Brownsville Ship Channel, all of which is characterized as essential fish habitat. However, tidal flats within and surrounding the Project site have been cut off from the influences of natural tidal exchange. Dredging is anticipated to restore tidal flows to the tidal flats surrounding the Project site, improving the overall aquatic habitat and enhancing essential fish habitat in the area. The draft EIS served to initiate essential fish habitat consultation with NMFS under the Magnuson-Stevens Fishery Conservation and Management Act. On February 5, 2019, NMFS concurred with our essential fish habitat assessment presented in the draft EIS and offered no further conservation recommendations.

Project in-water pile driving would create sound waves that would adversely affect fish and other aquatic resources. Behavioral and injury thresholds for fish would be exceeded within 7,065 feet and 1,522 feet of the pile driving activities, respectively. Texas LNG would minimize

**JA206**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

impacts on aquatic resources from pile driving by conducting most pile driving activities prior to dredging the maneuvering basin, with only 12 piles proposed to be installed in the water over 12 days. In addition, Texas LNG would utilize bubble curtains and cushion blocks to minimize underwater sound pressures. Further, we recommend that Texas LNG conduct test pile drives and measure the actual underwater noise prior to initiating pile driving activities to ensure that the underwater sound pressures are not more than predicted.

Cooling water intakes and intakes associated with the seawater firewater systems would result in in the entrainment of small organisms, such as fish larvae and eggs. All intakes would be screened; however, direct mortality of smaller organisms is anticipated to occur. Due to the limited frequency of LNG carriers calling on the LNG terminal (74 per year) and the infrequent use of the seawater firewater system, impacts on aquatic resources from entrainment would not be significant. Increased vessel traffic during construction and operation of the Project would also result in an increased potential for spills of hazardous materials; however, all ships are required to maintain a Shipboard Oil Pollution Emergency Plan to minimize impacts on aquatic resources.

Through the implementation of Texas LNG's minimization measures, as well as our recommendation, the Project would not have significant impacts on aquatic resources.

**Threatened and Endangered Species**

There are 18 federally listed threatened and endangered species, two species proposed for listing, and one candidate species that could occur within the Project site or along vessel transit routes. Suitable habitat is present for all 21 species; however, during species-specific surveys conducted for federally listed plants (South Texas ambrosia and Texas ayenia), no specimens were documented. Therefore, we conclude that the Project would have no effect on these two species.

Impacts on federally listed marine species, such as sea turtles, West Indian manatee, and whales, as well as other marine mammals protected under the Marine Mammal Protection Act of 1972, would primarily occur due to increased potential for vessel strikes along the LNG carrier transit routes as well as increases in turbidity and noise during dredging and pile driving. Impacts from the Project on federally listed birds and terrestrial mammals would primarily result from the removal of suitable habitat, as well as the increased lighting and noise associated with construction and operation of the Project. Texas LNG has proposed measures to minimize and avoid impacts on federally listed species, including but not limited to conducting species-specific surveys for birds prior to construction, implementing the NMFS *Vessel Strike Avoidance Measures and Reporting for Mariners* (2008), and utilization of bubble curtains and cushion blocks during in-water pile driving. In addition, we recommend that Texas LNG utilize biological monitors for all in-water construction activities to further minimize impacts on aquatic threatened and endangered species. Because suitable habitat is present within the proposed Project site and there is potential for federally listed species to occur in the Project area or along the vessel transit routes, but not be directly impacted by the Project, we concluded in the draft EIS that the Project *is not likely to adversely affect* federally listed species, would not result in the *adverse modification of critical habitat*, and would not significantly impact marine mammals.

In a letter dated February 8, 2019, the FWS concurred with our determination of *not likely to adversely affect* for all species except the ocelot and northern aplomado falcon. In this letter, as

**JA207**

Document Accession #: 20190315-3053          Filed Date: 03/15/2019

well as a letter dated December 17, 2018, the FWS indicated that the cumulative impact of the proposed Project when combined with other projects in the area, including the Rio Grande LNG Project and Annova LNG Project, would result in significant cumulative impacts on the ocelot due to habitat loss. Based on the significant cumulative impact, the FWS asserts that the proposed Project is *likely to adversely affect* the ocelot. In accordance with the FWS determination, we have revised the Biological Assessment to reflect this determination of effect for the ocelot. Similarly, the FWS did not concur with our determination of *not likely to adversely affect* for the northern aplomado falcon; however, the FWS notes that there is a 99-year Safe Harbor Agreement that authorizes "take" on property owned by the Brownsville Navigation District. Therefore, no additional consultation on this species is necessary. In addition, we note that the eastern black rail was recently proposed to be listed as threatened. We have determined that the proposed Project is *not likely to jeopardize the continued existence* of the eastern black rail. This final EIS and the revised Biological Assessment provided in appendix C serves to re-initiate consultation with the FWS pursuant to Section 7 of the Endangered Species Act for the ocelot and the eastern black rail. As consultations with FWS and NMFS are ongoing, we recommend that Texas LNG not begin any Project construction until FERC staff completes Endangered Species Act consultations with these agencies.

Several state-listed species also have the potential to occur within the Project site. Texas LNG has coordinated with the Texas Parks and Wildlife Department regarding the measures that it would implement to minimize impacts on state-listed species. The Texas Parks and Wildlife Department is particularly concerned with Texas tortoises and has recommended that Texas LNG develop a plan for the capture and relocation of tortoises prior to construction. We recommend that Texas LNG prepare this plan in coordination with the Texas Parks and Wildlife Department prior to construction. Through the implementation of measures committed to by Texas LNG, as well as our recommendation, we conclude impacts on state-listed species would not be significant.

Marine mammals, such as bottlenose dolphins occur in the Brownsville Ship Channel and would be impacted by the Project as a result of pile driving during construction and increased vessel traffic during operation. During pile driving activities, Texas LNG would minimize impacts on marine mammals through the use of soft starts and bubble curtains and/or cushion blocks. During operation, vessels would implement the NMFS *Vessel Strike Avoidance Measures and Reporting for Mariners* (2008). Through the implementation of minimization measures as well as our recommendation during construction, impacts on marine mammals from construction and operation of the Project would be minor.

**Land Use, Recreation, and Visual Resources**

Land use within the Project site consists of wetlands, scrub shrub, open land, and open water. The Project would impact 311.5 acres, of which 282 acres would be converted to industrial land for operation or would be permanently impacted by grading and dredging activities. Although the Project would result in the conversion of a large portion of currently undeveloped land into industrial land, the Project site is zoned for industrial use; therefore, we conclude that Project impacts on land use in the area would not be significant.

A total of nine recreational use areas were identified within five miles of the Project site, including the Laguna Atascosa NWR that is across State Highway 48, about 200 feet from the

**JA208**

Project site. All designated recreation areas within the Laguna Atascosa NWR are more than two miles from the proposed Project site. However, two designated recreation areas in the Bahia Grande Unit are directly off of State Highway 48, which would be affected by increased traffic during construction of the Project. Texas LNG anticipates that traffic would be greatest during non-peak times (prior to 7 am and after 5 pm).

Other recreation areas including the South Bay Coastal Preserve and South Bay Paddling Trail, Isla Blanca Park, and Loma Ecological Preserve are further from the Project site, but are near the vessel transit routes. Increased ship traffic during construction and operation, including LNG carriers, could adversely affect recreational boaters accessing the areas by delaying or temporarily restricting access across the Brownsville Ship Channel; however, because the proposed Project would only result in an incremental increase in ship traffic within an existing ship channel, impacts on recreation areas as a result of ship traffic would be minor. Due to the distance from the Project site, impacts on the remaining five recreation areas would be primarily limited to increases in roadway traffic during construction and visual impacts during operation.

There are also several recreational tour operators based in Port Isabel and South Padre Island which utilize waterways near the Project site, including the Brownsville Ship Channel. The Project facilities would result in a change in the land use, which would adversely affect recreation activities, such as dolphin watching, that may occur relatively close to the Project site. It is likely that increased noise during construction and operation could deter some of these activities in the immediate area and cause them to move to other less developed areas. In addition, increased ship traffic during construction and operation would increase the time it takes for recreational vessels to transit the Brownsville Ship Channel. Construction and operation could have moderate, but not significant, temporary and permanent impacts on recreation activities that may currently operate, at least partially, near the Project site within the Brownsville Ship Channel.

During construction, visual impacts would primarily result from the use of large construction equipment such as cranes. Texas LNG assessed potential operational impacts on the viewshed from several key observation points, including recreation areas, residential areas, and roadways, by producing visual simulations of the Project facilities during the day, at night, and during flaring events. While the LNG terminal, especially the storage tanks and flares, would be visible from most of the key observation points, it would generally not dominate the viewshed. However, the LNG terminal would dominate the daytime and nighttime viewshed at key observation point 6 (State Highway 48 and the Laguna Atascosa NWR) and would be prominent at the Loma Ecological Preserve.

The Project facilities would likely be visible from some residences in Port Isabel and South Padre Island. South Padre Island, in particular, has numerous high rise condominiums that would have views of the Project facilities, especially from the higher floors. In addition to residences, the Project facilities would be visible from sightseeing tours that operate within the Brownsville Ship Channel.

Due to the relatively undeveloped nature of the Project area, the visual sensitivity of nearby recreation areas, and the inability to implement visual screening measures, the Project would result in a significant impact on visual resources when viewed from the Laguna Atascosa NWR and would have a negligible to moderate permanent impact on the other visual resources evaluated.

**JA209**

**Cultural Resources**

One previously recorded archaeological site, Site 41CF8 (Garcia Pasture Site), is within the Project site and the direct area of potential effect, and is listed on the National Register of Historic Places (NRHP). No other cultural resources were identified within the Project area of potential effect. We identified site 41CF8 as a historic property that would be adversely affected and notified the Advisory Council on Historic Preservation (ACHP). Texas LNG produced a treatment plan for the site. We recommend that Texas LNG not begin construction until we have executed a Memorandum of Agreement (MOA) to resolve adverse effects, through the implementation of Texas LNG's treatment plan.

**Air Quality**

Construction of the Project would result in temporary impacts on air quality associated with the emissions generated from fossil-fuel fired construction equipment and fugitive dust. Emissions from construction activities over the nearly 5-year construction period for the Project would be temporary and localized and, therefore, not have a long-term effect on regional air quality. The Project would be in an area currently classified as being in attainment for all criteria pollutant standards. Fugitive dust emissions would be minimized through implementation of Texas LNG's Fugitive Dust Control Plan.

During operation of Phase 1 and before completion of construction and commissioning of Phase 2, when commissioning and/or operational activities are occurring concurrent with construction activities, impacts could be greater than those from the Project operations alone. The combination of construction, commissioning, and operational short-term emissions would, at times, be in excess of the modeled operational emissions alone in 2022, 2023, and 2024. During the concurrent construction, commissioning, and operational activities, the higher level of emissions could result in intermittent exceedances of certain National Ambient Air Quality Standards. These exceedances would not be persistent at any one time during these years due to the dynamic and fluctuating nature of construction activities within a day, week, or month.

The Project is not subject to the federal Prevention of Significant Deterioration review/permitting; as a result, the LNG terminal is subject to the New Source Review minor source construction permitting program under Texas regulations. Because potential operating emissions for the Project exceed the Title V major source threshold for at least one criteria air pollutant, the LNG terminal is subject to the Title V operating permit program. Texas LNG submitted an air quality impact analysis for operational emissions, which demonstrates that the model-predicted impact plus background concentration of each criteria air pollutant does not cause or contribute to an exceedance of the National Ambient Air Quality Standards.

We analyzed the estimated emissions from construction and operation of the Project, and the potential air quality impacts from operation of the LNG facility and other nearby proposed sources. Based on our independent review of the analyses conducted and Texas LNG's proposed mitigation measures, we conclude that construction of the Project would result in elevated emissions near construction areas and would impact local air quality. Through use of mitigation measures during construction activities and application of best available control technologies during operation, we conclude that there would be no regionally significant impacts on air quality.

**JA210**

**Noise**

Noise levels associated with construction activity would vary depending on the phase of construction in progress at any time. The highest level of construction noise typically occurs during earth-moving and pile-driving work. The predicted sound levels at nearby noise sensitive areas during Project construction were lower than the Commission's noise standard of 55 decibels on the A-weighted scale (dBA) day-night sound level ($L_{dn}$).

Pile driving, which would occur for approximately 13 months, with peak pile driving activities occurring over 4 months, was calculated to produce $L_{dn}$ 24-hour equivalent sound levels that are below our noise criterion of 55 dBA at the nearest noise sensitive area. The calculated maximum sound levels, or $L_{max}$, of pile driving (i.e., highest sound level during each hammer strike) would be similar to, to slightly above, the existing ambient levels. Although pile driving would be clearly audible at nearby residences when ambient sound levels are low, it would only occur during daytime construction hours (typically 7 a.m. to 5 p.m.). The impulsive noise of pile driving would be audible outside of residences, and potentially indoors in the homes closest to the Project. Therefore, to ensure that impacts due to maximum pile driving noise levels at the Project would be minimized, we recommend that Texas LNG monitor sound levels during the start of pile driving activities. If the sound levels due to pile driving are greater than 10 dBA over the ambient sound levels, then Texas LNG should cease activities, implement noise mitigation, and file evidence of reduced pile driving sound levels. Additionally, Texas LNG committed to implementing noise mitigations during in-water pile driving, such as cushion blocks or bubble curtains, that would reduce the pile driving underwater sound levels.

During operation, the LNG terminal would generate noise levels that would occur throughout the life of the Project. Noise would be produced continually by a number of sources that include various types of compressors, engines, motors, cooling fans, pumps, and piping. The LNG terminal would be constructed in two phases, and each phase would be commissioned and brought online as it is completed. Operational noise levels were modeled for Phase 1 and for Phases 1 and 2 in simultaneous operation. The predicted sound levels for operations for Phase 1 and for the combination of Phases 1 and 2 were below our 55 dBA $L_{dn}$ criteria at the nearest noise sensitive area, and resulted in potential increases in the ambient sound levels of 0.1 to 0.7 dBA $L_{dn}$ for Phase 1 and 0.1 to 1.0 dBA $L_{dn}$ for Phase 1 and 2. These increases would be considered imperceptible to most listeners. Therefore, noise impacts due to operation of the Project would not be significant.

In order to ensure that the sound levels due to the Project are consistent with the modeling used in our analysis, we recommend that Texas LNG perform a full load noise survey within 60 days of placing each liquefaction train into service. In addition, we recommend that a full load noise survey be conducted for the facility, after the completion of Phases 1 and 2. All post-construction survey recommendations require additional noise mitigation to be implemented if the noise attributable to the Project is greater than 55 dBA $L_{dn}$ at any nearby noise sensitive areas. Based on the noise analysis above, and our recommendations, we conclude that construction and operation of the Project would not have a significant impact on the noise environment near the Project.

**JA211**

**Reliability and Safety**

As part of the NEPA review and NGA determinations, Commission staff assesses the potential impact to the human environment in terms of safety and whether the proposed facilities would operate safely, reliably, and securely.

As a cooperating agency, the DOT advises the Commission on whether Texas LNG's proposed design would meet Title 49 of the Code of Federal Regulations, Part 193 (49 CFR 193), Subpart B, Siting requirements.  On February 13, 2019, the DOT issued a Letter of Determination (LOD) to FERC on the 49 CFR 193 Subpart B regulatory requirements.[5]  The LOD provides PHMSA's analysis and conclusions regarding 49 CFR 193 Subpart B regulatory requirements for the Commission's consideration in its decision on the Project application.  If the Project is authorized and constructed, the facility would be subject to the DOT's inspection and enforcement program and final determination of whether a facility is in compliance with the requirements of 49 CFR 193 would be made by the DOT staff.

As a cooperating agency, the Coast Guard also assisted the FERC staff by reviewing the proposed LNG terminal and the associated LNG carrier traffic.  The Coast Guard reviewed a Waterway Suitability Assessment (WSA) submitted by Texas LNG that focused on the navigation safety and maritime security aspects of LNG carrier transits along the affected waterway.  On February 14, 2018, the Coast Guard issued a Letter of Recommendation to FERC staff indicating the Brownsville Ship Channel would be considered suitable for accommodating the type and frequency of LNG marine traffic associated with this Project, based on the WSA and in accordance with the guidance in the Coast Guard's NVIC 01-11.  If the Project is authorized and constructed, the facility would be subject to the Coast Guard's inspection and enforcement program to ensure compliance with the requirements of 33 CFR 105 and 33 CFR 127.

As a cooperating agency, FAA assisted FERC staff in evaluating impacts on and from the SpaceX rocket launch facility.  Specific recommendations are included to address potential impacts from rocket launch failures on the Project.  However, the extent of impacts on SpaceX operations, National Space Program, and to the federal government would not fully be known until SpaceX submits an application requesting to launch with the FAA and whether the LNG plant is under construction or in operation at that time.

FERC staff conducted a preliminary engineering and technical review of the Texas LNG design, including potential external impacts based on the site location.  Based on this review, we recommend a number of mitigation measures to ensure continuous oversight prior to initial site preparation, prior to construction of final design, prior to commissioning, prior to introduction of hazardous fluids, prior to commencement of service, and throughout life of the facility, in order to enhance the reliability and safety of the facility to mitigate the risk of impact on the public.  With the incorporation of these mitigation measures and oversight, FERC staff conclude that the Texas LNG Project design would include acceptable layers of protection or safeguards that would reduce the risk of a potentially hazardous scenario from developing into an event that could impact the offsite public.

---

[5]     February 13, 2019 letter "Re: Texas LNG Project, Docket No. CP16-116-000, 49 CFR, Part 193, Subpart B, Siting     Letter of Determination" from Massoud Tahamtani to Rich McGuire.  Filed in Docket Number CP16-116-000 on February 13, 2019.  FERC eLibrary accession number 20190214-3002.

**JA212**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

**Cumulative Impacts**

We considered the potential contributions of Project-related impacts on cumulative impacts in the defined geographic scope and within the same timeframe as the proposed Project for the affected resources. As part of that assessment, we identified existing projects, projects under construction, projects that are proposed or planned, and reasonably foreseeable future projects including proposed LNG terminals, currently operating and future oil and gas projects, land transportation projects, commercial and industrial developments, and dredging projects.

The greatest potential for cumulative impacts associated with surface water resources would be during dredging activities, as well as during operation. Concurrent dredging of the maneuvering basin for the proposed Project as well as the Rio Grande LNG, Annova LNG, Bahia Grande Estuary Channel Widening/Restoration, and Brazos Island Harbor Channel Improvement Project would result in increased turbidity and sedimentation, resulting in short-term impacts on water quality. Due to the distance between the Annova and Texas LNG Projects, they are not expected to have significant overlapping effects. However, up to 0.63 inch of sedimentation could occur if the Texas LNG and Rio Grande Projects were to conduct construction dredging at the same time. The Bahia Grande Estuary Channel Widening/Restoration could also contribute an estimated 0.5 inch of additional sedimentation. The Brazos Island Harbor Channel Improvement project is not expected to result in sediment accumulation during dredging as the purpose of the project is to deepen the main channel and any accumulated sediments would likely be accounted for with the allowed over-dredge depth to achieve the final design depth. While the Brownsville Ship Channel is a routinely maintained, manmade channel, concurrent dredging activities and other impacts on surface water resources during construction activities, as described above, are anticipated to be temporary and moderate.

The operation of all three proposed Brownsville LNG projects would also result in a substantial increase in the number of large, ocean-going vessels transiting the Brownsville Ship Channel (estimated to be up to 511 LNG carriers per year combined). During operation, increased vessel traffic would result in a cumulative impact on surface water resources from increases in turbidity and shoreline erosion. Each of the three LNG projects has designed its respective facilities to minimize shoreline erosion through placement of rock riprap along the shoreline, or similar measures. Cumulative impacts on surface water quality during operation would be permanent and moderate to significant due to the persistent transit of LNG carriers and other large vessels within the Brownsville Ship Channel resulting in the increased erosion of shorelines along unarmored portions of the Brownsville Ship Channel.

The proposed Project, Rio Grande LNG and Annova LNG Projects, as well as the pipeline projects proposed in the area, are anticipated to have the greatest cumulative impacts on ocelot habitat through removal and conversion to industrial uses and fragmentation, respectively. In addition, these projects, along with several of the transportation projects, could result in increased road traffic and/or additional roads for transiting ocelots and jaguarundis to cross, thus increasing the potential for vehicle strikes. The current remaining habitat corridor in the region to connect U.S. and Mexico populations of these federally listed species is adjacent to and within the proposed Rio Grande LNG and Texas LNG Project sites north of the Brownsville Ship Channel and within and adjacent to the proposed Annova LNG Project site south of the Brownsville Ship Channel. Other impacts, such as those associated with noise, would be minimized by the projects to the

**JA213**

Document Accession #: 20190315-3053          Filed Date: 03/15/2019

extent practicable; however, due to the proximity of the Annova LNG and Rio Grande LNG Projects to the wildlife corridors, facility-generated noise during construction and operation would still be audible to ocelots and jaguarundis utilizing the wildlife corridor.  Due to the past, present, and proposed future development throughout the geographic scope for assessing cumulative impacts on ocelots and jaguarundis, as well as the associated increases in road traffic, light, and noise, we have determined that cumulative impacts on ocelots and jaguarundis would be permanent and significant.

The Project when combined with the Annova LNG Project, Rio Grande LNG Project, pipelines, wind development projects, and electric transmission lines would result in the removal of limited available aplomado falcon foraging and nesting habitat.  In addition, these projects would result in the construction of elevated structures, flares, and transmission lines, which could impact aplomado falcons by increasing potential strikes.  These cumulative impacts on habitat could prevent establishment of nesting pairs and would limit available foraging habitat within the area.  We received a comment from the FWS on the draft EIS asserting that the cumulative impacts on aplomado falcons would be significant.  We have adopted the FWS conclusion and note that all federally regulated projects, including all three of the proposed LNG projects, are required to coordinate with the FWS to minimize impacts on federally listed species.

Projects with permanent aboveground components, such as the Annova and Rio Grande LNG terminals, have the most potential to contribute to cumulative impacts on visual resources. In particular, motorists on State Highway 48 and visitors to the nearby recreation areas where two or three LNG Terminals would be visible (including the NWRs, Loma Ecological Preserve, and South Bay Coastal Preserve and South Bay Paddling Trail) would experience a permanent change in the existing viewshed during construction and operation of the projects.  In addition, the National Park Service filed a comment on the draft EIS regarding cumulative impacts on the Palmito Ranch Battlefield National Historic Landmark and Palo Alto Battlefield National Historic Landmark.  The National Park Service asserts there would be significant impacts on the visitor experience as a result of the cumulative visual impact of the three Brownsville LNG projects, combined with the existing San Roman Wind Farm and industrial port facilities.  Due to the proximity of the Rio Grande LNG and Annova LNG Projects to the same visual receptors as the Texas LNG Project, significant cumulative impacts on visual resources are anticipated.

Cumulative air quality impacts could occur as a result of concurrent construction and operation of the Texas LNG, Rio Grande LNG, and Annova LNG Projects.  Concurrent construction of these projects could result in temporary, moderate to major increases in emissions of air pollutants during construction.  The potential impacts of these localized elevated emissions would be greatest in the immediate vicinity of the LNG terminal sites; however, the implementation of mitigation measures (e.g., water application) would minimize such impacts.

The operation of the Rio Grande LNG and Annova LNG terminals would have the greatest potential to contribute to cumulative impacts on air quality with the operating Texas LNG terminal, given the proximity of the projects.  A conservative air quality modeling analysis of the emissions from these three projects operating concurrently shows that for all criteria pollutants and averaging periods, except for short-term (1-hour) $NO_2$, cumulative impacts would be below the NAAQS. The predicted maximum cumulative 1-hour $NO_2$ impact would exceed the 1-hour average NAAQS, although this impact is between the fence lines of the Texas LNG and Rio Grande LNG

terminals, on Port of Brownsville property. $NO_2$ concentrations would disperse to levels of less than 40 percent of the 1-hour $NO_2$ NAAQS before reaching nearby communities. While concurrent maximum operations of the three LNG terminals would result in increased concentrations of air pollutants in the vicinity of the terminals, the emissions from the projects are not expected to result in a significant impact on regional air quality, nor would any exceedance of the NAAQS occur in a populated area.

Currently, there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to Project's incremental contribution to GHGs. Absent such a method for relating GHG emissions to specific resource impacts, we are not able to assess potential GHG-related impacts attributable to this project. Additionally, we have not been able to find any GHG emission reduction goals established either at the federal level[6] or by the State of Texas. Without either the ability to determine discrete resource impacts or an established target to compare GHG emissions against, we are unable to determine the significance of the Project's contribution to climate change.

Cumulative noise impacts would primarily occur as a result of the concurrent construction and operation of the Texas LNG, Rio Grande LNG, and Annova LNG Projects. For simultaneous construction activities at all three LNG projects, the predicted sound level increase over the existing ambient ranges from 2.2 to 9.8 dBA $L_{dn}$ at the noise sensitive areas and sound levels of slightly over 55 dBA $L_{dn}$ are predicted for several noise sensitive areas, and range from less than noticeable increases in ambient noise to a doubling of noise at specific noise sensitive areas. For construction activities that are not simultaneous but incremental, the predicted sound level increase ranges from 1.0 to 8.6 dBA $L_{dn}$ at the noise sensitive areas. These increases would result in a minor to moderate impact; however, all levels would be below 55 dBA $L_{dn}$. For the Palmito Ranch Battlefield National Historic Landmark, the predicted cumulative construction increase was 10.1 dBA $L_{dn}$ over the existing ambient, which could result in periods of perceived doubling of noise. At the Laguna Atascosa NWR there is a higher ambient sound level, so the predicted increase due to cumulative construction noise would be 2.7 dBA $L_{dn}$, resulting in a minor impact.

For operational noise with all three projects fully operational, the predicted sound level impacts are much lower than construction impacts, with potential increases over the existing ambient of between 0.3 and 1.5 dBA $L_{dn}$ at noise sensitive areas, resulting in minor impacts. Operational impacts are slightly higher at the Palmito Ranch Battlefield National Historic Landmark and the Laguna Atascosa NWR, with possible increases in sound levels due to operations of between 1.3 and 4.8 dBA $L_{dn}$. We consider this to be a minor to moderate long-term impact.

**ALTERNATIVES**

In accordance with National Environmental Policy Act and FERC policy, we evaluated the no-action alternative, system alternatives, and other siting and design alternatives that could achieve the Project objectives. Alternatives were evaluated and compared to the proposed Project to determine whether these alternatives provided a significant environmental advantage over the

---

[6]     The national emissions reduction targets expressed in the EPA's Clean Power Plan and the Paris climate accord are pending repeal and withdrawal, respectively.

**JA215**

proposed Project. While the no-action alternative would avoid the environmental impacts identified in this EIS, adoption of this alternative would preclude meeting the Project objectives. If the Project is not approved and built, other LNG export projects could be developed in the Gulf Coast region or elsewhere in the U.S., resulting in both adverse and beneficial environmental impacts. LNG terminal developments of similar scope and magnitude to the proposed Project would likely result in environmental impacts of comparable significance, especially those projects in a similar regional setting.

Texas LNG did not identify specific geographic markets that would require the proposed Project to be constructed within Texas. Therefore, we evaluated 16 system alternatives that would utilize existing, proposed, or planned LNG export terminals along the Texas and Louisiana Gulf Coast. To meet Texas LNG's DOE-approved export volume, additional facilities similar to those of the proposed Project would be required. Any such project would require review and authorization of the additional facilities, would likely result in similar impacts to the proposed Project, and would not result in a significant environmental advantage. Therefore, the system alternatives were not evaluated further.

We also evaluated alternative sites within several ports along the Gulf Coast. Of the sites evaluated, only those within the Port of Brownsville were considered feasible, based on the availability of land, proximity to existing natural gas pipeline systems, and distance from residences. We then evaluated four sites along the Brownsville Ship Channel; however, two of the sites were determined to be too small and were dismissed from further evaluation. The remaining two sites that we evaluated include the proposed site and Alternative Site 2. While Alternative Site 2 would have an adequate amount of land available for construction of the LNG terminal, it would require a greater amount of fill to raise the site elevation, would require a greater amount of dredging for the turning basin, and would result in greater impacts on wetlands. Due to the reasons listed above, we do not consider Alternative Site 2 to provide a significant environmental advantage to the proposed Project.

**CONCLUSION**

We determined that the construction and operation of the Texas LNG Project would result in adverse environmental impacts. We conclude that impacts on the environment from the proposed Project would be reduced to less than significant levels with the implementation of Texas LNG's proposed impact avoidance, minimization, and mitigation measures and the additional measures recommended by FERC staff, with the exception of impacts on visual resources which would be significant when viewed from the Laguna Atascosa NWR. In addition, the Texas LNG Project, combined with other projects in the geographic scope, including the Rio Grande LNG and Annova LNG Projects, would result in significant cumulative impacts from sedimentation/turbidity and shoreline erosion within the Brownsville Ship Channel during operations from vessel transits; on the federally listed ocelot and jaguarundi from habitat loss and potential for increased vehicular strikes during construction; on the federally listed aplomado falcon from habitat loss and construction of elevated structures; and on visual resources from the presence of aboveground structures. We based our conclusions upon information provided by Texas LNG and through data requests; field investigations; literature research; geospatial analysis; alternatives analysis; public comments and scoping sessions; and coordination with federal, state,

and local agencies and Native American tribes.  The following factors were also considered in our conclusions:

- The LNG terminal would be constructed in an area currently zoned for commercial and industrial use, along an existing, man-made ship channel.

- Texas LNG would follow its Spill Prevention and Response Plan (construction), Spill Prevention Control and Countermeasures Plan (operation), Stormwater Pollution Prevention Plan, Noxious Weed and Invasive Plant Plan, Facility Lighting Plan, Terrestrial Reptile and Amphibian Conservation Plan, Unanticipated Discovery Plan for cultural resources, and Fugitive Dust Control Plan.

- The U.S. Coast Guard issued a Letter of Recommendation indicating that the Brownsville Ship Channel would be considered suitable for the LNG marine traffic associated with the Project.

- All appropriate consultations with the FWS and NMFS regarding federally listed threatened and endangered species would be completed before construction is allowed to start.

- All appropriate National Historic Preservation Act consultations with the Texas State Historic Preservation Office and the ACHP would be completed, and an MOA would be executed to resolve adverse effects at NRHP-listed Garcia Pasture Site before construction is allowed to start in any given area.

- Texas LNG would implement its Project-specific Environmental Construction Plan, which incorporates our *Upland Erosion Control, Revegetation, and Maintenance Plan* and *Wetland and Waterbody Construction and Mitigation Procedures*, to minimize impacts on soils, wetlands, and waterbodies.

- The FERC's environmental and engineering inspection and mitigation monitoring program for this Project would ensure compliance with all mitigation measures and conditions of any FERC authorization.

In addition, we developed site-specific mitigation measures that Texas LNG should implement to further reduce the environmental impacts that would otherwise result from construction of the Project.  We recommend that these mitigation measures, presented in section 5.2 of the EIS, be attached as conditions to any authorization issued by the Commission for the Project.

JA217

Document Accession #: 20190315-3053    Filed Date: 03/15/2019



**FIGURE 1-1      Project Overview Map**

**JA218**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

## 1.3     PUBLIC REVIEW AND COMMENT

### 1.3.1     Pre-filing Process and Scoping

On March 9, 2015, Texas LNG filed a request with FERC to use our pre-filing review process.  We approved this request on April 14, 2015, and pre-filing Docket No. PF15-14-000 was established in order to place information filed by Texas LNG and related documents issued by FERC into the public record.  The pre-filing review process provides opportunities for interested stakeholders to become involved early in project planning, facilitates interagency cooperation, and assists in the identification and resolution of issues prior to a formal application being filed with FERC.

Texas LNG held open houses in Brownsville and Port Isabel, Texas on May 5 and 6, 2015, respectively, to provide information to the public about the Project.  FERC staff participated in the open houses, explaining the FERC environmental review process to the public and providing those attending with information on how to file comments with FERC.

On July 23, 2015, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Texas Liquefied Natural Gas Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meeting* (NOI).  This notice was sent to about 375 interested parties, including federal, state, and local officials; agency representatives; conservation organizations; Native American tribes; local libraries and newspapers; and property owners in the vicinity of proposed Project facilities.  Publication of the NOI for the Project established a 30-day public comment period ending on August 24, 2015, for the submission of comments, concerns, and issues related to the environmental aspects of the Project.

We received comments from four federal agencies including FWS, COE, EPA, and NPS, in response to the NOI for the Project.  The Commission also received written comments from elected officials, public officials, individuals, and non-governmental agencies.

On August 11, 2015, FERC conducted a joint public scoping meeting in Port Isabel, Texas to provide an opportunity for the public to learn more about the Texas LNG Project, Annova LNG Project, and Rio Grande LNG Project and to participate in our analysis by providing verbal comments on environmental issues to be included in the EIS.  A total of 47 individuals provided verbal comments at the scoping meeting.  A transcript of these comments is part of the public record for the Texas LNG Project and is available for viewing on the FERC eLibrary (http://elibrary.ferc.gov/idmws/search/fercgensearch.asp) under Docket No. PF15-14.).

Environmental issues identified during public scoping are summarized in table 1.3-1 along with a listing of the EIS sections that address the comments.  The most frequently received comments relate to LNG safety; threatened and endangered species, land use, water quality, air quality, and cumulative impacts.  Issues identified that are not considered environmental considerations or are outside the scope of the EIS process are summarized in table 1.3-2 and are not addressed further in this EIS.

**JA219**

Document Accession #: 20190315-3053        Filed Date: 03/15/2019

| TABLE 1.3-1 | |
|---|---|
| **Environmental Issues Identified During the Public Scoping Process for the Texas LNG Project** | |
| **Issue/Specific Comment** | **EIS Section Addressing Comment** |
| **Alternatives** | |
| Alternative facility locations | 3.3.1 |
| Renewable energy alternatives | 3.1 |
| Alternative energy sources | 3.1 |
| **Soils and Geology** | |
| Impacts on soils | 4.2.3 |
| **Water Resources** | |
| Water use during construction and operation, including source and discharges | 4.3.1.4; 4.3.2.3 |
| Surface water and groundwater contamination | 4.3.1.4; 4.3.2.3 |
| Turbidity and resuspension of bottom sediments | 4.3.2.3 |
| Wetland impacts | 4.4.2 |
| Impacts from dredging | 4.3.2.3 |
| Bahia Grande impacts | 4.3.2.3 |
| Mitigation measures | 4.3.1.4; 4.3.2.3; 4.4.2.1 |
| **Wildlife and Aquatic Resources** | |
| Impacts of water discharges on aquatic species | 4.6.2.2 |
| Migratory birds | 4.6.1.3 |
| Habitat impacts and loss | 4.5.2; 4.6.1.2; 4.6.2.2 |
| Impacts on marine life, seagrass, and seaweed | 4.6.2.2 |
| Mitigation measures | 4.6.1.2; 4.6.2.2 |
| Impacts on commercial fisheries and shrimping | 4.6.2.1; 4.6.2.2; 4.9.8 |
| **Threatened and Endangered Species** | |
| Impacts on endangered, threatened, and sensitive species | 4.7 |
| **Land Use, Recreation, and Aesthetics** | |
| Light pollution | 4.8.5 |
| Impacts on visual resources | 4.8.5 |
| Impacts on outdoor recreation opportunities | 4.8.4 |
| Recreational fishing and boating | 4.6.2.2; 4.8.4; 4.9.8 |
| Changes in land use | 4.8.1 |
| Impacts on federal and state lands | 4.8.4 |
| Mitigation measures | 4.8.1.2; 4.8.4 |
| **Socioeconomics** | |
| Available workforce | 4.9.1 |
| Economic impacts of LNG exports | 4.9.2 |
| Property values | 4.9.7 |
| Job growth and loss | 4.9.2 |
| Impacts on tourism | 4.9.8 |
| Impacts on the minority populations | 4.9.9 |
| Tax revenue | 4.9.3 |
| Tax abatements | 4.9.3 |
| Impacts on public services | 4.9.5 |

JA220

| TABLE 1.3-1 | |
| :-- | :-- |
| **Environmental Issues Identified During the Public Scoping Process for the Texas LNG Project** | |
| **Issue/Specific Comment** | **EIS Section Addressing Comment** |
| Environmental justice | 4.9.9 |
| **Transportation and Traffic** | |
| Safe navigation of ship channel | 4.9.6.2 |
| Impacts of increased ship traffic | 4.9.6.2 |
| Impacts of increased road traffic | 4.9.6.1 |
| **Cultural Resources** | |
| Proximity to prehistoric cemeteries and scattered surface sites | 4.10.2 |
| Proximity to culturally significant site | 4.10.2 |
| Proximity to Palmito Ranch Battlefield National Historic Landmark, Palo Alto Battlefield National Historic Park and National Historic Landmark | 4.8.4.8; 4.8.4.9 |
| **Air Quality** | |
| Greenhouse gas emissions and mitigation | 4.11.1.4; 4.11.1.5 |
| Impacts of emissions on human health | 4.11.1.2 |
| Climate change | 4.11.1.2 |
| **Noise** | |
| Impacts from noise during construction | 4.11.2.3 |
| Impacts from noise during operations | 4.11.2.4 |
| **Reliability and Safety** | |
| Spill contingency plan | 4.12.5.4, 4.12.6 |
| Hurricane response plan | 4.12.5.5, 4.12.6 |
| Safety of flares | 4.12.5.3 |
| Emergency notification systems and preparedness | 4.12.6 |
| Catastrophic system failures | 4.12.6 |
| Potential terrorist target | 4.12.4 |
| Proximity to a densely populated area | 4.12.2, 4.12.3.2 |
| LNG carrier safety zones | 4.12.3.2 |
| Proximity to SpaceX | 4.12.5.6 |
| Impacts from extreme weather (hurricane, flooding, wind) | 4.12.5.5 |
| Vapor dispersion | 4.12.2, 4.12.3.2 |
| Security | 4.12.3.2, 4.12.4 |
| **Cumulative Impacts** | |
| Analysis of cumulative impacts associated with multiple LNG projects in the region | 4.13 |

In response to comments received regarding minimizing impacts on wetlands as well as impact on threatened and endangered species habitat, Texas LNG modified the facility layout. To minimize impacts on wetlands in accordance with Section 404 of the CWA, Texas LNG reconfigured the Project facilities and associated workspaces to minimize the permanent fill of wetlands within the site. In addition to modifying the Project layout to avoid and/or minimize wetland impacts, Texas LNG also reconfigured the Project layout to avoid placement of permanent structures on the western portion of the site to minimize impacts on suitable nesting and foraging habitat for the northern aplomado falcon.

**JA221**

**TABLE 1.3-2**

**Issues Identified and Comments Received That Are Outside the Scope of the EIS**

| Issue/Specific Comment | Explanation |
|---|---|
| Effects of hydraulically fractured shale gas production | The development of natural gas in shale plays by hydraulic fracturing is not the subject of this EIS nor is the issue directly related to the proposed Project. |
| Environmental and economic consequences of any induced production, especially in shale gas plays, as a result of increased natural gas exports | Production and gathering activities, and the pipelines and facilities used for these activities, are not regulated by FERC, but are overseen by the affected region's state and local agencies with jurisdiction over the management and extraction of the shale gas resource. Further, the volume of induced production as well as the source of induced production, should it occur, would be speculative as the proposed LNG terminal would tie into an existing intrastate natural gas pipeline system that ranges outside of the Project area. Therefore, the environmental and economic consequences of induced production are outside the scope of this EIS. |
| Consideration of other pending LNG export proposals before the DOE and FERC in the Brownsville area through the development of a programmatic EIS | The Commission does not intend to conduct a region wide analysis of proposed LNG export terminals. The DOE determines the public benefits of exporting LNG from terminals in the U.S. FERC's review and approval of individual projects under the NGA does not constitute a coordinated federal program. |
| Economic impacts of export of LNG and domestic use of LNG | Economic conditions regarding export and domestic use of LNG are assessed by the DOE and are not under the jurisdiction of FERC. Further, the DOE determines the public benefits of exporting LNG from terminals in the U.S. Therefore, this discussion is outside the scope of this EIS. |
| Insurance rates | Insurance rates are determined by private insurance companies based on several factors. The Commission has no authority to influence changes in insurance rates that may or may not occur as a result of the proposed Project; therefore, this discussion is outside the scope of this EIS. |
| Natural gas prices | The review of the Project is limited to the economic and environmental impacts of the proposal before the Commission; therefore, changes in natural gas prices as a result of exports are outside the scope of this EIS. |

## 1.3.2   Additional Agency Interactions

In a letter to the U.S. Department of Defense (DOD) Siting Clearinghouse dated October 2, 2015, the Commission requested the DOD's comments on whether the Project could potentially have an impact on the testing, training, or operational activities of an active military installation, or if military establishments in the Project area could be affected by the Project. The DOD provided a response on June 4, 2018, noting that the Project would have a minimal impact on military training and operations conducted in Cameron County, Texas.

## 1.3.3   Public Review of the Draft EIS

The draft EIS for the Project was issued for public review on October 26, 2018, and the Notice of Availability (NOA) for the draft EIS was published in the Federal Register on November 2, 2018 (83 FR 55156, pages, 55156-55157). The NOA included a notice of a public comment session on November 15, 2018 in Port Isabel, Texas. The NOA also provided summary information regarding the draft EIS and requested submission of all comments by December 17, 2018. At the comment sessions, we received several written comments and 55

**JA222**

verbal comments. The verbal comments were transcribed by two court reporters. Transcripts and all written comments that we received on the draft EIS are part of the public record for the Project.

In addition to receiving written and verbal comments on the draft EIS at the comment session, FERC also received over 900 submissions from parties including federal and state agencies, interested parties, Indian tribes, and Texas LNG. The majority of comments received on the draft EIS were related to socioeconomics, wetlands, threatened and endangered species, safety, recreation, and air quality. All environmental comments on the draft EIS are part of the public record and have been addressed in this final EIS. Our responses to comments are provided in appendix H.

### 1.3.4   Final EIS

In accordance with the Council on Environmental Quality's (CEQ) regulations implementing NEPA, no agency decision on a proposed action may be made until 30 days after the EPA publishes an NOA of the final EIS in the federal register. However, the CEQ regulations provide an exception to this rule when an agency decision is subject to a formal internal appeal process that allows other agencies or the public to make their views known. In such cases, the agency decision may be made at the same time the notice of the final EIS is published, allowing both periods to run concurrently. The Commission decision for the proposed action is subject to a 30-day rehearing period. Therefore, the FERC decision may be made and recorded concurrently with the publication of the final EIS.

## 1.4   NON-JURISDICTIONAL FACILITIES

Under the provisions of the NGA, FERC is required to consider, as part of a decision to authorize FERC-jurisdictional facilities, all facilities that are directly related to a proposed project where there is sufficient federal control and responsibility to warrant environmental analysis as part of the NEPA environmental review for the proposed Project. Some proposed projects have associated facilities that do not come under the jurisdiction of the Commission. These "non-jurisdictional" facilities may be integral to the need for the proposed facilities, or they may be merely associated as minor components of the jurisdictional facilities that would be constructed and operated as a result of authorization of the proposed facilities.

The following non-jurisdictional actions were identified in association with the Project:

- construction of an intrastate natural gas pipeline from an interconnect with another intrastate natural gas pipeline (Valley Crossing Pipeline [VCP]) to the Project site;

- construction of an electric transmission line from the existing American Electric Power (AEP) Union Carbide Substation to the Project site;

- construction of a potable water line from the BND's existing Fishing Harbor potable water line to the Project site; and

- construction of an auxiliary lane off of State Highway (SH) 48 to facilitate management of traffic during construction and operation of the Project.

**JA223**



**FIGURE 2.1-1     Artist Rendering of Proposed LNG Terminal**

**JA224**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019



**FIGURE 2.1.2-1    LNG Terminal Site Plan**

**JA225**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019



Figure 2.2-1
Land Requirements for the
Texas LNG Project

FIGURE 2.2-1    Land Requirements for the Texas LNG Project

2-13

**JA226**

The tidal flats within the Project site (estuarine wetlands) are often exposed and not inundated; however, based on NOAA data, tides in the area are slightly higher during the fall months. Although USGS topographic maps indicate that the area is subject to inundation, it is often barren and dry. Historic maps show the area as open water. It is likely that construction of the Brownsville Ship Channel along with the continued maintenance dredging has resulted in the deposition of displaced dredge material along the channel in what was historically shallow open water. The continued accretion of sediment from dredging as well as other sources, such as ship traffic, has effectively cut off natural tidal exchange in the area except during extreme high tides and storm surges. The tidal flats within the Project site provide habitat for shorebirds and benthic (bottom-dwelling) invertebrates and still supports water quality improvement by trapping and metabolizing nutrients from runoff. The tidal flats are sparsely vegetated with species such as turtleweed, dwarf glasswort, shoreline seapurslane, chickenclaws, and annual seepweed.

### 4.4.2    Wetland Impacts and Mitigation

Construction of the Project would result in the permanent loss of 42.9 acres of wetlands, including 1.1 acres of PEM wetlands and 41.8 acres of tidal flats, and an additional 2.3 acres in temporary impacts, including 0.5 acre of PEM wetlands and 1.8 acres of tidal flats (see table 4.4.2-1).

| TABLE 4.4.2-1 | | | | |
|---|---|---|---|---|
| Wetlands Impacted by the Project Facilities (in acres) | | | | |
| Facility [a, b] | Wetland ID | Wetland Classification | Construction Impact (acres) [c] | Operation Impact (acres) |
| **PERMANENT FACILITIES** | | | | |
| Liquefaction Process Area and LNG Storage Tanks | MA001 | E2US3P | <0.1 | <0.1 |
| | MA003 | E2US3P | <0.1 | <0.1 |
| | MB001 | E2US3P | 0.4 | 0.4 |
| | MB002 | E2US3P | 0.2 | 0.2 |
| | MB003 | E2US3P | 0.3 | 0.3 |
| | WA002 | PEM | <0.1 | <0.1 |
| | WB002 | PEM | 0.1 | 0.1 |
| Maneuvering Basin | MA003 | E2US3P | 38.7 | 38.7 |
| | MB003 | E2US3P | 0.3 | 0.3 |
| | MB004 | E2US3P | 0.4 | 0.4 |
| LNG Carrier Berthing Dock | MA003 | E2US3P | 1.3 | 1.3 |
| | MB003 | E2US3P | 0.2 | 0.2 |
| Permanent Access Road | N/A | N/A | N/A | N/A |
| Non jurisdictional Facilities within the Project Site | MB001 | E2US3P | <0.1 | <0.1 |
| | WB002 | PEM | 0.6 | 0.6 |
| | WA001 [d] | PEM | 0.3 | 0.3 |
| | WB001 [d] | PEM | <0.1 | <0.1 |
| **Permanent Facilities Subtotal** | -- | -- | **42.9** | **42.9** |
| **TEMPORARY WORKSPACE AND LAYDOWN AREAS** | | | | |
| Phase 1 Temporary Workspace | | | | |

| Facility [a,b] | Wetland ID | Wetland Classification | Construction Impact (acres) [c] | Operation Impact (acres) |
|---|---|---|---|---|
| **TABLE 4.4.2-1** | | | | |
| **Wetlands Impacted by the Project Facilities (in acres)** | | | | |
| Temporary Construction Basin | MA003 | E2US3P | 0.4 | 0.0 |
| Jetty and Flarestack Laydown Areas | N/A | N/A | N/A | N/A |
| LNG Carrier Berthing Dock | MA003 | E2US3P | 0.8 | 0.0 |
| | MB003 | E2US3P | 0.1 | 0.0 |
| Site Preparation Temporary Workspace | MA001 | E2US3P | 0.1 | 0.0 |
| | MB001 | E2US3P | 0.2 | 0.0 |
| | MB003 | E2US3P | 0.1 | 0.0 |
| | WA002 | PEM | 0.1 | 0.0 |
| | WB002 | PEM | 0.3 | 0.0 |
| Borrow Areas | N/A | N/A | N/A | N/A |
| **Phase 1 Subtotal** | **--** | **--** | **2.3** | **0.0** |
| Phase 1 and 2 Temporary Workspaces [e] | N/A | N/A | N/A | N/A |
| **PROJECT SITE TOTAL [f]** | **--** | **--** | **45.2** | **42.9** |

N/A = Not Applicable, Project component would not impact wetlands.

[a] PEM = palustrine emergent; E2US3P = estuarine intertidal unconsolidated shore irregularly flooded (tidal flat)

[b] No wetlands would be impacted by the disposal of dredge material at PA 5A.

[c] Construction impacts are inclusive of operation impacts.

[d] Wetlands WA001 and WB001 would be crossed by the permanent rights of way associated with the non jurisdictional facilities within the Project site. Impacts during construction would be temporary; however, the permanent rights of way would be subject to periodic vegetation maintenance; therefore, these impacts are considered permanent for the purposes of this table.

[e] None of the Phase 1 and 2 Temporary Workspaces, as identified in table 2.2 1, including the concrete batch plant, warehouse and workshops, laydown areas, contractor offices, contractor parking lot, crane pad, topsoil storage area, and temporary access road would impact wetlands.

[f] Numbers in this table have been rounded for presentation purposes; as a result the total may not equal the sum of the addends.

**JA228**

maneuvering basin (1.1 acres) would be allowed to naturally fill in following the completion of construction. [25]

The second phase would consist of dredging of the maneuvering basin to -43 MLLW with a 2-foot allowable over depth. To construct the maneuvering basin, Texas LNG would dredge a total of approximately 3.9 million cubic yards. The maneuvering basin would be recessed into the shoreline on the Brownsville Ship Channel. The dredged area would have sidewalls sloped to a 3 to 1 ratio in order to match the sidewall slope of the Brownsville Ship Channel, as described in section 2.1.4. A total of 72.0 acres would be dredged, including 39.4 acres of tidal flats and 32.7 acres located in the deep water habitat between the property boundary and the northern edge of the Brownsville Ship Channel.

Dredging of the maneuvering basin would require permanent deepening of the tidal flats resulting in the conversion of shallow water habitat to deep water habitat. However, as discussed in section 4.4.1 above, the existing tidal flats in the Project area have been cut off from natural tidal exchanges. During a site visit with Texas LNG in October 2015, FWS observed that through the dredging of the maneuvering basin, a conduit for tidal exchange could be created, improving the surrounding tidal flat habitat into a higher functioning estuarine shallow water habitat.

In response to comments from the FWS, Texas LNG designed the Project facilities to minimize wetland impacts to the extent practicable. Of the 60.0 acres of PEM wetlands delineated within the Project site, only 1.1 acres would be permanently impacted. Similarly, 178.0 acres of tidal flats were delineated within the Project site; however, only 41.8 acres of tidal flats would be permanently impacted by the Project. Texas LNG would minimize impacts on surrounding wetlands and wetlands temporarily impacted during construction by adhering to measures outlined in its Project-specific ECP. Texas LNG's Project-specific ECP was developed in accordance with the FERC Procedures except where Texas LNG has requested deviations, as identified in section 4.4.3. In addition, Texas LNG has indicated that the hydrology of wetlands not directly impacted by the Project would be maintained through the use of culverts.

### 4.4.2.1 Mitigation Plan

As required by the CWA and in accordance with the COE Final Mitigation Rule (33 CFR 332), Texas LNG is proposing compensatory mitigation to offset unavoidable impacts on wetlands that would occur as a result of the proposed Project. Texas LNG prepared a preliminary Conceptual Mitigation Plan that proposed to mitigate for the 42.9 acres of permanent wetland impacts that would occur as a result of the Project through preservation of 405 acres of tidal flats located within the Loma Ecological Preserve, approximately 0.8 mile south of the Project site. However, the COE sent a letter to Texas LNG stating that the mitigation plan should include restoration, creation, and/or enhancement of aquatic resources and should not rely only on preservation of existing aquatic resources. As of the writing of this final EIS, Texas LNG has not filed an updated Mitigation Plan to the COE for review. The COE will not issue Texas LNG a Section 404 permit until a suitable mitigation plan is developed to mitigate Project impacts on wetlands.

---

[25] The Brownsville Ship Channel is considered open water and is not classified as a wetland; impacts on the Brownsville Ship Channel are not captured in table 4.4.2-1

**JA229**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

Texas LNG is developing its Mitigation Plan in coordination with COE. In accordance with our recommendation 9 in section 5, Texas LNG is required to obtain all federal authorizations, or waver thereof, prior to construction. Further, because Texas LNG has minimized wetland impacts to the extent practicable, would maintain hydrologic connectivity for all wetlands not impacted, and would restore temporarily impacted wetlands in accordance with its ECP (which includes our Procedures), we conclude that impacts on wetlands would not be significant.

### 4.4.3   Alternative Measures to the FERC Procedures

Section VI.A.6 of the FERC Procedures states that aboveground facilities should be located outside of wetlands, except where such siting would prohibit compliance with DOT regulations. The Project would permanently convert 1.1 acres of PEM wetlands and 2.4 acres of tidal flats (excluding dredging impacts) to industrial land (see table 4.4.2-1); however, Texas LNG has sited the majority of Project facilities outside of the PEM wetlands present on the site. Due to the water dependency of the Project (access to a navigation channel for export) and the presence of tidal flats surrounding the Project site, impacts on tidal flats were determined to be unavoidable. Section 3.3 of this EIS provides an analysis of alternative Project sites and concludes that, when multiple factors are considered, alternative sites would not provide a significant environmental advantage. In addition, Texas LNG configured the proposed Project facilities within the Project site to impact the least amount of wetlands possible. Because the proposed alternative measures to Section VI.A.6 of the FERC Procedures are necessary due to land use requirements and limitations at the Project site, we have determined that the proposed deviation from the FERC Procedures is reasonably and adequately justified.

Section VI.B.1.a of our Procedures requires that all extra workspaces (e.g., staging areas and additional spoil storage areas) be at least 50 feet away from wetland boundaries, except where the adjacent upland consists of cultivated or rotated cropland or other disturbed land. Portions of the temporary workspace associated with the Project are within 50 feet of wetlands or located within wetlands, as further identified in table 4.4.3-1 below. Table 4.4.3-1 also provides justification for siting of the temporary workspaces in proximity to wetlands as well as compliance measures that would be implemented to ensure minimization of impacts on wetlands.

| TABLE 4.4.3-1 | | | | | |
|---|---|---|---|---|---|
| Wetlands Within 50 feet of Temporary Workspace at the Project Site | | | | | |
| Facility [a] | Wetland ID | Wetland Classification | Distance from Temporary Workspace (feet) | Justification | Equal Compliance Measures |
| Phase 1 Temporary Workspace | | | | | |
| Temporary Construction Basin | MA003 | E2US3P | 0 | Necessary for installation of three channel side mooring dolphins. | |
| Jetty and Flarestack Laydown Areas | MB003 | E2US3P | 40 | Unable to position these temporary facilities further from the wetland within the Project site. | Sediment barriers, such as silt fence, to prevent offsite sedimentation, and restoration of contours following construction. |
| | MB002 | E2US3P | 40 | | |

**JA230**



**FIGURE 4.8.5-28     Current Day View Facing East from State Highway 48 (KOP 6)**



**FIGURE 4.8.5-29     Simulation of Day View Facing East from State Highway 48 (KOP 6)**

**JA231**



**FIGURE 4.8.5-30    Current Night View Facing East from State Highway 48 (KOP 6)**



**FIGURE 4.8.5-31    Simulation of Night View Facing East from State Highway 48 (KOP 6)**

JA232



**FIGURE 4.8.5-32     Simulation of Daytime Flaring Facing East from State Highway 48 (KOP 6)**



**FIGURE 4.8.5-33     Simulation of Nighttime Flaring Facing East from State Highway 48 (KOP 6)**

JA233

- retail trade (U.S. Census Bureau, 2015b).

Travel and tourism also contribute to the local Cameron County economy.  Travel industry employment includes the leisure and hospitality sector (arts, entertainment, and recreation, and accommodation and food services); transportation (all air and ground transportation goods and services); and retail trade.  According to a report prepared for the Office of the Governor by Dean Runyan Associates in 2015, 4.5 percent of all jobs in Cameron County were related to the travel industry and total employee earnings from the travel industry accounted for an estimated $186.3 million.  In addition, according to the *2014 Texas Tourism Region and MSA Visitor Profile*, 94 percent of visitors to the Brownsville-Harlingen Metropolitan Statistical Area traveled there for leisure purposes (D.K. Shifflet & Associates, Ltd., 2015).

The civilian labor force is defined as the sum of employed persons and unemployed persons who are actively seeking work or are otherwise available for work and excludes people who are institutionalized and people on active duty in the United States Armed Forces (U.S. Census Bureau, 2010).  Assuming 80 percent of the workforce would be hired from within Cameron County, in 2015, the civilian labor force was 161,941 people and the average per capita income was $14,898, which is well below the per capita income for Texas as a whole ($26,513). Additionally, Cameron County had an unemployment rate of 10.5 percent in 2015 (or about 16,200 people), as compared to the 7.7 percent unemployment rate for the State of Texas (U.S. Census Bureau, 2015b).

Economic impacts are divided into three categories:

- direct effects   hiring of local workers and purchases of goods and services from local businesses;

- indirect effects   the additional demand for goods and services, such as replacing inventory from the firms that sell goods and services directly to the project or workers and their families; and

- induced effects   the spending of disposable income by the workers at local businesses, which in turn order new inventory from their suppliers.

Construction impacts of the Project would have a moderate economic impact due to the scale of spending.  Texas LNG commissioned Aaron Economic Consulting, LLC to prepare a socioeconomic report, evaluating the potential impacts of the Project on the local economy.

Construction and capital investment during Phase 1 is estimated to last 44 months beginning in 2019 and ending in 2023.  Based on the *Socioeconomics Report* prepared for the Project, the total direct, indirect, and induced impacts of Phase 1 construction is projected to be $251.8 million (in 2021 U.S. dollars).[33]  The construction of Phase 1 of the Project would contribute $88.5 million to the local economy in the form of value added (increase in the gross regional product [GRP]), raising Cameron County's GRP by 2.8 percent.  Indirect construction-related employment would add an estimated 166 jobs and another 180 jobs would be added through

---

[33]    Texas LNG's Socioeconomics Report is available on eLibrary under accession number 20170427-5039.

**JA234**

induced effects.  Texas LNG estimates that the direct average salary for construction workers would be $52,000 per year.

Construction and capital investment for Phase 2 is anticipated to last 43 months.  According to the *Socioeconomics Report*, the economic impact from Phase 2 was based on the Peak Impact Scenario.  The total construction impact for Phase 2 (direct, indirect, and induced effects) is estimated to be $281.9 million and would add $97.4 million in value added to the local economy (the economic impact is represented in 2025 U.S. dollars, which is when Texas LNG anticipates Phase 2 construction would be completed under the Peak Impact Scenario).  This value added would result in an increase of 3.3 percent to Cameron County's GRP.  Construction from Phase 2 would also add 294 indirect jobs, and an additional 309 induced jobs.

Unlike construction impacts, operation impacts on the economy are permanent.  Operation of Phase 1 would result in an annual value added of $173 million to the local economy (resulting from labor compensation, proprietary income, other property type income, and net incremental value added by the project), increasing the GRP by 3.6 percent.  Texas LNG would directly employ a total of 80 people for Phase 1 and pay an average annual compensation of approximately $70,000, equating to an estimated total payroll of approximately $5.6 million annually (based on the first full year of operation, estimated in 2021 U.S. dollars).

Following the completion of Phase 2 construction, the total value added to the local economy from operation of both Project phases combined would be an estimated $367 million, increasing the GRP for Cameron County by 7.2 percent.  During operation of both Phase 1 and Phase 2 of the Project, Texas LNG would employ 110 personnel, resulting in a total of $9.6 million in annual payroll.  These expenditures would result in a minor, but positive permanent impact on the local economy.

### 4.9.3    Local Taxes and Government Revenue

Texas LNG anticipates spending approximately $64 million on construction materials in the affected area during construction of Phases 1 and 2, which would generate increased local, state, and federal sales tax revenues.  The expenditures of goods and services by the construction workers and their families would also generate increased tax revenues.  In addition, local, state, and federal governments would tax the $45 million and $77 million in total construction workforce payroll during Phase 1 (2020 dollars) and Phase 2 (2025 dollars), respectively.  This increase in tax revenue would be a minor, temporary, and positive impact on tax revenue within the affected area.

The estimated annual ad valorem tax and sales tax attributable to operation of Phase 1 of the Project is $9.7 million and $780,000, respectively (in 2021).  The combined ad valorem tax and sales tax associated with operation of Phase 1 and Phase 2 would be approximately $25.5 million and $867,000, respectively.  Several comments from the public were received regarding tax abatements.  Texas LNG indicated that they have not requested any tax abatements for the Project.  Texas LNG estimates that without tax abatements, operation of the Project over a 25-year period would result in total ad valorem tax revenue of $567 million.  If tax abatements were granted, the estimated ad valorem tax revenue for the same 25-year period would be $493 million, assuming the Peak Impact Scenario.  We have determined that operation of the

**JA235**

would be greater during Project operation. Most popular tourist activities and destinations in the region would not be directly affected by the Project; therefore, we do not anticipate that the presence of the Project in the area would result in significant impacts on tourism.

### 4.9.8.2 Commercial Fishing

In 2014, the Port of Brownsville and Port of Isabel together were ranked as the second largest fishing port by value along the Gulf of Mexico (National Ocean Economics Program, 2016a). We received comments on the draft EIS expressing concern regarding the impacts of the Project on commercial fisheries, especially shrimping. Between the Port of Isabel and the Port of Brownsville, about 12.1 million pounds of commercial species valued at $69.1 million were caught in 2014 (National Ocean Economics Program, 2016b). A majority of the commercial fisheries in the region are based offshore, with some commercial fishing occurring in the Lower Laguna Madre. Commercial fishing in the Lower Laguna Madre and other bays primarily consist of bait fisheries (e.g., shrimp) and black drum. Trawlers also harvest bait shrimp from the Brownsville Ship Channel (Fisher, 2015).

The Port of Brownsville Fishing Harbor is approximately 7.5 miles west of the Project site and houses up to 500 fishing boats. In addition, there are approximately 180 shrimp boats in Brownsville and Port Isabel which catch 13 million pounds of shrimp each year with an estimated valued of $72 million (Port of Brownsville, 2017a).

Dredging of the marine berth and in-water pile driving may cause some bait fishery operators to relocate from the Project area to other portions of the Brownsville Ship Channel. As discussed in section 4.9.6.2, Texas LNG anticipates a total of 109 barge deliveries at the Project site over the five-year construction period, resulting in a negligible increase in vessel traffic during construction. Therefore, construction of the Project is not anticipated to impact commercial fishing in the region. During operation, the additional six LNG carriers per month calling on the LNG terminal could result in delays for fishing boats transiting the Brownsville Ship Channel. The additional ship traffic within the Brownsville Ship Channel would result in minor, intermittent impacts on commercial fisheries.

### 4.9.9   Environmental Justice

For projects with major aboveground facilities, FERC regulations (18 CFR 380.12(g)(1)) direct us to consider the impacts on human health or the environment of the local populations, including impacts that would be disproportionately high and adverse for minority and low-income populations. Additionally, during Project scoping, we received comments raising concerns about the impacts of the Texas LNG Project on minority and low-income populations.

The EPA's Environmental Justice Policies (which are directed, in part, by Executive Order 12898: *Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations*) focus on enhancing opportunities for residents to participate in decision making. The EPA (2011) states that Environmental Justice involves meaningful involvement so that: "(1) potentially affected community residents have an appropriate opportunity to participate in decisions about a proposed activity that would affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) the concerns of all participants involved would be considered in the decision-making process; and (4) the decision-

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

makers seek out and facilitate the involvement of those potentially affected." CEQ also has called on federal agencies to actively scrutinize a number of important issues with respect to environmental justice (CEQ, 1997).

As part of our NEPA review, we have evaluated potential environmental justice impacts related to the Texas LNG Project, taking into account the following:

- the racial and economic composition of affected communities;

- health-related issues that may amplify effects to minority or low-income individuals; and

- public participation strategies, including community or tribal participation in the NEPA process.

The EPA provides guidance on determining whether there is a minority or low-income community. According to this guidance, minority population issues must be addressed when they comprise over 50 percent of an affected area or when the minority population percentage of the affected area is substantially greater than the minority percentage in the larger area of the general population. Low-income populations are those that fall within the annual statistical poverty thresholds from the United States Department of Commerce, Bureau of the Census Population Reports, Series P-60 on Income and Poverty. According to 15 CFR 689(3)(A)(i), the United States Department of Housing and Urban Development defines a "low-income geographic area" as an area with a poverty rate of 20 percent or greater. Therefore, low-income populations for this analysis were determined to be those with 20 percent or greater of the population living below the poverty threshold or when the percent of the population in the affected area living below the poverty threshold is substantially greater than the percent of the population living below the poverty threshold in the larger area of the general population (e.g., county).

In accordance with these guidelines, we prepared an environmental justice analysis for the Project. In order to develop a more accurate understanding of the racial and ethnic characteristics of the communities in the immediate vicinity of the Project site, census block group-level data was used, as opposed to the larger geographic areas included in census tract and county level data. In this analysis, the minority and low-income population percentages in the State of Texas and Cameron County were compared to the respective percentages within the five census blocks intersected by a 2-mile radius around the proposed Project site. These five census block groups comprised the affected community based on the potential environmental impact. Table 4.9.9-1 identifies racial composition and economic status of the five block groups, Cameron County, and the State of Texas. Table 4.9.9-2 provides an overview of the general economic status of these areas.

JA237

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

| | TABLE 4.9.9-1 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Demographics in the Vicinity of the Texas LNG Project (in percent) | | | | | | | |
| State/County/Tract/Block | White, Not Hispanic or Latino | Black or African-American | Hispanic or Latino | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Other | Two or More Races |
| Texas | 44.8 | 11.5 | 37.9 | 0.26 | 3.9 | 0.07 | 0.1 | 1.4 |
| Cameron County | 10.5 | 0.4 | 88.2 | 0.1 | 0.6 | 0.0 | 0.1 | 0.2 |
| Census Tract 012304 | 18.8 | 0.8 | 80.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Block Group 2 | 21.0 | 0.0 | 79.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Block Group 3 | 7.6 | 0.1 | 92.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Census Tract 012305 | 77.6 | 2.4 | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Block Group 1 | 77.6 | 2.4 | 20.0 | 0.0 | 0.0. | 0.0. | 0.0. | 0.0 |
| Census Tract 012700 | 7.8 | 0.0 | 92.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Block Group 2 | 25.9 | 0.0 | 74.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Census Tract 014200 | 9.2 | 0.2 | 90.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Block Group 1 | 4.9 | 0.0 | 95.1 | 0.0 | 0.0. | 0.0. | 0.0. | 0.0 |
| Source:   U.S. Census Bureau, 2016 | | | | | | | | |

| | TABLE 4.9.9-2 | |
|---|---|---|
| | Demographics in the Vicinity of the Texas LNG Project (in percent) | |
| State/County/Tract/Block | Median Household Income | Percent Below Poverty Level |
| Texas | $53,207 | 17.6 |
| Cameron County | $33,266 | 34.8 |
| Census Tract 012304 | $58,621 | 29.9 |
| Block Group 2 | $20,106 | 24.1 |
| Block Group 3 | $10,577 | 41.0 |
| Census Tract 012305 | $42,989 | 21.9 |
| Block Group 1 | $42,989 | 21.9 |
| Census Tract 012700 | $24,513 | 33.8 |
| Block Group 2 | $15,809 | 33.4 |
| Census Tract 014200 | $18,523 | 34.4 |
| Block Group 1 | $7,388 | 37.8 |
| Source:   U.S. Census Bureau, 2016 | | |

The minority populations of four of the five block groups near the Project site are greater than the general EPA guideline of 50 percent of the total population; however, they are not substantially greater than minority population of Cameron County. Also, all five block groups have poverty rates that exceed 20 percent; however, only two block groups exceed the Cameron County poverty rate of 34.8 percent. While there are two low-income block groups within 2 miles

**JA238**

of the Project site, only one (Block Group 3, Census Tract 123.04) has residences within 2 miles. This community is approximately 1.8 miles northwest of the Project site in Port Isabel and has a poverty rate of 41.0 percent. As discussed throughout this EIS, construction and operation of the Project would not significantly affect water quality or air quality, which may contribute to environmental health risks, as discussed in sections 4.3 and 4.11.1, respectively.

Although the demographics indicate that potential environmental justice communities are present within the census blocks near the Project site, there is no evidence that these communities would be disproportionately affected by the Project or that impacts on these communities would appreciably exceed impacts on the general population. It is not anticipated that the Project would cause significant adverse health or environmental harm to any community with a disproportionate number of minority or low-income populations. Further, Texas LNG selected this site based on its proximity to the Gulf of Mexico and distance from residences, not land value or avoiding impacts on a particular community. Therefore, we have determined that the Project would have negligible impacts on environmental justice communities.

## 4.10    CULTURAL RESOURCES

Section 101 of the NHPA requires the identification of religious and cultural properties in the area of potential effect (APE) that may be important to Indian tribes. As discussed below, it is the obligation of the FERC to consult on a government-to-government basis with Indian tribes that may have an interest in the Project.

Section 106 of the NHPA requires the FERC to take into account the effect of its undertakings on historic properties, and to afford the ACHP an opportunity to comment. The steps in the process to comply with Section 106, outlined in the ACHP's implementing regulations at 36 CFR 800, include consultations, identification of historic properties, assessment of effects, and resolution of adverse effects. These steps, and the status of our compliance with Section 106, are summarized below.

Texas LNG, as a non-federal party, is assisting the FERC in meeting our obligations under Section 106 by preparing the necessary information, analyses, and recommendations, as authorized by 36 CFR 800.2(a)(3). This includes communications with consulting parties. However, the FERC remains responsible for all determinations of NRHP eligibility and Project effects. As the lead federal agency for the Project, the FERC will address compliance with Section 106.[34]

### 4.10.1  Consultations

The FERC sent copies of the NOI issued July 23, 2015 to a wide range of stakeholders, including federal agencies, such as the ACHP, EPA, COE, FWS, and NPS; state agencies including the THC representing the State Historic Preservation Office (SHPO); local governments; and Indian tribes which may have an interest in the Project area. The NOI contained a paragraph about Section 106 of the NHPA, stating that the FERC would use the NOI to initiate consultations with the SHPO, and to solicit its views, and those of other government agencies, interested Indian tribes, and the public on the Project's potential effects on historic properties.

---

[34] Pursuant to 36 CFR 800.2(a)(2), the EPAct 2005, and the May 2002 "Interagency Agreement on Early Coordination of Required Environmental and Historic Preservation Reviews."

**JA239**

adversely affected. On February 12, 2019, the FERC notified the ACHP of our finding of adverse effects and invited the ACHP to participate in the resolution of adverse effects, in accordance with Part 800.6(a)(1). That letter indicated that we would need to execute a MOA, pursuant to Part 800.6(c). However, the FERC staff would not produce the MOA until after the Project is authorized.[37] Therefore, **we recommend that**:

- **Texas LNG should <u>not begin construction</u> of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads <u>until</u>:**

  a. **Texas LNG files with the Secretary comments on the final cultural resources reports and plans from the SHPO, COE, NPS, and appropriate federally-recognized Indian tribes.**

  b. **FERC staff has executed an MOA regarding the resolution of adverse effects on historic properties ;**

  c. **the Director of OEP notifies Texas LNG in writing that treatment measures (including archaeological data recovery) may be implemented; and**

  d. **Texas LNG documents the completion of treatment, and the Director of OEP issues a written notice to proceed with construction.**

## 4.11   AIR QUALITY AND NOISE

### 4.11.1  Air Quality

Air quality would be affected by construction and operation of the Project. Although air emissions would be generated by operation of equipment during construction of the Project facilities, most air emissions associated with the Project would result from the long-term operation of the Project facilities. This section of the EIS addresses the construction- and operation-based emissions from the Project, as well as applicable regulatory requirements and projected impacts on air quality.

The term *air quality* refers to the relative concentrations of pollutants in the ambient air. The subsections below describe well-established air quality concepts that are applied to characterize air quality and to determine the significance of increases in air pollution. This includes metrics for specific air pollutants known as criteria pollutants, in terms of ambient air quality standards, regional designations to manage air quality known as Air Quality Control Regions (AQCR), and the on-going monitoring of ambient air pollutant concentrations under state and federal programs.

Combustion of fossil fuels, such as natural gas, produces criteria air pollutants such as nitrogen dioxide ($NO_2$), carbon monoxide (CO), $SO_2$, and inhalable particulate matter ($PM_{2.5}$ and $PM_{10}$). $PM_{2.5}$ includes particles with an aerodynamic diameter less than or equal to

---

[37]   If the Commission does not authorize the Project, an MOA would be moot, because the Project would not be built and there would be no impacts on historic properties. The purpose of the MOA would be to resolve adverse effects on affected historic properties. If the Project is authorized, the FERC staff would develop the MOA in consultations with the consulting parties (i.e., the SHPO, NPS, and ACHP if it participates).

**JA240**

2.5 micrometers, and $PM_{10}$ includes particles with an aerodynamic diameter less than or equal to 10 micrometers. Combustion of fossil fuels also produces volatile organic compounds (VOC), a large group of organic chemicals that have a high vapor pressure at room temperature; and nitrogen oxides ($NO_x$). VOCs react with nitrogen oxides, typically on warm summer days, to form ozone, which is another criteria air pollutant. Other byproducts of combustion are greenhouse gases (GHG) and hazardous air pollutants (HAP). HAPs are chemicals known to cause cancer and other serious health impacts.

The primary GHGs produced by fossil-fuel combustion are $CO_2$, methane ($CH_4$), and nitrous oxide ($N_2O$). The status of GHGs as a pollutant is not related to toxicity. GHGs are non-toxic and non-hazardous at normal ambient concentrations. GHG emissions due to human activity are the primary cause of increased levels of atmospheric GHG since the industrial age. The leading climate change scientists believe that these elevated levels of GHGs are the primary cause of warming of the global climate system. These existing and future global emissions of GHGs, unless significantly curtailed, have the potential to cause further warming and changes to the local, regional and global climate systems.

Emissions of GHGs are typically expressed in terms of $CO_2$ equivalents ($CO_2e$). The GHG $CO_2e$ unit of measure takes into account the global warming potential (GWP) of each GHG. The GWP is a ratio relative to $CO_2$ that is based on the particular GHG's ability to absorb solar radiation as well its residence time within the atmosphere. Based on this definition, $CO_2$ has a GWP of 1, $CH_4$ has a GWP of 25, and $N_2O$ has a GWP of 298. To obtain the $CO_2e$ quantity, the mass of the particular GHG compound is multiplied by the corresponding GWP, the product of which is the $CO_2e$ for that compound. The $CO_2e$ value for each of the GHG compounds is summed to obtain the total $CO_2e$ GHG emissions.

Other pollutants, not produced by combustion, are fugitive dust and fugitive emissions. Fugitive dust is a mix of $PM_{2.5}$, $PM_{10}$, and larger particles thrown up in to the atmosphere by moving vehicles, construction equipment, earth movement, and/or wind erosion. Fugitive emissions, in the context of this EIS, would be fugitive emissions of methane and/or VOCs from operational pipelines and aboveground facilities.

### 4.11.1.1    Regional Climate

The Project area climate   humid subtropical   is significantly influenced by its location in the Texas Coastal Zone (i.e., proximity to the Gulf of Mexico). In general, the Port Isabel area has very short, mild winters and long hot summers, although the sea breeze can help moderate peak temperatures. Climate data obtained from NOAA for the period 1981 to 2010 show an annual average temperature of 74 °F. Daily average high temperatures range from 68 °F during January to 91 °F during August. Daily average low temperatures range from 52 °F during January to 77 °F during July and August. The record minimum and maximum temperatures are 17 °F and 103 °F, respectively (NOAA, 2016a). The region experiences relatively high dew point values (about 75 °F in summer), resulting in higher relative humidity for the June through September period.

Monthly total rainfall tends to be highest (greater than 2 inches) during the early summer and autumn months. The annual average precipitation amounts to approximately 29 inches, with a monthly maximum of 6.3 inches in September (NOAA, 2016a). Much of this precipitation comes from thunderstorm activity, although the majority of days that receive precipitation

**JA241**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

experience light rain. Tropical storms or hurricanes, although uncommon, can also enhance summer and autumn rainfall in this region.

The overall predominant wind pattern for the year in the extreme southern Texas Coastal Zone is southeasterly winds, with northwesterly winds dominating at times in the cooler part of the year, particularly December. The annual average wind speed is approximately 10 miles per hour (mph), with the highest average monthly wind speeds occurring during spring (NOAA, 2016b). The prevailing southeast wind is further enhanced during spring and early summer by thermal winds which develop when the air over the heated land further west from the coast is warmer than the air over the relatively cooler waters of the Gulf of Mexico.

### 4.11.1.2    Existing Air Quality

**Ambient Air Quality Standards**

The EPA has established National Ambient Air Quality Standards (NAAQS) for six criteria pollutants: $SO_2$, CO, $O_3$, $NO_2$, particulate matter ($PM_{10}$ and $PM_{2.5}$), and lead. There are two classifications of NAAQS, primary and secondary standards. Primary standards set limits the EPA believes are necessary to protect human health, including sensitive populations such as children, the elderly, and asthmatics. Secondary standards are set to protect public welfare from detriments such as reduced visibility and damage to crops, vegetation, animals, and buildings.

Individual state air quality standards cannot be less stringent than the NAAQS. The federal NAAQS for criteria pollutants are the same as the state standards established by the TCEQ in accordance with 30 TAC Chapter 101.21. The TCEQ has also established 30-minute average property line standards for $SO_2$ and $H_2S$ in 30 TAC Chapter 112. The federal NAAQS and Texas-specific standards (referenced as net ground-level concentrations) are summarized in table 4.11.1-1.

| TABLE 4.11.1-1 | | | | |
|---|---|---|---|---|
| Ambient Air Quality Standards | | | | |
| Pollutant | Averaging Period | Primary NAAQS ($\mu$g/m$^3$) | Secondary NAAQS ($\mu$g/m$^3$) | Texas NGLC |
| $PM_{10}$ | 24 hr [a] | 150 | 150 | |
| $PM_{2.5}$ | Annual [b] | 12 | 15 | |
| | 24 hr [c] | 35 | 35 | |
| $NO_2$ | Annual [d] | 100 | 100 | |
| | 1 hr [e] | 188 (100 ppb) | N/A | |
| CO | 8 hr [f] | 10,000 | N/A | |
| | 1 hr [f] | 40,000 | N/A | |
| Ozone [g,h] | 8 hr [i] | 137 (0.070 ppm) | 137 (0.070 ppm) | |
| Lead [j] | Rolling 3 month average [d] | 0.15 | 0.15 | |
| $SO_2$ [k] | 3 hr [f] | N/A | 1,300 (0.5 ppm) | |
| | 1 hr [l] | 196 (75 ppb) | N/A | |
| | 30 min | | | 1,021 [m] |
| $H_2S$ | 30 min | | | 108/162 [n] |

**JA242**

| TABLE 4.11.1-1 | | | | |
| --- | --- | --- | --- | --- |
| **Ambient Air Quality Standards** | | | | |
| Pollutant | Averaging Period | Primary NAAQS (µg/m³) | Secondary NAAQS (µg/m³) | Texas NGLC |

| | |
| --- | --- |
| a | Not to be exceeded more than once pear year on average over three years. |
| b | 3 year average of annual mean PM$_{2.5}$ concentrations. |
| c | 98th percentile of the 24 hr concentrations, averaged over three years. |
| d | Not to be exceeded. |
| e | 98th percentile of the 1 hr daily maximum concentrations, averaged over three years. |
| f | Not to be exceeded more than once per year. |
| g | Although EPA revoked the 1 hr ozone standard (235 micrograms per cubic meter [µg/m³] or 0.12 ppm) in 2005 for all areas, some areas (excluding the Project area) have continuing obligations to adhere to the standard. |
| h | Final rule for the current 8 hr ozone standard became effective December 28, 2015.  Revocation of the previous (2008) ozone standards and transitioning to the current (2015) standards will be addressed in the implementation rule for the current standards. |
| i | Annual 4th highest daily maximum 8 hr concentration, averaged over three years. |
| j | In areas designated nonattainment for the lead standards prior to promulgation of the current (2008) standards, and for which implmentation plans to attain or maintain the current (2008) standards have not been submitted and approved, the previous standard (1.5 µg/m³ as a calendar quarter average) also remains in effect. |
| k | The revoked 24 hr and annual average SO$_2$ standards (365 µg/m³ and 80 µg/m³, respectively) remain in effect in any area: 1) where it is not yet one year since the effective date of designation under the current (2010) standards; and 2) for which an implementation plan providing for attainment of the current (2010) standards has not been submitted and approved and which is designated nonattainment under the previous SO$_2$ standards or is not meeting the requirements of a SIP call under the previous SO$_2$ standards (40 CFR §50.4(3)). |
| l | 99th percentile of the 1 hr daily maximum concentrations, averaged over three years. |
| m | Net ground level concentration (NGLC) not to be exceeded at the property boundary (30 TAC Chapter 112.3). |
| n | Net ground level concentration of 108 µg/m³ not to be exceeded on property normally occupied by people (30 TAC Chapter 112.31) and net ground level concentration of 162 µg/m³ not to be exceeded on property not normally occupied by people (30 TAC Chapter 112.32). |

**Air Quality Control Regions and Attainment Status**

AQCRs are areas established for air quality planning purposes in which SIPs describe how ambient air quality standards will be achieved and maintained.  AQCRs were established by the EPA and local agencies, in accordance with Section 107 of the CAA and its amendments, as a means to implement the CAA and comply with the NAAQS through SIPs.  The AQCRs are intrastate and interstate regions such as large metropolitan areas where the improvement of the air quality in one portion of the AQCR requires emission reductions throughout the AQCR.  The Project site is proposed in the Brownsville-Laredo Intrastate AQCR (No. 213).  Likewise, emissions from ship transit would impact the same AQCR.

An AQCR, or portion thereof, is designated based on compliance with the NAAQS. AQCR designations fall under three general categories as follows: attainment (areas in compliance with the NAAQS); nonattainment (areas not in compliance with the NAAQS); or unclassifiable. AQCRs that were previously designated nonattainment, but have since met the requirements to be classified as attainment are classified as maintenance areas.  The Brownsville-Laredo Intrastate AQCR is designated as unclassifiable and/or attainment for all criteria pollutants.

Transport of construction materials associated with the Project could occur within the Houston-Galveston-Brazoria (HGB) area, which is a "marginal" nonattainment area for the 2015 8-hour ozone standard.  Additionally, the HGB area is still classified as a "moderate" nonattainment area for the 2008 8-hour ozone standard and a "severe" nonattainment area for the 1997 8-hour ozone standard. Construction emissions from the Project occurring within the HGB area would not be expected to result in an exceedance of applicable general conformity thresholds.

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

## Air Quality Monitoring and Background Concentrations

Air quality monitors maintained by the TCEQ are located throughout the state to determine existing levels of various air pollutants. Air quality monitoring data for the period 2013-2015 were reviewed by Texas LNG to characterize ambient air quality for regulated criteria pollutants in the vicinity of the Project site. The assessment included the following pollutants: $O_3$, $CO$, $NO_2$, $PM_{2.5}$, $PM_{10}$, $SO_2$, and lead. Concentration data from representative monitors for the 2013-2015 period are summarized in table 4.11.1-2. The concentrations shown in this table are maximum or near maximum values (as defined by EPA — see table 4.11.1-2 footnotes) for the identified monitors, which are limited in number and location. As such, the concentrations are not necessarily representative of current actual air quality in the immediate vicinity of the Project site. For each pollutant, table 4.11.1-2 lists the available measured concentrations in terms of annual mean concentration values for each year and/or maximum short-term concentrations. As shown in the table, each of the measured pollutant concentrations is below the associated NAAQS for each applicable averaging period, thus indicating continued, on-going attainment of the standards.

**TABLE 4.11.1-2**

**Ambient Air Quality Concentrations in the Vicinity of the Texas LNG Project**

| Pollutant | Averaging Period | Concentration (µg/m³) by Year | | | Monitor Information | |
|---|---|---|---|---|---|---|
| | | **2015** | **2014** | **2013** | **Location** | **ID No.** |
| CO | 8 hour [a] | 1,144 | 801 | 915 | Cameron County | 480610006 |
| | 1 hour [a] | 2,173 | 1,258 | 1,716 | Cameron County | 480610006 |
| NO₂ | Annual [b] | 6 | 6 | 6 | Galveston County | 481671034 |
| | 1 hour [c] | 56 | 58 | 60 | Galveston County | 481671034 |
| O₃ | 8 hour [d] | 60 | 60 | 58 | Cameron County | 480610006 |
| PM₂.₅ | Annual [b] | 9 | 9 | 9 | Nueces County | 483550034 |
| | 24 hour [c] | 23 | 19 | 26 | Nueces County | 483550034 |
| PM₁₀ | 24 hour [a] | 51 | 62 | 55 | Nueces County | 483550034 |
| SO₂ | 24 hour [a] | 3 | 5 | 5 | Nueces County | 483550032 |
| | 1 hour [e] | 11 | 11 | 11 | Nueces County | 483550032 |
| Lead | 3 month [f] | 0.006 | 0.038 | 0.008 | Cameron County | 480610006 |

[a]   2nd highest measurement recorded for each year
[b]   Annual average measurement recorded for each year
[c]   98th percentile measurement recorded for each year
[d]   4th highest 8 hour average measurement recorded for each year
[e]   99th percentile measurement recorded for each year
[f]   Maximum 3 month measurement recorded for each year

Notes:
µg/m³ = micrograms per cubic meter
Except for lead, concentration values have been rounded to the nearest whole µg/m³

**JA244**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

### 4.11.1.3    Regulatory Requirements for Air Quality

The Project would be potentially subject to a variety of federal and state regulations pertaining to the construction and operation of air emission sources.  The TCEQ has the primary jurisdiction over air emissions produced by stationary sources associated with the Project.  The TCEQ is delegated by the EPA to implement federal air quality programs.  The TCEQ's air quality regulations are codified in 30 TAC Chapters 101, 106, 111-118, and 122.  New facilities, such as those associated with the Project, are required to obtain an air quality permit before initiating construction.

The following sections summarize the applicability of various state and federal regulations.

**Federal Air Quality Requirements**

The CAA, 42 USC 7401 et seq., as amended in 1977 and 1990, and 40 CFR Parts 50 through 99 are the basic federal statutes and regulations governing air pollution in the U.S.  The following federal requirements have been reviewed for applicability to the Project.

- New Source Review (NSR) / PSD;
- Title V Operating Permits;
- NSPS;
- NESHAP;
- GHG Reporting;
- Chemical Accident Prevention Provisions; and
- General Conformity.

<u>New Source Review/Prevention of Significant Deterioration</u>

Separate preconstruction review procedures for major new sources of air pollution (and major modifications of major sources) have been established for projects that are proposed to be built in attainment areas versus nonattainment areas.  The preconstruction permit program for new or modified major sources in attainment areas is known as the PSD program.  This review process is intended to keep new air emission sources from causing existing air quality to deteriorate beyond acceptable levels codified in the federal regulations.  Construction of major new stationary sources in nonattainment areas must be reviewed in accordance with the nonattainment NSR regulations, which contain stricter thresholds and requirements.  Because all of the stationary emission sources at the Project facilities are proposed within an attainment area for all criteria pollutants, nonattainment NSR does not apply.  Rather, each facility must be reviewed to determine applicability with the PSD program.  The nearest PSD Class I area   Big Bend National Park   is located more than 370 miles from the Project site, and the nearby Laguna Atascosa National Wildlife Refuge and Las Palomas Wildlife Management Area are not PSD Class I areas.

**JA245**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

The PSD rule defines a major stationary source as any source with a potential to emit (PTE) 100 tons per year (tpy) or more of any criteria pollutant for source categories listed in 40 CFR §52.21(b)(1)(i) or 250 tpy or more of any criteria pollutant for source categories that are not listed. In addition, with respect to GHG, the major source threshold for $CO_2e$ is 100,000 tpy; however, the $CO_2e$ threshold is only applicable if the major source threshold for another criteria pollutant is exceeded. If a new source is determined to be a major source for any PSD pollutant, then other remaining criteria pollutants would be subject to PSD review if those pollutants are emitted at rates that exceed significant emission thresholds (100 tpy for CO; 40 tpy for $NO_x$, VOC, and $SO_2$ each; 25 tpy for total suspended particulate, 15 tpy for $PM_{10}$, and 10 tpy for directly-emitted $PM_{2.5}$ and 75,000 tpy for $CO_2e$, where the GHG emission rate is greater than 0). Stationary sources with emissions that exceed the major source threshold are then subject to a PSD review.

Table 4.11.1-3 shows the estimated annual emission rate for each PSD-regulated pollutant for the Project. As shown in this table, only emissions of $CO_2e$ would be greater than the significant emission threshold. Therefore, the Project is not subject to PSD review per 40 CFR section 52.21 and 30 TAC Chapter 116.160, and there is no requirement for the Project to obtain a GHG PSD permit. The June 23, 2014 United States Supreme Court decision addressing the application of stationary source permitting requirements to GHG (Utility Air Regulatory Group v. Environmental Protection Agency, No. 12-1146) fundamentally changed GHG permitting requirements, regardless of whether permits are issued by EPA or the states. In summary, 1) where new sources emit GHG as the only pollutant with the potential to be emitted above the major source threshold, and 2) where existing major source modifications emit GHG as the only pollutant for which there is a significant emissions increase (and a significant net emissions increase), projects no longer require PSD or Title V permits.

| TABLE 4.11.1-3 |
| :--- |
| Major Stationary Source/Prevention of Significant Deterioration (PSD) Applicability Analysis for the Project |

| Pollutant [a] | Proposed Project Emissions (tpy) | Major Stationary Source Threshold Level (tpy) | PSD Review Triggered? |
| :--- | :---: | :---: | :---: |
| $PM_{10}$ | 6.3 | 250 | No |
| $PM_{2.5}$ | 6.3 | 250 | No |
| $NO_x$ | 96.2 | 250 | No |
| $SO_2$ | 76.8 | 250 | No |
| CO | 216.5 | 250 | No |
| VOC | 15.2 | 250 | No |
| $CO_2e$ | 604,087 | 100,000 | No [b] |

[a]  Projected emissions of other NSR/PSD regulated pollutants are small to negligible.
[b]  $CO_2e$ threshold is only applicable if the major source threshold for another criteria pollutant is exceeded.

Title V Operating Permit

Title V of the CAA requires states to establish an air quality operating permit program. The requirements of Title V are outlined in the federal regulations in 40 CFR 70 and in 30 TAC Chapter 122. The operating permits required by these regulations are often referred to as Title V or Part 70 permits.

JA246

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

Major sources (i.e., sources with a PTE greater than a major source threshold level) are required to obtain a Title V operating permit. Title V major source threshold levels are 100 tpy for CO, $SO_2$, $PM_{10}$, or $PM_{2.5}$, 10 tpy for an individual hazardous air pollutant (HAP), or 25 tpy for any combination of HAPs. The Title V GHG Tailoring Rule also requires facilities that have the PTE GHGs at a threshold level of 100,000 tpy $CO_2e$ be subject to Title V permitting requirements.

The Project would be subject to the Title V program because criteria pollutant emissions exceed the major source threshold for at least one pollutant (e.g., CO). Therefore, Texas LNG would need to apply for a Title V operating permit for the Project before beginning Project operation, per 30 TAC Chapter 122.130.

New Source Performance Standards

NSPS regulations (40 CFR 60) establish pollutant emission limits and monitoring, reporting, and recordkeeping requirements for various emission sources based on source type and size. These regulations apply to new, modified, or reconstructed sources. The following NSPS requirements were identified as potentially applicable to the specified Project sources.

Subpart A of 40 CFR 60, *General Provisions*, includes broader definitions of applicability and various methods for maintaining compliance with requirements listed in subsequent subparts of 40 CFR 60. This subpart also specifies the state agencies to which the EPA has delegated authority to implement and enforce standards of performance. The TCEQ has been delegated authority for all 40 CFR 60 standards promulgated by the EPA. Equipment at the Project facilities that would be subject to any of the NSPS subparts listed below would be subject to Subpart A.

Subpart Dc of 40 CFR 60, *Standards of Performance for Small Industrial-Commercial-Institutional Steam Generating Units*, applies to the two heat transfer fluid (HTF) heaters for the Project, each of which has a heat input rating of 79.5 million British Thermal Units per hour (MMBtu/hr). NSPS Subpart Dc applies to each steam generating unit that has a maximum heat input capacity of 100 MMBtu/hr or less, but greater than or equal to 10 MMBtu/hr. The two gas-fired HTF heaters would be subject to the recordkeeping and reporting requirements of NSPS Subpart Dc as defined in sections 60.48c(g)(1)-(3), i and 60.48c(a), (j).

Subpart Kb of 40 CFR 60, *Standards of Performance for Volatile Organic Liquid Storage Vessels,* applies to storage vessels containing volatile organic liquids. Regulatory applicability is dependent on the construction date, size, vapor pressure, and contents of the storage vessel. Subpart Kb applies to new tanks, unless otherwise exempted, that have a storage capacity between $75 \, m^3$ (19,813 gallons) and $151 \, m^3$ (39,890 gallons) and contain VOCs with a maximum true vapor pressure greater than or equal to 15.0 kilopascals (kPa). Subpart Kb also applies to tanks that have a storage capacity greater than or equal to $151 \, m^3$ and contain VOCs with a maximum true vapor pressure greater than or equal to 3.5 kPa. Pressure tanks are exempt from the requirements of Subpart Kb.

The LNG storage tanks would operate at approximately -260°F, and the true vapor pressure of the VOC (assumed to be propane) at this temperature is 0.0007 kPa. This would be well below the applicability threshold of 3.5 kPa; therefore, Subpart Kb would not apply to the LNG storage tanks.

**JA247**

The storage tanks for refrigerants   propane and ethylene   at the proposed facility are exempt from Subpart Kb because both tanks qualify as pressure vessels designed to operate in excess of 204.9 kPa and without emissions to the atmosphere.

There are two condensate storage tanks at the proposed LNG terminal that each has a capacity greater than 151 m$^3$ and store VOCs with a maximum true vapor pressure of about 15 kPa. Because these tanks do not meet the exemptions outlined in 40 CFR 60.110b(b) and (d), they are subject to Subpart Kb, and must comply with the VOC standards in 40 CFR 60.112b(a).

Project design also includes one used solvent storage tank, one HTF storage tank, one diesel storage tank, and one process water collection tank, all with fixed roofs.  The used solvent storage tank, diesel storage tank, and HTF storage tank are not subject to Subpart Kb because each would contain liquids with vapor pressures less than 3.5 kPa.  The process water collection tank, with a capacity of less than 75 m$^3$, is not subject to Subpart Kb.

Subpart OOOOa of 40 CFR 60, *Standards of Performance for Crude Oil and Natural Gas Facilities for which Construction, Modification or Reconstruction Commenced After September 18, 2015*, applies to emissions of GHG (methane) and VOC from affected facilities listed in section 60.5365a(a) through (i).  Examples of rule-identified facilities typically associated with natural gas facilities (including LNG storage/export operations) include centrifugal and reciprocating compressors, pneumatic controllers and pumps, and storage vessels.  This includes equipment used for LNG storage and LNG export and import operations.  The Project facility would operate reciprocating and centrifugal compressors, pneumatic controllers and pumps, and storage vessels. The centrifugal compressors are anticipated to be the dry seal-type; therefore, these units would not be subject to the Subpart OOOOa requirements (which apply only to wet seal-type centrifugal compressors).  The storage vessels are projected to have VOC emissions less than the Subpart OOOOa applicability threshold of 6 tpy; therefore, these vessels are not subject to the Subpart OOOOa requirements.  Monitoring for, and if necessary, repair of equipment leaks would be required.

Subpart IIII of 40 CFR 60, *Standards of Performance for Stationary Compression Ignition Internal Combustion Engines,* applies to Project diesel-fueled stationary compression ignition internal combustion engines of any size.  The rule requires manufacturers of these engines to meet emission standards based on engine size, model year, and end use.  The rule also requires owners and operators to configure, operate, and maintain the engines according to specifications and instructions provided by the engine manufacturer.  These requirements of Subpart IIII would apply to the eight (five 540-hp and three 810-hp) diesel-fired fire water pump engines and the five (three 2,682-hp, one 2,012-hp, and one 805-hp) diesel-fired standby emergency generators proposed for the Project.  The recordkeeping and reporting requirements would also apply.

National Emissions Standards for Hazardous Air Pollutants

The NESHAP codified in 40 CFR 61 and 63, regulate HAP emissions.  Part 61 was promulgated prior to the 1990 Clean Air Act Amendments (CAAA) and regulates specific HAPs, such as asbestos, benzene, beryllium, inorganic arsenic, mercury, radionuclides, and vinyl chloride.

**JA248**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

The 1990 CAAA established a list of 189 HAPs, while directing EPA to publish categories of major sources and area sources of these HAPs, for which emission standards were to be promulgated according to a schedule outlined in the CAAA. These standards, also known as the Maximum Achievable Control Technology standards, were promulgated under Part 63. The 1990 CAAA defines a major source of HAPs as any source that has a PTE of 10 tpy for any single HAP or 25 tpy for all HAPs in aggregate. Area sources are stationary sources that do not exceed the thresholds for major source designation. Federal NESHAP requirements are incorporated by reference in 30 TAC Chapters 113.55 and 113.00.

The annual PTE HAP emissions from the LNG terminal would be approximately 2.6 tpy in aggregate (see section 4.11.1.5), which is below the major source threshold; therefore, the Project would be classified as an area source of HAPs. The NESHAP described in the following paragraphs have been identified as being potentially applicable to specific emission units at an area source.

Subpart A of 40 CFR 63, *General Provisions*, includes broader definitions of applicability and various methods for maintaining compliance with requirements listed in subsequent subparts of 40 CFR 63. This subpart also specifies the state agencies to which the EPA has delegated authority to implement and enforce NESHAP. The specific NESHAPs that are applicable to the Project equipment have been delegated to the TCEQ.

Subpart ZZZZ of 40 CFR 63, *NESHAP for Stationary Reciprocating Internal Combustion Engines*, applies to reciprocating internal combustion engines of all sizes at major and area sources of HAPs. The Project emergency generators and fire water pump engines are considered new emergency reciprocating internal combustion engines at an area source and would be required to comply with the requirements of 40 CFR 60 Subpart JJJJ. These engines satisfy the requirements of Subpart ZZZZ by meeting the requirements of 40 CFR 60, Subpart JJJJ, per 40 CFR section 63.6590(c)(1).

Greenhouse Gas Reporting Rule

Subpart W under 40 CFR 98, the Mandatory GHG Reporting Rule, requires petroleum and natural gas systems that emit 25,000 metric tons or more of $CO_2e$ per year to report annual emissions of GHG to the EPA. "LNG storage" and "LNG import and export equipment" are industry segments specially included in the source category definition of petroleum and natural gas systems. Equipment subject to reporting includes storage of LNG, liquefaction of natural gas, and regasification of LNG.

Emissions of GHGs associated with the construction and operation of the Project were calculated. In addition, GHG emissions were converted to total $CO_2e$ emissions based on the GWP of each pollutant. The reporting rule does not apply to construction emissions; however, the construction emissions have been included for accounting and disclosure purposes. GHG emissions from operation of the Project are anticipated to exceed the 25,000-metric ton threshold and therefore would be subject to the reporting rule. If actual GHG emissions from the Project operation are equal to or greater than the reporting threshold, Texas LNG would need to comply with all applicable requirements of 40 CFR 98.

JA249

Chemical Accident Prevention Provisions

The chemical accident prevention provisions, codified in 40 CFR 68, are federal regulations designed to prevent the release of hazardous materials in the event of an accident and minimize potential impacts if a release does occur. The regulations contain a list of substances (including methane, propane, and ethylene) and threshold quantities for determining applicability to stationary sources. If a stationary source stores, handles, or processes one or more substances on this list in a quantity equal to or greater than specified in the regulation, the facility must prepare and submit a Risk Management Plan (RMP). An RMP is not required to be submitted to the EPA until the chemicals are stored onsite at the facility.

Stationary sources are defined in 40 CFR 68 as any buildings, structures, equipment, installations, or substance-emitting stationary activities which belong to the same industrial group, that are on one or more contiguous properties, are under control of the same person (or persons under common control), and are from which an accidental release may occur. The Project facilities would store significant quantities of methane (as LNG), propane, and ethylene onsite, which are regulated under 40 CFR 68. However, the definition also states that the term stationary source does not apply to transportation, including storage incidental to transportation, of any regulated substance or any other extremely hazardous substance. The term transportation includes transportation subject to oversight or regulation under 49 CFR 192, 193, or 195. Based on these definitions, the Project facilities are subject to 49 CFR 193 and would not be required to prepare an RMP.

General Conformity

A general conformity analysis must be conducted by the lead federal agency if a federal action would result in the generation of emissions that would exceed the general conformity applicability threshold levels of the pollutants(s) for which an AQCR is in nonattainment. According to Section 176(c)(1) of the CAA (40 CFR §51.853), a federal agency cannot approve or support any activity that does not conform to an approved SIP. Conforming activities or actions should not, through additional air pollutant emissions:

- cause or contribute to new violations of the NAAQS in any area;

- increase the frequency or severity of an existing violation of any NAAQS; or

- delay timely attainment of any NAAQS or interim emission reductions.

General Conformity assessments must be completed when the total direct and indirect emissions of a planned project would equal or exceed the specified pollutant applicability emission thresholds per year in each nonattainment area.

As discussed previously in section 4.11.1.2 of this EIS, the Project facilities are proposed in an area currently designated by the EPA as in attainment of all NAAQS or unclassifiable for all criteria pollutants. Operating emissions for these facilities would be entirely within designated unclassifiable/attainment areas for all criteria air pollutants and would be subject to evaluation under the NSR permitting program; therefore, these emissions are not subject to General

**JA250**

Conformity regulations. However, during the construction phase of the Project, barges carrying equipment and materials would travel periodically from the Port of Houston to the Project construction dock via the Gulf Intracoastal Waterway (GIWW). The Port of Houston is in the HGB "moderate" ozone nonattainment area (2008 8-hour NAAQS); therefore, each barge would spend part of its trip within the HGB ozone nonattainment area. The construction barge traffic emissions associated with travel in the HGB ozone nonattainment area would be subject to evaluation under General Conformity regulations.

The relevant general conformity pollutant thresholds for the HGB ozone nonattainment area are 25 tpy of $NO_x$ and VOC (ozone precursors) for the portion of the Project construction-related barge/tug emissions would be in that nonattainment area (which is still classified as "severe" for the 1997 8-hour ozone standard).

Texas LNG estimated emissions from tug vessels that push the barges using EPA Tier 1 engine emissions standards (under 40 CFR 89.112[a]), supplemented with emission factors from United States Department of the Interior- and EPA-sponsored marine vessel emissions studies. The emissions were apportioned between the HGB ozone nonattainment area and the adjacent unclassifiable/attainment areas based on the emissions generated during the time spent traveling through each of these areas. Texas LNG estimated that the total potential direct and indirect emissions of $NO_x$ and VOC from the Project construction-related activity (i.e., construction barge/tug travel in HGB ozone nonattainment area) would be less than 25 tpy for each year of the construction period. Based on these emissions, a General Conformity Determination is not required for the Project.

**Applicable State Air Quality Requirements**

In addition to the federal regulations identified above, the TCEQ has its own air quality regulations, codified in 30 TAC. The state requirements potentially applicable to the Project are discussed below.

- 30 TAC Chapter 101, Subchapter A   *General Rules*.

- 30 TAC Chapter 111   *Control of Air Pollution from Visible Emissions and Particulate Matter*.

- 30 TAC Chapter 112   *Control of Air Pollution from Sulfur Compounds*.

- 30 TAC Chapter 113   *Control of Air Pollution from Toxic Materials*. Chapter 113 incorporates by reference the NESHAP source categories (40 CFR 63).

- 30 TAC Chapter 114   *Control of Air Pollution from Motor Vehicles*.

- 30 TAC Chapter 116, Subchapter B   *Control of Air Pollution by Permits for New Construction or Modification*.

- 30 TAC Chapter 118   *Control of Air Pollution Episodes*.

- 30 TAC Chapter 122   *Federal Operating Permits*.

**JA251**

Document Accession #: 20190315-3053        Filed Date: 03/15/2019

### 4.11.1.4        Construction Emissions and Impacts and Mitigation

**Construction Emissions and Impacts**

Construction of the Project facilities would result in short-term increases in emissions of some air pollutants due to the use of equipment powered by diesel fuel or gasoline and the generation of fugitive dust due to the disturbance of soil and other dust-generating activities. More specifically, the construction activities that would generate air emissions include:

- site preparation (vegetation clearing, trenching, land contouring, foundation preparation, etc.);

- construction/installation of Project facilities;

- emissions from the concrete batch plant;

- operation of off-road construction equipment and trucks during construction;

- operation of marine vessels (e.g., equipment barges/tugs) during construction;

- offshore dredging; and

- workers' vehicles used for commuting to and from the construction site and delivery trucks (i.e., on-road vehicles).

The total period of construction for the Project facilities under Phases 1 and 2 are estimated by Texas LNG to be about 44 and 43 months, respectively, including pre-commissioning and commissioning activities. These two phases could overlap; for estimating potential workforce needs, Texas LNG examined one Project development scenario where Phase 2 construction begins 18 months after Phase 1 construction starts. Under this scenario, approximately 1,312 on-site workers would be required during the peak construction period. In general, overlap of the construction schedules for Phases 1 and 2 would tend to result in periods of higher emissions at the Project site compared to that associated with non-overlapping schedules.

Emission increases associated with the Project construction activities would have short-term, localized impacts on air quality. These emissions are not subject to the air quality permitting requirements that apply to emissions from operation of stationary sources at the Project site. It should be noted that there are no residential or sensitive populations within 1.5 miles of the Project site. Nevertheless, the construction-related emission rates are discussed in this section as a means of identifying potential air quality concerns associated with the construction phase of the Project and to assist in developing mitigation.

The amount of fugitive dust generated in an area under construction would depend on numerous factors including:

- nature and intensity of the construction activity;

- speed, weight, and volume of vehicular traffic;

**JA252**

- size of area disturbed;

- amount of exposed soil and soil properties (silt and moisture content); and

- wind speed.

Fugitive dust would be produced primarily during the site preparation activities, when the site would be cleared of debris, leveled, and graded. In addition, approximately 1.2 million cubic yards of fill would need to be imported to the site, with up to one-third of that total coming from the dredging of the maneuvering basin. Existing paved roads (SH 48) would be used to access the Project site.

Site preparation activities for the Project site would include land clearing, grading, filling, placement of aggregate materials (e.g., for lay-down areas and access roads within the Project site boundaries), and prescribed burning of vegetation. Site preparation activities would generate fugitive dust from earthmoving and movement of construction equipment over unpaved surfaces and tailpipe emissions from construction equipment and vehicle engines. Site preparation equipment would include bulldozers, payloaders, excavators, rollers, graders, dump trucks, and other mobile construction equipment. On-road truck traffic (e.g., supply trucks) and worker commuter vehicles at the Project site also would generate fugitive dust from travel on paved and unpaved surfaces. Texas LNG intends on conducting periodic watering of unpaved roads within the site to reduce the generation of fugitive dust.

The construction of access roads at the Project site would generally follow the anticipated layout of the permanent plant roads, and would be covered with asphalt, oyster shell, or gravel, depending on the anticipated traffic loads.

The construction equipment and trucks/vehicles would be powered by internal combustion engines that would generate $PM_{10}$, $PM_{2.5}$, $SO_2$, $NO_x$, VOC, and CO emissions. These emissions would be generated by a variety of diesel-fueled (primarily) equipment, including off-road sources (e.g., bulldozers, cranes, payloaders, pile drivers), on-road sources (e.g., construction worker vehicles, miscellaneous trucks), and marine vessels (e.g., barges/tugs). Most of the on-road vehicles would likely burn gasoline, although supply trucks and some worker pickup trucks would burn ultra-low-sulfur diesel fuel.

The construction of the LNG terminal would include installation of two liquefaction trains, two 210,000-$m^3$ LNG storage tanks, LNG carrier berth and LNG transfer lines, major mechanical equipment, and piping and instrumentation, as well as construction of foundations, pipe racks, miscellaneous storage tanks, and buildings. Construction activities also would include the removal of the existing 4.5-inch diameter abandoned natural gas gathering line parallel and immediately adjacent to the edge of the Brownsville Ship Channel (see section 2.5.4.2). The Project construction equipment would include cranes, forklifts, pile drivers, manlifts, cement pump trucks, air compressors, and generators (for various duties, such as pumping, lighting, etc.), which would result in fuel combustion emissions and, for mobile equipment, fugitive dust emissions.

Construction materials would be delivered to the site by barge. Texas LNG estimates that it would need 109 marine deliveries for the two Project phases, with the peak being approximately

**JA253**

three deliveries per day. Barge/tug operations would result in fuel combustion emissions from diesel-fired engines.

Construction of Project facilities would require large quantities of concrete. To meet those needs, a temporary concrete batch plant is planned at the Project site. Operation of the concrete batch plant would result in fuel combustion emissions from diesel-fired engines and fugitive dust emissions from material handling operations.

Project construction would also include off-shore dredging of the LNG carrier berthing area. The emissions generated by these activities would be predominantly fuel combustion emissions from diesel-fired engines associated with a hydraulic cutterhead dredge, excavator, tugboats, and survey/workboats.

Texas LNG developed an inventory of off-road equipment and vehicles, on-road vehicles, and expected activity levels (either hours of operation or miles travelled) based on the expected duration of construction at the site for the purposes of calculating emissions. The level of activity for each piece of construction equipment was combined with the relevant EPA emission factors (e.g., MOVES2014) to quantify annual emission estimates. Texas LNG would minimize vehicle emissions through compliance with 30 TAC Chapter 114 Control of Air Pollution from Motor Vehicles and the use of ultra-low-sulfur diesel. Fuel combustion emissions from barges/tugs were calculated using engine sizes, activity levels, and emission factors based on 1) EPA engine standards for $NO_x$, CO, VOC, and PM (for $PM_{10}$ and $PM_{2.5}$); and 2) federally-sponsored marine vessel emission inventory studies for $SO_2$ and $CO_2e$. Fugitive dust emission estimates associated with land clearing activities for the Project were based on an estimate of total disturbed acreage and the use of EPA's *Compilation of Air Pollutant Emission Factors* (AP-42) emission factors with a control factor for application of dust suppressant (i.e., watering).

The total criteria air pollutant and GHG (as $CO_2e$) emissions associated with construction-related activities for the Project are summarized in table 4.11.1-4. These totals include fuel combustion emissions as well as fugitive dust (i.e., particulate) emissions. The total $PM_{10}$ and $PM_{2.5}$ emissions shown in table 4.11.1-4 are mainly the result of fugitive dust-generating activities, with most of the fugitive dust emissions associated with land clearing/grading activities. Note that the estimated annual construction emissions are based on the latest available information on Project schedule; the timing and magnitude of annual emissions could vary based on when construction activities actually occur, which is dependent on business-related and other (e.g., regulatory) factors.

| TABLE 4.11.1-4 | | | | | | | |
|----------------|---|---|---|---|---|---|---|
| Annual Project Construction Emissions (tpy) [a] | | | | | | | |
| | Pollutant | | | | | | |
| Year | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | $CO_2e$ [b] |
| 2020 [c] | 180.7 | 29.2 | 63.4 | 36.5 | 4.3 | 4.1 | 8,879.6 |
| 2021 [d] | 812.9 | 131.0 | 284.9 | 164.4 | 19.2 | 18.4 | 39,939.6 |
| 2022 [d] | 1,135.3 | 183.0 | 397.9 | 229.6 | 26.8 | 25.7 | 55,782.8 |
| 2023 [d] | 694.4 | 111.9 | 243.3 | 140.4 | 16.4 | 15.7 | 34,118.2 |

JA254

| | TABLE 4.11.1-4 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Annual Project Construction Emissions (tpy) [a] | | | | | | |
| | Pollutant | | | | | | |
| Year | PM$_{10}$ | PM$_{2.5}$ | NO$_x$ | CO | SO$_2$ | VOC | CO$_2$e [b] |
| 2024 [e] | 91.1 | 14.7 | 31.9 | 18.4 | 2.2 | 2.1 | 4,476.6 |
| Total Emissions (tons per construction duration) | 2,914.4 | 469.8 | 1,021.4 | 589.3 | 68.9 | 65.9 | 143,196.8 |

[a]  Although construction emissions were projected by Texas LNG for 2019, it was assumed that emission generating construction activities would not actually begin until 2020
[b]  Metric tons
[c]  Phase 1 construction activity only
[d]  Phase 1 and Phase 2 construction activity
[e]  Phase 2 construction activity only

Emissions over the construction period would increase pollutant concentrations in the vicinity of the Project; however, the effect on ambient air quality would vary with time due to the construction schedule and extent of overlap of Project Phases 1 and 2, the mobility of the sources, and the variety of emission sources.  There may be localized minor to moderate elevated levels of fugitive dust and tailpipe emissions in the vicinity of construction areas during periods of peak construction activity.   In addition, there would be overlap of emissions from Phase 1 commissioning and operation and Phase 2 construction activities.  Following construction of Phase 2, air quality would not revert back to previous conditions, but would transition to operational-phase emissions after commissioning and initial start-up of Phase 2.  The potential impact of the overlap of emissions from construction, commissioning, and/or operations for the two Project phases are discussed in section 4.11.1.5.

**Mitigation Measures**

As discussed previously, fugitive dust accounts for the majority of PM emissions during the construction period for the Project.  Therefore, fugitive dust controls would play an important role in reducing potential effects on air quality in the Project area.  Project construction activities would be subject to 30 TAC Chapter 111.145, which requires the use of water or suitable oil or chemical for control of dust during construction activities or land-clearing operations.

In addition to the regulation-based precautions, Texas LNG developed a Fugitive Dust Control Plan (FDCP), committing to additional measures to reduce fugitive dust emissions.[38] Measures outlined in the FDCP include the following:

- use of a dedicated water truck to apply water (or water mixed with additives, as needed) to heavily used unpaved areas, as needed;

- ensure that dump trucks and other open-bodied trucks hauling soil or other dusty materials to or from the Project site are covered, as needed;

---

[38]   Texas LNG's Fugitive Dust Control Plan is publicly available on eLibrary under accession number 20160331-5064.

- use of signage to direct construction vehicle traffic to designated (paved or gravel) roads when practicable;

- enforcement of a 15-mph speed limit on unsurfaced roads;

- use of gravel at the construction entrance and exit locations of all access roads that are unpaved;

- for discrete activities (e.g., abrasive blasting), ensure that contractors enclose the work area, or for areas that cannot be enclosed, utilize wet-sandblasting methods; and

- use of a skid-steer or similar piece of equipment or a street sweeper to clean paved roads of deposited soil from track-out by trucks and other construction equipment.

Texas LNG would minimize vehicular exhaust and crankcase emissions from gasoline- and diesel-fired engines by complying with applicable EPA mobile source emission performance standards and by using equipment manufactured to meet these standards. Additionally, Texas LNG would implement the following work practices:

- maintain construction equipment in accordance with manufacturers' recommendations. Maintenance and tuning of all construction-related equipment would be conducted in accordance with the original equipment manufacturers' recommendations;

- minimize engine idling to the extent practicable. Texas LNG would instruct Project construction personnel to minimize the idle time of equipment to 5 minutes or less when not in active use. Texas LNG's expectations concerning minimizing on-site idling would be communicated to construction personnel during safety/environmental training sessions and enforced by construction supervisors and inspectors. Also, consistent with industry practice, unmanned equipment would be turned off and would not be left idling;

- take measures to prevent tampering with construction equipment;

- conduct unscheduled inspections to ensure that the outlined mitigation measures are followed; and

- reduce roadway traffic congestion (and the resulting increase in emissions) through implementation of the measures described in Texas LNG's *Traffic Management Plan*, to be submitted to the TXDOT and local authorities for review and comment.

Based on the projected level of construction activity, there may be localized minor to moderate elevated levels of fugitive dust and tailpipe emissions near construction areas during the 60-month construction period associated with the LNG Terminal site.

The construction emissions' impact on ambient air quality would vary with time due to the construction schedule, the mobility of the sources, and the variety of emission sources. Fugitive

**JA256**

dust and other emissions due to construction activities generally do not pose a significant increase in regional pollutant levels; however, local pollutant levels would increase at times during the construction period. Considering these factors, we determine that construction of the Project would have a minor to moderate impact on local air quality. However, construction emissions would not have a long-term, permanent effect on air quality in the area.

### 4.11.1.5     Operation Emissions and Impacts and Mitigation

**Operating Air Emissions**

Operation of the Project facilities would result in air emissions from stationary equipment (e.g., heaters, flares, oxidizers, and emergency generators) and mobile sources (e.g., LNG carriers and tugs). Operational-phase emissions from a variety of sources/equipment would be permanent. These various sources and associated criteria pollutant, GHG, and HAP emission rates are discussed in detail in the following sections.

The Project, under Phases 1 and 2, would operate up to two natural gas liquefaction trains. Stationary and mobile sources of air emissions associated with operation of the Project include:

- 13 diesel-fired engines for emergency use (five standby emergency generators and eight fire water pump engines);

- two gas-fired HTF heaters;

- five flares (for control of vented organic compound emissions);

- two thermal oxidizers (for control of acid gas emissions);

- miscellaneous storage tanks (e.g., condensate, HTF, used solvent, diesel fuel);

- fugitive VOC and GHG emissions sources (e.g., loading operations, leaks from equipment such as valves, flanges, and connectors);

- equipment maintenance, start-up, and shutdown (MSS) activities;

- maneuvering and hoteling LNG carriers; and

- truck traffic.

Emissions of $NO_x$, VOC, CO, $PM_{10}$, $PM_{2.5}$, and $SO_2$ would be generated primarily by the fuel combustion sources. The flares are used only for start-up, shutdown, routine maintenance, and non-routine venting of emissions due to excess pressure. Texas LNG plans to continuously operate the liquefaction facility, thus limiting start-up/shutdown events to those associated with periodic routine maintenance or the need to shut down due to equipment malfunction.

Once constructed, the LNG terminal would undergo a pre-commissioning and commissioning process before it could be fully operational. This initial start-up process, which is projected by Texas LNG to last approximately three months (approximately two months for the

**JA257**

pre-commissioning activities and one month for the commissioning activities), would result in increased air emissions. Table 4.11.1-5 summarizes the estimated criteria pollutants, GHGs, and HAP emissions for the initial startup activities.

| | | | | | | | | HAPs | |
|---|---|---|---|---|---|---|---|---|---|
| Emission Source | NO$_x$ | VOC | CO | SO$_2$ | PM$_{10}$ [b] | PM$_{2.5}$ [b] | CO$_2$e [a,c] | Total HAPs [d] | Single HAP [e] |
| Pre Commissioning and Commissioning Activities | 61.5 | 3.8 | 122.8 | 0.29 | 0 | 0 | 56,398 | 0.31 | 0.18 |

**TABLE 4.11.1-5**
**Annual Emissions Associated with Initial Start-Up of the Project Terminal**
**Annual Emissions (tpy)**

[a]     CO$_2$e emissions based on GWPs of 1 for CO$_2$, 25 for CH$_4$, and 298 for N$_2$O
[b]     Assumed to be zero or negligible based on EPA's AP 42 emission factor for non smoking flares of 0 µg/l in exhaust
[c]     CO$_2$ emissions account for approximately 92 percent of the total CO2e emissions
[d]     Flares emissions
[e]     Highest individual HAP emission rate for flares is for hexane

After completing the pre-commissioning and commissioning process, the terminal will start commercial operations. Table 4.11.1-6 provides a summary of the estimated annual criteria air pollutant, GHG (as CO2e), and HAP emission rates for sources, including marine vessels, associated with routine operation of the Project. The annual emissions are based on continuous operation of the liquefaction trains (8,760 hours per year), except for emergency generators, which are based on maximum allowed annual operation of 100 hours, and fire water pump engines, which are based on annual operation of 52 hours. As discussed earlier, the Project is not a major source under the PSD program and not a major source of HAPs (based on on-shore stationary source emissions).

**TABLE 4.11.1-6**
**Annual Emissions (tpy) Associated with Operation of the Project**

| Source | Pollutant | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | PM$_{10}$ | PM$_{2.5}$ | NO$_x$ | CO | SO$_2$ | VOC | HAPs | CO$_2$e [a] |
| Phase 1 Sources | | | | | | | | |
| HTF Heater #1 | 2.47 | 2.47 | 8.46 | 12.87 | 0.20 | 1.79 | 0.61 | 40,763 |
| Standby Diesel Generators (5) | 0.09 | 0.09 | 5.43 | 3.12 | <0.01 | 0.28 | <0.01 | 227 |
| Fire Water Pump Engines (5) | <0.01 | <0.01 | 0.45 | 0.40 | 0.05 | <0.01 | <0.01 | 30 |
| Flares (5) [b] | | | 0.73 | 6.27 | <0.01 | <0.01 | <0.01 | 2,018 [c] |
| Thermal Oxidizer #1 | 0.64 | 0.64 | 4.20 | 7.05 | 37.95 | 0.50 | 0.03 | 120,382 |
| Storage Tanks (5) | | | | | | 0.13 | <0.01 | |
| Fugitives [d] | 0.01 | <0.01 | | | | 2.97 | 0.28 | 107,335 |
| Phase 2 Sources | | | | | | | | |
| HTF Heater #2 | 2.47 | 2.47 | 8.46 | 12.87 | 0.20 | 1.79 | 0.61 | 40,763 |
| Fire Water Pump Engines (3) | <0.01 | <0.01 | 0.63 | 0.36 | 0.06 | 0.03 | <0.01 | 27 |
| Thermal Oxidizer #2 | 0.64 | 0.64 | 4.20 | 7.05 | 37.95 | 0.50 | 0.03 | 120,382 |
| Storage Tank (Condensate) | | | | | | 0.01 | <0.01 | |
| Fugitives [d] | 0.01 | <0.01 | | | | 2.91 | 0.28 | 107,335 |
| Across Phases | | | | | | | | |

**JA258**

Document Accession #: 20190315-3053      Filed Date: 03/15/2019

| TABLE 4.11.1-6 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Emissions (tpy) Associated with Operation of the Project | | | | | | | |
| | Pollutant | | | | | | |
| Source | PM$_{10}$ | PM$_{2.5}$ | NO$_x$ | CO | SO$_2$ | VOC | HAPs | CO$_2$e [a] |
| MSS | <0.01 | <0.01 | 63.7 | 166.5 | 0.35 | 4.25 | 0.77 | 64,825 |
| Marine Vessel Emissions [e] | 6.38 | 6.05 | 142.6 | 111.6 | 30.79 | 12.71 | | 9,814 |
| **Total Emissions** [f] | **12.7** | **12.4** | **238.9** | **328.1** | **107.6** | **27.9** | **2.6** [g] | **613,901** |

[a]      Metric tons per year
[b]      One marine flare, one acid gas flare, one cold dry flare, one warm wet flare, one spare flare
[c]      Includes 566 tpy of LNG carrier inerting gas (CO$_2$) emissions vented to the marine flare
[d]      Includes fugitive dust emissions from truck traffic
[e]      See tables 411.1 8 and 411.1 9 for further details on marine vessel emissions
[f]      The total project emissions shown above include marine vessel emissions, which are not required to be included in the PSD applicability determination and, therefore, are not included in the total emissions shown in table 4.11.1 3
[g]      The individual HAP with the highest contribution to this total is hexane (1.7 tpy)

Although the potential annual GHG emissions for the Project exceed the *de minimis* thresholds for air quality permitting programs (e.g., see section 4.11.1.3), these emissions will be minimized by Texas LNG's proposed operating scenario. The main power load for operation of the Project will be the electric motor drivers coupled to refrigeration compressors, with the electric power being provided via the local electric transmission grid.

Table 4.11.1-7 provides a summary of the estimated short-term (pounds per hour [lb/hr]) controlled criteria air pollutant and HAP emission rates for routine operation of on-shore (stationary) sources associated with the Project. Short-term emission rates associated with routine operation of the Project (including marine vessel emissions) are considered a separate operating scenario for the Project and are the basis of the short-term impact analyses presented below.

| TABLE 4.11.1-7 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Short-term Emissions (lb/hr) Associated with Operation of On-Shore Emission Sources for the Project [a] | | | | | | | |
| | Pollutant | | | | | | |
| Source | PM$_{10}$ | PM$_{2.5}$ | NO$_x$ | CO | SO$_2$ | VOC | HAPs |
| Phase 1 Emissions [b] | 3.41 | 3.41 | 128.7 | 84.31 | 12.34 | 10.75 | 0.26 |
| Phase 2 Emissions [c] | 1.54 | 1.54 | 27.36 | 18.83 | 12.10 | 2.50 | 0.21 |
| MSS [d] | 1.20 | 1.20 | 963.4 | 2,222.5 | 5.13 | 56.05 | 5.52 |
| **Total Emissions** [e] | **6.2** | **6.2** | **1,119.4** | **2,325.6** | **29.6** | **69.3** | **6.0** |

[a]      The marine vessel emissions are not included in this summary table because the lb/hr emissions cannot be summed across all activities as they do not occur simultaneously. Only one carrier would be inside the State water line, including at Texas LNG's terminal, at any given time.
[b]      Comprised of emissions for emergency generators (5), fire water pump engines (5), flares (5), thermal oxidizer, HTF heater, storage tanks (5), and fugitives
[c]      Comprised of emissions from fire water pump engines (3), thermal oxidizer, HTF heater, storage tank, and fugitives
[d]      Includes MSS emissions for HTF Heater #1 (Phase 1) and HTF Heater #2 (Phase 2)
[e]      The emissions totals are conservatively based on concurrent operation of all emission sources, including emergency units

Although the Project is not subject to PSD review, the Texas CAA and TCEQ rules (30 TAC Chapter 116.111) stipulate that all construction permit applicants must evaluate (and apply) best available control technology (BACT) for the air emission sources. The TCEQ reviewed and approved Texas LNG's BACT analysis for the Project sources, including the HTF

**JA259**

heaters, internal combustion engines (emergency generators and fire water pump engines), flares, and thermal oxidizers. Methods for reducing criteria pollutant emissions for each of these sources were evaluated based on technical feasibility. Texas LNG would reduce emissions of $NO_x$ from the HTF heaters through use of ultra-low $NO_x$ burners; CO and VOC emissions would be controlled through the use of good combustion practices. The limited-use emergency generators/engines would utilize good combustion practices and ultra-low sulfur diesel fuel to reduce emissions, especially for PM and $SO_2$ emissions. Emissions from the flares would be reduced through good combustion practices. Emissions from the oxidizers would be reduced through the use of low-$NO_x$ burners and good combustion practices. BACT for the flares and oxidizers would include continuous monitoring of key operating parameters. The various storage tanks and fugitive emissions (equipment leaks) would need to comply with source-specific BACT requirements as well. The resulting BACT-based emission rates are consistent with NSPS, NESHAP, and/or TCEQ-published BACT emission standards applicable to the Project emission sources.

Flaring emissions would occur during the regularly scheduled maintenance event on an LNG train and occasionally for inerted LNG carriers. Shutdown and start-up of the LNG train for maintenance is assumed by Texas LNG to occur once per year for each train. Approximately 12 LNG carriers per year would call on the port with their tanks filled with inert gas (mixture of mainly nitrogen and $CO_2$), which must be blown out of the tanks directly to the carrier's forward vent mast or to the marine flare, via a gassing up and cooldown process, before loading of LNG can begin. Texas LNG projects that this process would result in total annual $CO_2$ emissions of approximately 566 tpy.

During operation of the LNG terminal, LNG carriers and supporting marine vessels, namely tugboats and security vessels, would routinely generate air emissions. Texas LNG assessed the emissions associated with various potential LNG carrier operating scenarios, in terms of engine duty and fuel type, in determining the highest emissions-generating scenario. All scenarios assumed a representative LNG carrier main engine size rating of 33,900 kW (45,461 hp).

Air pollutant emissions from LNG carriers would occur along the entire route from the open seas to the ships' berth. Air emissions generated during ship transit in offshore areas would be temporary, transient, and occur at distances allowing for considerable dispersion before reaching any sensitive receptors. Therefore, air emissions from ship transit outside the point where the pilot boards the vessel (which is within state territorial waters) would not be expected to result in a significant impact on air quality.

Marine vessel emissions are quantified for operation along the entire length of the reduced speed zone (RSZ) inside the state water line (9 nautical miles offshore), for maneuvering in the channel and to the pier, and for hoteling at the pier. LNG carrier maneuvering within the Coast Guard-established moored safety zone would occur over a 40-min time period (20 min arriving and 20 min departing) with the assistance of three tugboats. While the LNG carrier is docked at the pier, emissions would be generated by carrier hoteling (i.e., standby and cargo loading operations on the carrier) and tugboat idling for an approximate representative time period of 22 hours. Texas LNG considered the various on-board power generating scenarios for the maneuvering and hoteling phase of LNG carrier calls at the terminal. For the hoteling phase, Texas LNG assumed that the power requirements for the LNG carriers would be met through a 50-50

**JA260**

split between natural gas- and oil-firing, given that it would require carriers to use at least 50 percent natural gas as fuel while at port.

Texas LNG's emission calculations for the marine vessels transiting through the RSZ and maneuvering through the channel to the pier are based on the worst-case (i.e., highest) emission factors between EPA Tier 1 engine emissions standards (under 40 CFR 89.112[a]) and emission factors from U.S. Department of the Interior- and EPA-sponsored marine vessel emissions studies, assuming use of fuel oil with a sulfur content of 0.1 percent in the vessel's main engine. Note that the use of the 0.1 percent sulfur content is consistent with the requirements of the International Maritime Organization MARPOL Annex VI standards for the North America Emission Control Area.

Table 4.11.1-8 presents a summary of the estimated highest annual criteria air pollutant and GHG (as $CO_2e$) emissions associated with 1) LNG carriers and tugboats (three for each ship call) maneuvering within the moored safety zone; and 2) LNG carriers hoteling at the pier and tugboats (one for each ship call) idling nearby. Table 4.11.1-9 presents a summary of the estimated highest annual criteria air pollutant and GHG (as $CO_2e$) emissions associated with the operation of marine vessels outside the moored safety zone. Marine vessel operations outside this zone would include LNG carriers and support vessels (tugboats, security vessels, and pilot boats) traversing the channel and RSZ inside the state water line. These emissions, which are not subject to review under the NSR/PSD program, are based on 74 LNG carrier calls per year.

| TABLE 4.11.1-8 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Emissions (tpy) Associated with Operation of Marine Vessels Within the Moored Safety Zone | | | | | | | |
| | Pollutant | | | | | | |
| Vessel Operation | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | $CO_2e$ |
| LNG Carrier Maneuvering and Hoteling[a] | 1.74 | 1.60 | 45.92 | 26.55 | 13.68 | 3.03 | 2,244.6 |
| Tugboats Support | 0.63 | 0.63 | 11.02 | 13.69 | 0.18 | 1.57 | 1,265.9 |
| **Total Emissions** | **2.4** | **2.2** | **56.9** | **40.2** | **13.9** | **4.6** | **3,510.5** |

[a]    Hoteling emissions include emissions associated with cargo loading and standby operations

| TABLE 4.11.1-9 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Emissions (tpy) Associated with Operation of Marine Vessels Outside the Moored Safety Zone [a] | | | | | | | |
| | Pollutant | | | | | | |
| Vessel Operation | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | $CO_2e$ |
| LNG Carrier [b] | 2.02 | 1.84 | 52.66 | 30.44 | 15.70 | 3.48 | 2,572.8 |
| Tugboats Support | 1.91 | 1.91 | 32.05 | 39.73 | 0.60 | 4.50 | 3,648.9 |
| Coast Guard Security Vessel | 0.05 | 0.05 | 0.67 | 0.83 | 0.43 | 0.09 | 56.0 |
| Pilot Boat | 0.03 | 0.02 | 0.31 | 0.39 | 0.20 | 0.04 | 26.0 |
| **Total Emissions** | **4.0** | **3.8** | **85.7** | **71.4** | **16.9** | **8.1** | **6,303.7** |

[a]    Marine vessel operations within state waters, exluding the Moored Safey Zone
[b]    Includes maneuvering and reduced speed operation

**JA261**

In addition to complying with regulatory requirements for support vessel emissions, Texas LNG would set forth rules and facility speed limit to ensure a safe speed in the vicinity of the dock, which would indirectly help to reduce support vessel emissions. The facility rules would also stress the importance of limiting air emissions and the need to restrict unnecessary engine idling.

The air quality impacts that could occur as a result of normal on-shore facilities operations and concurrent marine vessel operations for the Project are assessed as part of the air quality impacts analysis presented below.

**Operations Impacts Assessment**

To provide a more thorough evaluation of the potential impacts on air quality in the vicinity of the Project, Texas LNG conducted a quantitative assessment of air emissions associated with operation of the Project facilities. This assessment used EPA-recommended pollutant dispersion modeling methods to predict off-site (i.e., ambient) concentrations in the vicinity of the Project site for comparison against the NAAQS. Also, a TCEQ-specific Modeling and Effects Review Applicability analysis was conducted to evaluate the potential human health impacts of non-criteria pollutant emissions from the Project. Note that because the Project would be a minor source (i.e., not subject to PSD review) with respect to emissions of ozone precursors $NO_x$ and VOC an ozone impact assessment is not required.

As discussed in section 4.11.1.3, the Project is not subject to review under the PSD permitting program, based on the projected magnitude of potential emissions; therefore, the Project is subject to the Texas minor NSR permitting program requirements. An air quality impacts analysis was conducted by Texas LNG, per TCEQ modeling guidelines and included on-shore Project emission sources and off-site emission sources, to satisfy TCEQ permitting requirements. In conducting the air quality impact analysis to address FERC requirements, Texas LNG built upon the analysis conducted to satisfy TCEQ modeling requirements, addressing emissions from on-shore stationary sources as well as marine vessels (LNG carriers and assist tugboats) operating in the moored safety zone. In particular, the emissions associated with the marine vessels maneuvering in the moored safety zone (including both in-bound and out-bound transits) and with LNG carrier hoteling (including LNG loading and standby operations) at the LNG terminal were accounted for. The focus of the impact analysis was assessing compliance with the NAAQS for $NO_2$, $PM_{10}$, $PM_{2.5}$, CO, and $SO_2$.

The impact analysis included the criteria pollutant emissions from off-site stationary sources within 10 kilometers of the Project location. This set of off-site sources included to-be-constructed facilities (i.e., facilities with emissions not represented in the background concentration measurements), such as the proposed Rio Grande LNG and Annova LNG projects and the Space X Texas Launch Facility. At FERC's direction, impacts at the facility fenceline and beyond were predicted and assessed. Representative background concentrations were developed for each pollutant and associated averaging period and added to the controlling model-predicted concentrations, with the total concentrations compared against the NAAQS. The results of this analysis are summarized in table 4.11.1-10.

**JA262**

| TABLE 4.11.1-10 | | | | | |
| Summary of Pollutant Dispersion Modeling and Air Quality Impact Analysis Results for the Project | | | | | |
| Air Pollutant | Averaging Period | Model-Predicted Concentration ($\mu g/m^3$) | Background Concentration [a] ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $NO_2$ | 1 hour | [b] | [b] | 178.5 | 188 |
| | Annual | 6.4 | 6.1 | 12.5 | 100 |
| $PM_{2.5}$ | 24 hour | 3.5 | 22.9 | 26.4 | 35 |
| | Annual | 0.2 | 9.1 | 9.3 | 12 |
| $PM_{10}$ | 24 hour | 3.7 | 62.0 | 65.7 | 150 |
| $SO_2$ | 1 hour | 11.3 | 10.6 | 21.9 | 196 |
| | 3 hour | 20.4 | 10.5 | 30.9 | 1,300 |
| | 24 hour | 9.1 | 2.9 | 12 | 365 |
| | Annual | 0.9 | 1.6 | 2.5 | 80 |
| CO | 1 hour | 4,532 | 2,176 | 6,708 | 40,000 |
| | 8 hour | 3,118 | 1,260 | 4,378 | 10,000 |
| [a]   Background concentrations are based on available representative monitoring data for the 2013 2015 period | | | | | |
| [b]   1 hour $NO_2$ concentration is based on inclusion of seasonal diurnal background concentration, per EPA guidance | | | | | |

The results of the air quality impact analysis for the Project showed that potential ground-level concentrations were below the NAAQS. Therefore, the operation of the Project emission sources would not cause or contribute to an exceedance of the NAAQS.

As noted previously, the two liquefaction trains for the Project would be constructed in different phases over time, which will result in an overlap of construction, commissioning, and operational emissions in certain years. According to the Project schedule, in 2023, the Phase 1 liquefaction train would conduct commissioning activities and initiate operation while the Phase 2 liquefaction train is under construction. In 2024, Phase 2 construction and commissioning activities would occur concurrently with Phase 1 operations. Table 4.11.1-11 shows the Project's year-by-year total annual emissions for construction, commissioning, and operational activities for each phase.

| TABLE 4.11.1-11 | | | | | | | | |
| LNG Facility Combined Construction, Commissioning, and Operational Emissions (tpy) | | | | | | | | |
| | Pollutant | | | | | | | |
| Year | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | $CO_2e$[a] | Total HAPs |
|---|---|---|---|---|---|---|---|---|
| 2020[b] | 180.7 | 29.2 | 63.4 | 36.5 | 4.3 | 4.1 | 8,879.6 | |
| 2021[c] | 812.9 | 131.0 | 284.9 | 164.4 | 19.2 | 18.4 | 39,939.6 | |
| 2022[c] | 1,135.3 | 183.0 | 397.9 | 229.6 | 26.8 | 25.7 | 55,782.8 | |
| 2023[c,d,e] | 699.2 | 116.5 | 417.6 | 417.1 | 51.4 | 30.8 | 263,213.3 | 0.9 |
| 2024[e,f,g] | 100.7 | 24.0 | 319.0 | 449.0 | 71.8 | 28.5 | 406,268.8 | 1.6 |
| 2025[e,h] | 12.7 | 12.4 | 238.9 | 328.1 | 107.6 | 27.9 | 613,901.2 | 2.2 |

JA263

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **TABLE 4.11.1-11** | | | | | | | | |
| **LNG Facility Combined Construction, Commissioning, and Operational Emissions (tpy)** | | | | | | | | |
| | **Pollutant** | | | | | | | |
| **Year** | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | **CO** | $SO_2$ | **VOC** | $CO_2e^a$ | **Total HAPs** |
| [a]     Metric tons<br>[b]     Phase 1 construction activity<br>[c]     Phase 1 and Phase 2 construction activity<br>[d]     Phase 1 pre commissioning/commissioning activity<br>[e]     Phase 1 operation (including marine vessels) (start in July 2023)<br>[f]     Phase 2 construction activity<br>[g]     Phase 2 pre commissioning/commissioning activity<br>[h]     Phase 2 operation (including marine vessels) | | | | | | | | |

The combination of construction, commissioning, and operational short-term emissions would, at times, be in excess of the modeled operational emissions alone in 2022, 2023, and 2024. During the concurrent construction, commissioning, and operational activities, the higher level of emissions could result in intermittent exceedances of certain NAAQS. These exceedances would not be persistent at any one time during these years due to the dynamic and fluctuating nature of construction activities within a day, week, or month.

**Conclusion**

During the construction period, residents in the vicinity of the Project may experience local, temporary impacts on air quality. These impacts would be reduced through the implementation of measures outlined in the FDCP and other construction work practices designed to minimize construction-generated air pollutant emissions. During operation of Phases 1 and 2 (i.e., the completed Project), we have determined that associated air emissions would have minor impacts on the local air quality and would not result in significant impacts on regional air quality.

**4.11.2  Noise**

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water. When sound becomes excessive, annoying, or unwanted, it is referred to as noise. Construction and operation of the proposed Project would affect overall noise levels in the vicinity of Project components. The ambient sound level of a region is defined by the total noise generated within the specific environment and usually consists of natural and man-made sounds. At any location, both the magnitude and frequency of environmental noise may vary considerably over the course of a day and throughout the week.

Two measurements used by some federal agencies to relate the time-varying quality of environmental noise to its known effects on people are the equivalent-continuous sound level ($L_{eq}$) and the day-night sound level ($L_{dn}$). The single value figure most commonly used to describe sound levels that vary over time is the $L_{eq}$, which is defined as the sound pressure level of a noise fluctuating over a period of time, expressed as an average over the measurement period. The $L_{dn}$ is defined as the 24-hour weighted average in which sound levels during the daytime ($L_d$   from 7:00 a.m. to 10:00 p.m.) are averaged with sound levels during the nighttime ($L_n$   10:00 p.m. to 7:00 a.m.). In the calculation of the $L_{dn}$, late night and early morning (10:00 p.m. to 7:00 a.m.)

**JA264**

SpaceX submits an application requesting to launch with the FAA and whether the LNG plant is under construction or in operation.

FERC staff conducted a preliminary engineering and technical review of the Texas LNG design, including potential external impacts based on the site location. Based on this review, we recommend a number of mitigation measures, which would ensure continuous oversight prior to initial site preparation, prior to construction of final design, prior to commissioning, prior to introduction of hazardous fluids, prior to commencement of service, and throughout life of the facility, in order to enhance the reliability and safety of the facility to mitigate the risk of impact on the public. With the incorporation of these mitigation measures and oversight, FERC staff concludes that the Texas LNG Project design would include acceptable layers of protection or safeguards that would reduce the risk of a potentially hazardous scenario from developing into an event that could impact the offsite public.

## 4.13    CUMULATIVE IMPACTS

NEPA requires the lead federal agency to consider the potential cumulative impacts of proposals under its review. Cumulative impacts may result when the environmental effects associated with the proposed action are superimposed on or added to impacts associated with past, present, and reasonably foreseeable future projects. Cumulative impacts can result from individually minor, but collectively significant, actions taking place over a period of time.

The Project-specific impacts of the Texas LNG Project are discussed in detail in other sections of this EIS. The purpose of this section is to identify and describe cumulative impacts that would potentially result from implementation of the proposed Project along with other projects in the vicinity that could affect the same resources in the same approximate timeframe. To ensure that this analysis focuses on relevant projects and potentially significant impacts, the actions included in this cumulative analysis are projects that:

- impact a resource potentially affected by the Project;

- impact that resource within all or part of the time span encompassed by the proposed or reasonably expected construction or operation schedule of the Project; and

- impact that resource within all or part of the geographical area affected by the Project. The geographical area considered varies depending on the resource being discussed, which is the general area ("geographic scope") in which the Project could contribute to cumulative impacts on that particular resource.

The geographic distribution of the area considered in the cumulative effects analysis varies by project and by resource. The cumulative impact analysis area, or geographic scope, for a resource may be substantially greater than the corresponding Project-specific area of impact in order to consider an area large enough to encompass likely effects from other projects on the same resource. The CEQ (1997) recommends setting the geographic scope based on the natural boundaries of the resource affected, rather than jurisdictional boundaries. The geographic scope

**JA265**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

for each resource evaluated for cumualtive impacts associated with the Texas LNG Project is presented in table 4.13-1 and further discussed below.

| TABLE 4.13-1 |
|---|
| **Geographic Scope by Resource for Cumulative Impacts Associated with the Texas LNG Project** |

| Resource | Geographic Scope |
|---|---|
| Geology | Area affected by and adjacent to the Project |
| Soils | Area affected by and adjacent to the Project |
| Groundwater | HUC 12 watershed |
| Surface Water | HUC 12 watershed |
| Wetlands | HUC 12 watershed |
| Vegetation | HUC 12 watershed |
| Wildlife | HUC 12 watershed |
| Fisheries and Aquatic Resources | HUC 12 watershed |
| Threatened and Endangered Species | HUC 12 watershed |
| Land Use and Special Interest Areas | Cameron County |
| Visual Resources | Project viewshed (12.5 miles) |
| Socioeconomics | Cameron County |
| Transportation | Major roads and intersections used during construction and operation, Brownsville Ship Channel, and established navigation channels |
| Cultural Resources | Defined Area of Potential Effect [a] |
| Air Quality | Within 31 miles of the Project for operation impacts, within 0.5 mile of the Project for construction impacts [b,c] |
| Noise | Within 2 miles of the Project for operation impacts and 0.25 mile of the Project for construction impacts [b] |
| Environmental Justice | Cameron County/Census block groups within 2 miles of the Project |

[a] The APE may differ based on the type of resource considered; for example, impacts on buried artifacts would generally be considered only within the direct footprint where project impacts overlap, while impacts on historic structures may necessitate a wider scope.
[b] Due to the duration of construction, similar timelines, and/or comments received during the Project scoping period, the Annova LNG and/or Rio Grande LNG Project were also considered for this resource.
[c] GHGs do not have a localized geographic scope. GHG emissions from the Project would combine with emissions from projects world wide to increase $CO_2$, methane, and other GHG concentrations in the atmosphere.

The U.S. is divided and sub-divided into successively smaller hydrologic units, which are geographic areas representing part or all of a surface water drainage basin, a combination of drainage basins, or a distinct hydrologic feature. The unit used for our analysis in this EIS is the HUC 12 watershed. Because surface activities can affect the connectivity of resources within a watershed, we determined that the HUC 12 watershed within which the Project would be constructed is appropriate to use as the geographic scope for several resources including groundwater, surface water, wetlands, vegetation, wildlife, fisheries and aquatic resources, and threatened and endangered species. As such, other past, present, and reasonably foreseeable projects that overlap with the proposed Project's HUC 12 watershed could contribute to cumulative impacts on these resources.

Cumulative impacts analysis for geology, soils, and certain cultural resources are within and immediately adjacent to the construction footprint, as the features associated with these

JA266

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

resources are confined to a specific location. Further, erosion control measures included in Texas LNG's ECP would keep disturbance within the approved work areas.

Cumulative impacts on visual resources were considered for other projects occurring within the viewshed of the proposed Project. Based on viewshed simulations conducted for the Project, as discussed further in section 4.8.5, we estimate the distance at which the tallest structures may be observed is about 12.5 miles; therefore, this distance was considered the geographic scope for assessing cumulative impacts on visual resources.

Analysis of cumulative impacts on socioeconomics and land use were confined to Cameron County. Cameron County is the primary area in which construction and operation personnel are expected to reside, as well as the level at which planning and zoning ordinances are often prescribed. Further, evaluation of other past, present, and reasonably foreseeable projects within Cameron County, would address potential cumulative impacts on all recreational areas identified in section 4.8.4.

As described in section 4.9.9, communities within 2 miles of the proposed Project facilities were evaluated for potential environmental justice concerns for the Project; therefore, the geographic scope for the analysis of potential cumulative impacts on environmental justice communities was determined to be 2 miles.

Cumulative impacts on traffic were assessed by evaluating other projects that would utilize the same primary transportation routes used by the proposed Project during construction and operation. For roadway traffic, this primarily includes SH 48. For marine traffic, this includes the Brownsville Ship Channel, including the Brazos Santiago Pass.

The geographic scope evaluated for impacts on air quality was defined as within 31 miles (50 kilometers) of the Project for operation impacts and 1 mile of the Project for construction impacts. The CEQ guidance document, *Considering Cumulative Effects Under the National Environmental Policy Act*, states that a project impact zone for the air quality resource may be the physiographic basin in which the proposed action would be located. In terms of meteorology, the physiographic environment in which the Texas LNG Project would be located is the Texas Coastal Zone, which means sea breezes and land breezes would play an important role regarding the transport and dispersion of air pollutants. At times, the sea breeze along the southern Texas coast can penetrate 40 kilometers or more inland from the coast. Therefore, establishing a geographic scope for cumulative impacts on air quality resulting from operations emissions of 50 kilometers from the Project site is consistent with the extent of inland penetration of the sea breeze from the coast. In addition, 50 kilometers is the distance used by the EPA for cumulative modeling of large PSD sources during permitting (40 CFR 51, appendix W).

Cumulative impacts resulting from increased noise during construction and operation of the proposed Project were evaluated within 0.25 mile and 2 miles from the proposed Project facilities, respectively. Noise decreases logarithmically with increasing distance from a noise source; therefore, noise impacts would only occur where other facilities or activities occur close to the proposed Project activities. As described in section 4.11.2.2, the nearest NSA to the proposed Project is 1.6 miles; therefore, a geographic scope of 2 miles was selected to assess potential cumulative noise impacts at the nearest NSAs during operation. Noise associated with

**JA267**

Document Accession #: 20190315-3053    Filed Date: 03/15/2019

construction of the Project would be short-term and temporary; therefore, a smaller geographic scope of 0.25 mile was utilized to assess potential cumulative noise impacts during construction.

## 4.13.1  Projects and Activities Considered

The Project area has been modified and developed since initial human habitation thousands of years ago to more recent and rapid development in the last two hundred years.  The dredging of the Brownsville Ship Channel and development of the lower Rio Grande Valley as an industrial and port region has significantly contributed to the current environmental conditions characteristic of the area.  With respect to past actions, CEQ guidance (2005) allows agencies to adopt a broad, aggregated approach without "delving into the historical details of individual past actions," which is the approach taken in this EIS.  Recently completed projects are included with past projects as part of the environmental baseline.  Reasonably foreseeable projects that might cause cumulative impacts in combination with the Texas LNG Project include projects that are under construction, approved, proposed, or planned.  For FERC-regulated projects, proposed projects are those for which the proponent has submitted a formal application to the FERC, and planned projects are projects that are either in pre-filing or have been announced, but have not been proposed.  Planned projects also include projects not under the FERC's jurisdiction that have been identified through publicly available information, such as press releases, internet searches, Texas LNG's communications with local agencies, and information available from other federal agencies, provided in comments on the FERC docket for the Project.

Table 4.13.1-1 lists the projects and activities we considered in this cumulative impact analysis, including the location, distance from the Project, workforce, construction timeframe, and resources cumulatively affected in conjunction with the proposed facilities.  Project locations are identified in figure 4.13.1-1.  As noted in the following subsections, some projects were eliminated from further discussion if it was determined that they would not meet the criteria listed above or if sufficient information is not available to allow for meaningful analysis.  Descriptions of potential cumulative impacts by resource category are presented in section 4.13.2.  In cases where quantitative information is not available for projects considered in this analysis (e.g., projects in the planning stages or those contingent on economic conditions, availability of financing, or the issuance of permits), the potential impacts of those projects are considered qualitatively (see table 4.13.2-1).  We received comments on the draft EIS that identified additional projects for consideration in our cumulative analysis.  These include the Palmas Altas Wind Farm and East Rio Hondo to Palmas Transmission Line.  In addition, comments received on the Rio Grande LNG Project draft EIS identified a new steel mill and an airport terminal.  All of these projects are described further below.

**JA268**

Filed Date: 03/15/2019

Document Accession #: 20190315-3053



FIGURE 4.13.1-1    Location of Projects Identified for the Cumulative Impacts Analysis

4-273

**JA269**

Ocelot and Jaguarundi

The geographic scope for cumulative impacts on the ocelot and jaguarundi was considered to be terrestrial projects within the HUC 12 watershed affected by the Texas LNG Project. Projects considered for cumulative impacts on the ocelot and jaguarundi include the Rio Grande LNG Project and associated non-jurisdictional facilities, Annova LNG Project and associated non-jurisdictional facilities, non-jurisdictional facilities associated with the Texas LNG Project, VCP, Kingsville to Brownsville Pipeline, San Roman Wind Farm, Cross Valley Project, seven transportation projects, six Port of Brownsville Projects, SpaceX Commercial Spaceport Project, Stargate Facility, Palo Alto Battlefield Cultural Landscape Restoration, and Bahia Grande Coastal Corridor Project.

Dense thornscrub associated with the lomas on the Texas LNG Project site provide suitable habitat for ocelot and jaguarundi, as discussed in our BA. Further, surveys of the Project site identified feline tracks consistent with ocelot; however, these could not be definitively identified. While the Project site contains suitable habitat and is within the known range of ocelots and jaguarundi, the Project site likely serves only as stopover or temporary habitat for transient individuals rather than a breeding pair due to its size and lack of connectivity with larger more contiguous tracts, such as those present within the Laguna Atascosa NWR. Further, if an ocelot or jaguarundi is present on the site at the start of construction activities it would likely relocate to suitable adjacent habitat. Therefore, we have determined that the Texas LNG Project is not likely to adversely affect the jaguarundi. In a letter dated February 8, 2019, the FWS concurred with our determination for Project impacts on jaguarundi (see section 4.7). However, the FWS did not concur with our initial determination of not likely to adversely affect regarding the ocelot. As discussed in greater detail in section 4.7, we have revised the BA (appendix C) to determine that the Project is likely to adversely affect the ocelot. As such, consultations under Section 7 of the ESA have not been completed (see our recommendation in section 4.7.1).

As discussed in greater detail in our BA, the primary threat to ocelot and jaguarundi populations in the U.S. is habitat loss, degradation, and fragmentation (FWS, 2010b). The Texas LNG Project would contribute to habitat loss; however, this loss represents a small fraction of the overall available habitat present in the region. Nevertheless, habitat loss has been identified by the FWS as a primary threat to ocelot recovery. Also as discussed in our BA, the population size in Texas and growing isolation from loss of habitat connectivity with ocelot and jaguarundi populations in Mexico are contributing to a growing threat of genetic inbreeding in the Texas ocelot and jaguarundi populations. Moreover, the construction of roads through ocelot and jaguarundi habitat has resulted in high rates of road mortality, further inhibiting population growth and connectivity with adjacent populations (FWS, 2010b). These are important factors to consider when addressing potential cumulative impacts on these species.

Not all of the projects listed above are anticipated to impact ocelot and jaguarundi habitat, such as the Port of Brownsville projects, which are located within densely developed, previously disturbed areas. In addition, several projects would result in beneficial impacts on ocelots and jaguarundis including the Bahia Grande Coastal Corridor Project, the purpose of which is to further conserve land, and the SH 100 Wildlife Crossings, which are intended to minimize impacts from road traffic. The other two LNG projects, as well as the pipeline projects proposed in the area, are anticipated to have the greatest impacts on ocelot habitat through removal and conversion to

**JA270**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

industrial uses and fragmentation, respectively. The construction of the San Roman Wind Farm also resulted in the loss of ocelot and jaguarundi habitat and fragmentation of the Bahia Grande Ocelot Coastal Corridor between the Bahia Grande Unit of the Laguna Atascosa NWR and other units of the Laguna Atascosa NWR to the north. In addition, these projects along with several of the transportation projects could result in increased road traffic and/or additional roads for transiting ocelots and jaguarundis to cross. Direct mortality as a result of construction of the projects considered in this cumulative impacts analysis for ocelots and jaguarundi are unlikely due to the ability of individuals to leave the area; however, long-term impacts resulting from habitat loss and the potential for subsequent reduced genetic diversity from inbreeding could occur.

As discussed above, the past and continued development in and around Brownsville and across the border in Mexico has decreased the available corridor habitat necessary to connect ocelot and jaguarundi populations in Mexico and the U.S. While relatively small barriers such as the Brownsville Ship Channel and SH 4 do not create a significant impediment to individual movements, ocelots and jaguarundi require contiguous dense thornscrub for cover over longer distances (TPWD, 2017h; 2017i). In addition, ocelots and jaguarundis are elusive species with relatively large home ranges and low population densities that tend to avoid human development and activity (FWS, 2010b). The current remaining habitat corridor in the region to connect U.S. and Mexico populations of these federally listed species is located adjacent to and within the proposed Rio Grande LNG and Texas LNG Project sites north of the Brownsville Ship Channel and within and adjacent to the proposed Annova LNG Project site south of the Brownsville Ship Channel. The area adjacent to the proposed Rio Grande LNG Project site (see figure 3.3-4 of appendix C) is a conservation easement on land owned by the BND that expires in 2023. Annova has been working closely with the FWS to configure their proposed project to reduce potential impacts on ocelots and jaguarundis to the maximum extent practicable. This includes maintaining an approximately 1,500-foot-wide corridor to the west of the Annova LNG terminal, directly across from the existing wildlife corridor on the north side of the Brownsville Ship Channel. Further, the entirety of the Texas LNG Project site would not be fenced; however, ocelots would not be anticipated to utilize the site following the construction of the Project.

While a travel corridor would be maintained to allow ocelots and jaguarundis to move between Mexico and the U.S., the addition of three large industrial facilities in proximity to that corridor (Annova LNG, Rio Grande LNG, and Texas LNG), would create additional noise, light, and traffic, all of which could deter ocelots or jaguarundis from utilizing the corridor. However, in an effort to minimize impacts as a result of increased light pollution on all wildlife, including ocelots and jaguarundis, all three LNG projects have indicated that they would utilize down-facing lights. Other impacts, such as those associated with noise, would be minimized by the projects to the extent practicable; however, due to the proximity of the Annova LNG and Rio Grande LNG Projects to the wildlife corridors, facility-generated noise during construction and operation would still be audible to ocelots and jaguarundis utilizing the wildlife corridor.

In addition, increased road traffic along SH 4 associated with the Annova LNG Project, Kingsville to Brownsville Pipeline, VCP, SpaceX Commercial Spaceport Project, and the Stargate Facility, as well as increased traffic along SH 48 associated with the Texas LNG Project, Rio Grande LNG Project, Kingsville to Brownsville Pipeline, VCP, and the Port of Brownsville projects would result in increased potential for vehicle strikes on ocelots and jaguarundis.

As described above, there is potential for the continued reduction of suitable ocelot and jaguarundi habitat to a single, narrow corridor among industrial facilities. The loss, degradation, and fragmentation of habitat have been cited by the FWS in its 2010 Recovery Plan, as the primary threat to U.S. ocelot and jaguarundi populations. The further narrowing of this corridor could result in decreased dispersal of individuals between U.S. and Mexico populations, resulting in decreased genetic diversity (inbreeding). Further, the projects assessed for cumulative impacts on ocelots and jaguarundis would increase road traffic, particularly during periods of concurrent construction (see table 4.13.1-1), which is the primary cause of direct mortality on U.S. ocelot and jaguarundi populations (TPWD, 2017h; 2017i). Due to the past, present, and proposed future development throughout the geographic scope for assessing cumulative impacts on ocelots and jaguarundis, as well as the associated increases in road traffic, light, and noise, we have determined that cumulative impacts on ocelots and jaguarundis would be permanent and significant.

**Birds**

Seven bird species of concern have the potential to occur in the vicinity of the Project site. As discussed in our BA, we have determined that the Project *would be unlikely to cause a trend towards federal listing* for the red-crowned parrot (candidate for listing) due to the lack of habitat at the Texas LNG Project site. Four federally listed birds and on bird proposed for listing more likely to use the Texas LNG Project site are discussed further below.

<u>Northern Aplomado Falcon</u>

The geographic scope for cumulative impacts on the northern aplomado falcon was considered to be terrestrial projects within the HUC 12 watershed affected by the Texas LNG Project. Projects considered for cumulative impacts on the northern aplomado falcon include the Rio Grande LNG Project and associated non-jurisdictional facilities, Annova LNG Project and associated non-jurisdictional facilities, non-jurisdictional facilities associated with the Texas LNG Project, VCP, Kingsville to Brownsville Pipeline, San Roman Wind Farm, Cross Valley Project, transportation projects, Port of Brownsville projects, SpaceX Commercial Spaceport Project, Stargate Facility, Palo Alto Battlefield Cultural Landscape Restoration, and Bahia Grande Coastal Corridor Project.

The Texas LNG Project site provides suitable nesting and foraging habitat for the northern aplomado falcon. As discussed in our BA, Texas LNG implemented design measures recommended by the FWS to avoid impacts on suitable habitat to the extent practicable. Further, surveys of the Project site did not identify any existing nests that could be utilized by northern aplomado falcons. Texas LNG has also indicated that surveys would be conducted prior to the start of construction to ensure that no nesting birds are present. In a letter dated February 8, 2019, the FWS did not concur with our initial determination of not likely to adversely affect for the aplomado falcon, but contends that potential take would be covered under an existing 99-year Safe Harbor Agreement, as discussed further in section 4.7 and our BA (appendix C).

For the majority of projects considered, impacts on northern aplomado falcons are not known; however, suitable habitat is also present on the Annova LNG and Rio Grande LNG sites and would likely be crossed by the linear transmission and pipeline projects in the area. The Port of Brownsville projects are primarily located in an already industrialized area that likely does not

**JA272**

the Brownsville Ship Channel annually. This increase would likely result in additional delays for commercial fishing and recreational vessels that need to transit the Brownsville Ship Channel to reach the Gulf of Mexico or fishing destinations in the Laguna Madre. Overall, we anticipate that cumulative impacts on tourism and commercial fisheries would be permanent and moderate.

**Environmental Justice**

In section 4.9.9, we present the minority and low-income population percentages in the State of Texas, Cameron County, and the corresponding census blocks groups (tables 4.9.9-1 and 4.9.9-2). This analysis found that minority populations and low-income communities, as defined per the EPA guidelines, are present in the geographic scope and may be subject to cumulative impacts from the Texas LNG Project and other projects considered. The geographic scope for the assessment of cumulative impacts on socioeconomic indicators was defined as Cameron County. However, we specifically evaluated environmental justice communities within 2 miles of the Texas LNG Project site, to provide an overview of potential cumulative impacts on these communities.

As discussed in section 4.9.9, the nearest residential areas associated with environmental justice communities are about 1.8 miles from the Texas LNG Project site. As such, impacts on the human environment from construction of the Texas LNG Project would consist of traffic delays, increased enrollment at public schools, increased noise (primarily during construction), and displacement of recreational fishermen and other visitors to the public use areas near the Project site. These impacts would be minor and short-term, with the greatest impacts primarily occurring during construction.

Several of the projects listed in table 4.13.1-1 could contribute to potential impacts on minority populations and low-income communities, most notably the Annova LNG and Rio Grande LNG projects. Contractors working on these projects would be required to comply with applicable equal opportunity and non-discrimination laws and policies. The criteria for all positions would be based upon qualifications and in accordance with applicable, federal, state, and local employment laws and policies. Like the Texas LNG Project, tax revenues generated from construction of these projects could be used to offset impacts on public schools and infrastructure.

Potential air pollutant emissions from operation of the Texas LNG Project would be below the threshold for unhealthy air quality. Other projects that are permitted and built would be held to the same air quality standards. Therefore, the Texas LNG Project's contribution to cumulative impacts on the low-income or minority populations in the Project area would be limited to minor and temporary traffic delays and potential impacts on public schools during construction.

FERC and Texas LNG have issued documents and notices about the Project available to the public. FERC held public scoping meetings and public comment meetings, as described in section 1.3, during which materials were provided in both English and Spanish to accommodate the local Hispanic and Latino population. In addition, during the public scoping meeting and public comment meeting in Port Isabel for the Rio Grande LNG, Annova, and Texas LNG projects, both English and Spanish-speakers were present to converse one-on-one with stakeholders in attendance. While environmental justice communities have been identified within the geographic scope for the Texas LNG Project, the Project impacts discussed in this EIS such as traffic delays during construction, impediment of fishing/recreational opportunities at discrete locations,

**JA273**

constraints on public services, and impacts on air quality and noise would be the same for all communities, regardless of race or income. Therefore, the Texas LNG Project is not expected to contribute to cumulative disproportionate, adverse effects on minority and low-income residents in the area.

### 4.13.2.11      Cultural Resources

The geographic scope for cumulative impacts on cultural resources was determined to be the Texas LNG Project APE. The only cultural resource site that is present in this area is the Garcia Pasture Site (41CF8). As discussed in section 4.10, this historic property would be adversely affected by the Project. The FERC would execute an MOA to resolve adverse effects at 41CF8, and require Texas LNG to implement a treatment plan prior to Project construction.

Cumulative impacts on cultural resources would only occur if other projects were to share the same APE as the proposed Project. If there is a federal nexus for any other projects that may affect historic properties in the APE, those resources would be protected by the NHPA and other federal historic preservation laws and regulations. We can conclude that given those federal laws and regulations, it is not likely that there would be significant cumulative impacts on historic properties, resulting from the Texas LNG Project, in addition to other projects that may occur within the defined geographic scope.

Based on consultations with the NPS on the Palmito Ranch Battlefield NHL and the Palo Alto Battlefield NHL and NHP, Texas LNG examined potential visual impacts from the Project on these areas. Visual simulations created from points in proximity to the battlefields represent visitors' views of the battlefields. As described in section 4.8.5, nighttime and daytime visual impacts on the Palmito Ranch Battlefield NHL at three KOPs would vary from minor to moderate. The Project facilities would be at least partially visible but not prominent at any of the Palmito Ranch Battlefield NHL KOPs to varying degrees of distance, partial screening, and foreground vegetation. The other two LNG projects (Annova LNG and Rio Grande LNG) would also be visible from KOP 3, KOP 4 and KOP 5; however, based on distance and direction it is anticipated that the Texas LNG facilities when viewed from KOP 3 would be obscured by the Annova LNG and/or Rio Grande LNG Projects.

As discussed in section 4.13.2.10, the NPS provided a comment on the draft EIS asserting that the cumulative impact of the three LNG projects would result in cumulative impacts on traffic on SH 511 and SH 550, which are also used to access the Palo Alto Battlefield NHP. The NPS stated that the increase in traffic on these roadways would adversely impact the quality and setting of the Palo Alto Battlefield NHP by increasing noise and reducing air quality. We agree that concurrent construction of the projects evaluated for cumulative impacts would increase traffic on area roadways, including those adjacent to the Palo Alto Battlefield NHP.

Texas LNG also examined visual impacts on the Palo Alto Battlefield NHL and NHP at two key observation points, as discussed in section 4.8.5. The Texas LNG Project facilities would either not be visible or would be barely visible on the horizon at these locations (see section 4.8.5). Based on distance, direction, and existing vegetation buffers the Texas LNG Project would not contribute to cumulative impacts on the Palo Alto Battlefield NHL and NHP.

**JA274**

Document Accession #: 20190315-3053        Filed Date: 03/15/2019

### 4.13.2.12        Air Quality and Noise

**Air Quality**

<u>Construction</u>

The geographic scope for assessment of cumulative impacts on air quality during construction of the proposed Texas LNG Project is the area within 0.5 mile of the LNG Terminal, because construction emissions would be highly localized; however, the Annova LNG Project was also included due to the size of the Project and comments we received during the scoping period.[65] The projects within the construction geographic scope that are most likely to contribute to cumulative air impacts include the Annova LNG and Rio Grande LNG projects, non-jurisdictional facilities associated with the Texas LNG Project, and waterway improvement projects within the Brownsville Ship Channel.

Construction of the Texas LNG terminal would affect air quality due to emissions from combustion engines used to power construction equipment, vehicle emissions travelling to- and from the LNG Terminal site, marine deliveries of construction materials, and fugitive dust resulting from earth-disturbing activities and equipment movement on dirt roads.

Air emissions from projects in the vicinity of the Project would be additive. Because construction emissions would be temporary and limited to the construction period, standard EPA emission thresholds do not apply. General Conformity applicability thresholds do not apply at the LNG terminal site because the Project area is in attainment for all the NAAQS. Table 4.13.2-2 estimates the total cumulative emissions from concurrent construction of the Texas LNG, Rio Grande LNG, and Annova LNG projects. While construction emissions estimates from non-jurisdictional projects and waterway improvement projects within the Brownsville Ship Channel are not available, based on the intermittent and short-term nature of construction, these Projects would have a minor impact on cumulative air emissions when considered with the proposed LNG terminals in the Project vicinity.

Cumulative impacts from construction would be limited to the duration of the construction period. However, with other Projects in the vicinity, construction of the Texas LNG Project would contribute to localized elevated emissions near construction areas during the period(s) when construction of these activities would overlap. Due to the magnitude of the combined emissions, the greatest potential for cumulative impacts would be during Years 2 and 3 (see table 4.13.2-2). When compared with the EPA's most recently available national emissions inventory data, peak-year (Year 3) cumulative construction emissions of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$, would represent about 8.6, 61.6, 21.8, and 14.1 percent, respectively, of the 2014 inventory emissions levels. The EPA's national emissions inventory data include estimated emissions from on- and off-road mobile sources (vehicle travel), point sources (such as electric power generation facilities), and nonpoint sources (stationary sources that are individually small and numerous, such as residential heating and commercial marine vessels [EPA 2014]). Previous national emissions inventories conducted in 2008 and 2011 documented greater total emissions for criteria pollutants than the 2014 data; however, we have presented data from 2014 as a conservative estimate and to present

---

[65]    Although the typical construction geographic scope for air quality is 0.25 mile, we expand this on a case-by-case basis for large projects like LNG terminal.

**JA275**

the most recent inventory data. Further, since the 2014 emissions inventory, economic growth in Cameron County may have resulted in increased air emissions. Given the high level of construction emissions estimated for the three LNG terminals relative to the most recently inventoried emissions in the Project area, simultaneous construction of these projects could result in a temporary, moderate to major increase in emissions of criteria pollutants during construction. Construction emissions are localized, and impacts would be greatest in the immediate vicinity of the LNG terminal sites. Texas LNG, Rio Grande LNG, and Annova LNG would implement mitigation measures to minimize construction impacts on air quality, including application of water to minimize fugitive dust, limit engine idling, and using recent models of construction equipment manufactured to meet air quality standards (as discussed in section 4.11.1).

| TABLE 4.13.2-2 |
|---|
| Estimated Construction Emissions for the Brownsville Area LNG Projects (tons per year) [a,b] |

| Facility and Year [c] | $NO_x$ | CO | $SO_2$ | $PM_{10}$ | $PM_{2.5}$ | VOC |
|---|---|---|---|---|---|---|
| **Rio Grande LNG Terminal** | | | | | | |
| Year 1 | 12.0 | 18.6 | 2.0 | 589.4 | 60 | 0.7 |
| Year 2 | 69.7 | 111.4 | 11.8 | 1,199.5 | 125.8 | 4.2 |
| Year 3 | 127.8 | 174.3 | 23.5 | 1,146.6 | 125.8 | 6.4 |
| Year 4 | 59.3 | 118.5 | 10.6 | 91.4 | 14.2 | 3.6 |
| Year 5 | 45.0 | 106.7 | 8.0 | 56.1 | 9.2 | 2.9 |
| Year 6 | 39.0 | 70.2 | 7.1 | 26.9 | 5.8 | 2.1 |
| Year 7 | 1.2 | 10.4 | <0.1 | 13.9 | 1.4 | 0.1 |
| Year 8 | <0.1 | <0.1 | <0.1 | <0.1 | <0.1 | <0.1 |
| **Annova LNG** | | | | | | |
| Year 1 | 23 | 40 | 0.04 | 293 | 30 | 2.6 |
| Year 2 | 172 | 220 | 0.3 | 158 | 25 | 22 |
| Year 3 | 152 | 224 | 0.25 | 126 | 21 | 17 |
| Year 4 | 131 | 202 | 0.22 | 65 | 14 | 13 |
| Year 5 | 50 | 86 | 0.08 | 59 | 8 | 6 |
| **Texas LNG** | | | | | | |
| Year 1 | 63.4 | 36.5 | 4.3 | 180.7 | 29.2 | 4.1 |
| Year 2 | 284.9 | 164.4 | 19.2 | 812.9 | 131.0 | 18.4 |
| Year 3 | 397.9 | 229.6 | 26.8 | 1,135.3 | 183.0 | 25.7 |
| Year 4 | 243.3 | 140.4 | 16.4 | 694.4 | 111.9 | 15.7 |
| Year 5 | 31.9 | 18.4 | 2.2 | 91.1 | 14.7 | 2.1 |
| **Total Annual Construction Emissions** | | | | | | |
| Year 1 | 98.4 | 95.1 | 6.34 | 1,063.1 | 119.2 | 7.4 |
| Year 2 | 526.6 | 495.8 | 31.3 | 2,170.4 | 281.8 | 44.6 |
| Year 3 | 677.7 | 627.9 | 50.55 | 2,407.9 | 329.8 | 49.1 |
| Year 4 | 433.6 | 460.9 | 27.22 | 850.8 | 140.1 | 32.3 |
| Year 5 | 126.9 | 211.1 | 10.28 | 206.2 | 31.9 | 11 |
| Year 6 | 39 | 70.2 | 7.1 | 26.9 | 5.8 | 2.1 |
| Year 7 | 1.2 | 10.4 | <0.1 | 13.9 | 1.4 | 0.1 |
| Year 8 | <0.1 | <0.1 | <0.1 | <0.1 | <0.1 | <0.1 |
| **EPA National Emissions Inventory, Cameron County [d]** | | | | | | |
| 2008 | 9,366.2 | 52,511.8 | 107.0 | 32,165.8 | 4,371.8 | 28,884.9 |
| 2011 | 9,101.9 | 52,167.4 | 217.1 | 21,988.4 | 3,167.0 | 30,044.6 |
| 2014 | 7,864.3 | 43,352.9 | 82.0 | 11,023.3 | 2,340.3 | 24,701.4 |

**JA276**

| TABLE 4.13.2-2 |
| --- |
| Estimated Construction Emissions for the Brownsville Area LNG Projects (tons per year) [a,b] |

| Facility and Year [c] | NO$_x$ | CO | SO$_2$ | PM$_{10}$ | PM$_{2.5}$ | VOC |
| --- | --- | --- | --- | --- | --- | --- |

[a]    Emissions estimates include construction emissions from on and off road vehicle activity, truck deliveries, vessel activity, worker commutes, and fugitive dust.

[b]    Rio Grande LNG estimated annual fugitive emissions from use of the temporary haul road; to estimate annual construction emissions, the total fugitive emissions were included for Year 1, Year 2, and Year 3. In Year 1, given that construction would not commence until about 6 months into the year, annual estimated fugitive emissions from the haul road were assumed to be half of those estimated for Year 2 and Year 3.

[c]    Assumes all three Brownsville LNG Projects would initiate emission generating construction activities in 2020.

[d]    Due to refinements and modifications in the methods used to compile each inventory, the inventory results should not be used to describe year to year emissions trends.

Further, transport of construction materials associated with the Project could occur within the HGB area, which is a marginal nonattainment area for the 2008 8-hour ozone standard. Similarly, the Annova LNG and Rio Grande LNG projects would also receive deliveries of construction materials originating from or being transported through the HGB area. Although cumulative emissions are not subject to General Conformity, the cumulative construction emissions from the Texas LNG, Rio Grande LNG, and Annova LNG projects occurring within the HGB area would not be expected to result in an exceedance of applicable general conformity thresholds for the HGB area.

Operation

Pollutants such as criteria pollutants and HAPs would be emitted from sources in the area of the Project. These were analyzed for chronic and acute health impacts due to inhalation, as well as secondary environmental effects. For these pollutants, FERC considers a geographic scope for cumulative impacts assessment of up to 50 kilometers (31 miles). However, FERC does not use 50 kilometers to evaluate GHG emissions. GHGs were identified by the EPA as pollutants in the context of climate change. GHG emissions do not directly cause local ambient air quality impacts. GHG emissions result in fundamentally global impacts that feedback to localized climate change impacts. Thus, the geographic scope for cumulative analysis of GHG emissions is global rather than local or regional. For example, a project 1 mile away emitting 1 ton of GHGs would contribute to climate change in a similar manner as a project 2,000 miles distant also emitting 1 ton of GHGs.

Cumulative impacts associated with the operation of the LNG terminals are evaluated according to the significant impact area of the proposed facilities, determined through a significant impact modeling assessment. Projects that are most likely to result in and contribute to cumulative air impacts with operation of the Texas LNG terminal include the Annova LNG Project, the Rio Grande LNG Project, non-jurisdictional facilities associated with the Brownsville LNG Projects, Port of Brownsville Projects (including the Big River Steel Mill), and waterway improvement projects. The expanded Airport Terminal could also contribute to operational air emissions; however, the timing of the expansion is not known.

Air pollutant emissions during operation of the Texas LNG terminal would result from operation of the various components of the LNG terminal, marine traffic, and vehicles driven by personnel commuting to and from the site. The region in the vicinity of the LNG terminal is

JA277

currently in attainment with the NAAQS; however, increases in industrial point sources could affect local and regional air quality.

The Annova LNG and Rio Grande LNG terminals have the greatest potential to contribute to cumulative impacts on air quality with the proposed Texas LNG terminal, given the proximity and similar operations of the projects. Emissions from currently operational facilities, such as the Brownsville Liquids Terminal and Port of Brownsville Marine Cargo Dock 16 and Storage Yard, are captured in ambient air quality monitoring data. While estimates of construction emissions from non-jurisdictional projects, the Big River Steel Mill, and waterway improvement projects within the Brownsville Ship Channel are not available, based on the intermittent and short-term nature of construction and lack of operation emissions, these Projects would have a negligible impact on cumulative air emissions if they are concurrent with operations of the proposed Texas LNG Terminal. Any operational emissions from the Big River Steel Mill would be subject to applicable federal and state permitting, and therefore would not be permitted to result in a NAAQS exceedance.

We assessed the air dispersion modeling results provided for the Texas LNG, Rio Grande LNG, and Annova LNG terminals and used these models to estimate the cumulative air emissions during concurrent operation at all three facilities. Appendix E describes the methods used to conduct the cumulative assessment and provides the results of our analysis, including figures depicting the cumulative concentrations of each criteria air pollutant assessed (figures E-1 through E-8 in appendix E). Table 4.13.2-3, below, totals the modeled ambient pollutant concentrations for the Brownsville area LNG terminals operating during full build-out, including LNG carriers and support vessels operating during LNG loading and unloading at the terminal sites.[66] The estimated cumulative peak concentration is based on combining the predicted concentrations from each project at each receptor location regardless of the time when each concentration occurs. Since the timing and location of the maximum predicted impacts from each terminal would differ, and because it is unlikely that all three terminals would be loading LNG vessels simultaneously, the method used to develop the peak cumulative concentrations is conservative.

Peak estimated concentration for criteria pollutants and averaging periods were compared to the NAAQS, which represent standardized air quality criteria and were therefore used as a benchmark for comparison against model results. For all pollutants, except for 1-hour $NO_2$, cumulative impacts are predicted to be below the NAAQS and would disperse before reaching population centers in Port Isabel and Laguna Heights (see appendix E). Although estimated emissions for each project individually would not exceed the NAAQS, for 1-hour $NO_2$, the predicted maximum cumulative impact is estimated to exceed the short-term NAAQS of 188 $\mu g/m^3$. The predicted peak cumulative impact, however, is located between the fence lines of the Rio Grande LNG and Texas LNG terminals. It is unlikely, but possible, that people may be exposed to the $NO_2$ concentrations above the 1-hour NAAQS, which would occur on property within the Port of Brownsville (see appendix E and figure 4.13.2-1 below). Concentrations of 1-hour $NO_2$ in residential areas in Port Isabel and Laguna Heights are estimated to be below 75 $\mu g/m^3$, which is well below the 1-hour NAAQS. While concurrent maximum operations of the LNG facilities would result in increased concentrations of air pollutants in the immediate vicinity

---

[66]    80 annual LNG carrier calls were used for the purposes of estimating emissions during operation for the Annova LNG Project.

**JA278**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

of the facilities, the projects emissions are not expected to result in a significant impact on regional air quality, nor would any exceedance of the NAAQS occur in a populated area.

In response to comments issued by the Sierra Club on the draft EIS, we assessed the potential for cumulative impacts on ozone levels in the Project area. As described in section 4.11.1.3 of the EIS, based on a conservative analysis by the TCEQ, the 8-hour maximum predicted increase in ozone concentration would be 11.6 ppb, which, when combined with the background ozone concentration of 57 ppb, would not result in an exceedance of the 8-hour ozone NAAQS. The Annova LNG terminal and Texas LNG Terminal would not be major PSD sources with respect to ozone precursor pollutants $NO_x$ and VOC; therefore, an ozone impact assessment is not required for air permitting for these projects and is not available for review. Concurrent operation of the three Brownsville LNG terminals would result in greater total emissions of $NO_x$, as described above and in appendix E; however, the combined total annual operating $NO_x$ emissions estimated for the Annova and Texas LNG terminals identified in their draft EISs would be less than 10 percent of the annual $NO_x$ emissions estimated for the Rio Grande LNG terminal. If the maximum predicted increase of ozone concentration estimated for the Rio Grande LNG terminal is increased by 10 percent, and considered with the background ozone concentration identified above, the cumulative impact would not exceed the 8-hour ozone NAAQS.

**JA279**

Document Accession #: 20190315-3053          Filed Date: 03/15/2019



**FIGURE 4.13.2-1    Cumulative Impacts (Rio Grande LNG, Texas LNG, Annova LNG, and Background Concentrations), 1-Hour NO₂**

**JA280**

**TABLE 4.13.2-3**

**Peak Concentrations Estimated in Cumulative Air Dispersion Modeling for Stationary Source and LNG Vessels for the Brownsville Area LNG Projects**

| Criteria Air Pollutant | Averaging Period | Background Concentration [a] $(\mu g/m^3)$ | Peak Concentration based on Modeled Results $(\mu g/m^3)$[b] | | | | NAAQS $(\mu g/m^3)$ |
|---|---|---|---|---|---|---|---|
| | | | Rio Grande LNG Terminal | Annova LNG | Texas LNG | Peak Cumulative Concentration [c] | |
| CO | 1 hour | 2,175.5 | 276.1 | 247.9 | 470.6 | 2,746 | 40,000 |
| | 8 hour | 1,259.5 | 174.0 | 101.7 | 83.4 | 1,453 | 10,000 |
| $NO_2$ | 1 hour | 49.9 | 78.9 | 39.3 | 134.7 | 196 | 188 |
| | Annual | 6.1 | 2.7 | 0.5 | 1.8 | 9 | 100 |
| $SO_2$ | 1 hour | 10.6 | 2.0 | 3.8 | 10.3 | 23 | 196 |
| $PM_{10}$ | 24 hour | 62.0 | 1.4 | 0.7 | 2.3 | 64 | 150 |
| $PM_{2.5}$ | 24 hour | 22.9 | 1.3 | 0.7 | 2.0 | 25 | 35 |
| | Annual | 9.1 | 0.3 | 0.1 | 0.1 | 9 | 12 |

a    Background concentrations retrieved from Tables 4 1 and 4 2 of dispersion modeling report provided for the Texas LNG Project (available on FERC's eLibrary website, located at http://www.ferc.gov/docs filing/elibrary.asp, by searching Docket Number CP16 116 000 and accession numbers 20170928 5165).

b    Modeled impacts include stationary sources and LNG vessels at the LNG terminal sites and are based on 312 LNG carriers annually for the Rio Grande LNG Project and 80 LNG carriers annually for the Annova LNG Project.

c    Peak concentrations predicted for each of the three projects for each receptor location were conservatively combined without regard to day or time of occurrence, and include background concentrations. The peak cumulative concentration for each pollutant and averaging period does not equal the sum of the peak concentrations for each terminal and background, since peak concentrations associated with each terminal occur at different locations.

In addition to operation of the LNG terminal and the vessel emissions described in section 4.11.1.3, air emissions from LNG vessels, considered mobile sources of air emissions, would occur along the entire LNG vessel route during operations. These emissions would be cumulative with the other ships using the ship channel. These mobile sources would be transitory in nature and emissions would occur over a large area, however the cumulative ship emissions would result in long term elevated emissions for the area.

<u>Conclusion</u>

In summary, the Texas LNG Project would result in impacts on air quality during construction and long-term impacts during operations. Cumulative impacts from construction would be limited to the duration of the construction period. However, with other Projects in the vicinity, construction of the Texas LNG Project would contribute to localized moderate elevated emissions near construction areas during the period(s) when construction of these activities would overlap.

Operational air emissions from the Texas LNG Project would contribute to cumulative emissions with other projects in the geographic scope, and would be required to comply with

**JA281**

applicable air quality regulations.  Overall, impacts from the Texas LNG Project along with the other facilities would cause elevated levels of air contaminants in the area and a potential exceedance of the 1-hour $NO_2$ NAAQS in an uninhabited area between the facilities.  Therefore, cumulative impacts on regional air quality as a result of the operation of the Texas LNG Project and other facilities would be long-term during the operational life of the Project, but minor.  In addition, emissions from LNG vessels would occur along vessel transit routes and would be cumulative with the other ships using the ship channel.  These emissions sources would be transitory in nature and emissions would occur over a large area; however, the cumulative ship emissions would result in long term elevated emissions for the area.

**Climate Change**

Climate change is the variation in climate (including temperature, precipitation, humidity, wind, and other meteorological variables) over time, whether due to natural variability, human activities, or a combination of both, and cannot be characterized by an individual event or anomalous weather pattern.  For example, a severe drought or abnormally hot summer in a particular region is not a certain indication of climate change.  However, a series of severe droughts or hot summers that statistically alter the trend in average precipitation or temperature over decades may indicate climate change.  Recent research has begun to attribute certain extreme weather events to climate change (USGCRP 2018).

The leading U.S. scientific body on climate change is the U.S. Global Change Research Program (USGCRP), composed of representatives from thirteen federal departments and agencies[67]  The Global Change Research Act of 1990 requires the USGCRP to submit a report to the President and Congress no less than every four years that "1) integrates, evaluates, and interprets the findings of the Program; 2) analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and 3) analyzes current trends in global change, both human-induced and natural, and projects major trends for the subsequent 25 to 100 years."  These reports describe the state of the science relating to climate change and the effects of climate change on different regions of the U.S. and on various societal and environmental sectors, such as water resources, agriculture, energy use, and human health.

In 2017 and 2018, the USGCRP issued its *Climate Science Special Report: Fourth National Climate Assessment*, Volumes I and II (Fourth Assessment Report) (USGCRP, 2017; and USGCRP, 2018, respectively).  The Fourth Assessment Report states that climate change has resulted in a wide range of impacts across every region of the country.  Those impacts extend beyond atmospheric climate change alone and include changes to water resources, transportation, agriculture, ecosystems, and human health.  The U.S. and the world are warming; global sea level is rising and acidifying; and certain weather events are becoming more frequent and more severe.  These changes are driven by accumulation of GHG in the atmosphere through combustion of fossil fuels (coal, petroleum, and natural gas), combined with agriculture, clearing of forests, and other

---

[67]   The USGCRP member agencies are: Department of Agriculture, Department of Commerce, Department of Defense, Department of Energy, Department of Health and Human Services, Department of the Interior, Department of State, Department of Transportation, Environmental Protection Agency, National Aeronautics and Space Administration, National Science Foundation, Smithsonian Institution, and U.S. Agency for International Development.

**JA282**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

natural sources. These impacts have accelerated throughout the end 20th and into the 21st century (USGCRP 2018).

Climate change is a global phenomenon; however, for this analysis, we will focus on the existing and potential cumulative climate change impacts in the Project area. The USGCRP's Fourth Assessment Report notes the following observations of environmental impacts are attributed to climate change in the Southern Great Plains and South Texas regions (USGCRP, 2017; USGCRP, 2018):

- The region has experienced an increase in annual average temperature of 1°-2°F since the early 20th century, with the greatest warming during the winter months;

- Over the past 50 years, significant flooding and rainfall events followed drought in approximately one-third of the drought-affected periods in the region when compared against the early part of the 20th century;

- The number of strong (Category 4 and 5) hurricanes has increased since the early 1980s; and

- Global sea level rise over the past century averaged approximately eight inches; along the Texas coastline, sea levels have risen 5-17 inches over the past 100 years depending on local topography and subsidence.

The USGCRP's Fourth Assessment Report notes the following projections of climate change impacts in the Project region with a high or very high level of confidence[68] (USGCRP, 2018):

- Annual average temperatures in the Southern Great Plains are projected to increase by 3.6° 5.1°F by the mid-21[st] century and by 4.4°-8.4°F by the late 21st century, compared to the average for 1976-2005;

- The region is projected to experience an additional 30 to 60 days per year above 100°F than it does currently;

- Tropical storms are projected to be fewer in number globally, but stronger in force, exacerbating the loss of barrier islands and coastal habitats;

- Southern Texas is projected to see longer dry spells, although the number of days with heavy precipitation is expected to increase by mid-century; longer periods of time between rainfall events may lead to declines in recharge of groundwater, which would

---

[68]   The report authors assessed current scientific understanding of climate change based on available scientific literature. Each "Key Finding" listed in the report is accompanied by a confidence statement indicating the consistency of evidence or the consistency of model projections. A high level of confidence results from "moderate evidence (several sources, some consistency, methods vary and/or documentation limited, etc.), medium consensus." A *very* high level of confidence results from "strong evidence (established theory, multiple sources, consistent results, well documented and accepted methods, etc.), high consensus." https://science2017.globalchange.gov/chapter/front-matter-guide/

**JA283**

likely lead to saltwater intrusion into shallow aquifers and decreased water availability; and

- Sea level rise along the western Gulf of Mexico during the remainder of the 21st century is likely to be greater than the projected global average of 1-4 feet or more, which would result in the loss of a large portion of remaining coastal wetlands.

It should be noted that while the impacts described above taken individually may be manageable for certain communities, the impacts of compound extreme events (such as simultaneous heat and drought, wildfires associated with hot and dry conditions, or flooding associated with high precipitation on top of saturated soils) can be greater than the sum of the parts (USGCRP 2018).

The GHG emissions associated with construction and operation of the Project are described in section 4.11. Construction and operation of the Project would increase the atmospheric concentration of GHGs in combination with past and future emissions from all other sources and contribute incrementally to future climate change impacts.

Currently, there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to Project's incremental contribution to GHGs. We have looked at atmospheric modeling used by the EPA, National Aeronautics and Space Administration, the Intergovernmental Panel on Climate Change, and others and we found that these models are not reasonable for project-level analysis for a number of reasons. For example, these global models are not suited to determine the incremental impact of individual projects, due to both scale and overwhelming complexity. We also reviewed simpler models and mathematical techniques to determine global physical effects caused by GHG emissions, such as increases in global atmospheric $CO_2$ concentrations, atmospheric forcing, or ocean $CO_2$ absorption. We could not identify a reliable, less complex model for this task and we are not aware of a tool to meaningfully attribute specific increases in global $CO_2$ concentrations, heat forcing, or similar global impacts to project-specific GHG emissions. Similarly, it is not currently possible to determine localized or regional impacts from GHG emissions from the Project.

Absent such a method for relating GHG emissions to specific resource impacts, we are not able to assess potential GHG-related impacts attributable to this project. Additionally, we have not been able to find any GHG emission reduction goals established either at the federal level[69] or by the State of Texas. Without either the ability to determine discrete resource impacts or an established target to compare GHG emissions against, we are unable to determine the significance of the Project's contribution to climate change.

**Noise**

The geographic scope for operational noise from long term projects includes any facilities that can cause an impact at NSAs within 1 mile of the Project. The Annova LNG and Rio Grande LNG Projects have been included in the cumulative impact assessment, as well as other existing

---

[69]    The national emissions reduction targets expressed in the EPA's Clean Power Plan and the Paris climate accord are pending repeal and withdrawal, respectively.

**JA284**

Document Accession #: 20190315-3053          Filed Date: 03/15/2019

temporary, and local impact on air quality, and operation would not impact the local area's air quality designation (i.e., attainment status). Therefore, we conclude that transboundary effects of the Project would not be significant.

# 5.0   CONCLUSIONS AND RECOMMENDATIONS

## 5.1   CONCLUSIONS OF THE ENVIRONMENTAL ANALYSIS

The conclusions and recommendations presented in this section are those of the FERC environmental staff. Our conclusions and recommendations are based on input from the COE, Coast Guard, DOE, DOT, FWS, NPS, NMFS, and FAA as cooperating agencies in the preparation of this EIS. However, the cooperating agencies will present their own conclusions and recommendations in their respective Records of Decision or determinations. The cooperating agencies can adopt this EIS consistent with 40 CFR 1501.3 if, after an independent review of the document, they conclude that their requirements have been satisfied. Otherwise, they may elect to conduct their own supplemental environmental analyses.

We conclude that construction and operation of the Texas LNG Project would result in adverse environmental impacts. Most adverse environmental impacts would be temporary or short-term during construction; however, long-term and permanent impacts on water quality, aquatic resources, wildlife, visual resources, recreation, noise, and air quality would also occur as part of the Project. As part of our analysis, we developed specific mitigation measures that are practical, appropriate, and reasonable for the construction and operation of the Project. We are, therefore, recommending that these mitigation measures be attached as conditions to any authorization issued by the Commission. We conclude that, with the exception of visual impacts, implementation of the mitigation proposed by Texas LNG and our recommended mitigation would ensure that impacts in the Project area would be avoided or minimized and would not be significant. A summary of the Project impacts and our conclusions are presented below by resource.

### 5.1.1   Geologic Resources

Construction and operation of the Project would not materially alter the geologic conditions of the Project area, and the Project would not affect the extraction of mineral resources during construction or operation. Blasting is not anticipated during construction of the Project. Based on Texas LNG's proposal, including implementation of the Project-specific ECP, we conclude that impacts on geologic resources would be adequately minimized and would not be significant.

### 5.1.2   Soils

Construction of the Project facilities would disturb soils, resulting in increased potential for erosion, compaction, and the mixing of topsoil and subsoil. One soil in the Project area is highly susceptible to erosion by water. Most soils in the Project area are compaction prone and have low revegetation potential due to high salinity. Texas LNG would also import soils and may use dredge material to raise the elevation of the Project site. Texas LNG would implement the measures outlined in the Project-specific ECP to minimize impacts on soils.

JA285

During operation, the Project would have a positive economic effect on the general community, including minority and low-income populations through job creation, economic activity, and tax payments. The Project would not significantly affect urban or residential areas, nor would there be disproportionately high and adverse human health or environmental effects on minority populations, low-income communities, or Indian tribes. Therefore, we conclude that construction and operation of the Project would not disproportionately affect any population group, and no environmental justice issues are anticipated as a result of construction or operation of the Project.

## 5.1.11 Cultural Resources

One previously recorded cultural resource site, Site 41CF8 (Garcia Pasture Site), is within the Project site and the direct APE and is listed on the NRHP. Cultural resource surveys of the site conducted for the Project identified two areas within the site that contain intact buried cultural deposits that would be considered contributing elements to the Garcia Pasture Site. No other cultural resource sites were identified within the Project APE. We have identified site 41CF8 as an historic property in the APE that would be adversely affected. Texas LNG has produced a treatment plan that the THC found acceptable. We have not yet completed consultations with the ACHP regarding the adverse impacts on the Garcia Pasture Site; therefore, we recommend that consultations with ACHP be completed prior to the start of construction. With the implementation of our recommendation as well as Texas LNG's treatment plan, we have determined that impacts on cultural resources would not be significant.

## 5.1.12 Air Quality and Noise

### 5.1.12.1     Air Quality

Construction of the Project would result in temporary impacts on air quality associated with the emissions generated from fossil-fuel fired construction equipment and fugitive dust. Emissions from construction activities over the nearly 5-year construction period for the Project would be temporary and localized and, therefore, not have a long-term effect on regional air quality. The Project would be in an area currently classified as being in attainment for all criteria pollutant standards. Fugitive dust emissions would be minimized through implementation of Texas LNG's Fugitive Dust Control Plan.

During operation of Phase 1 and before completion of construction and commissioning of Phase 2, when commissioning and/or operational activities are occurring concurrent with construction activities, impacts could be greater than those from the Project operations alone. The combination of construction, commissioning, and operational short-term emissions would, at times, be in excess of the modeled operational emissions alone in 2022, 2023, and 2024. During the concurrent construction, commissioning, and operational activities, the higher level of emissions could result in intermittent exceedances of certain NAAQS. These exceedances would not be persistent at any one time during these years due to the dynamic and fluctuating nature of construction activities within a day, week, or month.

The Project is not subject to the federal PSD review/permitting; as a result, the LNG terminal is subject to the NSR minor source construction permitting program under Texas

**JA286**

regulations.  Because potential operating emissions for the Project exceed the Title V major source threshold for at least one criteria air pollutant, the LNG terminal is subject to the Title V operating permit program.  Texas LNG submitted an air quality impact analysis demonstrating that for operational emissions of each criteria air pollutant, the model-predicted impact plus background concentration does not cause or contribute to an exceedance of the NAAQS.

We analyzed the estimated emissions from construction and operation of the Project, and the potential air quality impacts from operation of the LNG facility and other nearby proposed sources.  Based on our independent review of the analyses conducted and Texas LNG's proposed mitigation measures, we conclude that construction of the Project would result in elevated emissions near construction areas and would impact local air quality.  Through use of mitigation measures during construction activities and application of best available control technologies during operation, we conclude that there would be no regionally significant impacts on air quality.

### 5.1.12.2     Noise

Noise levels associated with construction activity would vary depending on the phase of construction in progress at any time. The highest level of construction noise at the Project typically occurs during earth-moving and pile-driving work. The predicted sound levels at nearby NSAs during Project construction were lower than the Commission's noise standard of 55 dBA $L_{dn}$.

Pile driving, which would occur for approximately 13 months, with peak pile driving activities occurring over 4 months, was calculated to produce $L_{eq}$ sound levels that are below our noise criterion of 55 dBA at the nearest NSA. The calculated maximum sound levels or $L_{max}$ of pile driving (i.e., highest sound level during each hammer strike) would be similar to, to slightly above, the existing ambient levels. Although pile driving would be clearly audible at nearby residences when ambient sound levels are low, it would only occur during daytime construction hours (typically 7 a.m. to 5 p.m.).  The impulsive noise of pile driving would be audible outside of residences, and potentially indoors in the homes closest to the Project. Therefore, to ensure that impacts due to maximum pile driving noise levels at the Project would be minimized, we recommend that Texas LNG monitor sound levels during the start of pile driving activities.  If the sound levels due to pile driving are greater than 10 dBA over the ambient sound levels, then Texas LNG would cease activities, implement noise mitigation, and file evidence of reduced pile driving sound levels.  Additionally, Texas LNG committed to implementing noise mitigations during in-water pile driving, such as cushion blocks or bubble curtains, that would reduce the underwater pile driving sound levels.

During operation, the LNG terminal would generate noise levels that would occur throughout the life of the Project.  Noise would be produced continually by a number of sources that include various types of compressors, engines, motors, cooling fans, pumps and piping. The LNG terminal would be constructed in two phases, and each phase would be commissioned and brought online as it is completed. Operational noise levels were modeled for Phase 1 and for Phases 1 and 2 in simultaneous operation.  The predicted sound levels for operations for Phase 1 and for the combination of Phases 1 and 2 were below our 55 dBA $L_{dn}$ criteria at the nearest NSAs, and resulted in potential increases in the ambient sound levels of 0.1 to 0.7 for Phase 1 and 0.1 to 1.0 dBA $L_{dn}$ for Phase 1 and 2.  These increases would be considered imperceptible to most listeners. Therefore, noise impacts due to operation of the Project would not be significant.

In order to ensure that the sound levels due to the Project are consistent with modeling used in our analysis, we recommend that Texas LNG perform a full load noise survey within 60 days of placing each liquefaction train into service. In addition, we recommend that a full load noise survey be conducted for the facility, after the completion of Phases 1 and 2. All post-construction survey recommendations require noise mitigation to be implemented if the noise attributable to the Project is greater than 55 dBA $L_{dn}$ at any nearby NSAs. Based on the noise analysis above, and our recommendations, we conclude that construction and operation of the Project would not have a significant impact on the noise environment near the Project.

### 5.1.13  Reliability and Safety

As part of the NEPA review and NGA determinations, Commission staff assesses the potential impact to the human environment in terms of safety and whether the proposed facilities would operate safely, reliably, and securely.

As a cooperating agency, the DOT advises the Commission on whether Texas LNG's proposed design would meet the DOT's 49 CFR 193 Subpart B siting requirements. The DOT reviewed the design spill information submitted by Texas LNG and on June 22, 2018, provided a letter to FERC staff stating that the DOT had no objection to Texas LNG's design spill selection methodology to comply with the Part 193 siting requirements for the proposed LNG liquefaction facilities, but would need to resolve legal control of exclusion zones. On February 13, 2019, the DOT issued an LOD to FERC regarding the proposed Project's compliance with the 49 CFR 193, Subpart B regulatory requirements.[72]  The LOD provides PHMSA's analysis and conclusions regarding 49 CFR 193, Subpart B regulatory requirements, including the resolution of legal control of exclusion zones, for the Commission's consideration in its decision on the Project application. If the Project is authorized and constructed, the facility would be subject to the DOT's inspection and enforcement program and final determination of whether a facility is in compliance with the requirements of 49 CFR 193 would be made by the DOT staff.

As a cooperating agency, the Coast Guard also assisted the FERC staff by reviewing the proposed LNG terminal and the associated LNG carrier traffic. The Coast Guard reviewed a WSA submitted by Texas LNG that focused on the navigation safety and maritime security aspects of LNG carrier transits along the affected waterway. On February 14, 2018, the Coast Guard issued a LOR to FERC staff indicating the Brownsville Ship Channel would be considered suitable for accommodating the type and frequency of LNG marine traffic associated with this Project, based on the WSA and in accordance with the guidance in the Coast Guard's NVIC 01-11. If the Project is authorized and constructed, the facility would be subject to the Coast Guard's inspection and enforcement program to ensure compliance with the requirements of 33 CFR 105 and 33 CFR 127.

As a cooperating agency, FAA assisted FERC staff in evaluating impacts to and from the SpaceX rocket launch facility. Specific recommendations are included to address potential impacts from rocket launch failures to the Project. However, the extent of impacts to SpaceX operations, National Space Program, and to the federal government would not fully be known until

---

[72]  February 13, 2019 letter "Re: Texas LNG Project, Docket No. CP16-116-000, 49 CFR, Part 193, Subpart B, Siting  Letter of Determination" from Massoud Tahamtani to Rich McGuire.  Filed in Docket Number CP16-116-000 on February 13, 2019.  FERC eLibrary accession number 20190214-3002.

**JA288**

**APPENDIX A**

**DISTRIBUTION LIST**

# APPENDIX A

## DISTRIBUTION FOR THE NOTICE OF AVAILABILITY

**Federal Government Agencies**

Federal Emergency Management Administration, Mr. Tony Robinson, TX

National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Mr. Miles Croom, FL

National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Mr. Russell Swafford, TX

National Oceanic and Atmospheric Administration. National Marine Fisheries Service, Dr. Roy Crabtree, FL

Natural Resource Conservation Service, Mr. Salvador Salinas, TX

Natural Resource Conservation Service, Cameron County, Mr. Osvaldo Longoria, Jr., TX

Pipeline and Hazardous Materials Safety Administration; Engineering and Research Division PHP-80, Mr. Buddy Secor, Jr., P.E., DC

U.S. Army Corps of Engineers, Galveston District, Col. Richard P. Pannell, TX

U.S. Army Corps of Engineers, Galveston District, Dr. Edmond J. Russo Jr., TX

U.S. Army Corps of Engineers, Galveston District, Lt. Col. Jared Erickson, TX

U.S. Army Corps of Engineers, Regulatory Division, Mr. Dwayne Johnson, TX

U.S. Army Corps of Engineers, Regulatory Division, Mr. Jayson Hudson, TX

U.S. Army Corps of Engineers, Regulatory Division, Ms. Janet Thomas Botello, TX

U.S. Coast Guard, Lt. John Robertson, TX

U.S. Coast Guard, Corpus Christi, Lt. Cmdr. Russell Pickering, TX

U.S. Coast Guard, Sector / Air Station Corpus Christi, Captain Michael S. Antonellis, TX

U.S. Coast Guard, Sector / Air Station Corpus Christi, Captain Samuel R. Creech Jr., TX

U.S. Coast Guard, Sector / Air Station Corpus Christi, Commander Lance C. Belben, TX

U.S. Coast Guard, Sector / Air Station Corpus Christi, Master Chief Ian S. Lee, TX

U.S. Department of Energy, Mr. John Anderson, DC

U.S. Department of Transportation, Mr. Timothy P. Butters, DC

U.S. Environmental Protection Agency, Region 7, Mr. Rob Lawrence, TX

U.S. Fish and Wildlife Service, Dr. Benjamin Tuggle, NM

U.S. Fish and Wildlife Service, Mr. Boyd Blihovde, TX

U.S. Fish and Wildlife Service, Mr. Ernesto Reyes, TX

U.S. Fish and Wildlife Service, Ms. Dawn Gardiner, TX

U.S. Fish and Wildlife Service, Ms. Pat Clements, TX

U.S. Environmental Protection Agency, Region 6, Mr. Bill Honker, TX

**JA290**

U.S. Environmental Protection Agency, Region 6, Mr. John Blevins, TX

U.S Environmental Protection Agency, Region 6, Mr. Ron Curry, TX

U.S. Army Corps of Engineers, Galveston District, Ms. Denise Sloan, TX

National Park Service, Intermountain Region Environmental Quality, Mr. David Hurd, CO

National Park Service, Intermountain Region Environmental Quality, Ms. Melissa Trenchik, CO

National Park Service, Heritage Partnerships Programs, Ms. Christine Whitacre, CO

National Park Service, Heritage Partnerships Programs, Mr. Tom Keohan, CO

National Park Service, American Battlefield Protection Program, Mr. Patrick Jennings, D.C.

National Park Service, Palo Alto Battlefield National Historical Park, Mr. Mark Spier, TX

National Park Service, Palo Alto Battlefield National Historical Park, Mr. Rolando Garza, TX

Office for Oil and Gas Global Security and Supply, Office of Fossil Energy, Kyle Moorman, DC

Office for Oil and Gas Global Security and Supply, Office of Fossil Energy, Brian Lavoie, DC

Senate Energy and Natural Resources Committee, Lisa Murkowski, DC

Army Corps of Engineers, Planning and Policy Division, Attn: CECW-P, DC

Bureau of Indian Affairs, DOI, Terry L McClung, DC

Bureau of Indian Affairs, DOI, BJ Howerton, VA

U.S. Bureau of Land Management, DOI, US Department of Interior, DC

Bureau of Ocean Energy Management, DOI, Dr. Jill Lewandowski, VA

Bureau of Safety and Environmental Enforcement, DOI, David Fish, VA

National Park Service, DOI, Patrick Walsh, CO

Bureau of Oceans & International Environmental & Scientific Affairs, DOS, Alexander Yuan, DC

Council on Environmental Quality, Edward Boling, DC

U.S. Department of Health and Human Services, Mr. Everett Bole, CHMM, DC

Environment and Natural Resources Division, DOJ, US Department of Justice, DC

Environmental Protection Agency, Lawrence Starfield, DC

Environmental Protection Agency, Jerome Blackman, DC

Environmental Protection Agency, Susan E Bromm, DC

National Center for Environmental Health, CDC, HHS, Sharunda Buchanan, GA

USDA Forest Service-Ecosystem Management Coordination, Joe Carbone, DC

Natural Resources Conservation Service, USDA, Andree DuVarney, DC

Conservation and Environmental Program Division, FSA, USDA, Nell Fuller, DC

NOAA National Marine Fisheries Service, Dept. of Commerce, NOAA National Marine Fisheries Service, MD

**JA291**

Office of Environment and Energy, HUD, Danielle Schopp, DC

Office of Environmental Management, DOE, Mark Whitney, DC

US Department of Energy, John Anderson, DC

Office of NEPA Policy and Compliance, DOE, Brian Costner, DC

Office of Federal Programs, Advisory Council on Historic Preservation, Charlene D Vaughn, DC

Surface Transportation Board, USDOT, Victoria Rutson, DC

Office of Assistant Secretary for Transportation Policy, USDOT, Camille Mittelholtz, DC

Office of Assistant Secretary for Transportation Policy, USDOT, Helen Serassio, DC

Pipeline & Hazardous Materials Safety Administration USDOT, William Schoonover, DC

Pipeline & Hazardous Materials Safety Administration, Office of Pipeline Safety, USDOT, Karen Lynch, DC

Office of Pipeline Safety USDOT PHMSA, Kenneth Y Lee, DC

Office of Pipeline Safety USDOT PHMSA, Melanie Stevens, DC

Office of Pipeline Safety USDOT PHMSA, Ahuva Battams, DC

US Geological Survey, Esther Eng, VA

US Customs and Border Protection Dept. of Homeland Security, Christopher Oh, DC

DoD Siting Clearinghouse, Steve Sample, DC

Office of the Deputy Under Secretary of Defense (Installations &

Environment), ATTN: Chief, Mission Evaluation Branch, DC

Office of the Deputy Assistant Secretary of the Army (Energy & Sustainability), ATTN: Liaison, DoD Siting Clearinghouse, DC

Office of the Assistant Secretary of the Army for Civil Works, Assistant for Environment, Tribal & Regulatory Affairs, DC

Office of the Assistant Secretary of the Navy (Energy, Installations and Environment), DC

Office of the Deputy Assistant Secretary of the Air Force (Installations), ATTN: Liaison, DoD Siting Clearinghouse, DC

Commandant (CG-OES-4) Chief (Acting), Deepwater Ports Standards Division, U.S. Coast Guard, Curtis E. Borland, DC

**Federal Senators and Representatives**

Office of U.S. House of Representative Filemon Vela, Ms. Perry Brody, TX

Office of U.S. House of Representative Filemon Vela, Ms. Marisela Cortez, TX

Office of U.S. Senator John Cornyn, Ms. Ana Garcia, TX

Office of U.S. Senator Ted Cruz, Ms. Casandra Garcia, TX

U.S. House of Representatives, The Honorable Filemon Vela Jr., DC

U.S. Senate, The Honorable John Cornyn, DC

U.S. Senate, The Honorable Ted Cruz, DC

**State Government Agencies**

Texas Parks and Wildlife Department, Mr. Willy Cupit, TX

A-3

**JA292**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

Railroad Commission of Texas, Mr. David Porter, TX

Railroad Commission of Texas, Mr. Ryan Sitton, TX

Railroad Commission of Texas, Ms. Christi Craddick, TX

Railroad Commission of Texas, Ms. Leslie Savage, TX

Texas Commission on Environmental Quality, Mr. David Galindo, TX

Texas Commission on Environmental Quality, Mr. Erik Hendrickson, P.E., TX

Texas Commission on Environmental Quality, Mr. Steve Hagle, TX

Texas Commission on Environmental Quality, Ms. Kate Stinchcomb, TX

Texas Commission on Environmental Quality, Ms. Ruth Alvirez, TX

Texas General Land Office, Mr. George P. Bush, TX

Texas General Land Office, Mr. Tony Williams, TX

Texas Historical Commission, Mr. David Camarena, TX

Texas Historical Commission, Mr. Mark Wolfe, TX

Texas Parks and Wildlife Department, Cameron County, Mr. David Veale, TX

Texas Parks and Wildlife Department, Ms. Julie Wicker, TX

Texas Parks and Wildlife Department, Robin Riechers, TX

**State Officials**

State of Texas, The Honorable Eddie Lucio Jr., TX

State of Texas, The Honorable Ken Paxton, TX

State of Texas, The Honorable Dan Patrick, TX

State of Texas, The Honorable Greg Abbott, TX

State of Texas, Secretary Carlos Cascos, TX

**State Senators and Representatives**

Office of Representative Eddie Lucio, III, Mr. Ruben O'Bell, TX

Office of Representative Rene Oliveira, Mr. JJ Garza, TX

Office of Senator Eddie Lucio, Jr., Mr. Louie Sanchez, TX

State of Texas, Representative Eddie Lucio III, TX

State of Texas, Representative René O. Oliveira, TX

**Local Government Agencies**

Brownsville Chamber of Commerce, Ms. Andrea Figueroa Benton, TX

Brownsville Independent School District, Dr. Esperanza Zendejas, TX

Brownsville Independent School District, Mr. Cesar Lopez, TX

Brownsville Independent School District, Mr. Jose Hector Chirinos, TX

Brownsville Independent School District, Ms. Minerva M. Pena, TX

Cameron County, Mr. Alex Dominguez, TX

Cameron County, Mr. Armando Lucio, TX

Cameron County, Mr. Bennie Ochoa, TX

Cameron County, Mr. Charles "Chuck" D. Hoskins, TX

Cameron County, Mr. Dan Sanchez, TX

**JA293**

Cameron County, Mr. David A. Betancourt, TX

Cameron County, Mr. David A. Garza, TX

Cameron County, Mr. David Garcia, TX

Cameron County, Mr. David Hanawa, TX

Cameron County, Mr. Frutoso Gomez, TX

Cameron County, Mr. Gus Reyna Jr., TX

Cameron County, Mr. Humberto Barrera, TX

Cameron County, Mr. Joe E. Vega, TX

Cameron County, Mr. Luis V. Saenz, TX

Cameron County, Mr. Omar Lucio, TX

Cameron County, Mr. Pete Sepulveda Jr., TX

Cameron County, Mr. David Garcia, TX

Cameron County, Mr. Tony Yzaguirre, Jr., TX

Cameron County, Ms. Martha Galarza, TX

Cameron County, Ms. Sofia C. Benavides, TX

Chamber of Commerce Port Isabel, Ms. Betty Wells, TX

Chamber of Commerce South Padre Island, Ms. Roxanne Guenzel, TX

City of Brownsville, Dr. Rose M.Z. Gowen, TX

City of Brownsville, Mr. Charlie Cabler, TX

City of Brownsville, Mr. Damaris McGlone, TX

City of Brownsville, Mr. Joe Chavez, TX

City of Brownsville, Mr. John Villarreal, TX

City of Brownsville, Mr. Leonardo Perez, TX

City of Brownsville, Mr. Michael Warrix, TX

City of Brownsville, Mr. Odee A. Leal, TX

City of Brownsville, Mr. Orlando Rodriguez, TX

City of Brownsville, Mr. Pete Gonzalez, TX

City of Brownsville, Mr. Ricardo Longoria Jr., TX

City of Brownsville, Mr. Robert Esparza, TX

City of Brownsville, Mr. Santana Torres, TX

City of Brownsville, Ms. Deborah Portillo, TX

City of Brownsville, Ms. Jessica Tetreau-Kalifa, TX

City of Brownsville, The Honorable Tony Martinez, TX

City of Brownsville, Mr. Cesar de Leon, TX

City of Port Isabel, Mr. Charlie Wood, TX

City of Port Isabel, Mr. Daniel Marchan, TX

City of Port Isabel, Mr. Jared Hockema, TX

City of Port Isabel, Mr. Gually Gonzalez, TX

City of Port Isabel, Mr. Jeffery David Martinez, TX

City of Port Isabel, Mr. Juan Jose Zamora, TX

City of Port Isabel, Mr. Martin C. Cantu, TX

City of Port Isabel, Mr. Rodrigo Garcia, TX

City of Port Isabel, Ms. Maria de Jesus Garza, TX

City of Port Isabel, Mr. Joe E. Vega, TX

City of San Benito, Mr. Manuel Lara, TX

City of South Padre Island, Mr. Alex Avalos, TX

City of South Padre Island, Mr. Bill DiLibero, TX

City of South Padre Island, Mr. Dennis Stahl, TX

**JA294**

City of South Padre Island, Mr. Marcus
Smith, TX

City of South Padre Island, Mr. Randy
Smith, TX

City of South Padre Island, Mr. Sam Listi,
TX

City of South Padre Island, Ms. Alita
Bagley, TX

City of South Padre Island, Ms. Julee
LaMure, TX

Laguna Madre Water District, Mr. Jeff
Keplinger, TX

Laguna Madre Water District, Mr. Rick
Wells, TX

Laguna Madre Water District, Mr. Scott D.
Friedman, TX

Los Fresnos, Mr. Mark Milum, TX

Point Isabel Independent School District,
Dr. Lisa Garcia, TX

Point Isabel Independent School District,
Mr. Henry LeVrier, TX

Point Isabel Independent School District,
Mr. Joseph Furcron, TX

Point Isabel Independent School District,
Mr. Jimmy Vela, TX

Point Isabel Independent School District,
Ms. Bertha Zamora, TX

Point Isabel Independent School District,
Ms. Cecilia Castillo, TX

Point Isabel Independent School District,
Ms. Diane O'Leary, TX

Point Isabel Independent School District,
Ms. Jennifer Pinkerton, TX

Point Isabel Independent School District,
Ms. Olga Vega-Carter, TX

Port Isabel Chamber of Commerce, Ms.
Betty P. Wells, TX

Port Isabel Chamber of Commerce, Ms.
Ramona Kantack, TX

Rio South Texas Economic Council, Ms.
Alma Puente Colleli, TX

South Padre Island, The Honorable Barry
Patel, TX

Town of Laguna Vista, Ms. Susie Houston,
TX

Town of Laguna Vista, Mr. Mike Carter, TX

Town of Laguna Vista, Ms. Wanda Reyes-
Rice, TX

Town of Laguna Vista, Mr. Frank T.
Davalos Jr., TX

Town of Laguna Vista, Ms. Leti Martinez
Keplinger, TX

Town of Laguna Vista, Mr. Gary Meschi,
TX

Town of Laguna Vista, Mr. Richard
Hinojosa, TX

Town of Laguna Vista, Mr. Ronaldo Vela,
TX

Town of Laguna Vista, Mr. Anthony Alan
David, TX

Town of Laguna Vista, Mr. Robert
McGinnis, TX

**Native American Groups**

Alabama-Coushatta Tribe of Texas, Mr.
Bryant Celestine, TX

Alabama-Coushatta Tribe of Texas, Mr.
Ronnie Thomas, TX

Apache Tribe of Oklahoma, Mr. Lyman
Guy, OK

Comanche Nation, Oklahoma, Mr. Jimmy
Arterberry, NM

Comanche Nation, Oklahoma, Mr. Wallace
Coffey, OK

Jicarilla Apache Nation, Mr. Jeffery Blythe,
TX

**JA295**

Jicarilla Apache Nation, Mr. Ty Vincenti, NM

Kickapoo Traditional Tribe of Texas, Mr. Juan Garza, Jr., OK

Kiowa Tribe of Oklahoma, Ms. Amber Toppah, NM

Mescalero Apache Tribe, Mr. Danny H. Breuninger, Jr., NM

Mescalero Apache Tribe, Ms. Holly Houghten, TX

Tonkawa Tribe of Oklahoma, Mr. Donald L. Platterson, OK

Ysleta Del Sur Pueblo of Texas, Mr. Frank K. Paiz, TX

**Libraries**

Brownsville Public Library System, Ms. Brenda Trevino, TX

Brownsville Public Library System, Ms. Corinna Galvan, TX

Port Isabel Public Library, Ms. Janie Villarreal, TX

**Companies and Organizations**

710 KURV, Mr. Davis  Rankin, TX

Ambiotech Engineering, Dr.  Carlos Marin, TX

Audubon Texas , Mr. Pete Moore, TX

Brazos Santiago Pilots Association, Captain Grant S. Wilson, TX

Brownsville Downtown Lions Club, Ms. Tina Ruiz, TX

Brownsville Economic Development Council, Mr. Gilbert Salinas, TX

Brownsville Economic Development Council, Mr. Jason Hilts, TX

Brownsville Economic Development Council, Ms. Lizzy de la Garza Putegnat, TX

Brownsville Historical Association, Ms. Tera Putenga, TX

Brownsville Nite Lions, Mr. Jesse Gonzales, TX

Brownsville Public Utilities Board, Mr. Murith Galonsky, TX

Brownsville Public Utilities Board, Mr. Fernando Saenz, TX

Brownsville Public Utilities Board, Mr. John Bruciak, TX

Brownsville Public Utilities Board, Mr. Rafael Vela, TX

Brownsville Public Utilities Board, Ms. Edna Oceguera, TX

Brownsville Rotary Club, Mr. Nick Tipton, TX

Cameron County Historical Commission, Ms. Betty Agado, TX

Economic Development Corporation, South Padre Island, Ms. Darla Lapeyre, TX

Gladys Porter Zoo, Dr. Patrick M. Burchfield, TX

Gladys Porter Zoo, Ms. Cynthia Garza Galvan, TX

Gobar Systems Inc., Mr. Rolando Gonzalez Barron, TX

International Bank of Commerce, Brownsville, Mr. Fred Rusteberg, TX

Island Services Realty, Mr. Robert Pinkerton Jr., TX

KGBT, Mr. Tom Keeler, TX

KGBT, Ms. Roni Silva, TX

KGBT, Ms. Tiffany Huertas, TX

KRGV, Ms. Shelley Childers, TX

KVEO, Ms. Marty Watson, TX

Leadership Brownsville, Mr. Eddie Sikes, TX

**JA296**

Lower Laguna Madre Coastal Conservation Association, Mr. Oscar Garcia, TX

Lower Laguna Madre Coastal Conservation Association, Mr. Travis Flanagan, TX

Lower Laguna Madre Coastal Conservation Association, Mr. Wes Hudson , TX

Lower Rio Grande Valley Development Council, Mayor Chris Boswell, TX

Lower Rio Grande Valley Development Council, Mr. Terrie G. Salina, TX

Port Isabel - San Benito Navigation District, Mr. Steven B. Bearden, TX

Port Isabel Economic Development Corporation, Mr. Scott Friedman, TX

"Port Isabel Economic Development Corporation, Mr. Inocente

 Zurita, TX"

Port Isabel Economic Development Corporation, Mr. Jimmy Vela, TX

Port Isabel Economic Development Corporation, Mr. Larry Ellis, TX

Port Isabel Rotary Club, Ms. Jacqui Dempsey, TX

Port Isabel South Padre Press, Ms. Dina Arevalo, TX

Port Isabel/San Benito Navigation District , Mr. Steve Bearden, TX

Port of Brownsville, Mr. Ariel Chavez, TX

Port of Brownsville, Mr. Carlos Garcia, TX

Port of Brownsville, Mr. Carlos R. Masso, TX

Port of Brownsville, Mr. Eduardo A. Campirano, TX

Port of Brownsville, Mr. Eduardo Campirano, TX

Port of Brownsville, Mr. John Reed, TX

Port of Brownsville, Mr. John Wood, TX

Port of Brownsville, Mr. Mario Esquivel, TX

Port of Brownsville, Mr. Ralph Cowen, TX

Port of Brownsville, Mr. Sergio "Tito" Lopez, TX

Port of Brownsville, Ms. Beatrice G. Rosenbaum, TX

Port of Brownsville, Ms. Donna Eymard, TX

Rio Grande Valley Partnership, Mr. Julian Alvarez, TX

Rio Grande Valley Partnership, Ms. Deborah Cordova, TX

Rio Grande Guardian, Mr. Joey Gomez, TX

Rio Grande Guardian, Mr. Steve Tyler, TX

San Benito News, Mr. Jacob Lopez, TX

Texas Economic Development Corporation, Ms. Romina Black, TX

Texas Economic Development Council, Mr. Carlton Schwab, TX

Texas Rio Grande Legal Aid, Mr. Robert Duggett, TX

Texas Southmost College, Dr. Lily F. Tercero, TX

Texas Southmost College, Dr. Reynaldo Garcia, TX

Texas Southmost College, Mr. Art Rendon, TX

Texas Southmost College, Mr. Ed Rivera, TX

Texas Southmost College, Mr. Francisco (Kiko) Rendon, TX

Texas Southmost College, Mr. Ramon Hinojosa, TX

Texas Southmost College, Mr. Trey Mendez, TX

**JA297**

Texas Southmost College, Ms. Adela Garza, TX

Texas State Technical College, Dr. Stella Garcia, TX

The Brownsville Herald, Mr. Ryan Henry, TX

The Brownsville Herald, Mr. Steve Clark, TX

The Brownsville Herald, Mr. Ty Johnson, TX

The Monitor, Mr. Carlos Sanchez, TX

University of Texas Rio Grande Valley, Dr. Guy Bailey, TX

United Brownsville, Mr. Mike Gonzalez, TX

University of Texas at Brownsville, Dr. Jude Benavides, TX

University of Texas Brownsville, Dr. William R. Fannin, TX

University of Texas Brownsville, Mr. Irv Downing, TX

Valley Morning Star, Ms. Marci Caltabiano-Ponce, TX

Valley Regional Medical Center, Mr. Jim Tipton, TX

Valley Regional Medical Center, Mr. Steven Hoelscher, TX

Valley Regional Medical Center, Ms. Susan Andrews, TX

Workforce Solutions, Mr. Pat Hobbs, TX

Defenders of Wildlife, Mr. Jason C. Rylander, DC

**Individuals**

Mr. Gene N. Washburn, TX

Mr. Rob Nixon, TX

Ms. Edna Goette, TX

Ms. Helen O. Delgadilli, TX

Ms. Rhiannan Bates, TX

Mr. Rafael Salazar, TX

Ms. Lucila Martinez, TX

Mr. Gal Salazar, TX

Mr. Chris Watenpool, TX

Ms. Mary Lewis, TX

Mr. Stan O. Sterba, TX

Mr. Tommie Bucher, TX

Ms. Nancy Patterson, TX

Dr. John E. Kriller, TX

Mr. Philip Lawhon, TX

Mr. Sergio A. Saline, TX

Ms. Juliet Vallejo, TX

Ms. Viola Galvan, TX

Ms. Rebecca Hasse, TX

Ms. Maria Galasso, TX

Ms. Angie Gamez, TX

Mr. G Uhles, TX

Mr. Alex Dominguez, TX

Ms. Kristen Kline, TX

Ms. Ida Trevino, TX

Mr. Reyes Martinez, Jr., TX

Ms. Dora E. Lopez, TX

Mr. Julian Martinez, TX

Mr. Rico Roser, TX

Mr. Willy Cupit, TX

Ms. Laurel Steinberg, TX

Mr. Dutch Fisher, TX

Ms. Deborah Ruralcaba, TX

Ms. Stefanie Herweck, TX

Mr. Jim Chapman, TX

Mr. Pete Sepulueda, TX

Ms. Beatrice Martinez, TX

**JA298**

Ms. Diana Muzquiz, TX

Ms. Marisela Cortez , TX

Ms. Alma G. Leal, TX

Ms. Karen Boward, TX

Mr. Glenn Boward, TX

Mr. Ronaldo Garcia, TX

Ms. Diane Teter, TX

Mr. Rick Teter, TX

Mr. Faiz Rahman, TX

Mr. Raul Garza, TX

Mr. Jorge Rodarte, TX

Dr. John E. Keller, TX

Mr. Sergio Trevino, TX

Mr. Tereace Garrett, TX

Mr. Steve Mclaughlin, TX

Ms. Karin Hall, TX

Mr. Carlos Galvan, TX

Ms. Kate Cervone, TX

Ms. Cecilia Garrett, TX

Mr. Don Hockaday, TX

Mr. Marcos Munoz, TX

Mr. Greg Heig, TX

Ms. Lauren Heig, TX

Mr. Black Schroeder, TX

J.A. Escamille, TX

Ms. Charlotte A. Barker, TX

Ms. Nicole Ckstrom, TX

Ms. Cynthia Garza, TX

Ms. Norma Saenz, TX

S. Merril, TX

Ms. Margie Recio, TX

Mr. Oscar Garcia, TX

Ms. Gayle Hood, TX

Mr. Gary Snyder, TX

Ms. Cecelia DeMello, TX

Ms. Ann Banks, TX

Dr. John Keller, TX

Mr. Gary Tate, TX

Mr. Ken Rosevelt, TX

Ms. Linda Rosevelt, TX

Mr. David Suissa, TX

Ms. Laurie Howell, TX

Mr. Bill Hoenes, TX

Ms. Juliet Vallejo, TX

Mr. Josh Ballenso, TX

Mr. Kevin Horton, TX

Mr. Charles Irvine, TX

Ms. Debbie Bechulh, TX

Mr. Dennis Stahl, TX

Mr. Tom Davis, NM

Mr. Sean Oneil, TX

Ms. Debora Oneil, TX

Ms. Alice Bay, TX

Mr. Remmic Lewis, TX

Ms. LaVina Jo Meyer, TX

Ms. Sandra Vallejo, TX

Ms. Pat Younger, TX

Ms. Mel Torres, TX

Ms. Hilary Swarts, TX

Ms. Greta Daniels, TX

Ms. Julie Reardon, TX

Ms. Evelyn Merz, TX

Ms. Christine Rakestraw, TX

Mr. Michael Cateona, TX

Mr. Chalres Schmidt, TX

Mr. Guillermo Rico, TX

**JA299**

Document Accession #: 20190315-3053     Filed Date: 03/15/2019

Ms. Susan Geery, TX

Mr. Ed McBride, TX

Ms. Jennifer Favela, TX

**JA300**

USCA Case #23-1175     Document #2045210     Filed: 03/15/2024     Page 310 of 562

169 FERC ¶ 61,130
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
                        Richard Glick and Bernard L. McNamee.

| | |
|---|---|
| Texas LNG Brownsville LLC | Docket No.  CP16-116-000 |

ORDER GRANTING AUTHORIZATION UNDER SECTION 3 OF THE
NATURAL GAS ACT

(Issued November 22, 2019)

1.      On March 30, 2016, Texas LNG Brownsville LLC (Texas LNG) filed an
application pursuant to section 3 of the Natural Gas Act (NGA)[1] and Part 153 of the
Commission's regulations[2] for authorization to site, construct, and operate facilities for
the liquefaction and export of domestically-produced natural gas at a proposed liquefied
natural gas (LNG) terminal on the north side of the Brownsville Ship Channel in
Cameron County, Texas (Texas LNG Project).

2.      For the reasons discussed in this order, we will authorize Texas LNG's proposal,
subject to the conditions discussed below.

I.      **Background**

3.      Texas LNG, a limited liability company organized under the laws of Delaware
with its headquarters in Houston, Texas, is a single purpose subsidiary of Texas LNG
LLC.  As its operations will not be in interstate commerce, Texas LNG will not be a
"natural gas company" as defined in the NGA, although it will be subject to the
Commission's jurisdiction under NGA section 3.

II.     **Proposal**

4.      Texas LNG seeks authorization to site, construct, and operate an LNG export
terminal and associated facilities in order to export approximately 4 million metric tonnes
per annum (MTPA) of natural gas as LNG.  The terminal will receive natural gas via an

---

[1] 15 U.S.C. § 717b (2018).

[2] 18 C.F.R. pt. 153 (2019).

approximately 10.2-mile-long non-jurisdictional intrastate natural gas pipeline that would interconnect with the Valley Crossing Pipeline (VCP).[3]  VCP is a non-jurisdictional natural gas pipeline that extends southwest from a header system near the Agua Dulce natural gas hub to a jurisdictional border-crossing facility east of Cameron County, Texas.[4]

5.     Texas LNG's proposed facilities include two full-containment LNG storage tanks with a capacity of approximately 210,000 cubic meters of LNG each; two liquefaction trains, each with a capacity of 2.0 MTPA of LNG;[5] a single LNG carrier berth; mooring and loading facilities; and other appurtenant facilities.  The proposed project will be built in two phases, each phase designed to process approximately 0.309 Bcf/d[6] of natural gas and consisting of one liquefaction train and one full-containment storage tank.  Construction of Phase 1 will be initiated upon receipt of all required authorizations, and Phase 2 will be constructed upon receipt of sufficient customer demand.[7]  During Phase 1, the single LNG carrier berth, dredged maneuvering basin, and all necessary support facilities will be installed.  Phase 2 construction will include the second liquefaction train and storage tank, as well as all appurtenant facilities required to connect the Phase 2 facilities with the operating Phase 1 facilities.

---

[3] The record shows that the non-jurisdictional pipeline will be entirely in Texas and, when it begins service, will only transport Texas gas production received from other Texas intrastate pipelines or processing plants within Texas to the proposed LNG export terminal.  *See* Texas LNG August 16, 2018 Filing (responding to staff's June 27, 2018 letter requesting further information about the natural gas pipeline(s) that would provide feed gas to the proposed terminal).

[4] *See Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at P 4 (2017).

[5] While each liquefaction train will have a nameplate capacity of 2.25 MTPA, Texas LNG anticipates that as operated, each train will produce 2.0 MTPA of LNG for export.  Application at 4 n.8.

[6] 0.309 Bcf/d is approximately 2.25 MTPA of LNG based on average gas composition, average ambient temperature, and operation 365 days per year.  Application at 4 n.9.

[7] Texas LNG states in its application that construction of Phase 2 would commence no sooner than 18 months following the commencement of Phase 1 and is anticipated to commence no later than five years following the Commission's approval of Texas LNG's application.  Application at 5.

Document Accession #: 20191122-3048     Filed Date: 11/22/2019
Docket No. CP16-116-000                                                              - 3 -

6.      Texas LNG states it has an option agreement for a long-term lease with the Brownsville Navigation District of Cameron County, Texas, for an approximately 625-acre tract of land.  All of the approximately 625-acre total project area is zoned for heavy industrial use and the proposed project will be consistent with other industrial facilities along the shoreline.  Texas LNG will have control over the project site for at least the minimum expected operational life of the project, which is 25-30 years, and the right to extend the lease term.

7.      Texas LNG received authorization from the Department of Energy, Office of Fossil Energy (DOE/FE) in September 2015 to export annually up to 204.4 Bcf (approximately 0.56 Bcf/d) equivalent of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement.[8]  In addition, Texas LNG currently has pending before the DOE/FE an application to export annually up to 204.4 Bcf equivalent of LNG to other nations with which the U.S. permits such trade, but has not entered into a Free Trade Agreement.[9]

## III.    Procedural Matters

### A.      Notice, Interventions, Comments, and Protests

8.      Notice of Texas LNG's application was issued on April 14, 2016, and published in the *Federal Register* on April 20, 2016, with interventions, comments, and protests due on or before May 5, 2016.[10]  Timely, unopposed motions to intervene are granted by operation of Rule 214(c) of the Commission's Rules of Practice and Procedure.[11]  Untimely motions to intervene were granted by a Secretary's Notice issued on September 29, 2016.

9.      On December 12, 2018, SaveRGVfromLNG (SaveRGV) filed a motion to intervene.  Although SaveRGV filed its motion as a motion to intervene out of time, because the motion was filed before the December 17 deadline for filing comments on the draft Environmental Impact Statement (EIS), its motion was deemed timely and granted by the Commission on January 18, 2019.

---

[8] *Texas Gulf LNG*, DOE/FE Docket No. 15-62-LNG, Order No. 3716 (September 24, 2015); *see also* Application at 20.

[9] The application, filed on April 15, 2015 and amended on May 22, 2015, is pending before DOE/FE in Docket No. 15-62-LNG.

[10] 81 Fed. Reg. 23,291 (2016).

[11] 18 C.F.R. § 385.214(c) (2019).

**JA303**

10.     Sierra Club filed a protest asserting that the construction and operation of Texas LNG's proposed facilities will have adverse local effects on many resources, including air, water, endangered species, and on environmental justice communities. Sierra Club also claims that because the purpose of the project is to enable the export of LNG, the project will induce additional production activities with adverse environmental impacts, could result in increased domestic gas prices, and will negatively affect national and global efforts to reduce greenhouse gas emissions (GHGs).

11.     Many people and organizations filed comments: some in support of the project and others raising various economic, environmental, and safety concerns, including concerns about the proximity of the project to their residences and potential of the project to decrease property values, affect the local environment and wildlife, and increase pollution. Finally, they questioned whether the Commission would impose measures to ensure public safety in the event of an accident or incident. In particular, several commenters expressed concern regarding the proximity of SpaceX's South Texas Launch Site to the proposed project site.

12.     These comments and protests are addressed in the EIS for the project or in this order, as appropriate.

   B.     **Request for Hearing**

13.     Intervenor Defenders of Wildlife requested a formal hearing.[12] The Commission has broad discretion to structure its proceedings so as to resolve a controversy in the best way it sees fit.[13] An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[14] Defenders of Wildlife raised no material issue of fact that the Commission cannot resolve on the basis of the written record. Accordingly, the Commission denies the request for a formal hearing.

---

[12] Defenders of Wildlife May 4, 2016 Motion to Intervene at 1-2.

[13] *See Stowers Oil and Gas Co*., 27 FERC ¶ 61,001 (1984) (Commission has discretion to manage its own proceedings); *PJM Transmission Owners*, 120 FERC ¶ 61,013 (2007).

[14] *See, e.g.*, *Dominion Transmission, Inc*., 141 FERC ¶ 61,183, at P 15 (2012); *Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988).

**JA304**

## IV.    Discussion

### A.    Public Interest Standard

14.    The construction and operation of the proposed LNG terminal facilities and site of their location require approval by the Commission under section 3 of the NGA.[15] Although section 3 provides that an application for the exportation or importation of natural gas shall be approved unless the proposal "will not be consistent with the public interest," section 3 also provides that an application may be approved "in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate."[16]  NGA section 3(a) also provides that for good cause shown, the Commission may make supplemental orders as it may find "necessary or appropriate."[17]

15.    Sierra Club asserts we should find that Texas LNG's application to construct an LNG export terminal is contrary to the public interest in part because the exportation of gas will induce natural gas production activities with attendant adverse environmental impacts.  Sierra Club also asserts that Texas LNG's proposed LNG export terminal is not in the public interest because it will result in indirect environmental impacts from the combustion of exported gas in importing markets and exports may result in increased

---

[15] The regulatory functions of NGA section 3 were transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the Department of Energy Organization Act, Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq*.  In reference to regulating the imports or exports of natural gas, the Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No, 00-004.00A, effective May 16, 2006. Applications for authorization to import or export natural gas must be submitted to the Department of Energy (DOE).  The Commission does not authorize importation or exportation of the commodity itself.  *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (*EarthReports*) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[16] For a discussion of the Commission's authority to condition its approvals of LNG facilities under section 3 of the NGA, *see, e.g.*, *Distrigas Corporation v. FPC*, 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 834 (1974), and *Dynegy LNG Production Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

[17] 15 U.S.C. § 717b(a).

domestic gas prices that will result in increased reliance on coal as fuel at electric generation facilities, causing further adverse environmental impacts.

16.    We decline to address these claims as they concern impacts associated with the exportation of the commodity natural gas, rather than the proposal before the Commission.  Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country . . . without first having secured an order of the Commission authorizing it to do so."[18]  As noted above, in 1977, the Department of Energy Organization Act (DOE Act) transferred the regulatory functions of section 3 of the NGA to the Secretary of Energy.[19]  Subsequently, the Secretary delegated to the Commission authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports … ."[20]  The Secretary, however, has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself, or to consider the types of issues raised by Sierra Club as part of the Commission's public interest determination under NGA section 3(a).[21]

_____

[18] *Id.*

[19] DOE Act, Pub. L. No. 95-91, 42 U.S.C. § 7101 *et. seq*.  Section 301(b) of the DOE Act transferred regulatory functions under section 3 of the NGA from the Commission's predecessor, the Federal Power Commission (FPC), to the Secretary of Energy.  Section 402 of the DOE Act transferred regulatory functions under other sections of the NGA, including sections 1, 4, 5, and 7, from the FPC to the Federal Energy Regulatory Commission.  Section 402(f) states:

(f) Limitation
       No function described in this section which regulates the exports or imports of natural gas … shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

[20] DOE Delegation Order No. 00-004.00A (effective May 16, 2006).

[21] *See Freeport LNG Development, L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) (*Freeport*) (finding that because the Department of Energy, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis).  *See also Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117, *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016) (*Sabine Pass*) and *Dominion Cove Point LNG, LP*,

17.    DOE/FE, pursuant to its authority under NGA section 3, has authorized Texas
LNG to export up to 4 MTPA, or 0.56 Bcf/d, of domestically-produced natural gas to free
trade nations from the proposed Texas LNG Brownsville LLC Liquefied Natural Gas
Export Project, at the Port of Brownsville, Texas.[22]  DOE/FE's order approving Texas
LNG's export volumes states that "[i]n light of DOE's statutory obligation to grant this
Application without modification or delay, there is no need for DOE/FE to review other
arguments asserted by Texas LNG in support of the Application."[23]

18.    We have reviewed Texas LNG's application to determine if the siting,
construction, and operation of its LNG terminal as proposed would not be consistent with
the public interest.[24]  The proposed site for the terminal is an area zoned for heavy
industrial use on the north shore of the Brownsville Ship Channel in the Port of
Brownsville, Texas, and the terminal's operations would be consistent with those of the
other industrial facilities along the shoreline in that area.  Further, as discussed below, the
final EIS prepared for the proposed project finds most of the direct environmental
impacts from construction of the proposed Texas LNG Project are expected to be
temporary or short term during construction and operation, while some long-term and
permanent environmental impacts would also occur.[25]  However, all adverse impacts
from construction and operation of the facilities—with the exception of impacts on visual
resources, which would be significant when viewed from the Laguna Atascosa National

---

148 FERC ¶ 61,244 (2014), *reh'g denied*, 151 FERC ¶ 61,095 (2015), *aff'd sub nom.*
*EarthReports*, 828 F.3d 949.

[22] DOE/FE Order No. 3716 at 11 (2015) (authorizing export of approximately 4
MTPA to free trade countries).  DOE/FE has not yet issued an order addressing Texas
LNG's application filed on April 15, 2015 in FE Docket No. 15-62-LNG seeking
authorization to export to non-FTA countries.

[23] DOE/FE Order No. 3716 at 8.  Section 3(c) provides that the exportation and
importation of natural gas to and from countries with which there is in effect a Free Trade
Agreement "shall be deemed to be consistent with the public interest and applications for
such importation and exportation shall be granted without modification or delay." 15
U.S.C. § 717b(c).

[24] *See National Steel Corp.*, 45 FERC ¶ 61,100, at 61,332-33 (1988) (observing
that DOE, "pursuant to its exclusive jurisdiction, has approved the importation with
respect to every aspect of it except the point of importation" and that the "Commission's
authority in this matter is limited to consideration of the place of importation, which
necessarily includes the technical and environmental aspects of any related facilities.").

[25] Final EIS at ES-16.

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

Wildlife Refuge—will be reduced to less than significant levels if the project is constructed and operated in accordance with applicable laws and regulations and the environmental mitigation measures recommended in the final EIS and adopted by this order.[26]  The final EIS supports those findings regarding the potential direct project impacts, as well as a finding that cumulative impacts from operation of the Texas LNG Project—with the exception of cumulative impacts on surface water quality in the Brownsville Ship Channel during operational vessel transits; on the federally-listed ocelot and jaguarundi from habitat loss and increased potential for vehicular strikes during construction; on the federally listed northern aplomado falcon from habitat loss; on visual resources due to the presence of new facilities; and on nearby noise-sensitive areas (NSAs) during nighttime construction—will not be significant.[27]

19.     In accordance with the Memorandum of Understanding signed on August 31, 2018, by the Commission and the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the U.S. Department of Transportation (DOT),[28] PHMSA undertook a review of the proposed facility's ability to comply with the federal safety standards contained in Part 193, Subpart B, of Title 49 of the Code of Federal Regulations.[29]  On February 13, 2019, PHMSA issued a Letter of Determination indicating Texas LNG has demonstrated that the siting of its proposed LNG facilities complies with those federal safety standards.[30]  If the proposed project is subsequently modified so that it differs from the details provided in the documentation submitted to PHMSA, further review would be conducted by PHMSA.

20.     Texas LNG is proposing to operate its LNG terminal under the terms and conditions mutually agreed to by its customers and will solely bear the responsibility for

---

[26] *Id.*

[27] *Id.*  Since issuance of the final EIS for the Texas LNG Project, potential significant cumulative impacts on nearby NSAs from nighttime construction have been identified due to nighttime pile driving at the proposed Annova LNG Project.  *See infra* P 70.

[28] *Memorandum of Understanding Between the Department of Transportation and the Federal Energy Regulatory Commission Regarding Liquefied Natural Gas Transportation Facilities* (Aug. 31, 2018), https://www.ferc.gov/legal/mou/2018/FERC-PHMSA-MOU.pdf.

[29] 49 C.F.R. pt. 193, subpart B (2019).

[30] *See* Commission staff's February 14, 2019 Memo filed in Docket No. CP16-116-000 (containing PHMSA's Letter of Determination).

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

the recovery of any costs associated with construction and operation of the terminal. Accordingly, Texas LNG's proposal does not trigger NGA section 3(e)(4).

21.    In view of the above, we find that Texas LNG's proposal is not inconsistent with the public interest.  Therefore, we will grant Texas LNG's application for authorization under section 3 of the NGA to site, construct, and operate its proposed LNG terminal facilities.

### B.    Environmental Analysis

22.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[31] Commission staff evaluated the potential environmental impacts of the proposed project in an EIS.  Several agencies participated as cooperating agencies in the preparation of the EIS:  U.S. Army Corps of Engineers (COE), U.S. Coast Guard (Coast Guard), U.S. Environmental Protection Agency (EPA), DOT's PHMSA and Federal Aviation Administration (FAA), U.S. Fish and Wildlife Service (FWS), National Park Service, National Oceanic Atmospheric Administration's National Marine Fisheries Service (NMFS), and DOE.  Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by the proposals and participate in the NEPA analysis.

23.    Commission staff issued a draft EIS on October 26, 2018, which addressed the issues raised during the scoping period and up to the point of publication.  The Commission published notice of the draft EIS in the *Federal Register* on November 2, 2018, establishing a 45-day public comment period ending on December 17, 2018.[32] Commission staff held a public comment session on November 15, 2018, to receive comments on the draft EIS.  We also received over 900 comment submissions from federal and state agencies; Native American tribes; companies/organizations; and individuals in response to the draft EIS.  The transcripts of the public comment session and all written comments on the draft EIS are part of the public record for the project.[33]

---

[31] 42 U.S.C. § 4321 *et seq.* (2012).  *See also* the Commission's NEPA-implementing regulations at Title 18 of the Code of Federal Regulations, Part 380.

[32] 83 Fed. Reg. 55,156 (2018).

[33] The transcript for the public comment session in Port Isabel, Texas, was filed in the record on January 2, 2019.  *See also* Appendix H to the final EIS reproducing and responding to comments on the draft EIS.

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

24.     On March 15, 2019, Commission staff issued the final EIS for the project, and a public notice of the availability of the final EIS was published in the Federal Register.[34] The final EIS addresses geology; soils; water resources; wetlands; vegetation; wildlife and aquatic resources; threatened, endangered, and other special status species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; safety; cumulative impacts; alternatives; and all substantive environmental comments received on the draft EIS.

25.     The final EIS concludes that construction and operation of the project will result in some adverse environmental impacts, but with the exception of impacts on visual resources and the cumulative impacts on the above-mentioned resources, these impacts will be reduced to less-than-significant levels with the implementation of applicants' proposed, and Commission staff's recommended, mitigation measures, which are included as conditions in the appendix to this order.

26.     The Texas LNG Project, combined with other projects in the geographic scope, including the proposed Rio Grande LNG and Annova LNG Projects on the Brownsville Ship Channel,[35] would result in significant cumulative impacts on surface water quality in the Brownsville Ship Channel during operational vessel transits; on the federally-listed ocelot and jaguarundi from habitat loss and increased potential for vehicular strikes during construction; on the federally listed northern aplomado falcon from habitat loss; on visual resources due to the presence of new facilities; and on nearby NSAs during nighttime construction.

27.     The Commission received several comments following the issuance of the final EIS, only one of which was an adverse comment concerning the final EIS itself.  This comment and the resource areas addressed in the final EIS are discussed below.

      1.     **Geology**

28.     The primary impacts on geology would result from site preparation and grading, which would utilize cut and fill techniques as well as the import of fill.  Other impacts would occur as a result of the dredging of the maneuvering basin.[36]  As a result,

---

[34] 84 Fed. Reg. 10,818 (2019).

[35] Concurrently with this order, the Commission is also issuing orders approving the construction and operation of the Rio Grande LNG and Annova LNG Projects.  *See Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019); *Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132 (2019).

[36] Final EIS at 4-3.

Document Accession #: 20191122-3048    Filed Date: 11/22/2019

construction of the Texas LNG Project would permanently alter the existing topography and geologic conditions at the site. Considering the subsurface conditions for the Texas LNG site, shallow foundations would be suitable for lightly loaded structures; however, as is common for heavier structures in areas with these types of soil conditions, the LNG storage tanks, liquefaction trains, and many associated structures would require deep foundations.[37] Therefore, Texas LNG is proposing to drive precast square concrete piles for deep foundations for heavily loaded structures and settlement sensitive structures.[38] The project would not affect the extraction of mineral resources, and no blasting is anticipated during construction of the project.[39]

29.    Texas LNG has proposed structural and mechanical elements to incorporate into the design of the project to mitigate potential geological hazards and other natural hazards, such as high winds, storm surges, severe flooding, and shoreline erosion.[40] Due to the low relief across the Texas LNG site, there is little likelihood that landslides or slope movement at the site would be a realistic hazard.[41] Based on Texas LNG's proposed mitigation and design criteria, and Commission staff's recommended mitigation measures, included in the appendix to this order, the final EIS concludes that the potential impacts on the Texas LNG Project from geologic hazards and other natural hazards will be minimal, and the Texas LNG Project will not significantly impact geologic resources.

## 2.    Soils

30.    Construction of the Texas LNG Project could affect soil resources by increasing the potential for erosion, compaction, and mixing of topsoil and subsoil.[42] Further, most soils in the project site have low revegetation potential due to high salinity.[43] Texas LNG plans to import soils and may use dredge material to raise the elevation of the project

---

[37] *Id.* at 4-236.

[38] *Id.*

[39] *Id.* at 5-358.

[40] *See id.* at 4-3.

[41] *Id.* at 4-244.

[42] *Id.* at 5-358.

[43] *Id.*

site.[44]  To minimize soil impacts, Texas LNG would implement the mitigation measures contained in the project-specific Environmental Construction Plan (ECP).[45]  Dredging at the LNG terminal site would be conducted in accordance with permits issued by the COE.[46]  To minimize shoreline erosion, Rio Grande would stabilize the waterfront along the Brownsville Ship Channel, and would maintain the integrity of the shoreline throughout the operational life of the terminal.[47]

31.    Texas LNG has also prepared a *Spill Prevention and Response Plan* for use during construction to minimize the potential for soils to become contaminated from spills of hazardous materials.[48]  Commission staff recommends, and we require in Environmental Condition 13, that Texas LNG provide the Commission with a copy of its Spill Prevention, Control, and Countermeasure (SPCC) Plan for review and approval prior to operation.  Therefore, the final EIS concludes that impacts on soil resources would be permanent but minor and would be adequately minimized.

### 3.  Water Resources

32.    Texas LNG would not directly withdraw groundwater for construction or operation of the project, and any indirect withdrawals of groundwater, as a result of Texas LNG obtaining water from the Brownsville Public Utility Board's municipal water supply, would not significantly impact groundwater quantity.[49]  There are no drinking water wells or springs within 150 feet of the Project site.[50]  Although shallow

---

[44] *Id.*

[45] *Id.*  The project-specific ECP is based on the 2013 FERC Upland Erosion Control, Revegetation, and Maintenance Plan (Plan) and Wetland and Waterbody Construction and Mitigation Procedures (Procedures), which are a set of baseline construction and mitigation measures developed to minimize the potential environmental impacts of construction on upland areas, wetlands, and waterbodies.  *See* Federal Energy Regulatory Commission, *Environmental Guidelines* (May 2013), https://www.ferc.gov/industries/gas/enviro/guidelines.asp.

[46] Final EIS at 5-359.

[47] *Id.* at 4-24, 4-70, 4-236 – 4-237, 4-303.

[48] *Id.* at 5-359.

[49] *Id.*

[50] *Id.* at 4-13, 5-359.

groundwater areas could be vulnerable to contamination caused by inadvertent surface spills of hazardous materials and placement of the deep piles required for the LNG storage tanks, ship loading, and berthing areas, implementation of Texas LNG's Spill Prevention and Response Plan during construction and SPCC Plan, as referenced above, during operation, would help to ensure that impacts on groundwater as a result of contamination would not be significant.[51]

33.     No waterbodies are present within the project site, with the exception of the Brownsville Ship Channel.  Although Texas LNG proposes to carry out dredging and dredge material disposal within the project area, the final EIS concludes that Texas LNG's proposed dredge disposal methods would sufficiently minimize project-related turbidity and sedimentation within the Brownsville Ship Channel.[52]

34.     Based on the implementation of identified mitigation measures, the final EIS concludes that impacts on water resources will be adequately minimized and are not significant.

## 4.     **Wetlands**

35.     Construction of the Texas LNG Project would affect a total of 45.2 acres of wetlands, of which 42.9 acres would be permanently impacted as a result of dredging for the maneuvering basin and fill for certain permanent structures.[53]  Texas LNG prepared a preliminary Compensatory Mitigation Plan to mitigate permanent wetland impacts, but it was not approved by the COE.  To date, Texas LNG has not filed a revised Compensatory Mitigation Plan with the COE.  Texas LNG's wetland mitigation would include adhering to the measures in the Commission's Procedures, as well as any measures included in a Compensatory Mitigation Plan approved by the COE. Environmental Condition 9 requires Texas LNG to demonstrate that it has received all application federal authorizations, including a COE section 404 permit, prior to commencing construction.[54]

---

[51] *Id.*

[52] *Id.* at 5-360.

[53] *Id.* at 5-361.

[54] COE will not issue Texas LNG a section 404 permit until a suitable mitigation plan is developed to mitigate project impacts on wetlands.  *Id.*

**JA313**

Document Accession #: 20191122-3048    Filed Date: 11/22/2019

36.     With the implementation of an appropriate project-specific mitigation plan and the proposed mitigation measures discussed in the final EIS, the final EIS concludes that impacts on wetland resources will be adequately minimized and are not significant.

### 5.     Vegetation

37.     Construction and operation of the Texas LNG Project would permanently impact 249.3 acres of vegetation.[55]  To minimize impacts on vegetation communities, Texas LNG would construct and operate the project in accordance with its project-specific ECP.[56]  The Natural Resources Conservation Service and the Plant Materials Center anticipate revegetation of the project area to be difficult.  Texas LNG would utilize topsoil stripped from areas with the highest potential for revegetation prior to grading activities, and—pursuant to a recommendation from the Natural Resources Conservation Service—Texas LNG has developed a native seed mix in consultation with the Kika de la Garza Plant Materials Center best suited to the project site conditions.

38.     Five rare plant communities are present on the project site, as well as one rare plant species, lily of the loma.[57]  The Texas Parks and Wildlife Department (TPWD) expressed interest in preserving populations of lily of the loma documented at the project site.[58]  The final EIS recommends, and we require in Environmental Condition 14, that Texas LNG coordinate with the TPWD regarding seed/fruit collection from rare plant species impacted by the project.

39.     Recognizing the potential that land disturbance during construction of the project may enable the establishment of exotic or invasive plant communities and noxious weeds, Texas LNG would implement the measures outlined in its *Noxious Weed and Invasive Plant Plan* to minimize the spread of invasive species and treat invasive species if they become established.[59]

40.     Based on the implementation of the proposed mitigation measures, the final EIS concludes that construction and operation of the project would not have a significant impact on vegetation communities.

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 5-361 – 5-362.

**JA314**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

### 6.    Wildlife and Aquatic Resources

41.    The construction and operation of the Texas LNG Project would permanently affect wildlife and wildlife habitats, with impacts including displacement, stress, and direct mortality of some less mobile species, as well as a reduction in suitable cover, nesting, and foraging habitat due to vegetation clearing.[60]  Wildlife in the vicinity of the project would also likely be affected by impacts associated with noise and artificial light.[61]  However, the greatest noise impacts would be during construction, and therefore short-term in nature, and Texas LNG would implement measures outlined in its Facility Lighting Plan to minimize the effects of lighting on wildlife during operation, including utilizing motion detectors, timers, and shielded, down-facing lights.[62]  Impacts on wildlife would be further minimized through the implementation of the project-specific ECP.[63]

42.    Due to the proximity of the project site to the Laguna Atascosa National Wildlife Refuge, wildlife within the refuge would likely be impacted by increased noise and light during both construction and operation of the project.  However, impacts would be greatest during construction due to increased traffic and noise, both of which would decrease significantly during operation.[64]  With the implementation of the measures proposed by Texas LNG, the final EIS concludes that impacts on wildlife from construction and operation of the projects will not be significant.

43.    The project is within the migratory bird Central Flyway, which spans the central portion of North America into Central America.[65]  Texas LNG observed several migratory birds of conservation concern during surveys.[66]  In addition to disturbance of habitat and potential sensory disturbances, elevated structures such as the storage tanks

---

[60] *Id.* at 5-362.

[61] *Id.*

[62] *Id.* at 4-49.

[63] *Id.*

[64] *Id.* at 5-362.

[65] *See id.* at 4-50.  South Texas acts as a funnel for migratory birds as they try to avoid flying too far east (into open Gulf waters) or west (into desert habitat).

[66] *Id.* at 4-53.

**JA315**

and flares would also affect migratory birds by increasing the potential for collisions.[67] The EIS recommends—and we require in Environmental Condition 15—that prior to construction Texas LNG will consult with the FWS to revise its *Migratory Bird Plan* to address recommendations from the FWS and the TPWD. Thus, the EIS concludes that the Texas LNG Project would not have a significant impact on migratory bird populations.[68]

44.    Impacts on aquatic resources from construction and operation of the Texas LNG Project include increased turbidity and sediment suspension, increased in-water noise, increased vessel traffic, and alteration of light regimes and dissolved oxygen concentrations.[69] Texas LNG proposes to minimize turbidity and sediment suspension by utilizing a hydraulic cutterhead dredge, which produces less turbidity and sedimentation than a clamshell dredge.[70] Texas LNG would also implement construction techniques that minimize noise effects on aquatic species, including utilizing bubble curtains and cushion blocks to minimize underwater sound pressures. Environmental Condition 16 in the appendix to this order requires Texas LNG to perform test drives prior to initiating pile-driving activities, file acoustic monitoring results with the Commission and NMFS, and implement additional mitigation measures if noise impacts exceed anticipated levels.

45.    Due to the limited frequency of LNG carriers calling on the LNG terminal, the EIS concludes that impacts on aquatic resources from increased ship traffic are not expected to be significant.[71]

46.    Construction and operation of the project would also result in temporary and permanent impacts on essential fish habitat (EFH). Dredging of the maneuvering basin would permanently convert 39.4 acres of tidal flats to open water habitat and would impact the existing open water areas associated with the Brownsville Ship Channel, all of which is characterized as EFH.[72] However, the tidal flats within and surrounding the project site have historically been cut off from the influences of natural tidal exchange. As stated in the final EIS, dredging is anticipated to restore tidal flows to the tidal flats

---

[67] *See id.* at 4-52.

[68] *Id.* at 4-55.

[69] *Id.* at 5-363.

[70] *Id.*

[71] *Id.*

[72] *Id.*

surrounding the project site, improving the overall aquatic habitat and enhancing EFH in the area.[73]

47.     Texas LNG coordinated with the National Marine Fisheries Service (NMFS) on potential impacts on EFH.  In a filing dated February 5, 2019, NMFS concurred with Commission staff's conclusion that project impacts would be "temporary and minor."[74] Therefore, the EFH consultation required by the Magnuson-Stevens Fishery Conservation and Management Act is concluded, and no further coordination with the NMFS for EFH is required.[75]

48.     With implementation of the proposed mitigation measures, the final EIS concludes that the project would have minor and localized impacts on aquatic resources.

## 7.     Threatened, Endangered, and Other Special Status Species

49.     The final EIS identifies 21 species that are federally listed as threatened or endangered (or are identified as proposed, candidates, or under review for federal listing) that may occur within the vicinity of the project.[76]  Within the project vicinity, critical habitat has been designated for two species (the piping plover and the loggerhead sea turtle).[77]  As required by section 7 of the Endangered Species Act of 1973, we requested that the FWS and NMFS accept the information provided in the draft EIS as the Biological Assessment for the Texas LNG Project.  Commission staff determined that the project *is not likely to adversely affect* listed species or critical habitat under FWS's purview, and on February 8, 2019, FWS concurred for all species except the ocelot and northern aplomado falcon.[78]  In its February 8 letter, as well as in an earlier letter dated December 17, 2018, the FWS indicated that the cumulative impact of the proposed project—when combined with other projects in the area—would result in significant cumulative impacts on the ocelot due to habitat loss.  Based on the likely significant cumulative impact, the FWS asserts that the proposed project is *likely to adversely affect*

---

[73] *Id.*

[74] Letter from Virginia M. Fay, NMFS, concurring with staff's EFH assessment as included in the Draft Environmental Impact Statement (filed Feb. 6, 2019).

[75] *Id.*

[76] Final EIS at 4-83 – 4-86 (Table 4.7-1).

[77] *Id.* at 4-82.

[78] *Id.* at 5-364.

**JA317**

the ocelot, and the EIS notes that we have revised the BA to reflect this determination. Similarly, the FWS did not concur with staff's determination of *not likely to adversely affect* for the northern aplomado falcon. However, FWS notes that there is a 99-year Safe Harbor Agreement that authorizes "take" on property owned by the Brownsville Navigation District.[79] Therefore, no additional consultation on this species is necessary. The EIS also notes that the eastern black rail was recently proposed to be listed as threatened, but concludes that the proposed project is not likely to jeopardize the continued existence of the eastern black rail. On March 25, 2019, FERC staff sent a letter to the FWS requesting formal consultation under section 7 of the Endangered Species Act for the ocelot and requesting concurrence for the effect determination of the eastern black rail. In a filing dated May 15, 2019, and filed August 7, 2019, FWS responded requesting additional details, and explained that formal consultation would be initiated upon receipt of this information. Consultation will result in issuance of a Biological Opinion by FWS, which will include a jeopardy determination.[80] Should FWS find that an action may adversely affect a species, but not jeopardize its continued existence, FWS will also issue an incidental take statement for the project, detailing: (1) the potential impact of the project on the listed species; (2) reasonable and prudent measures to minimize that impact; (3) terms and conditions necessary to implement those measures; and (4) procedures to dispose of any individuals of a species actually taken.[81] Formal consultation is considered complete upon issuance of the biological opinion.[82] Environmental Condition 18 requires that Commission staff complete Endangered Species Act consultation with FWS before Texas LNG may commence construction.

50.     Commission staff determined that the project is *not likely to adversely affect* listed species or critical habitat under NMFS's purview. In a letter dated August 8, 2019, NMFS concluded the same.[83] Therefore, the consultation required under the Endangered Species Act is completed, and no further coordination with the NMFS is required.[84]

---

[79] *Id.*

[80] 50 C.F.R. § 402.14(h) (2019).

[81] 50 C.F.R. § 402.14(i)(1) (2019).

[82] 50 C.F.R. § 402.14(m)(1) (2019).

[83] Letter from David Bernhart, NMFS, in response to the Commission's October 30, 2018 letter requesting consultation pursuant to Section 7 of the Endangered Species Act (filed Aug. 22, 2019).

[84] *Id.*

**JA318**

51.     Although the final EIS found that marine mammals, such as bottlenose dolphins, may be affected by in-water pile driving during construction and increased vessel traffic during operation, Texas LNG will minimize this potential through the use of soft starts and bubble curtains and/or cushion blocks during pile-driving activities.[85]  During operation, vessels would implement the NMFS Vessel Strike Avoidance Measures and Reporting for Mariners (2008).[86]  Environmental Condition 20 requires Texas LNG to consult with NMFS to identify mitigation measures to avoid or minimize take of marine mammals during in-water pile driving.

52.     The final EIS identifies 55 state-listed threatened or endangered species with the potential to occur in Cameron County, where the proposed project would be located.[87]  However, with the applicants' implementation of measures identified by TPWD, as well as our recommendation, the final EIS concludes that the Texas LNG Project would not significantly impact state-listed species.[88]

53.     We have reviewed all the information and analysis contained in the record regarding the potential environmental effects of the project on all threatened, endangered and other special status species, including the ocelot, jaguarundi, and aplomado falcon. With imposition of the conditions required herein, which include any measures which may be required by FWS upon completion of consultation, we find construction and operation of the project as approved will be an environmentally acceptable action and not inconsistent with the public interest.

## 8.     Land Use, Recreation, and Visual Resources

54.     Land use in the vicinity of the project is generally classified as wetlands, scrub shrub, open land, and open water.[89]  The project site consists of a 625-acre parcel, as well as an additional 26.5-acre area necessary to connect the parcel to the Brownsville Ship

---

[85] Final EIS at 5-365.

[86] National Marine Fisheries Service, *Vessel Strike Avoidance Measures and Reporting for Mariners NOAA Fisheries Service, Southeast Region* (February 2008), https://www.fisheries.noaa.gov/webdam/download/92937962.

[87] *See* Appendix D to the final EIS detailing all state-listed species with potential to occur within Cameron County along with a description of habitat requirements.

[88] Final EIS at 5-365.

[89] *Id.* at 4-97.

**JA319**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

Channel.[90]  Construction of the Texas LNG Project would temporarily impact 311.5 acres of the site, of which 282.0 acres would be permanently impacted by operation.[91]  The land use types that will be affected by construction at the project site include open land (47 percent), scrub shrub (28 percent), wetland (14 percent), and open water (11 percent).[92]  Although the project would result in the conversion of a large portion of currently undeveloped land into industrial land, the project site is owned by the Brownsville Navigation District and is zoned for industrial use.  There are no existing or planned residential developments within 0.25 mile of the project site, but Rio Grande LNG, LLC has proposed to build an LNG export terminal immediately west of the project site on the north side of the Brownsville Ship Channel.  In addition Annova LNG Common Infrastructure, LLC and three affiliate entities have proposed a similar LNG facility approximately 1.7 miles southwest of the project site, also on the north side of the channel.[93]  The final EIS concludes that project impacts on land use in the area from construction and operation of the Texas LNG Project would not be significant.

55.     Project construction and operation may impact recreational activities at the Laguna Atascosa National Wildlife Refuge.  The nearest designated recreation area within the refuge is over two miles from the proposed project site, but a total of nine recreation areas were identified within five miles of the site.[94]  Activities at the nearby South Bay Coastal Preserve and Paddling Trail, Isla Blanca Park, and Loma Ecological Preserve may also be impacted by the recreation sites' proximity to vessel transit routes, as increased ship traffic during construction and operation could adversely affect recreational boaters accessing the areas by delaying or temporarily restricting access across the Brownsville Ship Channel.[95]

56.     The presence of the project and associated increased lighting would have a permanent impact on visual resources.[96]  Due to the relatively undeveloped nature of the project area, the visual sensitivity of nearby recreation areas, and the lack of feasible

---

[90] *Id.* at 4-98.

[91] *Id.*

[92] *Id.* at 4-102.

[93] *Id.* at 4-103 – 4-104.

[94] Final EIS at 4-104 – 4-105.

[95] *Id.* at 5-366.

[96] *Id.*

**JA320**

visual screening measures, the final EIS concludes that the project would result in a significant impact on visual resources when viewed from the Laguna Atascosa National Wildlife Refuge and would have a negligible to moderate permanent impact on the other visual resources evaluated.[97]

57.    The Texas LNG Project would be constructed within a designated coastal zone.[98] Environmental Condition 21 requires the applicants, prior to construction, to file a determination that the projects are consistent with the Texas Coastal Zone Management Program.  The project would be designed and built in compliance with conditions set forth in various agency authorizations, including any permits required under the Texas Coastal Zone Management Program.[99]  Considering the existing industrial zoning at the project site and the proximity of nearby proposed projects and recreation areas, the final EIS concludes that the land use and recreation impacts associated with the project would not be significant.[100]  With the exception of impacts on visual resources when viewed from the Laguna Atascosa NWR, impacts on visual resources would also not be significant.[101]

### 9.    Socioeconomics

58.    The final EIS concludes that construction of the Texas LNG Project would not have a significant adverse impact on the local population or existing local workforce.[102] Additionally, there would not be any disproportionately high or adverse environmental and human health impacts on low-income and minority populations.[103]  However, vehicle traffic is anticipated to temporarily increase substantially during construction of the

---

[97] *Id.*

[98] *See id.* at 4-141.

[99] *See id.*

[100] *Id.* at 5-365 – 5-366.

[101] *Id.* at 5-366.

[102] *See id.* at 5-367 – 5-368.

[103] *Id.* at 5-368.  The dissent suggests that it is not enough to find that low-income and minority groups "will experience conditions no worse" than the surrounding county. However, the final EIS concludes, and we agree, that no populations in the area, including the low-income and minority groups, will experience significance adverse impacts.

**JA321**

Document Accession #: 20191122-3048    Filed Date: 11/22/2019
Docket No. CP16-116-000                                                    - 22 -

project.[104]  To minimize traffic and safety hazards as a result of this increase, Texas LNG would coordinate with the Cameron County Sherriff's office to manually control the traffic during construction as a result of employees leaving the project site.[105]

59.    As noted above, operation of the Texas LNG Project could also result in impacts on marine traffic, but due to the infrequency of anticipated barge deliveries during construction and limited frequency of LNG carriers calling on the LNG terminal, the final EIS concludes that impacts from increased ship traffic are not expected to be significant.[106]  Therefore, the final EIS concludes that socioeconomic impacts associated with the project would be minor.

### 10.    Cultural Resources

60.    Construction and operation of the Texas LNG Project could have the potential to affect one historic property, Site 41CF8 (Garcia Pasture Site).[107]  The final EIS notes that staff have not yet completed consultations with the Advisory Council on Historic Preservation (Advisory Council) regarding the adverse impacts on the Garcia Pasture Site and recommends, as stated in Environmental Condition 23, that consultations with the Advisory Council be completed prior to the start of construction.  With the implementation of this condition, as well as Texas LNG's treatment plan, we conclude that impacts on cultural resources would not be significant.

### 11.    Air Quality and Noise

61.    Air quality would be affected by construction and operation of the Texas LNG Project.  Temporary impacts on air quality associated with the emissions generated from fossil-fuel fired construction equipment and fugitive dust would result during the nearly 5-year-long construction period.  However, these impacts would be temporary and localized and would not have a long-term effect on regional air quality.[108]  Although emissions during the period when commissioning and/or operational activities are occurring concurrent with construction activities could result in intermittent exceedances

---

[104] *Id.* at 5-367.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 5-368.

[108] *Id.*

**JA322**

of certain National Ambient Air Quality Standards (NAAQS), these exceedances would not be persistent.[109]

62.    The project is not subject to federal Prevention of Significant Deterioration review or permitting, and as a result, is subject instead to the New Source Review minor source construction permitting program under Texas regulations.[110]  Additionally, because potential operating emissions for the project exceed the Title V major source threshold for at least one criteria air pollutant, the project is subject to the Title V operating permit program.  Texas LNG submitted an air quality impact analysis demonstrating that for operational emissions of each criteria air pollutant, the model-predicted impact plus background concentration would not result in an exceedance of the NAAQS.[111]

63.    Based on staff's analyses and Texas LNG's proposed mitigation measures, the final EIS concludes that although construction of the project would result in elevated emissions near construction areas that would impact local air quality, there would be no regionally significant impacts.

64.    Certain construction activities, such as pile driving, could produce peak sound levels perceptible above the background sound levels at nearby NSAs.[112]  However, the predicted sound levels at nearby NSAs during project construction are below the Commission's criterion of a day-night average sound level of 55 A-weighted decibels.  To minimize impacts at NSAs, Texas LNG has proposed to conduct pile-driving activities only during daytime hours.[113]

65.    Operation of the LNG terminal would also generate noise continually throughout the life of the project.  However, the predicted sound levels for operations are below the Commission's criterion at the nearest NSAs, and increases in ambient sound level due to

---

[109] Concurrent emissions from phased-in construction and operation of the project would temporarily impact local air quality, and could result in exceedances of the NAAQS in the immediate vicinity of the project during construction years.  However, these exceedances would not be persistent at any one time during these years due to the dynamic and fluctuating nature of construction activities within a day, week, or month.  *Id.*

[110] *Id.* at 5-368 – 5-369.

[111] *Id.* at 5-369.

[112] *Id.*

[113] *Id.*

operations would be imperceptible to most listeners.[114]  To ensure NSAs are not significantly affected by operational noise, Environmental Conditions 25 and 26 require the applicants to conduct post-construction noise surveys after each noise-producing unit (e.g., each liquefaction train) is placed into service and after the entire project is placed into service.  Therefore, the final EIS concludes that noise impacts due to operation of the project would not be significant.

## 12.     Greenhouse Gas Emissions

66.     With respect to impacts from GHGs, the final EIS discloses the GHG emissions from construction and operation of the project, the climate change impacts in the region, and the regulatory structure for GHGs under the Clean Air Act.[115]

67.     The final EIS estimated that operation of the completed Texas LNG Project could result in GHG emissions of up to 613,901.2 metric tons per year of carbon dioxide equivalent ($CO_2e$).[116]  To provide context to the direct and indirect[117] GHG estimate, according to the national net $CO_2e$ emissions estimate in the EPA's *Inventory of U.S. Greenhouse Gas Emissions and Sinks* (EPA 2019), 5.743 billion metric tons of $CO_2e$ were emitted at the national level in 2017 (inclusive of $CO_2e$ sources and sinks).[118]  The operational emissions of this project could potentially increase annual $CO_2e$ emissions based on the 2017 levels by approximately 0.011 percent at the national level.  Currently, there are no national targets to use as benchmarks for comparison and, similarly, Texas does not have GHG targets or benchmarks.[119]

---

[114] *Id.*

[115] *Id.* at 4-164 – 4-187, 4-342 – 4-344.

[116] *Id.* at Table 4.11.1-11.

[117] Indirect GHG emissions are from vessel traffic associated with the project.

[118] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*, Docket No. 430-R-19-001, at ES-8 (2019), https://www.epa.gov/sites/production/files/2019-04/documents/us-ghg-inventory-2019-main-text.pdf.

[119] The national emissions reduction targets expressed in the EPA's Clean Power Plan were repealed, Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations, 84 Fed. Reg. 32,520, 32,522-32, 532 (July 8, 2019), and the targets in the Paris climate accord are pending withdrawal.

68.     The final EIS included a qualitative discussion that addressed various effects of climate change.[120]  The final EIS acknowledges that the quantified GHG emissions from the construction and operation of the project will contribute incrementally to climate change.[121]  Further, the Commission has previously concluded it could not determine a project's incremental physical impacts on the environment caused by GHG emissions.[122]  The Commission has also previously concluded it could not determine whether a project's contribution to climate change would be significant.[123]

## 13.    Reliability and Safety

69.     As part of the NEPA review, Commission staff assessed potential impacts to the human environment in terms of safety and whether the proposed facilities would operate safely, reliably, and securely.  Commission staff conducted a preliminary engineering and technical review of the Texas LNG design, including potential external impacts based on the site location.  Based on this review, the final EIS recommends a number of mitigation measures for implementation prior to initial site preparation, prior to construction of final design, prior to commissioning, prior to introduction of hazardous fluids, prior to commencement of service, and throughout the life of the facility, to enhance the reliability and safety of the facility.  With these measures, the final EIS concludes that acceptable layers of protection or safeguards would reduce the risk of a potentially hazardous scenario from developing that could impact the offsite public.[124]  These recommendations have been adopted as mandatory conditions in the appendix to this order.

70.     Texas LNG states that the proposed project would be designed, constructed, operated, and maintained to meet or exceed Coast Guard Safety Standards,[125] the Department of Transportation (DOT) Minimum Federal Safety Standards,[126] and other

---

[120] Final EIS at 4-342 – 4-344.

[121] *Id.* at 4-344.

[122] *Dominion Transmission, Inc.*, 163 FERC ¶ 61,128, at PP 67-70 (2018) (LaFleur, Comm'r, *dissenting in part*; Glick, Comm'r, *dissenting in part*).

[123] *Id.*

[124] Final EIS at 5-371.

[125] 33 C.F.R. pts. 105, 127 (2019).

[126] 49 C.F.R. pts. 192 and 193 (2019).

**JA325**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

applicable federal and state regulations.[127]  On February 14, 2018, the Coast Guard issued a Letter of Recommendation to the Commission indicating the Brownsville Ship Channel would be considered suitable for accommodating the type and frequency of LNG marine traffic associated with the project.  If the project is authorized and constructed, the facility would be subject to the Coast Guard's inspection and enforcement program to ensure compliance with the requirements of 33 C.F.R. 105 and 33 C.F.R. 127.[128]

71.     Further, as noted above,[129] PHMSA determined that the siting of the proposed LNG facilities complies with the federal safety standards governing the location, design, construction, operation, and maintenance of LNG facilities.  The PHMSA Letter of Determination summarizes PHMSA's evaluation of the hazard modeling results and endpoints used to establish exclusion zones, as well as its review of Texas LNG's evaluation of potential incidents and safety measures that could have a bearing on the safety of plant personnel and the surrounding public.

72.     In addition, Environmental Conditions 29, 33, 50, 60, 62, 70, 98, and 109 have been modified to be consistent with language in recently issued orders; however, the original intent of each environmental condition is the same.  Furthermore, Environmental Condition 97—requiring an assessment of structural passive protection systems—has been added since the issuance of the final EIS.  The intent of the modification is to ensure that adequate mitigation is provided to reduce the potential for cascading failures and reduce the risk to the offsite public.

73.     Commission staff corresponded with the FAA in evaluating the impacts on and from the SpaceX rocket launch facility in Cameron County.  Certain conditions of this order require Texas LNG to address potential impacts from rocket launch failures on the LNG Terminal.[130]  However, the extent of potential impacts on SpaceX operations, the National Space Program, and to the federal government would not fully be known until

---

[127] *See* final EIS at 1-20 – 1-21 (Table 1.5-1) (summarizing the major federal and state permits, approvals, and consultations required for the construction and operation of the Project).

[128] 33 C.F.R. §§ 105 and 127 (2019).

[129] *See supra* P 18.

[130] *See* Environmental Conditions 31 (construction crew positioning procedures during rocket launch activity) and 114 (rocket launch monitoring procedures).

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

SpaceX submits an application with the FAA requesting to launch, and will depend on whether the LNG Terminal is under construction or in operation at that time.[131]

### 14. Cumulative Impacts

74.     The final EIS considered the cumulative impacts of the proposed Texas LNG Project with other projects or actions within the geographic and temporal scope of the project.[132]  The types of other projects evaluated in the final EIS that could potentially contribute to cumulative impacts on a range of environmental resources include non-jurisdictional facilities associated with the Texas LNG Project,[133] including proposed LNG terminals, currently operating and future oil and gas projects, land transportation projects, commercial and industrial developments, and dredging projects.[134]

75.     The final EIS concludes that, for the majority of resources where a level of impact could be ascertained, the project's contribution to cumulative impacts on resources affected by the projects would not be significant, and that the potential cumulative impacts of the project and the other projects considered would be minor or insignificant.[135]  However, the Texas LNG Project combined with other projects within the geographic scope, including the Annova LNG and Rio Grande LNG Projects, would contribute to potential significant cumulative impacts on surface water quality in the Brownsville Ship Channel during operational vessel transits; on the federally-listed ocelot and jaguarundi from habitat loss and increased potential for vehicular strikes during construction; on the federally listed northern aplomado falcon from habitat loss, and on visual resources due to the presence of new facilities.  Since issuance of the final EIS, potential significant cumulative impacts on nearby NSAs from nighttime construction have been identified due to nighttime pile driving at the proposed Annova LNG Project. The final EIS discusses applicable mitigation measures, laws, and regulations protecting environmental resources, and permitting requirements to minimize effects on these

---

[131] Final EIS at 4-250.

[132] *Id.* at ES-13 – ES-15, 4-269 – 4-270.

[133] These include the approximately 10.2-mile-long, 30-inch-diameter intrastate natural gas pipeline, an auxiliary lane on State Highway 48 adjacent to the proposed Texas LNG Project site, 11 miles of 240-MW electric transmission line, and a 7.4-mile-long potable water line.  Final EIS at 4-282 to 4-283.

[134] *Id.* at 5-371.

[135] *Id.* at 5-371 – 5-374.

**JA327**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

resources.  Below, we briefly address each potentially significant cumulative impact in turn.

76.     Concurrent operation of the Texas LNG, Annova LNG, and Rio Grande LNG Projects would increase the number of large, ocean-going vessels transiting the Brownsville Ship Channel by 48 percent.[136]  Increased marine vessel traffic would result in a significant cumulative impact on surface water resources during operations from increased turbidity and shoreline erosion.[137]  The Texas LNG, Annova LNG, and Rio Grande LNG Projects would incorporate design features to minimize shoreline erosion and would be responsible for maintaining the shoreline to prevent future erosion.[138] Moreover, use of the channel by LNG carriers, barges, and support vessels would be consistent with the planned purpose and use of the Brownsville Ship Channel.[139] However, given the substantial increase in large vessel traffic within the channel related to the three Brownsville LNG projects, and other projects, the final EIS anticipates that cumulative impacts on surface water resources associated with shoreline erosion and turbidity from increased vessel traffic would be moderate to significant and persistent throughout the life of the projects.[140]

77.     Due to the extent of habitat modification associated with the Texas LNG Project, and other projects in the geographic scope that would be built at the same time as the proposed Texas LNG Project, moderate to significant cumulative impacts would likely occur for certain federally listed threatened and endangered species.  Specifically, the final EIS anticipates that significant cumulative impacts would likely occur for the ocelot and jaguarundi, given the loss and/or decrease in suitability of habitat within and adjacent to the projects and the increased potential for vehicular strikes during construction.[141] The final EIS also anticipates significant cumulative impacts for the northern aplomado falcon due to loss of foraging and nesting habitat and potential disruption of nesting in

---

[136] *Id*. at 4-303.

[137] *Id.*

[138] *Id.*

[139] *Id.* at 4-24.

[140] *Id.* at 4-303.

[141] *Id.* at 4-317.

the vicinity of the projects.[142]  Moderate cumulative impacts are anticipated for sea turtles due to dredging, vessel traffic, and pile driving.[143]

78.     The potential for cumulative visual impacts would be greatest if, in addition to the proposed Texas LNG Project, the Annova LNG and Rio Grande LNG Projects are permitted and built concurrently along the Brownsville Ship Channel.  Because motorists on State Highway 48 and other local roadways and visitors to local recreation areas would experience a permanent change in the existing viewshed during construction and operation of the projects, the final EIS concludes that the cumulative impacts of the three LNG projects on visual resources would be significant.[144]

79.     With regards to nighttime construction noise, the only 24-hour construction proposed at the Texas LNG Project would be dredging.[145]  The estimated overall sound levels from construction associated with the Texas LNG Project are expected to be lower than 55 dBA $L_{dn}$, the Commission's criterion for day-night average sound level, at all NSAs.[146]  However, significantly higher noise levels are estimated for the duration of the Annova LNG Project's nighttime pile driving, resulting in significant cumulative noise impacts, even though the Texas LNG Project's contribution to cumulative nighttime construction noise would be negligible.[147]  The predicted sound level impacts for simultaneous operation of all three LNG projects are much lower than the construction impacts, with potential sound level increases between 0.3 and 1.5 dBA $L_{dn}$ at NSAs, resulting in a negligible to minor cumulative impact.[148]

---

[142] *Id.* at 4-318.

[143] *Id.* at 4-321.

[144] *Id.* at 5-372 – 5-373.

[145] *Id.* at 4-192.

[146] *Id.* at 4-196.

[147] *See* Rio Grande LNG Project Final EIS at 4-494 (identifying impacts from construction noise during nighttime pile driving as a potential significant cumulative impact when combined with other projects within the geographic scope).  *See also* Annova LNG Project Final EIS at 4-341.

[148] Final EIS at 4-357.

JA329

Document Accession #: 20191122-3048        Filed Date: 11/22/2019

## 15. <u>Alternatives</u>

80.    The final EIS evaluated several alternatives to the Texas LNG Project, including the No-Action Alternative, system alternatives for the proposed LNG facility, alternative siting and design options, flaring system alternatives, and alternative means of power generation.[149]  The final EIS concluded that the alternatives proposed did not offer a significant environmental advantage and found that the proposed project, as modified by Commission staff's recommended mitigation measures, was the preferred alternative.[150]

## 16. <u>Comments Received After issuance of the Final EIS</u>

81.    We received comments from Kenneth G. Teague, who contends that staff ignored two comments that were provided on the draft EIS:  (1) that the natural gas pipeline would have greater wetland and other aquatic impacts than the liquefaction facility and that the Commission refuses to disclose the environmental impacts of the pipeline; and (2) that assumptions regarding the proposed revegetation measures are unrealistic.  Contrary to the commenter's assertions, Commission staff addresses both comments in the final EIS.[151]  In response to Mr. Teague's first comment, the final EIS states that the non-jurisdictional natural gas pipeline is anticipated to impact 56.3 acres of wetlands while the project itself would impact 45.2 acres; however, the impacts associated with the pipeline would likely be temporary.[152]  The final EIS then reiterates that the Commission does not have jurisdiction over the siting or construction of the intrastate natural gas pipeline that would be owned, operated, and maintained by other entities; however, staff estimated the impacts associated with these non-jurisdictional facilities based on available information provided by Texas LNG.[153]  The final EIS addresses Mr. Teague's second comment by explaining that the FERC Plan and Procedures require that applicants conduct post-construction monitoring of all areas disturbed by construction of a project, in addition to outlining success criteria for revegetation and restoration of temporary

---

[149] *Id.* at 5-374 – 5-375.

[150] *Id.*

[151] Mr. Teague's first comment was addressed in appendix H-2 of the final EIS under the responses to comment codes "WET-04" and "GEN-20."  The second comment was addressed under the responses to comment codes "VEG-02" and "WILD-03."

[152] Final EIS, app. H-2, at H-95.

[153] *Id.* at H-58.

**JA330**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

workspaces and requiring that additional action be taken until the areas that are temporarily disturbed are properly restored.[154]

82.    Mr. Teague also contends that the final EIS fails to acknowledge that the nearest seagrass beds are at the "Mexique" Flats, nearly 2 miles from the project site.  While the final EIS did not reference the Mexiquita Flats by name, they are described on page 4-59 as the nearest seagrass beds to the project site and are depicted on figure 4.6.2-1 in the final EIS.  The commenter also contends that the final EIS, "intentionally and incorrectly asserts that all nearby seagrasses are hydrologically isolated from the Brownsville Ship Channel."  On the contrary, page 4-59 in section 4.6.2.1 of the final EIS states that there are seagrass beds along the northern portion of the Brownsville Ship Channel, and that the nearest point of hydrologic connectivity for seagrass beds in the South Bay is 2.2 miles to the east.

83.    Mr. Teague acknowledges that Texas LNG's hydrodynamic modeling concludes that seagrasses would not be impacted by dredging, but asserts that the Commission should require Texas LNG to monitor total suspended solid levels and seagrass health during dredging.  The Brownsville Ship Channel is an actively maintained shipping channel.  As identified in section 4.13.1 of the final EIS, the Brownsville Ship Channel is routinely dredged for maintenance, including areas immediately adjacent to the seagrass beds discussed by the commenter and in the final EIS.  Based on Texas LNG's use of a cutterhead suction dredge to minimize turbidity, the results of the hydrodynamic modeling, the siting of the project along a routinely dredged ship channel, and the distance of the dredging activities from the nearest seagrass beds, the EIS concludes that the seagrass beds would not be impacted by construction or maintenance dredging.[155]  We agree and are not recommending monitoring of total suspended solids during dredging.

84.    In addition, Mr. Teague contends that the final EIS does not include a compensatory mitigation plan for impacts on wetlands—as required under section 404 of the Clean Water Act—and that Texas LNG has not proposed an alternative to the previously proposed mitigation that was based on "preservation only."  The commenter implies that the Commission should not have issued the final EIS until the final compensatory mitigation plan was available.  As discussed in the response to comment code "WET-02" in appendix H-2 of the final EIS, wetland mitigation is under the jurisdiction of the COE and Texas LNG would not be permitted to begin construction

---

[154] Id. at H-91.  See also supra P 36 (discussing measures to minimize impacts on vegetation communities).

[155] Final EIS at 4-63.

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

until all federal approvals and authorizations, including the mitigation plan as part of the section 404 permit, are complete.

### 17.     Environmental Analysis Conclusion

85.     We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as other information in the record.  We are adopting the environmental recommendations in the final EIS, as modified herein, and include them as conditions in the appendix to this order. Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of an approved project are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Commission staff will not issue a notice to proceed with an activity until the applicant has complied with all applicable conditions.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.[156]

86.     We agree with the conclusions presented in the final EIS and find that the project, if constructed and operated as described in the final EIS, is an environmentally acceptable action.  Further, for the reasons discussed throughout the order, as stated above, we find that the Texas LNG Project is not inconsistent with the public interest.

87.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this authorization.  The Commission encourages cooperation between Texas LNG and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[157]

---

[156] *See* Environmental Condition 2.

[157] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal

**JA332**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

## V.  **Conclusion**

88.    At a hearing held on November 21, 2019, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

(A)    Texas LNG is authorized under section 3 of the NGA to site, construct, and operate the Texas LNG Project located in Cameron County, Texas, as described and conditioned herein, and as more fully described in Texas LNG's application and subsequent filings, including any commitments made therein, subject to the environmental conditions contained in the Appendix of this order.

(B)    Texas LNG's proposed liquefaction facilities shall be constructed and made available for service within five years of the date of this order.

(C)    Texas LNG shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Texas LNG.  Texas LNG shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

(D)    Defenders of Wildlife's request for a formal hearing is denied.

By the Commission.  Commissioner Glick is dissenting with a separate statement
                                        attached.

( S E A L )


Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

regulation, or would delay the construction and operation of facilities approved by the Commission).

Document Accession #: 20191122-3048     Filed Date: 11/22/2019
Docket No. CP16-116-000                                                  - 34 -

# APPENDIX

## Environmental Conditions

As recommended in the final environmental impact statement (EIS), this authorization includes the following conditions:

1.   Texas LNG Brownsville, LLC (Texas LNG) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  Texas LNG must:

   a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b.   justify each modification relative to site-specific conditions;

   c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   d.   receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2.   The Director of the OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of life, health, property, and the environment during construction and operation of the project.  This authority shall allow:

   a.   the modification of conditions of the Order;

   b.   stop-work authority and authority to cease operation; and

   c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation.

3.   **Prior to any construction**, Texas LNG shall file an affirmative statement with the Secretary certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the

**JA334**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with the construction and restoration activities.

4.    The authorized facility locations shall be as shown in the EIS, as supplemented by filed site plans and maps. **As soon as they are available, and before the start of construction**, Texas LNG shall file with the Secretary any revised detailed site plan drawings for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these site plan drawings.

5.    Texas LNG shall file with the Secretary detailed site plan drawings and aerial photographs  identifying all facility relocations, and staging areas, storage yards, access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly required in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened and endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs, and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

b.    implementation of endangered, threatened, or special concern species mitigation measures;

c.    recommendations by state regulatory authorities; and

d.    agreements with individual landowners that affect other landowners or could affect environmentally sensitive areas.

**JA335**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

6. **Within 60 days of the Order and before construction begins**, Texas LNG shall file an Implementation Plan with the Secretary, for review and written approval by the Director of OEP. Texas LNG must file revisions to the plans as schedules change. The plans shall identify the following:

    a. how Texas LNG will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b. how Texas LNG will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

    c. the number of EIs assigned to the project and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d. company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e. the location and dates of the environmental compliance training and instructions Texas LNG will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

    f. the company personnel (if known) and specific portion of Texas LNG's organization having responsibility for compliance;

    g. the procedures (including use of contract penalties) Texas LNG will follow if noncompliance occurs; and

    h. for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        i. the completion of all required surveys and reports;

        ii. the environmental compliance training of onsite personnel;

        iii. the start of construction; and

        iv. the start and completion of restoration.

**JA336**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

7.    Texas LNG shall employ at least one EI for the project. Each EI shall be:

   a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorization documents;

   b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

   c.    empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

   d.    a full-time position, separate from all other activity inspectors;

   e.    responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

   f.    responsible for maintaining status reports.

8.    Beginning with the filing of its Implementation Plan, Texas LNG shall file updated status reports with the Secretary on a **monthly** basis until all construction and restoration activities are complete.  Problems of a significant magnitude shall be reported to the FERC **within 24 hours**.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include the following:

   a.    an update on Texas LNG's efforts to obtain the necessary federal authorizations;

   b.    project schedule including the current construction status, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

   c.    a listing of all problems encountered, contractor nonconformance/deficiency logs, and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

   d.    a description of the corrective and remedial actions implemented in response to all instances of noncompliance, nonconformance, or deficiency;

**JA337**

e.    the effectiveness of all corrective and remedial actions implemented;

f.    a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and measures taken to satisfy their concerns; and

g.    copies of any correspondence received by Texas LNG from other federal, state, or local permitting agencies concerning instances of noncompliance, and Texas LNG's response.

9.    Texas LNG must receive written authorization from the Director of OEP **before commencing construction of any project facilities**. To obtain such authorization, Texas LNG must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.    Texas LNG must receive written authorization from the Director of OEP **prior to introducing hazardous fluids into the LNG terminal**. Instrumentation and controls, hazard detection, hazard control, and security components/systems necessary for the safe introduction of such fluids shall be installed and functional.

11.    Texas LNG must receive written authorization from the Director of OEP **before placing the LNG terminal into service**. Such authorization will only be granted following a determination that the facilities have been constructed in accordance with the FERC approval, can be expected to operate safely as designed, and the rehabilitation and restoration of the areas affected by the LNG terminal are proceeding satisfactorily.

12.    **Within 30 days of placing the authorized facilities in service**, Texas LNG shall file an affirmative statement with the Secretary, certified by a senior company official:

a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b.    identifying which conditions of the Order Texas LNG has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

**JA338**

Document Accession #: 20191122-3048          Filed Date: 11/22/2019

13. **Prior to placing the LNG terminal into service**, Texas LNG shall file with the Secretary, for review and written approval by the Director of the OEP, its Spill Prevention, Containment, and Countermeasure Plan for operation of the project. (*section 4.2.4*)

14. **Prior to construction**, Texas LNG shall file with the Secretary, for review and written approval by the Director of OEP, a plan for the collection of seed/fruit from rare plant species within the proposed project site developed in consultation with the Texas Parks and Wildlife Department (TPWD).  (*section 4.5.4*)

15. **Prior to construction**, Texas LNG shall consult with the U.S. Fish and Wildlife Service (FWS) to develop a revised Migratory Bird Plan that addresses the TPWD and FWS recommendations.  Texas LNG shall file with the Secretary the final Migratory Bird Plan and evidence of consultation with the FWS.  (*section 4.6.1.3*)

16. **Prior to initiating pile-driving activities**, Texas LNG shall perform initial test drives to measure the actual underwater noise generated during in-water pile driving.  Following the completion of the initial test drives, Texas LNG shall file with the Secretary and the National Marine Fisheries Service (NMFS) the acoustic monitoring methods and results, including any additional mitigation measures that it will implement to reduce noise to anticipated levels. Texas LNG shall not initiate in-water pile driving for the project until approved by the Director of OEP. (*section 4.6.2.2*)

17. **During in-water construction activities**, Texas LNG shall utilize biological monitors to ensure that federally listed or other special status species are not present within the project area. In the event that federally listed or other special status species are observed, Texas LNG shall stop all in-water construction activities until the individual(s) leave the area on their own and Texas LNG shall notify the FWS or NMFS.  **Prior to construction**, Texas LNG shall file documentation, for review and written approval by the Director of OEP, demonstrating that these provisions have been incorporated into its environmental training program.  (*section 4.7.1*)

18. Texas LNG shall **not begin** construction activities **until**:

    a.  the FERC staff receives comments from the FWS regarding the proposed action;

    b.  the FERC staff completes Section 7 of the Endangered Species Act consultation with the FWS; and

**JA339**

    c.    Texas LNG has received written notification from the Director of OEP that construction or use of mitigation may begin.  (*section 4.7.1*)

19.    **Prior to construction**, Texas LNG shall file with the Secretary, for review and written approval by the Director of OEP, a plan for the capture and relocation of Texas tortoises developed in consultation with the TPWD.  (*section 4.7.2.1*)

20.    **Prior to construction**, Texas LNG shall file with the Secretary, for review and written approval by the Director of OEP, mitigation measures to avoid or further minimize take of marine mammals during in-water pile driving, developed in consultation with NMFS, and, if applicable, a copy of its Marine Mammal Protection Act Incidental Take Authorization.  (*section 4.7.2.2*)

21.    **Prior to construction**, Texas LNG shall file with the Secretary a determination from the Coastal Coordination Advisory Committee that the project is consistent with the laws and regulations of the state's Coastal Zone Management Program.  (*section 4.8.6*)

22.    **Prior to construction**, Texas LNG shall file with the Secretary a Traffic Management Plan for review and written approval by the Director of OEP that includes additional measures to minimize impacts on roadway traffic, including transporting workers from offsite locations via buses.  The Traffic Management Plan shall address impacts on State Highway (SH) 48 as well as impacts on other area roadways including SH 100, SH 511, and SH 500.  (*section 4.9.6.1*)

23.    Texas LNG shall **not begin construction** of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

    a.    Texas LNG files with the Secretary comments on the final cultural resources reports and plans from the State Historic Preservation Office, U.S. Army Corps of Engineers, National Park Service, and appropriate federally-recognized Indian tribes;

    b.    FERC staff has executed a memorandum of agreement regarding the resolution of adverse effects on historic properties;

    c.    the Director of OEP notifies Texas LNG in writing that treatment measures (including archaeological data recovery) may be implemented; and

    d.    Texas LNG documents the completion of treatment, and the Director of OEP issues a written notice to proceed with construction.

**JA340**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

All materials filed with the Commission containing **location, character, and ownership** information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **CUI/PRIV "CONTAINS PRIVILEGED INFORMATION - DO NOT RELEASE."** (*section 4.10.3*)

24. Texas LNG shall monitor sound levels during pile-driving activities, and file **weekly** noise data with the Secretary **following the start of pile-driving activities** that identify the noise impact on the nearest noise sensitive areas (NSA). If the maximum measured sound level due to pile driving at the nearest NSAs is greater than 10 decibels on the A-weighted scale (dBA) over the equivalent-continuous ambient sound levels, Texas LNG shall:

    a.    cease pile-driving activities and implement noise mitigation measures; and

    b.    file with the Secretary evidence of noise mitigation installation and request written notification from the Director of OEP that pile driving may resume.

25. Texas LNG shall file a full power load noise survey with the Secretary for the LNG terminal **no later than 60 days** after each liquefaction train is placed into service. If the noise attributable to operation of the equipment at the LNG terminal exceeds a day-night sound level ($L_{dn}$) of 55 dBA at the nearest NSA, **within 60 days** Texas LNG shall modify operation of the liquefaction facilities or install additional noise controls until a noise level below an $L_{dn}$ of 55 dBA at the NSA is achieved. Texas LNG shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. (*section 4.11.2.4*)

26. Texas LNG shall file a noise survey with the Secretary **no later than 60 days** after placing the entire LNG terminal into service. If a full load condition noise survey is not possible, Texas LNG shall provide an interim survey at the maximum possible horsepower load **within 60 days** of placing the LNG terminal into service and provide the full load survey **within 6 months**. If the noise attributable to operation of the equipment at the LNG terminal exceeds an $L_{dn}$ of 55 dBA at the nearest NSA under interim or full horsepower load conditions, Texas LNG shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date. Texas LNG shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. (*section 4.11.2.4*)

27. **Prior to initial site preparation**, Texas LNG shall file with the Secretary documentation demonstrating LNG marine vessels would be no higher than existing ship traffic or it has received a determination of no hazard (with or

Document Accession #: 20191122-3048    Filed Date: 11/22/2019

without conditions) by the U.S. Department of Transportation's Federal Aviation Administration (FAA) for mobile objects that might exceed the height requirements in 14 C.F.R. 77.9. (*section 4.12.6*)

28. **Prior to construction of final design**, Texas LNG shall file with the Secretary consultation from the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration staff as to whether the current provisions for detection and shutdown would meet the requirements of 49 C.F.R. 193 to prevent the discharge of LNG through the water removal systems in the impoundments. (*section 4.12.6*)

29. **Prior to construction of the final design**, Texas LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in Texas:

    a.    site preparation drawings and specifications;

    b.    LNG storage tank and foundation design drawings and calculations;

    c.    LNG terminal structures and foundation design drawings and calculations;

    d.    seismic specifications for procured Seismic Category I equipment prior to the issuing of requests for quotations; and

    e.    quality control procedures to be used for civil/structural design and construction.

    In addition, Texas LNG shall file, in its Implementation Plan, the schedule for producing this information. (*section 4.12.6*)

30. **Prior to commencement of service**, Texas LNG shall file with the Secretary a monitoring and maintenance plan, stamped and sealed by the professional engineer-of-record registered in Texas, for the site grade and LNG earthen impoundment berms which ensures the minimum elevation relative to mean sea level will be maintained for the life of the facility considering settlement, subsidence, and sea level rise. (*section 4.12.6*)

Conditions 31 through 125 shall apply to the Texas LNG Terminal facilities. Information pertaining to these specific conditions shall be filed with the Secretary for review and written approval by the Director of OEP, or the Director's designee, within the timeframe indicated by each condition. Specific engineering, vulnerability, or detailed design information meeting the criteria specified in Order No. 833 (Docket No. RM16-15-000), including security information, shall be submitted as critical energy

**JA342**

infrastructure information pursuant to 18 C.F.R. 388.113. *See Regulations Implementing FAST Act Section 61003 -- Critical Electric Infrastructure Security and Amending Critical Energy Infrastructure Information*, Order No. 833, 157 FERC ¶ 61,123 (2016). Information pertaining to items such as offsite emergency response, procedures for public notification and evacuation, and construction and operating reporting requirements will be subject to public disclosure. All information shall be filed **a minimum of 30 days** before approval to proceed is requested.

31.    **Prior to initial site preparation**, Texas LNG shall develop and implement procedures to monitor rocket launch activity and to position onsite construction crews and plant personnel in areas that are unlikely to be impacted by rocket debris of a failed launch during initial moments of rocket launch activity from the Brownsville SpaceX facility. Texas LNG's procedures for positioning of onsite construction crews and plant personnel shall include reference to any guidance from the FAA to the public regarding anticipated SpaceX launches. (*section 4.12.6*)

32.    **Prior to initial site preparation**, Texas LNG shall file an overall project schedule, which includes the proposed stages of the commissioning plan. (*section 4.12.6*)

33.    **Prior to initial site preparation**, Texas LNG shall file quality assurance and quality control procedures for construction activities. (*section 4.12.6*)

34.    **Prior to initial site preparation**, Texas LNG shall file procedures for controlling access during construction. (*section 4.12.6*)

35.    **Prior to initial site preparation**, Texas LNG shall evaluate the relocation of the main control building such that it does not present an ignition source to a release of combustible vapors and that it is not impacted by a pool or jet fire or otherwise demonstrate how it would be protected from such hazards. The evaluation shall compare against minimum spacing requirements for buildings relative to impounding systems and equipment containing hazardous fluids, distances used in electrical area classification for ignition sources as well as radiant heat distances from pool and jet fires. (*section 4.12.6*)

36.    **Prior to initial site preparation**, Texas LNG shall develop an Emergency Response Plan (including evacuation) and coordinate procedures with the U.S. Coast Guard (Coast Guard); state, county, and local emergency planning groups; fire departments; state and local law enforcement; and appropriate federal agencies. This plan shall include at a minimum:

        a.    designated contacts with state and local emergency response agencies;

**JA343**

b.     scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

c.     procedures for notifying residents and recreational users within areas of potential hazard;

d.     evacuation routes/methods for residents and public use areas that are within any transient hazard areas along the route of the LNG marine transit;

e.     locations of permanent sirens and other warning devices; and

f.     an "emergency coordinator" on each LNG carrier to activate sirens and other warning devices.

Texas LNG shall notify the FERC staff of all planning meetings in advance and shall report progress on the development of its Emergency Response Plan at **3-month intervals**. (*section 4.12.6*)

37. **Prior to initial site preparation**, Texas LNG shall file a Cost-Sharing Plan identifying the mechanisms for funding all project-specific security/emergency management costs that would be imposed on state and local agencies. This comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base. Texas LNG shall notify FERC staff of all planning meetings in advance and shall report progress on the development of its Cost Sharing Plan at **3-month intervals**. (*section 4.12.6*)

38. **Prior to construction of final design**, Texas LNG shall file change logs that list and explain any changes made from the front end engineering design provided in Texas LNG's application and filings. A list of all changes with an explanation for the design alteration shall be provided and all changes shall be clearly indicated on all diagrams and drawings. Records of changes shall be kept so FERC staff can verify during construction inspections. (*section 4.12.6*)

39. **Prior to construction of final design**, Texas LNG shall file information/revisions pertaining to Texas LNG's response numbers 5, 11, 12, 15, 19, 20, 21, 22, 23, and 25 of its July 29, 2016 filing, which indicated features it would include or consider in the final design. (*section 4.12.6*)

**JA344**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

40. **Prior to construction of final design**, Texas LNG shall file a plot plan of the final design showing all major equipment, structures, buildings, and impoundment systems. (*section 4.12.6*)

41. **Prior to construction of final design**, Texas LNG shall file three-dimensional plant drawings to confirm plant layout for maintenance, access, egress, and congestion. (*section 4.12.6*)

42. **Prior to construction of final design**, Texas LNG shall file drawings of the storage tank piping support structure and support of horizontal piping at grade including pump columns, relief valves, pipe penetrations, instrumentation, and appurtenances. (*section 4.12.6*)

43. **Prior to construction of final design**, Texas LNG shall file a complete specification and drawings of the proposed LNG tank design and installation. (*section 4.12.6*)

44. **Prior to construction of final design**, Texas LNG shall file the evaluation and conclusions by the tank manufacturer regarding the potential for the layering effect and the steps to avoid rollover for various LNG rundown scenarios, especially bottom fill, during the production of excessively warm LNG. This evaluation shall consider the suppression of flashing in the bottom fill downpipe caused by static pressure in the column resulting in failure of the LNG to completely reach equilibrium temperature at tank operating pressure. (*section 4.12.6*)

45. **Prior to construction of final design**, Texas LNG shall file engineering information that protects the LNG rundown system from the high pressure liquefaction system, including consideration for specifying the LNG rundown system from the main cryogenic heat exchanger (MCHE) to the LNG storage tanks at the same pressure as the LNG side of the MCHE with the specification break downstream of the motor operated valve (MOV) valves (i.e., MOV-51001 and 51002) located on the LNG storage tank fill lines. The evaluation shall consider removal of the end flash gas separator 1410-V-101 from the LNG product rundown system or a high-high liquid shutdown capability to ensure LNG will not overfill the drum and release LNG into the vapor handling system. In addition, Texas LNG shall provide the control loop simulation summary for the LNG rundown system. (*section 4.12.6*)

46. **Prior to construction of the final design**, Texas LNG shall file engineering information that demonstrates unobstructed flow of the LNG tank recycle line, including consideration for the 16-inch-diameter pump recirculation piping

**JA345**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

connection to the LNG storage tank top fill line being downstream of the motor control valves (i.e., MOV-51001).  (*section 4.12.6*)

47.   **Prior to construction of the final design**, Texas LNG shall file engineering information that demonstrates detection and protection as a result of cryogenic temperature conditions in the Demethanizer, including consideration for the addition of low temperature shutdown capabilities on temperature transmitters TI-21056 and TIC-21015 on the Demethanizer 1210-T-101 that would close the bottom outlet valve XZV-21006 in the event of depressurization that results in cryogenic temperatures at the bottom of the Demethanizer with the bottom outlet valve XZV-21006 remaining closed until the cryogenic temperature condition has been removed.  (*section 4.12.6*)

48.   **Prior to construction of the final design**, Texas LNG shall file engineering information that demonstrates protection of the Demethanizer Reboiler from cryogenic temperatures, including consideration for specifying the hot oil tubing and tube sheet within the Demethanizer Reboiler 1210-E-102 for cryogenic service.  (*section 4.12.6*)

49.   **Prior to construction of the final design**, Texas LNG shall file engineering information that demonstrates protection of the carbon steel condensate line from cryogenic fluid on the Spare Flare KO Drum 1840-V-103, including consideration of an automatic shutoff valve on the 4-inch-diameter condensate line (1840-PC-84002-4") downstream of the ¾-inch bleed valve controlled by low-low temperature, as well as designing the piping segment between the Spare Flare KO Drum and this low-low temperature shutoff valve for cryogenic temperatures. (*section 4.12.6*)

50.   **Prior to construction of final design**, Texas LNG shall file an up-to-date equipment list, process and mechanical data sheets, and specifications. The specifications shall include:

   a.   Building Specifications (e.g., control buildings, electrical buildings, compressor buildings, storage buildings, pressurized buildings, ventilated buildings, blast resistant buildings);

   b.   Mechanical Specifications (e.g., piping, valve, insulation, rotating equipment, heat exchanger, storage tank and vessel, other specialized equipment);

   c.   Electrical and Instrumentation Specifications (e.g., power system, control system, safety instrument system (SIS), cable, other electrical and instrumentation); and

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

d.    Security and Fire Safety Specifications (e.g., security, passive protection, hazard detection, hazard control, firewater). (*section 4.12.6*)

51.   **Prior to construction of final design**, Texas LNG shall file a list of all codes and standards and the final specification document number where they are referenced. (*section 4.12.6*)

52.   **Prior to construction of final design**, Texas LNG shall file up-to-date process flow diagrams and piping and instrument diagrams (P&IDs) including vendor P&IDs. The process flow diagrams shall include heat and material balances. The P&IDs shall include the following information:

a.    equipment tag number, name, size, duty, capacity, and design conditions;

b.    equipment insulation type and thickness;

c.    storage tank pipe penetration size and nozzle schedule;

d.    valve high pressure side and internal and external vent locations;

e.    piping with line number, piping class specification, size, and insulation type and thickness;

f.    piping specification breaks and insulation limits;

g.    all control and manual valves numbered;

h.    relief valves with size and set points; and

i.    drawing revision number and date. (*section 4.12.6*)

53.   **Prior to construction of final design**, Texas LNG shall file P&IDs, specifications, and procedures that clearly show and specify the tie-in details required to safely connect subsequently constructed facilities with the operational facilities. (*section 4.12.6*)

54.   **Prior to construction of final design**, Texas LNG shall file a car seal philosophy and a list of all car-sealed and locked valves consistent with the P&IDs. (*section 4.12.6*)

55.   **Prior to construction of final design**, the engineering, procurement, and construction contractor shall verify that the recommendations from the Front End Engineering Design Hazard Identification are complete and consistent with the

Document Accession #: 20191122-3048    Filed Date: 11/22/2019

requirements of the final design as determined by the engineering, procurement, and construction contractor. (*section 4.12.6*)

56.  **Prior to construction of final design**, Texas LNG shall file a hazard and operability review prior to issuing the P&IDs for construction. A copy of the review, a list of the recommendations, and actions taken on the recommendations shall be filed. (*section 4.12.6*)

57.  **Prior to construction of final design**, Texas LNG shall file the safe operating limits (upper and lower), alarm and shutdown set points for all instrumentation (i.e., temperature, pressures, flows, and compositions). (*section 4.12.6*)

58.  **Prior to construction of final design**, Texas LNG shall file cause-and-effect matrices for the process instrumentation, fire and gas detection system, and emergency shutdown system for review and approval. The cause-and-effect matrices shall include alarms and shutdown functions, details of the voting and shutdown logic, and set points. (*section 4.12.6*)

59.  **Prior to construction of final design**, Texas LNG shall file an evaluation of emergency shutdown valve closure times. The evaluation shall account for the time to detect an upset or hazardous condition, notify plant personnel, and close the emergency shutdown valve(s). (*section 4.12.6*)

60.  **Prior to construction of final design**, Texas LNG shall file an evaluation of dynamic pressure surge effects from valve opening and closures times and pump operations that demonstrate that the surge effects do not exceed the design pressures. (*section 4.12.6*)

61.  **Prior to construction of final design**, Texas LNG shall demonstrate that, for hazardous fluids, piping and piping nipples 2 inches or less in diameter are designed to withstand external loads, including vibrational loads in the vicinity of rotating equipment and operator live loads in areas accessible by operators. (*section 4.12.6*)

62.  **Prior to construction of final design**, Texas LNG shall file the electrical area classification drawings that reflect additional hazardous classification areas (e.g., Division 2) where highly volatile liquids are present (e.g., LNG, refrigerants, etc.) and additional hazardous classification areas where the heat transfer fluid would be processed above its flash point (e.g., near the heat transfer fluid heater) and at areas of fuel gas (e.g., fuel gas drums and surrounding equipment), including areas where they could be exposed to flammable gas during a purge cycle of a fired heater. (*section 4.12.6*)

63.   **Prior to construction of final design**, Texas LNG shall file drawings and details of how process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system meet the requirements of National Fire Protection Association Standard 59A (NFPA 59A) (2001).  (*section 4.12.6*)

64.   **Prior to construction of final design**, Texas LNG shall file details of an air gap or vent installed downstream of process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system. Each air gap shall vent to a safe location and be equipped with a leak detection device that shall continuously monitor for the presence of a flammable fluid, alarm the hazardous condition, and shut down the appropriate systems.  (*section 4.12.6*)

65.   **Prior to construction of final design**, Texas LNG shall file the design specifications for the feed gas inlet facilities (e.g., metering, pigging system, pressure protection system, compression, etc.).  (*section 4.12.6*)

66.   **Prior to construction of final design**, Texas LNG shall specify that piping and equipment that may be cooled with liquid nitrogen will be designed for liquid nitrogen temperatures, with regard to allowable movement and stresses.  (*section 4.12.6*)

67.   **Prior to construction of final design**, Texas LNG shall include LNG tank fill flow measurement with high flow alarm.  (*section 4.12.6*)

68.   **Prior to construction of final design**, Texas LNG shall include boil-off gas flow, tank density profile and temperature profile measurement for each tank.  (*section 4.12.6*)

69.   **Prior to construction of final design**, Texas LNG shall file the structural analysis of the LNG storage tank and outer containment demonstrating they are designed to withstand all loads and combinations.  (*section 4.12.6*)

70.   **Prior to construction of final design**, Texas LNG shall file an analysis of the structural integrity of the outer containment of the full containment LNG storage tanks demonstrating it can withstand the heat from a roof tank top fire or adjacent tank top fire.  (*section 4.12.6*)

71.   **Prior to construction of final design**, Texas LNG shall file a projectile analysis to demonstrate that the outer concrete impoundment wall of a full-containment LNG tank could withstand projectiles from explosions and high winds.  The analysis shall detail the projectile speeds and characteristics and method used to determine penetration or perforation depths.  (*section 4.12.6*)

**JA349**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

72.  **Prior to construction of final design**, Texas LNG shall file the sizing basis and capacity for the final design of the flares and/or vent stacks as well as the pressure and vacuum relief valves for major process equipment, vessels, and storage tanks. (*section 4.12.6*)

73.  **Prior to construction of final design**, Texas LNG shall specify that all Emergency Shutdown valves will be equipped with open and closed position switches connected to the Distributed Control System (DCS)/SIS.  (*section 4.12.6*)

74.  **Prior to construction of final design**, Texas LNG shall file a drawing showing the location of the emergency shutdown buttons.  Emergency shutdown buttons shall be easily accessible, conspicuously labeled, and located in an area which will be accessible during an emergency.  (*section 4.12.6*)

75.  **Prior to construction of final design**, Texas LNG shall file drawings and specifications for vehicle barriers at each facility entrance and control point for access control.  (*section 4.12.6*)

76.  **Prior to construction of final design**, Texas LNG shall file drawings and specifications for protecting transfer piping, firewater equipment (e.g., hydrants, monitors, manifolds, etc.), pumps, and compressors, etc. to ensure that they are located away from roadway or protected from inadvertent damage from vehicles. (*section 4.12.6*)

77.  **Prior to construction of final design**, Texas LNG shall file lighting drawings. The lighting drawings shall show the location, elevation, type of light fixture, and lux levels of the lighting system and shall be in accordance with the electrical design basis and referenced American Petroleum Institute Standard 540 (API 540) and provide illumination along the perimeter of the facility and along paths/roads of access and egress to facilitate security monitoring and emergency response operations.  (*section 4.12.6*)

78.  **Prior to construction of final design**, Texas LNG shall file fencing drawings. The fencing drawings shall provide details of fencing that demonstrates it would restrict and deter access around the entire facility and has a clearance from exterior features (e.g., power lines, trees, etc.) and from interior features (e.g., piping, equipment, buildings, etc.) that does not allow for the fence to be overcome. (*section 4.12.6*)

79.  **Prior to construction of final design**, Texas LNG shall file security camera and intrusion detection drawings.  The security camera drawings shall show the location, areas covered, and features of the camera (fixed, tilt/pan/zoom, motion detection alerts, low light, mounting height, etc.) to verify camera coverage of the

**JA350**

Document Accession #: 20191122-3048      Filed Date: 11/22/2019

entire perimeter with redundancies, and cameras interior to the facility that will enable rapid monitoring of the LNG plant including a camera be provided at the top of each LNG storage tank, and coverage within pretreatment areas, within liquefaction areas, within truck transfer areas, within marine transfer areas, and buildings.  The drawings shall show or note the location of the intrusion detection to verify it covers the entire perimeter of the LNG plant.  (*section 4.12.6*)

80.  **Prior to construction of final design**, Texas LNG shall file the details of a plant-wide Emergency Shutdown button, including details of the sequencing and reliability of the shutdown.  (*section 4.12.6*)

81.  **Prior to construction of final design**, Texas LNG shall evaluate the terminal alarm system and external notification system design to ensure the location of the terminal alarms and other fire and evacuation alarm notification devices (e.g. audible/visual beacons and strobes) will provide adequate warning at the terminal and external off-site areas in the event of an emergency.  (*section 4.12.6*)

82.  **Prior to construction of final design**, Texas LNG shall file an updated fire protection evaluation of the proposed facilities.  A copy of the evaluation, a list of recommendations and supporting justifications, and actions taken on the recommendations shall be filed.  The evaluation shall justify the type, quantity, and location of hazard detection and hazard control, passive fire protection, emergency shutdown and depressurizing systems, firewater, and emergency response equipment, training, and qualifications in accordance with NFPA 59A (2001).  The justification for the flammable and combustible gas detection and flame and heat detection shall be in accordance with International Society of Automation (ISA) 84.00.07 or equivalent methodologies that would demonstrate 90 percent or more of releases (unignited and ignited) that could result in an off-site or cascading impact that could extend off site would be detected by two or more detectors and result in isolation and de-inventory within 10 minutes.  The evaluation shall also demonstrate whether the use of only photoelectric smoke type detectors instead of cross zoning with ionization smoke type detectors and the dependence on linear heat type detectors instead of multi spectrum optical flame type detectors provides a more reliable and rapid means of detection.  The analysis shall take into account the set points, voting logic, and different wind speeds and directions.  The justification for firewater shall provide calculations for all firewater demands based on design densities, surface area, and throw distance and specifications for the corresponding hydrant and monitors needed to reach and cool equipment.  (*section 4.12.6*)

83.  **Prior to construction of final design**, Texas LNG shall file detailed calculations to confirm that the final fire water volumes will be accounted for when evaluating

**JA351**

Document Accession #: 20191122-3048          Filed Date: 11/22/2019
Docket No. CP16-116-000                                                              - 52 -

the capacity of the impoundment system during a spill and fire scenario. (*section 4.12.6*)

84. **Prior to construction of final design**, Texas LNG shall file spill containment system drawings with dimensions and slopes of curbing, trenches, impoundments, and capacity calculations considering any foundations and equipment within impoundments, as well as the sizing and design of a down-comer that would transfer spills from the tank top to the ground-level impoundment system. The spill containment drawings shall show containment for all hazardous fluids, including all liquids handled above their flashpoint, from the largest flow from a single line for 10 minutes, including de-inventory, or the maximum liquid from the largest vessel (or total of impounded vessels) or otherwise demonstrate that providing spill containment would not significantly reduce the flammable vapor dispersion or radiant heat consequences of a spill. (*section 4.12.6*)

85. **Prior to construction of the final design**, Texas LNG shall file a building siting assessment to ensure plant buildings that are occupied or critical to the safety of the LNG plant are adequately protected from potential hazards involving fires and vapor cloud explosions. (*section 4.12.6*)

86. **Prior to construction of the final design**, Texas LNG shall file an analysis that demonstrates the flammable vapor dispersion from design spills will be prevented from dispersing underneath the elevated LNG storage tanks, or the LNG storage tanks will be able to withstand an overpressure due to ignition of the flammable vapor dispersion cloud that disperses underneath the elevated LNG storage tanks. (*section 4.12.6*)

87. **Prior to construction of final design**, Texas LNG shall file an analysis of the localized hazards to operators from a potential liquid nitrogen release and shall also provide low oxygen detectors and other identified mitigation based on the analysis. (*section 4.12.6*)

88. **Prior to construction of final design**, Texas LNG shall file an analysis of the localized hazards from a potential hydrogen sulfide release and shall also provide toxic detectors for hydrogen sulfide releases from the acid gas piping system and potential release points (i.e. vents, relief valves, vent stacks, and thermal oxidizer stack). (*section 4.12.6*)

89. **Prior to construction of final design**, Texas LNG shall file an analysis of the off gassing of hydrogen in battery rooms and ventilation calculations that limit concentrations below the lower flammability limits (e.g., 25 percent of the lower flammability limit [LFL]) and shall also provide hydrogen detectors that alarm

**JA352**

Document Accession #: 20191122-3048          Filed Date: 11/22/2019

(e.g., 20 to 25 percent of the LFL) and initiate mitigative actions (e.g., 40 to 50 percent of the LFL). (*section 4.12.6*)

90.    **Prior to construction of final design**, Texas LNG shall file complete drawings and a list of the hazard detection equipment.  The drawings shall clearly show the location and elevation of all detection equipment.  The list shall include the instrument tag number, type and location, alarm indication locations, and shutdown functions of the hazard detection equipment.  (*section 4.12.6*)

91.    **Prior to construction of final design**, Texas LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of the hazard detectors when determining the lower flammable limit set points for methane, ethylene, propane, and condensate.  (*section 4.12.6*)

92.    **Prior to construction of final design**, Texas LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of hazard detectors when determining the set points for toxic components such as natural gas liquids and hydrogen sulfide.  (*section 4.12.6*)

93.    **Prior to construction of final design**, Texas LNG shall file a technical review of facility design that:

a.    identifies all combustion/ventilation air intake equipment and the distances to any possible flammable gas or toxic release; and

b.    demonstrates that these areas are adequately covered by hazard detection devices and indicates how these devices would isolate or shutdown any combustion or heating ventilation and air conditioning equipment whose continued operation could add to or sustain an emergency.  (*section 4.12.6*)

94.    **Prior to construction of final design**, Texas LNG shall file an evaluation of the voting logic and voting degradation for hazard detectors.  (*section 4.12.6*)

95.    **Prior to construction of final design**, Texas LNG shall file facility plan drawings and a list of the fixed and wheeled dry-chemical, hand-held fire extinguishers, and other hazard control equipment.  Plan drawings shall clearly show the location and elevation by tag number of all fixed dry chemical systems in accordance with NFPA 17, and wheeled and hand-held extinguishers location travel distances are along normal paths of access and egress and in compliance with NFPA 10.  The list shall include the equipment tag number, manufacturer and model, elevations, agent type, agent capacity, discharge rate, automatic and manual remote signals initiating discharge of the units, and equipment covered.  (*section 4.12.6*)

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

96.   **Prior to construction of final design**, Texas LNG shall file drawings and specifications for the structural passive protection systems to protect equipment and supports from cryogenic releases. (*section 4.12.6*)

97.   **Prior to construction of final design**, Texas LNG shall file calculations or test results for the structural passive protection systems to demonstrate that equipment and supports are protected from cryogenic releases. (*section 4.12.6*)

98.   **Prior to construction of final design**, Texas LNG shall file drawings and specifications for the structural passive protection systems demonstrating that equipment and supports are protected from pool and jet fires. (*section 4.12.6*)

99.   **Prior to construction of final design**, Texas LNG shall file an evaluation and associated specifications and drawings of how they would prevent cascading damage of transformers (e.g., fire walls or spacing) in accordance with NFPA 850 or equivalent. (*section 4.12.6*)

100.  **Prior to construction of final design**, Texas LNG shall file a detailed quantitative analysis to demonstrate that adequate mitigation would be provided for each significant component within the 4,000 British thermal units per square foot per hour zone from pool or jet fires that could cause failure of the component. Trucks at the truck transfer station shall be included in the analysis. A combination of passive and active protection for pool fires and passive and/or active protection for jet fires shall be provided and demonstrate the effectiveness and reliability. Effectiveness of passive mitigation shall be supported by calculations for the thickness limiting temperature rise and effectiveness of active mitigation shall be justified with calculations demonstrating flow rates and durations of any cooling water will mitigate the heat absorbed by the vessel. (*section 4.12.6*)

101.  **Prior to construction of final design**, Texas LNG shall file facility plan drawings showing the proposed location of the firewater and any foam systems. Plan drawings shall clearly show the location of firewater and foam piping, post indicator valves, and the location and area covered by, each monitor, hydrant, hose, water curtain, deluge system, foam system, water-mist system, and sprinkler. The drawings shall demonstrate that each process area, fire zone, or other sections of piping with several users can be isolated with post indicator valves and that hydrants and monitors provide enough firewater flow to reach and cool exposed surfaces subjected to a fire based on the throw distance, design density, and surface areas that are needed to be cooled taking into account obstructions. Drawings shall also include piping and instrumentation diagrams of the firewater and foam systems. (*section 4.12.6*)

**JA354**

102. **Prior to construction of final design**, Texas LNG shall demonstrate roads are wide enough (e.g., 20 feet per NFPA 307) to accommodate fire apparatus to reach and turn around in all areas of the plant where hydrants are proposed or otherwise provide alternative means that do not rely on fire apparatus (e.g., firewater monitors) in those areas. (*section 4.12.6*)

103. **Prior to construction of final design**, Texas LNG shall file documentation demonstrating the firewater storage volume for its facilities has minimum reserved capacity for its most demanding firewater scenario plus 1,000 gallons per minute for no less than 2 hours, including the fire water required for foam generation. The firewater storage shall also demonstrate compliance with NFPA 22, equivalent, or better level of safety. (*section 4.12.6*)

104. **Prior to construction of final design**, Texas LNG shall specify that the firewater flow test meter is equipped with a transmitter and that a pressure transmitter is installed upstream of the flow transmitter. The flow transmitter and pressure transmitter shall be connected to the DCS and recorded. (*section 4.12.6*)

105. **Prior to construction of final design**, Texas LNG shall specify that the firewater pump shelter is designed to remove the largest firewater pump or other component for maintenance with an overhead or external crane. (*section 4.12.6*)

106. **Prior to commissioning**, Texas LNG shall file a detailed schedule for commissioning through equipment startup. The schedule shall include milestones for all procedures and tests to be completed: prior to introduction of hazardous fluids and during commissioning and startup. Texas LNG shall file documentation certifying that each of these milestones has been completed before authorization to commence the next phase of commissioning and startup will be issued. (*section 4.12.6*)

107. **Prior to commissioning**, Texas LNG shall file detailed plans and procedures for: testing the integrity of onsite mechanical installation; functional tests; introduction of hazardous fluids; operational tests; and placing the equipment into service. (section 4.12.6)

108. **Prior to commissioning**, Texas LNG shall file a plan for clean-out, dry-out, purging, and tightness testing. This plan shall address the requirements of the American Gas Association's Purging Principles and Practice, and shall provide justification if not using an inert or non-flammable gas for clean-out, dry-out, purging, and tightness testing. (*section 4.12.6*)

109. **Prior to commissioning**, Texas LNG shall file the procedures for pressure/leak tests which address the requirements of American Society of Mechanical

Document Accession #: 20191122-3048        Filed Date: 11/22/2019

Engineers (ASME) Boiler and Pressure Vessel Code Section VIII and ASME B31.3.  In addition, Texas LNG shall file a line list of pneumatic and hydrostatic test procedures.  (*section 4.12.6*)

110.  **Prior to commissioning**, Texas LNG shall file the operation and maintenance procedures and manuals, as well as safety procedures, hot work procedures and permits, abnormal operating conditions reporting procedures, simultaneous operations procedures, and management of change procedures and forms.  (*section 4.12.6*)

111.  **Prior to commissioning**, Texas LNG shall tag all equipment, instrumentation, and valves in the field, including drain valves, vent valves, main valves, and car-sealed or locked valves.  (*section 4.12.6*)

112.  **Prior to commissioning**, Texas LNG shall file a plan to maintain a detailed training log to demonstrate that operating, maintenance, and emergency response staff have completed the required training.  (*section 4.12.6*)

113.  **Prior to commissioning**, Texas LNG shall file the settlement results from hydrostatic testing the LNG storage containers as well as a routine monitoring program to ensure settlements are as expected and do not exceed applicable criteria in API 620, API 625, API 653, and American Concrete Institute (ACI) 376.  The program shall specify what actions would be taken after various levels of seismic events.  (*section 4.12.6*)

114.  **Prior to commissioning**, Texas LNG shall equip the LNG storage tank and adjacent piping and supports with permanent settlement monitors to allow personnel to observe and record the relative settlement between the LNG storage tank and adjacent piping.  The settlement record shall be reported in the semi-annual operational reports.  (*section 4.12.6*)

115.  **Prior to introduction of hazardous fluids**, Texas LNG shall develop and implement procedures for plant personnel to monitor the rocket launches from the Brownsville SpaceX facility and take mitigative actions before and after a rocket launch failure to minimize the potential of a release reaching offsite, or resulting in cascading effects that could extend offsite or impact safe operations.  (*section 4.12.6*)

116.  **Prior to introduction of hazardous fluids**, Texas LNG shall develop and implement an alarm management program to ensure effectiveness of process alarms.  (*section 4.12.6*)

**JA356**

117.  **Prior to introduction of hazardous fluids**, Texas LNG shall complete and
document all pertinent tests (Factory Acceptance Tests, Site Acceptance Tests,
Site Integration Tests) associated with the DCS and SIS that demonstrates full
functionality and operability of the system.  (*section 4.12.6*)

118.  **Prior to introduction of hazardous fluids**, Texas LNG shall complete and
document a firewater pump acceptance test and firewater monitor and hydrant
coverage test.  The actual coverage area from each monitor and hydrant shall be
shown on facility plot plan(s).  (*section 4.12.6*)

119.  **Prior to introduction of hazardous fluids**, Texas LNG shall complete and
document a pre-startup safety review to ensure that installed equipment meets the
design and operating intent of the facility.  The pre-startup safety review shall
include any changes since the last hazard review, operating procedures, and
operator training.  A copy of the review with a list of recommendations, and
actions taken on each recommendation, shall be filed.  (*section 4.12.6*)

120.  Texas LNG shall file a request for written authorization from the Director of OEP
**prior to unloading or loading the first LNG commissioning cargo**.  After
production of first LNG, Texas LNG shall file **weekly** reports on the
commissioning of the proposed systems that detail the progress toward
demonstrating the facilities can safely and reliably operate at or near the design
production rate.  The reports shall include a summary of activities, problems
encountered, and remedial actions taken.  The weekly reports shall also include the
latest commissioning schedule, including projected and actual LNG production by
each liquefaction train, LNG storage inventories in each storage tank, and the
number of anticipated and actual LNG commissioning cargoes, along with the
associated volumes loaded or unloaded.  Further, the weekly reports shall include
a status and list of all planned and completed safety and reliability tests, work
authorizations, and punch list items.  Problems of significant magnitude shall be
reported to the FERC **within 24 hours**.  (*section 4.12.6*)

121.  **Prior to commencement of service**, Texas LNG shall label piping with fluid
service and direction of flow in the field, in addition to the pipe labeling
requirements of NFPA 59A (2001).  (*section 4.12.6*)

122.  **Prior to commencement of service**, Texas LNG shall file plans for any
preventative and predictive maintenance program that performs periodic or
continuous equipment condition monitoring.  (*section 4.12.6*)

123.  **Prior to commencement of service**, Texas LNG shall develop procedures for
offsite contractors' responsibilities, restrictions, and limitations and for
supervision of these contractors by Texas LNG staff.  (*section 4.12.6*)

**JA357**

Document Accession #: 20191122-3048          Filed Date: 11/22/2019

124. **Prior to commencement of service**, Texas LNG shall notify the FERC staff of any proposed revisions to the security plan and physical security of the plant. (*section 4.12.6*)

125. **Prior to commencement of service**, Texas LNG shall file a request for written authorization from the Director of OEP. Such authorization will only be granted following a determination by the Coast Guard, under its authorities under the Ports and Waterways Safety Act, the Magnuson Act, the Maritime Transportation Security Act of 2002, and the Security and Accountability For Every Port Act, that appropriate measures to ensure the safety and security of the facility and the waterway have been put into place by Texas LNG or other appropriate parties. (*section 4.12.6*)

In addition, conditions 126 through 129 shall apply **throughout the life of the Texas LNG Project**.

126. The facility shall be subject to regular FERC staff technical reviews and site inspections on at least an **annual basis** or more frequently as circumstances indicate. Prior to each FERC staff technical review and site inspection, Texas LNG shall respond to a specific data request including information relating to possible design and operating conditions that may have been imposed by other agencies or organizations. Up-to-date detailed P&IDs reflecting facility modifications and provision of other pertinent information not included in the semi-annual reports described below, including facility events that have taken place since the previously submitted semi-annual report, shall be submitted. (*section 4.12.6*)

127. **Semi-annual** operational reports shall be filed with the Secretary to identify changes in facility design and operating conditions; abnormal operating experiences; activities (e.g., ship arrivals, quantity and composition of imported and exported LNG, liquefied and vaporized quantities, boil off/flash gas); and plant modifications, including future plans and progress thereof. Abnormalities shall include, but not be limited to, unloading/loading/shipping problems, potential hazardous conditions from offsite vessels, storage tank stratification or rollover, geysering, storage tank pressure excursions, cold spots on the storage tanks, storage tank vibrations and/or vibrations in associated cryogenic piping, storage tank settlement, significant equipment or instrumentation malfunctions or failures, non-scheduled maintenance or repair (and reasons therefore), relative movement of storage tank inner vessels, hazardous fluids releases, fires involving hazardous fluids and/or from other sources, negative pressure (vacuum) within a storage tank, and higher than predicted boil off rates. Adverse weather conditions and the effect on the facility also shall be reported. Reports shall be submitted **within 45 days after each period ending June 30 and December 31**. In addition to the

above items, a section entitled "Significant Plant Modifications Proposed for the Next 12 Months (dates)" shall be included in the semi-annual operational reports. Such information would provide the FERC staff with early notice of anticipated future construction/maintenance at the LNG facilities. (*section 4.12.6*)

128. In the event the temperature of any region of the LNG storage container, including any secondary containment, including imbedded pipe supports, becomes less than the minimum specified operating temperature for the material, the Commission shall be notified **within 24 hours** and procedures for corrective action shall be specified. (*section 4.12.6*)

129. Significant non-scheduled events, including safety-related incidents (e.g., LNG, condensate, refrigerant, or natural gas releases; fires; explosions; mechanical failures; unusual over pressurization; and major injuries) and security-related incidents (e.g., attempts to enter site, suspicious activities) shall be reported to the FERC staff. In the event that an abnormality is of significant magnitude to threaten public or employee safety, cause significant property damage, or interrupt service, notification shall be made **immediately**, without unduly interfering with any necessary or appropriate emergency repair, alarm, or other emergency procedure. In all instances, notification shall be made to the FERC staff **within 24 hours**. This notification practice shall be incorporated into the LNG facility's emergency plan. Examples of reportable hazardous fluids-related incidents include:

    a.    fire;

    b.    explosion;

    c.    estimated property damage of $50,000 or more;

    d.    death or personal injury necessitating in-patient hospitalization;

    e.    release of hazardous fluids for 5 minutes or more;

    f.    unintended movement or abnormal loading by environmental causes, such as an earthquake, landslide, or flood, that impairs the serviceability, structural integrity, or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

    g.    any crack or other material defect that impairs the structural integrity or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

**JA359**

Docket No. CP16-116-000                                                    - 60 -

h.      any malfunction or operating error that causes the pressure of a pipeline or LNG facility that contains or processes hazardous fluids to rise above its maximum allowable operating pressure (or working pressure for LNG facilities) plus the build-up allowed for operation of pressure-limiting or control devices;

i.      a leak in an LNG facility that contains or processes hazardous fluids that constitutes an emergency;

j.      inner tank leakage, ineffective insulation, or frost heave that impairs the structural integrity of an LNG storage tank;

k.      any safety-related condition that could lead to an imminent hazard and cause (either directly or indirectly by remedial action of the operator), for purposes other than abandonment, a 20 percent reduction in operating pressure or shutdown of operation of a pipeline or an LNG facility that contains or processes hazardous fluids;

l.      safety-related incidents from hazardous fluids transportation occurring at or en route to and from the LNG facility; or

m.      an event that is significant in the judgment of the operator and/or management even though it did not meet the above criteria or the guidelines set forth in an LNG facility's incident management plan.  (*section 4.12.6*)

In the event of an incident, the Director of OEP has delegated authority to take whatever steps are necessary to ensure operational reliability and to protect human life, health, property, or the environment, including authority to direct the LNG facility to cease operations.  Following the initial company notification, the FERC staff would determine the need for a separate follow-up report or follow up in the upcoming semi-annual operational report.  All company follow-up reports shall include investigation results and recommendations to minimize a reoccurrence of the incident.

**JA360**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                     Docket No.     CP16-116-000

(Issued November 22, 2019)

GLICK, Commissioner, *dissenting*:

1.      I dissent from today's order because it violates both the Natural Gas Act[1] (NGA) and the National Environmental Policy Act[2] (NEPA).  The Commission once again refuses to consider the consequences its actions have for climate change.  Although neither the NGA nor NEPA permit the Commission to assume away the impact that constructing and operating this liquefied natural gas (LNG) facility and associated natural gas pipeline will have on climate change, that is precisely what the Commission is doing here.

2.      In today's order authorizing Texas LNG Brownsville LLC's (Texas LNG) LNG export facility (Project) pursuant to section 3 of the NGA, the Commission continues to treat climate change differently than all other environmental impacts.  The Commission steadfastly refuses to assess whether the impact of the Project's greenhouse gas (GHG) emissions on climate change is significant, even though it quantifies the GHG emissions caused by the Project.[3]  That refusal to assess the significance of the Project's contribution to the harm caused by climate change is what allows the Commission to misleadingly state that its approval of the Project will result in environmental impacts that are generally "less-than-significant"[4] and, as a result, conclude that the Project

---

[1] 15 U.S.C. §§ 717b, 717f (2018).

[2] National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*

[3] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130, at P 65 (2019) (Certificate Order); Environmental Impact Statement at Tables 4.11.1-4 – 4.11.1-6, 4.11.1-8 – 4.11.1-9, 4.11.1-11 (EIS).

[4] Certificate Order, 169 FERC ¶ 61,130 at P 24; EIS at ES-16.  *But see* Certificate Order, 169 FERC ¶ 61,130 at P 25 (noting that the Project, in conjunction with the two other LNG facilities in the region approved today, will have significant cumulative impacts on, among other things, federally listed endangered species, including the ocelot and jaguarundi).

**JA361**

Docket No. CP16-116-000                                                                    - 2 -

satisfies the NGA's public interest standards.[5]  Claiming that a project's environmental impacts are generally less-than-significant while at the same time refusing to assess the significance of the project's impact on the most important environmental issue of our time is not reasoned decisionmaking.

3.        In addition, the Commission's public interest analysis also does not adequately weigh or wrestle with the Project's adverse impacts.[6]  Collectively, the three LNG export projects[7] approved for the Brownsville Ship Channel will have a significant adverse impact on a number of endangered species, including the ocelot.  Moreover, all three projects are located in Cameron County, Texas—a region of the country where roughly a third of the population is below the poverty line and a substantial portion is made up of minority groups.[8]  I fully appreciate that the jobs and economic stimulus that a facility like the Project can provide may be especially important in a community facing economic challenges.  But we cannot lose sight of the cumulative environmental toll on regions, like Cameron County, from the development of new industrial facilities.  Although today's order recites these impacts, I believe that reasoned decisionmaking requires the Commission to affirmatively consider those impacts and explain how it nevertheless reached its public interest determination.  After all, surely considering the public interest requires us to do more than merely recite the significant adverse impacts and proceed to approve the Project.

## I.        The Commission's Public Interest Determinations Are Not the Product of Reasoned Decisionmaking

4.        The NGA's regulation of LNG import and export facilities "implicate[s] a tangled web of regulatory processes" split between the U.S. Department of Energy (DOE) and the Commission.[9]  The NGA establishes a general presumption favoring the import and

---

[5] Certificate Order, 169 FERC ¶ 61,130 at PP 20, 84.

[6] *See* EIS at 4-104.

[7] In addition to Texas LNG, the Commission today is also approving the Rio Grande LNG facility, *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), and the Annova LNG facility, *Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132 (2019).

[8] EIS at 4-157 (noting that the poverty rate in Cameron County is 34.8 percent); *id.* 4-156 (noting that four out of the five tracts of land studied were made up of more than 50 percent minority populations).

[9] *Sierra Club v. FERC*, 827 F.3d 36, 40 (D.C. Cir. 2016) (*Freeport*).

**JA362**

export of LNG unless there is an affirmative finding that the import or export "will not be consistent with the public interest."[10] Section 3 of the NGA provides for two independent public interest determinations:  One regarding the import or export of LNG itself and one regarding the facilities used for that import or export.  DOE determines whether the import or export of LNG is consistent with the public interest, with transactions among free trade countries legislatively deemed to be "consistent with the public interest."[11] The Commission evaluates whether "an application for the siting, construction, expansion, or operation of an LNG terminal" is itself consistent with the public interest.[12] Pursuant to that authority, the Commission must approve a proposed LNG facility unless the record shows that the facility would be inconsistent with the public interest.[13]

5.      As part of that determination, the Commission examines a proposed facility's impact on the environment and public safety.  A facility's impact on climate change is

---

[10] 15 U.S.C. § 717(a); *see EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016) (citing *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982) ("NGA [section] 3, unlike [section] 7, 'sets out a general presumption favoring such authorization.'")).  Under section 7 of the NGA, the Commission approves a proposed pipeline if it is shown to be consistent with the public interest, while under section 3, the Commission approves a proposed LNG import or export facility unless it is shown to be inconsistent with the public interest.  *Compare* 15 U.S.C. §717b(a) *with* 15 U.S.C. §717f(a), (e).

[11] 15 U.S.C. § 717b(c).  The courts have explained that, because the authority to authorize the LNG exports rests with DOE, NEPA does not require the Commission to consider the upstream or downstream GHG emissions that may be indirect effects of the export itself when determining whether the related LNG export facility satisfies section 3 of the NGA.  *See Freeport*, 827 F.3d at 46-47; *see also Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (*Sabal Trail*) (discussing *Freeport*).  Nevertheless, NEPA requires that the Commission consider the direct GHG emissions associated with a proposed LNG export facility.  *See Freeport*, 827 F.3d at 41, 46.

[12] 15 U.S.C. § 717b(e).  In 1977, Congress transferred the regulatory functions of NGA section 3 to DOE.  DOE, however, subsequently delegated to the Commission authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal, while retaining the authority to determine whether the import or export of LNG to non-free trade countries is in the public interest.  *See EarthReports*, 828 F.3d at 952-53.

[13] *See Freeport*, 827 F.3d at 40-41.

one of the environmental impacts that must be part of a public interest determination under the NGA.[14]  Nevertheless, the Commission maintains that it need not consider whether the Project's contribution to climate change is significant in this order because it lacks a means to do so—or at least so it claims.[15]  However, the most troubling part of the Commission's rationale is what comes next.  Based on this alleged inability to assess the significance of the Project's impact on climate change, the Commission concludes that the Project's environmental impacts would generally be reduced to "less-than-significant" levels.[16]  Think about that. The Commission is saying out of one side of its mouth that it cannot assess the significance of the Project's impact on climate change[17] while, out of the other side of its mouth, assuring us that its environmental impacts are generally not significant.[18]  That is ludicrous, unreasoned, and an abdication of our responsibility to give climate change the "hard look" that the law demands.[19]

---

[14] *See Sabal Trail*, 867 F.3d at 1373 (explaining that the Commission must consider a pipeline's direct and indirect GHG emissions because the Commission may "deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); *see also Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (holding that the NGA requires the Commission to consider "all factors bearing on the public interest").

[15] Certificate Order, 169 FERC ¶ 61,130 at P 66; EIS at 4-344.

[16] Certificate Order, 169 FERC ¶ 61,130 at P 24.

[17] *Id.* P 66; EIS at 4-344 ("[W]e are unable to determine the significance of the Project's contribution to climate change.")."

[18] Certificate Order, 169 FERC ¶ 61,130 at P 24 (stating that, with few exceptions and not considering cumulative impacts, the Project's impacts would be "reduced to less-than-significant levels").

[19] *See, e.g.*, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (explaining that agencies cannot overlook a single environmental consequence if it is even "arguably significant"); *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (internal quotation marks omitted)); *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (explaining that agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency").

Document Accession #: 20191122-3048          Filed Date: 11/22/2019

6.      It also means that the Project's impact on climate change does not play a meaningful role in the Commission's public interest determination, no matter how often the Commission assures us that it does.  Using the approach in today's order, the Commission will always conclude that a project will not have a significant environmental impact irrespective of that project's actual GHG emissions or those emissions' impact on climate change.  If the Commission's conclusion will not change no matter how many GHG emissions a project causes, those emissions cannot, as a logical matter, play a meaningful role in the Commission's public interest determination.  A public interest determination that systematically excludes the most important environmental consideration of our time is contrary to law, arbitrary and capricious, and not the product of reasoned decisionmaking.

7.      The failure to meaningfully consider the Project's GHG emissions is all-the-more indefensible given the volume of GHG emissions at issue in this proceeding.  The Project will directly release over 600,000 tons of GHG emissions per year, plus an untold several million more that go undocumented in the Commission's environmental analysis.[20]  The Commission acknowledges that "GHGs emissions due to human activity are the primary cause of increased levels of atmospheric GHG since the industrial age,"[21] a result that the Commission has previously (although notably not in the environmental analysis accompanying today's order) acknowledged will "threaten the public health and welfare of current and future generations through climate change."[22]  In light of this undisputed relationship between anthropogenic GHG emissions and climate change, the Commission must carefully consider the Project's contribution to climate change when determining whether the Project is consistent with the public interest—a task that it entirely fails to accomplish in today's order.

8.      In addition, the cumulative effects of the Project along with the Rio Grande LNG and Annova LNG facilities will have a significant adverse effect on the environment, notably endangered species, including the ocelot, the jaguarundi, and the aplomado

---

[20] *See infra* PP 11-14.  In particular, the Commission refuses to consider the GHG emissions caused by the Project's electricity consumption even though it poses—and uses—models for calculating and quantifying those emissions and those emissions represent the Project's principal contribution to climate change.

[21] EIS at 4-164.

[22] Environmental Assessment, Docket No. CP18-512-000 (Mar. 29, 2019); *see also id.* at 235 ("Construction and operation of the Project would increase the atmospheric concentration of GHGs in combination with past and future emissions from all other sources and contribute incrementally to future climate change impacts.").

**JA365**

falcon.[23]  Although the Commission reports those impacts in its EIS[24] and mentions them briefly in today's order,[25] it is far from clear whether and how they factor into the Commission's public interest analysis.  Given the extent of those adverse impacts on endangered species—which appear to be more extensive than those caused by other energy infrastructure projects that the Commission has approved under NGA section 3 and section 7 in recent years[26]—reasoned decisionmaking requires the Commission to do more than simply recite the potential harm to endangered species and then proceed to make a public interest determination without any further discussion.

9.     The Project's impact on these species is particularly concerning since the Fish and Wildlife Service (FWS) rejected the conclusion in Commission Staff's original biological assessment that the endangered ocelot and aplomado falcon would not be adversely affected by the project.[27]  Although Commission staff has resubmitted its biological assessment, FWS has yet to weigh in on the resubmitted assessment.  Given that FWS has already once disagreed with the agency on the Project's implications for those species, I am concerned that we are putting the cart before the horse in making a public interest determination without the benefit of hearing from the experts about the Project's impact on endangered species.

10.     Finally, the Project will be located in Cameron County, Texas—a county in which roughly a third of the population is below the poverty line and a substantial portion is

---

[23] EIS at 4-317 (ocelot and jaguarundi); *id.* at 4-318 (aplomado falcon).

[24] EIS at 4-315 – 4-317, 4-317 – 4-318, 5-364 – 5-365.

[25] Certificate Order, 169 FERC ¶ 61,130 at PP 48, 73, 75.

[26] For example, the Commission's EIS notes that "even incremental habitat loss could be significant" for the ocelot, of which there are only a few dozen remaining in the United States.  EIS at App. C-131.  There is no question that the cumulative effect of the three LNG projects will be to significantly contribute to the loss of ocelot habitat, which is the primary threat to ocelot survival, EIS 4-315.

[27] EIS 4-81.  The Commission appears to suggest that FWS improperly considered the cumulative impact of the three proximately located LNG facilities (Texas LNG, Annova LNG, and Rio Grande LNG).  *Id.*  For my part, I hardly see a problem in taking a holistic approach that considers how three large LNG export facilities in a single county will effect these endangered species.  Indeed, the bigger problem would seem to be if the Commission ignored the collective that those projects would have on endangered species.

made up of minority groups.[28]  I fully appreciate that the jobs and economic stimulus that a facility like the Project can provide may be especially important in a community facing economic challenges.  But, by the same token, we cannot turn a blind eye to the incremental impact that increased pollution will have on economically disadvantaged communities, which frequently experience a disproportionate toll from the development of new industrial facilities.  Especially in light of the potential cumulative impact of building three large LNG export facilities in a few-mile radius, I do not agree that we can dispose of the environmental justice concerns simply on the basis that those groups will experience conditions no worse than the surrounding county—particularly when the surrounding county presents many of the same concerns that underlie the Council on Environmental Quality's (CEQ) and U.S. Environmental Protection Agency's (EPA) environmental justice guidance.[29]

## II.    The Commission Fails to Satisfy Its Obligations under NEPA

11.    The Commission's NEPA analysis of the Project's GHG emissions is similarly flawed.  In order to evaluate the environmental consequences of the Project under NEPA, the Commission must consider the harm caused by its GHG emissions and "evaluate the 'incremental impact' that those emissions will have on climate change or the environment more generally."[30]  As noted, the operation of the Project will emit more than 600,000 metric tons of GHGs annually.[31]  But that drastically understates the actual GHG emissions attributable to the Project.  Unlike many of the LNG facilities that the Commission has approved this year, the Project is powered with electricity from the grid

---

[28] EIS at 4-157 (noting that the poverty rate in Cameron county is 34.8 percent); *id.* 4-156 (noting that four out of the five tracts of land studied were made up of more than 50 percent minority populations).

[29] EIS at 4-155 – 4-157 (discussing the guidelines provided by the CEQ and EPA to identify environmental justice communities).

[30] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 51 (D.D.C. 2019) (explaining that the agency was required to "provide the information necessary for the public and agency decisionmakers to understand the degree to which [its] decisions at issue would contribute" to the "impacts of climate change in the state, the region, and across the country").

[31] Certificate Order, 169 FERC ¶ 61,130 at P 65; *see also* EIS at Tables 4.11.1-6.

Docket No. CP16-116-000                                         - 8 -

rather than onsite natural gas turbines.[32]  Apparently on that basis, the Commission omits the resulting GHG emissions from its environmental analysis.

12.      The GHG emissions caused by the Project's substantial electricity consumption are reasonably foreseeable effects of the Project.  The Project will connect to the grid via a new transmission line that will extend from the Project to American Electric Power's Union Carbide substation.[33]  That known point of interconnection makes it easy for the Commission to estimate the incremental generation likely to be dispatched to serve the Project—as well as the resulting GHG emissions—using one of many well-accepted models, such as the Environmental Protection Agency's eGrid database or Avoided Emissions and Generation Tool (AVERT).  Deploying one or both of those models would have been precisely the sort of "'reasonable forecasting'" aided by "'educated assumptions'" that NEPA requires.[34]

13.      But don't just take my word for it.  Consider the fact that the Commission uses and relies on both of those models in similar contexts, including to calculate the air emissions in a separate order issued *today* that approves another LNG export facility that is less than 2 miles away from the Project.[35]  In that order, the Commission relied on both eGrid and AVERT to calculate the "indirect emissions," including GHG emissions, caused by the Annova LNG facility's electricity consumption when assessing the reasonable alternatives to that proposed project.  I see no reason why the Commission cannot use the same models to develop a reasonable estimate—which, again, is exactly what NEPA requires[36]—of the GHG emissions caused by the Project.

---

[32] EIS at 1-17 – 1-18.

[33] *Id.* at 1-17.

[34] *Sabal Trail*, 867 F.3d at 1374 (quoting *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014)).

[35] Annova LNG Environmental Impact Statement, Docket No. CP16-480-000, at 3-20; *id.* at 4-104 (stating that the Annova LNG facility is 1.7 miles away from the Project site).

[36] Moreover, to the extent that the Commission believes these models, and their underlying assumptions, may not be perfect solutions, it can still use the models, but disclose its concerns so that readers can take the results "with the appropriate grain of salt." *Sabal Trail*, 867 F.3d at 1374 ("We understand that emission estimates would be largely influenced by assumptions rather than direct parameters about the project, but some educated assumptions are inevitable in the NEPA process. And the effects of assumptions on estimates can be checked by disclosing those assumptions so that readers

**JA368**

14.     The Commission's failure to quantify the GHG emissions associated with the Project's considerable electricity consumption is especially unreasonable given the other sources of GHG emissions that it did quantify in the EIS.  For example, the EIS reports the indirect GHG emissions resulting from boat traffic caused by the Project.[37]  Indeed, it goes so far as to estimate the GHG emissions that will result from different types of boats used to serve the facility (e.g., LNG carrier v. tugboat v. pilot boat).[38]  I fail to see how the Commission can reasonably refuse to use well-established models—ones that it is perfectly comfortable relying on in a similar context—to estimate the GHG emissions from electricity consumption, but then confidently ascribe likely GHG emissions levels for different types of boats.

15.     In any case, although quantifying the Project's GHG emissions is a necessary step toward meeting the Commission's NEPA obligations, listing the volume of emissions alone is insufficient.[39]  As an initial matter, identifying the consequences that those emissions will have for climate change is essential if NEPA is to play the disclosure and good government roles for which it was designed.  The Supreme Court has explained that NEPA's purpose is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and to "guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[40]  It is hard to see how hiding the ball

---

can take the resulting estimates with the appropriate amount of salt." (internal citations and quotation marks omitted)).

[37] Certificate Order, 169 FERC ¶ 61,130 at n.111; *see also* EIS at Tables 4.11.1-8 – 4.11.1-9.

[38] EIS at Table 4.11.1-9.

[39] *See Ctr. for Biological Diversity*, 538 F.3d at 1216 ("While the [environmental document] quantifies the expected amount of $CO_2$ emitted . . . , it does not evaluate the 'incremental impact' that these emissions will have on climate change or on the environment more generally . . . ."); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is a necessary component . . . , but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres.").

[40] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (citing *Robertson v. Methow Valley Citizens Coun.*, 490 U.S. 332, 349 (1989)).

Document Accession #: 20191122-3048    Filed Date: 11/22/2019

by refusing to assess the significance of the Project's climate impacts is consistent with either of those purposes.

16.    In addition, under NEPA, a finding of significance informs the Commission's inquiry into potential ways of mitigating environmental impacts.[41]  An environmental review document must "contain a detailed discussion of possible mitigation measures" to address adverse environmental impacts.[42]  "Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects" of a project, meaning that an examination of possible mitigation measures is necessary to ensure that the agency has taken a "hard look" at the environmental consequences of the action at issue.[43]

17.    The Commission responds that it need not determine whether the Project's contribution to climate change is significant because "[t]here is no universally accepted methodology" for assessing the harms caused by the Project's contribution to climate change.[44]  But the lack of a single consensus methodology does not prevent the Commission from adopting *a* methodology, even if it is not universally accepted.  The Commission could, for example, select one methodology to inform its reasoning while also disclosing its potential limitations or the Commission could employ multiple methodologies to identify a range of potential impacts on climate change.  In refusing to assess a project's climate impacts without a perfect model for doing so, the Commission sets a standard for its climate analysis that is higher than it requires for any other environmental impact.

---

[41] 40 C.F.R. § 1502.16 (2018) (NEPA requires an implementing agency to form a "scientific and analytic basis for the comparisons" of the environmental consequences of its action in its environmental review, which "shall include discussions of . . . [d]irect effects and their significance.").

[42] *Robertson*, 490 U.S. at 351.

[43] *Id.* at 352.

[44] EIS at 4-344 (stating "there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to Project's incremental contribution to GHGs" and "[w]ithout either the ability to determine discrete resource impacts or an established target to compare GHG emissions against, we are unable to determine the significance of the Project's contribution to climate change"); *see also* Certificate Order, 169 FERC ¶ 61,130 at P 57 ("The Commission has also previously concluded it could not determine whether a project's contribution to climate change would be significant.").

**JA370**

Document Accession #: 20191122-3048     Filed Date: 11/22/2019

18.     In any case, the Commission has several tools to assess the harm from the Project's contribution to climate change.  For example, by measuring the long-term damage done by a ton of carbon dioxide, the Social Cost of Carbon links GHG emissions to the harm caused by climate change, thereby facilitating the necessary "hard look" at the Project's environmental impacts that NEPA requires.  Especially when it comes to a global problem like climate change, a measure for translating a single project's climate change impacts into concrete and comprehensible terms plays a useful role in the NEPA process by putting the harm in terms that are readily accessible for both agency decisionmakers and the public at large.  Yet, the Commission continues to ignore the Social Cost of Carbon, relying instead on deeply flawed reasoning that I have previously critiqued at length.[45]

19.     Furthermore, even without a formal tool or methodology, the Commission can consider all factors and determine, quantitatively or qualitatively, whether the Project's GHG emissions will have a significant impact on climate change.  After all, that is precisely what the Commission does in other aspects of its environmental review, where the Commission makes several significance determinations without the tools it claims it needs to assess the significance of the Project's impact on climate change.[46]  The Commission's refusal to similarly analyze the Project's impact on climate change is arbitrary and capricious.

20.     And even if the Commission were to determine that the Project's GHG emissions are significant, that is not the end of the analysis.  Instead, as noted above, the Commission could blunt those impacts through mitigation—as the Commission often does with regard to other environmental impacts.  The Supreme Court has held that an environmental review must "contain a detailed discussion of possible mitigation measures" to address adverse environmental impacts.[47]  As noted above, "[w]ithout such a discussion, neither the agency nor other interested groups and individuals can properly

---

[45] *See, e.g.*, *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099 (2018) (Glick, Comm'r, dissenting).

[46] *See, e.g.*, EIS at 4-14, 4-22, 4-23, 4-36 – 4-37, 4-44, 4-50, 4-55, 45-8, 4-72 (concluding there will be no significant impact on groundwater recharge, turbidity, surface water quality due to hydrostatic testing, wetlands, vegetation, wildlife, migratory bird populations, pollinator habitat, and aquatic resources due to cooling water intake, among other things).

[47] *Robertson*, 490 U.S. at 351.

**JA371**

evaluate the severity of the adverse effects."[48]  Consistent with this obligation, the EIS discusses mitigation measures to ensure that the Project's adverse environmental impacts (other than its GHG emissions) are reduced to less-than-significant levels.[49]  And throughout today's order, the Commissions uses its conditioning authority under section 3 and section 7 of the NGA[50] to implement these mitigation measures, which support its public interest finding.[51]  Once again, however, the Project's climate impacts are treated differently, as the Commission refuses to identify any potential climate mitigation measures or discuss how such measures might affect the magnitude of the Project's impact on climate change.

21.    Finally, the Commission's refusal to seriously consider the significance of the impact of the Project's GHG emissions is even more mystifying because NEPA "does not dictate particular decisional outcomes."[52]  NEPA "'merely prohibits uninformed—rather than unwise—agency action.'"[53]  The Commission could find that a project contributes significantly to climate change, but that it is nevertheless in the public interest because its benefits outweigh its adverse impacts, including on climate change.  In other words, taking the matter seriously—and rigorously examining a project's impacts on climate change—does not necessarily prevent any of my colleagues from ultimately concluding that a project satisfies the relevant public interest standard.

---

[48] *Id.* at 351-52; *see also* 40 C.F.R. §§ 1508.20 (defining mitigation), 1508.25 (including in the scope of an environmental impact statement mitigation measures).

[49] *See, e.g.*, Certificate Order, 169 FERC ¶ 61,130 at P 67 (discussing mitigation required by the Commission to address reliability and safety impacts from the Project); *id.* P 59 (discussing mitigation measures required to address air quality and noise); *id.* P 39 (discussing mitigation measures required to address impacts on vegetation).

[50] 15 U.S.C. § 717b(e)(3)(A); *id.* § 717f(e); Certificate Order, 169 FERC ¶ 61,130 at P 83 ("[T]he Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources . . . , including authority to impose any additional measures deemed necessary.").

[51] *See* Certificate Order, 169 FERC ¶ 61,130 at P 83 (explaining that the environmental conditions ensure that the Project's environmental impacts are consistent with those anticipated by the environmental analyses, which found that the Project would not significantly affect the quality of the human environment).

[52] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir. 2015).

[53] *Id.* (quoting *Robertson*, 490 U.S. at 351).

Docket No. CP16-116-000                                                 - 13 -

For these reasons, I respectfully dissent.

_____

Richard Glick
Commissioner

**JA373**

Document Accession #: 20200221-3023          Filed Date: 02/21/2020

170 FERC ¶ 61,139
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
          Richard Glick and Bernard L. McNamee.


Texas LNG Brownsville LLC        Docket No. CP16-116-001


ORDER ON REHEARING AND STAY

(Issued February 21, 2020)

1.  On November 22, 2019, the Commission issued an order pursuant to section 3 of the Natural Gas Act[1] and Part 153 of the Commission's regulations[2] authorizing Texas LNG Brownsville LLC (Texas LNG) to site, construct, and operate facilities for the liquefaction and export of domestically-produced natural gas at a proposed liquefied natural gas (LNG) terminal on the north side of the Brownsville Shipping Channel in Cameron County, Texas (Texas LNG Project).[3]  Sierra Club, Texas RioGrande Legal Aid (on behalf of Shrimpers and Fisherman of the RGV and Vecinos para el Bienestar de la Comunidad Costera), Save RGV from LNG, Defenders of Wildlife, the City of South Padre Island, the City of Port Isabel, and the Town of Laguna Vista (collectively Sierra Club) filed a joint request for rehearing and stay of the Authorization Order.  For the reasons discussed below, we deny the request for rehearing and dismiss the request for stay as moot.

---

[1] 15 U.S.C. § 717b (2018).

[2] 18 C.F.R. pt. 153 (2019).

[3] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019) (Authorization Order).

**JA374**

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

Docket No. CP16-116-001                                              - 2 -

## I.  **Background**

2.      The Texas LNG Project is designed to export approximately 4 million metric tonnes per annum (MTPA) of LNG.[4]  The project facilities will occupy 625 acres of land[5] and include two full-containment LNG storage tanks with a capacity of approximately 210,000 cubic meters of LNG each; two liquefaction trains, each with a capacity of 2.0 MTPA of LNG;[6] a single LNG carrier berth; mooring and loading facilities; and other appurtenant facilities.[7]  The Texas LNG Project will receive natural gas via an approximately 10.2-mile-long non-jurisdictional intrastate natural gas pipeline that would interconnect with the Valley Crossing Pipeline.[8]

3.      In September 2015, Texas LNG received authorization from the Department of Energy, Office of Fossil Energy (DOE) to export the project's full capacity, up to 204.4 billion cubic feet (Bcf) annually (approximately 0.56 Bcf per day (Bcf/d)) equivalent of natural gas, in the form of LNG to countries with which the United States has a Free Trade Agreement.[9]  In addition, Texas LNG currently has a pending

---

[4] *Id*. P 4.

[5] Of the 625 acres, about 312 acres would be disturbed.  Authorization Order, 169 FERC ¶ 61,130 at P 54.  The parcel is owned by the Brownsville Navigational District, a political subdivision of Texas that operates the Port of Brownsville.  Texas LNG has an option agreement for the parcel with the Brownsville Navigational District for a 25- to 30-year lease.  Authorization Order, 169 FERC ¶ 61,130 at P 6.

[6] While each liquefaction train will have a nameplate capacity of 2.25 MTPA, Texas LNG anticipates that as operated, each train will produce 2.0 MTPA of LNG for export.  *Id.* at n.5 (citing Application at 4, n.8).

[7] *Id.* P 5.

[8] *Id*. P 4.  Valley Crossing Pipeline is a non-jurisdictional natural gas pipeline that extends southwest from a header system near the Agua Dulce natural gas hub to a jurisdictional border-crossing facility east of Cameron County, Texas, in the Gulf of Mexico.

[9] *Texas LNG Brownsville LNG*, DOE/FE Docket No. 15-62-LNG, Order No. 3716 (Sept. 24, 2015), https://www.energy.gov/sites/prod/files/2015/09/f26/ord3716.pdf.

application with DOE to export LNG to other nations with which the U.S. permits such trade, but has not entered into a Free Trade Agreement.[10]

4.      On November 22, 2019, the Commission authorized Texas LNG's proposal, subject to conditions.[11]  On the same day, the Commission also authorized two other proposed LNG terminals on the Brownsville Shipping Channel:  the Rio Grande LNG Terminal proposed by Rio Grande LNG, LLC (Rio Grande)[12] and the Annova LNG Brownsville Project proposed by Annova LNG Common Infrastructure, LLC (Annova).[13]  In this order we refer to these projects collectively as the Brownsville LNG terminals.

## II.     Procedural Matters

5.      The Commission received Sierra Club's joint request for rehearing and stay at 5:48 pm on December 23, 2019.  On January 7, 2020, Texas LNG filed a combined motion to strike, motion for leave to answer, and answer in response to the request for rehearing.  On January 21, 2020, Sierra Club filed an answer to Texas LNG's motion to strike.

### A.      Late Filed Request for Rehearing

6.      NGA section 19(a) allows an aggrieved party to file a request for rehearing within 30 days after the issuance of a final Commission order.[14]  The Commission's business hours are "from 8:30 a.m. to 5:00 p.m.,"[15] and filings must be made before 5:00 p.m. in

---

[10] *Texas LNG Brownsville LNG*, DOE/FE Docket No. 15-62-LNG, https://www.energy.gov/fe/texas-lng-brownsville-lng-llc-fe-dkt-15-62-lng.

[11] Authorization Order, 169 FERC ¶ 61,130.

[12] *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, *on reh'g and stay*, 170 FERC ¶ 61,046 (2020).  In the same 2019 order the Commission authorized the Rio Bravo Pipeline Project proposed by Rio Bravo Pipeline Company, LLC.

[13] *Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132 (2019).  Annova submitted its application jointly with three affiliate entities.

[14] 15 U.S.C. § 717r(a) (providing that any aggrieved party "may apply for a rehearing within thirty days after the issuance of such order.").  *See* 18 C.F.R. § 385.713(b) (2019) ("A request for rehearing by a party must be filed not later than 30 days after issuance of any final decision or other final order in a proceeding.").

[15] 18 C.F.R. § 375.101(c) (2019).

Docket No. CP16-116-001                                          - 4 -

order to be considered filed on that day.[16]  The Commission may accept submissions deemed to be late when documents could not be presented on time due to error or oversight on the part of the Commission.[17]

7.      Requests for rehearing of the Authorization Order were due by 5:00 p.m. on December 23, 2019.  On that date, Sierra Club's request for rehearing was received at 5:48 p.m., after the 5:00 p.m. deadline.[18]  However, the Commission's eFiling system could not accept filings starting at 4:40 p.m. and function was not restored until after 5:00 p.m.  Accordingly, Sierra Club's filing is deemed to have been timely filed.  We deny Texas LNG's motion to strike, and we dismiss Sierra Club's answer to the motion as moot.

### B.      Party Status

8.      Under NGA section 19(a) and Rule 713(b) of the Commission's Rules and Practice and Procedure, only a party to a proceeding has standing to request rehearing of a final Commission decision.[19]  Any person seeking to become a party must file a motion to intervene pursuant to Rule 214 of the Commission's Rules of Practice and Procedure.[20]  Shrimpers and Fisherman of the RGV never sought to intervene in this proceeding and, accordingly, they may not join in the rehearing requests filed by Sierra Club.

### C.      Answer to Request for Rehearing

9.      Rule 713(d)(1) of the Commission's Rules of Practice and Procedure[21] prohibits answers to a request for rehearing.  Accordingly, to the extent Texas LNG's answer responds to Sierra Club's request for rehearing, as opposed to its motion for stay, we reject the answer.

---

[16] *See, e.g.*, *Cameron LNG, LLC*, 148 FERC ¶ 61,237, at P 6 (2014).

[17] *See, e.g.*, *Westar Energy, Inc.*, 137 FERC ¶ 61,142, at P 19 (2011) (accepting requests for rehearing when the request was submitted within the 30 day limit but was incorrectly time stamped due to an error in the Commission's eFiling system).

[18] Sierra Club December 23, 2019 Request for Rehearing and Stay.

[19] 15 U.S.C. § 717f(a); 18 C.F.R. § 385.713(b).

[20] 18 C.F.R. § 385.214(a)(3) (2019).

[21] 18 C.F.R. § 385.713(d)(1).

### D.    **Stay**

10.    Sierra Club requests that the Commission stay the Authorization Order pending issuance of an order on rehearing.[22]  Because this order addresses and denies their request for rehearing, we dismiss the request for stay as moot.

### III.    **Discussion**

### A.    **Connected Actions**

11.    Sierra Club contends that the DOE review of whether to authorize exports to non-Free Trade Agreement (FTA) nations is a "connected action" that must be considered in the Environmental Impact Statement (EIS) prepared by Commission staff for this project,[23] claiming that the EIS should have considered gas production and use as indirect impacts of the non-FTA-nation authorization, which DOE has acknowledged has reasonably foreseeable indirect impacts on gas production and use.[24]

12.    Pursuant to CEQ regulations, "connected actions" include actions that: (a) automatically trigger other actions, which may require an EIS; (b) cannot or will not proceed without previous or simultaneous actions; or (c) are interdependent parts of a larger action and depend on the larger action for their justification.[25]  In evaluating whether multiple actions are, in fact, connected actions, courts have employed a "substantial independent utility" test, which the Commission finds useful for determining whether the three criteria for a connected action are met.  The test asks "whether one project will serve a significant purpose even if a second related project is not built."[26]

---

[22] Sierra Club Request for Rehearing and Stay at 31-35.  Sierra Club argues in a footnote that the Secretary of the Commission lacks delegated authority to toll the time for action on Sierra Club's request for rehearing because it is paired with a motion for stay.  *Id*. at 31 n.107.  Sierra Club cites the preamble to the Commission's 1995 rulemaking on delegations of authority.  *Id*.  Our regulations delegate authority to the Secretary to "Toll the time for action on rehearing" without qualification.  18 C.F.R. § 375.302(v) (2019).  The unambiguous language of the regulation is controlling.  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002); *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004).

[23] Sierra Club Request for Rehearing and Stay at 29.

[24] *Id.*

[25] 40 C.F.R. § 1508.25(a)(1) (2019).

[26] *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987).

13.     The DOE authorization for Texas LNG to export to non-FTA nations is not a connected action to the Commission's authorization for the Texas LNG Terminal.  As explained in the Authorization Order,[27] as required by NGA section 3(c), DOE granted authority to Texas LNG to export 204.4 billion cubic feet per year to free trade nations, which is approximately equivalent to the full capacity of the project of 4 MTPA.[28]  No additional trade authorizations are needed for the terminal to operate.  Because the terminal already has a significant purpose and could proceed absent the authorization for non-FTA nations,[29] the two are not connected actions.

14.     Sierra Club disagrees and argues that, despite a full authorization for FTA nations, as a practical matter, the project is nonetheless dependent on non-FTA nation authorization to proceed.[30]  As evidence, Sierra Club points out that no other large LNG export proposal has proceeded without non-FTA nation authorization and there may not be a large enough LNG market in FTA countries to support project exports.[31]  Sierra Club's claim that all LNG projects rely on non-FTA nation authorization is speculative and its claim about the size of the FTA nation LNG market is unsupported.

15.     Sierra Club next contends that even if the Texas LNG Terminal does not depend on non-FTA nation authorization, the two actions are connected because the non-FTA nation exports authorization does not have independent utility absent the Texas LNG Terminal.[32]  But under CEQ's definition of a connected action, our action regarding Texas LNG's proposal must have an interdependent relationship with the non-FTA

*See also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007) (defining independent utility as whether one project "can stand alone without requiring construction of the other [projects] either in terms of the facilities required or of profitability").

[27] Authorization Order, 169 FERC ¶ 61,130 at P 7.

[28] *Texas Gulf LNG*, DOE/FE Docket No. 15-62-LNG, Order No. 3716 (Sept. 24, 2015).

[29] *Texas LNG Brownsville LLC*, DOE/FE Docket No. 15-62-LNG, Order No. 4489 (Feb. 10, 2020) (authorizing the export of 204.4 billion cubic feet per year to non-FTA nations).

[30] Sierra Club Request for Rehearing and Stay at 30.

[31] *Id.* at 35-36.

[32] *Id.*

**JA379**

Document Accession #: 20200221-3023          Filed Date: 02/21/2020

nation authorization.[33]  Nothing about our authorization of the Texas LNG Terminal "triggers" or mandates non-FTA nation authorization and, as discussed, the project can proceed without such authorization.

## B.       Commercial Fishing and Tourism Impacts

### 1.       Commercial Fishing and Shrimping Impacts

16.       Sierra Club asserts that the Final EIS failed to take a hard look at the impacts of LNG vessel transit on commercial fishing and shrimping operations using the Brownsville Shipping Channel.[34]  Sierra Club explains that commercial and sport fisherman will be impacted by increased vessel traffic, primarily caused by the U.S. Coast Guard's authority to restrict marine traffic and establish security zones for LNG carriers.[35]  Sierra Club states that LNG vessel arrivals and departures will block fishing and other traffic, but the Final EIS did not evaluate how those delays will impact commercial fishers.[36]

17.       We deny rehearing.  The Final EIS acknowledged that because large vessel traffic in the Brownsville Shipping Channel is one-way and because LNG carriers are subject to a moving security zone, the LNG carriers in transit to the three Brownsville LNG terminals could preclude other vessel traffic.[37]  Current vessel traffic is about 1,057 vessels per year, not including commercial and recreational fishing boats.[38]  During construction, the cumulative barge deliveries at the three Brownsville LNG terminals would result in an anticipated 17% annual increase in vessel traffic.[39]  Although the

---

[33] 40 C.F.R. § 1508.25(a)(1).  *See also Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (finding that four pipeline proposals were connected actions because the four projects would result in "a single pipeline" that was "linear and physically interdependent" and because the projects were financially interdependent).

[34] Sierra Club Request for Rehearing and Stay at 4-9.

[35] *Id.* at 6.

[36] *Id*. 6-7.

[37] Final EIS at 4-332.

[38] *Id*. at 4-150, 4-331.

[39] *Id*. at 4-331.  Texas LNG anticipates the arrival of 109 barges during the five-year construction period for the Texas LNG Project.  *Id*. at 4-150, 4-154.  Compared with the current 61 barges per month transiting the channel, *Id*. at 4-150, the Final EIS

**JA380**

increase would be noticeable, the Final EIS concluded that impacts to other users in the waterway would be consistent with existing use of the waterway.[40]   During operation, the cumulative LNG carrier transits to and from the three Brownsville LNG terminals would represent a 48% annual increase in vessel traffic.[41]   This would likely result in delays for commercial fishing and shrimping vessels that transit the Brownsville Shipping Channel to reach the Gulf of Mexico or fishing destinations in the Laguna Madre.[42]   LNG vessel operators would reduce the impacts on other users in the channel by notifying the U.S. Coast Guard and Harbormaster 96 hours in advance of the LNG vessel's expected arrival to ensure that the timing of LNG vessel transits are aligned with other shipping schedules.[43]   For this reason, the Final EIS concluded that cumulative impacts on commercial fisheries would be permanent and moderate.[44]   Thus, the Final EIS appropriately considered the impacts of LNG vessel transit on commercial fishing and shrimping operations.

18.     Additionally, Sierra Club asserts that the Final EIS does not address how aquatic life mortality caused by the LNG project will impact commercial fishing.[45]   We disagree. The Final EIS evaluated project impacts on aquatic resources due to dredging, in-water pile driving, ballast and cooling water discharges, water intakes, and increased vessel traffic.  First, the Final EIS stated that dredging of the maneuvering basin during construction would temporarily increase noise, turbidity, and sedimentation in the Brownsville Shipping Channel.[46]   These impacts would reduce light penetration and

---

concluded that Texas LNG's construction barge traffic represents a negligible increase that is not anticipated to impact commercial fishing in the region.  *Id*. at 4-154.

[40] *Id*. at 4-331.

[41] *Id*. at 4-332 to 4-333.  Texas LNG anticipates that six LNG vessels per month would call on its terminal, representing a 7% increase in annual vessel traffic in the channel.  *Id*. at 4-151.  The six LNG vessels could result in delays up to 18 hours per week for fishing boats transiting the channel.  *Id*. at 4-151.  The Final EIS concluded that this additional traffic would result in minor, intermittent impacts on commercial fisheries. *Id*. at 4-154.

[42] Final EIS at 4-333.

[43] *Id*. at 4-332.

[44] *Id*. at 4-332.

[45] Sierra Club Request for Rehearing and Stay at 5-6.

[46] Final EIS at 5-363.

**JA381**

decrease dissolved oxygen concentrations, adversely affecting fish egg and juvenile fish survival, benthic community diversity and health, foraging success, and suitability of spawning habitat.[47]  To dredge the channel, Texas LNG proposed to use a hydraulic cutterhead dredge to minimize impacts from turbidity and sedimentation during project construction.[48]  Second, in-water pile driving would create sound waves that would adversely affect fish and other aquatic resources.[49]  The Final EIS recommended that Texas LNG conduct test pile drives and measure the actual underwater noise prior to initiating pile-driving activities to ensure that underwater sound pressures are not greater than predicted in the Final EIS.[50]  Third, the Final EIS explained that LNG carriers would discharge ballast and cooling water that would result in temporary and localized changes in pH, salinity, temperature, and dissolved oxygen levels.[51]  However, the Final EIS determined, and we agree, that the impacts on aquatic resources resulting from ballast and cooling water discharges would be intermittent and not significant due to the volume of ballast and cooling water discharged relative to the total volume of water within the maneuvering basin and the mobility of aquatic life.[52]  Fourth, the Final EIS determined that cooling water intakes and intakes associated with the seawater firewater systems would also result in the entrainment of small organisms, such as fish larvae and eggs.[53]  Texas LNG will screen all intakes, but direct mortality of smaller organisms could occur.[54]  Despite the impacts, the Final EIS found that due to the limited frequency of LNG carriers calling on the Texas LNG's terminal (74 per year) and the infrequent use of the seawater firewater system, impacts on aquatic resources from entrainment would not be significant.[55]  Fifth, the Final EIS stated that increased vessel traffic during construction and operation of the project would also result in an increased potential for

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

spills of hazardous materials; however, all ships are required to maintain a Coast Guard Shipboard Oil Pollution Emergency Plan to minimize impacts on aquatic resources.[56]

19.    In addition, we find that the Texas LNG Project will not impact fish and shrimp populations[57] because a majority of commercial fisheries in the region are offshore, with some commercial fishing occurring in the Lower Laguna Madre.[58]  For commercial shrimping purposes, the Lower Laguna Madre, including the Brownsville Shipping Channel, is considered a Bait Bay.[59]  Specifically identified Bait Bays, including the Brownsville Shipping Channel, are not considered nursery areas that serve as significant growth and development environments for post larval and juvenile shrimp.[60]  Construction of the Texas LNG Project will result in dredging to create a maneuvering basin, permanently converting 39.4 acres of tidal flats to open water habitat in an area characterized as essential fish habitat.[61]  The Final EIS stated that the tidal flats within and surrounding the project site have historically been cut off from the influences of natural tidal exchange; thus, dredging is anticipated to restore tidal flows to the tidal flats surrounding the project site and improve aquatic habitat and enhance essential fish habitat in the area.[62]  During its essential fish habitat consultation required by the Magnuson-Stevens Fishery Conservation and Management Act,[63] the National Marine Fisheries Service concurred with Commission staff's conclusion that project impacts on essential

---

[56] *Id.*

[57] Sierra Club Request for Rehearing and Stay at 9.

[58] Final EIS at 4-153.

[59] *Id.* at 4-63.  The Final EIS defined "Bait Bays" as areas where a boat licensed as a commercial bait shrimp boat is used inside waters of the state for taking bait shrimp for pay, barter, sale, or exchange.  *Id.*

[60] *Id.* at 4-61.

[61] Authorization Order, 169 FERC ¶ 61,130 at P 46; Final EIS at 5-363.

[62] Authorization Order, 169 FERC ¶ 61,130 at P 46; Final EIS at 5-363.

[63] 16 U.S.C. § 1855(b)(2) (2018) (requiring federal agencies to consult with the Secretary of Commerce regarding any action or proposed action authorized, funded, or undertaken by the agency that may adversely affect essential fish habitat identified under the Magnuson-Stevens Fishery Conservation and Management Act).

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

fish habitat would be "temporary and minor."[64]   Accordingly, we find that the project is not expected to significantly impact the yield of commercial fisheries in the project area.

20.     Further, the Final EIS evaluated the cumulative impacts on aquatic resources caused by construction and operation of the Texas LNG, Annova, and Rio Grande LNG terminals and found that the impacts on aquatic resources would be additive.[65]   Although the Texas LNG Project will provide some long-term beneficial impacts on essential fish habitat, the Annova LNG Brownsville Project and Rio Grande LNG Terminal will adversely impact essential fish habitat; however, all of the projects are required to mitigate any permanent impacts on these habitats under their Clean Water Act (CWA) section 404 permits.[66]   Thus, the Final EIS found the cumulative impacts of the projects on essential fish habitat would be minor.[67]   The Final EIS found that construction of the projects would dredge a large portion of the Brownsville Shipping Channel for an extended period of time and would result in increases in turbidity and decreases in dissolved oxygen.[68]   The Final EIS stated that these effects would reduce the prey available for predators in the area and that more mobile species would relocate to find suitable habitat.[69]   However, the Final EIS explained that these effects would be moderate but temporary, ending once construction ceases.[70]   The Final EIS evaluated the effects of concurrent pile-driving activities and found, with mitigation measures, the effects of pile-driving on aquatic species would be minor.[71]   The Final EIS also evaluated the impacts of concurrent operation of the projects and found that impacts from cooling and ballast water discharges on aquatic species would be intermittent and negligible, while cooling

---

[64] Letter from Virginia M. Fay, NMFS, concurring with Commission staff's essential fish habitat assessment as included in the Draft Environmental Impact Statement (filed Feb. 6, 2019) (finding that Magnuson-Stevens Fishery Conservation and Management Act consultation is complete).

[65] Final EIS at 4-310.

[66] *Id*.

[67] *Id*.

[68] *Id*. at 4-310 to 4-311.

[69] *Id*. at 4-311.

[70] *Id*.

[71] *Id*.

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

water intakes would have an intermittent and moderate impact on aquatic resources.[72] The projects must comply with the CWA to minimize impacts on surface water, and to avoid, minimize, or mitigate wetland impacts.[73]  The Final EIS found, and we agree, that although the Texas LNG project will contribute to the cumulative impacts on aquatic resources, the impact would not be significant.[74]

### 2.    Tourism Impacts

21.    Sierra Club states that the Final EIS determined that the Texas LNG Project would have moderate and permanent impacts on tourism,[75] but failed to explain how impacts on wildlife,[76] recreational fishing,[77] short-term rentals,[78] and industrial development would impact tourism.[79]

22.    We disagree.  The Final EIS evaluated how project impacts would affect tourism. The Final EIS explained that impacts on tourism resulting from noise and road traffic would be greatest during construction of the Texas LNG Project.[80]  During project operation, tourism would experience impacts from increased vessel traffic and visibility of project facilities.[81]  However, the Final EIS states that most popular tourist activities and destinations in the project vicinity would not be directly affected by the Texas LNG Project.[82]

---

[72] *Id*.

[73] *Id*. at 4-312.

[74] *Id*. at 4-311.

[75] Sierra Club Request for Rehearing and Stay at 9 (citing Final EIS at 4-144, 4-152).

[76] *Id.* at 10.

[77] *Id*. at 11-12

[78] *Id*. at 12.

[79] *Id*. at 12-13.

[80] Final EIS at 4-153.

[81] *Id*. at 4-153 to 4-154.

[82] *Id*. at 4-153.

**JA385**

Document Accession #: 20200221-3023          Filed Date: 02/21/2020

23.    The Final EIS evaluated nine recreation sites near the Texas LNG Project, five of which provide wildlife tourism opportunities.[83]  In the Laguna Atascosa National Wildlife Refuge, all recreation areas are more than two miles from the proposed project site.[84]  The Final EIS indicated that bird-watching and wildlife viewing in the refuge could be affected by an increase in traffic and pile-driving noise during construction and an increase in ambient noise at the refuge of approximately 1.0 decibel during project operation.[85]  The Final EIS found that the impacts from construction noise would be temporary, but noticeable; the impacts from increased traffic during construction would be moderate, but temporary and not significant; and the impacts resulting from operational noise would be permanent, but not perceptible.[86]  Further, the Final EIS found that increased noise and light during both construction and operation of the project would likely impact wildlife within the Laguna Atascosa National Wildlife Refuge.  However, impacts would be greatest during construction and decrease significantly during operation.[87]  With the implementation of the measures proposed by Texas LNG, the Final EIS concluded that impacts on wildlife from construction and operation of the projects will not be significant.[88]  At the Loma Ecological Preserve, construction noise may be perceptible in parts of the preserve; however, the impacts would be temporary and not significant.  The Final EIS also found that the project's operational noise at the  Loma Ecological Preserve would be less than described for the Laguna Atascosa National Wildlife Refuge due to the increased distance of the Preserve from the project facilities.[89]  At the Lower Rio Grande Valley National Wildlife Refuge, impacts from construction noise would not rise above ambient noise levels, but the refuge could experience minor impacts from traffic during construction.[90]  The Final EIS also determined that due to the distance from project activities, the South Bay Coastal Preserve and South Bay Paddling

---

[83]  *Id*. at ES-8, 4-107 to 4-111.

[84]  *Id*. at 4-108.

[85]  Final EIS 4-107.  An increase in ambient noise of around 1 decibel is likely not perceptible to recreation users.  Typically perceptible noise increases for humans are around 3.0 decibels.

[86]  *Id*. at 4-108.

[87]  *Id*. at 5-362.

[88]  *Id*. at ES-6.

[89]  *Id*. at 4-108.

[90]  *Id*. at 4-111.

Trail, and the Brazos Island State Scenic Park would not be directly affected by the project activities.[91]

24.    Additionally, the Final EIS determined that concurrent operation of the Texas LNG, Rio Grande, and Annova LNG terminals will have a significant impact on visual resources from recreational areas, including the Laguna Atascosa and Lower Rio Grande Valley National Wildlife Refuges, the Loma Ecological Preserve, and the South Bay Coastal Preserve and South Bay Paddling Trail.[92]    However, the projects are not anticipated to have an impact on beach visitors, because the South Padre Island beaches face eastward toward the Gulf of Mexico, away from the project site.[93]

25.    We also disagree with Sierra Club's claim that the Final EIS did not address how impacts on recreational fishing would affect the tourism industry.[94]    The Final EIS determined that overall, the Texas LNG Project would not have significant impacts on recreational fishing.[95]    The Final EIS determined that construction and operation of the Texas LNG Project could affect recreational fishing through restrictions in fishing access, increases in noise, and changes in vessel traffic, but would not restrict fishing access to bays in the project area or in the Gulf of Mexico.[96]    The Final EIS stated that construction and operation of the project could cause some local anglers to use undesignated fishing areas further from the project site.[97]    However, the Final EIS determined, and we agree, that the project overall would not significantly impact recreational fishing.[98]    The Final EIS also found that operation of the Texas LNG, Annova LNG Brownsville, and Rio Grande LNG Projects will result in permanent and moderate cumulative impacts on tourism and recreational fishing, because a 48% increase in vessel traffic will cause

---

[91] *Id*. at 4-109.

[92] *Id*. at 4-326, 5-372.

[93] *Id*. at 4-332.

[94] Sierra Club Request for Rehearing and Stay at 11-12.

[95] Final EIS at 4-153.

[96] *Id*. at 4-333.

[97] *Id*. at 4-153.

[98] *Id*.

delays in recreational fishing vessel access to the Brownsville Shipping Channel to reach the Gulf of Mexico.[99]

26.    We also disagree with Sierra Club's assertion that the Final EIS did not consider how impacts on commercial fishing can affect tourism and vice versa.[100]  As explained above, the majority of the commercial fisheries in the region are based offshore, with some commercial fishing occurring in the Lower Laguna Madre.[101]  The Final EIS determined that construction of the project is not anticipated to impact commercial fishing because construction of the project will result in negligible increases in vessel traffic.[102]  However, during operation of the project approximately six LNG carriers will call on the Texas LNG Project per month, resulting in delays for fishing boats transiting the Brownsville Shipping Channel.  As a result, the Final EIS stated that operation of the project would result in minor, intermittent impacts on commercial fisheries.[103]  Additionally, the Final EIS evaluated the cumulative effects of concurrent operation of the Texas LNG, Annova LNG Brownsville, and Rio Grande LNG Projects on tourism and commercial fishing and found that the projects would result in permanent and moderate impacts, due to a 48% increase in vessel traffic in the Brownsville Shipping Channel which will delay fishing or tourist vessels accessing the Gulf of Mexico or fishing destinations in the Laguna Madre.[104]  Overall, the Final EIS anticipated that concurrent construction and operation of the projects would have permanent and moderate cumulative impacts on tourism and commercial fisheries.[105]

27.    Sierra Club argues that the Final EIS did not consider how an increased demand for short-term rentals used by the Texas LNG, Annova LNG Brownsville, and Rio Grande LNG Projects' construction workers would impact tourism.[106]  The Final EIS stated that within the affected area, approximately 142 hotels or motels could be used by

---

[99] *Id*. at 4-332 to 4-333.

[100] Sierra Club Request for Rehearing and Stay at 13.

[101] Final EIS at 4-154.

[102] *Id*.

[103] *Id*. at 4-154.

[104] *Id.* at 4-467.

[105] *Id*. at 4-333.

[106] Sierra Club Request for Rehearing and Stay at 12.

the short-term workforce, as well as campgrounds and recreational vehicle sites.[107]
The Final EIS found that the Texas LNG Project's workers would occupy less than
one percent of the available housing in Cameron County during project construction,
indicating sufficient lodging units would be available to accommodate the non-resident
workers, resulting in minor and temporary impacts on the availability of housing units.[108]
We find that the proposed construction schedules for the Texas LNG, Annova, and
Rio Grande LNG terminals and for the Rio Bravo Pipeline could coincide with other
demands for housing and temporary accommodations for tourism.[109]  Non-local workers
hired temporarily, who seek hotel accommodations, could potentially compete with
seasonal visitors in Cameron County, specifically, the destination locations of South
Padre Island, Port Isabel, Harlingen, and Brownsville.[110]  However, given the number of
hotel rooms in the vicinity of the projects, we do not anticipate serious disruptions to
short-term tourism housing.[111]

28.     Sierra Club states that industrial development will discourage future investment in
tourism industries.[112]  Sierra Club's assertion is unsupported and speculative.  The Final
EIS acknowledged that, although the land proposed to be developed for the Texas LNG,
Annova, and Rio Grande LNG terminals is zoned for industrial use, the concurrent
construction and operation of three large industrial facilities as well as the associated
non-jurisdictional facilities would result in a change of the landscape character.[113]  We
can reasonably assume that this change would cause some visitors to choose to vacation
elsewhere or alter their recreation activities to destinations in the region that are further
from the project sites.[114]  However, given the extent of tourism areas (including birding
areas, National Wildlife Refuges, National Historic Landmarks, and beaches) and the
distance of these areas from the LNG Terminal cites, neither construction or operation

---

[107] Final EIS at 4-146.

[108] *Id*. at 4-328 to 4-329.

[109] *Id*. at 4-147.

[110] *Id*.

[111] *Id*.

[112] Sierra Club Request for Rehearing and Stay at 12.

[113] Final EIS at 4-332.

[114] *Id*.

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

would be expected to significantly impact tourism at these locations.[115]  The Final EIS found, and we agree, that the projects may cause a change in visitation patterns to the area, but we do not expect that the projects will impact the most popular tourist activities and destinations in the region.[116]  Accordingly, we find that the projects would not result in significant impacts on tourism.

### 3.  Mitigation

29.    Sierra Club asserts that the Final EIS failed to include appropriate mitigation measures to compensate for the impacts of the Texas LNG project on commercial fishing and tourism.[117]  Sierra Club alleges that other LNG projects, such as the Northeast Gateway Deepwater Port and the Neptune Port, were approved "only contingent upon mitigation packages" that required companies to provide funds to commercial fisherman, public interest trusts, and marine habitat and mammal protection.[118]

30.    We do not find Sierra Club's reliance on mitigation packages required in the Northeast Gateway Deepwater Port and the Neptune Port persuasive here.  Both those projects are located in federal waters and are thus subject to U.S. Coast Guard and U.S. Maritime Administration authority;[119] not Commission authority.

31.    As discussed above, the Final EIS found that the Texas LNG Project is not anticipated to significantly impact commercial fishing during project construction and would result in minor, intermittent impacts on commercial fishing during project operation due to an increase in vessel traffic.[120]  Additionally, the project would not

---

[115] See Rio Grande LNG Terminal Final EIS at ES-11, 4-217 to 4-219; see also id. Volume 3 Part III at 21 (stating that construction and operation of the project is not expected to impact the birding, nature-based, or eco-tourism industries).

[116] Final EIS at 4-153.

[117] Sierra Club Request for Rehearing and Stay at 13-14.

[118] Id. at 14.

[119] Pursuant to the Deepwater Port Act, as amended, 33 U.S.C. §§ 1501-1524 (2006), the Secretary of Transportation has exclusive jurisdiction over the licensing, ownership, construction and operation of deepwater ports.  The Secretary of Transportation delegated the responsibility to license deepwater ports to the Maritime Administrator, with the U.S. Coast Guard and U.S. Maritime Administration sharing responsibility for the processing of applications for such licenses.

[120] Final EIS at 4-154.

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

significantly impact aquatic resources.[121]  Texas LNG proposes to dredge 39.4 acres of tidal flats for its maneuvering basin, which will restore tidal flows to the tidal flats surrounding the project, improve overall aquatic habitat, and enhance essential fish habitat.[122]  The Final EIS stated that LNG carriers would discharge ballast and cooling water that would result in temporary and localized changes in pH, salinity, temperature, and dissolved oxygen levels.[123]  However, given the volume of ballast and cooling water discharged relative to the total volume of water within the maneuvering basin and the mobility of aquatic life, the Final EIS found that impacts on aquatic resources resulting from ballast and cooling water discharges would be intermittent and not significant.[124]  Thus, we do not anticipate that the project will significantly impact commercial fisheries in the project area.  Accordingly, we will not require mitigation measures beyond those proposed by the applicant.

32.     The Final EIS also determined that the Texas LNG Project would have a permanent impact on visual resources due to the presence of the project facilities and the associated increase in lighting to the project area.[125]  The most prominent visual features at the project site would be the two LNG storage tanks (190 feet high and 290 feet wide), the main flare stack (315 feet high), and the marine flare stack (180 feet high).[126]  The new facilities would also require lighting for operations and safety, as well as compliance with requirements from the Federal Aviation Administration.[127]  Due to the relatively undeveloped nature of the project area, the visual sensitivity of nearby recreation areas, and the lack of feasible visual screening measures, the Final EIS concluded that the project would result in a significant impact on visual resources when viewed from the adjacent Laguna Atascosa National Wildlife Refuge but would have a negligible to moderate permanent impact on the other visual resources evaluated.[128]  Commission staff evaluated the use of a ground flare to minimize impacts on the viewshed but concluded

---

[121] *Id*. at 5-363.

[122] *Id*.

[123] *Id*.

[124] *Id*.

[125] Authorization Order, 169 FERC ¶ 61,130 at P 56; Final EIS at 5-366.

[126] Final EIS at 4-112.

[127] *Id*.

[128] Authorization Order, 169 FERC ¶ 61,130 at P 56; Final EIS at 4-113, 4-141, 5-366.

**JA391**

that this alternative would not result in a significant environmental advantage.[129]  No alternatives that would minimize impacts on visual resources from the LNG storage tanks were identified.[130]  Texas LNG has committed to minimize lighting by implementing measures outlined in its Facility Lighting Plan and by implementing measures recommended by the National Park Service if these measures do not interfere with necessary safety and security considerations and requirements.[131]  Texas LNG also committed to discuss lighting and marking for aircraft warning lights with the National Park Service and the Federal Aviation Administration.[132]  The Authorization Order requires that Texas LNG fulfill these commitments.[133]Although tourists at the Laguna Atascosa National Wildlife Refuge will experience negative visual impacts due to construction and operation of the Texas LNG project, we do not find that additional mitigation is necessary.[134]

33.     Further, operation of the LNG terminal would generate noise continually throughout the life of the project.[135]  However, the predicted sound levels for operations are below the Commission's criterion at the nearest noise sensitive areas, and increases in ambient sound level due to operations would be imperceptible to most listeners.[136]  To ensure noise sensitive areas are not significantly affected by operational noise, Environmental Conditions 25 and 26 require Texas LNG to conduct post-construction noise surveys after each noise-producing unit (e.g., each liquefaction train) is placed into

---

[129] Final EIS at 3-2, 3-12.  For example, a ground flare requires a larger construction area and has greater potential to ignite released vapor.  *Id*. at 3-12.

[130] *Id.* at 3-2.

[131] *Id.* at 4-112.

[132] *Id*.

[133] Authorization Order, 169 FERC ¶ 61,130 at ordering para. (A).

[134] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) (*Robertson*) (an agency need not conclude that all impacts require mitigation; NEPA does not constrain an agency from concluding that other values outweigh the environmental costs of a proposed action).

[135] Authorization Order, 169 FERC ¶ 61,130 at P 65.

[136] *Id*.; Final EIS at 5-366.

service and after the entire project is placed into service.[137]  Therefore, the Authorization Order agreed with the Final EIS' conclusion that noise impacts due to operation of the project would not be significant.[138]  We agree and find these measures sufficient to mitigate noise on tourism and do not find additional mitigation necessary.

## C.    **Air Quality Impacts**

34.     Sierra Club argues in its statement of issues that the Commission violated NEPA by failing to fully analyze air quality impacts, but Sierra Club does not elaborate on these claims in the body of its rehearing request.  Most of these arguments appear to have been drafted for Sierra Club's request for rehearing in the proceeding for the Rio Grande LNG Terminal,[139] but to the extent that we can respond to Sierra Club's claims in this proceeding, we have done so below.

35.     First, Sierra Club claims the Commission failed to justify its conclusion that the predicted exceedances of the one hour nitrogen oxides concentrations specified in the National Ambient Air Quality Standards (NAAQS) under the Clean Air Act (CAA) would not have significant health impacts, such as on persons transiting or recreating along the Brownsville Shipping Channel.[140]  The Final EIS explained that Commission modeling indicated that the project would contribute to cumulative emissions in an uninhabited area between the fence lines of the Rio Grande LNG and Texas LNG Terminals, resulting in emissions that exceed the one hour nitrogen dioxide ($NO_2$) concentrations in the NAAQS.[141]  Sierra Club cites *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*[142] without elaboration, presumably for the requirement that an "agency must examine the relevant data and articulate a satisfactory explanation for its action."[143]  But here, the Final EIS reasonably assessed these $NO_2$ emissions' impacts on human health,

---

[137] Authorization Order, 169 FERC ¶ 61,130 at P 65, Environmental Conditions 25 and 26.

[138] *Id.* at P 65.

[139] Sierra Club December 23, 2019 Rehearing and Stay Request of the Rio Grande LNG Terminal and Rio Bravo Pipeline Project (CP16-454-001, CP16-455-001).

[140] Sierra Club Rehearing and Stay Request at 2.

[141] Final EIS at 4-338.

[142] 463 U.S. 29, 43 (1983).

[143] *Id.*

**JA393**

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

explaining that it is unlikely, but possible, that people may be exposed to elevated $NO_2$ levels in the immediate vicinity of the facilities.

36.     Sierra Club next argues that the Commission's analysis of cumulative ozone impacts rests on simplistic multiplication with no support for this methodology and fails to consider foreseeable increases in Rio Grande's own output.[144]  Sierra Club's concern appears to be directed at the proceeding for the nearby Rio Grande LNG Terminal Project.  We note that the Commission recently updated its analysis for the projects' cumulative ozone impacts in that proceeding.[145]

37.     Sierra Club contends that the Commission relied on an analysis that underestimates direct emissions and incorrectly argued that Commission need not revisit determinations made by the Texas Commission on Environmental Quality (TCEQ).[146]  The Final EIS fully analyzed the project's direct emissions and, as part of that analysis, noted that the project would be subject to TCEQ permits pursuant to the CAA.[147]  However, it is unclear what emissions Sierra Club believes were omitted or what TCEQ determinations Sierra Club believes were erroneous.

38.     Finally, Sierra Club claims the Commission improperly assumes that emissions that increase ambient air pollution without causing a NAAQS violation will not have health impacts, notwithstanding clear evidence to the contrary.[148]  The Final EIS disclosed health impacts associated with the project's air emissions and appropriately relied on the NAAQS thresholds to assess health impacts.[149]  The NAAQS reflect the limits that the U.S. Environmental Protection Agency (EPA) believes are necessary to protect human health and welfare.[150]  Although Sierra Club states that there is clear evidence to rebut this, it has failed to provide any evidence to suggest the Final EIS could not reasonably rely on the NAAQS.

---

[144] Sierra Club Rehearing and Stay Request at 2.

[145] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046, at PP 51-56, 61-62.

[146] Sierra Club Rehearing and Stay Request at 2.

[147] Final EIS at 4-168 to 4-174.

[148] Sierra Club Rehearing and Stay Request at 2.

[149] *See* 42 U.S.C. § 7409(b) (2018).

[150] *See, e.g.*, Final EIS at 4-165, 4-185.

### D.     Environmental Justice Impacts

39.     Executive Order 12898 encourages independent agencies to identify and address, as part of their NEPA review, "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations.[151] The EPA recommends three steps to identify and address such effects: (1) determine the existence of minority and low-income populations, (2) determine if resource impacts are high and adverse, and (3) determine if the impacts fall disproportionately on minority and low-income populations.[152]

40.     The EPA's categorical thresholds for minority and low-income populations apply to a project-affected area if minority populations comprise over 50% of the total population and if the population with incomes below the poverty level is 20% or greater.[153] The Final EIS concluded that within the five census block groups intersected by a two-mile radius around the Texas LNG terminal site, in four the Hispanic or Latino population comprises 74 to 95 percent of the total population and in all five the population with incomes below the poverty level ranges from about 22 to 41 percent.[154] These census block groups are minority and low income communities. The Final EIS

---

[151] Exec. Order No. 12898, §§ 1-101, 6-604, 59 Fed. Reg. 7629, at 7629, 7632 (1994). *See Sierra Club v. FERC*, 867 F.3d 1357, at 1368 (D.C. Cir. 2017) (affirming the Commission's environmental justice analysis without determining whether "Executive Order 12,898 is binding on FERC"). Identification of a disproportionately high and adverse impact on a minority or low-income population "does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory." CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*, at 10 (1997) (CEQ 1997 Environmental Justice Guidance), https://www.epa.gov/environmentaljustice/ceq-environmental-justice-guidance-under-national-environmental-policy-act; Federal Interagency Working Group for Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews*, at 38 (2016) (quoting same), https://www.epa.gov/sites/production/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[152] *See* EPA, *Final Guidance For Incorporating Environmental Justice Concerns In EPA's NEPA Compliance Analysis*, at §§ 3.2.1-3.2.2., https://www.epa.gov/sites/production/files/2015-02/documents/ ej_guidance_nepa_epa0498.pdf (1998) (EPA 1998 Environmental Justice Guidance).

[153] EIS at 4-155; EPA 1998 Environmental Justice Guidance at §§ 2.1.1 to 2.1.2; CEQ 1997 Environmental Justice Guidance at 25-26.

[154] Final EIS at 4-155 to 4-156, Table 4.9.9-1, Table 4.9.9-2.

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

acknowledged that the affected census block groups do not substantially differ from Cameron County, Texas, as a whole, where the Hispanic or Latino population comprises 88% of the population and the poverty rate is about 35%.[155]

41.    We note that there is no alternative to the projects that would achieve the project's purpose and need while avoiding a site in environmental justice communities.  The site of the Texas LNG terminal and the other two Brownsville LNG terminals would be in an area currently zoned for commercial and industrial use along the existing, human-made Brownsville Shipping Channel.[156]   The thirteen southernmost counties in Texas, including Cameron County where all three Brownsville LNG terminals would be sited along the Brownsville Shipping Channel, have minority population percentages and, except in three counties, poverty rates that exceed the EPA's categorical thresholds to be minority and low income populations.[157]   The Final EIS evaluated alternatives that would avoid these areas—including a no-action alternative, system alternatives, and site alternatives—but concluded that none represented a significant environmental advantage to the proposed LNG terminal.[158]   Although the no-action alternative would avoid impacts on the project-affected minority and low-income communities, the Final EIS found that other LNG export projects could be developed at a similar scope and magnitude and likely result in environmental impacts of comparable significance, especially for those projects in a similar regional setting.[159]

42.    Sierra Club contends that the Final EIS improperly chose Cameron County, which could itself qualify as a minority and low-income population, as a comparison population

---

[155] *Id.* at 4-156.

[156] *Id.* at ES-8.

[157] The thirteen counties include the seven southernmost counties along the coast—Cameron, Willacy, Kenedy, Kleberg, Nueces, San Patricio, and Refugio Counties—and eight inland counties—Hidalgo, Starr, Brooks, Jim Hogg, Zapata, Jim Wells, Duval, and Webb Counties.  Only the coastal Kenedy, San Patricio, and Refugio Counties have poverty rates below the 20% threshold.  U.S. Census Bureau, QuickFacts, https://www.census.gov/quickfacts/fact/table/US/PST045219 (last accessed Jan. 25, 2020).

[158] Final EIS at 3-1 to 3-12.  The EIS considered system alternatives and site alternatives at many locations along the coasts of Texas, Louisiana, and Mississippi.  *Id.* at 3-3 to 3-12.  Among other screening factors for site alternatives, the EIS gave preference to sites not in proximity to population centers or residences.  *Id.* at 3-6 to 3-7.

[159] *Id.* at 3-2 to 3-3.

and thus masked, incorrectly characterized, and inappropriately minimized the Texas LNG Project's impacts on affected environmental justice communities.[160]

43.     Sierra Club emphasizes EPA's recommendation that an agency's NEPA analysis should consider how a project's impacts on resources could also impact the environmental justice communities that rely upon those resources as an economic base or a cultural value.[161] Sierra Club asserts that the EIS failed to determine whether minority or low-income populations are disproportionately susceptible to, and as a result are disproportionately burdened by, the project's impacts identified in the EIS to tourism, housing, and real property.[162]

44.     Sierra Club also contends that the Commission violated NEPA by failing to take a hard look at whether the project's direct, indirect, and cumulative impacts on air quality, even if the relevant emissions would not exceed the NAAQS, would disproportionately affect environmental justice communities.[163]

45.     Sierra Club misunderstands the use of another population for comparison in an environmental justice analysis. A "reference community" is sometimes necessary to identify which project-affected populations are minority or low-income populations.[164] Because here all project-affected populations meet or exceed the categorical standards to be minority or low-income populations, and in most cases both, there was no need to determine their existence using any broader reference community.[165] A "comparison group" can inform the inquiry whether a project's impacts on minority and low-income communities will be disproportionately high and adverse.[166] Because here all project-affected populations are minority or low-income populations, or both, it is not possible

---

[160] Sierra Club Request for Rehearing at 14-16.

[161] *Id*. at 18 n.69 (citing EPA Environmental Justice Guidance at § 2.2.2).

[162] *Id.* at 18-19.

[163] *Id*. at 16-18.

[164] Federal Interagency Working Group for Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* at 25, 27-28 (describing the use of a "reference community").

[165] The EIS did include the population traits of Cameron County and the state of Texas for context. Final EIS at 4-155 to 4-156, Table 4.9.9-1, Table 4.9.9-2.

[166] Federal Interagency Working Group for Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* at 43-46.

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

that impacts will be disproportionately concentrated on minority and low-income populations versus on some other project-affected comparison group.[167]  But it is possible, regardless of the uniformity, that a project's impacts on a minority or low-income population arising from some change to the environment or to the risk or rate of exposure to a pollutant would be disproportionately high and adverse if amplified by factors unique to the affected population, like inter-related ecological, aesthetic, historical, cultural, economic, social, or health factors.[168]  These factors are specific to the identified minority and low-income populations, but a relevant and appropriate comparison group can provide context for the analysis.[169]  Sierra Club offers no evidence and no specific examples to support its claims that the use in the EIS of Cameron County as a comparison group masked, incorrectly characterized, or inappropriately minimized the impacts on minority and low-income communities.[170]  To the contrary, as discussed above, Cameron County is used because that is where the LNG facility will be located, and no other alternatives would meet the projects' purpose and need.[171]

46.    Sierra Club offers no explanation how the Texas LNG Project's impacts identified in the EIS to tourism, housing, or real property might be disproportionately high and adverse to minority and low-income populations based on an unacknowledged sensitivity in these populations.  The socioeconomic analysis in the EIS examined data from Cameron County, where the majority of the project workforce is anticipated to reside[172] and where the minority population percentages and the poverty rate are similar to those

---

[167] Federal Interagency Working Group for Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* at 43-44 (suggesting that agencies "consider identifying the relevant and appropriate comparison group within the affected environment" and "consider the distribution of adverse and beneficial impacts between the general population and minority populations and low-income populations in the affected environment").

[168] *Id*. at 39 (suggesting that agencies recognize that even where a project's impact "appears to be identical to both the affected general population and the affected minority populations and low-income populations," the impact might be amplified by population-specific factors "e.g., unique exposure pathways, social determinants of health, community cohesion" making the impact disproportionately high and adverse).

[169] *Id*. at 40.

[170] Sierra Club Request for Rehearing and Stay at 16.

[171] *Supra* P 45.

[172] Final EIS at 4-142.

Document Accession #: 20200221-3023          Filed Date: 02/21/2020

traits in the census block groups adjacent to the project area.[173]   The EIS acknowledged that 4.5% of all jobs in Cameron County are related to travel and tourism.[174]   Because the Texas LNG project would not directly affect most popular tourist activities and destinations, the EIS anticipated no significant direct impacts on tourism.[175]   The EIS concluded that the combination of the Texas LNG Project with the other two Brownsville LNG terminals and other actions would cumulatively result in permanent and moderate impacts on tourism via cumulative impacts on recreation areas, visual resources, and vessel traffic in the Brownsville Shipping Channel.[176]   The EIS concluded that the Texas LNG Project would reduce unemployment in the project area and increase revenue for local businesses.[177]   The EIS also concluded that the expenditures and workforce associated with construction and operation of the three Brownsville LNG terminals would result in cumulative positive, short-term and permanent impacts on the local economy.[178]   Sierra Club does not support its assertion that the Commission was required to determine whether minority or low-income populations are primarily reliant on tourism-based industries for employment.[179]   And Sierra Club does not explain how further inquiry would potentially reveal a level of impact that was not already captured in the EIS's close analysis of socioeconomic impacts in Cameron County.

47.     In the evaluation of housing, the EIS explained that the cumulative demand for housing from non-local construction workers during construction of the three Brownsville LNG terminals might result in increased rental rates and housing shortages but that this impact would be temporary and moderate.[180]   Sierra Club notes that changes to housing availability would primarily impact individuals looking for housing.[181]   But the EIS closely considered the available housing and the rental housing cost for six

---

[173] *Id.* at 4-156, Table 4.9.9-1 and Table 4.9.9-2.

[174] *Id.* at 4-144.

[175] *Id.* at 4-153.

[176] *Id.* at 4-332 to 4-333.

[177] *Id.* at 4-328.

[178] *Id.* at 4-328.

[179] Sierra Club Request for Rehearing and Stay at 18-19.

[180] Final EIS at 4-328 to 4-329.

[181] Sierra Club Request for Rehearing and Stay at 37.

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

municipalities in Cameron County and for the county as a whole.[182]  The EIS anticipated that the workforces for the Rio Grande LNG Project and Annova LNG Brownsville Project would be primarily based out of Willacy, Cameron, and Hidalgo Counties, and thus would not result in significant cumulative impacts on any single community.[183]  The available housing and the rental housing cost in Cameron County reflect the supply and demand for housing in a county where the minority population percentages and the poverty rate are similar to those traits in the census block groups adjacent to the project area.[184]  Sierra Club offers no basis to conclude, and we find none, that these factors would differ for the narrower project-affected populations in a way that might result in a disproportionately high and adverse impact.

48.     The EIS also appropriately addressed the potential impacts on area property values.  The EIS acknowledged that property values could be affected by the construction and operation of the Texas LNG Project but explained that many factors influence the potential effect on property values, that the exact impact on a regional level is unknown, and that a potential purchaser might or might not take the LNG terminal into account when choosing an offer price.[185]  Sierra Club criticizes the Commission for failing to analyze the cumulative impact of the three Brownsville LNG terminals on nearby property values.[186]  But because the sources of uncertainty would be the same, the cumulative impact is not reasonably foreseeable and was appropriately omitted from the EIS.

49.     Next, we address Sierra Club's claim that the Commission inadequately considered whether the project's air quality impacts on minority and low-income communities would be disproportionately high and adverse.[187]  The impact pathways from a project's air emissions are primarily health-based.  The EPA established the NAAQS to protect human health and public welfare for all communities, including sensitive subpopulations (e.g., asthmatics, children, and the elderly).[188]  As noted above, the project's direct, indirect, and cumulative impacts on air quality, with the exception of

---

[182] Final EIS at 4-146 Table 4.9.4-1.

[183] *Id.* at 4-329.

[184] *Id.* at 4-156, Table 4.9.9-1 and Table 4.9.9-2.

[185] *Id.* at 4-152.

[186] Sierra Club Request for Rehearing and Stay at 19.

[187] *Id.* at 16-18.

[188] Final EIS at 4-165; *supra* P 38.

Document Accession #: 20200221-3023          Filed Date: 02/21/2020

ozone-related emissions, would not increase the concentration of criteria pollutants above the NAAQS.[189]  Exposure to these emissions near the facilities is unlikely, and the pollutants would disperse before reaching nearby population centers.[190]  Sierra Club offers no reason to expect that the identified environmental justice communities would be vulnerable to air quality impacts in a way that is not already accounted for in the establishment of the NAAQS thresholds.  Without Sierra Club supporting its position, we will not disregard Commission staff's reasonable reliance on the NAAQS as a proxy for potential health impacts on area populations, including minority and low-income populations.

50.     In the order on rehearing for the Rio Grande LNG Terminal proceeding, the Commission estimated that cumulative emissions of ozone precursors from that project, the Texas LNG Project, and the Annova LNG Brownsville Project could result in ozone concentrations of 76.5 parts per billion (ppb) that would exceed the current 8-hour ozone NAAQS of 75 ppb.[191]  It is appropriate to consider whether the impact on minority and low-income populations could be disproportionately high and adverse.  CEQ acknowledges that there is no standard formula for how environmental justice issues should be identified or addressed, but CEQ generally recommends that an agency consider readily available information about the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population, including historical patterns of exposure.[192]  CEQ and others recommend that an agency evaluate whether the impact from a significant environmental hazard to a minority or low-income population "appreciably exceeds or is likely to appreciably exceed" the impact on "the general population or other appropriate comparison group."[193]

51.     Data from EPA's EJSCREEN tool indicates that in the project area, the environmental justice index for ozone is equivalent to the 80th percentile in Texas

---

[189] Final EIS at 4-175 to 4-187; 4-335 to 4-342; *supra* P 35.

[190] Final EIS at 4-338 to 4-339.  For example, although the predicted peak cumulative concentration of $NO_2$ (196 ppb) would exceed the NAAQS (100 ppb), any exceedance would occur away from residential property, within the Port of Brownsville between the Rio Grande and Texas LNG terminals.  *Id.*; *id.* at 4-340 Table 4.13.2-3; *see supra* P 35.

[191] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046, at PP 51-56, 61-62.

[192] CEQ 1997 Environmental Justice Guidance at 9.

[193] *Id.* at 26; Federal Interagency Working Group for Environmental Justice and NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* at 45-46.

**JA401**

(meaning that 80% of the populations in the state have an equal or lower environmental justice index for ozone), the 84th percentile in EPA's administrative Region 6, and the 89th percentile in the nation.[194]  Based on this information, we find that in the affected minority and low-income populations there is a potential for multiple or cumulative exposure to the environmental hazard of ozone and that this exposure is likely to appreciably exceed the exposure level in more general comparison groups.

52.     During exceedance events, people in the surrounding communities might experience a number of health effects such as decreased lung function and airway inflammation, with respiratory symptoms including coughing, throat irritation, chest tightness, wheezing or shortness of breath.[195]  People with asthma are known to be especially susceptible to the effects of ozone exposure and tend to experience increased respiratory symptoms, increased medication usage, increased frequency of asthma attacks, and increased use of health care services.[196]  Chronic Obstructive Pulmonary Disease is the only other respiratory disease for which a relationship has been observed, based on a relatively few studies, between ozone and hospital admissions.[197]

53.     The project-affected minority populations are predominantly Hispanic or Latino with higher percentages of young children and older adults than the state population.[198] EPA and Texas have published data about the prevalence of asthma separated by race. Texas has also published data about mortality from chronic lower respiratory disease separated by county.  Data from the EPA for 2007 to 2010 showed that the prevalence of asthma in the United States was 7.9% among Hispanic children and 8.2% for White non-

---

[194] EJSCREEN Report Version 2019, EJSCREEN Tool, https://ejscreen.epa.gov/mapper/ (choose to "Select Location" using the polygon tool, next place a polygon over the footprint of the three Brownsville LNG terminals and along the shipping route, next click on the polygon and add a 2-mile buffer, then click to "Explore Reports") (last visited Jan. 10, 2020).

[195] EPA, *Health Effects of Ozone in the General Population*, https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-general-population (last visited Jan. 9, 2020).

[196] EPA, *Health Effects of Ozone in Patients with Asthma and Other Chronic Respiratory Disease*, https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-patients-asthma-and-other-chronic (last visited Jan. 9, 2020).

[197] *Id.*

[198] Percentages of children under age five (9%) and adults over age 64 (17%) are higher than in the general state population (66th and 78th percentiles, respectively).  *See supra* n.183.

Hispanic children.[199]  Data from Texas for 2016 showed that the prevalence of asthma in the state was 5.1% among Hispanic children and 9.2% for White children.[200]  The rate of hospitalizations for asthma in Texas was 8.7 per 10,000 children for Hispanic children and 8.8 per 10,000 children for White children.[201]  The mortality rate from chronic lower respiratory disease in Cameron County, which includes the sites of the Brownsville LNG terminals and compressor station 3 on Rio Bravo's proposed pipeline, was 21 deaths per 100,000 people.[202]  By contrast the mortality rate from chronic lower respiratory disease was 27 in the state's Public Health Region 11[203] and was 41.4 in the entire state.[204]  This information does not support a conclusion that the anticipated exposure to ozone in minority and low-income communities would result in a disproportionately high and adverse impact to these communities.

## E.  **Ballast Water Impacts**

54.    Sierra Club argues that the Commission failed to adequately consider the impact that the unloading of ballast water by maritime vessels taking on LNG at the terminal

---

[199] EPA, *America's Children and the Environment* at 218 (3rd ed. 2013), https://www.epa.gov/sites/production/files/2015-06/documents/ace3_2013.pdf.  The most recent version of this report published in 2019 did not separate the asthma data by race/ethnicity.

[200] Texas Department of State Health Services, *2016 Child Asthma Fact Sheet* (2016), https://dshs.state.tx.us/asthma/Documents/2016-Texas-Fact-Sheet_Child-Asthma.pdf.

[201] *Id*. at 2.

[202] Texas Department of State Health Services, Health Facts Profiles, http://healthdata.dshs.texas.gov/HealthFactsProfiles_14_15 (select "By County", Year 2015, Cameron County).

[203] Public Health Region 11 includes Cameron County and several other counties in southern Texas.  The aggregate population in 2015 was about 83% Hispanic and about 28.3% people living below the poverty threshold, very similar to the communities closest to the three Brownsville LNG terminals.  The mortality rate in Public Health Region 11 from chronic lower respiratory disease of 27 deaths per 100,000 people was the lowest of any Public Health Region in the state.

[204] Texas Department of State Health Services, Health Facts Profiles, http://healthdata.dshs.texas.gov/HealthFactsProfiles_14_15 (select "Texas Only").

may have by introducing foreign invasive species.[205]  Sierra Club objects to the
conclusion in the Final EIS that, while an LNG carrier would discharge 15 million
gallons of water while at the terminal, this discharge would exert a very minor influence
on the overall system.[206]  Sierra Club states that the Commission failed to adequately
review the terminal's impacts when it is unclear why this 15-million-gallon estimate is
nearly double the estimate given in the Annova LNG Brownsville Project Final EIS,
despite each terminal using similar sized vessels.  Sierra Club also argues that the
Commission used the wrong geographic scope to assess ballast water impacts, noting that
ballast water would not be promptly mixed into the entire volume of the shipping channel
but would accumulate near the terminal.[207]  Even a small amount of ballast water could
introduce invasive species, such as lionfish and tiger shrimp, that travel in and transmit
disease to native fish and shrimp populations.[208]  Finally, Sierra Club claims that this
failure to adequately assess impacts calls into question the Commission's conclusion that
harm to fisheries and tourism is only moderate.[209]

55.     Sierra Club's arguments ignore the Final EIS's discussion of ballast water
mitigation.  While docked, ballast water would be offloaded into the Brownsville
Shipping Channel as the ship takes on LNG.  To reduce the potential for the introduction
of invasive species and foreign organisms, the Coast Guard requires that ballast water be
completely exchanged in the open ocean at least 200 miles from U.S. waters.[210]  This
exchange is reported to reduce aquatic organisms by 88 to 99 percent.[211]  Alternatively, a
vessel may reduce organisms using an on-board ballast water treatment process.[212]  The
EIS concluded these measures would minimize the risk of introducing invasive species
into the project area.[213]  Accordingly, we see no need to either reevaluate the Final EIS's

---

[205] Sierra Club Request for Rehearing and Stay at 20-23.

[206] *Id.* at 20 (citing Final EIS at 4-25).

[207] *Id.* at 21.

[208] *Id.* at 21-22.

[209] *Id.* at 23.

[210] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046, at P 91 (citing Final EIS at 4-42 to
4-43).

[211] *Id.* (citing Final EIS at 4-113).

[212] Final EIS at 4-24 to 4-25.

[213] *Id.* at 4-26.

analysis of ballast water impacts on fisheries and tourism, or require more stringent conditions than those required by the Coast Guard.[214]

## F.   Sea Turtle Impacts

56.    Sierra Club states that although the Authorization Order acknowledged that cumulative impacts are anticipated for sea turtles due to dredging, vessel traffic, and pile-driving,[215] the Final EIS failed to discuss additional mitigation methods or acknowledge what impacts will not be mitigated.  Sierra Club objects to the required mitigation, the National Marine Fisheries Service's *Vessel Strike Avoidance Measures and Reporting for Mariners*, as insufficient for impacts from vessel traffic.  According to Sierra Club, the measures recommend that vessels should reduce speed to 10 knots or less when cetaceans are observed, but the Final EIS acknowledges that sea turtles cannot actively avoid collisions with vessels traveling faster than 2.2 knots.[216]  Sierra Club states that the Commission should have examined establishing a mandatory ship speed near the mouth of the Brownsville Shipping Channel and points to a December 20, 2019 personal communication with Lela Burnell Korab stating that some large vessels in the channel do not obey existing maritime speed limits.[217]

57.    The Commission has no jurisdiction over the speed for any vessels at the mouth of the Brownsville Shipping Channel.  Nevertheless, the Commission fully considered impacts on and mitigation of vessel speed impacts to sea turtles.  Sea turtles are rare visitors to the immediate project area and are more likely to be encountered along the LNG carrier transit routes in the Gulf of Mexico and nearshore waters and the Final EIS noted that sea turtles present in the area at the start of construction activities are anticipated to relocate to nearby suitable habitat or avoid the area.[218]  The threat of collision is also low within the channel as LNG vessels, barges, and support vessels would transit at speeds no greater than 8 knots, which allows sea turtles to more readily

---

[214] *EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016) (holding that the Commission "fairly evaluated" possible environmental impacts of ballast water where it acknowledged the risk of introduction of foreign invasive species and concluded that "the currently-required measures for all ships entering U.S. waters, including offshore ballast water exchange, provide best management practices to minimize risks from invasive species and contamination from non-U.S. ports").

[215] Sierra Club Request for Rehearing and Stay at 25.

[216] *Id.* at 25-26.

[217] *Id.*

[218] Final EIS at 4-320.

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

avoid such vessels, particularly when an LNG carrier creates bow waves to push water and floating objects, including sea turtles out of the vessel path.[219] In addition, Texas LNG is encouraging LNG carriers which will visit its facility to comply with the *Vessel Strike Avoidance Measures and Reporting for Mariners*.[220]  The measures require more than reduced speeds and directs vessels, when sea turtles are sighted, to attempt to maintain a distance of 50 yards or greater between the animal and the vessel whenever possible.[221]  We find the measures described above adequate to address the risks to sea turtles from vessel traffic.

58.    As for Sierra Club's claim that existing vessels are exceeding speed restrictions, we dismiss this new information provided to the Commission for the first time on rehearing.[222]  Nonetheless, we note that Sierra Club does not explain the relevance of speed violations by existing vessels and, in any event, the Coast Guard establishes and enforces speed limits in the Brownsville Shipping Channel.

59.    Sierra Club also claims that the Final EIS failed to address the cumulative impacts of noise from pile driving and dredging during project construction and asks that the Commission require coordination among the three Brownsville LNG terminals so that concurrent pile driving and dredging would not overlap.[223]  The Final EIS considered the cumulative impacts of underwater noise from pile and dredging.[224]  Due to the limited duration of pile driving and the long construction schedules for the projects, it is unlikely that there would be pile driving overlap, but the Final EIS noted that Texas LNG would minimize impacts on aquatic resources from pile driving by driving most piles into the tidal flats rather than open water and utilizing soft starts.[225]  Only the Texas LNG and Rio Grande Terminals' dredging activities would overlap, and the Final EIS noted that more

---

[219] *Id.* at Appendix C, Biological Assessment, C-116.

[220] *Id.* at 4-321.

[221] NMFS Southeast Region Vessel Strike Avoidance Measures and Reporting for Mariners; revised February 2008, https://www.fisheries.noaa.gov/southeast/consultations/regulations-policies-and-guidance.

[222] *PaTu Wind Farm, LLC v. Portland General Electric Company, LLC*, 151 FERC ¶ 61,223, at P 42 (2015).  *See also Potomac-Appalachian Transmission Highline, L.L.C.*, 133 FERC ¶ 61,152, at P 15 (2010).

[223] Sierra Club Rehearing and Stay at 26.

[224] Final EIS at 4-351, 4-352.

[225] *Id.* at 4-311.

mobile species would have to travel further to relocate to avoid dredging, or occupy less suitable habitat, which could impact behavior.[226]  Although these impacts could be moderate, the Final EIS concluded that they would be temporary and that Texas LNG would use a cutterhead suction dredge, which would minimize turbidity.[227]  Accordingly, we agree with the Final EIS that no additional mitigation measures are required.

## G.    Cultural Resource Impacts

60.    In consultation with the State Historic Preservation Office (SHPO) for Texas,[228] Commission staff concluded that the only historic property within the project's area of potential effect, an archaeological site known as the Garcia Pasture Site, would be adversely affected by the project.[229]  The EIS and the Authorization Order acknowledged that consultations under Section 106 of National Historic Preservation Act (NHPA) were not complete.[230]  The Authorization Order adopted the condition recommended in the EIS that Texas LNG file comments from the SHPO on reports and plans before Texas LNG may begin construction.[231]  The Commission concluded that with the implementation of

---

[226] *Id.*

[227] *Id.* at 4-63 to 4-64, 4-319, 5-360.

[228] Texas LNG, as a non-federal applicant, assisted the Commission in meeting our obligations to comply with Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108 (2018), by preparing necessary information, analyses, and recommendations as well as communicating with consulting parties including the SHPO. 36 C.F.R. § 800.2(a)(3) (2019) (allowing delegation). The Commission remains responsible for all formal determinations of site eligibility for the National Register of Historic Places and of project effects on an identified site.  *Id.*  Texas LNG began meeting with the Texas Historical Commission in January 2015 before the Commission's pre-filing process began in April 2015.  Final EIS at 4-157 to 4-158.

[229] Final EIS at 4-157 to 4-163

[230] *Id.* at 4-162 to 4-163; Authorization Order, 169 FERC ¶ 61,130 at P 60.

[231] Authorization Order, 169 FERC ¶ 61,130 at P 60; *id.* app. Environmental Condition 23.  Environmental Condition 23 does not allow Texas LNG to begin construction activities until:

> a. Texas LNG files with the Secretary comments on the final cultural resources reports and plans from the State Historic Preservation Office, U.S. Army Corps of Engineers, National Park Service, and appropriate federally-recognized Indian

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

this condition, as well as Texas LNG's proposed treatment plan for the Garcia Pasture Site, the project's impacts on cultural resources would not be significant.[232] Commission staff completed the process of compliance with Section 106 when Commission staff and the Texas SHPO executed a Memorandum of Agreement requiring treatment measures, plans, and reports to resolve potential adverse effects upon historic properties.[233]

61.    Sierra Club asserts that the Commission violated the NHPA and NEPA by failing to complete the consultation process under Section 106 of the NHPA before authorizing the Texas LNG Project.[234]  Sierra Club states that because Commission staff invited comments from the Advisory Council on Historic Preservation (Council) after the period for public comment on the Draft EIS, Commission staff foreclosed the opportunity for the public to respond to any comments from the Council.[235]  Sierra Club also contends that Commission staff should have executed the anticipated Memorandum of Agreement, which will resolve adverse effects on historic properties, before the Commission authorized the Texas LNG Project.[236]  By executing the Memorandum of Agreement after

---

tribes;

b. FERC staff has executed a memorandum of agreement regarding the resolution of adverse effects on historic properties;

c. the Director of OEP notifies Texas LNG in writing that treatment measures (including archaeological data recovery) may be implemented; and

d. Texas LNG documents the completion of treatment, and the Director of OEP issues a written notice to proceed with construction.

[232] Authorization Order, 169 FERC ¶ 61,130 at P 60.

[233] Texas State Historic Preservation Office February 12, 2020 Signed Memorandum of Agreement; 36 C.F.R. § 800.6(b)-(c) (2019) (describing the resolution of adverse effects via a memorandum of agreement).

[234] Sierra Club Request for Rehearing and Stay at 22-24.

[235] *Id.* at 24.

[236] *Id.*

**JA408**

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

the authorization, Sierra Club argues, the public cannot give input about, and the Commission cannot assess the adequacy of the Memorandum of Agreement content.[237]

62.     The Commission's conditional approval process complies with the dictates of the NHPA and NEPA.[238]  The prohibition on construction in the Authorization Order's Environmental Condition 23 ensures that there can be no effect on historic properties until there has been full compliance with the NHPA.[239]  The Commission's approach appropriately respects the integration of the various requirements for natural gas infrastructure, including the NGA, the NHPA, and NEPA.  As we have stated before, it is also a practical response to the reality that, in spite of the best efforts of those involved, it may be impossible for an applicant to obtain all reviews necessary to construct and operate a natural gas project in advance of the Commission's issuance of its authorization without unduly delaying the project.[240]  To rule otherwise could preclude companies from engaging in what are sometimes lengthy pre-construction activities while awaiting state or federal agency action and would likely delay the in-service date of natural gas infrastructure projects to the detriment of consumers and the public in general.

63.     The timing of Section 106 consultation has not deprived the public of a meaningful opportunity to review and comment on the Texas LNG Project's potential impacts on cultural resources.  Public involvement has included applicant-sponsored open houses in May 2015, public scoping meetings, the publication of the Draft EIS for review, a public comment session on the Draft EIS, and the submission of more than 900

---

[237] Id.

[238] See City of Grapevine, Tex. v. Dep't of Transp., 17 F.3d 1502, 1509 (D.C. Cir. 1994) (City of Grapevine, Tex.), cert. denied, 513 U.S. 1043 (1994) (upholding Federal Aviation Administration's approval of a runway conditioned upon the applicant's completion of compliance with the NHPA); Pub. Util. Comm'n of Cal. v. FERC, 900 F.2d 269, 282 (D.C. Cir. 1990) (under NEPA, an agency can make "even a final decision so long as it assessed the environmental data before the decision's effective date").  See also supra, Robertson, 490 U.S. at 352.  See also Del. Riverkeeper Network v. FERC, 857 F.3d 388, 397 (D.C. Cir. 2017) ("Because the Certificate Order expressly conditioned FERC's approval of potential discharge activity on Transco first obtaining the requisite § 401 certification, and was not itself authorization of any potential discharge activity, the issuance of the Certificate Order before Pennsylvania's issuance of its § 401 certificate did not violate § 401 of the [Clean Water Act].").

[239] See City of Grapevine, Tex., 17 F.3d at 1509.

[240] See, e.g., Broadwater Energy LLC, 124 FERC ¶ 61,225, at P 59 (2008); Crown Landing LLC, 117 FERC ¶ 61,209, at P 26 (2006); Millennium Pipeline Co., L.P., 100 FERC ¶ 61,277 at PP 225-231 (2002).

comments.[241]  Separately, at the request of the Texas SHPO, Texas LNG created a public outreach program in May 2017.[242]  The Draft EIS and Final EIS provided a summary of the cultural investigations undertaken for the project including:  consultations with the Texas SHPO, federal agencies, and Indian tribes; the definition of the area of potential effect; the results of a literature review as well as inventories and testing; and the status of compliance with the NHPA.[243]  This information is sufficient to enable the public to understand and consider the issues raised by the project.  The Commission satisfied its responsibilities by affording the Council a reasonable opportunity to comment,[244] but the Council has not participated in this proceeding.  Moreover, the Commission is not obligated to afford an opportunity for the public to review and respond to comments from the Council or to the content of a Memorandum of Agreement.  Commission staff coordinated with the Texas SHPO and Texas LNG to assure the adequacy of the treatments to be required under the Memorandum of Agreement before Commission staff and the Texas SHPO executed the Memorandum of Agreement as necessary signatories and Texas LNG executed it as a concurring party .[245]  The Memorandum of Agreement is available in the Commission's public record for this proceeding.[246]

64.     Sierra Club asserts that Commission staff failed to respond in the Final EIS to Sierra Club's comments that the choice of a one mile indirect area of potential effect had not been suggested by the National Park Service, as described in the Draft EIS, but had in fact been criticized by the National Park Service as inadequate to capture the potential visibility impacts on the nearby Palmito Ranch Battlefield National Historic Landmark and Palo Alto Battlefield National Historical Park and National Historic Landmark.[247]

---

[241] Final EIS at ES-2 to ES-3, 1-10 to 1-14.

[242] *Id.* at 4-158.

[243] Office of Energy Projects Texas LNG Project Draft EIS at 4-154 to 4-160, 4-321 to 4-322 (Oct. 26, 2018); Final EIS at 4-157 to 4-163, 4-334.

[244] *See* 36 C.F.R. § 800.1(a) (2019).

[245] 36 C.F.R. § 800.6 (2019) (procedures for the resolution of adverse effects).

[246] Texas State Historic Preservation Office February 12, 2020 Signed Memorandum of Agreement.

[247] Sierra Club Request for Rehearing and Stay at 24-25.

**JA410**

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

65.     The Final EIS addressed Sierra Club's claims about the indirect area of potential effect.[248]  Texas LNG's definition of the direct and indirect areas of potential effect was accepted by the SHPO and Commission staff.[249]  The National Park Service criticized the Draft EIS for underestimating the distances between the Texas LNG Project and the two battlefield sites, expressing concern that the Texas LNG Project could result in a cumulative adverse impact on the viewsheds at both battlefield sites.[250]  Commission staff responded in the Final EIS that all distances cited in the EIS were measured as accurately as possible based on publicly available information and that the distances to the battlefield sites appear to be correct.[251]  The Palmito Ranch Battlefield National Historic Landmark is over four miles from the Texas LNG Project site, and the Palo Alto Battlefield National Historic Park and National Historic Landmark are more than twelve miles from the Texas LNG Project site.[252]  The EIS analyzed the project's potential direct, indirect, and cumulative visual impacts on these battlefields.[253]  The EIS concluded that the Texas LNG terminal would only have minor and non-significant visual impacts on the battlefields.  Sierra Club offers no explanation how the Commission's choice of a one mile indirect area of potential effect led the Commission to mischaracterize or ignore any potential adverse effect to historic properties, including both battlefield sites.

## H.     Greenhouse Gas Emissions

### 1.     Global Warming Potentials

66.     Sierra Club contends that the Commission failed to adequately consider the project's greenhouse gas (GHG) impacts, alleging that the Commission relied on outdated global warming potentials for GHGs when it analyzed the project's GHG

---

[248] Final EIS at H-51, Table H-2, Comment Code CULT-09 (addressing the determination of the area of potential effect).

[249] Final EIS at 4-161.

[250] U.S. Department of the Interior December 17, 2018 Comments on the Draft EIS at 7-11.

[251] Final EIS at H-48 Table H-2, Comment Code CI-17.

[252] *Id.* at 4-161 to 4-162 (acknowledging concerns raised by the NPS about both battlefields but explaining that the 4.5-mile and 12.5-mile distances place them beyond the area of potential effects for the Section 106 process).

[253] *Id.* at 4-110 to 4-111, 4-325 to 4-327.

emissions using the EPA's international GHG reporting rules rather than current science.[254]

67.    The Commission appropriately relied on EPA's published global warming potentials,[255] which are the current scientific methodology used for consistency and comparability with other Commission jurisdictional projects as well as emissions estimates in the United States and internationally, including greenhouse gas control programs under the CAA.  This frame of reference would be lost if other values were used.[256]

68.    Sierra Club cites *Western Organization of Resource Councils v. Bureau of Land Management*[257] for the proposition that an agency violates NEPA when it exclusively relies on outdated science regarding global warming potentials in an EIS.  But in that case, the district court ruled that the agency failed to justify using a global warming potential with a longer time horizon to assess methane emissions when it had that time horizon in another EIS.[258]   In contrast, as we have explained, we have consistently used EPA's global warming potentials, including time horizons, in order to compare proposals with other projects and with GHG inventories.[259]

69.    In any event, while Sierra Club faults the Commission's reliance on EPA's published guidance, Sierra Club does not offer an alternative in its rehearing request.[260]  Sierra Club cites to an earlier comment, but such incorporation by reference is improper and is an alternative basis for dismissing Sierra Club's argument.[261]

---

[254] Sierra Club Request for Rehearing and Stay at 27.

[255] Final EIS at 4-164.

[256] *Dominion Transmission, Inc.*, 158 FERC ¶ 61,029, at P 4 (2017).

[257] No. CV 16-21-GF-BMM, 2018 WL 1475470, at *15 (D. Mont. Mar. 26, 2018), *reconsideration denied*, No. CV 16-21-GF-BMM, 2018 WL 9986684 (D. Mont. July 31, 2018), and *appeal dismissed*, No. 18-35836, 2019 WL 141346 (9th Cir. Jan. 2, 2019).

[258] *Id.*

[259] *Dominion Transmission, Inc.*, 158 FERC ¶ 61,029 at P 4.

[260] Sierra Club Request for Rehearing and Stay at 27.

[261] *San Diego Gas and Electric Co. v. Sellers of Market Energy*, 127 FERC ¶ 61,269, at P 295 (2009).  *See Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,007 (2016) ("the Commission's regulations require rehearing requests to provide the basis, in

## 2.   Significance of the Project's Greenhouse Gas Emissions under NEPA

70.    Sierra Club argues that the Commission could have determined whether the project's GHG emissions were significant by using the GHG emission reduction goals in the Paris Climate Accord, which were still in effect when the EIS and Authorization Order were issued.[262]  Even if the Commission chose not to use the Paris Climate Accord emissions reduction targets, Sierra Club claims that other methodologies could be used to ascribe significance, including tools used by the U.S. Global Change Research Program (USGCRP) to assess impacts or the Social Cost of Carbon tool.[263]

71.    Sierra Club's suggested methodologies would not help the Commission determine whether the projects' GHG emissions are significant.  As discussed in the Authorization Order, the Commission does not see the utility in using the targets in the Paris Climate Accord, because the United States had announced its intent to withdraw from the accord at the time the Commission issued the Authorization Order.[264]  But, even if the Commission were to consider those targets, without additional guidance, the Commission cannot determine the significance of the project's emissions in relations to the goals.  For example, there are no industry sector or regional emission targets or budgets with which to compare project emissions, or established GHG offsets to assess the project's relationship with emissions targets.

---

fact and law, for each alleged error including representative Commission and court precedent.  Bootstrapping of arguments is not permitted."); *see also ISO New England, Inc.*, 157 FERC ¶ 61,060 (2016) (explaining that the identical provision governing requests for rehearing under the Federal Power Act "requires an application for rehearing to 'set forth specifically the ground or grounds upon which such application is based,' and the Commission has rejected attempts to incorporate by reference grounds for rehearing from prior pleadings"); *Alcoa Power Generating Inc*., 144 FERC ¶ 61,218, at P 10 (2013) ("The Commission, however, expects all grounds to be set forth in the rehearing request, and will dismiss any ground only incorporated by reference.") (citations omitted).

[262] Sierra Club Request for Rehearing and Stay at 27-28.

[263] *Id*. at 28.

[264] *See* Authorization Order, 169 FERC ¶ 61,130 at P 67 & n.119.  On November 4, 2019, President Trump began the formal process of withdrawing from the Paris Climate Accord by notifying the United Nations Secretary General of his intent to withdraw the United States from the Paris Climate Accord, which takes 12 months to take effect.

72.     The Commission has provided extensive discussion on why the Social Cost of Carbon is not appropriate in project-level NEPA review and cannot meaningfully inform the Commission's decisions on natural gas infrastructure projects under the NGA.[265]  It is not appropriate for use in any project-level NEPA review for the following reasons:

> (1) EPA states that "no consensus exists on the appropriate [discount] rate to use for analyses spanning multiple generations"[266] and consequently, significant variation in output can result;[267]

> (2) the tool does not measure the actual incremental impacts of a project on the environment; and

> (3) there are no established criteria identifying the monetized values that are to be considered significant for NEPA reviews.

73.     Sierra Club claims that the Commission has never offered a rational explanation for why the Social Cost of Carbon tool is appropriate for other agencies, but not the Commission,[268] but we have explained that while the methodology may be useful for other agencies' rulemakings or comparing regulatory alternatives using cost-benefit analyses where the same discount rate is consistently applied, it is not appropriate for estimating a specific project's impacts or informing our analysis under NEPA.[269] Moreover, Executive Order 13783, Promoting Energy Independence and Economic Growth, has disbanded the Interagency Working Group on Social Cost of Greenhouse

---

[265] *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), (*Mountain Valley*), *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd, Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act. That is all that is required for NEPA purposes.").

[266] *See* Fact Sheet: *The Social Cost of Carbon* issued by EPA in November 2013, https://19january2017snapshot.epa.gov/climatechange/social-cost-carbon_.html.

[267] Depending on the selected discount rate, the tool can project widely different present-day costs to avoid future climate change impacts.

[268] Sierra Club Request for Rehearing and Stay at 28.

[269] *Mountain Valley*, 161 FERC ¶ 61,043 at P 296.

Docket No. CP16-116-001                                                    - 42 -

Gases and directed the withdrawal of all technical support documents and instructions regarding the methodology, stating that the documents are "no longer representative of governmental policy."[270]

74.    Sierra Club also asks that the Commission consider using "tools used by the [USGCRP]" to assess different emission scenarios and consequently the incremental impact of the GHG emissions at issue in these projects.[271]  Sierra Club itself acknowledges that such analysis of discrete physical impacts may be impossible,[272] but, in any event, such a vague request to use USGCRP tools without identifying a particular tool or further elaboration of the applicability or utility of such tools does not alert the Commission to what Sierra Club is asking us to reconsider on rehearing.[273]  Sierra Club cites to earlier comments, but it is unclear what climate model it would like the Commission to use and, again, such incorporation by reference is improper and therefore an alternative basis for dismissing its request.[274]

### 3.    Consideration of Greenhouse Gas Emissions

75.    Sierra Club argues that the Commission failed to consider greenhouse gas emissions as part of its public interest determination in violation of *Sierra Club v. FERC*.[275]  Sierra Club states that the Commission's failure to consider the significance of greenhouse gas emissions "preempts" its ability to assess whether the project is in the public interest.[276]

---

[270] Exec. Order No. 13,783, 82 Fed. Reg. 16,093 (2017).

[271] Sierra Club Request for Rehearing and Stay at 28.

[272] *Id.*

[273] The NGA requires that issues be specifically raised on rehearing.  15 U.S.C. § 717r(a).  We also note that Sierra Club omitted this request in its statement of issues in violation of Rule 713 of the Commission's Rules of Practices and Procedure.  18 C.F.R. § 385.713.

[274] *Supra* P 69 & n.248.

[275] 867 F.3d at 1373.

[276] Sierra Club Request for Rehearing and Stay at 29.

**JA415**

76.     Sierra Club is mistaken.  The Commission approved the Texas LNG Project under NGA section 3 based on the record, which includes the GHG emissions analysis.[277]  The Final EIS discusses the GHG emissions from construction and operation of the project,[278] the climate change impacts in the region,[279] and the regulatory structure for GHGs under the CAA.[280]  Although the Commission is unable to ascribe significance to GHG emissions based on the lack of current science or standards, contrary to Sierra Club's claim, the Commission stated in the Authorization Order that it agreed with all the conclusions presented in the Final EIS and found that the project, if constructed and operated as described in the Final EIS, is an environmentally acceptable actions.[281]

## I.    **Mitigation Measures**

77.     Sierra Club argues that the Commission violated NEPA by issuing the Final EIS without all mitigation plans complete.[282]  Sierra Club asserts that the failure to develop these plans deprived the public of the opportunity to comment and claims that the EIS and Authorization Order provided no basis to determine that the pending mitigation plans would be feasible or effective.[283]

78.     The inclusion in the Authorization Order of environmental conditions that require Texas LNG to file mitigation plans does not violate NEPA.  NEPA "does not require a complete plan be actually formulated at the onset, but only that the proper procedures be followed for ensuring that the environmental consequences have been fairly evaluated."[284]  Here, Commission staff published a Final EIS that identified baseline conditions for all relevant resources.  Later-filed mitigation plans will not present new environmentally-significant information nor pose substantial changes to the proposed action that would otherwise require a supplemental EIS.  As we have explained, practicalities require the

---

[277] Authorization Order, 169 FERC ¶ 61,130 at PP 66-68; Final EIS at 4-163 to 4-164, 4-169 to 4-172, 4-177, 4-180 to 4-184, 4-270, 4-280, 4-337, 4-342 to 4-344, 5-373.

[278] Final EIS at 4-172, 4-177, 4-180 to 4-184.

[279] *Id.* at 4-270, 4-280, 4-337.

[280] *Id.* at 4-342 to 4-344.

[281] Authorization Order, 169 FERC ¶ 61,130 at P 86.

[282] Sierra Club Request for Rehearing and Stay at 19-20.

[283] *Id.*

[284] *Robertson*, 490 U.S. 352.

issuance of orders before completion of certain reports and studies because large projects, such as this, take considerable time and effort to develop.[285]  Accordingly, post-authorization studies may properly be used to develop site-specific mitigation measures.[286]  It was not unreasonable for the Final EIS to deal with sensitive locations in a general way, leaving specificities of certain resources for later exploration during construction.[287]  What is important is that the agency make adequate provisions to assure that the applicant will undertake and identify appropriate mitigation measures to address impacts that are identified during construction.[288]  The Commission has and will continue to demonstrate our commitment to assuring adequate mitigation.[289]

79.     Sierra Club also argues that emergency response mitigation is inadequate, stating that it is unclear if Texas LNG has begun coordinating evacuation procedures with local emergency planning groups, fire departments, and local law enforcement as part of the Emergency Response Plan (ERP), as required by the Authorization Order.[290]  Sierra Club argues that if the City of South Padre Island has a serious concern with the plan or a related Cost-Sharing Plan, it is unclear how the City could act on these concerns or how the project could proceed if the City's concerns are not resolved.[291]

80.     As discussed, for purposes of NEPA, our authorization can be conditioned on the development of mitigation plans.[292]  Accordingly, Sierra Club's concerns are compliance

---

[285] *See, e.g.*, *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 94 (2016); *East Tenn. Natural Gas Co*., 102 FERC ¶ 61,225 at P 23, *aff'd sub nom. Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323 (2004).

[286] Under NGA section 3(e)(3)(A), the Commission may issue an order approving an import or export application "in whole or part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate."  15 U.S.C. § 717b(e)(3)(A).

[287] *Mojave Pipeline Co.*, 45 FERC ¶ 63,005, at 65,018 (1988).

[288] *Id*.

[289] *Id*.

[290] Sierra Club Request for Rehearing and Stay at 20.

[291] *Id.*

[292] *Robertson*, 490 U.S. at 352.

related.  Under the conditions in the Authorization Order, initial site preparation will not begin before we approve the plans, and the plans must be updated on a regular basis.[293]

81.    We disagree with Sierra Club's assertion that the Commission erred in granting Texas LNG NGA section 3 authority before the Commission completed Endangered Species Act (ESA) consultation with the Fish and Wildlife Service.[294]  Conditional authorization of a project does not prevent the Commission and Fish and Wildlife Service from completing formal consultation under the ESA.  Under ESA section 7(a)(2), a federal agency must ensure, in consultation with the Secretary of the Interior or Commerce, as appropriate, that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species.[295]  When a federal agency determines that a proposed action may affect a threatened or endangered species, it must consult with Fish and Wildlife Service or the National Marine Fisheries Service and obtain a biological opinion on whether the action is likely to result in a violation of the ESA.[296]  While consultation is pending, the agency and the applicant must not make any "irreversible or irretrievable commitment of resources" which would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures" to avoid jeopardy and the adverse modification of habitat.[297]

82.    The Commission may issue an order prior to completion of formal consultation under the ESA where it is not possible to complete consultation—for example, where species surveys cannot be completed until lands are obtained through eminent domain— prior to order issuance.[298]  If the completion of formal consultation results in a biological opinion finding of jeopardy or adverse modification of critical habitat, the project cannot go forward unless mutually agreeable modifications are adopted.  In this way, the Commission has ensured that no irreversible or irretrievable commitment of resources forecloses reasonable and prudent alternative measures.  Once the applicable environmental conditions have been met, the Commission would issue a "Notice to

---

[293] Authorization Order, 169 FERC ¶ 61,130 at Environmental Conditions 36-37.

[294] Sierra Club Request for Rehearing and Stay at 20.

[295] 16 U.S.C. § 1536(a)(2) (2018).  The Secretaries of Interior and Commerce have delegated their consultation responsibilities to the Directors of Fish and Wildlife Service and the National Marine Fisheries Service, respectively.

[296] *Id.*

[297] *Id.* § 1536(d).

[298] *See e.g.*, *Bradwood Landing LLC*, 126 FERC ¶ 61,035, at PP 43-44 (2009).

Proceed" with construction.  Consequently, we believe that the environmental conditions required for the project, including Environmental Conditions 9 and 18, ensure compliance with all applicable federal laws and regulations.[299]

## J.    Public Interest Determination

83.    Sierra Club argues that the Authorization Order fails to provide a reasoned explanation for why the project is in the public interest under the NGA, when the project will have significant adverse impacts on the environment.[300]  As discussed, the Commission determined that the NGA section 3 project was not inconsistent with the public interest and based on all information in the record, including information presented in the Final EIS.  Although the Final EIS identified some adverse environmental impacts, the Commission found that the project, if constructed and operated as described in the Final EIS with required conditions, is an environmentally acceptable action and, consequently, based on all the other factors discussed in the Authorization Order, the Texas LNG Project is not inconsistent with the public interest.[301]  We affirm that decision with the revised discussion of impacts on environmental justice communities.

The Commission orders:

(A)    Sierra Club's request for rehearing is hereby denied, as discussed in the body of this order.

(B)    Sierra Club's request for stay is hereby dismissed as moot, as discussed in the body of this order.

(C)    Shrimpers and Fisherman of the RGV's request for rehearing is rejected, as discussed in the body of this order.

(D)    Texas LNG's motion to strike is denied, as discussed in the body of this order.

(E)    Sierra Club's answer to Texas LNG's motion to strike is dismissed, as discussed in the body of this order.

---

[299] Authorization Order, 169 FERC ¶ 61,130 at Environmental Conditions 9 & 18.

[300] Sierra Club Request for Rehearing and Stay at 30-31.

[301] Authorization Order, 169 FERC ¶ 61,130 at P 86.

**JA419**

Document Accession #: 20200221-3023    Filed Date: 02/21/2020
Docket No. CP16-116-001                                                - 47 -

    (F)    Texas LNG's answer to Sierra Club's request for rehearing is rejected, as discussed in the body of this order.

By the Commission.  Commissioner Glick is dissenting with a separate statement attached.
                    Commissioner McNamee is concurring with a separate statement attached.

( S E A L )


                        Nathaniel J. Davis, Sr.,
                          Deputy Secretary.

**JA420**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.     CP16-116-001

(Issued February 21, 2020)

GLICK, Commissioner, *dissenting*:

1.     I dissent from today's order because it violates both the Natural Gas Act[1] (NGA) and the National Environmental Policy Act[2] (NEPA). Rather than wrestling with the Project's adverse impacts to the environment and the surrounding community, today's order makes clear that the Commission will not allow these impacts to get in the way of its outcome-oriented desire to approve the Project.

2.     As an initial matter, the Commission continues to treat climate change differently than all other environmental impacts. The Commission steadfastly refuses to assess whether the impact of the Project's greenhouse gas (GHG) emissions on climate change is significant, even though it purports to quantify those GHG emissions.[3] Claiming that the Project is "environmentally acceptable" while simultaneously refusing to assess its impact on the most important environmental issue of our time is arbitrary and capricious and not the product of reasoned decisionmaking.[4]

3.     In addition, I am also deeply troubled by the environmental justice implications of today's order. All three of the Brownsville LNG facilities[5] are located in Cameron County, Texas—a region of the country where roughly one third of the population is

---

[1] 15 U.S.C. §§ 717b, 717f (2018).

[2] National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*

[3] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130, at P 67 (2019) (Certificate Order); Environmental Impact Statement at Tables 4.11.1-4 – 4.11.1-6, 4.11.1-8 – 4.11.1-9, 4.11.1-11 (EIS).

[4] *Texas LNG Brownsville LLC*, 170 FERC 61,139, at PP 76, 83 (2020) (Rehearing Order).

[5] In addition to the Texas LNG Brownsville facility, the Commission also simultaneously approved the Rio Grande LNG facility, *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), and the Annova LNG facility, *Annova LNG LLC*, 169 FERC ¶ 61,132 (2019). I will refer to these collectively as the Brownsville LNG facilities.

below the poverty line and the vast majority is made up of minority groups.[6]  I fully appreciate that the jobs and economic stimulus that a facility like the Project can provide may be especially important in a community facing economic challenges.  But we cannot lose sight of the cumulative environmental toll that new industrial development can take on communities such as Cameron County.  Far from seriously considering those impacts, today's order shrugs them off, reasoning that they are all but inevitable and that, because they fall almost entirely on low-income or minority communities, they do not fall disproportionately on those communities.  That conclusion is both unreasoned and an abdication of our responsibility to the public interest.

4.      Finally, I am concerned about the Commission's cursory analysis and consideration of the Project's impacts on local air quality and endangered species as well as how to mitigate those impacts.  Collectively, the Brownsville LNG facilities will have significant adverse consequences on the surrounding region that, in my view, demand a more thorough analysis under both NEPA and the NGA than they have received from the Commission.

## I.      The Commission's Public Interest Determination Are Not the Product of Reasoned Decisionmaking

5.      The NGA's regulation of LNG import and export facilities "implicate[s] a tangled web of regulatory processes" split between the U.S. Department of Energy (DOE) and the Commission.[7]  The NGA establishes a general presumption favoring the import and export of LNG unless there is an affirmative finding that the import or export "will not be consistent with the public interest."[8]  Section 3 of the NGA provides for two independent

---

[6] Rehearing Order, 170 FERC 61,139 at P 40 ("The Final EIS concluded that within the five census block groups intersected by a two-mile radius around the Texas LNG terminal site, in four the Hispanic or Latino population comprises 74 to 95 percent of the total population and in all five the population with incomes below the poverty level ranges from about 22 to 41 percent."); *see also id.* (explaining that in Cameron County, Texas "the Hispanic or Latino population comprises 88 percent of the population and the poverty rate is about 35 percent." (footnotes omitted)).

[7] *Sierra Club v. FERC*, 827 F.3d 36, 40 (D.C. Cir. 2016) (*Freeport*).

[8] 15 U.S.C. § 717b(a); *see EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016) (citing *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982) ("NGA [section] 3, unlike [section] 7, 'sets out a general presumption favoring such authorization.'")).  Under section 7 of the NGA, the Commission approves a proposed pipeline if it is shown to be consistent with the public interest, while under section 3, the Commission approves a proposed LNG import or export facility unless it is shown to be inconsistent with the public interest.  *Compare* 15 U.S.C. § 717b(a) *with*

**JA422**

public interest determinations: One regarding the import or export of LNG itself and one regarding the facilities used for that import or export. DOE determines whether the import or export of LNG is consistent with the public interest, with transactions among free trade countries legislatively deemed "consistent."[9] Separately the Commission evaluates whether "an application for the siting, construction, expansion, or operation of an LNG terminal" is itself consistent with the public interest.[10] Pursuant to that authority, the Commission must approve a proposed LNG facility unless the record shows that the facility would be inconsistent with the public interest.[11] Today's order fails to satisfy that standard in multiple respects.

### A. The Commission's Public Interest Determination Does Not Adequately Consider Climate Change

6.     As part of its public interest determination, the Commission examines a proposed facility's impact on the environment and public safety, among other things. A facility's impact on climate change is one of the environmental impacts that must be part of a public interest determination under the NGA.[12] Nevertheless, the Commission maintains

---

15 U.S.C. § 717f(a), (e).

[9] 15 U.S.C. § 717b(c). The courts have explained that, because the authority to authorize the LNG exports rests with DOE, NEPA does not require the Commission to consider the upstream or downstream GHG emissions that may be indirect effects of the export itself when determining whether the related LNG export facility satisfies section 3 of the NGA. *See Freeport*, 827 F.3d at 46-47; *see also Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (*Sabal Trail*) (discussing *Freeport*). Nevertheless, NEPA requires that the Commission consider the direct GHG emissions associated with a proposed LNG export facility. *See Freeport*, 827 F.3d at 41, 46.

[10] 15 U.S.C. § 717b(e). In 1977, Congress transferred the regulatory functions of NGA section 3 to DOE. DOE, however, subsequently delegated to the Commission authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal, while retaining the authority to determine whether the import or export of LNG to non-free trade countries is in the public interest. *See EarthReports*, 828 F.3d at 952-53.

[11] *See Freeport*, 827 F.3d at 40-41.

[12] *See Sabal Trail*, 867 F.3d at 1373 (explaining that the Commission must consider a pipeline's direct and indirect GHG emissions because the Commission may "deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); *see also Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391

**JA423**

that it need not consider whether the Project's contribution to climate change is significant in this order because it lacks a means to do so—or at least so it claims.[13] However, the most troubling part of the Commission's rationale is what comes next. Based on this alleged inability to assess the significance of the Project's impact on climate change, the Commission concludes that the Project's environmental impacts would be "environmentally acceptable" and generally reduced to "less than significant levels."[14] Think about that. The Commission is saying out of one side of its mouth that it cannot assess the significance of the Project's impact on climate change[15] while, out of the other side of its mouth, assuring us that its impacts are "environmentally acceptable."[16] That is ludicrous, unreasoned, and an abdication of our responsibility to give climate change the "hard look" that the law demands.[17]

---

(1959) (holding that the NGA requires the Commission to consider "all factors bearing on the public interest").

[13] Rehearing Order, 170 FERC 61,139 at PP 70-71; Certificate Order, 169 FERC ¶ 61,130 at P 68; EIS at 4-344.

[14] Certificate Order, 169 FERC ¶ 61,130 at P 25; EIS at ES-16; *see also* Rehearing Order, 170 FERC 61,139 at P 76

[15] Rehearing Order, 170 FERC 61,139 at P 71; Certificate Order, 169 FERC ¶ 61,130 at P 68; EIS 4-344 ("[W]e are unable to determine the significance of the Project's contribution to climate change.").

[16] Rehearing Order, 170 FERC 61,139 at P 76; Certificate Order, 169 FERC ¶ 61,130 at P 53; *id.* at P 25 (stating that, with few exceptions and not considering cumulative impacts, the Project's impacts would be "reduced to less than-significant levels").

[17] *See, e.g.*, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (explaining that agencies cannot overlook a single environmental consequence if it is even "arguably significant"); *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (internal quotation marks omitted)); *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency").

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

7.      It also means that the Project's impact on climate change does not play a meaningful role in the Commission's public interest determination, no matter how often the Commission assures us that it does.  Using the approach in today's order, the Commission will always be able to conclude that a project will not have a significant environmental impact irrespective of that project's actual GHG emissions or those emissions' impact on climate change.  If the Commission's conclusion will not change no matter how many GHG emissions a project causes, those emissions cannot, as a logical matter, play a meaningful role in the Commission's public interest determination.  A public interest determination that systematically excludes the most important environmental consideration of our time is contrary to law, arbitrary and capricious, and not the product of reasoned decisionmaking.

8.      The failure to meaningfully consider the Project's GHG emissions is all-the-more indefensible given the volume of GHG emissions at issue in this proceeding.  As noted, the Project will directly release over 600,000 metric tons of GHG emissions per year, plus an untold several million more that go undocumented in the Commission's environmental analysis.[18]  The Commission acknowledges that "GHGs emissions due to human activity are the primary cause of increased levels of all GHG since the industrial age,"[19] a result that the Commission has previously (although notably not in today's order and accompanying environmental analysis) acknowledged "may endanger the public health and welfare through climate change."[20]  In light of this undisputed relationship between anthropogenic GHG emissions and climate change, the Commission must carefully consider the Project's contribution to climate change when determining whether the Project is consistent with the public interest—a task that it entirely fails to accomplish in today's order.

## B.    The Commission's Consideration of the Project's Other Adverse Impacts Is Also Arbitrary and Capricious

9.      As I explained in my dissent from the underlying order, the Commission "cannot turn a blind eye to the incremental impact that increased pollution will have on

---

[18] *See infra* PP 17-20.  The Commission refuses to consider the GHG emissions caused by the Project's electricity consumption as direct effects even though it possesses models for calculating and quantifying those emissions, *see infra* P 18, and there is no dispute that those emissions represent the Project's principal contribution to climate change.

[19] EIS at 4-164.

[20] Environmental Impact Statement, Docket No. CP16-480-000, at 4-172 (Mar. 15, 2019).

**JA425**

Document Accession #: 20200221-3023    Filed Date: 02/21/2020
Docket No. CP16-116-001                                                                    - 6 -

economically disadvantaged communities."[21]  And, as I noted at the outset, although I "fully appreciate that the jobs and economic stimulus that a facility like the Project can provide may be especially important in a community facing economic challenges,"[22] a reasoned application of the public interest cannot recognize those benefits and at the same time fail to wrestle with the Project's adverse consequences for vulnerable communities.  Carefully considering those adverse impacts is important both because vulnerable communities often lack the means to retain high-priced counsel to vindicate their interests and because of the long history in which these communities have "frequently experience[d] a disproportionate toll from the development of new industrial facilities."[23]  Especially in a case such as this one, where the adverse impacts include the type of potentially serious impacts on human health that can have cascading consequences in economically disadvantaged areas, the failure to seriously wrestle with those adverse effects is both profoundly unfair and inimical to the public interest.

10.    Nevertheless, the Commission barely bats an eye at the impacts its actions will have on environmental justice[24] communities.  Instead, it dismisses environmental justice concerns because, get this, all the surrounding communities are either low-income or minority communities and so environmental justice communities are not disproportionately affected relative to other communities affected by the Project.[25]  In other words, the Commission concludes that because the Project basically affects only

---

[21] Certificate Order, 169 FERC ¶ 61,130 (Glick, Comm'r, dissenting at P 10).

[22] *Id.*

[23] *Id.*; *cf., e.g.*, *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 87 (2020) ("As Justice Douglas pointed out nearly fifty years ago, as often happens with interstate highways, the route selected was through the poor area of town, not through the area where the politically powerful people live." (internal quotation marks and alterations omitted)).

[24] "The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a disproportionately high and adverse impact on low-income and predominantly minority communities."  *Sabal Trail*, 867 F.3d at 1368 (internal quotation marks omitted).

[25] *See, e.g.*, Rehearing Order, 170 FERC 61,139 at P 45 ("Because here all project-affected populations are minority or low-income populations, or both, it is not possible that impacts will be disproportionately concentrated on minority and low-income populations versus on some other project-affected comparison group.").

**JA426**

low-income or minority populations, its effects do not fall disproportionately on those
communities.

11.     But that observation only highlights the environmental justice implications of the
Project.  Concerns about environmental justice are rooted in the fact that low-income and
minority populations often bear the brunt of the environmental and human health impacts
of new industrial development.[26]  The Commission's observation that functionally all the
areas adversely affected by the Project are home to those communities ought to be a
reason to take a harder look at the Project's environmental justice implications, not to
brush them off.[27]  Suggesting that environmental justice is relevant to the public interest
only when a fraction of a Project's adverse impacts fall on environmental justice
communities and not when substantively all of those impacts fall on those communities is
both arbitrary and capricious and, frankly, hard to fathom.[28]  After all, the upshot of the
Commission's approach is to signal to developers that they can side step environmental
justice concerns so long as they ensure that all, or substantially all, of a project's adverse
impacts fall on low-income or minority communities.

12.     The Commission responds to these concerns by stating that, based on Texas
LNG's definition of the Project's purpose, it can only be built in environmental justice
communities.[29]  That hardly helps the matter.  Following the Commission's reasoning, if
a project developer defines its project such that in can only be built in environmental
justice communities, then that will, for all intents and purposes, be the end of the
Commission's environmental justice analysis.  That is hardly a rational result for a line of
inquiry that is supposed to recognize and respond to the fact that vulnerable communities
have long born a disproportionate share of the impact from industrial development.  An

---

[26] *See* Certificate Order, 169 FERC ¶ 61,130 (Glick, Comm'r, dissenting at P 10);
*cf., e.g.*, *Friends of Buckingham*, 947 F.3d at 87 (noting the "'evidence that a
disproportionate number of environmental hazards, polluting facilities, and other
unwanted land uses are located in communities of color and low-income communities'"
(quoting *Nicky Sheats, Achieving Emissions Reductions for Environmental Justice
Communities Through Climate Change Mitigation Policy*, 41 Wm. & Mary Envtl. L. &
Pol'y Rev. 377, 382 (2017))).

[27] Certificate Order, 169 FERC ¶ 61,130 (Glick, Comm'r, dissenting at P 10).

[28] Note that I am not arguing that the EIS was somehow inherently deficient, *cf.
Sabal Trail*, 867 F.3d at 1368-71, but instead that it is arbitrary and capricious to dismiss
environmental justice concerns under the Commission's public interest analysis on the
basis that the Project will adversely affect only environmental justice communities.

[29] Rehearing Order, 170 FERC 61,139 at P 41.

**JA427**

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

analytical framework that permits the Commission to write environmental justice out of the analyses in which it would seem to be most relevant is arbitrary and capricious.

13.     So far as I can tell, the Commission's perspective is that a project located in an overwhelmingly poor or minority community raises environmental justice concerns only if the individuals in that community have some sort of predisposition or susceptibility to the project's adverse impacts.[30]  For example, in its rehearing order regarding the Rio Grande LNG facility, the Commission recognized the potential for the cumulative effects of the Project and other sources in the region to contribute to a violation of the 8-hour National Ambient Air Quality Standards (NAAQS) for Ozone.[31]  Ozone is linked to a number of serious health problems, such as asthma and respiratory disease, including chronic obstructive pulmonary disorder (COPD).[32]  Nevertheless, after reciting a string of general statistics about the incidence of asthma and respiratory disease among different racial and age groups in Texas, the Commission concludes that those numbers do not indicate that "the anticipated exposure to ozone in minority and low-income communities [around the Project] would result in a disproportionately high and adverse impact on these communities."[33]

14.     The implication appears to be that, because Hispanic and Latino populations are not more susceptible than the general population to asthma or respiratory disease, exposing the predominately Hispanic and Latino population surrounding the project to ozone levels that the U.S. Environmental Protection Agency (EPA) has deemed unsafe will not disproportionately affect those individuals in comparison to those of other ethnic groups.

15.     That is nonsense.  The fact that Hispanic or Latino populations within Texas as a whole are relatively less likely to suffer from asthma or to die from respiratory disease than other racial groups[34] tells us nothing about the actual impacts that the elevated ozone

---

[30] Rehearing Order, 170 FERC 61,139 at P 45.

[31] *Id.* at P 50.  This includes the other Brownsville LNG facilities—although principally the Rio Grande facility, which would be powered by onsite gas turbines—and the ships that would serve the three facilities.

[32] *See* Rehearing Order, 170 FERC 61,139 at P 52 (discussing health effects ozone exposure); *see generally* National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (2015) (rule establishing current 8-hour ozone NAAQS).

[33] Rehearing Order, 170 FERC 61,139 at P 53.

[34] *Id.*

**JA428**

levels caused by the Project will have on minority and low-income groups in the affected areas. For example, assume for the sake of argument that the ozone exposure caused by the Project doubles the incidence of COPD in the affected communities. The population-wide incidence of respiratory disease does nothing to help us assess whether and how this Project will disproportionately affect the environmental justice communities in the surrounding area or what that means for the public interest.[35] The bottom line is that environmental justice considerations must play an important role in our public interest analysis, especially when the impacts on poor and minority communities are as significant and concentrated as they are here. Instead, the Commission basically shrugs its shoulders, concludes that the impacts on environmental justice communities are inevitable, and moves on. That simply is not a serious consideration of the Project's environmental justice implications.

16.     In addition, the cumulative effects of the Brownsville LNG facilities will have a significant adverse impact on endangered species, including the ocelot, the jaguarundi, and the aplomado falcon.[36] Although the Commission reported those impacts in its EIS[37] and mentioned them in the original order,[38] it is far from clear whether and how they factor into the Commission's public interest analysis.[39] Given the extent of those adverse impacts—which appear to be more extensive than those caused by other energy infrastructure projects that the Commission has approved under NGA section 3 and section 7 in recent years[40]—we ought to do more than simply recite the potential harm

---

[35] For example, although asthma can aggravate the effects of ozone exposure, ozone can have serious health effects in non-asthmatics and can lead to other conditions, including COPD. *See* U.S. Envtl. Prot. Agency, *Health Effects of Ozone Pollution*, https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution (last visited Feb. 20, 2020).

[36] EIS at 4-317 (ocelot and jaguarundi); *id.* at 4-318 (aplomado falcon)..

[37] *See supra* note 36.

[38] Certificate Order, 169 FERC ¶ 61,130 at PP 49, 75, 77.

[39] Rehearing Order, 170 FERC 61,139 at P 83 (summarily stating that the Commission finds the Project not inconsistent with the public interest).

[40] For example, the Commission's EIS states that "even incremental habitat loss could be significant" for the ocelot, of which there are only a few dozen remaining in the United States. EIS at App. C-131; *see also id.* at 4-315.

and then proceed, post haste, to make a public interest determination without further discussion.

## II.     The Commission Fails to Satisfy Its Obligations under NEPA

17.     The Commission's NEPA analysis is similarly flawed.  As an initial matter, to seriously evaluate the environmental consequences of the Project under NEPA, the Commission must consider the harm caused by its GHG emissions and "evaluate the 'incremental impact' that those emissions will have on climate change or the environment more generally."[41]  As noted, the Commissions states that the operation of the Project will directly emit more than 600,000 metric tons of GHGs annually.[42]  But that drastically understates the actual GHG emissions attributable to the Project.  Unlike many of the LNG facilities that the Commission has approved last year, the Project is powered with electricity from the grid rather than onsite natural gas turbines.[43]  Apparently on that basis, the Commission omits the resulting GHG emissions from its environmental analysis.

18.     But the GHG emissions caused by the Project's substantial electricity consumption are reasonably foreseeable effects of the Project.  The Project will connect to the grid via a new transmission line that will extend from the Project to American Electric Power's Union Carbide substation.[44]  That known point of interconnection makes it possible for the Commission to estimate the incremental generation likely to be dispatched to serve the Project—and the resulting GHG emissions—using one of many well-accepted models, such as the Environmental Protection Agency's eGrid database or Avoided Emissions and Generation Tool (AVERT).  Deploying one or both of those models would have been precisely the sort of "'reasonable forecasting'" aided by "'educated assumptions'" that NEPA requires.[45]

---

[41] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 51 (D.D.C. 2019) (explaining that the agency was required to "provide the information necessary for the public and agency decisionmakers to understand the degree to which [its] decisions at issue would contribute" to the "impacts of climate change in the state, the region, and across the country").

[42] Certificate Order, 169 FERC ¶ 61,130 at P 67; EIS at Table 4.11.11.

[43] EIS at 1-17 – 1-18, 4-182

[44] *Id.* at 1-17.

[45] *Sabal Trail*, 867 F.3d at 1374 (quoting *Del. Riverkeeper Network v. FERC*, 753

**JA430**

19.     But don't just take my word for it. Consider the fact that the Commission used and relied on both of those models in similar contexts, including to calculate the air emissions in a separate order issued the same day as Texas LNG that approves another LNG export facility that is less than 2 miles away from the Project.[46] In that order, the Commission relied on both eGrid and AVERT to calculate the "indirect emissions," including GHG emissions, caused by the Annova LNG facility's electricity consumption when assessing the reasonable alternatives to that proposed project. I see no reason why the Commission cannot use the same models to develop a reasonable estimate—which, again, is exactly what NEPA requires—of the GHG emissions caused by the Project.The Commission's failure to consider these reasonably foreseeable GHG emissions is especially unreasonable given the other sources of GHG emissions that it did consider in the EIS. For example, the EIS reports the GHG emissions resulting from mobile sources associated with the Project.[47] Indeed, it goes so far as to estimate the GHG emissions that will result from different forms of mobile sources used to serve the facility (e.g., boats and commuter traffic).[48] I fail to see how the Commission can reasonably refuse to use well-established models—ones that it is perfectly comfortable relying on in a similar context—to quantify and consider the GHG emissions from electricity consumption, but then confidently ascribe and consider estimated GHG emissions levels for different types of boats.

20.     In any case, although quantifying the Project's GHG emissions is a necessary step toward meeting the Commission's NEPA obligations, listing the volume of emissions alone is insufficient.[49] Identifying the potential consequences that those emissions will

---

F.3d 1304, 1310 (D.C. Cir. 2014)).

[46] Annova LNG Brownsville Project Environmental Impact Statement, Docket No. CP16-480-000, at 3-20 (Apr 19, 2019); EA at 4-104 (stating that the Annova LNG facility is 1.7 miles away from the Project site).

[47] EIS at Tables 4.11.1-8 – 4.11.19.

[48] *Id.* at Table 4.11.1-9.

[49] *See Ctr. for Biological Diversity*, 538 F.3d at 1216 ("While the [environmental document] quantifies the expected amount of $CO_2$ emitted . . . , it does not evaluate the 'incremental impact' that these emissions will have on climate change or on the environment more generally . . . ."); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is a necessary component . . . , but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres.").

**JA431**

have for climate change is essential if NEPA is to play the disclosure and good government roles for which it was designed.  The Supreme Court has explained that NEPA's purpose is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and to "guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[50]  It is hard to see how hiding the ball by refusing to assess the significance of the Project's climate impacts is consistent with either of those purposes.

21.     In addition, under NEPA, a finding of significance informs the Commission's inquiry into potential ways of mitigating environmental impacts.[51]  An environmental review document must "contain a detailed discussion of possible mitigation measures" to address adverse environmental impacts.[52]  "Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects" of a project, meaning that an examination of possible mitigation measures is necessary to ensure that the agency has taken a "hard look" at the environmental consequences of the action at issue.[53]

22.     The Commission responds that it need not determine whether the Project's contribution to climate change is significant because "[t]here is no universally accepted methodology" for assessing the harms caused by the Project's contribution to climate change.[54]  But the lack of a single consensus methodology does not prevent the

---

[50] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (citing *Robertson v. Methow Valley Citizens Coun.*, 490 U.S. 332, 349 (1989)).

[51] 40 C.F.R. § 1502.16 (2018) (NEPA requires an implementing agency to form a "scientific and analytic basis for the comparisons" of the environmental consequences of its action in its environmental review, which "shall include discussions of . . . [d]irect effects and their significance.").

[52] *Robertson*, 490 U.S. at 351.

[53] *Id.* at 352.

[54] EIS at 4-344 (stating "there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to Project's incremental contribution to GHGs" and "[w]ithout either the ability to determine discrete resource impacts or an established target to compare GHG emissions against, we are unable to determine the significance of the Project's contribution to climate change"); *see* Certificate Order, 169 FERC ¶ 61,130 at P 68 ("The Commission has also previously concluded it could not determine whether a project's contribution to climate change

**JA432**

Document Accession #: 20200221-3023      Filed Date: 02/21/2020

Commission from adopting *a* methodology, even if it is not universally accepted.  The Commission could, for example, select one methodology to inform its reasoning while also disclosing its potential limitations or the Commission could employ multiple methodologies to identify a range of potential impacts on climate change.  In refusing to assess a project's climate impacts without a perfect model for doing so, the Commission sets a standard for its climate analysis that is higher than it requires for any other environmental impact.

23.     In any case, the Commission has several tools to assess the harm from the Project's contribution to climate change.  For example, by measuring the long-term damage done by a ton of carbon dioxide, the Social Cost of Carbon links GHG emissions to the harm caused by climate change, thereby facilitating the necessary "hard look" at the Project's environmental impacts that NEPA requires.  Especially when it comes to a global problem like climate change, a measure for translating a single project's climate change impacts into concrete and comprehensible terms plays a useful role in the NEPA process by putting the harm in terms that are readily accessible for both agency decisionmakers and the public at large.  Yet, the Commission continues to ignore the Social Cost of Carbon, relying instead on deeply flawed reasoning that I have previously critiqued at length.[55]

24.     Furthermore, even without a formal tool or methodology, the Commission can consider all factors and determine, quantitatively or qualitatively, whether the Project's GHG emissions will have a significant impact on climate change.  After all, that is precisely what the Commission does in other aspects of its environmental review, where the Commission makes several significance determinations without the explicit tools it claims it needs to assess the significance of the Project's impact on climate change.[56]  The Commission's refusal to similarly analyze the Project's impact on climate change is arbitrary and capricious.

---

would be significant."); *see also* Rehearing Order, 170 FERC 61,139 at P 71 (stating that the Commission cannot evaluate significance without "targets or budgets with which to compare project emissions").

[55] *See, e.g.*, *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099 (2018) (Glick, Comm'r, dissenting).

[56] *See, e.g.*, EIS at 4-14, 4-22, 4-23, 4-36 – 4-37, 4-44, 4-50, 4-55, 45-8, 4-72 (concluding there will be no significant impact on groundwater recharge, turbidity, surface water quality due to hydrostatic testing, wetlands, vegetation, wildlife, migratory bird populations, pollinator habitat, and aquatic resources due to cooling water intake, among other things).

25.    And even if the Commission were to determine that the Project's GHG emissions are significant, that is not the end of the analysis.  Instead, as noted above, the Commission could blunt those impacts through mitigation—as the Commission often does with regard to other environmental impacts.  The Supreme Court has held that an environmental review must "contain a detailed discussion of possible mitigation measures" to address adverse environmental impacts.[57]  As noted above, "[w]ithout such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects."[58]  Consistent with this obligation, the EIS discusses mitigation measures to ensure that the Project's adverse environmental impacts (other than its GHG emissions) are reduced to less-than-significant levels.[59]  And throughout today's order, the Commission uses its conditioning authority under the NGA[60] to implement these mitigation measures, which support its public interest finding.[61]  Once again, however, the Project's climate impacts are treated differently, as the Commission refuses to identify any potential climate mitigation measures or discuss how such measures might affect the magnitude of the Project's impact on climate change.

26.    The Commission's failure to consider the significance of the impact of the Project's GHG emissions and possible mitigation measures is even more mystifying because NEPA "does not dictate particular decisional outcomes."[62]  NEPA "'merely

---

[57] *Robertson*, 490 U.S. at 351.

[58] *Id.* at 351-52; *see also* 40 C.F.R. §§ 1508.20 (defining mitigation), 1508.25 (including in the scope of an environmental impact statement mitigation measures).

[59] *See, e.g.*, Certificate Order, 169 FERC ¶ 61,130 at P 69 (discussing mitigation required by the Commission to address reliability and safety impacts from the Project); *id.* P 44 (discussing mitigation measures required to address noise); *id.* PP 38-40 (discussing mitigation measures required to address impacts on vegetation).

[60] *E.g.*, *id.* at P 85 ("[T]he Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources . . . , including authority to impose any additional measures deemed necessary.").

[61] *See id.* (explaining that the environmental conditions ensure that the Project's environmental impacts are consistent with those anticipated by the environmental analyses, which found that the Project would not significantly affect the quality of the human environment).

[62] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir. 2015).

**JA434**

prohibits uninformed—rather than unwise—agency action.'"[63]  The Commission could find that a project contributes significantly to climate change, but that it is nevertheless in the public interest because its benefits outweigh its adverse impacts, including on climate change.[64]  Taking the matter seriously—and rigorously examining a project's impacts on climate change—does not necessarily prevent any of my colleagues from ultimately concluding that a project satisfies the relevant public interest standard.

27.     Finally, the Project's GHG emissions are not the only flawed aspect of the Commission's NEPA review.  As noted, the Commission's recent rehearing order regarding the Rio Grande LNG facility acknowledged for the first time that the cumulative effect of the three Brownsville LNG facilities along with the ships that serve them would cause a potential violation of the 8-hour Ozone NAAQS.[65]  Today's order, however, refers to that potential violation only in the context of its cursory environmental justice review.[66]  Even though the Annova LNG facility and the associated boat traffic will potentially contribute to a significant NAAQS violation—one that neither the EIS nor the underlying order considered—today's order is completely silent on the consequences that violation may have for human health as well as what the Commission could or should do about it.[67]  It should go without saying that the ignoring a potential NAAQS violation is arbitrary and capricious.

For these reasons, I respectfully dissent.

_____
Richard Glick
Commissioner

_____

[63] *Id.* (quoting *Robertson*, 490 U.S. at 351).

[64] That is, after all, exactly what today's order does with the finding that the Project may cause a violation of the ozone NAAQS, but is nevertheless consistent with the public interest.  *See infra* P 27.

[65] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 (2020) at PP 53, 55.

[66] *See* Rehearing Order, 170 FERC 61,139 at PP 49-53.

[67] I recognize that the Rio Grande LNG facility, with its onsite natural gas turbines, would likely account for a much larger share of the increase in ozone attributable to the Brownsville LNG facilities.  *See Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 52-53, 55.  But the fact that the Texas LNG Brownsville facility and the related ship traffic is unlikely to be the primary cause of an ozone NAAQS violation is no reason to ignore its role altogether.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket No.    CP16-116-001

(Issued February 21, 2020)

McNAMEE, Commissioner, *concurring*:

1.    Today's order denies Sierra Club's[1] rehearing request of the Commission's November 22, 2019 Order (2019 Order)[2] authorizing pursuant to section 3 of the Natural Gas Act (NGA) the siting, construction, and operation of Texas LNG Brownsville LLC's (Texas LNG) Texas LNG Project (Project).[3]

2.    Because the 2019 Order complies with the Commission's statutory responsibilities under the NGA and the National Environmental Policy Act (NEPA), I fully support today's order denying rehearing and affirming the 2019 Order.  The 2019 Order determines that the siting, construction, and operation of the Project is not inconsistent with the public interest.[4]  The 2019 Order also finds that the Project is an environmentally acceptable action.[5]  Further, consistent with the holding in *Sierra Club v. FERC* (*Sabal Trail*),[6] the 2019 Order and the Environmental Impact Statement (EIS) for the Project quantified and considered the direct and indirect greenhouse gases (GHGs) emitted during the construction and operation of the Project.[7]

---

[1] Sierra Club filed its rehearing request together with Texas RioGrande Legal Aid (on behalf of Shrimpers and Fisherman of the RGV and Vecinos para el Bienestar de la Comunidad Costera), Save RGV from LNG, Defenders of Wildlife, the City of South Padre Island, the City of Port Isabel, and the Town of Laguna Vista.

[2] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019) (2019 Order).

[3] 170 FERC ¶ 61,139 (2020) (2020 Rehearing Order).

[4] 2019 Order, 169 FERC ¶ 61,132 at P 21.

[5] *Id.* P 53.

[6] 867 F.3d 1357 (D.C. Cir. 2017).

[7] 2019 Order, 169 FERC ¶ 61,132 at P 67; Texas LNG Project Final EIS at Table 4.11.1-11.

**JA436**

3.     Although I fully support today's order denying rehearing, I write separately to address what I perceive to be a misinterpretation of the Commission's authority under the NGA and NEPA.  There have been contentions that the Commission violates the NGA and NEPA by not determining whether GHG emissions significantly affect the environment, and that the NGA authorizes the Commission to establish measures to mitigate project-related GHG emissions.  I disagree.

4.     I believe that the Commission can consider project-related emissions in its NGA section 3 public interest determination and is required to consider them in its NEPA analysis.  However, the Commission has no objective basis to determine whether GHG emissions will have a significant effect on climate change nor the authority to establish its own basis for making such a determination.  Further, the Commission does not have the authority to unilaterally establish measures to mitigate GHG emissions.  It is my intention that my discussion below will assist the Commission, the courts, and other parties in their arguments regarding the Commission's consideration of a project's effect on climate change.

## I.     **The Commission has no reliable objective standard for determining whether GHG emissions significantly affect the environment**

5.     Sierra Club argues that the Commission violates the NGA and NEPA by not determining the significance of GHG emissions that are effects of the Project.[8]  My colleague has made similar arguments.[9]  He has challenged the Commission's explanation that it cannot determine significance because there is no standard for determining the significance of GHG emissions.[10]  He has argued that the Commission can adopt the Social Cost of Carbon[11] to determine whether GHG emissions are significant or rely on its own expertise as it does for other environmental resources, such as wetlands, vegetation, wildlife, and migratory bird populations.[12]  He has suggested that the Commission does not make a finding of significance in order to find that a project is

---

[8] Sierra Club Request for Rehearing at 27-28.

[9] See paragraphs 2, 5, and 15-16 of Commissioner Glick's dissent of the 2019 Order.  *See* 2019 Order, 169 FERC ¶ 61,130 (Glick, Comm'r, dissenting) (2019 Order Dissent).

[10] 2019 Order Dissent P 17.

[11] *Id.* P 18.

[12] *Id.* P 19 n.46.

Docket No. CP16-116-001                                           - 3 -

not inconsistent with the public interest.[13]

6.      I disagree with these contentions.  The Social Cost of Carbon is not a suitable
method for determining whether GHG emissions that are caused by a proposed project
will have a significant effect on climate change and the Commission has no authority or
objective basis using its own expertise to make such a determination.

## A.      Social Cost of Carbon is not a suitable method to determine significance

7.      The Commission has found, and I agree, that the Social Cost of Carbon is not a
suitable method for the Commission to determine significance of GHG emissions.[14]
Because the courts have repeatedly upheld the Commission's reasoning,[15] I will not
restate the Commission's reasoning here.

8.      However, I will address the suggestion that the Social Cost of Carbon can translate
a project's impact on climate change into "concrete and comprehensible terms" that will
help inform agency decision-makers and the public at large.[16]  The Social Cost of
Carbon, described as an estimate of "the monetized damages associated with an
incremental increase in carbon emissions in a given year,"[17] may appear straightforward.

---

[13] *Id.* P 5.

[14] *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233, at P 48 (2018).

[15] *Appalachian Voices*, 2019 WL 847199, *2; *EarthReports, Inc. v. FERC*, 828
F.3d 949, 956 (D.C. Cir. 2016); *Sierra Club v. FERC*, 672 F. App'x 38, (D.C. Cir. 2016);
*see also Citizens for a Healthy Cmty. v. U.S. Bureau of Land Mgmt.*, 377 F. Supp. 3d
1223, 1239-41 (D. Colo. 2019) (upholding the agency's decision to not use the Social
Cost of Carbon); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77-79 (D.D.C.
2019) (upholding the agency's decision to not use the Social Cost of Carbon); *High
Country Conservation Advocates v. U.S. Forest Serv.*, 333 F. Supp. 3d 1107, 1132 (D.
Colo. 2018) ("[T]he *High Country* decision did not mandate that the Agencies apply the
social cost of carbon protocol in their decisions; the court merely found arbitrary the
Agencies' failure to do so without explanation.").

[16] 2019 Order Dissent P 18.

[17] Interagency Working Group on the Social Cost of Greenhouse Gases, *Technical
Support Document – Technical Update of the Social Cost of Carbon for Regulatory
impact Analysis – Under Executive Order 12866* at 1 (Aug. 2016), https://www.
epa.gov/sites/production/files/2016-12/documents/sc_co2_tsd_august_2016.pdf

**JA438**

On closer inspection, however, the Social Cost of Carbon and its calculated outputs are not so simple to interpret or evaluate.[18]  When the Social Cost of Carbon estimates that one metric ton of $CO_2$ costs \$12 (the 2020 cost for a discount rate of 5 percent),[19] agency decision-makers and the public have no objective basis or benchmark to determine whether that cost is significant.  Bare numbers standing alone simply *cannot* ascribe significance.

### B.      <u>The Commission has no authority or objective basis to establish its own framework</u>

9.      Some argue that the lack of externally established targets does not relieve the Commission from establishing a framework or targets on its own.  Some have suggested that the Commission can make up its own framework, citing the Commission's framework for determining return on equity (ROE) as an example.  However, they overlook the fact that Congress designated the EPA, not the Commission, with exclusive authority to determine the amount of emissions that are harmful to the environment.  In addition, there are no available resources or agency expertise upon which the Commission could reasonably base a framework or target.

10.     As I explain below, Congress enacted the Clean Air Act to establish an all-encompassing regulatory program, supervised by the U.S. Environmental Protection Agency (EPA) to deal comprehensively with interstate air pollution.  Section 111 of the Clean Air Act directs the Administrator of the EPA to identify stationary sources that "in his judgment cause[], or contribute[] significantly to, air pollution which may reasonably

---

(2016 Technical Support Document).

[18] In fact, the website for the Climate Framework for Uncertainty Negotiation and Distribution (FUND) – one of the three integrated assessment models that the Social Cost of Carbon uses – states "[m]odels are often quite useless in unexperienced hands, and sometimes misleading.  No one is smart enough to master in a short period what took someone else years to develop.  Not-understood models are irrelevant, half-understood models are treacherous, and mis-understood models dangerous."  FUND-Climate Framework for Uncertainty, Negotiation and Distribution, http://www.fund-model.org/ (LAST VISITED Nov. 18, 2019).

[19] *See* 2016 Technical Support Document at 4.  The Social Cost of Carbon produces wide-ranging dollar values based upon a chosen discount rate, and the assumptions made.  The Interagency Working Group on Social Cost of Greenhouse Gases estimated in 2016 that the Social Cost of one ton of carbon dioxide for the year 2020 ranged from \$12 to \$123.  *Id.*

**JA439**

be anticipated to endanger public health or welfare"[20] and to establish standards of performance for the identified stationary sources.[21]  Thus, the EPA has exclusive authority for determining whether emissions from pipeline facilities will have a significant effect on the environment and for establishing an emissions control regime.

11.     Further, the Commission is not positioned to unilaterally establish a standard for determining whether GHG emissions will significantly affect the environment when there is neither federal guidance nor an accepted scientific consensus on these matters.[22]  This inability to find an acceptable methodology is not for a lack of trying.  The Commission reviews the climate science, state and national targets, and climate models that could inform its decision-making.[23]

12.     Moreover, assessing the significance of project effects on climate change is unlike the Commission's determination of ROE.  Establishing ROE has been one of the core functions of the Commission since its inception under the FPA as the Federal Power Commission.[24]  And, setting ROE has been an activity of state public utility

---

[20] 42 U.S.C. § 7411(b)(1)(A) (2018).

[21] *Id.* § 7411(b)(1)(B).

[22] The Council on Environmental Quality's 2019 Draft Greenhouse Gas Guidance states, "[a]gencies need not undertake new research or analysis of potential climate effects and may rely on available information and relevant scientific literature."  CEQ, *Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions*, 84 Fed. Reg. 30,097, 30,098 (June 26, 2019); *see also* CEQ FINAL GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON CONSIDERATION OF GREENHOUSE GAS EMISSIONS AND THE EFFECTS OF CLIMATE CHANGE IN NATIONAL ENVIRONMENTAL POLICY ACT REVIEWS at 22  (Aug. 1, 2016) ("agencies need not undertake new research or analysis of potential climate change impacts in the proposed action area, but may instead summarize and incorporate by reference the relevant scientific literature"), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf.

[23] *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233, at P 36; *see also WildEarth Guardians*, 738 F.3d 298, 309 (D.C. Cir. 2013) ("Because current science does not allow for the specificity demanded by the Appellants, the BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS.").

[24] *Hope*, 320 U.S. 591 (1944); *FPC v. Nat. Gas Pipeline Co. of America*, 315 U.S. 575 (1942).

commissions, even before the creation of the Federal Power Commission.[25]  The Commission's methodology is also founded in established economic theory.[26]  In contrast, assessing the significance of GHG emissions is not one of the Commission's core missions and there is no suitable methodology for making such determination.

13.    It has been argued that the Commission can establish its own methodology for determining significance, pointing out that the Commission has determined the significance of wetlands, vegetation, wildlife, and migratory bird populations using its own expertise and without generally accepted significance criteria or a standard methodology.

14.    I disagree.  As an initial matter, it is important to note that when the Commission states it has no suitable methodology for determining the significance of GHG emissions, the Commission means that it has no objective basis for making such finding.  The Commission's findings regarding significance for wetlands, vegetation, wildlife, and migratory bird populations have an objective basis.  For example for general impacts to wetlands, the Commission determined the wetlands in the existing area by referencing Texas LNG's wetland delineations, which were conducted in accordance with the U.S. Army Corps of Engineers' ("Corps") *Wetland Delineation Manual* and the *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coast Plain Region*.[27]  The Commission determined the Project's effect on existing wetlands by determining the total acreage of wetlands permanently affected by the project, and the wetland avoidance and mitigation measures Texas LNG will implement.[28]  Based on this information, the Commission made a reasoned finding that the Project will not have a significant impact on wetlands.  Similarly, the Commission conducted an objective evaluation of impacts on vegetation, wildlife, and migratory bird populations.

15.    In contrast, the Commission has no reasoned basis to determine whether a project

---

[25] *See, e.g., Willcox v. Consol. Gas Co.*, 212 U.S. 19, 41 (1909) (finding New York State must provide "a fair return upon the reasonable value of the property at the time it is being used for the public.").

[26] *Inquiry Regarding the Commission's Policy for Determining Return on Equity*, 166 FERC ¶ 61,207 (2019) (describing the Commission's use of the Discounted Cash Flow model that was originally developed in the 1950s as a method for investors to estimate the value of securities).

[27] Texas LNG Project Final EIS at 4-30 to 4-31.

[28] *Id.* 4-31 to 4-37.

has a significant effect on climate change. To assess a project's effect on climate change, the Commission can only quantify the amount of project emissions. Unlike the total acreage of permanently impacts wetlands, that calculated number cannot inform the Commission on the specific physical climate change effects caused by the project, e.g., increase of sea level rise, effect on weather patterns, or effect on ocean acidification. Nor are there acceptable scientific models that the Commission may use to attribute every ton of GHG emissions to a physical climate change effect.

16.     Without adequate support or a reasoned target, the Commission cannot ascribe significance to particular amounts of GHG emissions. To do so would not only exceed our agency's authority, but would risk reversal upon judicial review. Courts require agencies to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made."[29]  Simply put, stating that an amount of GHG emissions appears significant without any objective support fails to meet the agency's obligations under the Administrative Procedure Act (APA).

## II.     The NGA does not contemplate the Commission establishing mitigation for GHG emissions from LNG Facilities

17.     There have also been contentions that the Commission should require the mitigation of GHG emissions related to the authorized facilities.[30]  I understand these suggestions as proposing a carbon emissions fee, offsets or tax (similar to the Corps' compensatory wetland mitigation program), technology requirements (such as scrubbers), or emission caps. Some argue that the Commission can require such mitigation under NGA section 3(e)(3)(A), which provides "the Commission may approve an application . . . in whole or in part, with such modifications and upon such terms and conditions the Commission find necessary or appropriate."[31]

---

[29] *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C Cir. 2006) (quoting *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1235-36 (9th Cir. 2001)); *see also American Rivers v. FERC*, 895 F.3d 32, 51 (D.C. Cir. 2018) (" . . . the Commission's NEPA analysis was woefully light on reliable data and reasoned analysis and heavy on unsubstantiated inferences and *non sequiturs*") (italics in original); *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("The EA provides no foundation for the inference that a valid comparison may be drawn between the sheep's reaction to hikers and their reaction to large, noisy ten-wheel ore trucks.").

[30] 2019 Order Dissent P 19.

[31] 15 U.S.C. § 717b(e)(3)(A) (2018).

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

18.     I disagree.  The Commission cannot interpret NGA section 3(e)(3)(A) to allow the Commission to unilaterally establish measures to mitigate GHG emissions because Congress, through the Clean Air Act, assigned the EPA and the States exclusive authority to establish such measures.  Congress designated the EPA as the expert agency "best suited to serve as primary regulator of greenhouse gas emissions,"[32] not the Commission.

19.     The Clean Air Act establishes an all-encompassing regulatory program, supervised by the EPA to deal comprehensively with interstate air pollution.[33]  Congress entrusted the Administrator of the EPA with significant discretion to determine appropriate emissions measures.  Congress delegated the Administrator the authority to determine whether pipelines and other stationary sources endanger public health and welfare; section 111 of the Clean Air Act directs the Administrator of the EPA "to publish (and from time to time thereafter shall revise) a list of categories of stationary sources.  He shall include a category of sources in such list if in *his judgment* it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare"[34] and to establish standards of performance for the identified stationary sources.[35]  The Clean Air Act requires the Administrator to conduct complex balancing when determining a standard of performance, taking into consideration what is technologically achievable and the cost to achieve that standard.[36]

20.     In addition, the Clean Air Act allows the Administrator to "distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards."[37]  The Act also permits the Administrator, with the consent of the Governor of the State in which the source is to be located, to waive its requirements "to encourage the use of an innovative technological system or systems of continuous emission reduction."[38]

21.     Congress also intended that states would have a role in establishing measures to

---

[32] *American Elec. Power Co., Inc. v. Conn.*, 564 U.S. 410, 428 (2011).

[33] *See id.* at 419.

[34] 42 U.S.C. § 7411(b)(1)(A) (2018) (emphasis added).

[35] *Id.* § 7411(b)(1)(B).

[36] *Id.* § 7411(a)(1).

[37] *Id.* § 7411(a)(2).

[38] *Id.* § 7411(j)(1)(A).

**JA443**

mitigate emissions from stationary sources.  Section 111(f) notes that "[b]efore promulgating any regulations . . . or listing any category of major stationary sources . . . the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies."[39]

22.    Thus, the text of the Clean Air Act demonstrates it is improbable that NGA section 3(e)(3)(A) allows the Commission to establish GHG emission standards or mitigation measures out of whole cloth.  To argue otherwise would defeat the significant discretion and complex balancing that the Clean Air Act entrusts in the EPA Administrator, and would eliminate the role of the States.

23.    Furthermore, to argue that the Commission may use its NGA conditioning authority to establish GHG emission mitigation—a field in which the Commission has no expertise—and address climate change—an issue that has been subject to profound debate across our nation for decades—is an extraordinary leap.  The Supreme Court's "major rules" canon advises that agency rules on issues that have vast economic and political significance must be treated "with a measure of skepticism" and require Congress to provide clear authorization.[40]  The Court has articulated this canon because Congress does not "hide elephants in mouseholes"[41] and "Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration."[42]

24.    Courts would undoubtedly treat with skepticism any attempt by the Commission

_____

[39] *Id.* § 7411(f)(3).

[40] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014); *Brown & Williamson,* 529 U.S. at 160 ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); *see also Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006) (finding regulation regarding issue of profound debate suspect).

[41] *Whitman v. American Trucking Ass.,* 531 U.S. 457, 468 (2001).

[42] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 12, 159 (quoting Justice Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986)); *see also* Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: PART I*, 65 STAN. L. REV. 901, 1004 (2013) ("Major policy questions, major economic questions, major political questions, preemption questions are all the same.  Drafters don't intend to leave them unresolved.")

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

to establish out of whole cloth measures to mitigate GHG emissions. Congress has introduced climate change bills since at least 1977,[43] over four decades ago. Over the last 15 years, Congress has introduced and failed to pass 70 legislative bills to reduce GHG emissions—29 of those were carbon emission fees or taxes.[44] For the Commission to suddenly declare such power resides in the long-extant NGA and that Congress's efforts were superfluous strains credibility. Requiring pipelines to pay a carbon emissions fee or tax, or to invest in GHG mitigation would be a major rule, and Congress has made no indication that the Commission has such authority.

25.    Some may make the argument that the Commission can require mitigation without establishing a standard. I disagree. Establishing mitigation measures requires determining how much mitigation is required – i.e., setting a limit, or establishing a standard, that quantifies the amount of GHG emissions that will adversely affect the environment. Some may also argue that the Commission has unilaterally established mitigation in other contexts, including wetlands, soil conservation, and noise. These examples, however, are distinguishable. Congress did not exclusively assign the authority to establish avoidance or restoration measures for mitigating effects on wetlands or soil to a specific agency. The Corps and the EPA developed a wetlands mitigation bank program pursuant to section 404 of the Clean Water Act.[45] Congress endorsed such mitigation.[46] As for noise, the Clean Air Act assigns the EPA Administrator authority over determining the level of noise that amounts to a public nuisance and requires federal agencies to consult with the EPA when its actions exceed the public nuisance standard.[47] The Commission complies with the Clean Air Act by

---

[43] National Climate Program Act, S. 1980, 95th Cong. (1977).

[44] CONGRESSIONAL RESEARCH SERVICE, MARKET-BASED GREENHOUSE GAS EMISSION REDUCTION LEGISLATION: 108TH THROUGH 116TH CONGRESSES at 3 (Oct. 23, 2019), https://fas.org/sgp/crs/misc/R45472.pdfhttps://fas.org/sgp/crs/misc/R45472.pdf. Likewise, the CEQ issued guidance on the consideration of GHG emissions in 2010, 2014, 2016, and 2019. None of those documents require, let alone recommend, that an agency establish a carbon emissions fee or tax.

[45] 33 U.S.C. § 1344 (2018).

[46] See Water Resources Development Act, Pub. L. 110-114, § 2036(c), 121 Stat. 1041, 1094 (2007); National Defense Authorization Act, Pub. L. 108-136, § 314, 117 Stat. 1392, 1430 (2004); Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 103 (b)(6)(M), 112 Stat. 107, 133 (1998); Water Resources Development Act of 1990, Pub. L. 101-640, § (a)(18)(C), 104 Stat. 4604, 4609 (1990).

[47] 42 U.S.C. § 7641(c) ("In any case where any Federal department or agency is

Document Accession #: 20200221-3023    Filed Date: 02/21/2020

Docket No. CP16-116-001                                                      - 11 -

requiring project noise levels in certain areas to not exceed 55 dBA Ldn, as required by EPA's guidelines.[48]

26.    Accordingly, there is no support that the Commission can use its NGA section 3 authority to establish measures to mitigate GHG emissions from LNG facilities.

### III.    Conclusion

27.    In sum, the Commission has no objective basis for determining whether GHG emissions are significant that would satisfy the Commission's APA obligations.  Nor does the Commission have the ability to establish measures to mitigate GHG emissions. Pursuant to the Clean Air Act, Congress exclusively assigned authority to regulate emissions to the EPA and the States.

28.    I recognize that some believe the Commission should do more to address climate change.  The Commission, an energy agency with a limited statutory authority, is not the appropriate authority to establish a new regulatory regime.

For these reasons, I respectfully concur.

_____
Bernard L. McNamee

---

carrying out or sponsoring any activity resulting in noise which the Administrator determines amounts to a public nuisance or is otherwise objectionable, such department or agency shall consult with the Administrator to determine possible means of abating such noise.").

[48] *See Williams Gas Pipelines Cent., Inc.*, 93 FERC ¶ 61,159, at 61,531-52 (2000).

**JA446**

Document Accession #: 20200221-3023     Filed Date: 02/21/2020

Document Content(s)

CP16 116 001.DOCX.......................................................1

<u>Enclosure</u>

Texas LNG Brownsville LLC
Texas LNG Project (Project)
Docket No. CP16-116-000

**ENVIRONMENTAL INFORMATION REQUEST**

<u>**Resource Report 5**</u>

1.  Provide an updated table (see format below) of racial, ethnic, and poverty statistics for block groups within 50 kilometers[1] of aboveground facilities.  The table should include the following information from the U.S. Census Bureau for each state, county, and block group (for low-income data, use U.S. Census American Community Survey File Number B17017 and for race and ethnicity data, use U.S. Census American Community Survey File Number B03002):

    a.  total population;
    b.  percentage of each racial and ethnic group (White Alone Not Hispanic, Black or African American, American Indian and Alaska Native, Asian, Native Hawaiian and Other Pacific Islander, some other race, two or more races, Hispanic or Latino origin [of any race]);
    c.  total minority population including individuals of Hispanic or Latino origin (percentage of total population); and
    d.  percentage of total population below poverty level.

---

[1] The final determination of the environmental justice radius of review may differ from this initial request.

-1-

**JA448**

| | RACE COLUMN | | | | | | | | | LOW-INCOME COLUMN |
|---|---|---|---|---|---|---|---|---|---|---|
| State/ County/ Tract/ Block Group | White (Not Hispanic) (%) | Black or African American (%) | Asian (%) | American Indian and Alaskan Native (%) | Native Hawaiian and Other Pacific Islander (%) | Some other race (%) | Two or more races (%) | Hispanic or Latino (%) | Total Minority[b] (%) | Total Persons Below Poverty Level[b] (%) |
| State of | | | | | | | | | | |
| Include Name of Project Component | | | | | | | | | | |
| County | | | | | | | | | | |
| Census Tract / Block Group | | | | | | | | | | |
| Include Name of Project Component | | | | | | | | | | |
| County | | | | | | | | | | |
| Census Tract/Block Group | | | | | | | | | | |

Table XX
Minority Populations by Race[a] and Low-Income Populations in the Project Area

Source: American Community Survey, 2015-2019, File # B01017 and File # B03002.
[a] "Minority" refers to people who reported their ethnicity and race as something other than non-Hispanic White.
[b] Minority or low-income populations exceeding the established thresholds are indicated in bold type and gray shading.
Due to rounding differences in the dataset, the totals may not reflect the sum of the addends.

## Resource Report 9

2.    Provide an update of Texas LNG's criteria pollutant ($NO_x$, CO, $SO_2$, $PM_{10}$, $PM_{2.5}$), volatile organic compound, speciated greenhouse gases (carbon dioxide, methane, and nitrous oxide), and speciated hazardous air pollutant emission rates (in tons per year) based on the most recent design of the Texas LNG Terminal.  Include emission quantification for all phases of the Project such as construction, commissioning, and operation as well as from stationary and mobile sources. Provide an estimate of commissioning emissions and clarify when the anticipated commissioning would occur.  If the anticipated schedule for commissioning overlaps with construction and/or operation, provide an estimate of the combined emissions (as identified above).  Provide tables with annual emissions totals during any overlapping phases of the Project.  Include supporting calculations, emission factors, fuel consumption rates, vehicle power ratings, utilization rates, and hours of operation.  Emission factors should be based on one of the following methodologies:  U.S. Environmental Protection Agency (EPA)-certified emission

JA449

standards, manufacturer data; current EPA AP-42 emission factors; or peer-reviewed studies for the equipment.

3.     Provide an updated refined air quality model for the Texas LNG Terminal that includes:

a.     a demonstration that emissions of criteria pollutants from the Texas LNG Terminal and mobile sources do not result in exceedance of the National Ambient Air Quality Standards (NAAQS), or state standards. Ensure that all emissions from the Texas LNG Terminal are reflected in the air quality model inputs and provide all source input parameters (emission rate, stack height, stack temperature, exit velocity, etc.), and justify the bases for any assumptions. Include mobile ship emissions (LNG carrier, tugs, escort vessels) for the air quality model for the moored safety zone. The model should include relevant regional monitoring ambient background data and existing and proposed regional industrial major sources within 50 kilometers of the fenceline of the Texas LNG Terminal (excluding the Rio Grande LNG Terminal [Docket No. CP16-454-000]).

b.     Include a model of secondarily formed ozone based on background concentrations of ozone and relevant nearby sources. The model should follow guidance provided by the EPA for Region 6, if available.

c.     Provide a table showing the highest predicted concentrations of all criteria pollutants outside the fenceline as well as the location of these highest concentrations relative to the Texas LNG Terminal. The table should include (1) the modeled concentration that is contributed by the Texas LNG Terminal, (2) the modeled background concentration (based on all emissions within 50 kilometers) at that location, and (3) the total concentration.

d.     Provide figures showing the concentration isopleths (i.e., concentration plumes), showing the full range of concentrations for all criteria pollutants including ozone for the highest impact scenario. Show the concentration isopleths starting from the Texas LNG Terminal and extending to 50 kilometers from the fenceline. There should be a separate figure for each criteria pollutant.

e.     Provide another set of figures as in (d) with an overlay of census block groups in the figures. Clearly label areas where there is a modeled exceedance of the NAAQS.

f.     Provide a table (or tables) showing the maximum modeled concentrations of each criteria pollutant within each census block group within 50 kilometers of the Texas LNG Terminal fenceline.

**JA450**



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

March 4, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426

Re:     **Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
        **Texas LNG Project**
        **Response to February 3, 2022 Environmental Information Request**

Dear Ms. Bose:

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to site, construct, and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission staff issued an Environmental Information Request to Texas LNG on February 3, 2022 to address issues noted in the U.S. Court of Appeals for the District of Columbia Circuit's August 3, 2021 decision in *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("February 3 Data Request"). The February 3 Data Request requested responses within 30 days or, if certain information could not be provided within that time frame, an indication of which items will be delayed and a projected filing date.

Texas LNG hereby submits the enclosed response to the Commission's February 3, 2022 Data Request. A complete response to Data Request 1 and a partial response to Data Request 2 are included in this response. Texas LNG anticipates providing a response to the remainder of Data Request 2 no later than April 29, 2022.

Any questions may be directed to the undersigned.

Respectfully submitted,

*/s/ A. Gregory Junge*

---

[1] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139, 61,962 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

JA451



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

April 29, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Re:    **Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
       **Texas LNG Project**
       **Supplemental Response to February 3, 2022, Environmental Information Request**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to site, construct, and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission staff issued an Environmental Information Request to Texas LNG on February 3, 2022 to address issues noted in the U.S. Court of Appeals for the District of Columbia Circuit's August 3, 2021 opinion in *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("February 3 Data Request").  On March 4, 2022, Texas LNG submitted a complete response to Data Request 1 and a partial response to Data Request 2 and explained that it anticipated providing a response to the remainder of the Commission's February 3, 2022 Data Request no later than April 29, 2022.

Texas LNG herein submits responses to the remainder of the Commission's February 3, 2022 Data Request.

As part of this response Texas LNG updated its Air Dispersion Modeling and Air Quality Impact Analysis.  Due to the size and file format of the modeling files, Texas LNG is providing the

---

[1] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139, 61,962 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA452**

**Response 3**

a.  The updated refined air quality model for the Texas LNG Terminal demonstrates that emissions of criteria pollutants from the Texas LNG Terminal and mobile sources do not result in exceedance of the National Ambient Air Quality Standards (NAAQS) or state standards.  Texas LNG is providing an updated refined air quality model for the Texas LNG Terminal using the updated project emissions presented in Attachment 9-1 and current version of the USEPA-approved AERMOD modeling system.  The source input parameters and methodology used is consistent with the modeling report submitted as part of the "Response to August 25, 2017 Environmental Information Request" submitted September 28, 2017.  *See* FERC Accession No. 20170928-5165.  The updated model is consistent with methods and procedures that follow current agency guidance.  The following is a list of updates to the model:

- New AERMOD version (v. 21112).
- New AERMAP version (v. 18081).
- New meteorological data, as provided by TCEQ (2014-2018).
- Updated relevant background air quality data (2018-2020).
- New hourly ozone background data (2014-2018).
- Updated emissions from Texas LNG Terminal sources, per TCEQ Air Permit No. 139561.
- Regional industrial major sources, as provided by TCEQ, up to 50 kilometers from the fence line of the Texas LNG Terminal (excluding the Rio Grande Terminal [Docket No. CP16-454-000]).
- A $NO_2/NO_X$ in-stack ratio (ISR) of 0.2 was applied for all off-property sources based on each source's location over 3 kilometers away from the Texas LNG Terminal, as per the memo "Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the $NO_2$ National Ambient Air Quality Standard" released by the EPA on September 30, 2014.[2]

    Results of the updated modeling demonstrate that emissions of criteria pollutants from the Texas LNG Terminal and mobile sources do not result in exceedance of the National Ambient Air Quality Standards (NAAQS) or state standards.  See response to Question 3d for the highest predicted concentrations of all pollutants outside of the fence line.

b.  Secondarily formed ozone concentration was calculated using USEPA's guidance for an approach to Tier I demonstrations based on Modeled Emission Rates for Precursors

---

[2] Owen, R., *et al*. September 2014, *Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the NO₂ National Ambient Air Quality Standard*. United States Environmental Protection Agency Air Quality Modeling Group. https://www.epa.gov/sites/default/files/2020-10/documents/no2_clarification_memo-20140930.pdf.

**JA453**

(MERPS).[3]  Appendices Q and R in TCEQ's "Air Quality Modeling Guidelines APDG 6232," released in November 2019[4] refers to the USEPA MERPS guidance, and Texas LNG has used the TCEQ guidance to calculate the Project's secondary ozone impacts based on a Tier I approach.  Two hypothetical sources were assessed, one in Harris County, Texas, and another in Guadalupe County, Texas.  The Texas LNG Terminal $NO_X$ emissions are 96.22 tons per year (tpy) and the project VOC emissions are 15.17 tpy.  The lowest emission quantity modeled by hypothetical sources in a MERPS analysis is 500 tpy, so 500 tpy was used for both $NO_X$ and VOCs in addition to a "low" release height, or 10-m stack.  The ozone background in the region is 57 ppb based on air monitoring station 48-061-1023 in Harlingen, Texas.  The Harris County hypothetical source yielded a higher estimated secondary ozone value of 0.155 ppb attributable to the Texas LNG Terminal project.  When added to the existing background concentration of 57 ppb, the resulting impact is 57.155 ppb, well below the NAAQS threshold of 70 ppb.  The secondarily formed ozone MERPS analysis is outlined in the Table 9-2.

| Table 9-2 Ozone Analysis | | | |
|---|---|---|---|
| **Project Total Emissions (TPY)** | **NO$_X$** | | **VOC** |
| | 96.22 | | 15.17 |
| **Ozone MERPS Modeling Results (Harris County, TX)** | **Precursor** | **Emissions (tpy)** | **Stack Height** | **Maximum Modeled 8-hour Concentration (ppb)** |
| | **NO$_X$** | 500 | 10 | 0.788 |
| | **VOC** | 500 | 10 | 0.124 |
| **Secondary Ozone Concentration** | **Averaging Period** | **NO$_X$ Emissions Ratio (Project/Hypoth etical)** | **VOC Emissions Ratio (Project/ Hypothetical)** | **Ozone Concentration (ppb)[a]** |
| | 8-hour | 0.19244 | 0.03034 | 0.155 |

[a] – (NOX Emissions Ratio) * (MERPs NOX Modeling Result for Ozone) + (VOC Emissions Ratio) * (MERPS VOC Modeling Result for Ozone)

---

[3] USEPA Memorandum, April 30, 2019, from Richard Wayland "Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and PM2.5 under the PSD Permitting Program."
https://www.epa.gov/sites/default/files/2019-05/documents/merps2019.pdf.
[4] Texas Commission on Environmental Equality, Air Permits Division, November 2019, "Air Quality Modeling Guidelines APDG 6232"
https://www.tceq.texas.gov/assets/public/permitting/air/Modeling/guidance/airquality-mod-guidelines6232.pdf

JA454

Document Accession #: 20220502-5075     Filed Date: 05/02/2022

In addition to ozone, Texas LNG calculated secondary $PM_{2.5}$ formation using the MERPS Tier I approach and Texas LNG Terminal project emissions for $NO_X$ and $SO_2$. The project $NO_X$ emissions are 96.22 tpy and the project $SO_2$ emissions are 76.74 tpy. Similar to the ozone analysis, the lowest emission quantity of 500 tpy for the hypothetical sources was used in addition to a 10-m hypothetical source stack. The resulting secondary $PM_{2.5}$ impact for the Harris County hypothetical source is 0.2617 $\mu g/m3$ for 24-hour $PM_{2.5}$, and 0.0077 $\mu g/m3$ for annual $PM_{2.5}$. The secondary impact was added to the modeled impacts to determine a total concentration of $PM_{2.5}$. The MERPS analysis for the secondary formation of $PM_{2.5}$ is outlined in Table 9-3 below.

| Table 9-3 PM2.5 Secondary Formation Analysis | | | | | |
|---|---|---|---|---|---|
| **Project Total Emissions (TPY)** | **$NO_X$** | | | **$SO_2$** | |
| | 96.22 | | | 76.74 | |
| **PM2.5 MERPS Modeling Results (Harris County, TX)** | **Precursor** | **Emissions (tpy)** | **Stack Height** | **Maximum Modeled 24-hour Concentration ($\mu g/m^3$)** | **Maximum Modeled Annual Concentration ($\mu g/m^3$)** |
| | **$NO_X$** | 500 | 10 | 0.1141 | 0.0093 |
| | **$SO_2$** | 500 | 10 | 1.5620 | 0.0386 |
| **Secondary PM2.5 Concentration** | **Averaging Period** | **$NO_X$ Emissions Ratio** | **$SO_2$ Emissions Ratio** | **$PM_{2.5}$ Concentration ($\mu g/m^3$)[a]** | |
| | 24-hour | 0.19244 | 0.15348 | 0.2617 | |
| | Annual | | | 0.0077 | |

[a] – (NOX Emissions Ratio) * (MERPs NOX Modeling Result for PM2.5) + (SO2 Emissions Ratio) * (MERPS SO2 Modeling Result for PM2.5)

c.  A table showing the highest predicted concentrations of all criteria pollutants outside the fenceline as well as the location of these highest concentrations relative to the Texas LNG Terminal is provided in Table 9-4. The table includes, (1) the modeled background concentration (based on all emissions within 50 kilometers) at that location, and (2) the modeled concentration that is contributed by the Texas LNG Terminal.

The modeling analysis demonstrates no modeled violation of the NAAQS for CO (1-hour and 8-hour averaging periods), and no modeled violation of the NAAQS for $SO_2$ (1-hour, 3-hour, 24-hour, and annual averaging periods).

Document Accession #: 20220502-5075    Filed Date: 05/02/2022

Although the modeling analysis demonstrates exceedances of the NAAQS for 1-hour and annual $NO_2$, 24-hour $PM_{10}$, and 24-hour and annual $PM_{2.5}$. through MAXDCONT and exceedance analyses, the contribution of Texas LNG Terminal sources is less than the applicable Significant Impact Level (SIL) for every instance of an exceedance for each pollutant and averaging period.  Therefore, the modeling analysis demonstrates that Texas LNG Terminal does not cause or contribute to a modeled violation of the NAAQS for all pollutants and averaging periods.

**JA456**

Table 9-4
Results of the Cumulative Impact Analysis

| Pollutant | Averaging Period | Highest Predicted Concentration (Maximum Impact) ($\mu g/m^3$) | Ambient Background Values [1] ($\mu g/m^3$) | Coordinates of Maximum Impact Easting (X) (m) | Coordinates of Maximum Impact Northing (Y) (m) | Direction of Maximum Impact from TX LNG | Distance of Maximum Impact from TX LNG | NAAQS ($\mu g/m^3$) | Over NAAQS? | TX LNG Impact ($\mu g/m^3$) | TX LNG Impact at Exceedances [5] ($\mu g/m^3$) | SIL ($\mu g/m^3$) | Over SIL? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CO | 1-hour | 25,216.37 | 3,778.50 | 662,418.13 | 2,872,743.75 | SW | 17.13 | 40,000 | No | 1,023.80 | N/A | N/A | N/A |
| | 8-hour | 8,462.60 | 2,175.50 | 662,418.13 | 2,872,743.75 | SW | 17.13 | 10,000 | No | 120.37 | N/A | N/A | N/A |
| NO$_2$ | 1-hour | 2,171.30 | [2] | 662,418.13 | 2,872,743.75 | SW | 17.13 | 188 | Yes | 124.55 | 1.45 | 7.5 | No |
| | Annual | 196.90 | 4.72 | 655,668.13 | 2,870,043.75 | SW | 24.33 | 100 | Yes | 4.79 | 0.011 | 1 | No |
| PM$_{10}$ | 24-hour | 1,346.22 | 69.67 | 639,718.13 | 2,898,943.75 | NW | 41.12 | 150 | Yes | 4.04 | 0.078 | 5 | No |
| PM$_{2.5}$ | 24-hour | 225.35 [3] | 28.33 | 661,518.13 | 2,872,293.75 | SW | 18.13 | 35 | Yes | 3.07 | 0.30 [3] | 1.2 | No |
| | Annual | 13.83 [4] | 10.13 | 654,718.13 | 2,868,943.75 | NW | 25.69 | 12 | Yes | 0.17 | 8.90E-03 [4] | 0.2 | No |
| SO$_2$ | 1-hour | 133.21 | 14.85 | 651,718.13 | 2,878,943.75 | NW | 25.46 | 196 | No | 10.80 | N/A | N/A | N/A |
| | 3-hour | 86.14 | 5.24 | 651,718.13 | 2,878,943.75 | NW | 25.46 | 1,300 | No | 56.74 | N/A | N/A | N/A |
| | 24-hour | 19.95 | 3.14 | 673,068.13 | 2,877,993.75 | SW | 5.41 | 365 | No | 7.32 | N/A | N/A | N/A |
| | Annual | 7.24 | 1.36 | 655,668.13 | 2,870,043.75 | SW | 24.33 | 80 | No | 0.92 | N/A | N/A | N/A |

Notes:
(1) Ambient background values are included in the Highest Predicted Concentration (Maximum Impact) values.
(2) Seasonal/diurnal background data were developed for use in the 1-hour NO$_2$ modeling analysis.
(3) Secondary 24-hour PM$_{2.5}$ impact of 0.2617 $\mu g/m^3$ added to the Maximum Impact and Texas LNG Impact.
(4) Secondary annual PM$_{2.5}$ impact of 0.0077 $\mu g/m^3$ added to the Maximum Impact and Texas LNG Impact.
(5) Maximum Texas LNG contribution of modeled NAAQS exceedance, determined by MAXDCONT (1-hour NO$_2$ and 24-hour PM$_{2.5}$) or exceedance analysis (annual NO$_2$, 24-hour PM$_{10}$, and annual PM$_{2.5}$).

10

JA457

d. Figures that present modeled concentration isopleths, showing the full range of concentrations for all criteria pollutants for the highest impact scenario are provided in Attachment 9-2. The figures include concentration isopleths starting from the Texas LNG Terminal and extending to 50 kilometers from the fenceline. Ozone is not plotted, since a singular worst case ozone concentration was derived from the proposed Texas LNG emissions sources using a Tier I assessment approach, as described in the response to Comment 3b.

e. Figures that overlay concentration isopleths showing the full range of concentrations for all criteria pollutants for the highest impact scenario on census block groups are provided in Attachment 9-2.

f. Texas LNG has provided tables showing the maximum modeled concentrations of each criteria pollutant within each census block group within 50 kilometers of the Texas LNG Terminal fenceline. The tables include the following scenarios, and are provided in Attachment 9-3.

- Scenario 1: This scenario includes modeled concentrations including ambient background that are contributed by the Texas LNG Terminal during hoteling;
- Scenario 1-INV: This scenario includes modeled concentrations including ambient background that are contributed by the full inventory of sources within 50 kilometers of Texas LNG, in addition to modeled concentrations that are contributed by the Texas LNG terminal during LNG carrier hoteling;
- Scenario 2: This scenario includes modeled concentrations including ambient background that are contributed by the Texas LNG Terminal during maneuvering; and
- Scenario 2-INV: This scenario includes modeled concentrations including ambient background that are contributed by the full inventory of sources within 50 kilometers of Texas LNG, in addition to modeled concentrations that are contributed by the Texas LNG terminal during LNG carrier maneuvering.

Response by: Tom Wickstrom, Principal Consultant, ERM, 484-913-0453

**JA458**

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

**In Reply Refer To:**
OEP/DLNG/LNG2
OEP/DG2E/Gas Branch 1
Texas LNG Brownsville LLC
Texas LNG Project
Docket No. CP16-116-000

August 16, 2022

VIA Electronic Mail

A. Gregory Junge
Attorney for Texas LNG Brownsville LLC
Hogan Lovells US LLP
greg.junge@hoganlovells.com

**Re:    Environmental Information Request**

Dear Mr. Junge:

The information described in the enclosures is required for the above-mentioned docket to address deficiencies noted in the U.S. Court of Appeals for the D.C. Circuit's August 3, 2021 decision in Vecinos para el Bienetar de la Comunidad Costera v. FERC, 6 F.4th 1321 (D.C. Cir. 2021), and for staff to conduct additional necessary analysis for the authorized LNG export terminal.  **Please file a complete response within 30 days of the date of this letter**.  If certain information cannot be provided within this time frame, please indicate which items will be delayed and provide a projected filing date.

File your response in accordance with the provisions of the Commission's Rules of Practice and Procedure.  In particular, 18 CFR 385.2005 requires all responses to be filed under oath by an authorized Texas LNG Brownsville LLC representative, and 18 CFR 385.2010 (Rule 2010) requires service to each person whose name appears on the official service list for this proceeding.

Electronic filing is encouraged using the Commission's eFiling system (see https://www.ferc.gov/ferc-online/overview).  When filing documents and maps, prepare separate volumes as outlined on the Commission's website at https://www.ferc.gov/ceii-filing-guide and https://www.ferc.gov/enforcement-legal/ceii-ferc-cui-processes for labelling controlled unclassified information (CUI).  Critical Energy Infrastructure Information (CEII) (e.g., plot plans showing equipment or piping details) and privileged information (PRIV) (e.g., trade secret information; proprietary information) are

**JA459**

TEXAS LNG

TEXAS LNG BROWNSVILLE LLC
2800 NORTH LOOP WEST, SUITE 910
HOUSTON, TX 77092
USA

September 15, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

**Re:**    **Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
        **Texas LNG Project**
        **Response to August 16, 2022 Environmental Information Request**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to construct and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission Staff issued an Environmental Information Request to Texas LNG on August 16, 2022, to address issues noted in the U.S. Court of Appeals for the District of Columbia Circuit's August 3, 2021 opinion in *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("August 16 Data Request"). Texas LNG hereby responds to Commission Staff's August 16 data requests.

Some of the attached materials designated comprise or contain specific technical information pertaining to Texas LNG's LNG facilities and nearby energy infrastructure, the disclosure of which could be useful to a person planning an attack on this infrastructure. Accordingly, Texas LNG requests the Commission treat this material as Critical Energy Infrastructure Information ("CEII"), and it is marked "**CUI//CEII CONTAINS CRITICAL ENERGY INFRASTRUCTURE INFORMATION – DO NOT RELEASE.**"

---

[1] *Tex LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139 (2020), *remanded without vacatur, Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA460**

TEXAS LNG

TEXAS LNG BROWNSVILLE LLC
2800 NORTH LOOP WEST, SUITE 910
HOUSTON, TX 77092
USA

September 21, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

**Re:    Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
**Texas LNG Project**
**Supplemental Response to August 16, 2022 Environmental Information Request**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to construct and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission Staff issued an Environmental Information Request to Texas LNG on August 16, 2022, to address issues noted in the U.S. Court of Appeals for the District of Columbia Circuit's August 3, 2021 opinion in *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("August 16 Data Request"). On September 15, 2022, Texas LNG responded to Commission Staff's August 16 Data Request. Texas LNG inadvertently omitted Attachment 9-1 to its September 16 response. Texas LNG hereby supplements its September 16 response with Attachment 9-1.

If you have any questions, please do not hesitate to contact me at Pawandeep.Singh@aldermidcompanies.com or 443-771-5990.

Sincerely,

*/s/ Pawandeep Singh*

Pawandeep Singh
Vice President
Texas LNG Brownsville LLC

---

[1] *Tex LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA461**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas LNG Brownsville LLC                    Docket Nos.    CP16-116-000
                                                            CP16-116-002

NOTICE SEEKING PUBLIC COMMENT ON
RESPONSES TO INFORMATION REQUESTS

(September 30, 2022)

On March 30, 2016, Texas LNG Brownsville LLC (Texas LNG) filed an application under section 3 of the Natural Gas Act (NGA)[1] and Part 153 of the Commission's regulations[2] for authorization to construct and operate a liquefied natural gas (LNG) export terminal on the north embankment of the Brownsville Ship Channel in Cameron County, Texas.  On November 22, 2019, the Commission authorized Texas LNG's proposal, subject to conditions.[3]  On August 3, 2021, the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit) partially remanded, but did not vacate, the Commission's authorization.[4]  On August 16, 2022, and August 31, 2022, Commission staff issued environmental information requests to Texas LNG in order to address deficiencies noted in the D.C. Circuit's August 3, 2021 decision.  Texas LNG responded to Commission staff's information requests on September 15, 2022, and September 21, 2022.

By this notice, Commission staff requests public comments on the issues addressed in Texas LNG's responses to staff's above-referenced information requests of August 16 and August 31, 2022, regarding environmental justice communities, visual impacts, air quality modeling, and emergency planning.  Any person wishing to comment on these issues may do so.

---

[1] 15 U.S.C. § 717b.

[2] 18 C.F.R. pt. 153 (2021).

[3] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *on reh'g*, 170 FERC ¶ 61,139 (2020).

[4] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021) (remanding order without vacatur for the Commission to redress deficiencies regarding its analyses of project impacts on climate change and environmental justice communities).

**JA462**

Document Accession #: 20220930-3013     Filed Date: 09/30/2022

To ensure that your comments within the scope of this notice are timely and properly recorded, please submit your initial comments no later than **October 21, 2022.** Reply comments are due no later than **November 4, 2022.**

There are three methods you can use to submit your comments to the Commission. Please carefully follow these instructions so that your comments are properly recorded. The Commission encourages electronic filing of comments and has staff available to assist you at (866) 208-3676 or FercOnlineSupport@ferc.gov.

1)    You can file your comments electronically using the eComment feature, which is located on the Commission's website (www.ferc.gov) under the link to FERC Online.  Using eComment is an easy method for submitting brief, text-only comments on a project;

2)    You can file your comments electronically by using the eFiling feature, which is located on the Commission's website (www.ferc.gov) under the link to FERC Online.  With eFiling, you can provide comments in a variety of formats by attaching them as a file with your submission.  New eFiling users must first create an account by clicking on "eRegister."  You will be asked to select the type of filing you are making; a comment on a particular project is considered a "Comment on a Filing";

3)    You can file a paper copy of your comments by mailing them to the Commission.  Be sure to reference the project docket number (CP16-116-000) on your letter.  Submissions sent via the U.S. Postal Service must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 888 First Street NE, Room 1A, Washington, DC 20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, MD 20852.

Additional information about the project, including copies of the above-referenced information requests and responses, are available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website at www.ferc.gov using the eLibrary link.  Click on the eLibrary link, click on "General Search" and enter the docket number in the "Docket Number" field.  Be sure you have selected an appropriate date range.  For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or (866) 208-3676, or for TTY, contact (202) 502-8659. The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

Debbie-Anne A. Reese,
Deputy Secretary.

**JA463**

Document Accession #: 20220930-3013     Filed Date: 09/30/2022

**TEXAS LNG**

TEXAS LNG BROWNSVILLE LLC
2800 NORTH LOOP WEST, SUITE 910
HOUSTON, TX 77092
USA

September 30, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

**Re:    Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
**Texas LNG Project**
**Supplemental Response to August 16, 2022 Environmental Information Request**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to construct and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission Staff issued an Environmental Information Request to Texas LNG on August 16, 2022, to address issues noted in the U.S. Court of Appeals for the District of Columbia Circuit's August 3, 2021 opinion in *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("August 16 Data Request"). On September 15, 2022, Texas LNG responded to Commission Staff's August 16 Data Request. As noted in its September 15, 2022 response, Texas LNG explained that it would provide supplemental responses to questions 1(c) and 12. Texas LNG hereby supplements its September 15 response.

Some of the attached materials designated comprise or contain specific technical information pertaining to Texas LNG's LNG facilities and nearby energy infrastructure, the disclosure of which could be useful to a person planning an attack on this infrastructure. Accordingly, Texas LNG requests the Commission treat this material as Critical Energy Infrastructure Information ("CEII"), and it is marked **CUI//CEII – DO NOT RELEASE**."

---

[1] *Tex LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019) ("Authorization Order"), *order on reh'g and stay*, 170 FERC ¶ 61,139 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA465**

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY
FEDERAL ENERGY REGULATORY COMMISSION

| | | | |
|---|---|---|---|
| Texas LNG Brownsville LLC | ) | Docket Nos. | CP16-116-000 |
| | ) | | CP16-116-002 |

## Comments on Responses to Information Requests

### I.     Introduction

The United States Court of Appeals for the District of Columbia determined that the Federal Energy Regulatory Commission ("FERC") inadequately analyzed the impacts to environmental justice communities of the Texas LNG facility.[1] The *Vecinos* court remanded to FERC without vacatur and ordered FERC to adequately analyze impacts to environmental justice communities. FERC has now begun that process by requesting information from Texas LNG and has requested public comment on the responses provided by Texas LNG.

As explained in more detail below, the beginning of FERC's new analysis suggests that FERC will continue to improperly analyze the impacts of the Texas LNG facilities to environmental justice communities. FERC has asked the wrong questions and received inadequate information in response to its requests. FERC has, so far, created a public participation process that systematically excludes the environmental justice communities that it is supposed to be protecting through this process. The undersigned commenters urge FERC to course correct in order to ensure a legally adequate environmental justice analysis that protects the health, wellbeing, and safety of the environmental justice communities that are in the vicinity of the Texas LNG project.

### II.    To Date, Outreach to Environmental Justice Communities Has Been Inadequate

To properly analyze environmental justice, FERC must obtain "meaningful community representation in the process."[2] FERC must "be aware of the diverse

---

[1] *See Vecinos para el Bienestar de la Comunidad Costera v. Federal Energy Regulatory Commission*, 6 F.4th 1321, 1331 (D.C. Cir. 2021).
[2] Council on Environmental Quality, Environmental Justice: Guidance Under The National Environmental Policy Act 9 (1997) [*hereinafter* "CEQ 1997 Guidance"] (attached).

constituencies within any particular community" and "have complete representation of the community as a whole."[3] "[C]ommunity participation must occur as early as possible if it is to be meaningful."[4] Among the constituencies that must be included in the process is tribal representation of any impacted tribes.[5]

To do this, FERC must go beyond its typical public outreach practices. Instead, FERC must determine the necessary "adaptive or innovative approaches to overcome linguistic, institutional, cultural, economic, historical, or other potential barriers to effective participation" in its decisionmaking process.[6] These approaches can include translation of major documents, opportunities to comment through other means than written communication, and creating materials specifically designed to garner the involvement of different constituencies.[7]

Here, the proposed project will have significant impacts on environmental justice communities.[8] The City of Port Isabel, the closest city to the project area is 82.7% Hispanic/Latino and 30.3% of the population lives below the poverty line.[9] Similarly, the population of Cameron County, where the project site is located, is 90% Hispanic/Latino and 24.4% live below the poverty line.[10] By comparison, less than 15% of the entire population of Texas lives below the poverty line and only 40.2% of the State's population is Hispanic/Latino.[11]

Accordingly, as explained in more detail below, FERC has, so far, failed to utilize the public outreach and engagement practices necessary to ensure adequate participation of the impacted environmental justice communities.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.* at 13. *Accord* EPA, Guidance on Considering Environmental Justice During the Development of Regulatory Actions 32-35 (2015) [*hereinafter* "EPA 2015 Guidance"]

[7] CEQ 1997 Guidance.

[8] An area may contain an environmental justice population (1) if more than 50% of the population is in a potentially affected area are people of color or the percentage of people of color in a specific area exceed the percentage of the general population, or (2) if there are affected populations with incomes below the statistical poverty thresholds. CEQ 1997 Guidance at 25.

[9] U.S. Census Bureau, *Quick Facts: Cameron County, Port Isabel, Texas*, *available at*

https://www.census.gov/quickfacts/fact/table/cameroncountytexas,TX,portisabelcityt exas/PST045221. (Last accessed Sept. 28, 2022) (attached).

[10] *Id.*

[11] *Id.*

a. *FERC Has Not Provided Translated Versions of the Underlying Documents*

If Texas LNG were to go forward, it would be constructed in an area where a majority of the population speaks Spanish at home and 25.2% speak English less than very well.[12] Despite this, FERC has not provided translated versions of the Texas LNG's responses to the information requests underlying this request for public comment. This has the obvious effect of cutting at least the 25.2% of people in the project area that speak English less than very well out of FERC's decisionmaking process.

This isn't only a problem because it is plainly wrong to cut an entire population out of decisionmaking that will affect them, it is wrong because it will inevitably lead to bad decisionmaking.[13] Longstanding guidance recognizes that it is crucial for agencies to analyze environmental and health data "in light of any additional qualitative or quantitative information gathered through the public participation process."[14] This is because "background data" on environmental justice communities, including "empirical data, based on verifiable observations or experience" is crucial to an agency's environmental justice analysis.[15] Additionally, environmental justice populations "in the affected environment may hold an opposing technical or scientific view (which can be based on several sources,

---

[12]  U.S. Census Bureau, American Community Surveys: DP02 Selected Social Characteristics, Port Isabel, *available at* https://data.census.gov/cedsci/table?tid=ACSDP5Y2020.DP02&g=0400000US48_1600000US4858892&hidePreview=true) (Last viewed Sept. 28, 2022) (attached). *See also* U.S. Census Bureau, American Community Surveys: DP02 Selected Social Characteristics, Cameron County, *available at* https://data.census.gov/cedsci/table?tid=ACSDP5Y2020.DP02&g=0400000US48_0500000US48061&hidePreview=true. (Last viewed Sept. 28, 2022) (attached).

[13] *See* EPA, Final Guidance For Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses at pdf 46 (1998) [*hereinafter* EPA 1998 Guidance] (attached) ("Adequate public participation is crucial to incorporating environmental justice considerations into EPA's NEPA actions, both to enhance the quality of the analyses and to ensure that potentially affected parties are not overlooked and excluded from the process.").

[14] CEQ 1997 Guidance at 14.

[15] Interagency Working Group on Environmental Justice & NEPA Committee, Promising Practices for EJ Methodologies in NEPA Reviews 29 (2016) [*hereinafter* "Promising Practices"] (attached).

including the community) from agencies regarding specific impacts and/or methods of analysis," which "may warrant discussion in a NEPA document."[16]

Ultimately, by excluding people that speak English less than very well, FERC will ensure that it misses all of these data points concerning this affected population. FERC, for example, will have no way to know whether this population "may be differently affected by past, present, or reasonably foreseeable future impacts than the general population."[17] Or, whether the effects of the Texas LNG project on this population would be amplified by "past exposure histories, and social factors."[18] FERC is in essence, deciding, to deny itself the opportunity to be educated and to have the community "help identify the means to identify alternatives and/or mitigate the impacts."[19]

FERC must ensure that this population is not systemically excluded from FERC's decisionmaking. FERC must, at least, provide translated documents to allow for meaningful participation. And FERC must go beyond limiting participation to written comments. It must provide public meetings that allow for meaningful participation from people who speak English less than well and other environmental justice communities. Without taking these steps, FERC will not be able to perform an adequate environmental justice analysis.

### b. FERC Must Consult with the Carrizo Comecrudo Tribe of Texas

Longstanding guidance affirms the importance of working with tribes that will be impacted by projects. The Carrizo Comecrudo Tribe of Texas will be impacted here because the Texas LNG project will occupy and impact lands sacred to the Tribe. For example, the Garcia Pasture Site is a sacred site to the Tribe and features human burial sites, village ruins, rock art, and shell working areas.[20] FERC has already acknowledged that the Texas LNG project will adversely impact the Garcia Pasture Site as the Garcia Pasture Site is within the Texas LNG project footprint.[21] However, despite the destruction of Garcia Pasture, FERC has not consulted with the Carrizo Comecrudo Tribe of Texas and Texas LNG merely sent a single email to the Tribe providing some information.[22]

---

[16] *Id.* at 30.
[17] *Id.*
[18] *Id.* at 31.
[19] EPA 1998 Guidance at pdf 54.
[20] Garcia Pasture, WMF.Org, https://www.wmf.org/project/garcia-pasture (Last Visited October 11, 2022) (attached).
[21] Final EIS at 4-334.
[22] *Id.* at 4-160 - 4-161.

None of this satisfies FERC's environmental justice obligations. FERC is specifically required to seek input from impacted tribal populations whether or not a particular tribe is federally recognized.[23] By not engaging with the Carrizo Comecrudo Tribe of Texas, FERC has failed to satisfy its environmental justice obligations or to perform an adequate environmental justice analysis. FERC must immediately consult with the Carrizo Comecrudo Tribe of Texas concerning the impacts that the Texas LNG project will have on sacred sites.

c. *FERC Must Provide Additional Time to Comment on Texas LNG's Responses, Do More Public Outreach, and Provide Additional Means for the Public to Comment*

In addition to the more specific issues discussed above, the overall issue here is that FERC has not tailored this comment period to ensure the meaningful participation of any of the environmental justice communities that would be impacted by the Texas LNG project if it went forward. FERC issued this notice on September 30, 2022 with comments due on October 21, 2022, a 21-day comment deadline. On the same day, FERC issued a parallel notice in docket nos. CP16-454-000, CP16-454-003, CP16-455-000, and CP16-455-002, requesting public comment on similar issues but concerning the nearby Rio Grande LNG and Rio Bravo Pipeline projects. Those comments are due the same day as these comments. Additionally, when both of these notices were issued, the deadline for scoping comments concerning Rio Grande LNG's carbon capture and storage proposal was ongoing.

The subject matter of these comments is highly technical in nature. For example, FERC requested and Texas LNG provided significant amounts of air emissions data, including air emissions modeling data.[24] Similarly, Texas LNG

---

[23] *See* EPA 1998 Guidance at pdf 75 (Agencies must work with federally recognized tribes on a government-to-government basis "as well as with any affected or interested indigenous person(s) as public stakeholders"). *Contra* Final EIS at 4-160. *Accord* Promising Practices at 10 ("[A]gencies should conduct meaningful engagement efforts … specifically designed to reach indigenous tribal populations and organizations.")

[24] *See* Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000 Texas LNG Project Supplemental Response to August 16, 2022 Environmental Information Request at Attachment 9-1, Accession 20220921-5053.

included a jargon laden discussion of an emergency response plan.[25] Clearly, Texas LNG's responses were not written for a general audience, they were written for subject matter experts.

Accordingly, FERC has created a public participation structure tailor made to leave out the environmental justice communities that will be impacted. FERC is supposed to use "adaptive and innovative approaches both to public outreach … and participation" but instead of doing that, FERC has buried these environmental justice communities under multiple deadlines seeking comment on several complex issues rendering meaningful participation impossible.[26] FERC has not provided the information it seeks comment on in a format that is concise, understandable, and readily accessible to the public.[27] As a result, FERC is not likely to be able to perform an adequate environmental justice analysis, contradicting the D.C. Circuit's *Vecinos* decision.

That alone renders FERC's apparent attempt to comply with *Vecinos* insufficient, but the infirmities of FERC's process so far does not stop there. FERC has not so much as suggested that it is going to provide these environmental justice communities any opportunity to participate outside the opportunity to provide written comments. As explained in several guidance documents and by common sense, this decision by FERC is not going to lead to adequate participation of members of environmental justice communities.[28] And, in turn, will inevitably lead to FERC not properly analyzing the impacts to these environmental justice communities. FERC should course correct now, rather than when it is already too late. FERC should provide alternative methods of public participation including multiple town hall style public hearings held at various locations tailored for access by environmental justice communities and at several different times to allow people with different work and life schedules to attend.

Ultimately, environmental justice analysis is as much a process as it is a way to ensure substantive policy ends. As the Federal Interagency Working Group on Environmental Justice & NEPA Committee recently explained, structuring the environmental review process to ensure meaningful participation of members of environmental justice communities is an end in itself.[29] FERC is currently failing to ensure an adequate process

---

[25] *See* Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Response to August 16, 2022 Environmental Information Request at 21-23, Accession 20220915-5265.
[26] Promising Practices at 8.
[27] *Cf.* CEQ 1997 Guidance at 33.
[28] *See, e.g.*, *Id.* at 13.
[29] *See* Promising Practices at 8-11.

Document Accession #: 20221019-5066          Filed Date: 10/19/2022

### III.  The Air Emissions Data Provided by Texas LNG is Inadequate and Requires Significant Explanation and Clarification

FERC should ask Texas LNG to explain its assumptions and clarify some of the information provided in Tables 9-3-1 and 9-3-2. However, even without that clarification, it is clear from Texas LNG's modeling that the cumulative air emissions associated with this project pose significant risks to environmental justice communities living near the terminal, particularly in those census block groups where Texas LNG anticipates an exceedance of the NAAQS.

#### a.  Texas LNG's Assumptions Should Be Explained

FERC should ask Texas LNG to explain the assumptions it used to model its own contributions in Tables 9-3-1 and 9-3-2. It is unexpected that the hourly concentration contributions for hoteling would be higher than the hourly concentration contributions for $NO_2$, $PM_{2.5}$, and $PM_{10}$. Yet, for many of the census blocks, the hourly concentration contributions for Texas LNG during hoteling are higher than during maneuvering.

Similarly, FERC should ask Texas LNG to explain its assumptions regarding it and Rio Grande LNG's contributions to the concentration of CO. For many block groups, Texas LNG alone contributes several micrograms per cubic meter, but when both Texas LNG and Rio Grande LNG's emissions are removed from the full inventory of sources, the total concentrations only decline by a few decimal points. For example, in Census Tract 014200, Block Group 1 Texas LNG projects that its contributions of CO during hoteling are 951.2 µg/m3 and during maneuvering are 973.3 µg/m3. It further models that the total inventory during hoteling is 25216.3 µg/m3 and during maneuvering is 25216.4 µg/m3. Yet, when both Texas LNG and Rio Grande LNG's contributions are removed from the modeling the CO background concentrations only decline to 25216.2 µg/m3, despite Texas LNG's own contribution exceeding 900 µg/m3.[30]

Given that Texas LNG's modeling does not conform with reasonable expectations of the impacts of emissions in various scenarios, FERC should request an explanation of the assumptions used for each scenario and criteria pollutant analyzed.

---

[30] Texas LNG, Supplemental Response to August 16, 2022 EIR, Attachment 9-1: Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update at 7. (Sept. 21, 2022).

Table 9-3-2 also appears to contain a significant typo as all Census Tracts are labeled 010100. FERC should ask Texas LNG to submit a table with the proper Census Tract labeling.

### b. *Texas LNG's Emissions Will Have Disproportionately High and Adverse Impacts on Environmental Justice Communities*

Tables 9-3-1 and 9-3-2 demonstrate that air emissions from the Texas LNG facility will extend as far as 50 km away from the facility's fenceline. There is a modeled concentration of criteria pollutants from Texas LNG's facility during both hoteling and maneuvering in every single census tract and block group modeled.[31] Criteria pollutants, including particulate matter and nitrogen dioxide are recognized as pollutants for which there is no threshold of exposure that adequately protects human health.[32] As discussed further below, there are several census blocks where $NO_2$, $PM_{2.5}$, and $PM_{10}$ are expected to exceed the NAAQS. However, given that these pollutants are recognized as causing harm even below the NAAQS, impacts of from an increased concentration of each will increase the risk of harm to exposed populations.[33]

In the case of Texas LNG these emissions will have disproportionately high and adverse impacts on environmental justice communities because all but three of the census block groups (which have people living in them) which were included in the modeling, have either a higher rate of Hispanic/Latino individuals or low-income people than the general population of the State of Texas, or both.[34] This alone demonstrates there will be disproportionately high and adverse impact on environmental justice communities from Texas LNG's air emissions.[35]

---

[31] *See* Texas LNG, Supplemental Response to August 16, 2022 EIR, Attachment 9-1: Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).

[32] *See* Am. Trucking Ass'n, Inc. v. EPA, 283 F.3d 355, 359-360 (D.C. Cir. 2002); 75 Fed. Reg. 6474 at 6500 (Feb. 9, 2010)

[33] To be clear, just because a criteria pollutant is not present in concentrations that exceed the NAAQS does not mean that it is not causing a disproportionately high and adverse impacts on environmental justice communities. *See* CEQ 1997 Guidance at 10.

[34] The three census block groups that do not meet the EJ criteria are CT 101, BG 4, CT 121.01, BG 1, and CT 123.05, BG 1. Texas LNG, Response to Feb. 3, 2022 EIR., Table 5-1. (Mar. 4, 2022).

[35] *See e.g.* CEQ, *Environmental Justice Guidelines Under the National Environmental Policy Act*, 25 (Dec. 1. 1997).

The risks of exposure on EJ populations can also be heightened by factors specific to those populations.[36] As previously raised in this docket, the EJ populations in this area are less likely to have access to medical infrastructure including hospitals and insurance, have high concentrations of young and elderly populations, and low-income populations may likely have worse respiratory health than the general population of Texas. FERC should consider these factors before determining whether the impacts of air emissions are significant. [37]

   c. *Texas LNG's Modeling Shows Texas LNG & Rio Grande LNG Will Cause or Contribute to NAAQS Violations in Multiple Census Block Groups that Contain Environmental Justice Populations*

Tables 9-3-1 and 9-3-2 demonstrate that emissions from Texas LNG and Rio Grande LNG will cause or contribute to violations of the NAAQS for $NO_2$, $PM_{2.5}$, and $PM_{10}$. These are undoubtedly significant impacts, as the NAAQS are intended to reduce the risk to "sufficiently protect human health."[38] These NAAQS violations only occur in census blocks populated by EJ communities. (See Tables 1-2).[39] This only heightens the severity of their impacts.

---

**Table 1 – Demographics of Census Block Groups Where Texas LNG has Modeled Violations of the 1-hr NAAQS of $NO_2$.**

---

[36] CEQ, *Environmental Justice Guidelines Under the National Environmental Policy Act*, 9 (Dec. 1. 1997).

[37] "Agency consideration of impacts on low-income populations, minority populations, or Indian tribes may lead to the identification of disproportionately high and adverse human health or environmental effects that are significant and that otherwise would be overlooked." CEQ, *Environmental Justice Guidelines Under the National Environmental Policy Act*, 10 (Dec. 1. 1997).

[38] *See* Am. Trucking Ass'n, Inc. v. EPA, 283 F.3d 355, 359-360 (D.C. Cir. 2002).

[39] A similar table cannot be made for $PM_{2.5}$ because of the aforementioned typo. There are several places where Texas LNG has modeled an exceedance of the $PM_{2.5}$ NAAQS and Texas LNG should clarify which census blocks groups these are. *See* Texas LNG, Attachment 9-1, Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update at 9, 12, and 15.

| Census Tract and Block | Modeled Inventory During Texas LNG Hoteling[40] | Modeled Inventory During Texas LNG Maneuvering[41] | Modeled Inventory Without Texas or Rio Grande LNG[42] | % Racial or Ethnic Minority[43] | % Low-income[44] |
|---|---|---|---|---|---|
| CT 10800 BG 4 | 273.1 µg/m3 | 273.1 µg/m3 | 149.5 µg/m3 | 80 | 49 |
| CT 12304 BG 2 | 209.1 µg/m3 | 125.2 µg/m3 | 97.5 µg/m3 | 68 | 12 |
| CT 12401 BG 1 | 194.6 µg/m3 | 194.6 µg/m3 | 125.5 µg/m3 | 93 | 25 |
| CT 126.07 BG 1 | 797.6 µg/m3 | 797.6 µg/m3 | 775.1 µg/m3 | 99 | 34 |
| CT 12700 BG 2 | 1993.7 µg/m3 | 1993.8 µg/m3 | 828.4 µg/m3 | 87 | 40 |
| CT 14200 BG 1 | 5218.4 µg/m3 | 5218.4 µg/m3 | 2171.3 µg/m3 | 99 | 34 |

[40] Texas LNG, Attachment 9-1, Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).
[41] Texas LNG, Attachment 9-1, Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).
[42] Texas LNG, Attachment 9-1, Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).
[43] Texas LNG, Response to Feb. 3, 2022 EIR., Table 5-1. (Mar. 4, 2022).
[44] Texas LNG, Response to Feb. 3, 2022 EIR., Table 5-1. (Mar. 4, 2022).

| Census Tract and Block | Modeled Inventory During Texas LNG Hoteling[45] | Modeled Inventory During Texas LNG Maneuvering [46] | Modeled Inventory Without Texas or Rio Grande LNG[47] | % Racial or Ethnic Minority[48] | % Low-income[49] |
|---|---|---|---|---|---|
| CT 10100 BG 2 | 264.8 µg/m3 | 264.8 µg/m3 | 264.89 µg/m3 | 87 | 24 |
| CT 010800 BG 4 | 1346.2 µg/m3 | 1346.2 µg/m3 | 1346.2 µg/m3 | 80 | 49 |
| CT 011400 BG 4 | 608.6 µg/m3 | 608.6 µg/m3 | 6.08.6 µg/m3 | 87 | 22 |
| CT 12700 BG 2 | 520.5 µg/m3 | 520.5 µg/m3 | 520.5 µg/m3 | 87 | 40 |
| CT 14200 BG 1 | 408.7 µg/m3 | 408.7 µg/m3 | 408.7 µg/m3 | 99 | 34 |

*Table 2 – Demographics of Census Block Groups Where Texas LNG has Modeled Violations of the 1-hr NAAQS of* $PM_{10}$.

As a general matter, projects that cause or contribute to exceedances of the NAAQS are not in the public interest.[50] The NAAQS, "based on such criteria and

---

[45] Texas LNG, Supplemental Response to August 16, 2022 EIR, Attachment 9-1: Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).

[46] Texas LNG, Supplemental Response to August 16, 2022 EIR, Attachment 9-1: Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).

[47] Texas LNG, Supplemental Response to August 16, 2022 EIR, Attachment 9-1: Maximum Modeled Concentrations of Criteria Pollutants within Census Block Groups: Sept. 2002 Update. (Sept. 21, 2022).

[48] Texas LNG, Response to Feb. 3, 2022 EIR., Table 5-1. (Mar. 4, 2022).

[49] Texas LNG, Response to Feb. 3, 2022 EIR., Table 5-1. (Mar. 4, 2022).

[50] And, despite Texas LNG's suggestion to the contrary, *see* Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Response to August 16, 2022 Environmental Information Request at 10, Accession 20220915-5265, using Significant Impact Levels ("SIL") to determine whether this project causes or contributes to exceedances of the NAAQS is improper. The Clean Air Act unambiguously prohibits the use of SILs to demonstrate that a project would not cause or contribute to a NAAQS exceedance. *See, e.g., Alabama Power Co. v. Costle*,

allowing an adequate margin of safety, are requisite to protect public health."[51]
Exceedances of the NAAQS will contribute to worsening respiratory and
cardiovascular health of exposed populations. The health of local communities
should not be jeopardized for the expansion of liquified natural gas exports.

Moreover, this modeling demonstrates that many these census block groups
are exposed to NAAQS exceedances for $NO_2$, $PM_{2.5}$, and $PM_{10}$ before the construction
and operation of Texas LNG and Rio Grande LNG. Moreover, the two census block
groups closest to the Texas LNG facility, Tract 12700, Block Group 2, and Tract
14200, Block Group 1 are in the 99th percentile for the environmental justice index
for $PM_{2.5}$, and in the 93rd and 96th percentile (respectively) in the State.[52] The
construction and operation of an additional pollution source in areas that are
populated by environmental justice communities that are already exposed to
emissions levels that exceed the standard set to protect human health is a serious
environmental justice concern and at a minimum demands the consideration of
alternative sites.

---

636 F.2d 323, 362 (D.C. Cir. 1979) (Congress specifically used the terms "cause" and
"contribute" together to ensure that the Prevention of Significant Deterioration
program would prevent increments and the NAAQS from being exceeded by
considering all possible violations or contributions to violations); *Bluewater Network
v. EPA*, 370 F.3d 1, 13 (D.C. Cir. 2004) (interpreting nearly identical language in
the Clean Air Act to mean that the term "contribute" "has no inherent connotation
as to magnitude or importance of the relevant 'share' in the effect; certainly it does
not incorporate any any 'significance' requirement."); *Sierra Club v. EPA*, 705 F.3d
458, 465-66 (D.C. Cir. 2013) (vacating EPA's PM 2.5 SILs regulation because EPA
lacks "authority to exempt sources from the requirements of the" Clean Air Act and
the regulation "simply states that the demonstration required under [section]
165(a)(3) is deemed to have been made if a proposed source or modification's air
quality impact is below the SIL."). *See also Sierra Club v. EPA*, 955 F.3d 56, 63-64
(D.C. Cir. 2020) (Affirming that the Court lacks jurisdiction to vacate a non-binding
policy document as part of a facial challenge but explaining that "[t]he SILs
Guidance is not sufficient to support a permitting decision—simply quoting the
SILs Guidance is not enough to justify a permitting decision without more evidence
in the record, including technical and legal documents.").
[51] 42 CFR 7409(b)(1).
[52] EJ Screen Report Blockgroup 480610127002 (Attached); EJ Screen Report
Blockgroup 480610142021 (Attached) (Please note that EPA's EJ Screen mistakenly
labels blockgroup 480610142021 as 480610142022. *Compare* Texas Education
Agency, Census Block Group Map, available at
https://hub.arcgis.com/datasets/TEA-Texas::census-block-group-
map/explore?location=26.031312%2C-97.291719%2C11.96. (Screen shot attached).

IV.    **The Offsite Parking Locations Impacts Data Provided by Texas LNG is Inadequate**

FERC will not be able to properly analyze impacts to environmental justice communities from offsite parking locations. FERC requested data on census block groups within one mile of "offsite parking locations from which workers would be transported."[53] There is no basis for limiting the analysis of these impacts on environmental justice communities to a one-mile radius. Instead, by limiting the analysis in this manner, FERC is ensuring that it will run headlong into one of the issues that rendered its environmental justice analysis inadequate in *Vecinos*. There, the D.C. Circuit determined that FERC analyzed environmental justice impacts within an arbitrarily determined geographic range and, therefore, FERC's environmental justice analysis was inadequate.[54] FERC appears to be doing the same thing here.

Instead, FERC must analyze impacts within a rationally determined geographic radius. There is good reason to think that a one-mile radius is, indeed, inappropriate. For example, the final environmental impact statement suggests that some traffic impacts will be felt well outside a one-mile radius and will impact environmental justice communities.[55] Whatever geographic radius FERC determines must be supported by the record and be adequately explained.[56]

In addition to asking the wrong question, FERC also does not have sufficient data to perform an adequate analysis of traffic impacts on environmental justice communities. Texas LNG indicated that it has not yet determined where it will place offsite parking lots and, therefore, cannot provide FERC with actionable data yet. Accordingly, Texas LNG provided almost no information on these impacts.[57]

---

[53] Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Response to August 16, 2022 Environmental Information Request at 3, Accession 20220915-5265.

[54] *Vecinos*, 6 F.4th at 1330-31.

[55] Final EIS at 4-333.

[56] *Vecinos*, 6 F.4th at 1330-31.

[57] Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Resposnet to August 16, 2022 Environmental Information Request at 3-9, Accession 20220915-5265. Additionally, what little information Texas LNG did provide, suggests that its ultimate analysis of traffic impacts will rely on a traffic impact analysis prepared in 2016. *See id.* at 5. Irrespective of the merits of this data in 2016, it is plainly stale now and Texas LNG must provide updated data. Likewise, Texas LNG provides two mitigation measures it claims will reduce "traffic impact on local roadways." *Id.* at 9. But there is no assessment of either the overall effectiveness of these mitigation measures or the effectiveness of these mitigation

---

*Comment in CP16-116-000 and CP16-116-002*     13

**JA478**

Because FERC does not have enough data to perform this analysis, it goes without saying that the public does not have enough information to provide meaningful comment on these impacts. FERC must provide for additional opportunities to comment on this issue. Otherwise, FERC is not ensuring the meaningful involvement of environmental justice communities that could be impacted in this manner.[58]

## V.    The Emergency Management Plan Information Provided by Texas LNG Is Inadequate

Texas LNG has not provided enough information to analyze the sufficiency of the emergency management plan. As Texas LNG acknowledged in its response to FERC's request that it has not yet developed an emergency management plan.[59] Therefore, there is no plan to comment on.

However, the information provided by Texas LNG does paint a worrisome picture. For example, in the information provided by Texas LNG, there is no mention of providing emergency response services in any languages other than English. This is unacceptable given the amount of people in the project area that are bilingual or speak English less than very well.[60] This obviously creates an extremely dangerous situation for the large portion of the project area population that would not be given information in a language that they understand and emergency response personnel operating in the inevitable chaos that would result from this confusion.

Additionally, despite the clear impacts of the Texas LNG project on environmental justice communities, Texas LNG has not indicated that it has any plans to ensure that its emergency response plan would mitigate any disproportionately high and adverse effects of the project experienced by project area environmental justice communities. FERC must ensure that the emergency management plan mitigates such effects.

---

measures to remedy any disproportionate impacts on environmental justice communities. FERC must perform these analyses with the most recent available data. Otherwise, FERC will not be able to perform an adequate analysis of the traffic impacts on environmental justice communities.

[58] *See* Promising Practices at 8-11.

[59] Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Response to August 16, 2022 Environmental Information Request at 21, Accession 20220915-5265.

[60] *See supra* note 12.

*Comment in CP16-116-000 and CP16-116-002*                                              14

**JA479**

## VI.    FERC Has Not Requested Sufficient Information To Analyze the Visual Impacts of the Texas LNG Project

As FERC is already aware, development of LNG infrastructure in the relatively undeveloped project area will entirely alter the character of the project area. Despite the likelihood of significant visible impacts, FERC has not requested enough information here to properly analyze the full extent of visual impacts that would be caused by the Texas LNG project or the cumulative visual impacts caused by the Texas LNG project and the Rio Grande LNG project.

FERC only requested information on "visual impacts on nearby residences from the LNG Terminal."[61] But this information request is plainly not inclusive of the many vantage points from which visual impacts can occur—*e.g.* recreational pursuits and driving.[62] Clearly, people may be able to see the Texas LNG terminal from places that are not residences and experience adverse visual impacts from those viewings. FERC must obtain the relevant data to analyze the full extent of the visual impacts that the Texas LNG facility will cause.

FERC's request is also not adequate to determine whether environmental justice communities will experience disproportionate levels of visual impacts. Cabining the request to impacts viewable from the residence nearest to the facility of course eliminates analyzing any visual impacts that may be uniquely felt by environmental justice communities because of the unique activities of those communities.[63] This underscores the importance of ensuring adequate participation of impacted environmental justice communities. Ensuring such participation allows FERC to analyze invaluable qualitative data as it considers these impacts.[64] The absence of this data renders FERC's analysis necessarily inadequate.

---

[61] Texas LNG Brownsville, LLC, FERC Docket No. CP16-116-000 Texas LNG Project Response to August 16, 2022 Environmental Information Request at 1, Accession 20220915-5265.

[62] Of course, while FERC's request is not inclusive of *all* possible visual impacts, visual impacts to people at residences are one aspect of visual impacts and must be studied by FERC along with other visual impacts. But FERC must evaluate residential visual impacts at residences outside the one closest to the facility. Other residences may be further away but may have, *e.g.*, less obstructed views of the facility.

[63] *E.g.* members of the Carrizo Comicrudo Tribe of Texas may be experience unique adverse visual impacts because the lands impacted by the Texas LNG facility are sacred to the tribe. *See supra* § IIb.

[64] *See supra* note 14.

## VII.   Conclusion

The undersigned commenters appreciate the opportunity to submit these comments and urge FERC to make the necessary changes to properly analyze the impacts to environmental justice communities. Ultimately, FERC must deny any outstanding applications and vacate any existing approvals. This project cannot go forward.

Respectfully Submitted,

*/s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
(424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club*

*/s/ Jennifer Richards*
Jennifer Richards
Texas Rio Grande Legal Aid
4920 N. IH-35
Austin, TX 78751
(512) 374-2758
jrichards@trla.org
*Attorney for Shrimpers and Fishermen of the RGV and Vecinos para el Bienestar de la Comunidad Costera*

*/s/ Juan B. Mancias*
Juan B. Mancias
onebigjuan@gmail.com
*On Behalf of Carrizo Comecrudo Tribal Nation of Texas*

*/s/ Ranjana Bhandari*
Ranjana Bhandari
liveablearlington@gmail.com
*On Behalf of Liveable Arlington*

*/s/ Joanie Steinhaus*
Joanie Steinhaus
joanie@tirn.net
*On Behalf of Turtle Island Restoration Network*

*/s/ Roishetta Ozane*
Roishetta Ozane
roishetta@gmail.com
*On Behalf of The Vessell Project of Louisiana*

*/s/ John Beard, Jr.*
John Beard, Jr.
john.beard901456@outlook.com
*On Behalf of Port Arthur Community Action Network*

*/s/ Juan Parras*
Juan Parras
parras.juan@gmail.com
*On Behalf of Texas Environmental Justice Advocacy Services*

/s/ Mary Lovell
Mary Lovell
mary@ran.org
*On Behalf of Rainforest Action Network*

/s/ James Hiatt
James Hiatt
james@labucketbrigade.org
*On Behalf of Louisiana Bucket Brigade*

/s/ Luke Metzger
Luke Metzger
luke@environmenttexas.org
*On Behalf of Environment Texas*

/s/ Nichelle Taylor
Nichelle Taylor
ntaylor@gnoha.org
*On Behalf of Greater New Orleans
Housing Alliance*

/s/ Stefanie Klass
Stefanie Klass
stefanie.klass@gmail.com
*On Behalf of CatholicNetwork US*

/s/ Anna Ramirez
Anna Ramirez
afrancis_@hotmail.com
*On Behalf of Southwest Organization
for Sustainability*

/s/ Harmony Cummings
Harmony Cummings
harmonycharlee1@gmail.com
*On Behalf of Green House Collaboration
Center*

/s/ Renée Chacon
Renée Chacon
reneemchacon@gmail.com
*On Behalf of Womxn from the Mountain*

/s/ Collin Rees
Collin Rees
collin@priceofoil.org
*On Behalf of Oil Change International*

/s/ Jim Walsh
Jim Walsh
jwalsh@fwwatch.org
*On Behalf of Food and Water Watch*

/s/ Shelley Livaudais
Shelley Livaudais
*On Behalf of Texas Public Interest
Research Group Education Fund*

/s/ Cheryl Barnds
Cheryl Barnds
risewiththesea@gmail.com
*On Behalf of RapidShift Network &
Honor the Earth*

/s/ Shannon Francis
Shannon Francis
sfrancis@spiritofthesun.org
*On Behalf of Spirit of the Sun*

/s/ Fred Kirsch
Fred Kirsch
cforse.fred@gmail.com
*On Behalf of Community for
Sustainable Energy*

/s/ Marie Venner
Marie Venner
marie@vennerconsulting.com
*On Behalf of Business for a Livable
Climate*

/s/ Jeff Hart
Jeff Hart
jeffshart@gmail.com
*On Behalf of Save the Environmental
Protection Agency*

/s/ Maura Stephens
Maura Stephens
maurastephens1@gmail.com
*On Behalf of System Change Not Climate Change*

/s/ Matt Leonard
Matt Leonard
matt@oilgasaction.org
*On Behalf of Oil and Gas Action Network*

/s/ Michael Esealuka
Michael Esealuka
michaelesealuka@healthygulf.org
*On Behalf of Healthy Gulf*

/s/ Martha Carleton
Martha Carleton
calamitymj@yahoo.com
*On Behalf of 350 Austin*

/s/ Rebekah Sale
Rebekah Sale
rebekahsale@pipelinecenter.org
*On Behalf of Property Rights and Pipeline Center*

/s/ Elida Castillo
Elida Castillo
ecastillo@lcv.org
*On Behalf of Chispa Texas*

/s/ Mary Bernard
Mary Bernard
mary@btbiosphereserve.org
*On Behalf of Big Thicket Biosphere Reserve*

/s/ Jesús Manuel Reyes
Jesús Manuel Reyes
Jesusreyes867@gmail.com
*On Behalf of SunRise El Paso*

/s/ Phillip Beck
Phillip Beck
beck.phillips@gmail.com
*On Behalf of Indivisible Ambassadors*

/s/ Sheila Serna
Sheila Serna
sheila@rgisc.org
*On Behalf of Rio Grande International Study Center*

/s/ Emma Guevara
Emma Guevara
emmacguevara89@gmail.com
*On Behalf of South Texas Environmental Justice Network*

/s/ Jules Blank
Jules Blank
jules@seedingsovereignty.org
*On Behalf of Seeding Sovereignty*

/s/ Rebekah Hinojosa
Rebekah Hinojosa
anothergulfispossible@gmail.com
*On Behalf of Another Gulf is Possible Collaborative*

/s/ Denisce Palacios
Denisce Palacios
denisce@tfn.org
*On Behalf of Texas Rising Action*

/s/ Marcie Keever
Marcie Keever
mkeever@foe.org
*On Behalf of Friends of the Earth*

/s/ Drew Hudson
Drew Hudson
drew@198methods.org
*On Behalf of 198 Methods*

*/s/ Robin Schneider*
Robin Schneider
robin@texasenvironment.org
*On Behalf of Texas Campaign for the
Environment*

*/s/ Chris Phelan*
Chris Phelan
ftggcoastalbend@gmail.com
*On Behalf of For the Greater Good*

*/s/ Jennifer Krill*
Jennifer Krill
jkrill@@earthworksaction.org
*On Behalf of Earthworks*

Document Accession #: 20221019-5066    Filed Date: 10/19/2022

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Bexar County, Texas this 19th Day of October, 2022.

/s/ *Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
(424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club*

# Promising Practices for EJ Methodologies in NEPA Reviews

*Report of the Federal Interagency Working Group on Environmental Justice & NEPA Committee*

*Working together towards collaborative and innovative solutions*

MARCH 2016

JA486

Environmental Impact Statement should be prepared.

3. A disproportionately high and adverse impact to minority populations and low-income populations can occur at any level of NEPA review. In some circumstances, an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA. In other circumstances, an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA.

4. In general, pursuant to NEPA, determining whether an impact is significant requires consideration of both context (i.e., society as a whole, the affected region, the affected interests, and the locality) and intensity (i.e., the severity of the impact) (see 40 CFR §1508.27(a)-(b)). The impacts of a proposed action on minority populations and low-income populations should inform the determination of whether impacts are significant.

5. An assessment of an impact's significance to the general population without consideration of the impact to minority populations and low-income populations in the affected environment may not be adequate. An agency's consideration of impacts to minority populations and low-income populations helps ensure that significant impacts are identified.

6. Executive Order 12898 instructs agencies to determine whether impacts are disproportionately high and adverse to minority populations and low-income populations but EO 12898 does not address significance. Agencies may choose to consider determining whether an impact is significant prior to analyzing whether the impact is disproportionately high and adverse, since significance may be a factor for consideration in an agency's disproportionately high and adverse determination.[14] To the extent agencies seek additional guidance on how to analyze significance. Refer to CEQ NEPA regulation on significance at 40 CFR §1508.27. (See also section 7.1-2)

7. Determining whether an impact is significant to minority populations and low-income populations in the affected environment involves focusing the analysis on aspects of context and intensity most relevant to the impacted community. In general, this entails focusing on various factors related to an impact's severity

---

[14] See Appendix A, "Text of Executive Order 12898, 'Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,' Annotated with Proposed Guidance on Terms in the Executive Order," which is attached to CEQ's *Environmental Justice Guidance Under the National Environmental Policy Act* (1997)

Document Accession #: 20221019-5066     Filed Date: 10/19/2022

# VIII.  DISPROPORTIONATELY HIGH AND ADVERSE IMPACTS

## Guiding Principles

Agencies can be informed by consideration of the following guiding principles:

1. As informed by CEQ's *Environmental Justice Guidance Under the National Environmental Policy Act* (1997), the identification of a disproportionately high and adverse impact on minority and low income populations does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory. If an agency determines there is a disproportionately high and adverse impact to minority populations and low-income populations, an agency may wish to consider heightening its focus on meaningful public engagement regarding community preferences, considering an appropriate range of alternatives (including alternative sites), and mitigation and monitoring measures.

2. 'Context' and 'intensity', evaluated during the consideration of an impact's significance (See 40 CFR §1508.27) may be factors that can (as appropriate) inform an agency's determination whether an impact is disproportionately high and adverse (See Executive Order 12898).

3. 'Significance' may, as appropriate, be a factor in determining if an impact is disproportionately high and adverse. (See Appendix A, Text of Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, Annotated with Proposed Guidance on Terms" which is attached to CEQ's *Environmental Justice Guidance Under the National Environmental Policy Act* (1997) ). In some circumstances, an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA. In other circumstances, an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA. A finding of no significant impacts to the general population is insufficient (on its own) to base a determination that there are no disproportionately high and adverse impacts to minority populations and low-income populations.

4. Disproportionately high and adverse impacts are typically determined based on the impacts in one or more resource topics analyzed in NEPA documents. Any identified impact to human health or the environment (e.g., impacts on noise, biota, air quality, traffic/congestion, land use) that potentially affects

Document Accession #: 20221019-5066     Filed Date: 10/19/2022

minority populations and low-income populations in the affected environment might result in disproportionately high and adverse impacts.

5. Agencies may wish to integrate the analysis of the potential for disproportionately high and adverse impacts to minority populations and low-income populations into the NEPA process. The basic principles and practices of analysis applicable to all resource topics analyzed in the NEPA document (air emissions, water, biota, human health, noise, etc.) apply to the analysis of disproportionately high and adverse impacts as well.

6. Agencies may wish to consider factors that can amplify identified impacts (e.g., the unique exposure pathways, prior exposures, social determinants of health) to ensure a comprehensive review of potential disproportionately high and adverse impacts to minority populations and low-income populations.

7. Agencies may wish to recognize that in instances where an impact from the proposed action initially appears to be identical to both the affected general population and the affected minority populations and low-income populations, there may be inter-related ecological, aesthetic, historic, cultural, economic, social, or health factors that amplify the impact (e.g., unique exposure pathways, social determinants of health, community cohesion). After consideration of factors that can amplify an impact to minority populations and low-income populations in the affected environment, an agency may determine the impact to be disproportionately high and adverse.

8. Agencies' approaches should not determine that a proposed action or alternative would not have a disproportionately high and adverse impact on minority populations and low-income populations solely because the potential impacts of the proposed action or alternative on the general population would be less than significant (as defined by NEPA). Agencies may wish to consider unique vulnerabilities, special exposure pathways, and cultural practices associated with minority populations and low-income populations in the affected environment.

9. The disproportionately high and adverse impacts determination can help inform how an agency develops and/or selects alternative(s) and mitigation measures to avoid, minimize, rectify, reduce, or compensate for adverse impacts.

10. Agencies may wish to consider the distribution of beneficial and adverse impacts between minority populations and low-income populations in the

JA489



Federal Energy Regulatory Commission
Secretary of the Commission, Kimberly D. Bose
888 First St, NE, Washington, DC 20426

October 19, 2022

**Re: Public Comments for Rio Grande / Texas LNG (Docket No. CP16-454-000, CP16-454-003, CP16-455-000, CP16-455-002 , CP16-116-000, and CP16-116-002)**

To the Federal Energy Regulatory Commission (FERC),

The Sierra Club submits the following 249 signatures on behalf of our members and supporters with the following message language:

Dear Commisioners,

The FERC is currently re-reviewing the climate and environmental justice impacts of the Rio Grande LNG and Texas LNG facilities that would destroy vital wildlife habitat for the endangered ocelot and pollute marginalized people of color and Indigenous communities. I support communities in South Texas that would feel the negative impacts of the dirty, dangerous gas plants, and I oppose Rio Grande LNG and Texas LNG.. In South Texas, South Padre Island, Port Isabel, Laguna Vista, and Long Island Village have all passed resolutions against LNG because they don?t want to live next to polluting LNG facilities. If Rio Grande LNG and Texas LNG were built, they would release toxic pollution that causes cancer, like volatile organic compounds (VOCs) and dangerous particulate matter, which makes respiratory illnesses worse in these South Texas communities that don't have easy access to medical care. The Carrizo Comecrudo Tribe of Texas has never been formally consulted by these LNG companies or FERC, even though building and running gas plants would disturb their sacred sites. The FERC needs to host public meetings in a town hall format with Spanish language interpretation and translate all permit documents into Spanish so the community can ask questions and receive information about the LNG projects. The FERC must also consider how this LNG terminal would affect nearby communities and the climate when deciding whether or not to approve the application. If the application is denied, this LNG terminal will not be built. Thank you for considering my comment.


Thank you for considering these comments.

**JA490**

**45.** Derinda Nilsson
Utica, NY 13502


**46.** Lisa Silguero
San Antonio, TX 78259


**47.** Shelley Cole
Roseville, MI 48066


**48.** Sharon LaLond
Oro Valley, AZ 85704


**49.** Denise Jones
Conroe, TX 77305


**50.** Ginger A Young
Spring, TX, TX 77379


**51.** Brenda Choi
Las Vegas, NV 89122


**52.** Sue Duncan
Wellington, FL 33414


**53.** Daniel Summers
Kingwood, TX 77346


**JA491**

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

**In Reply Refer To:**
OEP/DLNG/LNG2
OEP/DG2E/Gas Branch 1
Texas LNG Brownsville LLC
Texas LNG Project
Docket No. CP16-116-000

October 28, 2022

VIA Electronic Mail

A. Gregory Junge
Attorney for Texas LNG Brownsville LLC
Hogan Lovells US LLP
greg.junge@hoganlovells.com

**Re:    Environmental Information Request**

Dear Mr. Junge:

The information described in the enclosures is required for the above-mentioned docket to address deficiencies noted in the U.S. Court of Appeals for the D.C. Circuit's August 3, 2021 decision in Vecinos para el Bienetar de la Comunidad Costera v. FERC, 6 F.4th 1321 (D.C. Cir. 2021), and for staff to conduct additional necessary analysis for the authorized LNG export terminal.  **Please file a complete response within 10 days of the date of this letter**.  If certain information cannot be provided within this time frame, please indicate which items will be delayed and provide a projected filing date.

File your response in accordance with the provisions of the Commission's Rules of Practice and Procedure.  In particular, 18 CFR 385.2005 requires all responses to be filed under oath by an authorized Texas LNG Brownsville LLC representative, and 18 CFR 385.2010 (Rule 2010) requires service to each person whose name appears on the official service list for this proceeding.

Electronic filing is encouraged using the Commission's eFiling system (see https://www.ferc.gov/ferc-online/overview).  When filing documents and maps, prepare separate volumes as outlined on the Commission's website at https://www.ferc.gov/ceii-filing-guide and https://www.ferc.gov/enforcement-legal/ceii/ferc-cui-processes for labelling controlled unclassified information (CUI).  Critical Energy Infrastructure Information (CEII) (e.g., plot plans showing equipment or piping details) and privileged information (PRIV) (e.g., trade secret information; proprietary information) are

**JA492**

considered CUI.  This information should be filed as non-public and labeled as:
**"CUI//CEII – DO NOT RELEASE"** (18 CFR §388.113), **"CUI//PRIV – DO NOT RELEASE"** (18 CFR §388.112), and as otherwise appropriate with other statutes for labelling CUI (e.g., **"CUI//CEII/SSI – DO NOT RELEASE"** and in accordance with 49 CFR §15.13 marking requirements).  All CUI should be filed separately from the remaining information, which should be marked **"Public."**  For assistance with the Commission's eFiling system, please contact FERC Online Support at FERCOnlineSupport@ferc.gov, (866) 208-3676 (toll free), or (202) 502-8659 (TTY).

In addition, hardcopy deliveries to the Commission's headquarters at 888 First Street NE, Washington, DC 20426 will only be accepted through the U.S. Postal Service. Hand-deliveries and submissions sent through carriers other than the U.S. Postal Service must be sent to 12225 Wilkins Avenue, Rockville, MD 20852 for security screening and processing (see 18 CFR § 385.2001).

If you have any questions, please contact me at (202) 502-6265.  Thank you for your cooperation.

Sincerely,

Kareem Monib
Gas Branch 1
Office of Energy Projects

Enclosure 1 - Public

**JA493**

Enclosure 1

Texas LNG Brownsville LLC
Texas LNG Project
Docket No. CP16-116-000

**ENVIRONMENTAL INFORMATION REQUEST**

1.      Provide the distance from the proposed facility to the farthest exceedance of the Significant Impact Level (SIL) for each criteria pollutant.

2.      Provide a discussion explaining why concentrations of pollutants during maneuvering are in some cases less than during hoteling.  For example, table 9-3-1 in your September 21, 2022 filing gives concentrations for several criteria pollutants which are greater during hoteling than during maneuvering.

3.      With reference to table 9-3-1, provide a discussion explaining why in many cases the background inventory (3-INV)[1] when added to the Texas LNG contribution during hoteling or maneuvering is substantially less than 1-INV[2] and 2-INV[3] values.

4.      Provide a discussion of each modeled exceedance of the National Ambient Air Quality Standards (NAAQS) in table 9-3-1 and whether Texas LNG's contribution would exceed the SIL for that NAAQS exceedance.  For example, in Census Tract 012304, Block Group 2, the predicted concentration of 1-hour nitrogen dioxide during hoteling is 209.1 micrograms per cubic meter ($\mu g/m^3$) which exceeds the NAAQS of 188 $\mu g/m^3$.  The contribution of Texas LNG in this scenario is given as 135.9 $\mu g/m^{3,}$ which is above the interim SIL for 1-hour nitrogen dioxide of 7.5 $\mu g/m^3$.

---

[1] Scenario 3-INV: This scenario includes the full inventory of sources within 50 kilometers of TX LNG and ambient background concentrations, excluding Texas LNG and NextDecade Rio Grande.

[2] This scenario includes modeled concentrations including ambient background that are contributed by the full inventory of sources within 50 kilometers of Texas LNG, in addition to modeled concentrations that are contributed by the Texas LNG terminal during hoteling.

[3] This scenario includes modeled concentrations including ambient background that are contributed by the full inventory of sources within 50 kilometers of Texas LNG, in addition to modeled concentrations that are contributed by the Texas LNG terminal during maneuvering.

1

**JA494**

Document Accession #: 20221028-3007    Filed Date: 10/28/2022

Document Content(s)

CP16 116 Texas LNG DR Oct 2022.pdf.......................................1

**JA495**

TEXAS LNG

TEXAS LNG BROWNSVILLE LLC
2800 NORTH LOOP WEST, SUITE 910
HOUSTON, TX 77092
USA

November 7, 2022

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Re:    **Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
       **Texas LNG Project**
       **Response to October 28, 2022 Environmental Information Request**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to construct and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

Commission Staff issued a supplemental Environmental Information Request to Texas LNG on October 28, 2022 ("October 28 Data Request").  Texas LNG hereby responds to Commission Staff's October 28 data requests.

As part of this response Texas LNG updated its Air Dispersion Modeling and Air Quality Impact Analysis.  Due to the size and file format of the modeling files, Texas LNG has provided the modeling archive associated with the air emissions modeling analysis to FERC on a portable hardrive under separate cover.  These files include:

- README text file describing modeling archive contents;
- AERMOD input and output files; and
- Plot Files.

---

[1] *Tex LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA496**

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas 1
Texas LNG Brownsville LLC
Texas LNG Project
Docket No. CP16-116-000
§ 375.308(x)

January 6, 2023

VIA FERC Service

Pawandeep Singh
Vice President
Texas LNG Brownsville LLC
2800 North Loop West, Suite 910
Houston, TX 77092

**Re: Environmental Information Request**

Dear Mr. Singh:

    The information described in the enclosure is requested for the above-mentioned docket to address deficiencies noted in the U.S. Court of Appeals for the D.C. Circuit's August 3, 2021 decision in *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021). **Please file a complete response within 15 days of the date of this letter.** If certain information cannot be provided within this time frame, please indicate which items will be delayed and provide a projected filing date.

    File your response in accordance with the provisions of the Commission's Rules of Practice and Procedure. In particular, 18 CFR 385.2005 requires all responses be filed under oath by an authorized Texas LNG Brownsville LLC representative, and 18 CFR 384.2010 requires service to each person whose name appears on the official service list for this proceeding.

    Electronic filing is encouraged using the Commission's eFiling system (see https://ferconline.ferc.gov/eFiling.aspx). Be sure to prepare separate volumes, as outlined on the Commission's website at https://www.ferc.gov/sites/default/files/2020-04/CEII-Filing-guidelines.pdf, and label all controlled unclassified information (CUI) as described

**JA497**

**Texas LNG Project (Project)**
**Docket No. CP16-116-000**
**Environmental Information Request dated January 6, 2022**

1.      On May 2, 2022, Texas LNG provided modeling results showing that the Texas LNG terminal would not be culpable for any National Ambient Air Quality Standards (NAAQS) exceedances. We note that on November 1, 2022, Rio Grande LNG, LLC (Rio Grande LNG) provided updated emissions values for its project.[2] In order for FERC staff to complete its analysis of the emissions from both Texas LNG and Rio Grande LNG as accurately as possible, including cumulatively, please provide an updated analysis that includes maximum emissions scenarios from the Rio Grande LNG Terminal [Docket No. CP16-454- 000]. Specifically, provide an updated refined air quality model for the Texas LNG Terminal that demonstrates whether Texas LNG's emissions of criteria pollutants from the Texas LNG Terminal and mobile sources result in any exceedance of the NAAQS, or state standards. **Provide a detailed narrative to describe the modeling protocols and methodology used to determine the predicted and background concentration values**. Ensure that all emissions from the Texas LNG Terminal are reflected in the air quality model inputs and provide all source input parameters (emission rate, stack height, stack temperature, exit velocity, etc.), and justify the bases for any assumptions. Include mobile ship emissions (LNG carrier, tugs, escort vessels) for the air quality model for the moored safety zone. The model should include relevant regional monitoring ambient background data and existing and proposed regional industrial major sources within 50 kilometers of the fence line of the Texas LNG Terminal (include the Rio Grande LNG Terminal [Docket No. CP16-454-000] and associated vessel emissions).

**PLEASE NOTE**: FERC Staff is issuing a similar request to Rio Grande LNG, and we strongly encourage Texas LNG and Rio Grande LNG to share emissions values and modeling parameters to obtain accurate and consistent results; this will greatly assist FERC staff in interpreting the modeled emissions from each project separately as well as cumulatively.

**Response 1**

Consistent with FERC Staff's strong encouragement for Texas LNG and Rio Grande LNG to share emissions values and modeling parameters, Texas LNG acquired the modeled source parameters and emission rates for the Rio Grande LNG Terminal and associated vessel emissions from Rio Grande LNG (Docket No. CP16-454-000). Texas LNG has also acquired the background inventory used by Rio Grande LNG Terminal. Rio Grande LNG and Texas LNG's background inventory was compiled in a similar manner to identify background sources out to 50 kilometers from the project site. The background inventory data were obtained from Texas Commission for Environmental Quality (TCEQ). Texas LNG took steps to fill in missing data in the TCEQ data using established TCEQ guidelines, similar to Rio Grande LNG. Rio Grande LNG took additional steps to condition the raw TCEQ inventory data using standard and well-accepted methods to reflect real world conditions better, as outlined below. As noted below, Texas LNG has adopted the background inventory sources used by Rio Grande LNG, with an additional refinement of the $PM_{2.5}$ background monitor value in this

**JA498**

response to FERC to more accurately reflect the actual circumstances of the background emissions concentrations.

**Rio Grande LNG TCEQ Inventory Data Conditioning**

*Consistent with guidance from the Environmental Protection Agency (EPA), short-term $NO_X$ and $SO_2$ emissions for sources that operate intermittently (e.g., emergency generators, fire water pump engines, flares) were scaled by the annual hours of operation to calculate an average hourly rate rather than a maximum hourly rate. This methodology is consistent with guidance recommended in the USEPA guidance memo Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ National Ambient Air Quality Standard[2] and referenced in Appendix S of the TCEQ modeling guidance. Hourly $PM_{10}$ and $PM_{2.5}$ emissions for emergency engines were scaled by 1/24 to calculate the average hourly rate to simulate testing and/or maintenance occurring for one hour in any given day.*

*Further site-specific refinements were made to the following inventory sources:*

- *Transmontaigne Operating Company – Southwest Terminal. At the Transmontaigne Operating Company – Southwest Terminal, no source parameters were provided in the IRD inventory for the vapor combustion unit (inventory ID: 550779). The source parameters were updated using parameters from a thermal oxidizer (ID: 550719) at the same facility.*

- *Chapa Quiroga, LLC – San Benito Grain Elevator. The IRD inventory did not provide source parameters for two combustion sources (IDs 400083 and 400087) at the Chapa Quiroga, LLC – San Benito Grain Elevator facility. Based on industry experience and inspection of Google earth aerial photos and Streetview, the following stack parameters were assigned to the two sources:*

  - *Stack height = 30.48 m*
  - *Exhaust Temperature = 422.04 K*
  - *Exit Velocity = 9.14 m/s*
  - *Stack Diameter = 0.61 m*

- *Gavilon Grain Harlingen. No source data was provided in the IRD inventory for all sources at Gavilon Grain Harlingen. Based on industry experience and inspection of Google Earth aerial photos and Streetview, it was concluded that the emissions from this facility are emitted from dust collectors or baghouses. Therefore, the following stack parameters were assigned to all Gavilon sources:*

  - *Stack Height = 36.58 m*
  - *Exhaust Temperature = Ambient + 30 degrees (represented as -30 in the model file)*

---

[2] https://www.epa.gov/sites/default/files/2015-07/documents/appwno2_2.pdf

**JA499**

> • *Exit Velocity = 9.14 m/s*
> • *Stack Diameter = 0.61 m*

- *Keppel Amfels. Based on review of modeling files from a 1988 permit application, one of the fugitive sources at The Keppel Amfels facility (ID: 518641) was limited to 8 hours per day of operation, specifically from 9 AM until 5 PM. The model keywords EMISFACT and HROFDY were used in the PM10 and PM2.5 model runs to limit the hours of operation for this emission unit.*

- *City of Harlingen Landfill. In the IRD inventory, the incinerator at the City of Harlingen Landfill (ID: 480142) was missing two source parameters; the exhaust temperature and the exit velocity. The missing parameters were filled using another incinerator in the IRD inventory located at Lopez Enterprises (ID: 29423).*

- *The New Fuels Inc. Xanol Production Facility. The Xanol Production Facility (ID: 3617) was permitted in 1981. However, the facility was never built, and the company was disbanded in 1993. Therefore, this emission unit was removed from the inventory.*

The steps taken by Rio Grande LNG to condition the TCEQ inventory data are an appropriate step to prevent the background inventory sources from overstating air quality impacts based on unrealistic operations of these background inventory sources.    For example, removing emissions associated in the TCEQ inventory data with the Xanol Production Facility that was never built and therefore has no emissions improves the accuracy of TCEQ's data.   The additional research conducted by Rio Grande LNG for the above inventory sources better reflects the actual circumstances of those sources than the unconditioned data set. Additionally, and in accordance with the EPA's 2022 Guidance for Ozone and Fine Particulate Matter Permit Modeling,[3] ERM refined the ambient background concentrations for 24-hour $PM_{2.5}$ by applying a 3-year average of the seasonal 24-hour $PM_{2.5}$ monitor values (as shown in Table 9-4) rather than the less accurate 3-year average design background monitor value.  This refinement better reflects the actual circumstances of the background concentrations of $PM_{2.5}$. Therefore, Texas LNG has adopted the background inventory sources used by Rio Grande LNG, with an additional refinement of the $PM_{2.5}$ background monitor value in this response to FERC.

Accordingly, this filing provides an updated set of modeling results (summarized below in Tables 9-5 through Table 9-6), which summarize the results of the cumulative air quality modeling analysis that includes sources from Texas LNG, Rio Grande LNG, background sources within 50 kilometers, and background monitor data.

This filing also includes as Attachment 1 an updated Table 9-3-1 and Table 9-3-2. These tables present the maximum modeled design concentrations for each census block group within 50 kilometers of the Project.  Additionally, figures that present modeled concentration isopleths are provided in Attachment 2.  These figures present the full range of concentrations for all

---

[3] https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM25_Permit_Modeling.pdf

criteria pollutants for two scenarios: the stationary sources with marine sources hoteling, and stationary sources with marine sources maneuvering/transiting.

With regard to FERC Staff's request to provide detailed modeling protocol and methodology, Texas LNG previously filed this information with FERC as follows:

- With the exception of modeling Rio Grande LNG, LLC, Texas LNG provided the requested information in response to the Commission's February 3, 2022 Environmental Information Request (FERC Accession # 20220203-3050).
- Texas LNG excluded Rio Grande LNG LLC from the modeling updates at the Commission's request in Texas LNG's response (FERC Accession # 20220502-5075, filed on 4/29/2022). Texas LNG satisfied that EIR in that response, including a description of each update made to the modeling report previously filed with FERC (Document Accession # 20170928-5165 filed on 9/28/2017) titled, *Air Dispersion Modeling and Air Quality Impact Analysis, Texas LNG Project, Cameron County, Port of Brownsville, Texas, FERC Docket CP16-116, September 2017.* Note that Table 9-3-1 in this filing was later revised and re-submitted to FERC, see FERC Accession # 20221107-5114. Also note that Table 9-4 in this filing was later revised and re-submitted to FERC, see FERC Accession # 20220915-5265.


Response by:   Pawandeep Singh, Vice President
               Texas LNG Brownsville LLC
               443-771-5990

2.      Using the model developed in response to question 1 above, evaluate the maximum contribution of the Texas LNG Terminal to any modeled NAAQS exceedance using the MAXDCONT option in AERMOD.

**Response 2**

The modeling results presented in this revision are shown for two scenarios (originally, the results presented in Table 9-4 were for the highest of the two scenarios):

- stationary sources with marine sources hoteling; and
- stationary sources with marine sources maneuvering/transiting

The modeling results for the hoteling scenario and maneuvering scenario are presented in Table 9-5 and Table 9-6, respectively. Further analysis was not performed because no modeled exceedances were identified in the analysis.

Response by:   Pawandeep Singh, Vice President
               Texas LNG Brownsville LLC
               443-771-5990

**Table 9-4**
**Seasonal 98th Percentile PM2.5 24-hour Ambient Background Concentration in Brownsville (Monitor ID 48-061-0006)**

| Year | Winter | Spring | Summer | Fall |
|---|---|---|---|---|
| 2018 | 20.30 | 21.90 | 26.10 | 16.60 |
| 2019 | 24.00 | 25.10 | 22.60 | 24.30 |
| 2020 | 22.50 | 34.00 | 30.30 | 28.00 |
| **3-Year Average** | **22.27** | **27.00** | **26.33** | **22.97** |

Document Accession #: 20230130-5250    Filed Date: 01/30/2023

Table 9-5
Results of the Cumulative Impact Analysis – Hoteling Scenario

| Pollutant | Ave Period | Highest Predicted Concentration (Max Impact) (µg/m³) | Ambient Background Values [1] (µg/m³) | Coordinates of Maximum Impact | | Direction of Max Impact from TX LNG | Distance of Max Impact from TX LNG (km) | NAAQS (µg/m³) | Over NAAQS? | Maximum TX LNG Impact [5] (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Easting (X) (m) | Northing (Y) (m) | | | | | |
| CO | 1-hour | 6,867.45 | 3,778.50 | 673,368.13 | 2,877,693.75 | SW | 5.40 | 40,000 | No | 951.20 |
| | 8-hour | 4,545.67 | 2,175.50 | 673,368.13 | 2,877,693.75 | SW | 5.40 | 10,000 | No | 120.38 |
| $NO_2$ | 1-hour | 147.78 | [2] | 677,313.96 | 2,881,360.45 | SE | 0.38 | 188 | No | 124.53 |
| | Annual | 9.60 | 4.72 | 677,181.70 | 2,881,130.04 | S | 0.53 | 100 | No | 4.79 |
| $PM_{10}$ | 24-hour | 112.99 | 69.67 | 664,218.13 | 2,873,193.75 | SW | 15.36 | 150 | No | 4.04 |
| $PM_{2.5}$ | 24-hour [3] | 32.29 | [2] | 636,718.13 | 2,897,943.75 | NW | 43.50 | 35 | No | 3.33 |
| | Annual [4] | 11.75 | 10.13 | 663,768.13 | 2,873,193.75 | SW | 15.74 | 12 | No | 0.10 |
| $SO_2$ | 1-hour | 140.96 | 14.85 | 651,718.13 | 2,878,943.75 | W | 25.48 | 196 | No | 10.80 |
| | 3-hour | 96.41 | 5.24 | 651,718.13 | 2,878,943.75 | W | 25.48 | 1,300 | No | 53.37 |
| | 24-hour | 21.34 | 3.14 | 651,718.13 | 2,878,943.75 | W | 25.48 | 365 | No | 6.85 |
| | Annual | 5.19 | 1.36 | 673,068.13 | 2,877,993.75 | SW | 5.40 | 80 | No | 0.97 |

Notes:

(1) Ambient background values are included in the Highest Predicted Concentration (Maximum Impact) values.

(2) Seasonal/diurnal background data were developed for use in the 1-hour $NO_2$ modeling analysis; seasonal background data were developed for use in the 24-hour $PM_{25}$ modeling analysis. Table 9-4 summarizes the $PM_{2.5}$ seasonal background concentrations that were developed based on the three-year average of seasonal 98th percentile 24-hr monitor values.

(3) Secondary 24-hour $PM_{2.5}$ impact of 0.2617 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(4) Secondary annual $PM_{2.5}$ impact of 0.0077 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(5) Maximum Texas LNG contribution that could occur anywhere or anytime on the grid. The Texas LNG impact is not paired in time or space with the peak concentration.

**JA504**

Table 9-6
Results of the Cumulative Impact Analysis – Maneuvering and Transit Scenario

| Pollutant | Ave Period | Highest Predicted Concentration (Max Impact) (µg/m³) | Ambient Background Values [1] (µg/m³) | Coordinates of Maximum Impact Easting (X) (m) | Northing (Y) (m) | Direction of Max Impact from TX LNG | Distance of Max Impact from TX LNG (km) | NAAQS (µg/m³) | Over NAAQS? | Maximum TX LNG Impact [5] (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|---|
| CO | 1-hour | 6,867.45 | 3,778.50 | 673,368.13 | 2,877,693.75 | SW | 5.40 | 40,000 | No | 973.34 |
| | 8-hour | 4,545.67 | 2,175.50 | 673,368.13 | 2,877,693.75 | SW | 5.40 | 10,000 | No | 113.16 |
| NO₂ | 1-hour | 141.54 | [2] | 637,718.13 | 2,899,943.75 | NW | 43.38 | 188 | No | 81.86 |
| | Annual | 8.06 | 4.72 | 655,668.13 | 2,870,043.75 | SW | 24.33 | 100 | No | 1.87 |
| PM₁₀ | 24-hour | 112.98 | 69.67 | 664,218.13 | 2,873,193.75 | SW | 15.36 | 150 | No | 1.76 |
| PM₂.₅ | 24-hour [3] | 32.29 | [2] | 636,718.13 | 2,897,943.75 | NW | 43.50 | 35 | No | 1.46 |
| | Annual [4] | 11.75 | 10.13 | 663,768.13 | 2,873,193.75 | SW | 15.74 | 12 | No | 0.10 |
| SO₂ | 1-hour | 140.96 | 14.85 | 651,718.13 | 2,878,943.75 | W | 25.48 | 196 | No | 10.80 |
| | 3-hour | 96.41 | 5.24 | 651,718.13 | 2,878,943.75 | W | 25.48 | 1,300 | No | 53.37 |
| | 24-hour | 21.34 | 3.14 | 651,718.13 | 2,878,943.75 | W | 25.48 | 365 | No | 6.84 |
| | Annual | 5.19 | 1.36 | 673,068.13 | 2,877,993.75 | SW | 5.40 | 80 | No | 0.92 |

Notes:

(1) Ambient background values are included in the Highest Predicted Concentration (Maximum Impact) values.

(2) Seasonal/diurnal background data were developed for use in the 1-hour $NO_2$ modeling analysis; seasonal background data were developed for use in the 24-hour $PM_{2.5}$ modeling analysis. Table 9-4 summarizes the $PM_{2.5}$ seasonal background concentrations that were developed based on the three-year average of seasonal 98th percentile 24-hr monitor values.

(3) Secondary 24-hour $PM_{2.5}$ impact of 0.2617 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(4) Secondary annual $PM_{2.5}$ impact of 0.0077 µg/m³ added to the Maximum Impact and Texas LNG Impact.

(5) Maximum Texas LNG contribution that could occur anywhere or anytime on the grid. The Texas LNG impact is not paired in time or space with the peak concentration.

Document Accession #: 20230130-5250          Filed Date: 01/30/2023

**JA505**

Texas LNG

TEXAS LNG BROWNSVILLE LLC
2800 NORTH LOOP WEST, SUITE 910
HOUSTON, TX 77092
USA

February 22, 2023

Kimberly D. Bose
Office of the Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Re:     **Texas LNG Brownsville LLC, FERC Docket No. CP16-116-000**
     **Texas LNG Project**
     **Response to February 7, 2023 Request for Additional Information**

Dear Ms. Bose,

On November 22, 2019, the Federal Energy Regulatory Commission ("Commission" or "FERC") authorized Texas LNG Brownsville LLC ("Texas LNG") to construct and operate facilities for the liquefaction and export of domestically produced natural gas at a liquefied natural gas ("LNG") terminal on the north side of the Brownsville Ship Channel in Cameron County, Texas ("Texas LNG Project").[1]

On February 7, 2023, Texas LNG received an informal request from Commission staff that Texas LNG update previously filed information with more recent census block data. Texas LNG hereby submits the enclosed material to respond to the Commission Staff's February 7, 2023, informal request for additional information.

If you have any questions, please do not hesitate to contact me at pawandeep.singh@aldermidcompanies.com or 443-771-5990 (Direct Phone).

Sincerely,

*/s/ Pawandeep Singh*

Pawandeep Singh
Vice President
Texas LNG Brownsville LLC

Enclosures

cc:     Kareem Monib, FERC
     Robin Griffin, FERC

---

[1] *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (2019), *order on reh'g and stay*, 170 FERC ¶ 61,139 (2020), *remanded without vacatur*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

**JA506**

Tristan Brown
Deputy Administrator
Pipeline and Hazardous Materials Safety
Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Willie Phillips
Chairman,
Federal Energy Regulatory Commision
888 First St NE
Washington, DC 20426

CC:
Commissioner James Danly
Commissioner Allison Clements
Commissioner Mark C. Christie

March 17, 2023

Dear Deputy Administrator Brown and Chairman Phillips,

We, the undersigned, are residents of communities on the frontline of the extreme and overwhelming buildout of LNG export terminals in the region. All of us live, work, and recreate near existing or planned LNG sites and over the past few years we have been forced to grapple with the challenges of what that means for our families and communities. The purpose of this letter is to express solidarity with the people of Freeport who are very worried about the reopening of Freeport LNG and share with you a few of our needs moving forward.

We have had a stiff learning curve. We've had to teach ourselves about "flaring," research the carcinogenic effects of chemicals like "benzene," and learn how the air pollutants and particulate matter in our environments cause respiratory illness and impact our reproductive health. Our fishermen and shrimpers have had to learn to navigate around massive LNG tankers and to find new places to harvest shrimp and oysters. We have kept our heads above water during unprecedented hurricanes and winter storms just to struggle with less tourism, a decrease in commercial and recreational fishing, and other environmentally-friendly industries that cannot exist along with the LNG export terminals. While we were promised that industry would be good for our local economies, we have learned that tax abatement programs mean no new money for our counties and parishes and that the industry hires most of its skilled labor from other parts of this nation. Households have learned that exporting gas to Asia and Europe means that our own energy prices go up, along with the cost of food and our other daily products. All of this new collective knowledge has led us to the conclusion that WE DO NOT WANT these LNG export terminals.

After Freeport LNG exploded last June, we learned that we also need to worry about "vapor clouds", "blast zones", and "emergency management plans". We learned that all of the claims that LNG is SAFE are wrong. It turns out that of the five LNG export terminals operating in the

**JA507**

Gulf, at least two (Freeport LNG and Sabine Pass LNG) have had major problems that could have been catastrophic for our communities. And when we ask about their safety and risk management plans, we are told that the information is either *classified* to protect national security or *classified* because the companies want to protect their business trade secrets. This is an un-American conspiracy. It makes no sense that these big industries and your government agencies put us at risk of major explosions and catastrophe, and then keep that information about these risks from us - including safety plans we could use to protect ourselves, our families, and our communities. We are indeed a "sacrifice zone" for greed and world energy policies that do not even take our own people into account.

LNG export terminals were forced onto and forcibly marketed to our communities. And we want to reiterate that WE DO NOT WANT THEM and the risks that they pose to our children, our landscape, our rich culture, our way of life, and our future possibilities for diverse and self-sufficient economies. We will continue to speak out against the ones that have not yet been built and will continue to work to hold those that are operational accountable for their corporate sins. We will keep demanding that government agencies like FERC and PHMSA put our families' wellbeing over oil and gas interests. We want to have OUR VOICE HEARD in how these LNG terminals are permitted and regulated, and we want for us and our loved ones to have access to information about what is happening in our backyards. We are at this point far too aware of all of the previous gas-related disasters, including the 2004 explosion at a gas liquefaction plant in Algeria that killed 27 people and the 2005 vapor cloud that exploded at the BP refinery that killed 15 people. No one should have to die for profit, and we feel every single one of those losses.

Today, we, the undersigned, write in support of the good people and families of Brazoria County, Texas and their adamant opposition to FERC's recent order to allow Freeport LNG to resume producing and shipping LNG. We share the concern that appropriate repairs have not been made to the facility and that the company has not done enough to ensure that they will not experience another catastrophic event. We echo the call of Brazoria County's families for FERC and PHMSA to rescind the authorization letters allowing Freeport LNG to resume operation, and we further demand accountability in the form of protective measures, action plans, and investments in our public spaces and public health for putting us directly in harm's way.

**This is what we want from FERC and PHMSA**.

**Inspections**. We want to know what the inspection protocols and schedules are - and not just for Freeport reopening, but for all of the LNG terminals. We do not trust oil and gas companies to be honest and forthcoming in their self-inspections, and we demand that FERC and PHMSA do a better job inspecting them, holding them accountable, and informing us and our communities when any issues arise. We also want to have UNREDACTED access to inspection reports so that we can know about the issues that a facility is having before it has an explosion that kills and poisons people. IF your response is as it has been in the past that FERC and PHMSA do not have the resources to conduct regular, in-person inspections, then you should

Document Accession #: 20230322-5123     Filed Date: 03/22/2023

just shut down the plants until you can get those resources. We are Americans too, and you are supposed to represent and fight for us like you would represent and fight for your own families.

**Anonymous Reporting**. We have learned that for most industrial accidents in the U.S., workers flagged the problem before the accident occurred and the plant operators failed to take action. Often, these accidents occur as a direct result of continuously dangerous working cultures. The EPA Risk Management Program is considering adopting a rule creating an anonymous reporting mechanism, which gives plant workers a way to report issues directly to the agency, bypassing the company. This ensures that workers do not suffer retaliation for reporting problems and it gives regulatory agencies notice when problems arise, maximizing the response time. We want FERC and PHMSA to adopt anonymous reporting through accessible, convenient, and protective means so that workers can communicate issues as they arise. We also want FERC and PHMSA to follow up immediately, restricting operations at the facility if necessary - even if it means the company has to sacrifice short term profits. Again, if you cannot fund or staff this, then simply DO NOT PERMIT any additional facilities until you can. If an employee reports a potential problem and FERC and PHMSA deem it a possible threat, our communities have the right to know.

**Hazardous Materials**. Our communities should know on a daily basis how much methane gas, LNG, refrigerants, and other hazardous materials are on site as well as when permit violations occur due to the release of these materials. This will help us know what we are being exposed to and when our risks are highest, so that we can plan potential safety measures.

**Transparency**. We need and demand access to more information. Trade secrets are not more important than our lives, and it is corrupt and simply ethically abhorrent that Freeport LNG was allowed to redact so much of their accident report. We need and have a right to know what exactly happened and what these folks are doing to mitigate risks of their future explosions. We also need and have a right to access risk analyses of all LNG export terminals, both planned and currently operational. We need and have a right to know the "blast zones" for the plants and how companies will respond in case of emergency. We do not want to keep running into issues like they do in Cameron, LA,  where they report that alarms go off all the time at Venture Global's Calcasieu Pass LNG, but they do not even know what they mean. Companies like Venture Global should be proactively and consistently communicating with their local residents about these alarms, why they are constantly burning massive flares, and what risks the plant does actually pose across a variety of metrics to the communities they exist within.

And national security is not a real reason to act sneaky and keep information from us. If these plants are such a threat to national security, simply do not build them, and certainly do not put them where people live.

Additionally, the recent Freeport explosion demonstrates that mechanical failure and human error happen all of the time and are significant risks impacting frontline communities. It also shows that the existing emergency management plans are not sufficient and most likely will fail -

**JA509**

just like Freeport LNG's plan did on June 8, 2022. We need something better and we need something NOW.

Counties and Parishes in Texas and Louisiana are supposed to have local Emergency Management Committees. Sadly, those committees are largely populated by industry staff and supporters and local politicians that support industry. Residents do not feel like these are safe, productive spaces and have largely stayed away from them.

**Worker Safety**. It is extremely lucky and by the grace of some sort of higher power that no one was killed by the Freeport explosion and fire. However, several people and even someone standing outside of the plant were injured. Our communities are deeply concerned about worker safety - not only for our friends and families working in the plants, but even for the workers that come from out of state. During the February 11, 2023 community meeting, our Freeport friends asked PHMSA officials how they are protecting workers. They told us that OSHA is the agency responsible for worker safety. However, when we looked into that, we found an OSHA Standard Interpretation that says, "OSHA's PSM Standard, 29 CFR § 1910.119 does not apply to LNG facilities, including export facilities, subject to the U.S. Department of Transportation's (DOT) pipeline safety regulation, 49 CFR Part 193. OSHA's PSM Standard is preempted by DOT regulation, 49 CFR § 193 which address the same working conditions."[1]

Who is protecting our workers at these LNG plants? PHMSA? OSHA? What is being done to mitigate the risks of harm to our friends and family working in these LNG terminals?

**Evacuation Plans**. Recognizing that LNG facilities pose a risk to our region, community members have the right to know what the evacuation plans are in case there is an explosion or emergency. The residents of Quintana Island were not evacuated, though the risk of an even larger blast was significant in the wake of the first. Venture Global is currently building Plaquemines LNG on the only road in and out of the Parish. If Plaquemines were to have an incident like Freeport, or worse, the few thousand people south of the facility would not even have one single escape route. This would be especially problematic if an explosion were coupled with a hurricane or other flooding event. FERC and PHMSA must require LNG export terminals to coordinate with other existing area agencies and boards to have effective evacuation plans that are well-coordinated with local emergency responders and which even protect the most vulnerable areas.

These are just a few of our needs from FERC and PHMSA.

We are grateful that PHMSA staff took the time to come to Freeport to meet with the families concerned about Freeport LNG. However, they are just one community of the many more who are worried for the safety and wellbeing of our families in proxy to the LNG buildout. We need more face-to-face meetings to talk about our concerns. Last fall, two FERC Commissioners and their staff visited Port Arthur, Texas and Lake Charles, Louisiana, as well as Plaquemines Parish, Louisiana. They met with community members and started a conversation about how

---

[1] (https://www.osha.gov/laws-regs/standardinterpretations/2021-04-27)

these facilities impact families, and how they can partner with other federal and state agencies to keep people safe and healthy. We want more of this. And we want community voices reflected in agency decisions regarding these projects.

We invite FERC and PHMSA officials and staff to join our conversation even more. Come learn about us like we have had to learn about you. Our communities are warm and loving, and while we cannot always promise you clean air or clean water, we will gladly get you a bowl of gumbo or plate of tacos and show you some hospitality. You cannot do your jobs well unless you get out of your DC offices and learn about the places and people impacted by your decisions.

Jessi Parfait
jessi.parfait@sierraclub.org
Baton Rouge, Louisiana
Sierra Club

John Allaire
johncallaire@yahoo.com
Holly Beach, Louisiana
Resident

James Hiatt
james@betterbayou.net
Lake Charles, Louisiana
For a Better Bayou

Roishetta Ozane
roishetta@gmail.com
Sulphur, Louisiana
Vessel Project

Ariana Akbari
arianaakbariart@gmail.com
Nederland, Texas
Resident

John Beard
john.beard901456@outlook.com
Port Arthur, Texas
Port Arthur Community Action Network

Trevor Carroll
trevor@texasenvironment.org
Brazoria Fossil Fuel Exports Organizer
Texas Campaign for the Environment

Gwen Jones
lolita632003@yahoo.com
Freeport, Texas
Better Brazoria

Melanie Oldham
oldham_melanie@yahoo.com
Freeport, Texas
Better Brazoria

Chloe Torres
chloe@texasenvironment.org
Corpus Christi, Texas
Texas Campaign for the Environment

Elida Castillo
ecastillo@lcv.org
Corpus Christi, Texas
Chispa Texas

Armon Alex
armon.alex101@gmail.com
Corpus Christi, Texas
Gulf of Mexico Youth Climate Summit

Bekah Hinojosa
rebekah.hinojosa@sierraclub.org
Brownsville, Texas
Sierra Club

Emma Guevara
emma.guevara@sierraclub.org
Brownsville Texas
Sierra Club

**JA511**

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY
FEDERAL ENERGY REGULATORY COMMISSION

IN THE MATTER OF                )
                                )
Texas LNG Brownsville LLC       )      Docket No.    CP16-116-002

**Request for Rehearing of Vecinos para el Bienestar de la Comunidad Costera, Sierra Club, and City of Port Isabel**

Vecinos para el Beienestar de la Comunidad Costera, Sierra Club, and City of Port Isabel request rehearing of *Texas LNG LLC*, Order on Remand, 183 FERC ¶ 61,047, Dkt. Nos. CP16-116 (Apr. 21, 2023) ("Remand Order").

This order purports to respond to the remand issued in *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (*Vecinos*). *Vecinos* found, *inter alia*, that FERC had violated the National Environmental Policy Act (NEPA). In every other case the undersigned are aware of—including FERC's handling of prior remands—after a court found an agency found to have violated NEPA, the agency responded by publishing new a NEPA analysis. But astonishingly, FERC has refused to do so here. This procedural shortcut itself renders FERC's inaction invalid. Moreover, the information FERC does provide is incomplete, and demonstrates that rather than exercise its independent judgment, FERC has simply uncritically accepted the representations of the industry FERC is supposed to regulate.

In his concurrence and in other statements regarding the project, Chairman Phillips notes that it has been two years since the D.C. Circuit decided *Vecinos*. Numerous others have filed comments with FERC complaining about how long the remand has taken. But NEPA does not allow agencies to skip procedural steps or approve a project without the required hard look simply because the agency, applicant, or others have gotten impatient. If anything, as Commissioner

Clements explained in her dissenting statement, FERC's decision to skip legally required steps and analysis here will further postpone the project, if it takes litigation and a court order to compel FERC to do what FERC should have done, and should have known it needed to do, in the first place.

The undersigned remain opposed to this project. If FERC had properly solicited and considered community input, and taken a hard look at the project, FERC would have seen that it is contrary to the public interest and should be denied. FERC cannot avoid the issue by skipping steps and failing to fully grapple with these adverse impacts.

FERC should correct this error now, withdraw its approval, and refrain from making a final decision until FERC has provided the analysis and public participation opportunities the law requires.

## I.    Statement of Issues

Pursuant to 18 C.F.R. § 385.713(c)(1), we offer the following concise statement of alleged errors. These errors are explained in greater detail below.

1. FERC cannot refuse to consider issues purportedly outside the scope of the remand order or amendment request. FERC has prepared a completely new analysis of air pollution impacts, with changes regarding the sources, amounts, and impacts of air pollution. Members of the public must have the opportunity to comment on and dispute this new material.  And beyond the new material FERC has already considered, FERC must also consider other significant new information bearing on the projects, in light of FERC's ongoing control and authority to act on that information. 40 C.F.R. § 1502.9(d).

2. FERC's analysis of air pollution impacts on environmental justice communities is

arbitrary.

    a.   FERC failed to explain, or even acknowledge, substantial changes to the estimates of project air emissions. NEPA requires such explanation. Moreover, FERC's failure to explain these changes indicates that FERC has uncritically accepted the applicant's submissions without exercising FERC's own independent judgment.

    b.   In discussing PM2.5 pollution, FERC ignored data from the air monitor closes to the terminal site. This monitor, at Isla Blanca, reports higher baseline values of PM2.5. Using these baseline values indicates that the project is likely to cause or contribute to NAAQS exceedances.

    c.   In discussing ozone, FERC fails to provide, cite to, or otherwise incorporate an actual analysis. FERC merely cites the applicants' statement that an ozone analysis was performed, without providing the analysis or explaining where it could be found. Moreover, FERC indicates that the ozone analysis here updates that performed in the FEIS, without recognizing that the FEIS's ozone analysis was incomplete, as FERC recognized in the prior rehearing order.

    d.   Insofar as FERC relied on the claim that project contributions to pollution would be below significant impact levels, it is unclear whether FERC included all foreseeable sources of pollution attributable to the projects, rather than merely considering pollution from stationary sources regulated by the Clean Air Act.

    *e.*   FERC improperly determined that impacts to environmental justice communities

will be less than significant based on its conclusion that the NAAQS would not be exceeded. FERC must consider the possibility of significant or harmful impacts at air pollution levels below the NAAQS, especially as a result of cumulative exposure to multiple pollutants. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1123 (D.C. Cir. 1971).*

f.  Rather than merely identify the proportion of low income and minority communities within 50 kilometers of the project, FERC was required to identify which communities would actually experience impacts as a result of the project, and address whether the communities that would actually be harmed were disproportionately environmental justice communities.

g.  Where FERC acknowledges the potential for significant impacts, FERC cannot conclude that mitigation will avoid those impacts, where no actual mitigation plan has been developed, and where FERC has not even demonstrated that mitigation would be possible.

h.  FERC could not cure the NEPA deficiencies identified in *Vecinos* without publishing a new NEPA document, and providing the public with the opportunity to comment thereon. FERC failed to publish its updated environmental justice analysis in a supplemental EIS or other NEPA document. FERC's failure to do so had several adverse consequences. FERC's decision effectively limited public participation, including participation by the newly identified environmental justice

communities that may be impacted by the Project. This is exacerbated by FERC's refusal to provide any written materials in Spanish, despite the prevalence of Spanish speakers in the project area. Additionally, FERC's updated analysis contradicts its previous environmental justice analysis. Ultimately, FERC's failure to comply with NEPA in response to the *Vecinos* remand is unlawful.

3.  FERC's analysis of the impacts of the Project's greenhouse gas emissions is arbitrary.

    a.  FERC's conclusion that the it cannot evaluate the significance of greenhouse gas emissions was arbitrary and unsupported by evidence. The Natural Gas Act and NEPA require FERC to consider greenhouse gas emissions in FERC's public interest analysis and to determine whether greenhouse gas emissions are significant. *Sierra Club v. FERC,* 867 F.3d 1357 (D.C. Cir. 2017) ("*Sabal Trail*"). Here, FERC's claim that it lacked any viable method for doing so was arbitrary, where FERC does not dispute that the social cost of carbon is generally accepted in the scientific community, and where FERC's criticisms of that tool are unsupported. *Vecinos,* 6 F.4th 1321. In the alternative, FERC's refusal to apply its own interim climate guidance, or to otherwise make an ad hoc determination, was also arbitrary.

4.  FERC arbitrarily failed to supplement its EIS based on new information concerning SpaceX.

    a.  On the same day FERC issued the Remand Order, SpaceX performed a test launch of the Starship Superheavy Rocket. While FERC previously assessed impacts from

launches of smaller rockets, FERC did not assess impacts from this kind of rocket. The Superheavy's radius and magnitude of impacts was far outside what FERC analyzed in its FEIS. Thus, this new information about SpaceX triggers FERC's obligation to supplement its FEIS for the Project.

A.    **FERC Cannot Limit Its Analysis to The Two Issues Identified in the *Vecinos* Remand and Rio Bravo's Proposed Design Changes**

*Vecinos* held that FERC's analysis was deficient in two ways, undermining both FERC's NEPA and Natural Gas Act analyses. First, FERC had not justified limiting its analysis of environmental justice impacts to communities within two miles of the terminal, given FERC's statements that impacts would be felt outside this radius (*e.g.*, that air quality would be impacted up to 31 miles away).[1] Second, FERC failed to address whether 40 C.F.R. § 1502.21 (formerly § 1502.22) required FERC to use methods generally accepted in the scientific community, including the social cost of carbon, to evaluate greenhouse gas emissions.[2]

The Remand Order states that FERC will not consider comments that do not pertain to these two issues.[3] But the order itself is not so limited, nor could it be. Both the project and the environmental context have changed significantly since FERC's prior approval, and FERC cannot turn a blind eye to these changes.

For example, rather than merely redo the environmental justice analysis based on the prior analysis of air impacts, FERC requested that Texas LNG redo the air pollution and environmental

---

[1] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1325 (D.C. Cir. 2021).

[2] *Id.*

[3] Remand Order P15.

justice analyses in their entirety. The new analysis of air pollution predicts fewer emissions from terminal operation than the FEIS predicted.[4] The Remand Order does not explain these changes. And neither does the record.

Rather than merely reconsidering the scope of the environmental justice analysis, FERC now rests on applicant submissions that consider a different set of emission sources, with different emission rates, and different baseline pollution levels. We agree that it would have been improper for FERC to ignore this new information—FERC needs to consider the project that the developers actually intend to build, and the impacts the surrounding communities would actually suffer. And FERC plainly had authority to do so. Even though the remand specifically concerned FERC's prior analysis of the Project's climate and environmental justice impacts, "once FERC reacquired jurisdiction, it had the discretion to reconsider the whole of its original decision."[5] But the public must have a meaningful opportunity to review and comment on this new information, and in particular, to raise objections, errors, or other concerns with FERC.

Relatedly, FERC cannot turn a blind eye to other new information beyond that provided by Texas LNG or addressed in the Remand Order. NEPA imposes an ongoing duty to supplement analyses in the face of new information.[6] Here, new information about the SpaceX facility—including the recent severe explosion—must be considered in FERC's safety and cumulative

---

[4] *Compare* Accession 20220502-5075 at Table 9-1, *with* FEIS at 4-186.

[5] *Se. Michigan Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998).

[6] 40 C.F.R. § 1502.9. FERC also has a continuing obligation to consider changed circumstances under the Natural Gas Act. *See* 15 U.S.C. § 717o (FERC can only amend orders when it is "necessary or appropriate" to do so); *Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("[A]ppropriate is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors."

impact analyses.[7]

Finally, regardless of changed circumstances, FERC still must consider the environmental justice issues that were litigated but not decided in *Vecinos*, including FERC's refusal to acknowledge the potential for significant, disproportionately adverse impacts from air pollution that does not violate the National Ambient Air Quality Standards.[8]

### B.    FERC's Analysis of Environmental Justice Impacts of Air Pollution Is Arbitrary

#### 1.    FERC Has Not Explained, or Even Acknowledged, Substantial Changes in Emission Data

The Remand Order rests on new air pollution emission and modeling data submitted by the applicants. This data reflects a different set of rates, and background than what was considered in the FEIS.

For example, the applicants' May 2022 response estimates NOx emissions to be only three-quarters what was estimated in the FEIS: 110.43 tpy, down from 142.6.[9] The applicant's updated modeling also identifies lower marine vessel VOC, CO, PM10, SOx, and greenhouse gases.[10] The Remand Order does not identify *any* change at all in the number, type, or behavior of marine vessels, much less a change that would explain an order-of-magnitude reduction in these emissions.

FERC cannot rely on these new, lower emission estimates without explaining to the public

---

[7] *Infra* § II(D).

[8] *California Public Utilities Commission v. Federal Energy Regulatory Commission*, 29 F.4th 454, 462 (9th Cir. 2022); *accord Canning v. NLRB*, 823 F.3d 76, 79 (D.C. Cir. 2016).

[9] C*ompare* FEIS at 4-182 *with* Accession No. 20220505-5075 at Table B-33.

[10] *Id*.

what has changed and why, and without providing the public with a meaningful opportunity to comment thereon. And FERC itself cannot uncritically accept the applicants' submissions. The FEIS purportedly reflects *FERC*'s estimates of likely emissions. Before accepting new estimates, FERC's technical staff must review them, pass judgment on them, and demonstrate that they have done so. As it stands, it was arbitrary for FERC to accept the new, lower emission estimates without an explanation as to why these estimates are lower than those presented in the FEIS.

### 2. FERC Must Consider Data Showing Higher Baseline Pollution, and Thus Increased Risk of NAAQS Exceedances.

There are two PM2.5 air monitors in Cameron County, where the terminal would be located. The applicants based their analysis on baseline data from the monitor that is farther from the terminal site, which reports lower baseline levels of PM2.5 pollution. FERC must also consider data from the closer monitor, which indicates that operation of the project may lead to exceedances of the hourly and annual PM2.5 NAAQS.

Texas LNG's analysis relied on baseline data from the AQS ID 48061006 air monitor, in Brownsville.[11] This monitor is roughly 28 km from the terminal site. According to Texas LNG this monitor shows background PM2.5 levels of 10.3μg/m³ on an annual basis, and only discloses the seasonal 3-year average for the 24-hour PM2.5 concentrations.[12] When added to the PM2.5 emissions that Texas LNG modeled for these projects, Texas LNG estimated PM2.5 levels barely below the NAAQS: 0.25 and 2.71 μg/m below the annual and hourly NAAQS, respectively.[13]

The Texas Commission on Environmental Quality maintains another PM2.5 air monitor,

---

[11] Accession 20230130-5250 at Table 9-4.

[12] Accession 20230130-5250 at Table 9-4 & 9-5.

[13] *Id*. at Tables 9-5 & 9-6.

AQS ID 480612004, in Isla Blanca.[14] For years 2020-2022 the Isla Blanca monitor shows an

annual PM2.5 concentration of 11.2 μg/m³ and an hourly PM2.5 concentration of 31 μg/m³,

higher than the background values indicated by the more distant Brownsville monitor.[15] If Texas

LNG's cumulative impact analysis is modified to use the higher baseline value for annual PM2.5

the result shows potential violation of the annual NAAQS by .95 μg/m³ . A similar comparison

cannot be made for the 24-hour PM2.5 NAAQS because it is unclear what baseline background

concentration was used in Texas LNG's cumulative analysis and FERC did not provide that

information in the reauthorization order. However, the Isla Blanca 24-hour PM2.5 average of 31

μg/m³ is 4 - 8.73 μg/m³ greater than the seasonal averages provided by Texas LNG.[16]

     When using monitor data from a monitor more closely situated to the facility site, FERC's

conclusion that the total concentration of background criteria pollutants would remain under the

applicable NAAQS does not hold. Crucially, this table only includes operational emissions, rather

than the higher emissions considered in the Remand's discussion of cumulative operation and

construction. This indicates that NAAQS exceedances may be long term, rather than limited to the

temporary period in which construction and operation occur simultaneously. And it suggests that

impacts may occur farther away than the 1.6 mile radius that FERC estimates for construction

---

[14] TCEQ, Monitor Information for Isla Blanca State Park Road,
https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=report.view_site&siteAQS=48061200
4

[15] Data from this monitor, AQI 480612004, was downloaded from the TCEQ website for January
1, 2020 through December 31, 2022. This data was then used to calculate the annual mean over 3
years. Data available here:
https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=report.view_site&siteAQS=48061200
4.

[16] See Accession 20230130-5250 at Table 9-4

emissions. For instance, the EPA's report on the environment finds that PM2.5 can remain air borne for long periods and travel hundreds of miles.[17]

FERC has an obligation to consider the full impacts of the decision to reauthorize the project and inform the public of those impacts.[18] To do so, FERC must "make use of reliable existing data and resources."[19] TCEQ's monitor at Isla Blanca is a reliable existing source of data on the air quality where the project will be located. FERC has an obligation to incorporate data from this monitor into its analysis of the projects' impacts on air quality because it more accurately reflects the current true conditions of PM2.5 levels near the project site. Thus, it more accurately discloses what the project's impacts will be on local air quality and the health and safety of nearby residents. This is particularly true as data from Isla Blanca monitor indicates cumulative operational PM2.5 levels will exceed the NAAQS, whereas data from the Brownsville monitor does not.

### 3.    FERC's Ozone Estimates Are Unexplained

In discussing ozone impacts, the Remand Order simply recites its findings in the EIS that Texas LNG would contribute less than 10% of the annual NOx emissions estimated for the Rio Grande LNG Terminal.[20] Based on that FERC concludes that if Rio Grande LNG's ozone impacts are increased by 10%, there will be no exceedance of the NAAQS for ozone.[21] FERC has

---

[17] EPA, Report on the Environment: Particulate Matter Emissions. (Available at https://cfpub.epa.gov/roe/indicator.cfm?i=19).

[18] 40 CFR § 1502.1.

[19] 40 CFR § 1502.23.

[20] Remand Order P74.

[21] *Id.*

provided no justification for the use of simple multiplication to estimate Texas LNG's ozone impacts, particularly when Texas LNG has provided an estimation of its ozone contribution.[22]

Additionally, it is unclear whether FERC's overall cumulative analysis is flawed based on excluding mobile emission sources from Rio Grande LNG's ozone analysis. The Rio Grande LNG Remand Order states that Rio Grande updated the analysis presented in the FEIS.[23] But the analysis presented in the Rio Grande FEIS was itself deeply flawed, as FERC recognized in the Rio Grande rehearing order, because it excluded cumulative emissions from Texas LNG and emissions from both terminals' marine vessel traffic.[24] Here, it is unclear whether the updated ozone modeling repeats that error. And if this modeling did include marine vessel emissions, it is unclear what estimates of vessel emissions it used.

### 4.    FERC's Analysis Misuses "Significant Impact Levels"

The remand order states that the radius of air impacts from the Texas LNG Terminal is 24 kilometers.[25] FERC justifies this determination by relying on the level at which criteria pollutants from Texas LNG drop below significant impact levels.[26] It does not appear that Texas LNG conducted any significant impact level modeling and FERC does not cite any filing by Texas LNG that identifies the results of any significant impact level modeling.[27] If FERC is relying on

---

[22] Accession 20220505-5075 at Table 9-2. *Contra* 40 CFR § 1502.23 ("Agencies shall make use of reliable existing data and resources.")

[23] Rio Grande Remand Order P150.

[24] Accession 20200123-3129 at P55.

[25] Remand Order P33.

[26] *Id*.

[27] *See Id*. at fn. 82 (citing paragraphs 67-78 of the Remand Order, none of which discuss significant impact levels).

significant impact levels to identify the radius or significance of Texas LNG's air emissions impacts, FERC must disclose the basis of its conclusions.[28]

It is also unclear whether FERC relied on significant impact levels as any part of the basis of its conclusion that that air impacts from the Terminal's emissions are insignificant. To the extent that it did, this is a misuse of significant impact levels.

As justification for using the significant impact levels to identify the radius of air emissions impact from Texas LNG's terminal, FERC, without citation states that emissions modeled below significant impact levels "may generally be considered to be a sufficient demonstration that the proposed source will not cause or contribute to a violation of the applicable National Ambient Air Quality Standard or Prevention of Significant Deterioration increment."[29] It is unclear whether FERC relied on the SILs modeling to determine that the project would not cause or contribute to a NAAQS violation and therefore were insignificant,[30] but to the extent that it did, that was inappropriate.

SILS are tools designed for use in the Clean Air Act's Prevention of Significant Deterioration program, but they are contentious—and litigated—even in that context.[31]

---

[28] 40 CFR § 1502.23 (Agencies "shall make explicit reference to the scientific and other sources relied upon for conclusions…").

[29] Remand Order P33 n.81.

[30] Remand Order P75.

[31] *See e.g. Sierra Club v. EPA*, 705 F.3d 458, 465-66 (D.C. Cir. 2013) (vacating EPA's PM 2.5 SILs regulation because EPA lacks "authority to exempt sources from the requirements of the" Clean Air Act and the regulation "simply states that the demonstration required under [section] 165(a)(3) is deemed to have been made if a proposed source or modification's air quality impact is below the SIL."); *Sierra Club v. EPA*, 955 F.3d 56, 63-64 (D.C. Cir. 2020) (Affirming that the Court lacks jurisdiction to vacate a non-binding policy document as part of a facial challenge but explaining that "[t]he SILs Guidance is not sufficient to support a permitting decision—simply quoting the SILs Guidance is not enough to justify a permitting decision without more evidence in

Moreover, EPA has emphasized that a source *can* cause or contribute to a NAAQS violation even when the source's emissions do not exceed significant impact levels.[32]  EPA regulations say that "a major source or major modification *will be considered* to cause or contribute to a violation of the national ambient air quality standard when such a source or modification would, at a minimum, exceed the [] significance levels…"[33] This means that an exceedance of the SIL unequivocally demonstrates causation of or contribution to a NAAQS violation, should one occur the area of the facility. It does not mean that a facility does not cause or contribute to a NAAQS violation if its emissions do not exceed the SIL. EPA itself recognizes that the only reason these impact levels remain legally valid is because "the regulatory text in that section did not say that a proposed source that has an impact less than the significance level is always deemed to not cause or contribute to a violation."[34]

### 5.    Significant Impacts Can Occur, Especially for Environmental Justice Communities, Even Where Pollution Does Not Exceed the NAAQS

Regardless of whether Texas LNG' cumulative impact will cause a violation of the NAAQS, there is significant evidence that there are harmful and adverse health impacts to communities exposed to increased air pollution at levels below the NAAQS. FERC's assumption that air pollution which does not violate the NAAQS will not have health impacts

---

the record, including technical and legal documents.").

[32] *See* EPA, *Attachment 1 to Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, at 7 (Apr. 17, 2018).

[33] 40 C.F.R. § 51.165(b)(2) (emphasis added).

[34] *See* EPA, *Attachment 1 to Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, at 7 (Apr. 17, 2018).

and will be insignificant is mistaken.[35]

The EPA has recognized that levels of PM2.5, ozone, nitrogen-dioxide, and carbon monoxide below the NAAQS thresholds can result in adverse health impacts. In January of this year the EPA announced a proposal to reduce the annual PM2.4 NAAQS between 9.0 and 10.0 μg/m³.[36] According to the Policy Assessment for this announcement, the EPA has determined that the current PM2.5 NAAQS are not adequately protective of human health and that scientific evidence supporting that conclusion has been available since at least 2020.[37] The annual PM2.5 concentration from the air quality monitor located as Isla Blanca State Park, approximately 10 km from the Project site and 5 km away from the City of Port Isabel, is 11.2 μg/m³.[38] This is just

---

[35] Reauthorization P75. In the instance where FERC found that NAAQS violations may be possible, concurrent construction and operation, FERC *still* determines that the impact will not be significantly adverse to EJ communities because Texas LNG must submit a plan on how to address those violations at some point prior to commissioning. *Id*. P 72.

[36] EPA, National Ambient Air Quality Standards for PM. https://www.epa.gov/pm-pollution/national-ambient-air-quality-standards-naaqs-pm; EPA Press Office, EPA Proposes to Strengthen Air Quality Standards to Protect the Public from Harmful Effects of Soot (Jan. 6, 2023). https://www.epa.gov/newsreleases/epa-proposes-strengthen-air-quality-standards-protect-public-harmful-effects-soot.

[37] EPA, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter at 1-14-15 (May 2022) ("The EPA is reconsidering the December 2020 decision because the available scientific evidence and technical information indicate that the current standard may not be adequate to protect public health and welfare, as required by the Clean Air Act. We note that the 2020 [Policy Assessment] concluded that the scientific evidence and information supported revising the level of the primary annual PM2.5 standard to below the current level of 12.0 μg/m³."); *see also* EPA Press Office, EPA Proposes to Strengthen Air Quality Standards to Protect the Public from Harmful Effects of Soot (Jan. 6, 2023) ("EPA estimates that if finalized, a strengthened primary annual PM2.5 standard at a level of 9 micrograms per cubic meter, the lower end of the proposed range, would prevent: up to 4,200 premature deaths per year; 270,000 lost workdays per year; result in as much as $43 billion in net health benefits in 2032.") (Available at https://www.epa.gov/newsreleases/epa-proposes-strengthen-air-quality-standards-protect-public-harmful-effects-soot.)

[38] Data from this monitor, AQI 480612004, was downloaded from the TCEQ website for January 1, 2020 to December 31, 2022. This data was then used to calculate the annual mean over 3 years.

.8 μg/m³ below the NAAQS and more than the proposed revision of the annual NAAQS. The EPA's policy assessment indicates that nearby EJ communities are likely already suffering adverse impacts from the level of PM2.5 concentrations in their region. Any addition from projects like Texas LNG should be considered significant no matter the quantity.

Additionally, the policy assessment for the EPA's 2010 Rulemaking for NO2 NAAQS thresholds found there was "little evidence of any effect threshold" for NO2.[39] That same PA found evidence of adverse health effects from NO2 exposure at levels below 53 ppb and from short term NO2 exposure.[40] This is less than the current NO2 NAAQS threshold of 100 ppb.[41] Similarly, in its 2011 Rulemaking for the carbon-monoxide (CO) standards, the EPA recognized that epidemiological studies showed associations between worsened cardiovascular outcomes at levels below the current NAAQS threshold for CO.[42] The EPA also found in the 2015 rulemaking on the current ozone standard, that exposure to ozone at 60 parts per billion (ppb) could result in adverse health impacts, such as declining lung function and pulmonary inflammation, which is 10 ppb less than the current ozone standard.[43] As discussed *supra*, it is

---

Data available here: https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=report.view_site&siteAQS=480612004. As already discussed, data from this monitor was not used by the Applicant to assess the air quality impacts of the project. Instead, it used a monitor from Brownsville, approximately 28 km away from the Project site.

[39] 75 Fed. Reg. 6474 at 6880 (Feb. 9, 2010) (citing Integrated Science Assessment, section 3.1.7 and 5.3.2.1).

[40] *Id*.

[41] 40 C.F.R. Pt. 50, App. S §3.2.

[42] 76 Fed. Reg. 54294, 54307 (Aug. 31, 2011).

[43] NAAQS for Ozone, 80 Fed. Reg. 65292, 65303 & 65317-65318 & 65322 (Oct. 26, 2015).

unclear whether FERC corrected its prior ozone analysis deficiencies by including mobile emissions emissions in its updated ozone analysis. If it didn't, this project likely contributes to ozone concentrations above 60 ppb given that the Rio Grande LNG terminal's emissions alone bring ozone contributions to 58.6 ppb.[44]

These repeat finding by EPA demonstrate that even if FERC were correct in concluding that the cumulative air impacts would not exceed the NAAQS thresholds, this would not demonstrate that the cumulative air pollution would not adversely affect the health of nearby communities.

The consequences of health impacts below the NAAQS may be more acutely experienced by the EJ populations FERC has identified in the updated EJ and air impacts analysis. As EPA has explained in its guidance on evaluating environmental justice impacts in NEPA review: "Focusing the analysis [on the relevant environmental justice context] may show that potential impacts, which are not significant in the NEPA context, are particularly disproportionate or particularly severe on minority and/or low-income communities."[45] Thus, the direct, indirect, and cumulative effects of a project may have a disproportionately severe or adverse impact on an environmental justice community even if an agency determines that the general impacts are not significant. For instance, EPA recognizes that lack of access to health care is a factor which increases a community's risk of environmental hazards.[46] In Cameron County, 30% of the Hispanic/Latino

---

[44] Rio Grande Remand Order P 150.

[45] EPA Guidance at 3.2.2.

[46] EPA Guidance at 2.3

population is uninsured.[47] This is nearly twice the uninsured rate of 18% for Texas as a whole.[48] Moreover, the communities closest to the facilities do not have access to a hospital. FERC has an obligation to determine whether factors such as this and others increase the significance of the cumulative effect of emissions from multiple facilities on nearby environmental justice communities, regardless of whether ambient air quality remains below the NAAQS.[49]

### 6.    FERC's Environmental Justice Analysis Does Not Identify Which Communities Will Actually Be Impacted

FERC identified a potentially impacted population of residents in census blocks groups within 50 km of the project based on EPA standards for cumulative air modeling.[50] FERC also finds that for air impacts a less conservative radius of impact is 24 km based on assertion that this is the distance at which criteria pollutants will decline below Significant Impact Levels.[51] *Id*. FERC does not disclose how it reached the 24 km radius, only citing other paragraphs in the reauthorization order that do not discuss significant impact levels.[52] Regardless, FERC fails to identify which census block groups, within a 50 km or 24 km radius, are likely to be impacted by the increased emissions from the project.

---

[47] https://data.census.gov/table?t=Health&g=040XX00US48_050XX00US48061

[48] https://data.census.gov/table?t=Health&g=040XX00US48_050XX00US48061

[49] *See* e.g. Glick Dissent to Original FERC Authorization, at 10 ("we cannot turn a blind eye to the incremental impact that increased pollution will have on economically disadvantaged communities.")

[50] Remand Order P118.

[51] *Id*. Requesters do not believe that the significant impact levels analysis FERC refers to sufficiently includes all emissions associated with the project, nor do requesters believe that SILs are always an appropriate standard to set a radius of impact. However, since FERC ultimately used a wider 50 km radius, these criticisms are unnecessary to expand on.

[52] Reauthorization P33 n.82.

It is not enough for FERC to identify that EJ populations exist within the project's zone of impact, FERC must take the next step and identify which of those EJ populations will be most heavily impacted by constructions and operation of the project.[53] FERC is clearly aware of its obligation to conduct such an analysis. In the reauthorization's analysis of the EJ impacts from impacts to wetlands, recreational and subsistence fishing, road traffic, marine traffic, and visual impacts, FERC identified which census block groups were most likely to feel the effects of the impacts.[54]

FERC did not make a similar disclosure for the census block groups that would experience the effects of increased concentrations of air emissions from the terminal. This is despite having modeled impacts of criteria pollutant emissions for all census block groups within a 50 km radius of the terminal.[55] FERC has the information necessary to identify which EJ communities are most likely to be affected by FERC's reauthorization of the project and has failed to provide that analysis to the public.

### 7.    FERC's Reliance on a Hypothetical Future Mitigation Plan Is Arbitrary

FERC concluded that concurrent construction and operation of the Terminal may lead to exceedances of the National Ambient Air Quality Standards (NAAQS) for NO2, PM10, and PM2.5 on its own and cumulatively with Rio Grande LNG.[56]  Nonetheless, FERC instructed

---

[53] CEQ, Guidance on Environmental Justice, 14 ("When a disproportionately high and adverse human health or environmental effect on an [EJ population] has been identified, agencies should analyze how environmental and health effects are distributed through the affected community.")

[54] Reauthorization PP36, 39, 47, 55, and 78.

[55] Accession 20230130-5250, Table 9-3-1.

[56] Remand Order P69. As explained in more detail *infra*, FERC wrongly dismisses the

Texas LNG to come up with a plan to mitigate these impacts, and FERC concluded that the requirement to come up with a plan rendered these possible NAAQS exceedances an insignificant problem. Specifically, FERC determined that air quality impacts to environmental justice communities "would be less than significant" because of "the addition of Environmental Condition 130 in Appendix A."[57] This condition provides that Texas LNG: "shall file with the Secretary, for review and written approval … a Project Ambient Air Quality Mitigation and Monitoring Plan for periods when construction, commissioning and start-up, and operation of the LNG terminal occur simultaneously."[58]

As Commissioner Clements' dissent explains, this condition is "vague"[59] and there is no indication that it will be effective in reducing air quality impacts to environmental justice communities below the significance threshold. Thus, FERC's determination that these impacts on environmental justice communities are not significant is unsupported and arbitrary.

FERC has not event attempted to explain how this proposed mitigation measure will reduce air quality impacts to environmental justice communities below the significance level. The new condition is essentially a plan to have a plan. FERC has ordered Texas LNG to come up with a monitoring and mitigation plan rather than developing such a plan.[60] Because the monitoring and mitigation plan is currently hypothetical, it is impossible to determine its effectiveness.[61] And

---

significance of this new disclosure on the basis of a not-yet-written mitigation plan. *Id.*

[57] *Id.* P71.

[58] *Id.* at Appendix A, Condition 130.

[59] Clements Dissent P4.

[60] *Accord id.* P4 n.11.

[61] *Cf. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA's EIS requirement "ensures that the agency, in reaching its decision, will have available, and will

the condition is so vague as to preclude even an inference on whether the ultimate mitigation measures will work. For example, it is not clear that Texas LNG will have to include any mitigation measures to *prevent* a NAAQS exceedance rather than acting after an exceedance has occurred. It's not clear what FERC would do to ensure that NAAQS are not exceeded. The condition provides no criteria for when FERC will approve or disapprove Texas LNG's plan. It's not even clear from the text whether this is a "condition" in the ordinary sense of the term. Can construction, commissioning, or operations occur before the plan is approved by FERC? In short, FERC has not justified its finding that these impacts will not be significant on the basis of this environmental "condition."

This is not to say that mitigation is not worthwhile. NEPA requires FERC to consider possibilities for mitigation, and the Natural Gas Act provides FERC with authority to require mitigation. And in particular, in some circumstances, NEPA permits agencies to rely on mitigation measures to determine that a given environmental effect is less than significant.[62] But when an agency does so, it must "sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts so that they will not significantly affect the environment."[63] Thus, agencies are required to provide "a serious and thorough evaluation" of proposed mitigation measures.[64] "[M]ere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's" determination that an

---

carefully consider, detailed information concerning significant environmental impacts.").

[62] *Cabinet Mountains Wilderness/Scothman's Peak Grizzly Bears v. Peterson*, 681-82 (D.C. Cir. 1982).

[63] *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 234 (5th Cir. 2007); *accord Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 16-17 (2d Cir. 1997).

[64] *O'Reilly*, 477 F.3d at 231 (internal quotations omitted).

effect lacks significance.[65] Here, however, the requirement to come up with a future mitigation plan falls short of these requirements.

The problem is not just that FERC doesn't have any facts or details with which FERC could plausibly assure *itself* that mitigation would work. The public must also have an opportunity to comment on mitigation. Approving the project now, on the basis of a mitigation plan that has not yet been developed, unlawfully deprives the public of this opportunity. FERC must provide for public comment on the mitigation plan so that the public, and especially impacted environmental justice communities, can weigh in. Absent public comment, the record is incomplete. FERC must also invite comment from the Environmental Protection Agency ("EPA"), the federal agency charged with administering the Clean Air Act.[66] The condition must contain mandatory and enforceable provisions that actually ensure emissions will be sufficiently reduced. On monitoring, FERC must consult with EPA to determine the appropriate amount and location of ambient air quality monitors. FERC must ensure that there are sufficient monitors to ensure that the air quality in *all* potentially impacted environmental justice communities is below the NAAQS. FERC must also consult EPA to determine appropriate monitoring at the sources of air pollution. FERC could require Texas LNG to have dedicated employees that monitor pollution on site or high definition cameras that can monitor particulate matter emissions. FERC must also ensure the mitigation plan is enforceable. FERC must make the adequate monitoring and mitigation plan part of the Project's Certificate Order and FERC must require Texas LNG to amend its Title V air permit to include the plan as an enforceable condition in that permit. Finally,

---

[65] *Id.*

[66] *See* 40 C.F.R. § 1501.8(a).

as part of the plan, FERC must determine what happens when a NAAQS exceedance occurs. FERC should require immediate cessation of activities and further mitigation measures to reduce emissions.

### 8.    NEPA Required FERC to Publish Its Updated Environmental Justice Analysis in a Supplemental EIS or Other NEPA Document

FERC invited comment on some of the Applicants' responses to FERC Environmental Information Requests.[67] And deficiencies in the Applicants' air modeling were identified in those comments.[68] FERC requested new information from the Applicants' in response to those comments.[69] But FERC did not provide for public comment on this new information despite FERC's reliance on that information here.[70] If FERC utilized the NEPA supplementation process, public comment would have been required.[71]

Through its updated EJ analysis, FERC also now acknowledges that impacts on environmental justice communities will be "disproportionately high and adverse because they will be predominantly borne by environmental justice communities."[72] Previously, FERC found the

---

[67] *See* Remand Order P11.

[68] *See* Accession 20221019-5066.

[69] *See* Accession 2030106-3039.

[70] *Compare* Remand Order P10 (identifying dates of information requests and responses) *with* Remand Order P11 (identify date of solicitation of comments on responses).

[71] 40 C.F.R. § 1503.1(a)(2)(v). To be clear, FERC allowing comment on the Applicants' responses to Environmental Information Requests does not alleviate FERC's obligation to provide its own analysis in the form of an SEIS. FERC must provide impact statements "in plain language" so that the public "can readily understand such statements." *See* 40 C.F.R. § 1502.8. These statements must be based on FERC's analysis, supporting data from relevant scientific sources. *Id.*

[72] Remand Order P82.

Terminal "there is no evidence that these communities would be disproportionately affected by the Project or that impacts on these communities would appreciably exceed impacts on the general population."[73] NEPA requires FERC to take a "hard look" at environmental impacts.[74] and "to consider every significant aspect of environmental impact of a proposed action."[75] This complete reversal of position triggers the need for an SEIS.[76]

Also concerning is FERC's conclusion that 274 new environmental justice communities may be impacted by the Project.[77] These newly identified effected EJ populations are effectively shut out of this process as none were provided the opportunity to intervene into these dockets, protest, or request rehearing. Again, this obvious issue would have been remedied had FERC utilized the NEPA process.[78]

FERC's failure to engage impacted communities in its decision making process by publishing an SEIS is made more profound by its finding that the impacts of the project will disproportionately high and adverse for these environmental justice communities. The executive order mandating environmental justice reviews of agency actions specifically calls on federal agencies to conduct their programs in a manner that does not "have the effect of excluding

---

[73] FEIS at 4-157.

[74] *City of Los Angeles, California v. Federal Aviation Administration*, 63 F.4th 835, 841 (9th Cir. 2023).

[75] *Baltimore Gas and Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). *See also* 40 C.F.R. § 1502.8 (requiring impact statements to be based on "analysis and supporting data from natural and social sciences and the environmental design arts.").

[76] *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 938 (9th Cir. 2010) (finding an SEIS is required where new information directly contradicts previously published NEPA documents).

[77] Remand Order P33.

[78] *See* 18 C.F.R. 380.10(a)(1)(i).

persons (including populations) from participation" in its programs.[79] FERC itself acknowledges that Environmental Justice is "the fair treatment and meaningful involvement of all people . . . with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[80] The Commission further cites the EPA in stating that "[m]eaningful involvement . . . means: (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health . . . (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected."[81] In addition to its decision to forgo an environmental impact statement,[82] FERC has also failed to meet these Environmental Justice mandates by denying community requests for a public meeting and by failing to provide any materials in Spanish.

### a)    FERC Failed to Provide a Public Meeting

In their comments to responses by the Applicant to FERC's information requests, many

---

[79] Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations at 2-2 (Feb. 11, 1994).

[80] Remand Order P19 (citing EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sep. 6, 2022)).

[81] *Id.*

[82] As raised by the Clements Dissent, the newly identified impacted EJ communities were not invited or even *provided* an opportunity to participate or intervene in these proceedings. There were no hearings to participate in and the communities were unaware that they should have been submitting comments. The point of the notification process is that it "provides an opportunity for property owners and residents located near a proposed pipeline to express their concerns, including any issue regarding the impact on particular segments of the community." *Horizon Pipeline Co., L.L.C. Nat. Gas Pipeline Co. of Am.*, 96 FERC ¶ 61,053, 61,153 (2001).

community groups requested that FERC hold a public meeting on the Project.[83] FERC denied these requests finding "the record is sufficient for [FERC] to address the issues identified by the court."[84] Yet, based on this new record, FERC made significant new findings of impact and a public hearing would have provided the impacted public with the opportunity to express opposing technical or scientific view (which can be based on several sources, including the community) from agencies regarding specific impacts and/or methods of analysis," which "may warrant discussion in a NEPA document."[85] Public meetings afford impacted EJ communities the opportunity to express whether they "may be differently affected by past, present, or reasonably foreseeable future impacts than the general population."[86] Or, whether the effects of the Project on this population would be amplified by "past exposure histories, and social factors."[87] The Commission is, in essence, deciding to deny itself the opportunity to be educated and to have the community "help identify the means to identify alternatives and/or mitigate the impacts."[88] By denying impacted communities' request for a public meeting, FERC has systemically excluded them from the Commission's decisionmaking.

### b)    FERC Failed to Provide Information in Spanish

In addition, FERC declined to provide <u>any</u> written materials in Spanish.[89] As FERC

---

[83] Remand Order P14.

[84] Remand Order P15.

[85] Interagency Working Group on Environmental Justice & NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews*, 30 (2016) [*hereinafter* "Promising Practices"].

[86] *Id.*

[87] *Id.* at 31.

[88] EPA 1998 Guidance § 4.2.

[89] Reauthorization P15.

recognized, the majority of impacted census block groups are majority Hispanic/Latino.[90] Many

of these communities have limited English proficiency and require translations in order to fully

evaluate the impacts of FERC's decisions. For instance, in Port Isabel, the closest city to the

Project, a majority of the population speaks Spanish at home and 27.1% speak English less than

very well.[91] Similarly in Cameron County, 70% of the residents speak Spanish at home and

33.5%  of the Spanish speaking population speaks English less than very well.[92] Even faced with

this demographic information,[93] the Commission has again refused to provide translated

documents, effectively excluding a significant portion of the impacted populations from

participating in the decisionmaking process contra to mandates by EJ guidance.[94] This exclusion

also ignores multiple long-standing executive orders focused on language access and

environmental justice.[95] The inability to effectively participate in FERC's proceedings only

---

[90] Reauthorization P34.

[91] U.S. Census Bureau, American Community Surveys: S1601: Language Spoken at Home, Port Isabel, *available at* https://data.census.gov/table?q=Port+Isabel+city;+Texas,+language&tid=ACSST5Y2021.S1601 (last viewed May 7, 2023).

[92] U.S. Census Bureau, American Community Surveys: S1601: Language Spoken at Home, Cameron County, *available at* https://data.census.gov/table?q=language+spoken+at+home&g=050XX00US48061

[93] This issue was previously raised by commenters. *See* Rebekah Hinojosa August 27, 2020 Comment.

[94] CEQ Guidance on EJ at 16 ("Agencies should also consider translating documents into languages other than English where appropriate and practical."); *Promising Practices* at 10 (Consistent with applicable requirements, agencies should prepare NEPA documents in plain, clear language and provide multiple forms of communication (e.g. written, oral, pictorial) to accommodate varied levels of reading proficiency, to facilitate meaningful engagement, and to account for limited English proficiency."

[95] For example, EO 13166 issued more than 20 years ago required that each agency develop a language access plan which "shall include the steps the agency will take to ensure that eligible LEP persons can meaningfully access the agency's programs and activities." Exec. Order 13,166,

amplifies the disproportionately high and adverse impacts of this Project on EJ communities.[96]

### 9.    FERC Must Consider Environmental Justice Impacts Under the Natural Gas Act

FERC's obligation to consider and disclose impacts to environmental justice communities does not end with NEPA. FERC must also consider these impacts under the Natural Gas Act and issue a certificate "only if a project's public benefits (such as meeting unserved market demand) outweigh its adverse effects (such as a deleterious environmental impact on the surrounding community."[97] Yet, FERC does not even attempt to grapple with how approving a new LNG terminal which will have "disproportionately high and adverse" impacts on EJ communities and whose impacts will be "predominately [borne]" by EJ communities is in the public interest.[98]

There is a long history of siting industrial facilities in black, brown, and poor communities

---

*Improving Access to Services for Persons with Limited English Proficiency* (Aug. 16, 2000). The mandate of that EO was re-emphasized in a memorandum last fall which stated "[a]ll people in this country, regardless of the language they speak, deserve meaningful access to programs and activities that are conducted or supported by federal agencies."[95] *Memorandum For Heads of Fed. Agencies, Heads of Civil Rts. Off., and Gen. Counsels: Strengthening the Fed. Gov't's Commitment to Language Access*, DEP'T OF JUSTICE (Nov. 21, 2022). In addition, Executive Order 14096 specifically addresses the Environmental Justice concerns presented by failing to provide public information in languages other than English in stating that the "Government must continue to remove barriers to the meaningful involvement of the public in such decision-making, particularly those barriers that affect members of communities with environmental justice concerns, including those related to disability, language access, and lack of resources." Exec. Order 14,096, *Revitalizing Our Nation's Commitment to Environmental Justice for All* (April 26, 2023) ("environmental justice can successfully occur only through meaningful engagement and collaboration with underserved and overburdened communities to address the adverse conditions they experience and ensure they do not face additional disproportionate burdens or underinvestment.").

[96] *See Promising Practices*, 43.

[97] *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) ("*City of Oberlin*") (citations omitted).

[98] Remand Order PP83, 85.

in the United States.[99] The very purpose of requiring environmental justice reviews is to try and correct this long-standing practice.[100] The growing development of natural gas infrastructure is already creating disparity in which populations are subject to the emissions and degradation of the natural environment caused by this industry.[101] FERC's authorization of the Rio Grande project is a continuation of practices by federal and state agencies of creating sacrifice zones in low-income black, brown, and poor communities. FERC unequivocally recognizes that EJ communities will once again be asked to bear the burden of environmental harm for "the greater public good" and chose to completely disregard that perpetuating racist siting of industrial polluters is not in the public interest.

### C. Greenhouse Gases

In reauthorizing the terminal and pipeline, and in approving the pipeline amendment, FERC failed to reasonably respond to the *Vecinos* remand regarding greenhouse gases.

---

[99] *See* Donaghy, Timothy et. al., *Fossil Fuel Racism in the United States: How Phasing Out Coal, Oil, and Gas Can Protect Communities*, Energy Research & Social Science V. 100 (June 2023).

[100] *See* Memorandum for the heads of all departments and agencies: executive order on federal actions to address environmental justice in populations and low-income populations (Feb. 11, 1994) (available at https://www.epa.gov/sites/default/files/2015-02/documents/clinton_memo_12898.pdf) (EO 12898 "is designed to focus Federal attention on the environmental and human health conditions in minority communities and low-income communities with the goal of achieving environmental justice. That order is also intended to promote non-discrimination in Federal programs substantially affecting human health and the environment…").

[101] Donaghy, et at. § 5.2 ("With the shale boom, the U.S. has seen a rapid build-out of oil and gas pipelines, as well as liquified natural gas (LNG) and crude export terminals, which has had the effect of converging significant volumes of oil and gas into regions that are already experiencing environmental justice burdens. These include "Cancer Alley", Corpus Christi, Houston [175], Port Arthur, and other Gulf South communities.")

1.    **FERC's Claim that It Cannot Evaluate the Significance of Greenhouse Gas Emissions Is Arbitrary and Unsupported**

As the D.C. Circuit affirmed in *Sierra Club v. FERC,* 867 F.3d 1357, 1376 (D.C. Cir. 2017) ("*Sabal Trail*"), the Natural Gas Act provides FERC with the authority and obligation to consider greenhouse gas emissions in making its public interest determinations. NEPA therefore requires FERC to inform those determinations with a hard look at, *inter alia*, the significance and impact of greenhouse gas emissions. *Id.*; *accord Vecinos*, 6 F.4th at 1331.

Here, FERC estimates operation of the Texas LNG terminal will emit about 701,709 tons per year of carbon dioxide equivalent.[102] But FERC refused to provide any analysis of the significance of these emissions, claiming it was impossible to do so. FERC's reasons for rejecting the social cost of carbon or other methods for weighing these impacts were arbitrary. And FERC violated the Natural Gas Act by failing to factor these emissions into FERC's public interest analysis. If FERC's conclusions will not change no matter how many tons of greenhouse gases are emitted, or no matter what level of impact those emissions have, then greenhouse gas emissions do not actually play any role in FERC's decisionmaking. But the Natural Gas Act and NEPA do not permit FERC to ignore this issue.

a)    **FERC's Refusal to Use Social Cost Remains Arbitrary Where FERC Also Fails to Provide Any Alternative Analysis**

As *Vecinos* explained, NEPA and the Natural Gas Act do not permit FERC to throw up its hands, or to hold out for a perfect methodology. Where, as here, FERC claims that it is missing information relevant to reasonably foreseeable adverse impacts, NEPA requires FERC to, *inter alia*, evaluate impacts "based upon theoretical approaches or research methods generally accepted in the scientific community." *Id.* at 1328 (quoting 40 C.F.R. § 1502.21(c)(4)); *accord Mont. Wilderness Ass'n v. McAllister,* 666 F.3d 549, 559 (9th Cir. 2011) (when confronted with a difficult problem, "the proper response to that problem is for [the agency] to do the best it can with the data it has, not to ignore the [issue] completely."). Thus, the issue isn't whether *FERC* thinks the tool is acceptable, but whether the broader scientific community does. *Vecinos*, 6 F.4th at 1329.

---

[102] Remand Order P23.

Here, FERC does not dispute that the social cost of carbon protocol is "generally accepted in the scientific community," nor could it. FERC has previously admitted the same. *Fla. Se. Connection, LLC Transcon. Gas Pipe Line Co., LLC Sabal Trail Transmission, LLC*, 164 FERC ¶ 61,099, P10 (2018). And here, FERC calculated the social cost of the projects' emissions (excluding upstream and downstream emissions associated with gas production and use), using the range of discount rates recommended by the Interagency Working Group.[103] But FERC refused to use these estimates to make a determination of whether the Project's foreseeable greenhouse gas emissions were significant or, apparently, to factor these estimates into FERC's evaluation of whether the project's benefits outweighed its harms.[104] Instead, FERC stated it that it was providing these estimates for "informational purposes,"[105] but not, apparently, to inform FERC's own decisionmaking.

The reasons FERC gives here for refusing to consider social cost in FERC's own decisionmaking are arbitrary. FERC repeats its argument that social cost of carbon may be appropriate for "rulemaking," but FERC asserts that it is unsuitable for project-level NEPA review.[106] FERC provides no explanation as to why the impact of two million tons of greenhouse gases emitted by an individual project differs from the impact of two million tons emitted as a result of a regulation. Elsewhere, FERC has asserted that in rulemaking, the choice of discount rate is less important, because the same discount rate can be consistently applied throughout a cost-benefit analysis.[107] But FERC is simply mistaken in suggesting that uniform application of a discount rate means that the choice of which rate to use is less important. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1414 (D.C. Cir. 1985) (in reviewing energy efficiency

---

[103] *Id.* P24.

[104] *Id.* P25.

[105] *Id.* P21.

[106] *Id.* P20.

[107] *But see Mountain Valley Pipeline, LLC Equitrans, L.P.*, 163 FERC ¶ 61,197 P281 n.772 (2018) (recognizing that BOEM, OSM, DOE, and numerous state agencies have used social cost of carbon in environmental review of individual projects). In that order, FERC suggested that greenhouse gas emissions were primarily a problem for agencies that regulate production or use of fossil fuels. But the direct emissions at issue here are exactly that: emissions that result from use of fossil fuels in a FERC-jurisdictional project.

standards, choice between 5%, 7%, or 10% discount rate "substantially" changed conclusion of regulations' benefits). More broadly, FERC has never provided any non-arbitrary explanation as to *why* or *how* project-level proceedings differ from rulemakings in ways that make social cost of carbon appropriate for the latter but not the former. And while CEQ is working "to review, revise, and update its 2016" GHG guidance, CEQ has encouraged agencies to comply with the 2016 guidance pending revision.[108] The 2016 GHG Guidance identifies social cost of carbon as "a harmonized, interagency metric that can give decision makers and the public useful information *for their NEPA review.*"[109] FERC has not identified any CEQ statement stating that social cost of GHGs is, or may be, inappropriate for project-specific review.

FERC's only other criticism of the social cost of carbon here is that "there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria."[110] But there are few, if any, bright-line criteria for determining significance for *any* types of environmental impacts, and NEPA requires agencies to make informed judgments on these impacts as well. *See Mont. Wilderness Ass'n*, 666 F.3d at 559. And although it may be hard to know whether certain monetized costs are worth worrying about in other cases, here, where FERC estimates social cost of greenhouse gases directly emitted as a result of the Rio Grande LNG and Rio Bravo projects at over $2 *billion*[111] in the center case, these emissions are plainly not something that can be shrugged off or assumed not to weigh in the public interest calculus.

FERC misleadingly argues that it is justified in refusing to use the social cost of carbon in its own decisionmaking because courts have affirmed FERC's rejection of the tool in the past.[112] As *Vecinos* explained, prior decisions did not consider FERC's obligations under 40 C.F.R. § 1502.21 (or its prior codification at 40 C.F.R. § 1502.22 (2019)). *Vecinos*, 6 F.4th at 1329

---

[108] *See* Accession No. 20210527-5009.

[109] https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf at 33 n.86.

[110] Remand Order P25.

[111] *Id.* P24.

[112] *Id.* P20 n.53.

(distinguishing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016)); *see Delaware Riverkeeper Network v. FERC*, 45 F.4th 104, 112 (D.C. Cir. 2022) (holding that petitioners there had failed to exhaust the argument that prevailed in *Vecinos*). The law is clear: where FERC refuses to analyze the significance of greenhouse gases with any other method, and where FERC fails to provide a rational explanation as to why the social cost of greenhouse gases is not a generally accepted as a suitable tool for this task, then FERC must use that tool here.

### b)    Alternatively, FERC Could Apply Its Draft Greenhouse Gas Guidance

The Remand Order also represents an about-face from FERC's 2022 practice. Instead of applying the social cost of carbon, last year, FERC published a proposed policy statement on Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews, 178 FERC ¶ 61,108. That interim, now draft, policy identified a different way to evaluate the significance of project greenhouse gas emissions: a simple 100,000 tons per year threshold. *Id.* P79. For projects exceeding this threshold, FERC would not categorically rule that greenhouse gas emissions rendered the project contrary to the public interest, but these "significant" emissions would need to be factored into FERC's public interest analysis. In orders issued after publication of this draft, FERC did not dispute that it was possible to evaluate the significance of greenhouse gas emissions, but FERC stated that it would not do so until this policy was finalized.

Although, as FERC notes here, this draft policy has been "suspended,"[113] that does not mean that FERC could not use the same principles articulated therein to make an ad-hoc determination for this project. Such an ad hoc evaluation might not be ideal, but the law does not permit FERC to refuse to consider issues simply because FERC would prefer to figure out a way to do so later. The *direct* operational emissions here, exceed 700,000 tons of carbon dioxide equivalent per year,[114] substantially greater than the significance threshold for *lifecycle* emissions proposed in the interim, now draft, policy. While FERC is considering how to use this proposal in general, or while considering an alternate proposal, that does not justify refusing to make the decisions required by NEPA and the Natural Gas Act here. FERC can choose how it approaches

---

[113] *Id.* P24 n.64.

[114] *Id.* P23.

this problem—FERC can make a case-specific significance determination here, or FERC can wait until it is comfortable applying the general policy and *then* do so here—but FERC can't approve now and analyze (for other projects) later.

### c)  Comparisons with State and National Emission Totals Would Not a Substitute for Determining Significance

Finally, FERC cannot meet its NEPA and Natural Gas Act obligations simply by comparing direct project emissions with emissions of the United States or Texas as a whole.. Observing that emissions here are a small portion of regional or national totals does not illustrate their impact. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1217 (9th Cir. 2008). Even a "very small portion" of a "gargantuan source of … pollution" may "constitute[] a gargantuan source of … pollution on its own terms." *Sw. Elec. Power Co. v. EPA,* 920 F.3d 999, 1032 (5th Cir. 2019).

### D.  FERC Must Supplement its EIS Based on New Information Concerning Launch Failures at the Space X Boca Chica Site

In issuing the Remand Order, FERC ignored multiple issues that require FERC to supplement the Environmental Impact Statement initially issued to review the Project and relied on extensively in the Remand Order.

NEPA imposes a continuing obligation to "supplement" and reconsider prior findings even after the initial analysis is prepared and the agency has taken initial action, when "significant new circumstances or information "are presented.[115] This duty persists so long as there is "remaining government action [that] would be environmentally significant" and the agency retains "a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment."[116] "When new information comes to light the agency must consider

---

[115] 40 C.F.R. § 1502.9(d)(1).

[116] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 372 (1989).

it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures."[117]

In the FEIS, FERC analyzed the impacts for Falcon 9 and Falcon Heavy launch vehicles.[118] FERC found that launch failures of these vehicles could result in cascading damage, but did not disclose what the cascading damage may be or how launch failures could have such a result.[119] Instead, FERC concluded that Texas LNG need only develop response procedures should a launch failure occur based, in part, on FAA guidance regarding SpaceX launches.[120] FERC's analysis did not account for "conceptual launch vehicles that may launch from the SpaceX launch facility such as the Big Falcon Rocket."[121]

Since the release of the FEIS, the FAA has published written re-evaluations and addendums for SpaceX's EIS in August 2019, November 2019, June 2020, May 2020, and December 2020, a Final Programmatic Environmental Assessment ("PEA") in June 2022 for the SpaceX's Starship Super Heavy,[122] the largest rocket every built,[123] and a written re-evaluation of the 2022 Final PEA in April 2023.[124] SpaceX is conducting an expanded suite of tests, is

---

[117] *People Against Nuclear Energy v. U.S. Nuclear Regul. Comm'n*, 678 F.2d 222, 234 (D.C. Cir. 1982), *rev'd on other grounds sub nom. Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) (quotation omitted).

[118] FEIS at 4-249.

[119] *Id.*

[120] *Id.* at 4-250, 4-255, 4-265.

[121] *Id.* at 4-249.

[122] https://www.faa.gov/space/stakeholder_engagement/spacex_starship. This is the current construction of the "Big Falcon" referenced in the FEIS. https://www.nasaspaceflight.com/2020/10/the-continued-evolution-of-the-big-falcon-rocket/.

[123] https://time.com/6252046/spacex-starship-rocket/.

[124] https://www.faa.gov/space/stakeholder_engagement/spacex_starship

launching larger rockets more frequently than anticipated in 2019, and has plans to continue doing so. According the PEA, debris from launches was "expected to be contained within the debris study area, which is a 700-acre area within the 'all hard checkpoint'" immediately surrounding the launch site.[125] The PEA also identified impacts to historic properties,[126] essential fish habitat,[127] and federally protected species.[128] Launches from the site will also contribute to degradation of local air quality.[129]

Following the FAA's PEA and program approval, SpaceX began test launching the Starship vehicles. Between 2020 and 2021, four of five launches ended in explosions and the fifth still ended in a fire.[130]  One of those launches in March of 2021 resulted in debris landing as far as 5 miles from the launch site.[131] More recently, on April 20, 2023, the test launch of the Starship Super Heavy resulted in an explosion and a 25-foot crater at the launch site.[132] As a result, parts of Port Isabel, several miles away from the FAA's predicted zone of impact,[133] were coated in dust and wet particulate.[134] Dispersion of particulate matter as far as six-miles from the launch

---

[125] FAA PEA 98.

[126] FAA PEA S-18, ES-20, ES-22.

[127] FAA PEA S-25

[128] FAA PEA S-25-26; The April 2023 reassessment affirmed the conclusions of the original PEA.

[129] FAA PEA - 50

[130] https://time.com/6252046/spacex-starship-rocket/.

[131] *See* CBD v. FAA suit, P 65.

[132] https://www.nytimes.com/2023/04/21/us/spacex-rocket-dust-texas.html

[133] FAA PEA – 700 acres.

[134] https://www.nytimes.com/2023/04/21/us/spacex-rocket-dust-texas.html

site was not an FAA considered or predicted impact from the Starship program.[135] Residents have also reported their homes shaking during past launches. According to residents, this shaking was more pronounced during the April 20th launch, and at least one person has reported a broken window as a result of the launch's impacts.[136]

     Despite the FAA categorizing explosions of this nature "anomalies"[137], ongoing explosions at the SpaceX launch site in Boca Chica should be expected given the SpaceX ethos of learning from failure and disregard for launch impacts.[138] Multiple news outlets have reported that SpaceX's progress is the result of taking significant risks to learn from their mistakes.[139] However, SpaceX's apathetic approach towards risk also results in a blind eye for safety concerns known to the company prior to launches. For instance, in December 2020, SpaceX ignored FAA's determination that a starship launch would violate the company's launch license. That launch ended in an explosion at the rocket's landing.[140] Although no individuals or homes were

---

[135] FAA PEA

[136] https://www.nytimes.com/2023/04/21/us/spacex-rocket-dust-texas.html

[137] FAA PEA – 29 "A Starship/Super Heavy test operation or launch could result in a deviation from what is expected (referred to as an anomaly). An anomaly on the launch pad could cause fire on the launch pad and/or an explosion that spreads debris." The PEA goes on to say that such anomalies are "unexpected."

[138] *See e.g.* Tweet from Elon Musk, Apr. 20, 2023 (Following the explosion that left a 25-ft crater in Boca Chica "Congrats @SpaceX team on an exciting test launch of Starship! Learned a lot for next test launch in a few months.") Available at: https://twitter.com/elonmusk/status/1649050306943266819

[139] https://www.theverge.com/2023/4/26/23699365/spacex-starship-damage-launch-pad-debris ("SpaceX's high tolerance of risk is what has enabled the company to make such impressive strides forward in areas like reusable rockets"); https://www.space.com/every-spacex-starship-explosion-lessons-learned (discussing that SpaceX's prototype spacecraft has been a risky and explosive process "simply because Starship is a new system trying to do unusual things.")

[140] https://www.theverge.com/2021/6/15/22352366/elon-musk-spacex-faa-warnings-starship-sn8-launch-violation-texas

impacted, the FAA's concern was that impacts from an in-air explosion would extend to people's homes.[141] SpaceX launched its prototype anyway. Similarly, SpaceX knew that a steel plate would prevent the launch pad from disintegrating during the April 20, 2023 launch but chose to proceed with the launch even though the plate was not ready.[142]

It appears that the frequency of explosions at the SpaceX launch site has resulted in more significant environmental impacts than FERC's FEIS or the FAA's PEA disclosed. Relatedly, the FAA has now been sued by several organizations for its failure to evaluate the true impacts of the program, including frequency of lost access to public spaces used by both indigenous tribes and the public at large,[143] increased wildlife mortality,[144] damage to essential wildlife habitat,[145] including losses from fires which release PM2.5[146] a criteria pollutant that is already near the NAAQS in the local area,[147] as well as increased activities and explosive "anomalies" than predicted by the PEA or authorized.[148]

FERC's previous analysis of safety and cumulative impacts based on the proximity of the Terminal to the SpaceX launch site and current environmental conditions 31 and 114 that Texas

---

[141] *Id.*

[142] https://twitter.com/elonmusk/status/1649523985837686784.; https://www.theverge.com/2023/4/26/23699365/spacex-starship-damage-launch-pad-debris

[143] CBD v. FAA, petition 72-23.

[144] *Id.* at 69. This includes the same migratory birds impacted by the construction and operation of the Project.

[145] *Id.* 66-68.

[146] https://www.epa.gov/wildfire-smoke-course/why-wildfire-smoke-health-concern#:~:text=Fine%20particles%20(also%20known%20as,are%20of%20greatest%20health%20concern.

[147] *See infra* § II(B)(5).

[148] CBD v. FAA, petition 63.

LNG must develop response procedures for SpaceX launches is insufficient. Experientially, SpaceX has demonstrated a disregard of FAA safety guidance. Its program has also demonstrated that launches can have impacts far outside FAA's impact zone. FERC must supplement its initial environmental analysis to evaluate the potential for cascading impacts from future failed launches of the Starship Super Heavy, including particulate matter potentially distributed by future launches that may coat the terminal and vibrations that are strong enough to shatter glass several miles away.[149] The radius of particulate matter extended as far away as 7 miles encompassing the Texas site.[150] FERC should also evaluate the cumulative impacts of SpaceX's launches, launch failures, and the simultaneous operation of Texas LNG on the environmental justice communities located in the vicinity of the terminal and the SpaceX launch site. Finally, FERC should reconsider whether it is in the public interest to have an export terminal, pipeline, and tankers for volatile and combustible liquids so close to a site where rocket launches and landings are repeatedly resulting in explosions and fires.

## II.    Conclusion

For the reasons stated above, Sierra Club hereby requests rehearing of the Remand Order and that FERC rescind the certificate order.

Respectfully submitted May 22, 2023

---

[149] *See Wild Virginia v. United State Forest Service*, 24 F.4th 915, 927-29 (4th Cir. 2022) (Finding NEPA violation when Forest Service and BLM violated NEPA when they failed to consider real-world data which indicated modeled impacts were unreasonable and inconsistent with actual impacts.)

[150] On April 27, 2023, FERC requested environmental information from NextDecade relating to failed April 20th SpaceX launch and the possible impact on the Rio Grande LNG terminal. It does not appear that FERC issued such request for the Texas LNG terminal.

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org
*Attorney for Sierra Club*


*/s/ Gilberto Hinojosa*
Gilberto Hinojosa
City Attorney, City of Port Isabel
504 E. Saint Charles St.
Brownsville, Texas 78520
956-544-4218
ghinojosa@ghinojosalaw.net
*Attorney for City of Port Isabel*

*/s/ Jennifer Richards*
Jennifer Richards
Texas Rio Grande Legal Aid
4920 N. IH-35
Austin, TX 78751
512-374-2758
jrichards@trla.org
*Attorney for Vecinos para el Bienestar de la Comunidad Costera*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Oakland, CA May 22, 2023.

_____
Nathan Matthews
Senior Attorney
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of March, 2024, I electronically filed the foregoing Joint Appendix with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

*Attorney for Sierra Club and Vecinos para el Bienestar de la Comunidad Costera*